IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DAVID DONNIE WILLIAMS,    )
        )
    PETITIONER,       )
        )
v.         )    NO. 2:07-CV-642-WHA
        )
RALPH HOOKS, WARDEN, *et. al.,* )
        )
    RESPONDENTS.    )

**RESPONDENTS'S ANSWER**

Come now the Respondents in the above-styled cause, by and through the

Attorney General for the State of Alabama, and, in response to this Honorable

Court's order to show cause why a writ of habeas corpus should not be granted,

state as follows:

1. David Donnie Williams attacks his November 23, 2004, Bullock County

conviction for stalking and his resulting sentence of thirty-eight years'

imprisonment. Williams challenges his conviction on following grounds:

    a. There was insufficient evidence to support his stalking conviction;

    b. He received ineffective assistance of trial counsel because trial
    counsel failed to object to the trial court's instruction requiring the
    jury to continue deliberations; and,

c.  He received ineffective assistance of appellate counsel because appellate counsel failed to challenge on direct appeal:

> i.      that the trial court's instruction that the jury continue deliberations; and,
>
> ii.     that the trial court was without jurisdiction to adjudicate him guilty of stalking because he was acquitted of the lesser-included offense of harassment.

2.  The Respondents acknowledge that Williams is presently incarcerated in St. Clair Correctional Facility pursuant to his lawful conviction of stalking, but deny that Williams is in custody in violation of the laws or Constitution of the United States.

3.  The Respondents aver that Williams's petition must be denied and dismissed with prejudice because his claims are procedurally defaulted and/or without merit.

4.  Respondents aver that, by asserting the defense of procedural default, they do not waive the future assertion of other applicable defenses such as lack of federal question and lack of merit.

## PROCEDURAL HISTORY

### A.  Trial Proceedings and Direct Appeal

On October 19, 2004, a Bullock County Grand Jury indicted Williams and charged him with one count of stalking in violation of Section 13A-6-90 of the

Code of Alabama (1975).  (Exhibit A, pp. 12-13)  Mr. Paul Brunson, Jr.

represented Williams and filed a plea of not guilty and waiver of arraignment form

on November 9, 2004.  (Exhibit A, p. 14)  On November 22, 2004, Mr. Keith

Ausborn filed a notice of appearance on Williams's behalf.  (Exhibit A, p. 26)

On November 23, 2004, the jury found Williams guilty of one count of stalking.

(Exhibit A, p. 550)  On December 9, 2004, the trial court sentenced Williams to

thirty-eight years' imprisonment.  (Exhibit A, p. 563)

On January 10, 2005, Williams filed a motion for reconsideration and

reduction of his sentence, a motion for judgment notwithstanding the verdict, and a

motion for a new trial.  (Exhibit A, pp. 39-47)  Judge L. Bernard Smithart denied

Williams's post-trial motions on January 18, 2005.  (Exhibit A, p. 39-41)

Williams filed a notice of appeal on February 9, 2005.  (Exhibit A, p. 2)  In

his brief on appeal, Williams alleged there was insufficient evidence to support his

stalking conviction.  (Exhibit B)  The Alabama Court of Criminal Appeals issued a

memorandum opinion on December 16, 2005, finding the claim precluded from

review because Williams "failed to comply with Rule 28(a)(10), Ala. R. App.P. by

not including the required citation to appropriate authority in support of his

contentions."  (Exhibit D, p. 4)  The court also found that Williams's claim was

without merit because "evidence adduced at trial showed Donnie Williams

intentionally and repeatedly followed, harassed, and expressly threatened Callie

Williams with the intent to place her in reasonable fear of death or serious bodily injury....no less than six times." (Exhibit D, p.6)

The Alabama Court of Criminal Appeals overruled Williams's application for rehearing was on January 13, 2006. (Exhibit F) A certificate of judgment was issued on February 1, 2006. (Exhibit G)

## B. Rule 32 Proceedings

On March 28, 2006, Williams filed a Rule 32 postconviction petition in the Bullock County Circuit Court raising the following claims:

> 1. The Constitution of the United States or of the State of Alabama requires a new trial because:
>
> a. the trial court erroneously instructed the jury to continue deliberations after it informed the trial court that it was deadlocked;
>
> b. the trial court should have personally instructed the jury regarding its deliberations in front of Williams and his trial counsel;
>
> c. Williams was denied effective assistance of trial counsel because trial counsel failed to object to the trial court's instruction that the jury continue deliberations; and,
>
> d. Williams was denied effective assistance of appellate counsel because:
>
> > i. the only issue raised on appeal was sufficiency of the evidence and "other issues were appealable"; and,

    ii.    appellate counsel's brief was "written in a manner to be totally" incomprehensible; and,

2. The trial court was without jurisdiction to render judgment or impose sentence because Williams was acquitted of the lesser included offense.

(Exhibit H, pp. 2-13)  The State filed a response to Williams's petition on June 28, 2006.  (Exhibit H, pp. 53-56)

On April 25, 2006, Judge L. Bernard Smithart denied Williams's petition in a written order finding that Williams's claims of ineffective assistance of counsel were precluded and without merit.  (Exhibit H, p. 59)  Judge Smithart also found Williams's petition failed to meet his burden of proof under Rule 32.2 of the Alabama Rules of Criminal Procedure.  (Exhibit H, p. 59)  Judge Smithart further found that the trial court's response to the jury's note regarding reaching a verdict was proper.  (Exhibit H, p. 59)

Williams appealed, raising four issues:

(1)  Williams received ineffective assistance of trial counsel because trial counsel did not object to the trial judge sending a written instruction to the jury to continue deliberation;

(2)  Williams's trial counsel was ineffective because he did not object to the trial court's lack of jurisdiction to adjudicate him guilty of stalking;

(3)  Williams's appellate counsel was ineffective because he failed to raise the aforementioned claims on direct appeal; and,

(4) Williams did not receive proper notice that he was being charged with stalking.

(Exhibit I)  On June 28, 2006, the State filed its response brief.  (Exhibit J)

On August 18, 2006, the Alabama Court of Criminal Appeals issued a written memorandum opinion affirming the trial court's decision to deny Williams's postconviction relief.  (Exhibit L)  That court concluded that: (1) two of Williams's claims – he received ineffective assistance of trial counsel because trial counsel failed to object to the purported issue regarding the lack of jurisdiction of the trial court to adjudicate him guilty of stalking and that he did not receive proper notification that he was being charged with stalking – were raised for the first time on appeal, and thus, were not properly presented for appellate review; (2) Williams's claim that trial counsel was ineffective because he failed to object to the trial judge's written instruction to the jury to continue deliberations was moot because the jurors were split on the domestic violence charge of which Williams was acquitted; (3) appellate counsel could not be ineffective for failing to raise a moot issue on direct appeal; and (4) appellate counsel was not ineffective for failing to raise the erroneous argument on appeal that the domestic violence charge against Williams was a lesser included offense of the stalking charge because separate evidence was necessary for each charge.  (Exhibit L)

Williams's application for rehearing was overruled on September 1, 2006, by the Alabama Court of Criminal Appeals.  (Exhibit N)  The Supreme Court of

Alabama denied Williams's petition for writ of certiorari without opinion on October 13, 2006.  (Exhibit P)

On February 7, 2007, Williams filed a second petition in the Bullock County Circuit Court.  (Exhibit Q, p. 9)  Williams presented three issues in the petition:

(1)  Williams's conviction was obtained in violation of the Double Jeopardy Clause;

(2)  The trial court was without jurisdiction to render judgment or impose sentence because Williams was convicted in violation of the Double Jeopardy Clause; and,

(3)  Williams's sentence exceeds the maximum authorized by law.

(Exhibit Q, pp. 6, 13)  The State filed a response to Williams's petition on March 7, 2007.  (Exhibit Q, p. 24)

On March 15, 2007, Judge Smithart denied Williams's petition in a written order finding Williams's claims were successive, time-barred, and precluded. (Exhibit Q, p. 35)  Judge Smithart also held that Williams's double jeopardy claim was without merit and did not accurately reflect the circumstances of his conviction.  (Exhibit Q, p. 35)  He further held that Williams's failed to meet his burden of proof regarding his claims that the trial court was without jurisdiction and that his sentence was not authorized by law.  (Exhibit Q, p. 35)

Williams appealed arguing that the trial court erred by denying his petition because he was acquitted of the lesser included offense of harassment, and therefore, his conviction of stalking was in violation of the Double Jeopardy

Clause. (Exhibit R) He also challenged the sufficiency of the evidence presented

for his stalking conviction, contending that the victim's testimony was not

sufficient to convict him. (Exhibit R) The State filed its response on July 27,

2007. (Exhibit S) This appeal is currently pending before the Alabama Court of

Criminal Appeals.


### C. Federal Habeas Petition

Williams filed the present federal habeas petition, his first, on July 2, 2007.[1]

(Exhibit T) Respondents now file this answer in response.


### STATUTE OF LIMITATION

A one-year limitation period applies to federal habeas petitions under the

Antiterrorism and Effective Death Penalty Act (AEDPA). See Title 28 U.S.C. §

2244(d)(1); Ford v. Moore, 296 F. 3d 1035, 1035 (11th Cir. 2002) ("AEDPA sets

forth a one-year statute of limitations for a prisoner to apply for federal habeas

relief from the judgment of a state court."). Williams had one year from the date

his conviction became final in state court with the issuance of a certificate of

judgment on February 1, 2006, plus ninety days to appeal to the United States

---

[1] This is the date Williams's petition is signed. See Houston v. Lack, 487 U.S. 266, 108 S. Ct. 2379 (1988).

Supreme Court. See Wade v. Battle, 379 F. 3d 1254, 1256 (11th Cir. 2004)

("judgment of conviction became 'final'… when the ninety-day period in which to

seek *certiorari* from the United States Supreme Court expired"). Therefore,

Williams's statute of limitation period began to run on May 3, 2006. On May 3,

2006, however, Williams had already filed a state court post-conviction petition

which tolled running the statute of limitation until that post-conviction petition

became final in state court on October 13, 2006, with the issuance of a certificate

of judgment. (Exhibit I) See Sibley v. Culliver, 377 F. 3d 1196, 1199-1200 (11th

Cir. 2004) (Section 2244(d) "provides that this limitation period may be tolled

during any time in which 'a properly filed application for State post-conviction or

other collateral review with respect to the pertinent judgment or claim is

pending'"). Thus, the statute of limitation began to run on October 14, 2006,

giving Williams until October 14, 2007, to file the present petition. As he filed the

present petition on July 2, 2007, this petition is not barred by the statute of

limitation.

## ARGUMENT

### A. Exhaustion

### 1. Direct Appeal

Before this Court may reach the merits of Williams's claims, he must exhaust the remedies available in state court. See O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); Henderson v. Campbell, 353 F.3d 880, 897 (11th Cir. 2003). Thus, until a petitioner's claims have been fully and fairly presented to the state courts for consideration, the federal exhaustion requirement has not been satisfied. See Thomas v. Crosby, 371 F.3d 782, 813-14 (11th Cir. 2004). Exhaustion of state remedies occurs when a petitioner properly presents his issues in a "petition for discretionary review in the state's highest court" even if "the state supreme court rarely grants such petitions and usually confines itself to answering questions of broad significance." Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001). When a petitioner fails to exhaust state remedies that are no longer available, "that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." Id.

In this case, Williams's claim that there was insufficient evidence supporting his stalking conviction is procedurally defaulted. First, this issue was raised on direct appeal and the Alabama Court of Criminal Appeals held it was precluded

because Williams's had failed to comply with Rule 28(a)(10) of the Alabama Rules of Appellate Procedure. See Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006) ("Federal courts are barred from reaching the merits of a state prisoner's federal habeas claim where the petitioner has failed to comply with an independent and adequate state procedural rule.").

Second, Williams did not seek the Alabama Supreme Court's discretionary review, and thus, this claim has not has not been exhausted for purposes of federal habeas review. See Boerckel, 526 U.S. at 842; Smith, 256 F. 3d at 1138.  Because he failed to seek the Alabama Supreme Court's discretionary review under Rule 39 of the Alabama Rules of Appellate Procedure, and cannot return to state court to relitigate this issue, it is effectively exhausted and procedurally defaulted. See Coleman v. Thompson, 501 U.S. 722, 735, n. 1 (1991) ("if the [p]etitioner failed to exhaust state remedies and the court to which [p]etitioner would be required to present his claims in order to meet the exhaustion requirement could now find the claims procedurally barred[,] ... three is a procedural default for purposes of federal habeas.").  As a result, until Williams establishes either cause and prejudice or that a fundamental miscarriage of justice will result if his claim is not considered by this Court, this claim is due no further review or relief. See Jones v. White, 992 F.2d 1548, 1564 (11th Cir. 1993).

Finally, Williams has raised his claim regarding sufficiency in his second Rule 32 postconviction petition. Even if considered properly raised, Williams has failed to properly exhaust the claim because the claim is pending before the state courts. Nevertheless, because this claim is clearly defaulted, there is no need to dismiss it without prejudice.

### 2. Rule 32

Williams's remaining three claims regarding ineffective assistance of counsel have been presented to the state courts in his timely first Rule 32 postconviction petition and, therefore, for purposes of federal habeas, have been exhausted.

### B. Merits

Williams contends that his trial counsel was ineffective because he did not object to the trial court's instruction requiring the jury to continue deliberations. He also claims that appellate counsel was ineffective because he failed to raise on direct appeal that: (1) the trial court's instruction requiring the jury to continue deliberations was improper; and, (2) the trial court did not have jurisdiction to adjudicate him guilty of stalking because he was acquitted of the lesser-included offense of harassment. His three claims of ineffectiveness of counsel were

presented to the state courts in his first timely Rule 32 proceeding. The trial court determined that Williams's claims were without merit and denied his petition. (Exhibit H) The Alabama Court of Criminal Appeals affirmed the trial court's decision, finding that Williams's claims of ineffectiveness were without merit. (Exhibit L)

Williams's claims of ineffective assistance of counsel warrant no relief on federal habeas review because he has not shown that the state courts applied the incorrect law or unreasonably applied the law to the facts in his case. Moreover, Williams has not cited any federal law to support his claims.

Furthermore, he is not entitled to any relief because the state courts applied the correct law in resolving the issue of ineffective assistance of counsel. The correct federal law is stated in Strickland v. Washington, 466 U.S. 668, 687 (1984). In Strickland, the Supreme Court set forth a two-pronged standard for reviewing ineffective assistance of counsel claims: (1) that counsel's actions or omissions were deficient; and, (2) that the deficiency resulted in a prejudicial result. Id. See also Johnson v. Alabama, 256 F.3d 1156, 1175-76 (11th Cir. 2001) ("The petitioner bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a Strickland claim, and both prongs must be proved to prevail."). Thus, Williams must show that counsel's performance was unreasonable under the circumstances. Strickland, 466 U.S. at 690 ("a court

deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."). To demonstrate counsel's deficiency, Williams must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment. Id. at 687. The deficiency component was subject to review "under 'prevailing professional norms'" with the presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. Thus, Williams must demonstrate that "counsel's errors were no serious as to deprive [him] of a fair trial[,]" thereby creating a "trial whose result [was] unreliable." Id. at 687. He had to prove that "there [was a] reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different[,]" such that it "undermine[d] confidence in the outcome" of the case. Id. at 694. The state courts correctly held that Williams failed to do this.

The Alabama Court of Appeals held that Williams's claim that trial counsel was ineffective because he should have "objected to the trial judge's written instruction to the jury to continue deliberations" was moot. (Exhibit L, p. 3). The court found that "[t]he jury's note to the judge … indicated that the jurors were split on the domestic violence charge" of which Williams was acquitted. (Exhibit, pp. 3-4) The court concluded that "[o]bviously, Williams was the beneficiary of

14

the jury's continued deliberations" and therefore not "entitled to relief." (Exhibit L, p. 4)

The court further held that "there could be an error on the part of appellate counsel for not raising this issue on appeal." (Exhibit L, p. 4) The court held that Williams's last claim – that appellate counsel was ineffective for failing to raise the issue of whether the trial court had jurisdiction to adjudicate him guilty of stalking because he was acquitted of the lesser offense of domestic violence – was based on a "faulty premise." (Exhibit L, p. 4) The court found that "separate evidence had to be presented regarding" the stalking charge and the domestic violence charge. (Exhibit L, p. 4) Thus, in Williams's case, "domestic violence cannot be considered a lesser included offense encompassed in the stalking charge" and it would have been "improper for Williams's appellate counsel to make such an erroneous argument" on appeal. (Exhibit L, p. 4)

In so holding, the language used by the court finding Williams's ineffectiveness claims meritless was consistent with the standard established in Strickland. The court correctly concluded that Williams's ineffectiveness of counsel claims did not constitute deficient representation because the underlying substantive claims were without merit.

## CONCLUSION

For the above-stated reasons, this Court should dismiss Williams's petition with prejudice.

Respectfully submitted,

Troy King (KIN047)
Attorney General
By:


s/Audrey Jordan
Audrey Jordan
Assistant Attorney General

# EXHIBIT LIST

Exhibit A  -  Copy of the record on direct appeal (4 volumes). CC-04-144;
CR-04-0846;

Exhibit B  -  Copy of Williams's brief on direct appeal. CC-04-144;
CR-04-0846;

Exhibit C  -  Copy of the State's brief on direct appeal. CC-04-144; CR-04-0846;

Exhibit D  -  Copy of the Alabama Court of Criminal Appeals's written
memorandum opinion on direct appeal. CC-04-144; CR-04-0846;

Exhibit E  -  Copy of Williams's application for rehearing. CC-04-144;
CR-04-0846;

Exhibit F  -  Copy of the Alabama Court of Criminal Appeals's order overruling
Williams's application for rehearing. CC-04-144; CR-04-0846;

Exhibit G  -  Copy of the certificate of judgment. CC-04-144; CR-04-0846;

Exhibit H  -  Copy of the record of Williams's first Rule 32 proceeding (1 vol.).
CC-04-144.60; CR-05-1451;

Exhibit I  -  Copy of Williams's brief on appeal of his first Rule 32.
CC-04-144.60; CR-05-1451;

Exhibit J  -  Copy of the State's response to Beasley's Rule 32 petition.
CC-04-144.60; CR-05-1451;

17

Exhibit K  -  Copy of Williams's reply brief. CC-04-144.60; CR-05-1451;

Exhibit L  -  Copy of the Alabama Court of Criminal Appeals's memorandum opinion. CC-04-144.60; CR-05-1451;

Exhibit M  -  Copy of Williams's application for rehearing. CC-04-144.60; CR-05-1451;

Exhibit N  -  Copy of the Court of Criminal Appeals's order overruling Williams's application for rehearing. CC-04-144.60; CR-05-1451;

Exhibit O  -  Copy of Williams's petition for writ of certiorari. CC-04-144.60; CR-05-1451; No. 1051744;

Exhibit P  -  Copy of the Alabama Supreme Court's order denying Williams's petition for writ of certiorari. CC-04-144.60; CR-05-1451; No. 1051744

Exhibit Q  -  A copy of the record in Williams's second Rule 32 proceeding (1 vol.). CC-04-144.61; CR-06-1048;

Exhibit R  -  A copy of Williams's brief on appeal. CC-04-144.61; CR-06-1048;

Exhibit S  -  A copy of the State's brief on appeal. CC-04-144.61; CR-06-1048.

Exhibit T  -  A copy of Williams's petition for habeas corpus.

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of August, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:  David Donnie Williams, AIS # 169189, St. Clair Correctional Facility, 1000 Clair Road, Springville, Alabama 35146.

Respectfully submitted,

s/Audrey Jordan
Audrey Jordan
Office of the Attorney General
Alabama State House
11 South Union
Montgomery, AL  36130-0152
Telephone:  (334)  242-7300
Fax:  (334)  242-2848
E-Mail:  AJordan@ago.state.al.us

309636/111065

COURT OF CRIMINAL APPEALS NO. CR 04-0846

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

## CIRCUIT COURT OF _____Bullock_____ COUNTY, ALABAMA

CIRCUIT COURT NO.   CC-2004-144

CIRCUIT JUDGE   Hon. L. Bernard Smithart

Type of Conviction / Order Appealed From: Stalking

Sentence Imposed:   38 years

Defendant Indigent:   [X] YES   [ ] NO

David Donnie Williams

Hon. Donald E. Spencer   334-269-1934

(Appellant's Attorney)                                    (Telephone No.)

547 S. Lawrence Street

(Address)

Montgomery, AL   36104

(City)                      (State)                      (Zip Code)

**NAME OF APPELLANT**

V.

## STATE OF ALABAMA

(State represented by Attorney General)

**NAME OF APPELLEE**

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

_____

(For Court of Criminal Appeals Use Only)

EXHIBIT

P

PENGAD 800-631-6989

INDEX

David Donnie Williams AIS#169189   VS   State Of Alabama
CC-2004-144

CAS ------------------------------------------------------------- 1

Warrant, Deposition and Statements ------------------------------ 3

Indictment ------------------------------------------------------ 12

Plea Of Not Guilty and Waiver of Arraignment -------------------- 14

Plea Of Not Guilty and Waiver of Arraignment -------------------- 15

Jury Strike List ------------------------------------------------ 16

Jury ------------------------------------------------------------ 19

Notice To Defendant of State's Intent to Present Evidence at Trial 20

Notice of Appearance -------------------------------------------- 26

Defendant's Motion for Disclosure and Production ---------------- 27

Defendant's Motion to Suppress ---------------------------------- 29

Notice of Intent to Request Enhancement ------------------------- 32

Jury Verdict ---------------------------------------------------- 34

Order ----------------------------------------------------------- 35

Sentencing Order ------------------------------------------------ 37

Transcript ------------------------------------------------------ 38

Defendants Motion for Reconsideration, et al ------------------- 39

Defendant's Motion for Judgment Notwithstanding Order of Verdict 42

Defendant's Motion for a Trial De Novo Proceeding --------------- 45

Defendant's Motion for Stay of Thirty Eight Year Sentence ------- 48

State's Response to Defendant's Motions ------------------------- 50

Notice of Appeal ------------------------------------------------ 52

Clerk's Notice of Appeal ---------------------------------------- 53

Defendant's Amended Notice of Appeal ---------------------------- 54

Docketing Statement --------------------------------------------- 56

Reporter's Transcript Order ------------------------------------- 57

Defendant's Motion for Free Transcript and Motion for Formas
  Pauperis Status ---------------------------------------------- 58

Defendant's Counsel's Motion to Withdraw and Defendant's Counsel's
  Motion for Appointment of Appointed Counsel for Appellee Proceedings 60
Order ----------------------------------------------------------- 62
Letter Of Transmittal ------------------------------------------- 63
Certificate of Completion --------------------------------------- 64

```
ACR0372            ALABAMA JUDICIAL INFORMATION SYSTEM    CASE: CC 2004 000144.00
OPER: IRJ                    CASE ACTION SUMMARY
PAGE:   1                    CIRCUIT  CRIMINAL              RUN DATE: 10/29/2004
       ===================================================================
1.. THE CIRCUIT COURT OF  BULLOCK                                     JUDGE: LBS

STATE  OF  ALABAMA              VS      WILLIAMS DAVID DONNIE
                                       505 JOHNSON STREET
CASE: CC 2004 000144.00
                                       UNION SPRINGS , AL  36089 0000

DOB: 08/14/1965      SEX: M  RACE: B  HT: 5 06  WT: 140   HR: BLK EYES: BRO
SSN: 014622787  ALIAS NAMES:
       ===================================================================
CHARGE01: STALKING                CODE01: STAL LIT: STALKING       TYP: F #: 001
OFFENSE DATE: 04/17/2004                 AGENCY/OFFICER: 0090000 MURRY

DATE WAR/CAP ISS:                      DATE ARRESTED: 04/21/2004
DATE    INDICTED: 10/19/2004           DATE    FILED: 10/29/2004
DATE    RELEASED:                      DATE  HEARING:
BOND    AMOUNT:            $.00           SURETIES:

DATE 1: 11/09/2004   DESC: ARRG           TIME: 0830 A
DATE 2:              DESC:                 TIME: 0000

TRACKING NOS: DC 2004 000209 00  /                        /

    DEF/ATY: BRUNSON PAUL W JR        TYPE: R                    TYPE:
             P.O. BOX 475      Ausborn, K.

             CLAYTON          AL 36016                     00000

PROSECUTOR: WHIGHAM BOYD

       ===================================================================
OTH CSE: DC200400020900 CHK/TICKET NO:               GRAND JURY: BF0434
C RT REPORTER: _____  SID NO:     000169189
D. STATUS: PRISON              DEMAND:                        OPER: IRJ
DATE       ACTIONS, JUDGEMENTS,  AND  NOTES
       ===================================================================
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|------|-------------------------------|
| 11/10/04 | Order to Transfer |
| 11/9/04 | Waiver |
| 11/12/04 | Order To Transfer |
| 11/15/04 | Plea & waiver filed |
| 11/16/04 | Original Strike List filed. |
| 11/16/04 | Original Jury List |
| 11/18/04 | Notice o... State to Present 404(b) Evidence |
| 11/22/04 | Notice of Appearance, Motion for Disclosure; Motion to Suppress filed |
| 11/23/04 | Notice of Intent to Request Enhancement filed |
| 11/23/04 | Jury Verdict filed |
| 11/30/04 | Judgment Order filed |
| 12/1/04 | Order to Transfer filed — Copies To Parties |
| 12/8/04 | Def's Petition for Mercy |
| 12/20/04 | Sentencing Order filed |
| 12-21-04 | Transcript filed — forwarded to S O & D O C |

2

ACR0369  A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2004 000144.00
JUDGE ID: LBS

STATE OF ALABAMA                VS    WILLIAMS DAVID DONNIE

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|
| 1/10/05 | Motion for "Reconsideration & Reduction" |
| 1/10/05 | Motion for Judgment Notwithstanding - |
| 1/10/05 | Motion for "Trial DeNovo" filed |
| 1/10/05 | Motion for "Stay" filed |
| 1-18-05 | (4)Motions Denied - copies to Att. & DA |
| 1/18/05 | State's Response to Defendant's Motions filed - |
| 2-1-05 | Corress filed - CAS forwarded to def. |
| 2/4/05 | Corr. (Request for Appeal) filed by def |
| 2-9-05 | Corress, from Court of Criminal Appeals filed |
| 2-9-05 | Clerk's Notice of Appeal filed - forwarded to AG, DA, def. |
|  | Atty Ausborn, Court reporter, Court of Criminal Appeals |
| 2-14-05 | Corress, from Court of Criminal Appeals filed |
| 2-24-05 | Amended Notice of Appeal - Motion for free transcript & |
|  | in Forma Pauperis Status) - Counsel Motion to withdraw & |
|  | Counsel motion for appointment of appointed counsel for |
|  | appellate proceeding, docketing statement & Reporter's Transcript |
|  | order |

BRU 017                                                                                        3

| State of Alabama<br>Unified Judicial System<br><br>Form C-64(front) Rev. 11/92 | **COMPLAINT and WARRANT**<br>(Felonies, Misdemeanors, or Violations<br>District Court or Municipal Court) | Warrant Number<br><br>Case Number<br>DC-04-209 |

IN THE _Dlstrlct_ _____ COURT OF _Bullock_ _____ ALABAMA
(Circuit, District, or Municipal)                (Name of Municipality or County)

☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

v. _David Donnie Williams_ _____ , Defendant

Before me, the undersigned authority, personally appeared this day the undersigned complainant, who, upon first being duly sworn, states on oath that he/she has probable cause for believing, and does believe, that _David Donnie Williams_ _____, Defendant whose name is otherwise unknown to the complainant, did, prior to the commencement of this action, commit the offense of _Stalking_ _____ within the

☒ County of _Bullock_ _____
☐ City/Town of _____ or in the police jurisdiction thereof, in that he/she did:
(State specific facts here. Continue on a separate sheet of paper if needed.) _David Donnie Williams did_
_intentionally and repeatedly follows or harass Callie Williams and made_
_threats on her life with the intent to place her in reasonable_ in violation of
☒ Section _13A-6-90_ _____, Code of Alabama 1975 _fear of death_
☐ Ordinance Number _____, which embraces section _____, Code of Alabama 1975,
previously adopted, effective and in force at the time the offense was committed.
☐ Other _____

Sworn to and Subscribed before me this
_19th_ day of
_April_ _2004_

_Wilbert M. Jernigan_
Judge/Magistrate/Warrant Clerk

_Callie M. Williams_
Complainant
_1010 MLK Blvd Lot #2_
Address _Union Springs AL 36089_
_738-3401_
Telephone Number

## WARRANT OF ARREST

**TO ANY LAW ENFORCEMENT OFFICER WITHIN THE STATE OF ALABAMA:**
☒ Probable cause has been found on Complaint filed in this Court against (name or description of person to be arrested)
_David Donnie Williams_
charging: [description of offense(s)] _Stalking_

in violation of _13A-6-90_ ; OR
☐ An Indictment has been returned by the Grand Jury of this county against (name or description of person to be arrested)

charging: [description of offense(s)] _____

in violation of _____

☐ YOU ARE THEREFORE ORDERED to arrest the person named or described above and bring that person before a judge or magistrate of this Court to answer the charges against that person and have with you then and there this warrant with your return thereon. If a judge or magistrate of this Court is unavailable, or if the arrest is made in another county, you shall take the accused person before the nearest or most accessible judge or magistrate in the county of arrest.
☐ You may release the accused person without taking the accused person before a judge or magistrate:
☒ If the accused person enters into a bond in the amount of $ _5000.00_ with two good sureties approved by an authorized officer or by depositing cash or negotiable bonds in the amount with the court clerk.
☒ If the accused person posts an appearance bond in the amount of $ _5000.00_
☐ On his or her personal recognizance.

_April 19, 2004_
Date

_Wilbert M. Jernigan_
Judge/Magistrate/Clerk

| Form C-64(back)   Rev. 11/92 | COMPLAINT and WARRANT<br>(Felonies, Misdemeanors, or Violations - District Court) |

## CERTIFICATE OF EXECUTION

I, the undersigned law enforcement officer, certify that I executed the foregoing ARREST WARRANT by arresting the accused person named (or described) therein at _8:30_ o'clock ☑ a.m. ☐ p.m., on the _21_ day of _April_, _2004_, in _Bullock_ COUNTY, ALABAMA.

After arrest, the accused person was:

☐ Released as authorized at _____ o'clock ☐ a.m. ☐ p.m., _____

☐ Taken before ( ☐ Judge) ( ☐ Magistrate) at _____ o'clock ☐ a.m. ☐ p.m.,

Date _2-21-04_                                    _Lou Murray_
                                    Signature/Title/Agency

## IDENTIFICATION OF ACCUSED PERSON

Name of Accused Person _David Donnie Williams_          Telephone Number _N/A_

| Social Security Number _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_ | Date of Birth _8-14-65_ | Age _38_ | Race _B_ | Sex _M_ | Height _5-7_ |

| Weight _185_ | Hair _Blk_ | Eyes _Br_ | Other |

Address _305 Johnson St_      City _Union Springs_      State _Al_   Zip Code _36089_

Name of Employer _N/A_                          Employer's Telephone Number

Address                          City          State   Zip Code

## WITNESSES

| Name | Address | Telephone Number |
|------|---------|------------------|
|      |         |                  |
|      |         |                  |
|      |         |                  |
|      |         |                  |

## ACKNOWLEDGEMENT BY ACCUSED PERSON

☐ I hereby acknowledge that at the time of my release from custody I was directed to appear in person before the court, as follows:

Place: _____

Date: _____

Time: _____ o'clock ☐ a.m. ☐ p.m., and as thereafter needed until discharge.

☐ I promise to appear as directed before the court, as follows:

Place: _____

Date: _____

Time: _____ o'clock ☐ a.m. ☐ p.m., and as thereafter needed until discharged.

Date _____                          Signature of Accused Person _____

State of Alabama
Unified Judicial System

**DEPOSITION**

Case Number

Form C-64(a) (front) Rev. 6/91

IN THE _District_ COURT OF _Bullock_ COUNTY

[X] STATE OF ALABAMA    [ ] MUNICIPALITY OF _____

v. _Druid Donnie Williams_ , Defendant

## INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE ACCUSED

| Name of Accused (or Alias) | | | | Telephone Number | | |
| Social Security Number | Driver's License Number | | Date of Birth | Age | Race | Sex |
| Height | Weight | Hair | Eyes | Complexion | | |
| Address of Accused (or Alias) | | City | | | State | Zip Code |
| Name of Employer | | | | Employer's Telephone Number | | |
| Address of Employer | | City | | | State | Zip Code |

## INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE OFFENSE

Offense: _Stalking_

Date and Time of Offense: _4-17-04    approx. 11:45 AM_

Place of Occurrence: _Union Springs, A/G_

Person Attacked or Property Damaged: _____

How Attacked: _____

Did Accused Possess or Use a Weapon?  [ ] Yes  [X] No    Type: _____

Damage Done or Injuries Received: _____

Value of Property: _____

Details of Offense: _Callie Williams advised David D. Williams keeps following her and threatening to kill her_

Any Law Enforcement Agency Contacted?  [X] Yes  [ ] No

If yes, which one? _Union_

I make this statement for the purpose of securing a WARRANT/SUMMONS against the named accused. I understand that I am instituting a criminal proceeding and cannot dismiss this case. I further understand that if any of the foregoing facts are untrue, I may, in addition to any other punishment provided by law, be taxed with court costs in this proceeding.

Sworn to and Subscribed before me this _19th_ day of _April_, _2004_

_Wilbert M. Jernigan_
Judge/Clerk/Magistrate

_Callie M. Williams_
Complainant

_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_
Social Security Number

_1010 MLK BLVD Lot #2_
Address _Union Springs, AL 36089_

# WITNESS STATEMENT

Statement of: _Callie M. Williams_

Race: _Black_    Sex: _F_    DOB: _2/14/64_    Age: _40_

SSN: _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_    Education: _12th_

Address: _1010 M.L.K. BLVD Lot #2_

Place of Employment: _Wayne Farms_

Telephone Number: (Home) _738-3401 or_    (Work) _739-2930_
_430-6321_

Place of Statement: _____

Date: _April 17, 2004_    Time Started: _about 11:40 a.m._

Statement Given To: _____

This statement is of my own free will without threats, promises, or duress having been made toward me.

_I was coming out of the Grocery Store (A.G.) at_
_the, he was parked beside the car that I was,_
_driving, I didn't say any thing to him at time,_
_he told me as I was getting into the car,_
_I don't like what you did to me at Wayne_
_Farm. And I told him to leave me alone. So_
_I told him to stay away from my house at_
_night because he don't belongs there day_

Continued on Supplement (   )Y (   )N

Time Ended: _____

# UNION SPRINGS
## POLICE DEPARTMENT

OR TITLE                                  PAGE___OF___

CASE NUMBER

or night. And I also told him too bring me back those earrings, back that he stole out of my bedroom, because I suppose too be sending those earrings back where they came from, and he told me he don't have no dam earrings of mine So at the time my son said why don't you leave my mother alone, and he told my son too shut up before I fuck you up. And that's the time the guy that was in the car with him was looking very funny because he didn't know what's going on. So at time David Williams told me I am going too kill you and I will have you begging for life, because you know that I am not nothing too play with. He also said that he will see me Heaven or Hell, What he mean by that he is going too kill me and turn around and Kill himself. So at time he pulled off and left AG Grocery Store, and back up at left the the Grocery Store. And that's the time I lookin the rear view mirror and saw him following me, and that's the I called the Police Station for them too send a unit down too Grocery Store, because I am being

SIGNATURE

Harrassed by the guy in the grocery Store. In less than 2 minutes the police was there, when he saw the Police Car turning around that's the time when he took off driving real fast with that guy in the Car with him.

Callie M. Williams

# WITNESS STATEMENT

Statement of: Anthony Blakely

Race: B    Sex: M    DOB: 8-21-62

SOC: 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    Education: 12th    Age: 41

Address: 1749 Highlog Road  Fitzpatrick, ALA 36029

Place of Employment: Construction Worker

Telephone No.: Home  584-7532    Work

Place of Statement:

Date:    Time Started: 12:58 p.m.

Statement Given To: Officer Sharon Dean

This statement is of my own free will without threats, promises, or duress having been made toward me.

I asked Donnie to drop me off in the bottom, the next thing I
know he started talking to this woman, I don't know what's going on,
the next thing I know we were in a car chase from the police, I
ask him sevarl times to let me out of the car. We liked to
hit a telegram post and we liked to hit a big truck. We ending
up on County Road 61, A. B.

## Nothing Follows

Anthony Blakely

Continued on Supplement (   ) Y ( ✓ )

Time Ended: 1:06 p.m.

10

# ALABAMA UNIFORM INCIDENT/OFFENSE REPORT

| VICTIM'S SSN | COMPLAINANT'S SSN 416 98 3098 | 1 INCIDENT ☑ OFFENSE ☐ SUPPLEMENT | 2 CASE # 040330-30 | 3 SFX |
|---|---|---|---|---|

| 4 | 5 DATE AND TIME OF THIS REPORT 03 30 04  3:23 ☑AM ☐PM ☐MIL | 6 AGENCY NAME Union Springs Police Dept | 7 IF SUPPLEMENT ORIGINAL OFFENSE DATE M D Y |
|---|---|---|---|

| 8 REPORTED BY ☑ VICTIM OR | 10 PHONE ( ) |
|---|---|

**11 ☐ VICTIM'S MULT. LE OFFICERS**

| 12 VICTIM (LAST, FIRST, MIDDLE NAME) ☐1P ☐2B ☑3S WILLIAMS, Callie M. | 13 ADDRESS (STREET, CITY, STATE, ZIP) 1010 MLK Blvd Lot#2 UnionSprings, Al | 14 PHONE 738-3401 |
|---|---|---|
| 15 EMPLOYER/SCHOOL WayBtfany Gibson | 16 OCCUPATION Cabor | 17 ADDRESS (STREET, CITY, STATE, ZIP) Locke & Verdis Ave UnionSprings Al | 18 PHONE 738-2930 |

| 19 ☑1 RESIDENT ☐2 NON-RESIDENT | 20 INJURY ☐1Y ☐2N | 21 RACE ☑2 B | 22 SEX ☐1 MALE ☑2 FEMALE | 23 HGT 5'11 | 24 WGT 168 | 25 DOB 07 11 4164 | 26 AGE | 27 WAS OFFENDER KNOWN TO VICTIM? ☐1Y ☑2N | 28 VICTIM WAS (EXPLAIN RELATIONSHIP) | 29 CODE |
|---|---|---|---|---|---|---|---|---|---|---|

| 30 TYPE INCIDENT OR OFFENSE ☐1 FEL. ☑2 MISD. Criminal Mischief | 31 DEGREE (CIRCLE) 1  2 | 32 UCR CODE | 33 STATE CODE/LOCAL ORDINANCE |
|---|---|---|---|
| 34 TYPE INCIDENT OR OFFENSE ☐1 FEL. ☐2 MISD. | 35 DEGREE (CIRCLE) 1  2 | 36 UCR CODE | 37 STATE CODE/LOCAL ORDINANCE |

| 38 PLACE OF OCCURRENCE Lot#2 MLK Blvd 1010 | 39 SECTOR |
|---|---|

**EVENT**

| 40 POINT OF ENTRY ☐ DOOR ☐ ROOF ☐ WINDOW ☐ OTHER | 41 METHOD OF ENTRY ☐ FORCIBLE ☐ NO FORCE ☐ ATT. FORCIBLE | 42 ASSAULT ☐1 SIMPLE ☑2 AGGR. | 43 TREATMENT FOR ASSAULT INJURY ☐1 Y ☐2 N |
|---|---|---|---|

| 44 OCCURRED ON OR BETWEEN | 45 TIME 3:00 ☐1AM ☑2PM ☐3MIL 03 30 04 | 46 ☐S ☑M ☐T ☐W ☐T ☐F ☐S 1 2 3 4 5 6 7 | 47 LIGHTING ☑1 NATURAL ☐2 MOON ☐3 ART. EXT. ☐4 ART. INT. ☐5 UNK. | 48 WEATHER ☑1 CLEAR ☐2 CLOUDY ☐3 RAIN ☐4 FOG ☐5 SNOW ☐6 HAIL ☐7 UNK. | 49 PREMISE ☐A HWY.—ST.—ALLEY ☐B RAILROAD ☑C RESIDENCE ☐D CHURCH ☐E SCHOOL ☐F CONVENIENCE ☐G INDUSTRIAL ☐H SERVICE STA. | ☐I BANK ☐J DRUG STORE ☒K APT./TWN. HSE. ☐L SHOPPING CENTER ☐M PARKING LOT ☐N OTHER COMMER. ☐O OTHER | 50 CODE |
|---|---|---|---|---|---|---|---|
| | 52 TIME 3:05 ☐1AM ☑2PM ☐3MIL | 53 ☐S ☑M ☐T ☐W ☐T ☐F ☐S 1 2 3 4 5 6 7 | | | | | |

| 54 VERIFY FOR ☐1Y ☑2N RAPE EXAM | 55 TREAT. FOR ☐1Y ☑2N RAPE INJURY | 56 CIRCUMSTANCES HOMICIDE & ASSAULT LOCATION: RAPE | 57 CODE |
|---|---|---|---|

| 58 WEAPON USED ☐1 FIREARM ☐3 HANDS, FISTS, VOICE, ETC. ☐2 KNIFE ☐4 OTHER DANGEROUS | 59 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE ☐1 HANDGUN ☐2 RIFLE ☐3 SHOTGUN ☐4 UNKNOWN DESCRIBE: |
|---|---|

**PROPERTY DESCRIPTION**

| 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.) | 62 DOLLAR VALUE | | 63 RECOVERED | |
|---|---|---|---|---|---|
| | | STOLEN | DAMAGED | DATE | VALUE |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

☐ CONTINUED IN NARRATIVE

**DOLLAR VALUE**

| 64 MOTOR VEHICLE | 65 CURRENCY, NOTES | 66 JEWELRY | 67 CLOTHING/FURS | 68 FIREARMS | 69 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S | S | S | S | S | S |
| R | R | R | R | R | R |
| D | D | D | D | D | D |
| C | C | C | C | C | C |

| 70 ELECTRONICS | 71 HOUSEHOLD | 72 CONSUMABLE GOODS | 73 LIVESTOCK | 74 MISCELLANEOUS |
|---|---|---|---|---|
| S | S | S | S | S |
| R | R | R | R | R |
| D | D | D | D | D |
| C | C | C | C | C |

**VEHICLES**

75 CHECK CATEGORIES  ☐1 STOLEN  ☐2 RECOVERED  ☐3 SUSPECTS VEH.  ☐4 VICTIMS VEH.  ☐5 UNAUTH. USE  ☐6 ABANDONED

| 76 # STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR | 81 VIN |
|---|---|---|---|---|---|
| 82 YYR | 83 VMA | 84 VMO | 85 VST | 86 VCO: TOP: BOTTOM: | 87 ADDITIONAL DESCRIPTION |

| STOLEN MTRL. VEH ONLY | 88 AREA STOLEN ☐1 BUS. ☐2 RES. ☐3 RUR. | 89 OWNERSHIP ☐1 TAG RECEIPT ☐2 BILL OF SALE VERIFIED BY: ☐3 TITLE ☐4 OTHER | 90 WARRANT SIGNED ☐N ☐Y # |
|---|---|---|---|

| 91 AUTO INSURER NAME (COMPANY) ADDRESS (STREET, CITY, STATE, ZIP) | 92 PHONE ( ) |
|---|---|

| MOTOR VEH. RECOVERY ONLY REQUIRED FOR 34XX UCR CODE | 93 STOLEN IN YOUR JURISDICTION? ☐Y ☐N WHERE? | 94 RECOVERED IN YOUR JURISDICTION? ☐Y ☐N WHERE? |
|---|---|---|

## TYPE OR PRINT IN BLACK INK

ACJIC—32 REV 8-96

| INCHES | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| INCIDENT/OFFENSE REPORT CONTINUED | 95 DATE AND TIME OF REPORT 03.30.03 23 | □AM ☑PM □MIL | 96 CASE # 0403310-106 | 97 SFX | 98 □ OFFENDER □ SUSPECT □ MISSING PERSON | □ CHECK IF MULTIPLE |
|---|---|---|---|---|---|---|

99 NAME (LAST, FIRST, MIDDLE) WILLIAMS, DAVID D.
100 NICKNAME/ALIAS
101 RACE ☑W □A □B □I
102 SEX ☑M □F
103 DOB 04.31.1965
104 AGE

105 ADDRESS (STREET, CITY, STATE, ZIP) JOHNSON ST.
106 HGT 5'7
107 WGT 160
108 EYE BRO
109 HAIR BLK
110 COMPLEXION MED

111 PROBABLE DESTINATION
112 ARMED? □Y □N ☑UNK.
113 WEAPON

114 CLOTHING
□ SCARS □ MARKS □ TATOOS
115 □ ARRESTED ☑ WANTED

116 NAME (LAST, FIRST, MIDDLE)
117 NICKNAME/ALIAS
118 RACE □W □A □B □I
119 SEX □M □F
120 DOB M    D    Y
121 AGE

122 ADDRESS (STREET, CITY, STATE, ZIP)
123 HGT
124 WGT
125 EYE
126 HAIR
127 COMPLEXION

128 PROBABLE DESTINATION
129 ARMED? □Y □N □UNK.
130 WEAPON

131 CLOTHING
□ SCARS □ MARKS □ TATOOS
132 □ ARRESTED □ WANTED

| WITNESSES | 133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB | | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE | 136 BUS. PHONE |
|---|---|---|---|---|---|
| | #1 | SEX □M □F RACE □W □A □B □I M D Y | | ( ) | ( ) |
| | #2 | SEX □M □F RACE □W □A □B □I M D Y | | ( ) | ( ) |
| | #3 | SEX □M □F RACE □W □A □B □I M D Y | | ( ) | ( ) |
| | #4 | SEX □M □F RACE □W □A □B □I M D Y | | ( ) | ( ) |

WITNESS #1 SSN          WITNESS #2 SSN          WITNESS #3 SSN          WITNESS #4 SSN

137 NARRATIVE

Mrs. Williams advised that she had Donnie Williams trespassed from her residence and he still comes around harassing her and stalking her. also he has made threatening remarks toward her life.

CONTINUED ON SUPPLEMENT □Y ☑N

ASSISTING AGENCY ORI          ASSISTING AGENCY CASE #          SFX

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned.

138 LOCAL USE

SIGNATURE  Callie M. Williams
139 STATE USE

| MULTIPLE CASES CLOSED | 140 CASE # | 141 SFX | 142 CASE # | 143 SFX | 144 CASE # | 145 SFX | 146 ADDITIONAL CASES CLOSED NARRATIVE □Y □N |
|---|---|---|---|---|---|---|---|

| ADMINISTRA. | 147 CASE STATUS □ PENDING ☑ INACTIVE □ CLOSED ENTERED ACIC/NCIC DATE □Y □N | 148 CASE DISPOSITION: □ CLEARED BY ARREST (JUV.) □ CLEARED BY ARREST (ADULT) □ UNFOUNDED □ ADM. CLEARED | □ EXCEPTIONAL CLEARANCE: □ SUSPECT/OFFENDER DEAD □ OTHER PROSECUTION □ EXTRADITION DENIED □ LACK OF PROSECUTION □ JUVENILE, NO REFERRAL □ DEATH OF VICTIM | 149 REPORTING OFFICER OPN WILLIAM | ID # |
| | | | | 150 ASSISTING OFFICER PFC. TAYLOR Jr. | ID # |
| | | | | 151 SUPERVISOR APPROVAL   ID # | 152 WATCH CMDR.   ID # |

*12*

NO.: _04-14_                                          G. J. No. BF-04-034

A TRUE BILL, presented to the judge Presiding in open Court by the Foreperson of this Grand Jury, and filed in open court this _19_ day of _Oct_ , _04_.

_Leon Battle_                 _WMG_                              _10/19/04_
Grand Jury Foreman          Clerk of the Circuit Court              Date
                              of Bullock County
                             Third Judicial Circuit

## INDICTMENT

### THE STATE OF ALABAMA
*vs.*

*DAVID DONNIE WILLIAMS*

*Address: 505 JOHNSON STREET, UNION SPRINGS, AL 36089*
*alias*
*None Reported*

CHARGES:                                    CLASS       TYPE
STALKING(13A-6-90)                            C           F
WITNESSES:

LT. JAMES FINNEY, UNION SPRINGS POLICE DEPARTMENT, UNION SPRINGS, AL 36089
CALLIE WILLIAMS, 1010 MLK BLVD, LOT #2, UNION SPRINGS, AL 36089
OFFICER NATHAN WILLIAMS, UNION SPRINGS POLICE DEPT, UNION SPRINGS, AL 36089
QUADARIOUS WILLIAMS, 1010 MLK BLVD, LOT #2, UNION SPRINGS, AL 36089

Previous Bond $ _____ Bail fixed at $ _No Bond_ this _19th_ day of _October, 2004_

                                            _Bf Sfcf_
                                         Judge Presiding

THE STATE OF ALABAMA                              CIRCUIT COURT
Bullock COUNTY                                         2004

                                        BOYD WHIGHAM
                                     DISTRICT ATTORNEY
                                     THIRD JUDICIAL CIRCUIT

NO. :_____

## THE STATE OF ALABAMA, Bullock COUNTY

Circuit Court - Third Judical Circuit

## COUNT 1

The Grand Jury of said county charge that, before the finding of this indictment, DAVID DONNIE WILLIAMS, whose name is otherwise unknown to the Grand Jury, did on or about between March 24, 2004 and April 17, 2004, intentionally and repeatedly follow or harass CALLIE WILLIAMS and did make a credible threat with the intent to place CALLIE WILLIAMS in reasonable fear of death or serious bodily harm, in violation of Section 13A-6-90 of the Code of Alabama,

against the peace and dignity of the State of Alabama.

BOYD WHIGHAM
District Attorney
Third Judicial Circuit

Ben C. Reeves, Jr.
Chief Asst. Dist. Atty.

| State of Alabama<br>Unified Judicial System<br><br>Form CR-9    Rev. 3/95 | PLEA OF NOT GUILTY AND WAIVER OF<br>ARRAIGNMENT | Case Number<br><br>*CC04-144* |
|---|---|---|

IN THE _____ CIRCUIT _____ COURT OF _____ BULLOCK _____, ALABAMA
*(Circuit, District, or Municipal)*      *(Name of County or Municipality)*

[✓] STATE OF ALABAMA v. _____ DAVID DONNIE WILLIAMS _____, Defendant

Comes now, the defendant in the above-styled matter, and to the offense charged enters a plea of

[✓] Not Guilty
[ ] Not Guilty by Reason of Mental Disease or Defect
[ ] Not Guilty and Not Guilty by Reason of Mental Disease or Defect

Defendant acknowledges receipt of the copy of the charge against him/her and further waives the right to have an arraignment at which the defendant is present in person, or at which the defendant is represented by an attorney.

But, the defendant specifically and expressly reserves the right upon the filing hereof to hereafter, but before trial or before such date as may be set by the court, to interpose any defenses, objections, or motions which the defendant had the right as a matter of law or rule to interpose in this cause, prior to the filing hereof.

Defendant's date of birth is 08/14/65 _____ Defendant's age is 39

The defendant is not eligible for consideration by the court for youthful offender status as provided by law.

*Nov 9 2004* _____ *[signature]* _____
Date _____ Defendant

*Nov 9, 2004* _____ *[signature]* _____
Date _____ Attorney for Defendant

This is to certify that I am the attorney for the defendant in this matter, and that I have fully explained this form and all matters set forth herein, and pertaining hereto, to the defendant. I further state to the court that I have explained to the defendant his right to be arraigned in person and his right to have me represent him at arraignment. I further certify to the court that my client hereby knowingly, voluntarily, and intelligently waives these rights after a full and complete explanation of each and every one of them to him/her by me. BOTH MYSELF AND THE DEFENDANT UNDERSTAND THAT I AM RESPONSIBLE FOR ASCERTAINING WHAT DATE, IF ANY, HAS BEEN SET BY THE COURT FOR THE MAKING OR FILING OF ANY DEFENSES, OBJECTIONS, OR MOTIONS. I FURTHER UNDERSTAND THAT I AM RESPONSIBLE FOR NOTIFYING MY CLIENT OF THE DATE HIS/HER CASE IS SET FOR TRIAL, AND THAT I HAVE ADVISED AND INFORMED HIM/HER THAT IN THE EVENT HE/SHE FAILS TO APPEAR ON THE DATE HIS/HER CASE IS SET FOR TRIAL, ALL APPROPRIATE LEGAL ACTION WILL BE TAKEN BY THE COURT AGAINST THE DEFENDANT AND HIS/HER BOND. I further certify to the court that I have advised my client that he/she is responsible for obtaining the date his/her case is set for trial in this matter and that in the event he/she fails to appear on the date his/her case is set for trial all appropriate legal action will be taken by the court against the defendant and his/her bond, and I hereby certify that the defendant knows that he/she is personally responsible for obtaining the date his/her case is set for trial and for being present in court on that date.

*Nov 9, 2004* _____
Date _____ Attorney for Defendant Signature

I certify that I served a copy of the foregoing plea and waiver of arraignment on the Prosecutor by mailing/delivering a copy of the same to him/her on:

**Paul W. Brunson, Jr.**
Printed or Typed Attorney's Name

**PO Box 475, Clayton, AL   36016**
Address

_____
Date

This is to certify that my attorney has explained each and every matter and right set forth in this form and I have completely and fully read and do so understand each and every matter set forth in this form. I further state to the court that I do not wish to be personally present at an arraignment in this case and that I do not want to have an attorney represent me at an arraignment and WITH FULL KNOWLEDGE OF EACH OF THESE RIGHTS, I HEREBY EXPRESSLY WAIVE SUCH RIGHTS. I further state to the court that I have been informed of the charge against me and have received a copy of the charge.

*Nov 9, 2004* _____ *[signature]* _____
Date _____ Defendant Signature

Filed in office this date _____ _____By_____

_____
Clerk

| State of Alabama<br>Unified Judicial System | PLEA OF NOT GUILTY AND WAIVER OF<br>ARRAIGNMENT | Case Number |
|---|---|---|
| Form CR-9   Rev. 3/95 | | CC-2004-144-149-LE |

IN THE _CIRCUIT_ COURT OF _BULLOCK_, ALABAMA
(Circuit, District, or Municipal)           (Name of County or Municipality)

☒ STATE OF ALABAMA v. _DAVID D. WILLIAMS_, Defendant

Comes now, the defendant in the above-styled matter, and to the offense charged enters a plea of

☒ Not Guilty
☐ Not Guilty by Reason of Mental Disease or Defect
☐ Not Guilty and Not Guilty by Reason of Mental Disease or Defect

Defendant acknowledges receipt of the copy of the charge against him/her and further waives the right to have an arraignment at which the defendant is present in person, or at which the defendant is represented by an attorney.

But, the defendant specifically and expressly reserves the right upon the filing hereof to hereafter, but before trial or before such date as may be set by the court, to interpose any defenses, objections, or motions which the defendant had the right as a matter of law or rule to interpose in this cause, prior to the filing hereof.

Defendant's date of birth is _0-14-65_ Defendant's age is _39_
The defendant is not eligible for consideration by the court for youthful offender status as provided by law.

_11-15-04_
Date

_NOV. 15, 2004_
Date

_David D. Williams_
Defendant MTZ DAVID D. WILLIAMS

_Keitha Bosbotz_
Attorney for Defendant

This is to certify that I am the attorney for the defendant in this matter, and that I have fully explained this form and all matters set forth herein, and pertaining hereto, to the defendant. I further state to the court that I have explained to the defendant his right to be arraigned in person and his right to have me represent him at arraignment. I further certify to the court that my client hereby knowingly, voluntarily, and intelligently waives these rights after a full and complete explanation of each and every one of them to him/her by me. BOTH MYSELF AND THE DEFENDANT UNDERSTAND THAT I AM RESPONSIBLE FOR ASCERTAINING WHAT DATE, IF ANY, HAS BEEN SET BY THE COURT FOR THE MAKING OR FILING OF ANY DEFENSES, OBJECTIONS, OR MOTIONS. I FURTHER UNDERSTAND THAT I AM RESPONSIBLE FOR NOTIFYING MY CLIENT OF THE DATE HIS/HER CASE IS SET FOR TRIAL, AND THAT I HAVE ADVISED AND INFORMED HIM/HER THAT IN THE EVENT HE/SHE FAILS TO APPEAR ON THE DATE HIS/HER CASE IS SET FOR TRIAL, ALL APPROPRIATE LEGAL ACTION WILL BE TAKEN BY THE COURT AGAINST THE DEFENDANT AND HIS/HER BOND. I further certify to the court that I have advised my client that he/she is responsible for obtaining the date his/her case is set for trial in this matter and that in the event he/she fails to appear on the date his/her case is set for trial all appropriate legal action will be taken by the court against the defendant and his/her bond, and I hereby certify that the defendant knows that he/she is personally responsible for obtaining the date his/her case is set for trial and for being present in court on that date.

_11-15-04_
Date

_Keitha Osbotz, Esq_
Attorney for Defendant Signature

I certify that I served a copy of the foregoing plea and waiver of arraignment on the Prosecutor by mailing/delivering a copy of the same to him/her on:

_11-15-04_
Date

Printed or Typed Attorney's Name _Keitha Osbotz, Esq_
_224 Ryan St._
_Montg., Ala. 36107_
Address _(334) 264-9333_

This is to certify that my attorney has explained each and every matter and right set forth in this form and I have completely and fully read and do so understand each and every matter set forth in this form. I further state to the court that I do not wish to be personally present at an arraignment in this case and that I do not want to have an attorney represent me at an arraignment and WITH FULL KNOWLEDGE OF EACH OF THESE RIGHTS, I HEREBY EXPRESSLY WAIVE SUCH RIGHTS. I further state to the court that I have been informed of the charge against me and have received a copy of the charge.

_11-15-04_
Date _NOV. 15, 2004_

_David D. Williams_
Defendant Signature MTZ DAVID D. WILLIAMS

Filed in office this date _____

Clerk _____ By _____

BULLOCK COUNTY CRIMINAL COURT      FALL TERM              VEMBER 16, 2004      16

| | | | |
|---|---|---|---|
| 1 | Adams, Thomas W. Jr. *D* | WM | P. O. Box 100, Midway |
| 2 | ~~ers, Ruby Persons~~ *D* | BF | 507 County Road 174 |
| 3 | ~~Barnett, Allison Vernon~~ | WM | 765 Rounty Road 88 |
| 4 | Betts, William Ronald *S* | WM | 5752 Hwy 82, Fitzpatrick |
| 5 | ~~Borders, Ethel Baker~~ | BF | P. O. Box 468, Union Springs |
| 6 | ~~Calhoun, Alma Germany~~ | BF | 339 County Road 166, Union Springs |
| 7 | ~~Calhoun, Barbara Elder~~ | BF | 5512 Old Union Road, Fitzpatrick |
| 8 | Calloway, Greta *S* | BF | 107 Pecan Lane, Union Springs |
| 9 | ~~Churchwell, Beverly Rotton~~ *AD* | WF | 6190 Co Road 14, Union Springs |
| 0 | Culpepper, William Scott *S* | WM | 14019 Hwy 29, Union Springs |
| 1 | ~~Dillas, Lucille~~ | BF | 212 Boxwood Lane, Hurtsboro |
| 2 | ~~Douglas, Barbara Torbert J.~~ | BF | P. O. Box 5233, Union Springs |
| 3 | Ellis, Essie Lee *D* | BF | 721 Grove Circle, Union Springs |
| 4 | Ellis, Susie Jackson *D* | BF | 781 Washington Street, Union Springs |
| 5 | Ellis, Willie Ann *S* | BF | 721 Grove Circle, Union Springs |
| 6 | Goshea, Willie Clyde *S* | BM | 264 State Hwy 239, Union Springs |
| 7 | Green, John Robert *S* | WM | 11107 Highway 29, Union Springs |
| 8 | Gregg, Joel Kevin *D* | WM | 184 Gholston St., Fitzpatrick |
| | Harris, Walter James *S* | BM | 269 Ponderosa Loop Rd., Union Springs |
| | ~~Holmes, Ida Burgess~~ | BF | P. O. Box 522, Union Springs |
| | ~~Hubbard, Alvia Bassett~~ | WF | 5169 County Road 15, Union Springs |
| | Jackson, Michael Ed *S* | BM | 708 Pittman Drive, Union Springs |
| | ~~King, Barbara Smith Ann~~ | BF | 4842 County Road 47, Midway      23 |

BULLOCK COUNTY CRIMINAL COURT    FALL TERM    NOVEMBER 16, 2004

| 24 | Lane, Barbara Avery L. *D* | BF | 792 Hardaway Church Road, Union Springs |
|---|---|---|---|
| | ~~Moon, Ann Reynolds~~ | WF | P. O. Box 3, Fitzpatrick |
| | ~~Moore, John Murray~~ | WM | 18705 Hwy 29, Union Springs |
| 26 | Nobles, Larry Terrel *S* | BM | P. O. Box 204, Union Springs |
| 27 | ~~Oliver, Natalie Renea~~ | BF | 33 County Road 59, Union Springs |
| | ~~Palmer, Celecia W.~~ | BF | P. O. Box 823, Union Springs |
| 28 | ~~Parham, Melinda Ann~~ | BF | 272 Main Street, Midway |
| 29 | Parker, Marvin Jerome, Jr. *S* | BM | P. O. Box 41, Union Springs |
| 30 | Pickett, Joyce Moseley *S* | WF | 325 Pickett Road, Fitzpatrick |
| | ~~Pierce, Leta Denise~~ | WF | 15333 Hwy 82, Union Springs |
| 31 | Robbins, Yvette Shikiki *D* | BF | P. O. Box 191, Midway |
| 32 | Rogers, Marcus Johnson James *S* | BM | P. O. Box 172, Midway |
| | ~~Rutland, Joseph Raoul~~ | WM | 13663 Hwy 110, Fitzpatrick |
| 33 | Simmons, Darren Lamar *D* | BM | 706 Lamar Drive, Union Springs |
| | Simmons, Roberta T. *D* | BF | 599 Co. Rd. 64, Union Springs |
| | ~~Simmons, Zachery Tyrone~~ | BM | P. O. Box 903, Union Springs |
| 35 | Smith, Daniel Lee *S* | BM | P. O. Box 187, Union Springs |
| 36 | Smith, Thelma Ann *D* | BF | P. O. Box 5204, Union Springs |
| 37 | Taylor, Margaret Marie *D* | BF | Apt. 119, Bloomfield Ct., Union Springs |
| | ~~Walker, Traci Dionne~~ | BF | 2889 Highway 51 South, Midway |
| 38 | Williams, Harley B. *D* | BM | 108 Holcombe Ave., Union Springs |
| | ~~Williams, Rose Merry~~ | BF | P. O. Box 823, Union Springs |

18

11-22-04

CC 2004-144
CC 2004-145

State of Alabama vs David Donnie Williams

| | |
|---|---|
| 1. 35 | 1. 1 |
| 2. 22 | 2. 13 |
| 3. 16 | 3. 14 |
| 4. 32 | 4. 24 |
| 5. 15 | 5. 34 |
| 6. 17 | 6. 37 |
| 7. 19 | 7. 36 |
| 8. 30 | 8. 38 |
| 9. 26 | 9. 33 |
| 10. 29 | 10. 31 |
| 11. 10 | 11. 2 |
| 12. 4 | 12. 18 |
| 13. 8 | 13. A |

```
JUR210                        ALABAMA JUDICIAL INFORMATION SYSTEM                  PAGE:     1
OPER: CEC                              BULLOCK COUNTY                    RUN DATE: 11/16/2004
                                | STRIKE LIST BY: N A M E  |           RUN TIME: 11:52:17

TERM DATE: 11/16/2004    PANEL: 002    STATUS: A
```

| IKE | JUROR# | JUROR'S NAME/COMMENTS | BIRTH DATE | SEX | RAC | PNL | STATUS | #DFR |
|------|--------|-----------------------|------------|-----|-----|-----|--------|------|
| 0008 | 001225 | BARNETT ALLISON VERNON | 09/17/1926 | M | W | 02 | ACTIVE | 00 |
| 0012 | 003266 | BORDERS ETHEL BAKER | 02/10/1930 | F | B | 02 | ACTIVE | 00 |
| 0019 | 001223 | CALHOUN ALMA GERMANY | 04/16/1949 | F | B | 02 | ACTIVE | 00 |
| 0020 | 002036 | CALHOUN BARBARA ELDER | 06/21/1953 | F | B | 02 | ACTIVE | 00 |
| 0023 | 004899 | CHURCHWELL BEVERLY ROTTON | 08/19/1975 | F | W | 02 | ACTIVE | 00 |
| 0035 | 004071 | DILL LUCILLE | 08/07/1965 | F | B | 02 | ACTIVE | 00 |
| 0038 | 002041 | DOUGLAS BARBARA TORBERT J | 01/08/1941 | F | B | 02 | ACTIVE | 00 |
| 0057 | 002456 | HOLMES IDA BURGESS | 03/07/1954 | F | B | 02 | ACTIVE | 00 |
| 0058 | 004529 | HUBBARD JULIA BASSETT | 08/31/1952 | F | W | 02 | ACTIVE | 00 |
| 0065 | 002043 | KING BARBARA SMITH ANN | 03/24/1963 | F | B | 02 | ACTIVE | 00 |
| 0080 | 000816 | MOON ANN REYNOLDS | 04/01/1936 | F | W | 02 | ACTIVE | 00 |
| 0086 | 001222 | OLIVER VALARIE RENEA | 01/29/1969 | F | B | 02 | ACTIVE | 00 |
| 0090 | 002863 | PARHAM MELINDA ANN | 03/12/1962 | F | B | 02 | ACTIVE | 00 |

```
             * * *   P R O G R A M   T O T A L S * * *

RECORDS WRITTEN:    13


          CC - 2004 - 144 & 145    David Donnie Williams

                 November 22, 2004 @ 8:30 A.M.
```

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

FILED IN OFFICE
NOV 1 8 2004
CLERK-REGISTER, BULLOCK CO., ALA.

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| Plaintiff, | ) | |
| Vs. | ) | |
| DAVID DONNIE WILLIAMS, | ) | CASE NO: CC2004-144 & 145 |
| Defendant. | ) | |

## NOTICE TO THE DEFENDANT OF THE STATE'S INTENT TO PRESENT 404(b) EVIDENCE AT TRIAL

Comes now the State of Alabama, by and through its Assistant District Attorney, Carmella Penn, and gives notice under Rule 404(b) Alabama Rules of Evidence of the prosecutor's intent to present evidence at trial of other crimes, wrongs or acts by the Defendant, David Donnie Williams, for the purpose of showing Motive, Opportunity, Intent, Preparation, Plan, Knowledge (consciousness of guilt), Identity, and Pattern, Scheme or Design.

The State would show as to the general nature of the evidence that the Defendant has the following prior convictions:

1. Bullock County, CC1992-02, Escape 3rd Degree, 07/09/92

2. Bullock County, CC1995-42 - Distribution of Controlled Substance, 06/19/95

3. Bullock County, CC1999-215 – Burglary 3rd Degree, 12/08/99

4. Bullock County, CC2001-100 – Theft of Property 2nd Degree, 11/01/01

5. Bullock County, CC2001-104 – Escape 2nd Degree, 11/01/01

The State requests a pretrial ruling on the issue of application of Rule 404(b) to the prior convictions.

Respectfully submitted this *18th* day of November, 2004.

Carmella Penn

Carmella Penn, Assistant District Attorney
Third Judicial Circuit
P O Box 61, Eufaula, AL 36072-0061

### CERTIFICATE OF SERVICE

I hereby certify that I have this *18th* day of November 2004, served a copy of the above and foregoing Notice on Honorable Keith Ausborn, Attorney for the Defendant, by U.S. Mail, postage prepaid and properly addressed to 1224 Ryan Street, Montgomery, AL 36107, facsimile #334-264-9339.

Carmella Penn

Carmella Penn

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

STATE OF ALABAMA       *

                               *

VS.                   *  CASE NO. CC-95-42

                               *

DAVID DONNIE WILLIAMS   *

                               *

## SENTENCING ORDER

On this day appeared the defendant with his attorney and, with the consent and approval of his attorney, withdrew his plea of not guilty and entered a plea of guilty to Unlawful Distribution of Controlled Substance. Before accepting defendant's plea of guilty, the Court advised the defendant of all of his constitutional rights with the colloquy being taken down by the court reporter. The Court then permitted the defendant to withdraw his plea of not guilty and enter a plea of guilty to Unlawful Distribution of Controlled Substance. The Court inquired of defendant if he had anything to say why judgment and sentence should not now be pronounced upon him and defendant said nothing. It is therefore ORDERED and ADJUDGED by the Court that the defendant is guilty of Unlawful Distribution of Controlled Substance and as punishment defendant is hereby formally sentenced to the penitentiary of the State of Alabama for a term of 5 years. Sentence to be split with 2 years to serve and 3 years on probation. Defendant is ordered to complete the drug rehabilitation program provided by the State of Alabama, Department of Corrections.

Defendant is ordered to pay court costs, attorney fees and $50.00 Crime Victim Compensation Fund.

DONE this the 19th day of June, 1995.

WILLIAM H. ROBERTSON
Circuit Judge

I, Wilbert M. Jernigan, do hereby certify that the foregoing is a true and correct copy of a document, as the same appears of record and on file in this office.
Witness my hand and the Seal this the 17th day of November, 2004

Wilbert M. Jernigan
As Register of the
Circuit Court of
Bullock County, Alabama

23

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

STATE OF ALABAMA,                    )
                                     )
        Plaintiff,                   )
vs.                                  )        CASE NO. CC-2001-100
DAVID DONNIE WILLIAMS,               )
                                     )
        Defendant.                   )

## SENTENCING ORDER

On this day appeared the Defendant with his attorney and, with the consent and approval

of his attorney, withdrew his plea of not guilty and entered a plea of guilty to the charge of Theft

of Property, Second Degree, as charged in the Indictment.  Before accepting Defendant's plea of

guilty, the Court advised the Defendant of all of his constitutional rights with the colloquy being

taken down by the court reporter.  The Court accepted Defendant's plea of guilty and adjudged

the Defendant to be guilty of the crime of Theft of Property, Second Degree.  The Court inquired

of Defendant if he had anything to say why judgment and sentence should not now be

pronounced upon him and Defendant said nothing.

IT IS, THEREFORE, the sentence of the law and the judgment of this Court that the

Defendant be, and hereby is, sentenced to the penitentiary of the State of Alabama for a period of

fifteen (15) years.  The Defendant is further ORDERED to pay a fine in the amount of $500.00,

court costs, $50.00 for the Crime Victim's Compensation Fund, and attorney's fees.

Defendant's sentence in this case shall run concurrent with his sentence in Case No. CC-

1999-215 in which probation was revoked and with his sentence in Case No. CC-2001-104.

DONE and ORDERED this 1st day of November, 2001.

I, Wilbert M. Jernigan, do hereby certify that the
foregoing is a true and correct copy of a
document, as the same appears of record and
on file in this office.

Witness my hand and the Seal this the
17th day of November, 2004

*Wilbert M. Jernigan*
As Register of the
Circuit Court of
Bullock County, Alabama

*Bt Stht*
_____
Burt Smithart, Presiding Circuit Judge
Third Judicial Circuit of Alabama

24

# IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

STATE OF ALABAMA,　　　　　　　　　)

　　　　Plaintiff,　　　　　　　　　　　)

vs.　　　　　　　　　　　　　　　　　)　　　CASE NO. CC-2001-104

DAVID DONNIE WILLIAMS,　　　　　　)

　　　　Defendant.　　　　　　　　　　)

## SENTENCING ORDER

On this day appeared the Defendant with his attorney and, with the consent and approval

of his attorney, withdrew his plea of not guilty and entered a plea of guilty to the charge of

Escape, Second Degree, as charged in the Indictment. Before accepting Defendant's plea of

guilty, the Court advised the Defendant of all of his constitutional rights with the colloquy being

taken down by the court reporter. The Court accepted Defendant's plea of guilty and adjudged

the Defendant to be guilty of the crime of Escape, Second Degree. The Court inquired of

Defendant if he had anything to say why judgment and sentence should not now be pronounced

upon him and Defendant said nothing.

IT IS, THEREFORE, the sentence of the law and the judgment of this Court that the

Defendant be, and hereby is, sentenced to the penitentiary of the State of Alabama for a period of

fifteen (15) years. The Defendant is further ORDERED to pay court costs, $50.00 for the

Crime Victim's Compensation Fund, and attorney's fees.

Defendant's sentence in this case shall run concurrent with his sentence in Case No. CC-

1999-215 in which probation was revoked and with his sentence in Case No. CC-2001-100.

DONE and ORDERED this 1st day of November, 2001.

i, Wilbert M. Jernigan, do hereby certify that the
foregoing is a true and correct copy of a
document, as the same appears of record and
on file in this office.
Witness my hand and the Seal this the
17th day of November, X2004

Wilbert M. Jernigan
As Register of the
Circuit Court of
Bullock County, Alabama

Burt Smithart, Presiding Circuit Judge
Third Judicial Circuit of Alabama

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

STATE OF ALABAMA,          )
     Plaintiff,           )
vs.                      )    CASE NO. CC-1999-215
DAVID DONNIE WILLIAMS,    )
     Defendant.         )

## SENTENCING ORDER

On this day appeared the defendant with his attorney and, with the consent and agreement of his attorney, withdrew his plea of not guilty and entered a plea of guilty to Burglary, 3rd Degree. Before accepting defendant's plea of guilty, the Court advised the defendant of all of his constitutional rights with the colloquy being taken down by the court reporter. The Court accepted defendant's plea of guilty and adjudged the defendant to be guilty of the crime of Burglary, 3rd Degree. The Court inquired of the defendant if he had anything to say why judgment and sentence should not now be pronounced upon him and the defendant said nothing.

IT IS, THEREFORE, the sentence of the law and the judgment of the Court that the defendant be, and hereby is, sentenced to the penitentiary of the State of Alabama for a period of fifteen (15) years, said sentence being split with three (3) years to serve and five (5) years on probation. The defendant is further ORDERED to complete the Substance Abuse Program provided by the Department of Corrections. Upon successfully completing the Substance Abuse Program, the defendant will be returned to the Court for probation consideration. The defendant is further ORDERED to pay court costs, $50.00 for the Crime Victim's Compensation Fund, and attorney's fees.

The defendant having made application for probation, imposition of sentence is hereby suspended pending a probation hearing set by this Court for December 13, 1999.

DONE this 8th day of December, 1999.

I, Wilbert M. Jernigan do hereby certify that the foregoing is a ___ document, as the s___ ___ and or file in this office.

Witness my hand and the Seal this the 17th day of November, X 2004

_Wilbert M. Jernigan_
As Register of the
Circuit Court of
Bullock County, Alabama

_Burt Smithart_
Burt Smithart, Presiding Circuit Judge
Third Judicial Circuit of Alabama

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

STATE OF ALABAMA      *
                      *
VS.                   * CASE NO. CC-92-02
                      *
DAVID DONNIE WILLIAMS    *
                      *

### SENTENCING ORDER

On this day appeared the defendant with his attorney and, with the consent and approval of his attorney, withdrew his plea of not guilty and entered a plea of guilty to Escape, 3rd Degree. Before accepting defendant's plea of guilty, the Court advised the defendant of all of his constitutional rights with the colloquy being taken down by the court reporter. The Court then permitted the defendant to withdraw his plea of not guilty and enter a plea of guilty to Escape, 3rd Degree. The Court inquired of defendant if he had anything to say why judgment and sentence should not now be pronounced upon him and defendant said nothing. It is therefore ORDERED and ADJUDGED by the Court that the defendant is guilty of Escape, 3rd Degree and as punishment defendant is hereby formally sentenced to the penitentary of the State of Alabama for a term of 3 years on which he is hereby given credit for any time spent incarcerated pending trial.

Defendant ordered to pay court costs, attorney fees, $250.00 fine and $50.00 for Crime Victim Compensation Fund. Defendant makes application for probation.

DONE this the 9th day of July, 1992.

_____
WILLIAM H. ROBERTSON
Circuit Judge

I, Wilbert M. Jernigan, do hereby certify that the foregoing is a true and correct copy of a document, as the same appears of record and on file in this office.
Witness my hand and the Seal this the 18th day of November, 2004

_____
As Register of the
Circuit Court of
Bullock County, Alabama

26

IN THE CIRCUIT COURT FOR
BULLOCK COUNTY, ALABAMA
CRIMINAL DIVISION

STATE OF ALABAMA,                    *
                                     *
    PLAINTIFF,                       *
                                     *
VS.                                  * CASE NO.: <u>CC-2004-144-145-L.B.S.</u>
                                     *
DAVID DONNIE WILLIAMS,               *
                                     *
    DEFENDANT.                       *

## NOTICE OF APPEARANCE OF DEFENDANT'S COUNSEL

COMES NOW KEITH AUSBORN, Attorney at Law, serving Notice upon this HONORABLE COURT that he has agreed to Represent the above named Defendant, **DAVID DONNIE WILLIAMS**, for the Limited Purpose of "**CIRCUIT COURT - TRIAL LEVEL PROCEEDINGS**", and respectfully request that this **HONORABLE COURT** ensure that the Record reflects the same.

RESPECTFULLY SUBMITTED this _____ day of _____, 2004.

_____
ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

ATTORNEY KEITH AUSBORN – "LITIGATOR"
D/B/A "LAW OFFICE OF ATTORNEY KEITH AUSBORN"
1224 RYAN STREET
MONTGOMERY, ALABAMA 36107
(334) 264-9333 (OFFICE) & (334) 264-9339 FACSIMILE
E-MAIL ADDRESS: <u>KAILAWYER@KNOLOGY.NET</u>

## CERTIFICATE OF SERVICE

I, **ATTORNEY KEITH AUSBORN**, hereby certify that I have **SERVED** a copy of the foregoing upon the HONORABLE S. BOYD WHIGHAM & MR. DAVID DONNIE WILLIAMS, on this the _____ day of _____, 2004, via "HAND DELIVERY & HAND DELIVERY".

_____
ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

27

IN THE CIRCUIT COURT FOR
BULLOCK COUNTY, ALABAMA
CRIMINAL DIVISION

STATE OF ALABAMA,           *
                            *
    PLAINTIFF,             *
                            *
VS.                         * CASE NO.: <u>CC-2004-144-145-L.B.S.</u>
                            *
DAVID DONNIE WILLIAMS,      *
                            *
    DEFENDANT.             *

## <u>DEFENDANT'S MOTION FOR DISCLOSURE AND PRODUCTION</u>

    COMES NOW the Defendant, by way of Counsel, moves that the State be required to disclose and produce the followings matters, if the same are in its possession or under its control.

1)    All **"EXPERIMENTS, TESTS, EXAMINATIONS, and ETC."** regarding the Instant Offenses.

2)    All **"SEARCH WARRANT(S)/CONSENT(S)/INVENTORY FORM(S)"** signed by, or attributed to the Defendant.

3)    All **"CRIMINAL HISTORY(S)"** of the Defendant & Witnesses.

4)    All matters required to be disclosed by <u>**BRADY VS. MARYLAND**</u>.

5)    All Constitutionally entitled **"EXCULPATORY MATERIAL"**.

6)    All **"THIRD (3RD) PARTY WITNESS' STATEMENT(S)"**.

7)    All **"MIRANDA RIGHTS FORM"** signed by, or attributed to the Defendant.

8)    All **"TRANSCRIPTS"** of any Audio Recordations made by, or attributed to the Defendant.

9)    All **"AUDIO RECORDATIONS"** made by, or attributed to the Defendant.

10)    All **"VIDEO RECORDATIONS"** made by, or attributed to the Defendant.

11)    Lastly, said Defendant requests that the **STATE OF ALABAMA** <u>**DISCLOSE**</u> and <u>**PRODUCE**</u> any and all **"DISCOVERY"** not expressly sought above, that said Defendant is Constitutionally Entitled to, either in **"LAW"**, and/or **EQUITY"**.

RESPECTFULLY SUBMITTED this _____ day of _____, 2004.

ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

ATTORNEY KEITH AUSBORN – "LITIGATOR"
D/B/A "LAW OFFICE OF ATTORNEY KEITH AUSBORN"
1224 RYAN STREET
MONTGOMERY, ALABAMA 36107
(334) 264-9333 (OFFICE) & (334) 264-9339 FACSIMILE
E-MAIL ADDRESS: KAILAWYER@KNOLOGY.NET

## CERTIFICATE OF SERVICE

I, **ATTORNEY KEITH AUSBORN**, hereby certify that I have **SERVED** a copy of the foregoing upon the **HONORABLE S. BOYD WHIGHAM & MR. DAVID DONNIE WILLIAMS**, on this the _____ day of _____, 2004, via "HAND DELIVERY & HAND DELIVERY".

ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

IN THE CIRCUIT COURT FOR
BULLOCK COUNTY, ALABAMA
CRIMINAL DIVISION

STATE OF ALABAMA,          *

        *

    PLAINTIFF,        *

        *

VS.         * CASE NO.: <u>CC-2004-144-145-L.B.S.</u>

        *

DAVID DONNIE WILLIAMS,       *

        *

    DEFENDANT.        *

## DEFENDANT'S MOTION TO SUPPRESS

COMES NOW the Defendant in the above-styled cause, by and through His Attorney of Record, and MOVES the Court to SUPPRESS the evidence obtained against Him, as grounds for said Motion sets down and assigns the following:

1) The Defendant was Arrested without a Warrant of Arrest or the Warrant of Arrest was not properly issued as provided by Law, because the Constitutional Rights against unreasonable search and seizures guaranteed to the Defendant, both under the Constitution of the United States and the Constitution of the State of Alabama have been violated.

2) There was no probable cause for believing that an offense had been committed so as to authorize an arrest. Furthermore, if the officers who made this search had probable cause for the arrest of the Defendant on a felony charge, they had ample time to present these facts to a Magistrate or other Officer authorized to issue Search Warrants.

3) That the Arrest was illegal because it was not made in conformity with the Laws of the Constitution of Alabama and/or the Laws and Constitution of the United States.

4) That the search of the Defendant, His vehicle, and/or his residence followed an illegal Arrest.

5) That the Evidence was obtained by a Search of any area, which was not within the immediate presence of the Defendant.

6) That the Defendant's statement is inadmissible because:

a)    he was not properly advised of his Constitutional Rights prior to the time that the statement of Defendant was taken;

b)    the statement of the Defendant was not voluntary, but was given as the result of coercion, threats, promise, and etc.

c)    the statement of the Defendant was made at a time prior to Defendant being informed of the nature of the charges against him;

d)    at the time the statement was given the Defendant was informed that he was being questioned on an offense other than the charge made in this case;

e)    the statement of the Defendant was obtained in violation of the Laws and Constitution of the State of Alabama and/or the Laws and Constitution of the United States;

f)    the statement of the Defendant contained no admissions of guilt or underlying circumstances indicating guilt, but contained information not relative to this case, which would be prejudicial to the Defendant and would inflame the minds of the Jury;

g)    the statement of the Defendant was taken prior to his Arrest and Detention by authorized Officers of the Law, or by private Persons who did not advise the Defendant of his rights under the Laws and Constitution of the State of Alabama and the United States;

h)    the age and mental condition of the Defendant was such that he was incapable of understanding his rights although informed of them.

**WHEREFORE**, the Defendant **MOVES** the Court to make and enter an order **SUPPRESSING** all the evidence found and obtained as a direct and proximate result and consequence of statements of the Defendant; the Affidavit and Warrant of Arrest; and the Affidavit and Search Warrant or Warrants in this case.

31

RESPECTFULLY SUBMITTED this _____ day of _____, 2004.

_____
ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

ATTORNEY KEITH AUSBORN – "LITIGATOR"
D/B/A "LAW OFFICE OF ATTORNEY KEITH AUSBORN"
1224 RYAN STREET
MONTGOMERY, ALABAMA 36107
(334) 264-9333 (OFFICE) & (334) 264-9339 FACSIMILE
E-MAIL ADDRESS: KAILAWYER@KNOLOGY.NET

## CERTIFICATE OF SERVICE

I, **ATTORNEY KEITH AUSBORN,** hereby certify that I have **SERVED** a copy of the foregoing upon the **HONORABLE S. BOYD WHIGHAM & MR. DAVID DONNIE WILLIAMS,** on this the _____ day of _____, 2004, via "**HAND DELIVERY & HAND DELIVERY**".

_____
ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

STATE OF ALABAMA,           )
     Plaintiff,                )
Vs.                         )
DAVID DONNIE WILLIAMS,      )        CASE NO: CC2004-144 & 145
     Defendant.               )

## NOTICE OF INTENT TO REQUEST ENHANCEMENT

Comes now the State of Alabama, by and through its Assistant District Attorney, Carmella Penn, and hereby gives notice to the Defendant and his Attorney Keith Ausborn, that at the sentencing hearing set before this Court, the State expects to request the Court to enhance the sentence imposed upon the said Defendant. This request for enhancement is made on the grounds that the Defendant has at least three (3) prior felony convictions, and his sentence must be enhanced pursuant to Section 13A-5-9(c)(1), of the Code of Alabama, which states as follows:

(c)(1)  In all cases when it is shown that a criminal defendant has been

previously convicted of any three felonies and after such convictions has

committed another felony, he or she must be punished as follows:

(1) On conviction of a Class C felony, he or she must be

punished by imprisonment for life or for any term of not

more than 99 years but not less than 15 years.

The State would show the prior felony convictions of the Defendant to be:

1.  Escape Third Degree, Bullock County, case number CC1992-02, on

July 9, 1992

2. Distribution of Cotrolled Substance, Bullock County, case number 1995-42, on June 19, 1995

3. Burglary Third Degree, Bullock County, case number 1999-215, on December 8, 1999

4. Theft of Property Second Degree, Bullock County, case number 2001-100, on November 1, 2001

5. Escape Second Degree, Bullock County, case number CC2001-104, on November 1, 2001

Respectfully submitted this _____ day of November 2004.

_Carmella Penn_

Carmella Penn, Assistant District Attorney
Third Judicial Circuit of Alabama
P.O. Box 61, Eufaula, AL  36072-0061

### CERTIFICATE OF SERVICE

I hereby certify that I have this 23rd day of November 2004, served a copy of the foregoing motion on the Honorable Keith Ausborn, Attorney for the Defendant, by U.S. Mail, postage prepaid and properly addressed to 1224 Ryan Street, Montgomery, AL 36107.

_Carmella Pen_

Carmella Penn

34

## IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
|     Plaintiff, | ) | |
| vs. | ) | CASE NO. CC-2004-144 & 145 |
| DAVID DONNIE WILLIAMS, | ) | |
|     Defendant. | ) | |

## JURY VERDICT

## GUILTY VERDICT

We, the Jury, find the Defendant, David Donnie Williams, guilty of the offense of

Stalking, as charged in the Indictment.

_____
Foreperson

## NOT GUILTY VERDICT

We, the jury, find the Defendant, David Donnie Williams, not guilty of the offense of
stalking.

_____
Foreperson

## GUILTY VERDICT

We, the jury, find the Defendant, David Donnie Williams, guilty of the offense of

Harassment/Domestic violence as charged in the Indictment.

_____
Foreperson

## NOT GUILTY VERDICT

We, the jury, find the Defendant, David Donnie Williams, not guilty of the offense of

Harrassment/Domestic violence.

_____
Foreperson

So Say We All.
November 23, 2004

*35*

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

STATE OF ALABAMA,                )
    Plaintiff,                         )
vs.                                              )          CASE NO. CC-2004-144 & 145
DAVID DONNIE WILLIAMS,      )
    Defendant.                        )

## O R D E R

The Defendant, David Donnie Williams, was indicted and arraigned upon an Indictment on a charge of Stalking in Case No. CC-2004-144, and upon an Indictment on a charge of Domestic Violence, Third Degree/Harassment, in Case No. CC-2004-145, and did heretofore enter pleas of not guilty to said charges. Thereupon, on the 22nd day of November, 2004, came a jury of good and lawful citizens, to-wit: Allison V. Barnett and eleven others, who being duly impaneled, sworn, and charged by the Court according to law, and before whom the trial of this cause was entered upon and continued from day to day and from time to time, said Defendant being in open Court at each and every stage and during all proceedings in this cause;

NOW, on the 23rd day of November, 2004, said jurors upon their oaths do say in Case No. CC-2004-144:

> "We, the Jury, find the Defendant, David Donnie Williams, guilty of the offense of Stalking, as charged in the Indictment."

The Court, therefore, hereby adjudges the Defendant, David Donnie Williams, guilty of the crime of Stalking with sentence to be imposed at a sentencing hearing set for December 9, 2004, at 8:30 a.m., at the Bullock County Courthouse in Union Springs, Alabama. The Probation and Parole Officer is hereby directed to prepare a pre-sentence report and submit said report to the Court, with copies to the District Attorney, Boyd Whigham, and Defendant's Attorney, Keith Ausborn.

Said jurors upon their oath do say in Case No. CC-2004-145:

> "We, the jury, find the Defendant, David Donnie Williams, not guilty of the offense of Harrassment/Domestic violence."

36

The Court, therefore, hereby adjudges the Defendant, David Donnie Williams, not guilty of the offense of Harassment/Domestic Violence, Third Degree, in Case No. CC-2004-145.

**DONE AND ORDERED** this 29th day of November, 2004.

Burt Smithart, Presiding Circuit Judge
Third Judicial Circuit of Alabama

37

## IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

STATE OF ALABAMA,                )
    Plaintiff,                       )
vs.                                              )          CASE NO. CC-2004-144
DAVID DONNIE WILLIAMS,    )
    Defendant.                      )

### SENTENCING ORDER

This matter came before the Court on this 9th day of December, 2004, for

sentencing of the Defendant, the Defendant having been found guilty by a jury of the

crime of Stalking, as charged in the Indictment.  The Defendant and his attorney, Keith

Ausborn, were present before the Court, with the State represented by District Attorney

Boyd Whigham.  Upon consideration of the pre-sentence report of the Probation and

Parole Officer and the oral arguments and testimony presented to the Court, it is the

sentence of the law and the judgment of this Court that the Defendant be, and hereby is,

sentenced to the penitentiary of the State of Alabama for a period of thirty-eight (38)

years.  IT IS FURTHER ORDERED that the Defendant shall complete the Dual

Diagnosis Substance Abuse Program and Anger and Stress Management Program with

the Department of Corrections.  The Defendant is further ORDERED to pay a fine in the

amount $5,000.00, court costs, $50.00 for the crime victims compensation fund, and

attorney's fees.

**DONE AND ORDERED** this 9th day of December, 2004.

Burt Smithart, Presiding Circuit Judge
Third Judicial Circuit of Alabama

ACR359                          ALABAMA JUDICIAL DATA CENTER
                                     BULLOCK COUNTY
                                  TRANSCRIPT OF RECORD
                                   CONVICTION REPORT

                                                CC 2004 000144.00 01
                                                HON. BURT SMITHART

| CIRCUIT COURT OF BULLOCK COUNTY | COURT ORI: 009015 J |

STATE OF ALABAMA      VS.                    DC NO: DC 2004 000209.00
WILLIAMS DAVID DONNIE      ALIAS:            G J:    BF0434
505 JOHNSON STREET         ALIAS:            SSN:   014622787
UNION SPRINGS    AL   36089                  SID:   000169189
                                             AIS:

DOB: 08/14/1965    SEX: M   HT: 5 06    WT: 140   HAIR: BLK   EYE: BRO
RACE: ( )W (X)B ( )O   COMPLEXION: ___    AGE: ___   FEATURES: ___

DATE OFFENSE: 04/17/2004   ARREST DATE: 04/21/2004   ARREST ORI: 0090000

CHARGES @ CONV     CITES          CT  L COURT ACTION          CA DATE
STALKING          13A-006-090     01    CONVICTED             11/23/2004
                                  00                          00/00/0000
                                  00                          00/00/0000

JUDGE: HON. BURT SMITHART          PROSECUTOR: WHIGHAM BOYD

PROBATION APPLIED   GRANTED   DATE      REARRESTED DATE  REVOKED   DATE
( )Y( )N _____   ( )Y( )N _____      ( )Y( )N _____  ( )Y( )N _____

15-18-8, CODE OF ALA 1975    IMPOSED    SUSPENDED    TOTAL    JAIL CREDIT
( )Y (X)N    CONFINEMENT: 38 00 000  00 00 000  38 00 000  00 00 000
             PROBATION :  00 00 000              00 00 000
DATE SENTENCED: 12/09/2004    SENTENCE BEGINS: 12/09/2004

PROVISIONS            COSTS/RESTITUTION           DUE         ORDERED

  PENITENTIARY       RESTITUTION             $0.00          $0.00
  DOC/SAPP PGM       ATTORNEY FEE            $0.00          $0.00
                     CRIME VICTIMS          $50.00         $50.00
                     COST                  $289.00        $289.00
                     FINE                 $5000.00       $5000.00
                     MUNICIPAL FEES          $0.00          $0.00
                     DRUG FEES               $0.00          $0.00
                     ADDTL DEFENDANT         $0.00          $0.00
                     DA FEES                 $0.00          $0.00
                     COLLECTION ACCT         $0.00          $0.00
                     JAIL FEES               $0.00          $0.00

                     TOTAL                $5339.00       $5339.00

APPEAL DATE      SUSPENDED        AFFIRMED         REARREST
( )Y( )N _____   ( )Y( )N _____   ( )Y( )N _____   ( )Y( )N _____

REMARKS:                            THIS IS TO CERTIFY THAT THE
                                    ABOVE INFORMATION WAS EXTRACTED
                                    FROM OFFICIAL COURT RECORDS
                                    AND IS TRUE AND CORRECT.
ORDERED THAT DEF SHALL COMPLETE THE DUAL DIAGNOSIS SUBSTANCE
ABUSE PROGRAM & ANGER & STRESS MGMT PROGRAM WITH THE D O C

                                    *Wilbert M. Jernigan*
                                    WILBERT M. JERNIGAN

                                    12/21/2004

OPERATOR: WIJ
PREPARED: 12/21/2004

39

IN THE CIRCUIT COURT FOR
BULLOCK COUNTY, ALABAMA
CRIMINAL DIVISION

**FILED IN OFFICE**

JAN 1 0 2005

STATE OF ALABAMA,                    *

     PLAINTIFF,                        *

                                  *    CLERK-REGISTER, BULLOCK CO., ALA.

VS.                                  * CASE NO.: <u>CC-2004-144-145-L.B.S.</u>

DAVID DONNIE WILLIAMS,               *

     DEFENDANT.                        *

### DEFENDANT'S MOTION FOR "RECONSIDERATION & REDUCTION" OF THIRTY – EIGHT (38) YEAR SENTENCE

COMES NOW the Defendant, **DAVID DONNIE WILLIAMS**, via Retained Counsel of Record, **ATTORNEY KEITH AUSBORN**, and hereby submit to this **HONORABLE COURT** said "**DEFENDANT'S MOTION FOR RECONSIDERATION & REDUCTION OF 'THIRTY – EIGHT (38)' YEAR SENTENCE**", for the reasons succinctly articulated as follows:

Said Defendant is entitled to a "**REVERSED – SPLIT SENTENCE**", and/or in the alternative a "**JUDGMENT OF ACQUITTAL**", and/or "**TRIAL DE NOVO**"; as per the "**DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL**" & "**DEFENDANT'S MOTION FOR 'TRIAL DE NOVO' PROCEEDING**", concurrently filed with the Instant Motion; and hereby expressly **ADOPTED & INCORPORATED** herein; though not expressly set – out herein, as well as for the below mentioned factors; amongst many others unmentioned:

A)    Said Defendant was effectively deprived of "**SUBSTANTIVE and/or PROCEDURAL DUE PROCESS**", in that said Defendant was **DENIED** the Constitutional Right to have a Jury of his Peers to fairly and accurately consider "**EXCULPATORY EVIDENCE**" in their Jury Deliberations; notwithstanding the Jury Instructions obligating the same; of which Proper Considerations would have culminated in a "**JUDGMENT OF ACQUITTAL**" for said Defendant, as opposed to a "**JUDGMENT OF GUILT**".

B)    Said Defendant was effectively deprived of "**SUBSTANTIVE and/or PROCEDURAL DUE PROCESS**", in that said Defendant was **DEPRIVED** of his Fundamental Constitutional Right; to-wit, "**RIGHT TO A FAIR & JUST TRIAL**"; derivative through "**JURY NULLIFICATION OF EVIDENCE**"…stemming from the Jury's Obvious **FAILURE** to comprehend and Apply the Jury Instructions supplied by this **HONORABLE COURT**.
Given the same, said Judgment of Guilt, and Companion Sentence are both "**ABOMINATIONS**"; henceforth, the same should be **NULLIFIED**, and/or **AMENDED**, as being the "**FRUIT OF**

1-18-05
Denied
R J Slep

THE POISONOUS TREE"; thereby warranting a "TRIAL DE NOVO", and/or "J.N.O.V.".

C)    Said Instant Offense was a "STALKING OFFENSE"; and **NOT** an Actual "CRIME OF VIOLENCE", though still **SERIOUS** in nature, for which said Defendant's Culpability is in Question, enlight of the "DEFENDANT'S POST-JUDGMENT MOTIONS & EXCULPATORY EVIDENCE", expressly **ADOPTED & INCORPORATED** herein, in support of the Instant Motion; thereby, said Defendant having retained his cloak of the "LEGAL PRESUMPTION OF INNOCENCE". Additionally, said Defendant appears to have been the Victim of "CRUEL & UNUSUAL PUNISHMENT", in that Other Convicted Defendants; similarly, and/or identically situated, have received **LESSER** Sentences; of which the same impacts said Defendant's Constitutional Rights to "EQUAL PROTECTION", under the "EIGHTH (8TH) & FOURTEENTH (14TH) AMENDMENT", with there being "NO AGGRAVATING FACORS" to **OVERCOME** this premise; however, there existing "NUMEROUS MITIGATING FACTORS" to **SUBSTANTIATE** the fact that the Defendant's Instant Sentence is "DISPROPORTIONATE" to the Facts and Evidence of His Case.

D)    Said Defendant had "ACCEPTED RESPONSIBILITY" for his Previous Felony Criminal Wrongdoings, and avers that prior to the Instant Offense, He was attempting to "GET HIS LIFE BACK TOGETHER"; of which the Instant Offense was **NOT** committed by Him. Notwithstanding the Defendant's Conviction to the contrary, said State **NEVER** proved the fact that the Defendant posed an "IMMINENT & SERIOUS RISK OF HARM" to the Alleged Victim; thereby, further substantiating the fact that the defendant's Sentence was **EXCESSIVE**; of which the same, again; impacts said Defendant's Constitutional Rights to "EQUAL PROTECTION", under the "EIGHTH (8TH) & FOURTEENTH (14TH) AMENDMENT"; since there was "NO AGGRAVATING FACORS" to **OVERCOME** this premise; however, there existed "NUMEROUS MITIGATING FACTORS" to **SUBSTANTIATE** this premise.

E)    Said Defendant denies that He has a Criminal Recidivism Propensity, and/or Anger Problem; however, said Defendant will, and can continue his assessment and/or monitoring via the "BULLOCK COUNTY PROBATION AND PAROLE OFFICE", in conjunction with enrollment in an "ANGER MANAGEMENT PROGRAM"; of which said Defendant is willing to absorb "ALL COSTS" for the same. Additionally, said Defendant promises to **STRICTLY** "COOPERATE" with Any Directives of the same, while concurrently maintaining a "STABLE HOME PLAN; STABLE JOB PLAN; ABSTAINING FROM VICTIM CONTACT & TIMELY PAYING COURT – ORDERED MONIES".

Lastly, in the "BEST INTERESTS OF JUSTICE; JUDICIAL EXPEDIENCY & JUDICIAL ECONOMY", said Defendant respectfully prays that said Instant Motion be **GRANTED**, balancing said Defendant's Constitutional Rights to the same, against any and all Opposing Interests…Unknown at this Time.

41

RESPECTFULLY SUBMITTED this _____ day of _____, 2005.

_____
ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

ATTORNEY KEITH AUSBORN – "DEFENDANT'S COUNSEL"
D/B/A "LAW OFFICE OF ATTORNEY KEITH AUSBORN"
1224 RYAN STREET
MONTGOMERY, ALABAMA 36107
(334) 264-9333 (WK.) & (334) 264-9339 (FAX)
E-MAIL ADDRESS: KA1LAWYER@KNOLOGY.NET

## CERTIFICATE OF SERVICE

I, **ATTORNEY KEITH AUSBORN**, hereby certify that I have **SERVED** a copy of the foregoing upon the **HON. S. BOYD WHIGHAM & MR. DAVID DONNIE WILLIAMS**, on this the _____ day of _____, 2005, all via "**U. S. MAIL – REGULAR DELIVERY**" at their *Last Known Addresses*.

_____
ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

IN THE CIRCUIT COURT FOR
BULLOCK COUNTY, ALABAMA
CRIMINAL DIVISION

STATE OF ALABAMA,                    *
                                     *
        PLAINTIFF,                   *
                                     *
VS.                                  *  CASE NO.: <u>CC-2004-144-145-L.B.S.</u>
                                     *
DAVID DONNIE WILLIAMS,               *
                                     *
        DEFENDANT.                   *

<u>DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING
ORDER OF VERDICT</u>

COMES NOW the Defendant, **DAVID DONNIE WILLIAMS**, via Retained Counsel of Record, **ATTORNEY KEITH AUSBORN**, and hereby submit to this **HONORABLE COURT** said "**DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING ORDER OF VERDICT**", for the reasons succinctly articulated as follows:

Said Defendant is entitled to a "**JUDGMENT OF ACQUITTAL**", and at the very least...a "**TRIAL DE NOVO**"; as per the "**DEFENDANT'S MOTION FOR TRIAL DE NOVO**", concurrently filed with the Instant Motion, in that the evidence was **INSUFFICIENT** & **INCONCLUSIVE** to support the Jury's Verdict of Guilt, considering the below mentioned factors; amongst many others unmentioned:

1) "**NO WITNESS**" testified that they Physically Observed the Defendant commit the offense of "**STALKING**" of the Alleged Victim on the Date and Time, as noted in the State's Indictment. Moreover, as this **HONORABLE COURT** will no doubt recall, Each and Every One of the State's Witnesses were **AGGRESSIVELY** confronted on "**CROSS — EXAMINATION**"; wherein, Each of the Witnesses were either **IMPEACHED**, and/or gave "**EXCULPATORY EVIDENCE**" in favor of the Defendant; thereby, lending itself to "**REASONABLE DOUBT**".

2) "**NO REASONABLE & CREDIBLE MOTIVE**" was presented by the State to establish the Defendant's Inducement to commit the Offense of "**STALKING**"; however, to the contrary, **SUBSTANTIAL** Evidence was presented on behalf of the Defendant...to **CORROBORATE** the fact that the Alleged Victim was in fact "**CRAZY IN LOVE**" with the Defendant; thereby, also lending itself to "**REASONABLE DOUBT**".

1-18-05
Denied
Rxt Salp A

43

3) INCONCLUSIVE, INCONSISTENT & INSUFFICIENT" *Testimonial and Demonstrative evidence was presented by the* State, in an attempt to establish the Defendant's Liability to the Instant Offense; of which, a reasonable construction and application of the same by an Objective Trier of Fact lends itself to the Un-Mistakeable Fact that the Defendant…at best; had An Extensive, Possibly On-Going, and Voluntary **INTIMATE** Relationship with the Alleged Victim; however, the Defendant was **NOT** the Perpetrator of a "STALKING" Offense; but, in fact, was the Unfortunate Victim Himself of the Revengeful Actions of a *"SCORNED – LOVER"; thereby, also lending itself to* *"REASONABLE DOUBT".*

4) "NO PRIMA FACIE CASE" was presented by the State to establish the Defendant's Guilt; vis-à-vis, the Plaintiff's Meeting of its Legal Obligation for Each and Every Material Element of the Offense of "STALKING"; henceforth, given the **ABSENCE** of said Legal Evidence, it was Reversible Error for the Trier of Fact to have adjudicated the Defendant **GUILTY** of "STALKING"; thereby, also lending itself to *"REASONABLE DOUBT".*

5) By Law; in as much that the State **FAILED** to Meet its Legal Burden of proving the Defendant Guilty **"BEYOND A REASONABLE DOUBT";** this HONORABLE COURT is empowered by Law, and/or Equity to **GRANT** said **"DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL".**

Lastly, in the "BEST INTERESTS OF JUSTICE; JUDICIAL EXPEDIENCY & JUDICIAL ECONOMY", *said Defendant respectfully prays* that said Instant Motion be **GRANTED**, balancing said Defendant's Constitutional Rights to the same, against any and all Opposing Interests…Unknown at this Time.

RESPECTFULLY SUBMITTED this _____ day of _____, 2005.


                                        **ATTORNEY KEITH AUSBORN**
                                        **DEFENDANT'S COUNSEL (AUS010)**

ATTORNEY KEITH AUSBORN – "DEFENDANT'S COUNSEL"
D/B/A "LAW OFFICE OF ATTORNEY KEITH AUSBORN"
1224 RYAN STREET
MONTGOMERY, ALABAMA 36107
(334) 264-9333 (WK.) & (334) 264-9339 (FAX)
E-MAIL ADDRESS: KAILAWYER@KNOLOGY.NET

44

## CERTIFICATE OF SERVICE

I, **ATTORNEY KEITH AUSBORN**, hereby certify that I have <u>**SERVED**</u> a copy of the foregoing upon the **HON. S. BOYD WHIGHAM & MR. DAVID DONNIE WILLIAMS**, on this the _____ day of _____, 2005, all via "**U. S. MAIL – REGULAR DELIVERY**", at their Last Known Addresses.

_____
**ATTORNEY KEITH AUSBORN**
**DEFENDANT'S COUNSEL (AUS010)**

45

IN THE CIRCUIT COURT FOR
BULLOCK COUNTY, ALABAMA
CRIMINAL DIVISION

STATE OF ALABAMA,                       *
                                        *
        PLAINTIFF,                      *
                                        *
VS.                                     * CASE NO.: CC-2004-144-145-L.B.S.
                                        *
DAVID DONNIE WILLIAMS,                  *
                                        *
        DEFENDANT.                      *

## DEFENDANT'S MOTION FOR A 'TRIAL DE NOVO' PROCEEDING"

COMES NOW the Defendant, DAVID DONNIE WILLIAMS, via Retained Counsel of Record, ATTORNEY KEITH AUSBORN, and hereby submit to this HONORABLE COURT said "DEFENDANT'S MOTION FOR A 'TRIAL DE NOVO' PROCEEDING", for the reasons succinctly articulated as follows:

Said Defendant is entitled to a "TRIAL DE NOVO", and/or in the alternative a "JUDGMENT OF ACQUITTAL", as per the "DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL", concurrently filed with the Instant Motion, in that the evidence was INSUFFICIENT & INCONCLUSIVE to support the Jury's Verdict of Guilt, considering the below mentioned factors; amongst many others unmentioned:

1) "NO WITNESS" testified that they Physically Observed the Defendant commit the offense of "STALKING" of the Alleged Victim on the Date and Time, as noted in the State's Indictment. Moreover, as this HONORABLE COURT will no doubt recall, Each and Every One of the State's Witnesses were AGGRESSIVELY confronted on "CROSS – EXAMINATION"; wherein, Each of the Witnesses were either IMPEACHED, and/or gave "EXCULPATORY EVIDENCE" in favor of the Defendant; thereby, lending itself to "REASONABLE DOUBT".

2) "NO REASONABLE & CREDIBLE MOTIVE" was presented by the State to establish the Defendant's Inducement to commit the Offense of "STALKING"; however, to the contrary, SUBSTANTIAL Evidence was presented on behalf of the Defendant...to CORROBORATE the fact that the Alleged Victim was in fact "CRAZY IN LOVE" with the Defendant; thereby, also lending itself to "REASONABLE DOUBT".

3) INCONCLUSIVE, INCONSISTENT & INSUFFICIENT" Testimonial and Demonstrative evidence was presented by the

1-18-05
Denied
BfSflt

State, in an attempt to establish the Defendant's Liability to the *Instant Offense*; of which, *a reasonable construction* and application of the same by an Objective Trier of Fact lends itself to the Un-Mistakeable Fact that the Defendant…at best; had An Extensive, Possibly On-Going, and Voluntary **INTIMATE** Relationship with the Alleged Victim; however, the Defendant was **NOT** the Perpetrator of a "STALKING" Offense; but, in fact, was the Unfortunate Victim Himself of the Revengeful Actions of a "SCORNED – LOVER"; thereby, also lending itself to "REASONABLE DOUBT".

4) "NO PRIMA FACIE CASE" was presented by the State to establish the Defendant's Guilt; vis-à-vis, the Plaintiff's Meeting of its Legal Obligation for Each and Every Material Element of the Offense of "STALKING"; henceforth, given the **ABSENCE** of said Legal Evidence, it was Reversible Error for the Trier of Fact to have adjudicated the Defendant **GUILTY** of "STALKING"; thereby, also lending itself to "REASONABLE DOUBT".

5) By Law; in as much that the State **FAILED** to Meet its Legal Burden of proving the Defendant Guilty "**BEYOND A REASONABLE DOUBT**"; this **HONORABLE COURT** is empowered by Law, and/or Equity to **GRANT** said "**DEFENDANT'S MOTION FOR A 'TRIAL DE NOVO' PROCEEDING**".

Lastly, in the "**BEST INTERESTS OF JUSTICE; JUDICIAL EXPEDIENCY & JUDICIAL ECONOMY**", said Defendant respectfully prays that said Instant Motion be **GRANTED**, balancing said Defendant's *Constitutional Rights* to the same, against any and all Opposing Interests…Unknown at this Time.

RESPECTFULLY SUBMITTED this ____ day of _____, 2005.

_____
ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

ATTORNEY KEITH AUSBORN – "DEFENDANT'S COUNSEL"
D/B/A "LAW OFFICE OF ATTORNEY KEITH AUSBORN"
1224 RYAN STREET
MONTGOMERY, ALABAMA 36107
(334) 264-9333 (WK.) & (334) 264-9339 (FAX)
E-MAIL ADDRESS: KA1LAWYER@KNOLOGY.NET

47

## CERTIFICATE OF SERVICE

I, **ATTORNEY KEITH AUSBORN**, hereby certify that I have **SERVED** a copy of the foregoing upon the **HON. S. BOYD WHIGHAM & MR. DAVID DONNIE WILLIAMS**, on this the _____ day of _____, 2005, all via "**U. S. MAIL – REGULAR DELIVERY**" at their Last Known Addresses.

**ATTORNEY KEITH AUSBORN**
**DEFENDANT'S COUNSEL (AUS010)**

48

IN THE CIRCUIT COURT FOR
BULLOCK COUNTY, ALABAMA
CRIMINAL DIVISION

STATE OF ALABAMA,                    *
                                     *
        PLAINTIFF,                   *
                                     *
VS.                                  *  CASE NO.: CC-2004-144-145-L.B.S.
                                     *
DAVID DONNIE WILLIAMS,               *
                                     *
        DEFENDANT.                   *

### DEFENDANT'S MOTION FOR "STAY" OF THIRTY – EIGHT (38) YEAR SENTENCE…PENDING DISPOSITION OF ALL POST-JUDGMENT MOTIONS

COMES NOW the Defendant, **DAVID DONNIE WILLIAMS**, via Retained Counsel of Record, **ATTORNEY KEITH AUSBORN**, and hereby submit to this **HONORABLE COURT** said **"DEFENDANT'S MOTION FOR STAY OF 'THIRTY – EIGHT YEAR SENTENCE' … PENDING DISPOSITION OF ALL POST – JUDGMENT MOTIONS"**, for the reasons succinctly articulated as follows:

1) Said Defendant is concurrently filing a Number of Post-Judgment Motions with the Instant Motion; to-wit: **"DEFENDANT'S MOTION FOR TRIAL DE NOVO; DEFENDANT'S MOTION FOR J.N.O.V.; DEFENDANT'S MOTION FOR RECONSIDERATION/REDUCTION OF 12/09/04 SENTENCE"**, for which said Aforementioned Motions should be resolved **PRIOR** to said Defendant's Continued Service of the Instant Sentence, procured through the Instant Judgment of Guilt.

2) Said Defendant's Post-Judgment Motions are **"MERITORIOUS"** Contentions; both in Law and Fact, with a Fair and Accurate Disposition of the same, more likely to result in **FAVORABLE** Rulings for the Defendant; henceforth, for the Defendant to continue to remain under Service of Sentence…pursuant to an Erroneous Jury Verdict, **IMMEDIATELY** presents **"IRREPARABLE HARM"** to the Defendant, while a **STAY** of Judgment and Companion Sentence is **NOT** likely to result in **"SUBSTANTIAL PREJUDICE"** to the State, nor Victim, pending the Disposition of the Instant Post- Judgment Motions.

3) Said Defendant is **NOT** a **"FLIGHT CANDIDATE"**; if a **STAY** is Issued, nor is the Defendant receptive to **"CRIMINAL RECIDIVISM"**; henceforth this **HONORABLE COURT** would be Justified in giving **(FAVORABLE)** Consideration to the Instant Motion.

1- 18 -05
Denied
Bt Sflet

Lastly, in the "BEST INTERESTS OF JUSTICE; JUDICIAL EXPEDIENCY & JUDICIAL ECONOMY", said Defendant respectfully prays that said Instant Motion be GRANTED, balancing said Defendant's Constitutional Rights to the same, against any and all Opposing Interests...Unknown at this Time.

RESPECTFULLY SUBMITTED this _____ day of _____, 2005.

_____
ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

ATTORNEY KEITH AUSBORN – "DEFENDANT'S COUNSEL"
D/B/A "LAW OFFICE OF ATTORNEY KEITH AUSBORN"
1224 RYAN STREET
MONTGOMERY, ALABAMA 36107
(334) 264-9333 (WK.) & (334) 264-9339 (FAX)
E-MAIL ADDRESS: KA1LAWYER@KNOLOGY.NET

### CERTIFICATE OF SERVICE

I, ATTORNEY KEITH AUSBORN, hereby certify that I have SERVED a copy of the foregoing upon the HON. S. BOYD WHIGHAM & MR. DAVID DONNIE WILLIAMS, on this the _____ day of _____, 2005, all via "U. S. MAIL – REGULAR DELIVERY" at their Last Known Addresses.

_____
ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

*50*

IN THE CIRCUIT COURT FOR BULLOCK COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA,<br>PLAINTIFF, | )<br>)<br>) | **FILED IN OFFICE** |
| VS. | )<br>)<br>) | CC-2004-144-145    JAN 1 4 2005 |
| DAVID DONNIE WILLIAMS,<br>DEFENDANT. | )<br>)<br>) | CLERK-REGISTER, BULLOCK CO., ALA. |

### STATE'S RESPONSE TO
### DEFENDANT'S MOTIONS

COMES NOW the State of Alabama and responds to the several motions filed by the Defendant and says the following:

1.  The Defendant David Donnie Williams has previously been convicted of three or more felonies, making him a Habitual Offender. Defendant's Sentence is well within the sentencing range of 15 – 99 years or life and is indeed near the lower end of that range.

2.  Defendant's culpability is not in question as a jury of his peers found him guilty beyond a reasonable doubt of the charges.

3.  Defendant offers no new evidence to support his motion for a new trial.

4.  Defendant argues his case in making the motions. Those arguments here are misplaced as Your Honor has conducted a trial where Defense Counsel presented his testimony and cross-examined witnesses and made open and closing remarks. The arguments made were considered by the fact-finder at trial and Your Honor denied Defendant's Motions as to the Affirmative Charge. Defendant has failed to state a single ground on which a new trial is warranted in this case.

5.  Defendant is requesting this Judge replace the jury's verdict with a verdict of Not Guilty or Judgment of Acquittal because, as he would have this Court believe, the evidence was insufficient and inconclusive. These are all issues in the Jury's province and Your Honor instructed the Jury as to the evidence and what they should and should not consider. Defendant was satisfied with those instructions and the Jury followed the Judge's instructions in coming to a verdict.

6.  Defendant is not entitled to a stay on his sentence. He can file an appeals' bond if he appeals this case. However, Defendant has several escape

*1-25-05*

charges and he is a flight risk if allowed to be released considering the magnitude of the charges and the sentence received.

WHEREFORE, PREMISES CONSIDERED, the State respectfully asks this Court to deny Defendant's Motions filed in this case without hearing to better serve the Interests of Justice, Judicial Expediency and Judicial Economy.

Respectfully Submitted this the 14th day of January, 2004.

Carmella Johnson Penn (PEN015)
Assistant District Attorney
P.O. Box 5027
Union Springs, Alabama  36089
334-738-3720

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing Response upon counsel for Defendant, Attorney Keith Ausborn by placing a copy in the United States Mail properly addressed and postage prepaid.

Done this the 14th day of January, 2004

Carmella Johnson Penn

FILED IN OFFICE

FEB 0 4 2005

CLERK-REGISTER, BULLOCK CO., ALA.

January 28, 2005

David Williams
AIS#169189  G2C-230
1000 St. Clair Rd.
Springville, AL 35146

To: Clerk Wilbert Jernigan
Circuit Court Bullock County
217 N. Prairie Street
Union Springs, Al 36089

Re: Information regarding proceedings in case State of Alabama vs. David
Donnie Williams, case No. CC-04-144-145.

Dear Clerk,

My greetings to you. I'm writing in regards of my appeal. since I was
sentence in December 2004 I have not heard from my attorney Keith Ausborn
nor this Court concerning my appeal. I have not waived my rights to appeal
and I wish to appeal my conviction and sentence.

I would like to know whether a Notice of Appeal has been filed, wheether
a motion for new trial has been filed and what attorney will represent me
on appeal. Additionally, I would like a copy of all documents concerning
my appeal.

If it's possible would you please forward me the requested information.
I would like to thank you for your time and consideration in this matter.

Sincerely,

CC: Alabama Court of Criminal Appeals
Attorney    Ausborn

53

REV. 4/1/97

## NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
### BY THE TRIAL COURT CLERK

David Donnie Williams
_____     v.     | X | STATE OF ALABAMA
**APPELLANT'S NAME**                | | CITY OF _____
(as it appears on the indictment)                        **APPELLEE**

| X | CIRCUIT  | | DISTRICT  | | JUVENILE COURT OF  Bullock ____ COUNTY

CIRCUIT/DISTRICT/JUVENILE JUDGE:  Hon. L. Bernard Smithart

DATE OF NOTICE OF APPEAL:   January 31, 2005

(NOTE: If the appellant is incarcerated and files notice of appeal, this date should be the date on the certificate of service, or if there was no certificate of service, use the postmark date on the envelope.)

INDIGENCY STATUS:
Granted Indigency Status at Trial Court:     ☐ Yes ☒ No
Appointed Trial Counsel Permitted to Withdraw on Appeal:   ☐ Yes ☒ No
Indigent Status Revoked on Appeal:     ☐ Yes ☒ No

DEATH PENALTY:
Does this appeal involve a case where the death penalty has been imposed?   ☐ Yes ☒ No

TYPE OF APPEAL: (Please check the appropriate block.)
☒ State Conviction        ☐ Pretrial Appeal by State   ☐ Juvenile Transfer Order
☐ Rule 32 Petition        ☐ Contempt Adjudication      ☐ Juvenile Delinquency
☐ Probation Revocation    ☐ Municipal Conviction       ☐ Habeas Corpus Petition
☐ Mandamus Petition       ☐ Writ of Certiorari         ☐ Other(specify)

IF THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E., RULE 32 PETITION, WRIT OF HABEAS CORPUS, ETC.) OR FROM ANY OTHER ORDER ISSUED BY THE TRIAL JUDGE, COMPLETE THE FOLLOWING:

TRIAL COURT CASE NO.: _____

DATE ORDER WAS ENTERED: _____   PETITION: ☐ Dismissed   ☐ Denied   ☐ Granted

THIS IS AN APPEAL FROM A CONVICTION, COMPLETE THE FOLLOWING:
DATE OF CONVICTION:  11-23-04      DATE OF SENTENCE:  12-9-04

YOUTHFUL OFFENDER STATUS:
Requested:  ☐ Yes ☒ No      Granted:  ☐ Yes ☐ No

LIST EACH CONVICTION BELOW: (attach additional page if necessary)
1. Trial Court Case No.  CC-2004-144   CONVICTION:  Stalking
   Sentence:  38 years
2. Trial Court Case No. _____   CONVICTION: _____
   Sentence: _____
3. Trial Court Case No. _____   CONVICTION: _____
   Sentence: _____

| POST-JUDGMENT MOTIONS FILED: (complete as appropriate) | Date Filed | Date Denied | Continued by Agreement To (Date) |
|---|---|---|---|
| ☒ Motion for New Trial | 1/10/05 | 1/18/05 | |
| ☐ Motion for Judgment of Acquittal | | | |
| ☐ Motion to Withdraw Guilty Plea | | | |
| ☒ Motion in Arrest of Judgment | 1/10/05 | 1/18/05 | |
| ☒ Other  Motion for Stay | 1/10/05 | 1/18/05 | |

COURT REPORTER(S): Kelli Mills
ADDRESS: Bullock County Courthouse
Union Springs, Alabama 36089

APPELLATE COUNSEL: _____
ADDRESS: _____

APPELLANT: (IF PRO SE)  AIS# 169189
ADDRESS: 1000 St. Clair Road
Springville, Alabama 35146

APPELLEE (IF CITY APPEAL): _____
ADDRESS: _____

I certify that the information provided above is accurate to the best of my knowledge and I have served a copy of this Notice of Appeal on all parties to this action on this 9th day of February, 2005.

*Wilbert M. Jernigan*
CIRCUIT COURT CLERK

54

IN THE CIRCUIT COURT FOR
BULLOCK COUNTY, ALABAMA
CRIMINAL DIVISION

FILED IN OFFICE

FEB 2 4 2005

CLERK-REGISTER, Bullock Co., Ala.

STATE OF ALABAMA,                    *

    PLAINTIFF,                        *

                          *

VS.                                  * CASE NO.: <u>CC-2004-144-L.B.S.</u>
                          *
DAVID DONNIE WILLIAMS,               *

    DEFENDANT.                        *

## DEFENDANT'S AMENDED NOTICE OF APPEAL

    COMES NOW the Defendant, **DAVID DONNIE WILLIAMS,** via Counsel of Record, **ATTORNEY KEITH AUSBORN,** and hereby submit to this **HONORABLE COURT** said "**DEFENDANT'S <u>AMENDED</u> NOTICE OF APPEAL**"; whereby said Defendant hereby **APPEALS** both His "**NOVEMBER 23, 2004 JUDGMENT OF CONVICTION**"; "**DECEMBER 09, 2004 SENTENCE**" & "**JANUARY 18, 2005 ADVERSE POST – JUDGMENT ORDERS**" to **THE HONORABLE ALABAMA COURT OF CRIMINAL APPEALS.**

    **RESPECTFULLY SUBMITTED** this _____ day of _____, 2005.

ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

ATTORNEY KEITH AUSBORN – "DEFENDANT'S COUNSEL"
D/B/A "LAW OFFICE OF ATTORNEY KEITH AUSBORN"
1224 RYAN STREET
MONTGOMERY, ALABAMA 36107
(334) 264-9333 (WK.) & (334) 264-9339 (FAX)
E-MAIL ADDRESS: <u>KAILAWYER@KNOLOGY.NET</u>

## CERTIFICATE OF SERVICE

I, ATTORNEY KEITH AUSBORN, hereby certify that I have **SERVED** a copy of the foregoing upon the HON. LANE W. MANN; HON. TROY R. KING; HON. BENJAMIN C. REEVES; HON. KELLI MILLS & MR. DAVID DONNIE WILLIAMS, on this the ⟶ day of ⟶, 2005, all via "U. S. MAIL – REGULAR DELIVERY/FACSIMILE; BOX DELIVERY; U. S. MAIL – REGULAR DELIVERY; U. S. MAIL – REGULAR DELIVERY & U. S. MAIL – REGULAR DELIVERY", at their Last Known Addresses.

ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

FILED IN OFFICE

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 26 (front)    8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br>CR - ~~FEB 8/3 2005~~ |

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF BULLOCK  COUNTY

DAVID DONNIE WILLIAMS , Appellant

V.  ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF

| Case Number<br>CC-2004-144-L.B.S. | Date of Complaint or Indictment<br>UNKNOWN | Date of Judgment/Sentence/Order<br>01/19/05<br>11/23/04 12/09/04 ¢ |
| Number of Days of Trial/Hearing<br>(02)  Days | Date of Notice of Appeal<br>Oral:  N/A | Written: 01/31/05 |
| Indigent Status Requested: ☒ Yes ☐ No | Indigent Status Granted: ☐ Yes ☐ No "PENDING" |

**B. REPRESENTATION:** NOTE: "APPOINTED COUNSEL" REQ. PENDING.

Is Attorney Appointed or Retained?  ☒ Appointed  ☒ Retained.  If no attorney, will appellant represent self?  ☐ Yes ☒ No
☒ TRIAL COUNSEL ONLY.

Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)    Telephone Number
"APPOINTED COUNSEL" REQ. PENDING.    N/A

| Address<br>N/A | City<br>N/A | State<br>N/A | Zip Code<br>N/A |

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant N/A | Case Number N/A |
| Codefendant N/A | Case Number N/A |
| Codefendant N/A | Case Number N/A |

**D. TYPE OF APPEAL:** Please check the applicable block.

☒ 1 State Conviction  ☐ 4 Pretrial Order  ☐ 7 Juvenile Transfer Order  ☐ 10 Other (Specify)
☐ 2 Post-Conviction Remedy  ☐ 5 Contempt Adjudication  ☐ 8 Juvenile Delinquency
☐ 3 Probation Revocation  ☐ 6 Municipal Conviction  ☐ 9 Habeas Corpus Petition

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for state convictions.

☐ 1 Capital Offense - § _____    ☐ 6 Trafficking in Drugs - § _____    ☐ 11 Fraudulent Practices - § _____
☐ 2 Homicide - § _____    ☐ 7 Theft - § _____    ☐ 12 Offense Against Family - § _____
☐ 3 Assault - § _____    ☐ 8 Damage or Intrusion    ☐ 13 Traffic - DUI - § _____
☐ 4 Kidnapping/Unlawful    to Property - § _____    ☐ 14 Traffic - Other - § _____
   Imprisonment - § _____    ☐ 9 Escape - § _____    ☒ 15 Miscellaneous (Specify):
☐ 5 Drug Possession - § _____    ☐ 10 Weapons/Firearms - § _____    "STALKING" § 13A-6-90

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes ☒ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript?  ☒ Yes ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed.  02/22/05 (date)
3. If the answer to question "1" is "No":
   (a)  Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes ☒ No
   (b)  Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☐ Yes ☒ No
   NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).  N/A

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C    8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br>~~FILED IN OFFICE~~ |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT   ☐ DISTRICT COURT   ☐ JUVENILE COURT OF **BULLOCK**

**DAVID DONNIE WILLIAMS**

FEB 24 2005

CLERK-REGISTER, BULLOCK CO. ALA.                                                COUNTY

V.   ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF _____ Appellant

| Case Number<br>**CC04-144-L.B.S.** | Date of Judgment/Sentence/Order,<br>**11-23-04 -1/09/04 - 01/19/05** |
| Date of Notice of Appeal<br>Oral:  **N/A**          Written: **01/31/05** | Indigent Status Granted: **PENDING**<br>☐ Yes   ☐ No |

PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT. **MOTION FILED ON 02/22/**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

| Signature | Date | Print or Type Name |

PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED. Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:

COURT REPORTER(S)
**HON. KELLI MILLS**
**BULLOCK COUNTY CT. H.S.**
**UNION SPRINGS, AL**
**36089**

A. ☒ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

B. ☒ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause.  Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☒ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
| D. | | |
| E. | **N/A** | **N/A** |
| F. | | |
| G. | | |

IMPORTANT NOTICE:  The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT: **MOTION PENDING**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW.  I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.  **IN FORMA PAUPERIS**

| Signature | Date **02/22/05** | Print or Type Name **KATHA AUBURN, LSQ** |

DISTRIBUTION:  Original filed with Clerk of Trial Court and copies mailed to:   (1) Clerk of the Court of Criminal Appeals,   (2) the District Attorney,
(3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings.

58

FILED IN OFFICE

FEB 2 4 2005

CLERK-REGISTER, BULLOCK CO., ALA.

## IN THE CIRCUIT COURT FOR
## BULLOCK COUNTY, ALABAMA
## CRIMINAL DIVISION

STATE OF ALABAMA,                         *

      PLAINTIFF,                            *
                             *

VS.                                       * CASE NO.: <u>CC-2004-144-L.B.S.</u>
                             *

DAVID DONNIE WILLIAMS,                     *

      DEFENDANT.                            *

## <u>DEFENDANT'S MOTION FOR FREE TRANSCRIPT</u>
## <u>AND</u>
## <u>DEFENDANT'S MOTION FOR "IN FORMA PAUPERIS" STATUS</u>

      COMES NOW the Defendant, **DAVID DONNIE WILLIAMS**, via Counsel of Record, **ATTORNEY KEITH AUSBORN**, and hereby submit to this **HONORABLE COURT** said "**DEFENDANT'S MOTION FOR FREE TRANSCRIPT AND DEFENDANT'S MOTION FOR "IN FORMA PAUPERIS" STATUS**, for the reasons succinctly articulated below:

    A)  Said Defendant has a "**MERITORIOUS**" APPEAL that He desperately desires to Prosecute before **THE HONORABLE ALABAMA COURT OF CRIMINAL APPEALS.**

    B)  Unless this **HONORABLE COURT** <u>GRANTS</u> said Defendant a "**FREE TRANSCRIPT**" and "**IN FORMA PAUPERIS**" **STATUS**, said Defendant will be financially unable to Prosecute said "**MERITORIOUS**" APPEAL.

    C)  Said Defendant and Family are without any funds to pay to **THE COURT REPORTER**, and/or this **HONORABLE COURT** to acquire said "**TRIAL TRANSCRIPT**" & satisfy the "**APPEAL DOCKET FEE**" to **THE HONORABLE ALABAMA COURT OF CRIMINAL APPEALS.**

    D)  The Defendant's Mother; Sisters & Other Family Members have represented To the Defendant's Counsel that they have gone into <u>SUBSTANTIAL</u> "**DEBT**" exhausting their Surplus, and borrowing Monies to pay Attorney Fees for the Trial – Level Defense; of which the Undersigned Counsel Handled the Post – Judgment Motions Representation "**PRO BONO**". Accordingly, they further represent that they do <u>**NOT**</u> anticipate coming into Any Additional Funds to allocate for the "**TRANSCRIPT & APPEAL COSTS**", with Additional Attempts…being deemed an "**EXERCISE IN FUTILITY**".

E) Said Defendant is both "**INCARCERATED & INDIGENT**", and <u>**NOT**</u> realistically expected to acquire Any (Substantial) Monies to remotely meet the Costs Obligation of said "**MERITORIOUS**" APPEAL; henceforth, it is <u>**CRUCIAL**</u> that this **HONORABLE COURT** "**FAVORABLY**" consider the Instant Motions.

F) Said Defendant will <u>**SUPPLEMENT**</u> said Instant Motion with an "**AFFIDAVIT OF INDIGENCY/HARDSHIP**"... for this **HONORABLE COURT'S** <u>**FAVORABLE**</u> consideration, should the same be required.

G) Lastly, the "**BEST INTERESTS OF JUSTICE; JUDICIAL EXPEDIENCY & JUDICIAL ECONOMY**" warrant a <u>**GRANT**</u> of the Defendant's Aforementioned Motions... balancing the Constitutional Rights of the Defendant to Any and All Opposing Interests... Unknown at this time.

**RESPECTFULLY SUBMITTED** this _____ day of _____, 2005.

_____
**ATTORNEY KEITH AUSBORN**
**DEFENDANT'S COUNSEL (AUS010)**

ATTORNEY KEITH AUSBORN – "DEFENDANT'S COUNSEL"
D/B/A "LAW OFFICE OF ATTORNEY KEITH AUSBORN"
1224 RYAN STREET
MONTGOMERY, ALABAMA 36107
(334) 264-9333 (WK.) & (334) 264-9339 (FAX)
E-MAIL ADDRESS: <u>KAILAWYER@KNOLOGY.NET</u>

## CERTIFICATE OF SERVICE

I, **ATTORNEY KEITH AUSBORN**, hereby certify that I have <u>**SERVED**</u> a copy of the foregoing upon the HON. LANE W. MANN; HON. TROY R. KING; HON. BENJAMIN C. REEVES; HON. KELLI MILLS & MR. DAVID DONNIE WILLIAMS, on this the _____ day of _____, 2005, all via "U. S. MAIL – REGULAR DELIVERY/FACSIMILE; BOX DELIVERY; U. S. MAIL – REGULAR DELIVERY; U. S. MAIL – REGULAR DELIVERY & U. S. MAIL – REGULAR DELIVERY", at their Last Known Addresses.

_____
**ATTORNEY KEITH AUSBORN**
**DEFENDANT'S COUNSEL (AUS010)**

IN THE CIRCUIT COURT FOR
BULLOCK COUNTY, ALABAMA
CRIMINAL DIVISION

FILED IN OFFICE

FEB 2 4 2005

STATE OF ALABAMA,                    *

    PLAINTIFF,                       *

                         *

VS.                                  * CASE NO.: CC-2004-144-L.B.S.

DAVID DONNIE WILLIAMS,               *

    DEFENDANT.                       *

CLERK-REGISTER, BULLOCK CO., ALA.

## DEFENDANT'S COUNSEL'S MOTION TO WITHDRAW & DEFENDANT'S COUNSEL'S MOTION FOR APPOINTMENT OF APPOINTED COUNSEL FOR APPELLATE PROCEEDINGS

COMES NOW the Defendant, **DAVID DONNIE WILLIAMS**, via Counsel of Record, **ATTORNEY KEITH AUSBORN**, and hereby submit to this **HONORABLE COURT** said "**DEFENDANT'S COUNSEL'S MOTION TO WITHDRAW & DEFENDANT'S COUNSEL'S MOTION FOR APPOINTMENT OF APPOINTED COUNSEL FOR APPELLATE PROCEEDINGS**", for the reasons succinctly articulated below:

A) Said Defendant has a "**MERITORIOUS**" **APPEAL** that He desperately desires to Prosecute before **THE HONORABLE ALABAMA COURT OF CRIMINAL APPEALS.**

B) Unless this **HONORABLE COURT GRANTS** said Defendant "**APPOINTED APPELLATE COUNSEL**", said Defendant will be financially unable to Prosecute said "**MERITORIOUS**" **APPEAL.**

C) Said Defendant and Family are **WITHOUT** Additional Funds to pay to **THE UNDERSIGNED COUNSEL** for "**APPELLATE REPRESENTATION**" Before **THE HONORABLE ALABAMA COURT OF CRIMINAL APPEALS.**

D) The Defendant's Mother; Sisters & Other Family Members have represented To the Defendant's Counsel that they have gone into **SUBSTANTIAL** "**DEBT**" exhausting their Surplus, and borrowing Monies to pay Attorney Fees for the Trial – Level Defense; of which the Undersigned Counsel Handled the Post – Judgment Motions Representation "**PRO BONO**". Accordingly, they further represent that they do **NOT** anticipate coming into Any Additional Funds to allocate for the "**APPELLATE REPRESENTATION**", with Additional Attempts…being deemed an

"EXERCISE IN FUTILITY".

E) Said Defendant is both "INCARCERATED & INDIGENT", and **NOT** realistically expected to acquire Any (Substantial) Monies to remotely meet the Costs Obligation of said "MERITORIOUS" APPEAL; henceforth, it is **CRUCIAL** that this HONORABLE COURT "FAVORABLY" consider the Instant Motions.

F) Said Defendant will **SUPPLEMENT** said Instant Motion with an "AFFIDAVIT OF INDIGENCY/HARDSHIP"... for this HONORABLE COURT'S **FAVORABLE** consideration; should the same be required.

G) Lastly, the "**BEST INTERESTS OF JUSTICE; JUDICIAL EXPEDIENCY & JUDICIAL ECONOMY**" warrant a **GRANT** of the Defendant's Aforementioned Motions... balancing the Constitutional Rights of the Defendant to Any and All Opposing Interests... Unknown at this time.

RESPECTFULLY SUBMITTED this _____ day of _____, 2005.

ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

ATTORNEY KEITH AUSBORN – "DEFENDANT'S COUNSEL"
D/B/A "LAW OFFICE OF ATTORNEY KEITH AUSBORN"
1224 RYAN STREET
MONTGOMERY, ALABAMA 36107
(334) 264-9333 (WK.) & (334) 264-9339 (FAX)
E-MAIL ADDRESS: KA1LAWYER@KNOLOGY.NET

## CERTIFICATE OF SERVICE

I, ATTORNEY KEITH AUSBORN, hereby certify that I have **SERVED** a copy of the foregoing upon the HON. LANE W. MANN; HON. TROY R. KING; HON. BENJAMIN C. REEVES; HON. KELLI MILLS & MR. DAVID DONNIE WILLIAMS, on this the _____ day of _____, 2005, all via "U. S. MAIL – REGULAR DELIVERY/FACSIMILE; BOX DELIVERY; U. S. MAIL - REGULAR DELIVERY; U. S. MAIL – REGULAR DELIVERY & U. S. MAIL – REGULAR DELIVERY", at their Last Known Addresses.

ATTORNEY KEITH AUSBORN
DEFENDANT'S COUNSEL (AUS010)

IN THE CIRCUIT COURT FOR
BULLOCK COUNTY, ALABAMA
CRIMINAL DIVISION

STATE OF ALABAMA,                 *

      PLAINTIFF,           *

VS.                           * CASE NO.: <u>CC-2004-144-L.B.S.</u>

DAVID DONNIE WILLIAMS,     *

      DEFENDANT.        *

<u>ORDER</u>

The above styled cause having come before this **HONORABLE COURT** on the "**DEFENDANT'S COUNSEL'S MOTION TO <u>WITHDRAW</u>**", and this **HONORABLE COURT** having carefully read and considered the same, and for "**GOOD CAUSE**" shown, it is hereby <u>**ORDERED**</u> that said **MOTION** is due to be and hereby is <u>**GRANTED**</u>.

Finally; also for "**GOOD CAUSE**" shown, said "**DEFENDANT'S MOTION FOR APPOINTED COUNSEL**" is due to be, and hereby is _Granted_, with it being further <u>**ORDERED**</u> that ATTORNEY _Gene Spencer_ is hereby Appointed to Legally Represent the Defendant's Legal Interests in All Appellate Proceedings.

DONE this the _2nd_ day of _March_, 2005.

_<B+ Self>_

HON. L. BERNARD SMITHART
CIRCUIT JUDGE

C: HON. BENJAMIN C. REEVES – "BULLOCK COUNTY D. A.";
   HON. LANE W. MANN – "CLERK – A.C.O.C.A.";
   HON. TROY R. KING – "STATE ATTORNEY GENERAL";
   HON. KELLI MILLS – "CERTIFIED COURT REPORTER";
   ATTY. _Gene Spencer_ – "DEFENDANT'S APPELLATE COUNSEL"
   ATTY. KEITH AUSBORN – "DEFENDANT'S TRIAL COUNSEL"
&
   MR. DAVID DONNIE WILLIAMS – "DEFENDANT/APPELLANT"
   A.I.S.#: 169189; G2C – 230
   1000 ST. CLAIR ROAD
   SPRINGVILLE, ALABAMA 35146 - 5582

CERTIFICATE OF COMPLETION AND
TRANSMITTAL OF RECORD ON APPEAL
-BY TRIAL CLERK

DavidDDonnieWWilliams
_____
APPELLANT
v.

State Of Alabama
APPELLEE

TO:  The Clerk Of the Court of
Criminal Appeals of Alabama

CASE NO.:  __CC 2004-144__

DATE OF NOTICE  OF APPEAL: 1-31-05

    I certify that I have this date completed and transmitted
herewith to the appellate court the record on appeal by assembling
in ( __3__ volumes of 200 pages each and one volume of __25__ pages)
the clerk's record and the reporter's transcript and that one copy
each of the record on appeal has been served on the defendant and
the Attorney General of the State of Alabama for the preparation of
briefs.

    I certify that a copy of this certificate has this date been
served on counsel for each party the appeal.

DATED this __1st__ day of __July_____, XX 2005.

_Wilbert M. Jernigan_
Circuit Clerk

__Bullock_____
County

63

AP 12-3 Letter of Transmittal of Notice of Appeal to the Court of Criminal Appeals by Trial Clerk   Printed and for Sale by Roberts & Son, Birmingham

## LETTER OF TRANSMITTAL OF NOTICE OF APPEAL TO
## THE COURT OF CRIMINAL APPEALS BY
### TRIAL CLERK

David Donnie Williams
_____
Appellant

V.

STATE OF ALABAMA
Appellee

Offense ____ **Stalking** ____

Sentence ____ **38 Years** ____

Notice of Appeal ____ 1-31-05 ____
Date Filed

Judgement Entry ____ 12-09-04 ____
Date Entered

[   ]   Oral notice of appeal has been given prior to or on the date of entry of the judgment of conviction in this cause,

[ X ]   Written notice of appeal has been filed on the date indicated hereon (within 42 days from the entry of judgment or the order overruling a post conviction motion),

A certified copy of the entry of record of the oral notice of appeal or the written notice of appeal is forwarded herewith for filing with the Court of Criminal Appeals.

I certify that I have served a copy of this letter of transmittal along with a copy of the notice of appeal on each of the following:

1.  Court Reporter (Name and address) _____
2.  Defendant
3.  Defendant's appellate counsel. (Name and address)_____
4.  District Attorney
5.  Attorney General

DATED this ____1st____ day of ____July____ XIO 2005 _____

_Wilbert M. Jernigan_
Circuit Clerk

1           IN THE THIRD JUDICIAL CIRCUIT
         IN AND FOR BULLOCK COUNTY, ALABAMA
2

3    STATE OF ALABAMA,
            Plaintiff,
4
                           Circuit Court Criminal
5    Vs.                   Action Nos. CC-2004-144 & 145

6
     DAVID DONNIE WILLIAMS,
7           Defendant.

8

9

10        * * * * * * * * * * * * * * * * * * * *
          REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL
11        * * * * * * * * * * * * * * * * * * * *

12

13        Criminal Trial Proceedings taken in the

14   above-styled cause in the Bullock County Courthouse,

15   Union Springs, Alabama, on November 22, 2004 and

16   December 9, 2004, before the Honorable Burt Smithart.

17

18                    APPEARANCES

19   ON BEHALF OF THE STATE:
          Carmella Penn,
20        Assistant District Attorney

21   ON BEHALF OF THE DEFENDANT:
          Keith Ausborn,
22        Attorney at Law

23

24              OFFICIAL COURT REPORTER
                   Kelli Wise Mills
                  408 N. Prairie Street
25        Union Springs, Alabama 36089
                  (334) 738-3284



```
 1                            INDEX

 2   MOTIONS . . . . . . . . . . . . . . . . . . . .5
     COURT'S OPENING REMARKS . . . . . . . . . . . 12
 3   OPENING STATEMENTS . . . . . . . . . . . . . .19

 4   WITNESSES CALLED ON BEHALF OF THE STATE:
             CALLIE WILLIAMS
 5               DX by Mrs. Penn . . . . . . . . . .19
                 CX by Mr. Ausborn . . . . . . . . .61
 6               RD by Mrs. Penn . . . . . . . . . 122

 7           JOHNNIE M. BAKER
                 DX by Mrs. Penn . . . . . . . . . 133
 8               CX by Mr. Ausborn . . . . . . . . 140

 9           JOHN TAYLOR
                 DX by Mrs. Penn . . . . . . . . . 170
10               CX by Mr. Ausborn . . . . . . . . 177
                 RD by Mrs. Penn . . . . . . . . . 197
11               RD by Mr. Ausborn . . . . . . . . 202

12           WILBERT JERNIGAN
                 DX by Mrs. Penn . . . . . . . . . 207
13               CX by Mr. Ausborn . . . . . . . . 216
                 RD by Mrs. Penn . . . . . . . . . 240
14
             NARKEISHA WILLIAMS
15               DX by Mrs. Penn . . . . . . . . . 244
                 CX BY Mr. Ausborn . . . . . . . . 253
16               RD by Mrs. Penn . . . . . . . . . 267

17           QUADARIUS WILLIAMS
                 DX by Mrs. Penn . . . . . . . . . 272
18               CX by Mr. Ausborn . . . . . . . . 281
                 RD by Mrs. Penn . . . . . . . . . 296
19               RX by Mr. Ausborn . . . . . . . . 301
                 FRD by Mrs. Penn . . . . . . . . .306
20
             ANTHONY BLAKELY
21               DX by Mrs. Penn . . . . . . . . . 307
                 CX by Mr. Ausborn . . . . . . . . 325
22               RD by Mrs. Penn . . . . . . . . . 338

23           LIEUTENANT DURWOOD FREEMAN
                 DX by Mrs. Penn . . . . . . . . . 339
24               CX by Mr. Ausborn . . . . . . . . 353
                 RD by Mrs. Penn . . . . . . . . . 365
25               RX by Mr. Ausborn . . . . . . . . 367
```

LAKEISHA WILLIAMS
    DX by Mrs. Penn . . . . . . . . . . . 368
    CX by Mr. Ausborn . . . . . . . . . . 386
    RD by Mrs. Penn . . . . . . . . . . . 408
    RX by Mr. Ausborn . . . . . . . . . . 413


WITNESSES CALLED ON BEHALF OF THE DEFENDANT:

    ROBERT E. EDWARDS
        DX by Mr. Ausborn . . . . . . . . . .420
        CX by Mrs. Penn . . . . . . . . . . .436

    LYNN JONES
        DX by Mr. Ausborn . . . . . . . . . .447
        CX by Mrs. Penn . . . . . . . . . . .457

    CALLIE WILLIAMS
        RX by Mr. Ausborn . . . . . . . . . .459
        FRD by Mrs. Penn . . . . . . . . . . 490
        VD by Mr. Ausborn . . . . . . . . . .492
        FRD (Cont'd) . . . . . . . . . . . . 492
        VD by Mr. Ausborn . . . . . . . . . .494
        FRD (Cont'd) . . . . . . . . . . . . 495
        VD by Mr. Ausborn . . . . . . . . . .497
        EX by The Court . . . . . . . . . . .502
        FRD (Cont'd) . . . . . . . . . . . . 503
        FRX by Mr. Ausborn . . . . . . . . . 510

REBUTTAL WITNESSES CALLED ON BEHALF OF THE STATE:

    JENNY RENFROE
        DX by Mrs. Penn . . . . . . . . . . .512
        DX (Cont'd) . . . . . . . . . . . . .515
        CX by Mr. Ausborn . . . . . . . . . .517
        EX by The Court . . . . . . . . . . .529
        RD by Mrs. Penn . . . . . . . . . . .530
        RX by Mr. Ausborn . . . . . . . . . .531


MOTIONS . . . . . . . . . . . . . . . . . . 415
CLOSING ARGUMENTS . . . . . . . . . . . . . 533
JURY CHARGE . . . . . . . . . . . . . . . . 535
VERDICT . . . . . . . . . . . . . . . . . . 549
SENTENCING . . . . . . . . . . . . . . . . .551

1

STATE'S EXHIBITS

2

3    STX 1 . . . . . . . . . . . . . . . 172

4    STX 2 . . . . . . . . . . . . . . 211

5    STX 3 . . . . . . . . . . . . . . 309

6    STX 4 . . . . . . . . . . . . . . 491

7    STX 5 . . . . . . . . . . . . . . 495

8    STX 6 . . . . . . . . . . . . . . 503

9    STX 7 . . . . . . . . . . . . . . 529

10

11

DEFENDANT'S EXHIBITS

12    DFX 1 . . . . . . . . . . . . . . .106

13    DFX 2 . . . . . . . . . . . . . . .113

14    DFX 3 . . . . . . . . . . . . . . .118

15    DFX 5 . . . . . . . . . . . . . . .478

16    DFX 6 . . . . . . . . . . . . . . .479

17

18

19

20

21

22

23

24

25

```
 1              (On November 16, 2004, a jury venire was

 2               brought in, duly sworn and qualified, from

 3               which a jury was struck, seated in the jury

 4               box without objection from either counsel,

 5               given a recess instruction by the Court and

 6               released until November 22, 2004.)

 7          (The following proceedings were held

 8           November 22, 2004, in open court outside

 9           the presence of the jury:)

10          (Defendant present with counsel.)

11                         MOTIONS

12          THE COURT:  Kelli, this is Case Number

13     CC-2004-144 and 145, State versus David Donnie

14     Williams.

15          Mr. Williams is present represented by Keith

16     Ausborn and the State by Carmella Penn.

17          The State has filed a notice of intent to

18     present 404(b) evidence related to the prior

19     convictions that are listed in the motion.

20          The defense has asked for oral arguments with

21     regard to this motion.

22          MRS. PENN:  Your Honor, it was my intent that

23     the first three prior convictions, as well as the

24     two that I'm about to argue, will be offered in a

25     motion to enhance upon conviction.
```

1          Numbers 4 and 5 and an Escape Second,

2    CC-2001-10 and CC-2001-104, these prior convictions

3    involve the current victim in this case.  This is a

4    domestic violence/harassment charge and a stalking

5    charge that we are currently here on today.

6        This is an ongoing crime, the stalking is.  And

7    in 2001, the defendant was convicted on charges

8    where Callie Williams was the victim as well.

9        There were two assault charges brought with

10    that.  He was charged with burglary.  He broke

11    in to the house and stole property from her and her

12    daughter and assaulted both of them taking both of

13    them away from their home, assaulting both of them.

14        I think as a part of the plea arrangement, the

15    assault charges were pled away, but he was

16    convicted of theft of property.  He stole property

17    from her and her daughter in that particular case.

18        And the escape case is once he was arrested, he

19    escaped.  And those would be the charges that the

20    State would be asking to present at trial.

21        THE COURT:  So you are wanting to present the

22    Theft of Property Second and the Escape Second as

23    part of the full charges that were brought

24    originally?  Those are the only two he pled to, but

25    there were other charges brought that involved the

same victim that were nol prossed in a plea bargain
in your office.

Any law on that?

MRS. PENN:  Just the prior bad acts and the
fact that he was convicted.

MR. AUSBORN:  Your Honor, we would strenuously
object to this 404 motion.

We oppose it in that the constitution,
statutorily speaking, the State cannot offer prior
bad acts as proof and conformity to charges that
are totally irrelevant to what he is charged with
in the two other indictments.

As the Court is very aware, a defendant is
cloaked with the legal presumption of innocence
until and unless proven guilty beyond a reasonable
doubt.

The fact that these cases were plea bargained
down is indicative that the State did not pierce
that legal cloak and presumption.

The charges of burglary and escape are
irrelevant offenses as it relates to the two
offenses which he is charged today.

The precarious position that this would place
us in, if the Court were to grant this motion by
the State, is that it would necessarily force my

1        client to surrender his constitutional right to

2        remain silent in this case because he would

3        absolutely have to take the stand in order to

4        defend against the contentions made for by the

5        victim as relates to those old charges.

6            Unquestionably, if he did not take the

7        stand -- Unquestionably, we are talking about

8        highly prejudicial evidence that would come forth

9        that obviously would divest him to his

10       constitutional right to a fair trial in this case.

11           THE COURT:  As to Theft of Property and Escape,

12       those are out.  The motion to suppress is granted

13       concerning those.

14           However, prior acts of domestic violence

15       concerning this victim whether nol prossed or not

16       can be brought in through the testimony of the

17       victim.

18           She can talk about what complaint she signed

19       and what the ultimate disposal was, but I want her

20       instructed not to talk about Mr. Williams' other

21       charges.  Those cases were nol prossed.

22           MR. AUSBORN:  Your Honor, I would ask that the

23       Court give a detailed and limiting instruction to

24       this jury that those were allegations that the

25       state contended that my client committed; however,

1     he was not found guilty of those particular

2     allegations. Because if the Court doesn't give a

3     limiting instruction, he, again, necessarily is

4     still going to have to take the stand in order to

5     aggressively oppose.

6        THE COURT: I'll look and see how it goes. If

7     he doesn't testify, the prior conviction isn't

8     going to come in. If he does, they can cross him.

9        MR. AUSBORN: What was that, now, Your Honor?

10        THE COURT: I am saying where this Theft of

11     Property Second and Escape was plea bargained down,

12     if Mrs. Penn questions him and he says, yes, and

13     describes those without going into conviction, and

14     you decide to cross, then I would probably let

15     Mrs. Penn bring back the total circumstances and

16     all.

17        Do you see what I'm saying?

18        MR. AUSBORN: I necessarily have to cross.

19     Because if I don't challenge that, then the jury

20     takes the position --

21        THE COURT: I want your cross limited to those

22     cases didn't go forward and they were dismissed and

23     nol prossed by the State.

24        And if we leave it at that point, I think

25     that's the fairest way to doll it.

1        MRS. PENN:  Judge, as to the original motion I

2    argued those second two, but there are other

3    charges, and those are not going -- we are not

4    arguing them for the proof of the matter asserted.

5        THE COURT:  I don't understand.

6        MRS. PENN:  Your Honor, basically he is a

7    criminal, and he has the propensity to commit

8    crimes; and, Your Honor, basically, I believe, why

9    the district attorney filed that motion in the

10    case.

11        THE COURT:  That's what I am saying.  I am

12    taking it off for you.

13        MRS. PENN:  That's what I'm saying.  I wanted

14    to make sure that I didn't take it off.

15        I think it is proper for sentencing.  I think

16    404 and 403 read together.

17        You have something more than what you've got?

18        MR. AUSBORN:  Your Honor, the other thing I've

19    got is I know the State has orally moved and

20    noticed the defendant of their intent to sentence

21    this defendant --

22        THE COURT:  Orally or in writing?

23        MR. AUSBORN:  That's my argument.  That does

24    not negate their responsibility to put it in

25    writing.

1    MRS. PENN:  I could have faxed it to him, but

2    he had his phone transferred.

3    THE COURT:  What's the plea offer?  Was it in

4    the plea offer?

5    MRS. PENN:  We had all of the priors.

6    THE COURT:  All right.

7    MR. AUSBORN:  Your Honor, what are the

8    parameters on opening?  I suspect that it will be a

9    pretty quick trial.

10    THE COURT:  I usually don't put any on

11    openings.

12    Anything else?

13    MR. AUSBORN:  No, sir.

14    THE COURT:  Bring them in, Smitty.

15    (Whereupon a Bench conference was held outside

16    the hearing of the reporter.)

17    THE COURT:  Are you invoking the Rule?

18    MRS. PENN:  Yes, Your Honor.

19    (Whereupon the Rule was invoked and all

20    potential witnesses left the courtroom.)

21    (Whereupon the jury was seated in the jury

22    box, and the following proceedings were had in

23    open court within the presence and hearing of

24    the jury:)

25    THE COURT:  Good morning.  Is everybody

```
 1    comfortable?  As comfortable as you can be in those

 2    seats with no lights.

 3         By way of reminder, this is Case Number

 4    CC-04-144 and 145, State of Alabama versus David

 5    Donnie Williams.

 6         Just as a reminder, I am Judge Smithart.  This

 7    is Carmella Penn with the district attorney's

 8    office, the victim Callie Williams.  The defense

 9    attorney Mr. Keith Ausborn, and the defendant David

10    Donnie Williams.

11         When we struck the jury the other day, I read

12    to you the indictments.  One was for Stalking and

13    one was for Domestic Violence Third.

14         As I told you then, the indictments are just

15    the formal way charges are brought against

16    somebody.  The State has the burden of proof and

17    that burden never shifts.  That burden is beyond a

18    reasonable doubt.  This is a criminal trial.

19         I need for each of you to raise your right hand

20    and to be sworn in as the jury to try the case of

21    State of Alabama versus David Donnie Williams.

22         (Whereupon the jury was sworn.)

23              COURT'S OPENING REMARKS

24         THE COURT:  Ladies and gentlemen, before we

25    broke after the jury striking, I gave you what was
```

1  called a recess instruction, where I talked to you

2  about your conduct as jurors and about the Court

3  order concerning not talking about the case or

4  letting the case be talked about in front of you or

5  doing any kind of research or experiments on the

6  case or looking up any law or visiting the scene of

7  any occurrence.

8      Do y'all remember that instruction?

9      (Affirmative response from the jury.)

10     THE COURT:  I'll ask you periodically

11 throughout this trial if you found out anything

12 about this case other than the arguments of the

13 lawyers and the testimony.  And before women start,

14 I need to ask that question:

15     Have any members of the jury had any kind of

16 contact or conversation concerning this case that

17 needs to be reported to the Court?

18     (Negative response from the jury.)

19     THE COURT:  I'll renew that instruction.  And

20 it applies to your service throughout this trial.

21     Don't discuss the case even amongst yourselves

22 because that wouldn't be fair to both sides.

23     I want you to wait and discuss the case after

24 the close of the case.  By close of the case, I'll

25 tell you just briefly how that goes.

14

1      You will have the case presented by the State

2   and then the defense, then you'll have closing

3   arguments, and then you'll have an instruction

4   given by me.  And that instruction is the law that

5   you are to apply to a certain case.

6      I'll give you the law that you need when

7   deciding this case, and then you will go back and

8   begin your deliberations.  Then and only then will

9   it be appropriate for you to discuss the case.

10      Does everybody understand?

11      (Affirmative response from the jury.)

12      THE COURT:  With that is the State satisfied

13   with just a brief reminder of a recess instruction

14   from this point forward?

15      MRS. PENN:  Satisfied.

16      THE COURT:  Defense?

17      MR. AUSBORN:  Satisfied.

18      THE COURT:  Ladies and gentlemen of the jury,

19   before proceeding with the trial of this case, it

20   may be helpful for you to have an understanding of

21   the rules of procedure that will be followed by you

22   and by the Court in this case.  When a judge and

23   jury sit together in a court of law, it's the duty

24   of the judge to see that the trial progresses in an

25   orderly fashion, to rule upon the legal matters

1    that are presented and define the issues that are

2    involved in the case, and then finally to instruct

3    you as to the law that you're to apply to a

4    particular case.

5        It's your duty as jurors to follow the law so

6    stated to you by the judge.  You will therefrom

7    return a verdict in accordance with the facts as

8    you determine them to be from the evidence and the

9    law given to you by the Court.

10       This is a criminal case and the procedure will

11   be as follows:  First, counsel for the State will

12   make an opening statement of their case.  Counsel

13   for the defense will then respond with a statement

14   of their defense.  Each side will be confined to an

15   outline of what they expect the evidence to show.

16   These statements are not evidence but are given to

17   you to familiarize you with the case and to

18   acquaint you with the contentions of each side from

19   the beginning.

20       Following opening statements, evidence will be

21   presented by witnesses and perhaps from exhibits.

22   In receiving the evidence, you should bear in mind

23   that as officers of the court, the attorneys have a

24   duty to present the evidence on behalf of the

25   parties they represent, to make such objections as

they deem proper, and to fully argue their party's cause.

An attorney's statements are not evidence but are given to you to help you understand the evidence and apply the law.  Therefore, you should consider in your verdict only statements supported by the evidence and by the law given to you by the Court.

Likewise, statements made by the Court are not evidence, and they're not to be so considered by you as evidence.

During the trial, I'll be called upon to rule on objections as to the admissibility of testimony or other evidence.  You must not concern yourself with the reason for my rulings since those are controlled and required by the rules of law.

You're not to speculate as to possible answers to questions which I do not require to be answered.  Additionally, the overruling of an objection to evidence is not intended to indicate the weight to be given that evidence by you.

Occasionally during the trial, it will be necessary for me to confer with the attorneys outside of your presence.  I may excuse you from the courtroom or we may whisper up here at the

1    Bench or we may go outside.  You're not to consider

2    these conferences in any way or let them in any way

3    affect your verdict.  That's not evidence.  The

4    evidence will come to you from witnesses and from

5    exhibits.  You should not speculate on the content

6    of any of those conversations nor allow the

7    conference or any inference you might draw affect

8    your verdict in any way.

9        Following the close of the evidence, counsel

10    will again address you in closing arguments.  In

11    these arguments, they will discuss the evidence and

12    all the reasonable inferences to be drawn therefrom

13    to help guide you to a true and just verdict.

14    Counsel for the State will start, followed by the

15    defense, and then again by the State because the

16    State has the burden of proof.

17        You will be the sole and exclusive judges of

18    the facts of this case.  It will be your duty to

19    attempt to reconcile all the testimony of all the

20    witnesses so as to make them all speak the truth if

21    that can be reasonably done.  If you cannot

22    reasonably reconcile all the testimony, it's then

23    your duty to consider the testimony with a view of

24    determining what the true facts are.

25        In doing so, you may accept or reject any part

1    of any testimony of any witness and accept only the

2    testimony that you consider to be worthy of belief.

3        In determining what the true facts are from the

4    testimony, you may take into consideration any

5    natural interest or bias a witness may have as a

6    result of their connection with the case.  You may

7    take into account any interest or bias a witness

8    may show while testifying.  You may take into

9    consideration the demeanor of the witness as to

10   whether that witness has apparently testified

11   frankly or evasively.  You may take into

12   consideration any matter which you would use in

13   your everyday affairs in deciding upon the

14   truthfulness and accuracy of someone's testimony.

15       Weigh the testimony that you hear today in

16   light of your common observations and everyday

17   experiences and reach a verdict that will be based

18   upon the truth as you determine it from all of the

19   evidence.

20       In this case, your verdict must be unanimous.

21       With that is the State ready to proceed?

22       MRS. PENN:  Ready, Your Honor.

23       THE COURT:  Defense?

24       MR. AUSBORN:  Ready, Your Honor.

25       THE COURT:  Opening for the State.

1          OPENING STATEMENTS

2               (Whereupon Mrs. Penn presented her opening

3                statements to the jury on behalf of the

4                State, and no objections were made

5                thereto.)

6               THE COURT:  For the defense.

7               (Whereupon Mr. Ausborn presented his opening

8                statements to the jury on behalf of the

9                defendant, and no objections were made

10               thereto.)

11              THE COURT:  Call your first witness.

12              MRS. PENN:  Callie Williams.

13                    CALLIE M. WILLIAMS

14      having first been duly sworn, testified as follows:

15                    DIRECT EXAMINATION

16      BY MRS. PENN:

17      Q.   State your name for the ladies and gentlemen of the

18           jury, please.

19      A.   Callie M. Williams.

20      Q.   Mrs. Williams, where do you reside?

21      A.   1010 MLK Boulevard, Lot 2, Union Springs, Alabama,

22           36089.

23      Q.   Do you know Donnie Williams?

24      A.   Yes, I do.

25      Q.   Where do you work?

```
 1   A.   Wayne Farms.

 2   Q.   How long have you been working at Wayne Farms?

 3   A.   Almost seven years.

 4   Q.   And how did you come to know Mr. Williams?

 5   A.   I was sitting on my step one day, June of '97, and

 6        he was passing by with his nephew in a white

 7        Explorer, and he said, hey, how you doing.  I said,

 8        I'm doing fine.  And he said, I'll be back to

 9        holler at you; and I said, okay.  And the next day

10        he came up there and we had conversation about

11        getting together and everything.

12   Q.   And you began a relationship at that point?

13   A.   Yes.

14   Q.   And so you had been dating Mr. Williams since '97

15        up until what time?

16   A.   Yes, off and on.  Yes.  We have broken up and went

17        back together.

18   Q.   Up until what time?

19   A.   We have dated several times.  I can't remember all

20        of the dates in the year.

21   Q.   When was the last time?

22   A.   This year, March the 24th -- I mean march 19th when

23        I broke up with him.

24   Q.   And you said you had broken up off and on several

25        times throughout the years.
```

```
 1              Any particular reason you broke it off and went
 2         back and broke it off and went back?
 3    A.   He kept talking about he was going to change and do
 4         this for me and do that for me.  And he said he
 5         didn't want to see me with anybody else.  That's
 6         what he was telling me.
 7    Q.   When he said he was going to change, what did he
 8         mean?
 9    A.   I thought he was going change.  I thought he was
10         for real.
11    Q.   Do you know what he was saying he was going to
12         change?  What was it?
13    A.   He was on crack.  He was on drugs real bad, and he
14         told me he was going to leave drugs alone.
15    Q.   Let's go to March 19th.  You broke up on March
16         19th.
17              Were you at home?  Tell me about that date and
18         how you broke up with Donnie.
19    A.   We were off at Wayne Farm on March 19th.  We got
20         paid on March 18th.  He got paid and he offered to
21         give me some money.  And I got off the (inaudible)
22         and he was standing outside with another friend of
23         his, and he offered me $60.  And he said, Callie,
24         I'll be back in 20 minutes.  And time went to going
25         and going and he gave me some money to hold for
```

```
 1        him, and I said, Donnie, don't take the money to
 2        throw it all away; you need to save the $120.  And
 3        then he left and came back again and asked for
 4        $120.  And I stated, don't go and throw it away
 5        because you promised to give me some money every
 6        week.  And then he said, I'll be back in a few
 7        minutes.  And time went to going and going and
 8        going, and about 6:30 that morning, I called my
 9        daughter and said, will you please come pick him up
10        (sic).  And at that time, he grabbed my cellular
11        phone too.  On March 18th, he grabbed my cellular.
12             THE COURT:  Slow down and speak up,
13        Ms. Williams.  The court reporter can't understand
14        you.
15   Q.   Okay.  Before we stopped, you called your daughter,
16        what happened as a result of that phone call to
17        your daughter at 6:30 in the morning?
18   A.   I told Lakeisha would she come pick me up because I
19        had a feeling something was going to happen.  And
20        it was about 6:40, and I left, and she had never
21        showed up.  And I went on to my daughter's house to
22        lay down and go to sleep.  And then later on that
23        afternoon, we went over there to pick the kids up
24        when they get off the bus.  And finally his
25        brother-in-law brought him over to my house, and I
```

```
 1        told him to give me my cellular phone; I don't want
 2        you no more because you have gotten back on that
 3        crack.  And I went on in the house, and he came
 4        back knocking on the door.  And I said, Donnie, go
 5        on; I don't want you anymore.  And he said, what
 6        you doing over here -- (unintelligible).
 7             And I took him over to the house, and I
 8        wouldn't go in the house.  I was afraid of this man
 9        because he was full of crack.  And he said, Callie,
10        come do something to me.  And I got in the car and
11        went to the high school looking for my son.  And I
12        picked him up looking for him at my house.
13             And Donnie came over again behind me all day
14        the 19th.  And he was constantly behind me and then
15        later on that night about 9:00, he came back again.
16        And I said, Donnie, go on and leave me alone.  And
17        I went on and was talking to my daughter and
18        friends that was in the house with her.  And then
19        he came back again.  And he wouldn't leave me alone
20        and I had left my house.  He was constantly coming
21        back.
22   Q.   This was on the 19th?
23   A.   Yes.
24   Q.   How many times did he come to your daughter's house
25        that evening?
```

```
 1   A.   Several times.  I can't remember; five or six
 2        times.
 3   Q.   Did you ever go home on the 19th?
 4   A.   I went over there to pick my daughter off the bus,
 5        but I wouldn't go in the house because he was full
 6        of that crack.
 7   Q.   Was he in the car with you off and on?
 8   A.   Yes.
 9   Q.   I don't know if the jury --
10             He was in the car with you?
11   A.   Yeah, he had asked me.
12   Q.   Hold up.  Let me ask a question and then you just
13        answer it.  That will help the court reporter out.
14             You took him to your house, but you didn't get
15        out of the car; correct?
16   A.   Yeah, because I was afraid.
17   Q.   You picked your daughter up?
18   A.   Yes.
19   Q.   And then I believe you said you went to the high
20        school to get your son?
21   A.   Yes.
22   Q.   Where did you go when you left there?  And just
23        answer the question I'm asking you.
24   A.   When I went to pick up my son, I came back by the
25        house and he wanted me to take him back out there.
```

```
 1   Q.   You went back to your house?

 2   A.   Yes.

 3   Q.   And was Donnie there?

 4   A.   Yes.

 5   Q.   And you took him somewhere?

 6   A.   Yes.

 7   Q.   Where did you take him to?

 8   A.   It was out there -- he told me to take him out to

 9        (inaudible) Trailer Park.  This girl he was

10        supposed to get some (unintelligible) from, she was

11        from up north somewhere.

12   Q.   Did you take him to Hendley?

13   A.   Yes, I did.

14   Q.   Did you wait on him?

15   A.   He never got out of the car.  He said that was the

16        wrong place.  I said that's where you told me to

17        go.

18   Q.   Where did you take him after that?

19   A.   He told me to go up -- I haven't been up the road

20        in years he wanted me to go back in.  He wanted me

21        to go up in one of those roads to take me up a back

22        dirt road so he could kill me.  I knew that was

23        what he was trying to do.

24   Q.   Let's do the question/answer thing.  You went to

25        Hendley's?
```

26

```
 1    A.   Yes.

 2    Q.   And he said this is not where I want to be?

 3    A.   Yes.

 4    Q.   And then he directed you to another road?

 5    A.   Yes.

 6    Q.   And then did he tell you any specific place to go

 7         on that road?

 8    A.   No.

 9    Q.   You went on the road?

10    A.   No, I didn't go.

11    Q.   You did not go.  Where did you go?  Just answer the

12         question where did you go when he asked you to take

13         him down that road?  Where did you go?

14    A.   I went back and put Donnie out at my house.

15    Q.   Where did you go after you put him out?

16    A.   Went back to my daughter's house.

17    Q.   Did you see him anymore that day?

18    A.   Yes, I did.

19    Q.   Where did you see him?

20    A.   He came back over to my daughter's house.

21    Q.   What was he doing at your daughter's house?

22    A.   Trying to make me come back home.

23    Q.   And did he come in to your daughter's house?

24    A.   Yes, he did.

25    Q.   And he was asking you to come home?
```

```
 1   A.   Yes.

 2   Q.   And did you go home with him?

 3   A.   No, I did not.

 4   Q.   How long did he stay on that particular instance?

 5   A.   He didn't stay there long.

 6   Q.   Did you see him anymore after he left that time,

 7        that night?

 8   A.   Yes, he came back again.

 9   Q.   How many times did he come back on the night of the

10        19th?

11   A.   He came several times.  I can't remember how many

12        times.

13   Q.   And each time you would tell him that you weren't

14        going?

15   A.   Yes.

16   Q.   So, do you know about what time the last time he

17        came out there was?

18   A.   No.

19   Q.   Were you working at Wayne Farms at the time?

20   A.   We was off that day.

21   Q.   On the 19th you were off?

22   A.   Yeah, everybody was off.

23   Q.   Now, we got the 19th in, and we are out of the way

24        with that.

25             When is the next time you saw David Donnie
```

```
 1         Williams?
 2    A.   It was on March the 20th.  I would say after we had
 3         got off -- I would say between 12:30, 1:00 it was
 4         really the 24th, March 24th.
 5    Q.   Are we talking about 12:30 a.m.?
 6    A.   Yes.
 7    Q.   You were at work?
 8    A.   Yes.
 9    Q.   Did you see Donnie at work?
10    A.   Yes, I did.
11    Q.   Did you-all work the same shift?
12    A.   But he didn't come to work that day.
13    Q.   He did not come on the 24th?
14    A.   As I can remember.  When I got in the breakroom, at
15         first I didn't see him.
16    Q.   But you saw him at work?
17    A.   Yeah, I saw him at work.  But I don't know where he
18         came from.
19    Q.   You saw him at work in the breakroom?
20    A.   Yes.  He came up to me.
21    Q.   And was there any confrontation at that time?
22    A.   Yes.
23    Q.   Were you arguing or anything?
24    A.   I'm fixing to tell you what he told me.
25    Q.   I know you want to tell me everything, but answer
```

```
 1              exactly what I'm asking you.
 2                   Was there any argument about anything at that
 3              time?
 4    A.        Yes.
 5    Q.        What were you arguing about?
 6    A.        He said, bitch, you don't know; I'll hurt you.  He
 7              grabbed me in my back by my sweatshirt and said,
 8              bitch, you don't know; I'll hurt you.  I don't like
 9              what you did.  And then he grabbed my cellular
10              phone, and I was talking to my lady friend, and I
11              walked away from him.  And he told me, I'm going
12              make you lose your job.
13    Q.        Let's back up.  You said he called you a name and
14              said, I don't like what you did to me?
15    A.        Yes.
16    Q.        Do you know what he was referring to?
17    A.        I believe it was because I had called his parole
18              officer.
19                   MR. AUSBORN:  Objection, Your Honor.
20                   THE COURT:  Sustained.  Strike the last
21              response.
22    Q.        And after the incident in the breakroom, you went
23              back to work or were you off for the day?
24    A.        I was pulling my supplies.
25    Q.        Were you off of work or had you gotten off?
```

```
 1    A.    I was getting ready to go to work.

 2    Q.    You had just gotten there?

 3    A.    Yes.

 4    Q.    And did you see him anymore during the day at work

 5          on the 24th?

 6    A.    Yes, I did.

 7    Q.    And did you have any other confrontations with him

 8          on the 24th at work?

 9    A.    Yes.

10    Q.    How many more?

11    A.    It was two.

12    Q.    Two other than once in the breakroom?

13    A.    Yes.

14    Q.    Where did he confront you at the second time?

15          You've gone to work now.  We've gone in the

16          breakroom.  What happened the second time?

17    A.    When I got on the floor, I told my supervisor

18          Anthony.  I said, Anthony, can I go to the office

19          for a minute.  I don't want to lose my job.  And I

20          was trying to find the plant manager on second

21          shift.  And the second shift supervisor saw Donnie

22          pulling on my smock.  And I said, Donnie, go and

23          leave me alone.  Leave me alone.

24              MR. AUSBORN:  I object to any hearsay, Your

25          Honor.
```

```
 1            THE COURT:  Mrs. William, the jury can't
 2       understand what you are saying because you are
 3       going to fast and talking to low.
 4            THE WITNESS:  Okay.
 5   Q.   We are back to the second time.
 6            Did you make it to the office or did you meet
 7       Donnie on the way to the office?
 8   A.   He was coming behind me.  That's the time he was
 9       pulling on my smock.
10   Q.   And that's what the supervisor saw?
11   A.   The supervisor saw him pulling on my smock.
12   Q.   And the supervisor stopped him or you stopped him?
13   A.   No.  The supervisor stopped me.  And she asked me
14       what was wrong --
15            MR. AUSBORN:  I object, Your Honor; hearsay.
16            THE COURT:  Sustained.
17   Q.   Now, did you eventually go on to the office?
18   A.   At that time I was trying to find Lonzie.
19   Q.   That's the plant manager?
20   A.   Yes, on second shift.
21   Q.   Did you find Lonzie?
22   A.   We had to walk away before we found him, not right
23       then.
24   Q.   But you did find Lonzie?
25   A.   Yes.
```

| 1 | Q. | What did you do when you found Lonzie? |
|---|---|---|
| 2 | A. | I told him I needed to talk to him about something. |
| 3 | Q. | And you talked to him? |
| 4 | A. | Yes. |
| 5 | Q. | And what was the result of your conversation with |
| 6 | | Lonzie? |
| 7 | A. | He told me to tell him what happened at that time. |
| 8 | | THE COURT:  You can't tell what somebody else |
| 9 | | says to you, okay. |
| 10 | Q. | You told Lonzie what happened? |
| 11 | A. | Yes. |
| 12 | Q. | Don't tell me what Lonzie said to you.  But what |
| 13 | | did Lonzie do?  I don't want to know what he said. |
| 14 | | I just want to know what he did. |
| 15 | A. | He told Donnie -- |
| 16 | Q. | Did he talk to Donnie? |
| 17 | A. | Yes, he talked to him. |
| 18 | Q. | Did he make any written complaint? |
| 19 | A. | At my remembrance, I don't know. |
| 20 | Q. | So you didn't see him make any written complaint? |
| 21 | A. | I don't know. |
| 22 | Q. | But he did talk to Donnie Williams? |
| 23 | A. | Yes. |
| 24 | Q. | Did you go back to work then or was there something |
| 25 | | else you had to do? |

```
 1    A.    Yeah, I went back to work.

 2    Q.    And that was the second time we talked about on the

 3          24th?

 4    A.    Yes.

 5    Q.    And there was another confrontation with Donnie on

 6          the 24th at your job?

 7    A.    Yes.

 8    Q.    Tell me about when was that.

 9    A.    It was about 10:00.  We were going back after

10          lunch.

11    Q.    Going back at about 10:00?

12    A.    He was going on back after break -- (inaudible).

13    Q.    Speak up and slow down.

14              You saw him coming behind you doing what?

15    A.    Coming behind me.  And then he said, I went and

16          told your mama what you did.  And I said, leave me

17          alone, Donnie; leave me alone.  And I kept walking.

18          And then Lonzie had said --

19    Q.    Don't tell me what Lonzie said.  Just tell me what

20          you did or what Donnie did.

21              Did he follow you to the line?

22    A.    No, he didn't follow me to the line.

23    Q.    When you got back to the line, did you notify

24          anybody that he had come to confront you again?

25    A.    Yes, I did.
```

```
 1    Q.    Who did you notify?

 2    A.    It was a supervisor.

 3    Q.    Did that supervisor do something -- I don't want to

 4          know what they said.  But did they do something in

 5          reference to notifying them about David harassing

 6          you?

 7    A.    Yeah, she went to get Lonzie for me.

 8    Q.    And did Lonzie come over to the line?

 9    A.    Yes, he came to the area I worked at.

10    Q.    Did you talk to Lonzie?

11    A.    Yes, I did.

12    Q.    Do you know what Lonzie did after you talked to

13          Lonzie?

14    A.    I don't know what he did after I talked to him.

15    Q.    He just walked away?

16    A.    Yes, he walked away.

17    Q.    And when you talked to him, what did you say?

18    A.    I told him that Donnie came back in my face after

19          lunch.  And he said, I told him don't come back

20          around you on your job.

21    Q.    And he leaves after that, and you don't know what

22          happened after that?

23    A.    No, I don't.

24    Q.    And that's three times on the 24th at work; is that

25          right?
```

```
 1    A.    Yes.

 2    Q.    What time do you get off?

 3    A.    We get off at different times every night.  I can't

 4          remember what time we got off.

 5    Q.    So you didn't see him anymore that night while at

 6          work?

 7    A.    Not at work.

 8    Q.    Did you see him anymore after you got off work that

 9          night?

10    A.    No.

11    Q.    How did you get home that night?

12    A.    My daughter came and picked me up.

13    Q.    What happened after she came and picked you up?

14          Where did you go?

15    A.    I went to her apartment.

16    Q.    And did you see him anymore that night?

17    A.    He came over there knocking on her door.

18    Q.    On the 24th?

19    A.    Yes.

20    Q.    He came to your daughter's apartment and knocked on

21          the door?

22    A.    Yes.

23    Q.    And did you open the door for him?

24    A.    No, I didn't open it.  Didn't nobody open the door.

25    Q.    How many times did he come out to the apartment
```

1          that night?

2     A.   That was the last time he came that night.

3     Q.   That was the last time he came.

4          When was the next time you saw David Donnie

5          Williams after the 24th?

6     A.   It was on the 26th.  He came over to my daughter's

7          apartment.

8     Q.   So two days later he comes back to your daughter's

9          apartment.  Were you there?

10    A.   Yes, I was there.  But didn't nobody open the door.

11    Q.   Did he knock?

12    A.   Yes, he knocked.

13    Q.   And you didn't say anything?

14    A.   I didn't say anything.

15    Q.   And he went away?

16    A.   Yes, he went away.

17    Q.   Did you see him anymore on the 26th?

18    A.   No, I didn't.

19    Q.   When was the next time after the 26th when you

20         didn't open the door for him that you saw him

21         again?

22    A.   On the 27th.

23    Q.   This is the very next day?

24    A.   Yes.

25    Q.   And where did you see him on the 27th?

```
 1    A.    He was in my house.

 2    Q.    At your house or in your house?

 3    A.    He was in my house.

 4    Q.    He was in your house on the 27th.  Where were you?

 5    A.    I had pulled up to get me and my children some

 6          change of clothes to put on, and I saw him, saw the

 7          car in my yard.  And I said, he was trespassed away

 8          from my house.

 9    Q.    When did you trespass him away from the property?

10    A.    The first trespass warrant I did was on March 24th.

11    Q.    Three days earlier?

12    A.    Yes.

13    Q.    And when had you done that?

14    A.    It was around about -- I don't know the exact time

15          I did.

16    Q.    Morning or night?

17    A.    It was sometimes during that day.

18    Q.    It was before you went to work?

19    A.    Before I went to work.

20    Q.    You had signed a trespass warrant before you went

21          to work?

22    A.    Yes.

23    Q.    And where did you sign that at?

24    A.    Mr. Wilbert Jernigan's office.

25    Q.    Now, let's go back to the 27th.  He was at your
```

```
 1           house?

 2   A.      Yes.

 3   Q.      And did you go in your house?

 4   A.      Not at that time until the police got there because

 5           I was afraid.

 6   Q.      Did you call the police?

 7   A.      Yes, I did.

 8   Q.      And what happened when the police got there?  Was

 9           Donnie still there?

10   A.      He was in there asleep.

11   Q.      He was in there asleep?

12   A.      Yes.

13   Q.      And when you did the trespass warrant, did you do

14           it away from you or away from your house or how did

15           you do that?  Do you know?

16   A.      I wanted to do it away from my house.

17   Q.      So he was in your house?

18   A.      Yes.

19   Q.      And when the police got there, what happened?

20   A.      I told them one go to the front and one go to the

21           back.  He might wake up and run.  And then I don't

22           know this officer's name, but he went to the door

23           and knocked; Donnie, Donnie, and the man went in

24           the house and said, she don't want you in her

25           house.
```

39

```
 1              MR. AUSBORN:  Object.  Move to strike.

 2              THE COURT:  Sustained.  Motion granted.

 3    Q.    Don't tell me what somebody said.  You saw the

 4          police go into your house?

 5    A.    Yes.

 6    Q.    And you did not get out of the car?

 7    A.    No.

 8    Q.    Did you see the police officer come back when he

 9          came out?

10    A.    Yes.

11    Q.    Was he alone?

12    A.    Donnie was with him.

13    Q.    And what did Donnie do when he came out of the

14          house?

15    A.    He got in the car and took off.

16    Q.    So the police didn't take him with them?

17    A.    No.

18    Q.    And he was allowed to get in his car and leave?

19    A.    Yes.

20    Q.    And did you see him anymore on the 27th?

21    A.    I went to Smokey O's to get me and my kids

22          something to eat.

23    Q.    Where did you see him?  I don't want to know what

24          you were doing.

25    A.    Smokey O's.
```

| | | |
|---|---|---|
| 1 | Q. | Was he there when you got there? |
| 2 | A. | No, he wasn't. |
| 3 | Q. | When you pulled up, you did not see David Donnie |
| 4 | | Williams in the parking area? |
| 5 | A. | No. |
| 6 | Q. | Where were you at Smokey O's when you saw Donnie? |
| 7 | A. | I was on the inside ordering some food. |
| 8 | Q. | Where did you see him at when you saw him? |
| 9 | A. | He walked in there. |
| 10 | Q. | He walked into Smokey O's? |
| 11 | A. | Yes. |
| 12 | Q. | Let me ask you: What were you driving? |
| 13 | A. | My daughter was driving. |
| 14 | Q. | Was she in Smokey O's with you or outside? |
| 15 | A. | She came in there with me. |
| 16 | Q. | Is this the car she normally drives? |
| 17 | A. | Yes; white Lancer. |
| 18 | Q. | So this is a car that Mr. Williams is familiar? |
| 19 | A. | Yes. |
| 20 | Q. | Knows that's your daughter's car? |
| 21 | A. | Yes. |
| 22 | Q. | And knows that you ride with your daughter? |
| 23 | A. | Yes. |
| 24 | Q. | Did he say anything to you? |
| 25 | A. | He told me, bitch, I don't like what you did to me. |

```
 1            And I told Donnie, why don't you leave me alone.
 2    Q.    When he said, I don't like what you did to me, did
 3          he tell you what it was that you did to him?
 4    A.    No, he didn't tell me at the time.
 5    Q.    That's all he said when he walked in?
 6    A.    When he walked in, yes.
 7    Q.    And when you asked him To leave you alone, did he
 8          leave and turn around and walk out?
 9    A.    I walked out in front of him.
10    Q.    You walked out?
11    A.    Yes.
12    Q.    And had you gotten your food yet?
13    A.    I had ordered the food and paid for it.
14    Q.    Did he stay in there and order food?
15    A.    No.  He walked out behind me.
16    Q.    He walked right out the door behind you?
17    A.    Yes.
18    Q.    Did he say anything else to you or do anything to
19          you?
20    A.    When I was getting in the car, he was riding with
21          somebody in a burgundy car with tinted windows, and
22          he told me, bitch, I will kill you.  And I said,
23          Donnie, if you are going to do it, do it right
24          here.  I'm tired of you threatening my life.
25          That's what I told him.
```

```
 1    Q.   And when you said that, what happened?

 2    A.   He got in the car and left.

 3    Q.   And did you see him anymore that day?

 4    A.   No.

 5    Q.   And that would have been the 27th?

 6    A.   27th.

 7    Q.   Now, tell me when the next time after the 27th at

 8         James O's that you saw him, David Donnie Williams.

 9    A.   I didn't see him no more at Smokey O's.

10    Q.   After that?

11    A.   I seen him on March 30th.

12    Q.   Where were you on March 30th when you saw him?

13    A.   I was at my residence picking up my daughter.  But

14         she wasn't there at that time when I got there.

15    Q.   And I believe you told us earlier that the bus

16         drops your daughter off at the house?

17    A.   Yes.

18    Q.   And you went there to pick her up?

19    A.   Yes.

20    Q.   Was anybody with you?

21    A.   My daughter.

22    Q.   And who else?  Was that the only person?

23    A.   My grandbaby.

24    Q.   What car were you in?

25    A.   White lancer.
```

43

| 1 | Q. | Were you driving? |
|---|----|-------------------|

```
 1   Q.   Were you driving?

 2   A.   No.  My daughter was driving.

 3   Q.   And when you got there, you didn't see your

 4        daughter?

 5   A.   No.

 6   Q.   And when did you see her?

 7   A.   About two minutes later after me and my daughter

 8        pulled across the yard, Donnie came across the

 9        railroad where I live at with my daughter in the

10        back.  I told my 21-year-old daughter, I told you

11        he had my daughter.  I knew he had her.  He was

12        looking to get back at me.

13   Q.   At this time how old was your daughter that he had

14        with him?

15   A.   Eight years old.

16   Q.   She was in the car.  Did he bring her to the house?

17   A.   He parked across the road.  At that time he knew he

18        was trespassed from my property.

19   Q.   Did he say anything to you for you to know he was

20        trespassed from the property?

21   A.   No.

22   Q.   When he pulled across the road, did your

23        eight-year-old daughter get out of the car?

24   A.   He got out first and had my daughter by her hand

25        holding her back.
```

| | | |
|---|---|---|
| 1 | Q. | At that point was he in the yard or in the road? |
| 2 | A. | He walked half way across the roadway from where |
| 3 | | the car was parked to the car I was in. |
| 4 | Q. | Did you get out of the car? |
| 5 | A. | No, I didn't. |
| 6 | Q. | What were you doing? |
| 7 | A. | I was sitting in the car.  And my grandbaby |
| 8 | | accidentally opened the back door. |
| 9 | Q. | Your grandbaby is in the backseat and opens the |
| 10 | | back door? |
| 11 | A. | Yes. |
| 12 | Q. | What happened? |
| 13 | A. | Donnie was holding my eight-year-old daughter back, |
| 14 | | holding her back from getting in the car, and I was |
| 15 | | fussing at Donnie, why did you get my daughter off |
| 16 | | the bus.  And he said, bitch, I don't like what you |
| 17 | | did.  Bitch, I don't like what you did to me, and |
| 18 | | pulled my sweatshirt trying to get me out of the |
| 19 | | car. |
| 20 | Q. | And was your door open? |
| 21 | A. | No. |
| 22 | Q. | He reached in to -- |
| 23 | A. | -- the back passenger side of the car. |
| 24 | Q. | And was pulling you? |
| 25 | A. | Pulling on the back of my sweatshirt. |

| | | |
|---|---|---|
| 1 | Q. | Did he make any threats to you? |
| 2 | A. | He said he was going to kill me. |
| 3 | Q. | Do you know how many times he told you? |
| 4 | A. | That he told me several times. |
| 5 | Q. | Did you believe him? |
| 6 | A. | Yes, I believed him.  He looked very serious |
| 7 | | because he was on that crack. |
| 8 | Q. | Did you believe he was -- |
| 9 | A. | Yes, I did. |
| 10 | Q. | Were you afraid he was going to kill you? |
| 11 | A. | Yes. |
| 12 | Q. | Was your door ever opened? |
| 13 | A. | No, it wasn't. |
| 14 | Q. | After he tried to pull you out of the front seat |
| 15 | | through the back, when after that point did he |
| 16 | | let -- turn your daughter loose?  Or did he ever |
| 17 | | turn her loose? |
| 18 | A. | He was steadily holding her hand while he was |
| 19 | | talking, and then he turned her hand loose.  And |
| 20 | | then we pulled off, and he pulled in front of the |
| 21 | | stop sign in front of my yard trying to make her |
| 22 | | wreck. |
| 23 | Q. | But that didn't work out? |
| 24 | A. | No, that didn't work. |
| 25 | Q. | Did he go ahead and leave? |

```
 1   A.    Yes, he did.

 2   Q.    Where did you go when he left there?

 3   A.    I went to my job.

 4   Q.    You went to work?

 5   A.    No.  I went to the police station first, and then I

 6         went to my job.

 7   Q.    Do you know what officer was on duty when you went?

 8   A.    Older aged man.  I don't know his name.

 9   Q.    Black or white?

10   A.    He black.

11   Q.    And did you make a report?

12   A.    Yes, I did.

13   Q.    And told them what you told us here today?

14   A.    Yes.

15   Q.    And do you know if they took any action on that

16         report?

17   A.    Well, I believe I did.  And I did a formal trespass

18         warrant that same day.

19         MR. AUSBORN:  I object, Your Honor, to

20         speculation unless she has actual knowledge.

21         THE COURT:  You said you did a trespass warrant

22         that same day?

23         THE WITNESS:  Trespass warrant that same day.

24   Q.    So that would be two now in about a week?

25   A.    Yes.  Yes.
```

```
 1    Q.    After you made the report, you went to work?

 2    A.    Went to work.

 3    Q.    Did you see Donnie at work?

 4    A.    No.

 5    Q.    He wasn't scheduled to work that day?

 6    A.    No.  He had got fired.

 7    Q.    When did he get fired?

 8    A.    On the 24th, I believe.  I don't know exactly what

 9          happened, but he didn't appear at work after the

10          24th?

11              MR. AUSBORN:  Object, Your Honor, to

12          speculation unless she has --

13              THE COURT:  Sustained.

14    Q.    So you didn't see him anymore after the 24th at

15          work?

16    A.    No, I didn't.

17    Q.    How do you know that he was fired?  I'm talking

18          about know, How did you find out that he was fired?

19    A.    I just know cause I ain't seen him at work.

20    Q.    Okay.  Now, you went to work.  Did you see him

21          anymore that day?  This is the 30th when we are

22          talking about him taking your daughter off the bus.

23    A.    I don't remember seeing him no more.

24    Q.    You went to work and got off at whatever time you

25          get off.  Did you see him that night?
```

```
 1    A.    I can't remember all of the dates he came to my

 2          job.

 3    Q.    We will get to that in a few minutes, but we are

 4          working specifically with the 30th because we have

 5          an incident on that day.

 6    A.    Okay.

 7    Q.    As far as you remember, you didn't see him anymore

 8          that night?

 9    A.    No.

10    Q.    Now, what about April 17th?  Do you remember

11          specifically that day?

12    A.    Yes, I did.

13    Q.    What happened on April 17th?

14    A.    I was at my house washing some clothes.  At that

15          time I was afraid to live in my house.

16    Q.    Turn around and speak so what you say can project

17          out and they can hear you.

18    A.    At the time I was at my house washing some clothes,

19          and I was afraid to go to my house by myself.  The

20          police told me to take someone with me

21              MR. AUSBORN:  Object as to what she was told.

22              THE COURT:  Sustained.

23    Q.    Don't tell us what anybody else told you.  Just

24          tell us what you did.

25    A.    Okay.
```

```
 1   Q.   You were at your home.  Who was with you?

 2   A.   My 14-year-old son.

 3   Q.   And his name is?

 4   A.   Quadarius Williams.

 5   Q.   And you were there doing what?

 6   A.   Washing clothes.

 7   Q.   Had you spent the night there?

 8   A.   No, I didn't.

 9   Q.   You were just there to wash clothes?

10   A.   Yes.

11   Q.   And did David Donnie Williams come to your house

12        that day?

13   A.   No, he didn't.

14   Q.   Did you see him at all on the 17th?

15   A.   Yes, at the grocery store.

16   Q.   Which grocery store would that have been?

17   A.   AG.

18   Q.   Where is the AG as it relates to your house?

19   A.   It is right next door.

20   Q.   So in other words, you have a --

21   A.   You have to walk out my yard across the street.

22   Q.   Up one street and you are at the AG?

23   A.   Yes.

24   Q.   What did you do at the AG?

25   A.   I went to get some orange juice.
```

50

```
 1    Q.    You got orange juice?

 2    A.    I paid for the orange juice.

 3    Q.    Did you see Donnie Williams when you were in the

 4          store?

 5    A.    Not in the store, period.

 6    Q.    I know in relationship to the AG and your house you

 7          have to walk over there.  Did you walk?

 8    A.    No, I didn't.

 9    Q.    How did you get there?

10    A.    I drove.

11    Q.    And what were you driving?

12    A.    A white Lancer.

13    Q.    And that's the same Lancer you told us about

14          earlier?

15    A.    In front of the Old Radio Shack.  That's where I

16          parked at.

17    Q.    Did you see David Donnie Williams anywhere when you

18          parked?

19    A.    No, I didn't.

20    Q.    And I believe you said you bought orange juice?

21    A.    Bought orange juice.

22    Q.    Paid for the orange juice?

23    A.    Paid for it.

24    Q.    And what did you do after that?

25    A.    I went to come out of the store and I saw Donnie
```

|     |     | Williams. |
| --- | --- | --- |
| 1   |     | Williams. |
| 2   | Q.  | Where was he parked? |
| 3   | A.  | Parked right beside there, backed where the driver |
| 4   |     | side -- he wouldn't have to get out. |
| 5   | Q.  | And he backed in there? |
| 6   | A.  | Yes. |
| 7   | Q.  | And you say you paused? |
| 8   | A.  | I paused for a minute, and I was scared. |
| 9   | Q.  | You were scared? |
| 10  | A.  | I was scared. |
| 11  | Q.  | Did you come on out of the store? |
| 12  | A.  | I hesitated.  And I said, you go anywhere you want |
| 13  |     | to go and he can go where he want, and I went on |
| 14  |     | out of the store.  And when I was getting in the |
| 15  |     | car, he said, bitch, I don't like what you did to |
| 16  |     | me.  And I said, Donnie, why don't you leave me |
| 17  |     | alone.  I ain't bothering you.  He said, why don't |
| 18  |     | you leave my mama alone and he said shut up before |
| 19  |     | I fuck you up. |
| 20  | Q.  | And did you say anything back to him besides leave |
| 21  |     | you alone? |
| 22  | A.  | When he told my son, I'll fuck you up, I told my |
| 23  |     | son to get in the car and don't say nothing to him. |
| 24  |     | And then he said, if you mess around with me, I'd |
| 25  |     | rather see you in heaven or hell.  And he -- |

```
 1    Q.   I don't want you to tell us what he --

 2    A.   Sorry.

 3    Q.   He threatened your life?

 4    A.   Yes.

 5    Q.   And were you afraid of him?

 6    A.   Yes, I was.

 7    Q.   And did you get in your car and leave?

 8    A.   Not at that incident.  He was steadily passing

 9         words to words to me.

10    Q.   Why did he leave first versus you?

11    A.   I don't know why he left first.

12    Q.   And when you left, where did he go?

13    A.   Where did he go?

14    Q.   Where did you go?

15    A.   I left fixing to head going to my daughter's

16         apartment.

17    Q.   Was he by himself?

18    A.   No, he was not.  Anthony Blakely was in the car

19         with him.

20    Q.   And it was Anthony Blakely?

21    A.   Yes.

22    Q.   And you left going towards your daughter's

23         apartment?

24    A.   Yes.

25    Q.   Did you see him leave?
```

53

```
 1   A.   Well, he had left.  And when I looked up in my
 2        rearview mirror, he was coming up behind me.  And I
 3        stopped in the middle of the parking lot and told
 4        them to send a unit down there, they had did
 5        several police reports on the man, but he refused
 6        to leave me alone.  And when he saw Freeman pull
 7        up, that's the time he pulled off and went towards
 8        Aberfoil and they had that long chase.
 9   Q.   And that's last time you saw him that day?
10   A.   I seen him again that evening down at the store
11        again with somebody else.
12   Q.   The same evening after the chase?
13   A.   Yes.
14   Q.   And who was he with that evening at the store?
15   A.   It was two ladies.  I don't know them.
16   Q.   And did you make a report?
17   A.   No, I didn't have time to go back at that time.
18        My daughter had to be at work at 5:00.  She was
19        running late.
20   Q.   Now, I'm talking about the earlier event at the
21        store.
22   A.   Did I see him again?
23   Q.   No, not the second time.
24   A.   Yeah, I went back up to the police station and did
25        one.
```

```
 1    Q.    Tell me about the second time you saw him at the
 2          AG.  Was he in the store?
 3    A.    No.  He was in the back of the car.  I had pulled
 4          up, and she was trying to let the window up and
 5          afraid that he was going to get him.  And I told
 6          them, get that man away from me because he is very
 7          dangerous.  And he went to pointing at me shaking
 8          his head.
 9    Q.    And so he never said anything to you on that
10          occasion?
11    A.    No.
12    Q.    He was just pointing and shaking his head?
13    A.    Yes.
14    Q.    Did you see him anymore after that on the 17th?
15    A.    No, I didn't.
16              THE COURT:  How much more?
17              MS. PENN:  I'm close to the end, but you can
18          take a break.  I need to get in to some other
19          stuff.
20              THE COURT:  Take a ten-minute recess.  Don't
21          discuss the case.  Restrooms are on the bottom
22          floor.
23              (Whereupon a short recess was taken, after
24               which time the jury returned to the courtroom,
25               and the following proceedings were had in open
```

```
 1              court:)
 2              DIRECT EXAMINATION (Cont'd)
 3    BY MRS. PENN:
 4    Q.   Were there other instances of domestic violence
 5         that you suffered at the hands of Mr. Williams?
 6    A.   Well, a lot of times.  He had came down on my job
 7         when I was getting off, and my daughter came to
 8         pick me up.  And he was sitting at the guard shack
 9         one night, and he came in the gate.  And in order
10         to get in there, he was supposed to show your
11         picture ID, and he was pulling on the back of my
12         coat.  And my daughter was getting ready to come
13         out, and she realized she couldn't come out.  And
14         at that time he started, bitch, I'll do this and
15         that, and he got in the car with my daughter.  And
16         that's the night we went up looking for the police,
17         went up to the police station, and he followed us
18         up there to the police station.
19    Q.   He actually followed you to the police station?
20    A.   Yes, he did.
21    Q.   And you were scared to get out of the car?
22    A.   I was scared to get out of the car.  At that time
23         we were blowing and I told my daughter to find a
24         police unit somewhere because I was afraid to get
25         out at the police station.
```

56

```
1   Q.   Did he follow you around town?

2   A.   No, he didn't.

3   Q.   After you got to the police station, he stopped

4        following you?

5   A.   Yes.  We went back to the police station and

6        officer Finney was up there and he did the police

7        report on me -- on him.

8   Q.   Any other instances of domestic violence,

9        harassment or stalking from Mr. Williams?

10  A.   I can't remember the date, but he came down there

11       several nights on my job out in the parking lot.

12  Q.   Tell me about those instances.  When you come out

13       of work -- you said something about the gate or

14       security booth?

15  A.   Yes.  You have to show a picture to get in.

16  Q.   Was someone in that booth?

17  A.   There is supposed to be someone there all the time.

18  Q.   And where did your daughter park?

19  A.   In front of the guard shack.

20  Q.   And when you would see him at night when you got

21       off, where would he be?

22  A.   Sitting out there in the parking lot sometime.

23  Q.   Would it be out past the guard shack or outside?

24  A.   Sometimes he would just come park by the guard

25       shack; sometime.
```

```
 1    Q.   And when you would see him out there and get in the
 2         car, would he do anything specifically?
 3    A.   No.  He was just watching me.
 4    Q.   Did he follow you?
 5    A.   Yeah, some nights he followed me to my daughter's
 6         apartment.
 7    Q.   And what did you do when you got over there?
 8    A.   I was afraid to get out of the car.
 9    Q.   What did you do?
10    A.   I would wait until my daughter got out, and I was
11         afraid he was standing out there.
12    Q.   So you would wait and take your chance to run in
13         the house?
14    A.   Yes.
15    Q.   And this would not be anything -- he wouldn't harm
16         you at this point, but he was just following you
17         and watching you?
18    A.   Yes.
19    Q.   And can you tell me about how many times he's
20         followed you at night?
21    A.   Several times.
22    Q.   Is it five?
23              MR. AUSBORN:  Your Honor, if I may.
24              THE COURT:  Hold on.
25    A.   Probably one or two times.
```

```
 1              MR. AUSBORN:  Your Honor, can we approach?
 2              THE COURT:  Come up.
 3              (Whereupon the following Bench conference was
 4               held outside the hearing of the jury:)
 5              MR. AUSBORN:  The two children in the
 6       courtroom, I am concerned about whether or not they
 7       are witnesses.
 8              THE COURT:  They are not.  As long as they act
 9       right, which I know they will, they are fine.
10              MRS. PENN:  Thank you, Judge.
11              (In open court.)
12  Q.   (By Mrs. Penn:) Is that one or two times after you
13       broke up with him this time or is that over the
14       course of the relationship?
15  A.   This is after I broke up with him this time.
16  Q.   Had he followed you any other times?
17  A.   It's been several times.  I just can't remember all
18       of the dates.
19              And a lot of mornings when my daughter used to
20       take her son to Headstart, he know what time she
21       would take him, and I be at the house getting my
22       sleep, he would come and follow her to the
23       apartment.
24  Q.   But you didn't see any of these?
25  A.   I didn't see any of these.
```

```
 1   Q.   I'm talking about the times you witnessed him
 2        following you?
 3   A.   A lot of times I would be taking my daughter to
 4        school, he would see that car and follow me where I
 5        was going if I go to the elementary school.
 6   Q.   So you noticed him in the mornings following you?
 7   A.   Yes, yes.
 8   Q.   Would it be every morning?
 9   A.   Not every morning.
10   Q.   But you can't give me a count about how many times
11        it was?
12   A.   No.
13   Q.   Was there any other times where there was actual
14        physical domestic violence?
15   A.   Talking about during the time I signed the warrants
16        on him?
17   Q.   No.
18   A.   Talking about during the relationship that we had?
19   Q.   Yes.
20   A.   Yes, there was.
21   Q.   And can you tell us what that would be?
22   A.   These going back years.
23   Q.   Okay.
24   A.   This was back in 2001 in January, he took me down
25        the road by "The Spot".  My granddaughter was with
```

```
 1          me and she wasn't but eight at the time.  He took

 2          me in a wooded area, and he threatened to kill me

 3          then if I didn't give him $20.

 4    Q.    Did you give him $20?

 5    A.    Yes.  I give him $20 so he would leave me alone.

 6    Q.    Were there other times there was some kind of

 7          domestic violence?

 8    A.    Yes.  That same year on February 17th (phonetic),

 9          me and my daughter had took my grandbaby and her

10          son uptown to get a haircut, and I couldn't find

11          him, and when we walked back home, he was in the

12          house searching through my drawers.  I don't know

13          what he was looking for.  I don't know what he was

14          doing in there rambling, and I went in there to sit

15          down, and I was talking on the phone with one of my

16          lady friends I work with at work, and he came back

17          and saw me on the phone.  And he said, what you

18          doing on the phone, and I said, none of your

19          business.  And he grabbed me by my wrist, and I

20          told the lady I would call her back later on.  And

21          all of the sudden he left out of the house and came

22          back, and my daughter had left her purse on the

23          table.  And she went back in there after she had

24          left again.  We didn't realize it was missing at

25          the time and nobody got that purse but Donnie.  She
```

```
 1          had $90 (phonetic) dollars.  The baby's Medicaid
 2          card was in there, and the voucher -- about a
 3          hundred dollars worth of vouchers was in there.  He
 4          got all of that.  I don't know what he did with the
 5          purse, but when he came back he was arguing at me.
 6    Q.    Okay.  Is it fair to say that you had a stormy
 7          relationship with Mr. Williams?
 8    A.    It was a violent relationship, very violent.
 9    Q.    Has there been any times when Mr. Williams has told
10          you to leave me alone, I don't want you anymore?
11    A.    He have never told me that.
12    Q.    Giving you any indication that he wanted to break
13          off this relationship?
14    A.    He have never told me that.
15              MRS. PENN:  That's all I have right now for
16          this witness, Judge.
17              THE COURT:  Cross.
18                      CROSS-EXAMINATION
19    BY MR. AUSBORN:
20    Q.    May it please the Court.  Ms. Williams, I am
21          attorney Keith Ausborn.  Of course, you know I
22          represent David Donnie Williams.
23              If I ask you a question and you don't
24          understand that question, bring it to my attention
25          and I'll try to clarify it for you.
```

62

```
 1              I want to take you back to 1997 when you first
 2         met Mr. Donnie Williams; is that correct?
 3    A.   Yes.
 4    Q.   And immediately thereafterwards you-all struck up a
 5         conversation and you started dating one another; is
 6         that correct?
 7    A.   Yes.
 8    Q.   And you have been dating on and off from 1997 to
 9         2004; is that correct?
10    A.   Yes.
11    Q.   And you testified earlier under direct examination
12         that Mr. Donnie Williams was a crack addict, he
13         used crack; is that correct?
14    A.   Yes.
15    Q.   And nowhere in any of the statements that you made
16         to law enforcement, did you state that you -- If
17         Donnie Williams asked you to take him somewhere to
18         get crack, did you?
19    A.   No.
20    Q.   That is not in your statement, is it?
21    A.   No.
22    Q.   Now, how long do you contend that Mr. Donnie
23         Williams was doing crack?
24    A.   He been doing it off and on the whole while I was
25         with him.
```

```
 1    Q.    Okay.  Now, you said he has been doing crack on and
 2          off since 1997; is that correct, that's your
 3          contention?
 4    A.    Yes.
 5    Q.    And you knew about it?
 6    A.    Yes.
 7    Q.    And you stayed with him?
 8    A.    Yes, because he was threatening me.
 9    Q.    Okay.  Let's talk about the alleged threats.
10          How far did you go in school?
11    A.    12th grade.
12    Q.    You can read and write okay?
13    A.    Yes.
14    Q.    Have you ever been diagnosed with a mental disease
15          or defect or anything like that?
16    A.    No.
17    Q.    You consider yourself a sane and rational
18          individual?
19    A.    Yes.
20    Q.    How sane and rational is it that you stayed with a
21          man you contend has been threatening you all over
22          the years?  Is that sane?
23    A.    No.
24    Q.    Is it sane that you stay with a man that you
25          contend has been abusing you all of these years?
```

```
 1          Is that sane?
 2    A.    No.
 3    Q.    Now, you contend that Mr. Donnie Williams assaulted
 4          you.  I think you said 2001.  This was an assault
 5          case; is that correct?
 6    A.    Yes.
 7    Q.    Mr. Donnie Williams has never been convicted of
 8          assaulting you in 2001; is that correct?
 9    A.    Yes.
10    Q.    Has Mr. Donnie Williams been convicted of assault,
11          assault on you in 2001?
12    A.    Yes.
13    Q.    Do you have any proof showing that Mr. Donnie
14          Williams was convicted of assault in 2001?  Do you
15          have something you can offer to the ladies and
16          gentlemen of the jury?
17    A.    I stated to my lawyer about that just a few minutes
18          ago.
19    Q.    So you don't have anything, do you?  Do you have a
20          document, a physical document, that we can examine
21          and look at the four corners of it and see where
22          Mr. Donnie Williams was convicted of assault in
23          2001?  You don't have that, do you?
24    A.    No.
25    Q.    Let me ask you to state your address for the
```

65

```
 1          Record.
 2    A.    1010 MLK Boulevard, Lot Number 2.
 3    Q.    Are you buying that place or renting?  Leasing it?
 4    A.    I'm renting.
 5    Q.    Who's the landlord of that place?
 6    A.    Mr. Wilbert Jernigan.
 7    Q.    Now, for the clarification of the ladies and
 8          gentlemen of the jury, do you know where
 9          Mr. Wilbert Jernigan is employed at?
10    A.    Yes.
11    Q.    Where is that?
12    A.    Circuit clerk's office in the courthouse.
13    Q.    Okay.  Now, is that who you pay your rent to?
14    A.    Yes.
15    Q.    You have been in that place for how many years?
16    A.    Eight or nine years.
17    Q.    Eight or Nine years you have established your
18          business relationship with Mr. Jernigan; is that
19          correct?
20    A.    Yes.
21    Q.    Do you consider yourself a personal friend of
22          Mr. Jernigan also?
23    A.    Yes.
24    Q.    Is he a friend of yours also?
25    A.    Yes.
```

```
 1   Q.   Now, tell the ladies and gentlemen of the jury on
 2        the two complaints that you swore out against my
 3        client, the stalking, who did you go to, to get
 4        that warrant?
 5   A.   Mr. Wilbert Jernigan.
 6   Q.   The harassing, who did you go to, to get that
 7        warrant?
 8   A.   Mr. Wilbert Jernigan.
 9   Q.   You went to your friend, didn't you?  Is that not
10        your friend who you went to?
11   A.   Yes.
12   Q.   Now, you state that -- And I made some notation so
13        I'll take you back.
14             You said March 19th is when you first got
15        harassed and stalked, okay; for the month of March;
16        isn't that correct?
17   A.   Yes.
18   Q.   Did you swear out a warrant on March 19th?
19   A.   No, I didn't do a warrant then.
20   Q.   Excuse me.
21   A.   No, I didn't.
22   Q.   Okay.  You stated that he harassed you several
23        times on March 19th?
24   A.   Yes.
25   Q.   You didn't swear out a warrant not one time on
```

```
 1            March 19th?

 2   A.   No.  Because at the time --

 3   Q.   Hold on a minute.  Stay right there.  Don't get

 4        ahead of me.

 5            Were you in fear of your safety on March 19th?

 6   A.   Yes.

 7   Q.   You thought this young man was going to kill you?

 8   A.   Yes.

 9   Q.   You were in fear for your safety?

10   A.   Yes.

11   Q.   But you didn't swear out a warrant, did you?

12   A.   No.

13   Q.   You ever heard of 911?

14   A.   Yes.

15   Q.   Did you call 911 on March 19th?

16   A.   At that time I wasn't thinking --

17   Q.   Answer my question yes or no.

18   A.   No.

19   Q.   You've heard of 911, haven't you?

20   A.   Yes, I did.

21   Q.   It means help, doesn't it?

22   A.   Yes.

23   Q.   You didn't call for help?

24   A.   No.

25   Q.   Now, March 19th, you got any witnesses who will
```

```
 1            testify that you got harassed on March 19th?
 2    A.    My 21-year-old daughter.
 3    Q.    Now, you gave birth to that daughter, did you not?
 4    A.    Yes.
 5    Q.    That's not his child, is it?
 6    A.    No.
 7    Q.    Is her allegiance with you or with him?
 8    A.    I don't understand what you mean.
 9    Q.    Her loyalty with you or him?
10    A.    Me.
11    Q.    Did you talk to her about this case?
12    A.    I hadn't talked to her 'cause she saw it.
13    Q.    Okay.  All right.
14            Now, you state that you were in eminent fear of
15          bodily harm by my client Mr. David Donnie Williams;
16          is that correct?
17    A.    Yes.
18    Q.    Ma'am, did you at any time apply to the circuit
19          clerk's office for a petition for protection from
20          abuse?
21    A.    At that time I was thinking about that --
22    Q.    Answer my question.  Is that a yes or no?
23    A.    No.
24    Q.    You knew about it, though, didn't you?
25    A.    Yes.
```

```
 1    Q.    And you knew that a petition for protection from
 2          abuse is actually a physical injunction or court
 3          order restraining this young man from having any
 4          contact with you?  You knew you could applicate for
 5          that, didn't you?
 6    A.    Yes.
 7    Q.    And you didn't do that, did you?
 8    A.    No.
 9    Q.    And the reason you didn't do it is because you
10          didn't want to stay away from him?
11    A.    I was afraid that he would kill me.
12    Q.    But you didn't apply for a court order that would
13          have secured your person.  Does that make any
14          sense?
15    A.    No.
16    Q.    There is a lot that doesn't make sense about this
17          case.
18                You say you were harassed on March 27th; is
19          that correct?
20    A.    Yes, I was.
21    Q.    Several times.  Isn't that what you testified to?
22    A.    Yes, I said --
23    Q.    Did you apply for a warrant or affidavit on March
24          27th?
25    A.    I couldn't.  That was a Saturday.
```

```
 1    Q.   Did you call 911 on March 27th?

 2    A.   No, I didn't.

 3    Q.   You know that 911 responds on weekends, don't you?

 4    A.   I wasn't thinking at the time.

 5    Q.   Wasn't thinking?

 6    A.   I was afraid.

 7    Q.   Too afraid to get some help?  Does that make sense?

 8    A.   No, it don't.

 9    Q.   Wouldn't you agree that when people are afraid they

10         get help and they pick up the phone and punch 911?

11         Isn't that what people who are in fear of their

12         safety, isn't that what they do?

13    A.   Yes.

14    Q.   Did you do that?

15    A.   No.

16    Q.   Now, you stayed with Donnie Williams on and off on

17         over the years, didn't you?

18    A.   Yes.

19    Q.   He lived with you, didn't he?

20    A.   Yes, he was there with me.

21    Q.   He had a key with you, didn't he?

22    A.   This time he didn't, breaking up in my house all

23         the time and I wasn't there.

24    Q.   Now, don't get ahead of me.

25              Now, did Donnie Williams have a key to your
```

```
 1          residence at any time?

 2    A.    Up until he got locked up in 2001.

 3    Q.    You had him arrested for something in 2001?

 4    A.    Yes.

 5    Q.    He wasn't convicted, was he?

 6    A.    No.

 7    Q.    You're in the habit of filing false charges, aren't

 8          you?

 9    A.    No, I wasn't.

10    Q.    You filed a false charge in 2001?

11    A.    He wasn't threatening me.  He went and got a lawyer

12          to get charges dropped, and he said he'd give my

13          daughter her money back.

14          MR. AUSBORN:  I move to strike that as

15          nonresponsive.

16          THE COURT:  Denied.

17    A.    That's what I did.

18    Q.    On March 27th you testified that he was several

19          times --

20    A.    Yes, I did.

21    Q.    Did you go down to the police station March 27th?

22    A.    Yes.

23    Q.    You were in your vehicle, weren't you?

24    A.    No.  I wasn't driving that day.  That was at night.

25    Q.    Who was driving?
```

```
 1   A.   They had escorted him out of my house and told him

 2        not to be coming back to my house.  But why he was

 3        harassing me, I don't know.

 4   Q.   Did you have a vehicle on March 27th?

 5   A.   My daughter was driving.  I was with her.

 6   Q.   Now, did you tell your daughter, take me down to

 7        the police station so I can get a warrant on

 8        Mr. David Donnie Williams?

 9   A.   After I told him I didn't want him no more, he

10        should have left me alone.

11   Q.   Answer my question.

12   A.   No, I didn't.

13   Q.   You testified under direct examination, and I heard

14        you testify like 10, 15 or more times every time he

15        saw you he was saying -- excuse my

16        verbiage -- Bitch, why did you do that to me; I'm

17        going to kill you; I'm going to "F" you up?

18   A.   Yes, he did.

19   Q.   Do you believe that?

20   A.   Yes, I do.  Because he was on that crack.

21   Q.   You believe that, but not one time did you seek the

22        protection of this court for a protection order

23        against Mr. David Donnie Williams, not one time,

24        did you?

25   A.   No.
```

```
 1   Q.   Now, you testified that he stalked you about 15 or
 2        more times.  Isn't that what you testified to ?
 3   A.   Yes, I sure did.
 4   Q.   Not one time out of that 15 or more times did you
 5        come down to the court and speak to your buddy the
 6        circuit clerk and say, can I get a protection
 7        order?  You did don't that not one time, did you?
 8   A.   No, I didn't.
 9   Q.   Do you carry a gun?
10   A.   No, I don't.
11   Q.   Do you carry a knife?
12   A.   No, I don't.
13   Q.   You ain't no match for David Donnie Williams in a
14        physical contest, are you?
15   A.   Repeat that.
16   Q.   Are you a match for him in a physical contest?
17   A.   No.
18   Q.   Knowing that you don't carry a gun, knowing that
19        you don't carry a knife, knowing that you are not a
20        match for him in a physical contest, you didn't
21        seek law enforcement by going down to the police
22        station and here and getting a warrant on him on
23        March 19th?  You didn't do it, did you?
24   A.   No.
25   Q.   You didn't do it on the 27th either, did you?
```

74

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | You were asked on direct examination did Donnie |
| 3 | | tell you at any time that he wanted to break up |
| 4 | | with you? |
| 5 | A. | No, he didn't.  He have never told me that. |
| 6 | Q. | You would remember that, wouldn't you? |
| 7 | A. | Yes.  I told him that I wanted him to leave me |
| 8 | | alone.  He said he would kill me and the other guy. |
| 9 | | He would kill the man first and kill me second. |
| 10 | Q. | Let me ask you this right here:  And you believe |
| 11 | | that? |
| 12 | A. | Yes, I do. |
| 13 | Q. | Now, other than your daughter, other than your |
| 14 | | kids, you have one neutral witness who is going to |
| 15 | | come to court and testify that they heard David |
| 16 | | Donnie Williams make a death threat to you? |
| 17 | A. | No.  Because he did it when nobody wasn't around. |
| 18 | | That's why he did it like that; he didn't want |
| 19 | | nobody to hear him say that. |
| 20 | Q. | And you believe that? |
| 21 | A. | Yes, I do. |
| 22 | Q. | Now, people who are in fear of eminent harm and |
| 23 | | their safety respond accordingly, don't they? |
| 24 | A. | Yes. |
| 25 | Q. | You did don't that, now, did you? |

```
 1   A.   No.

 2   Q.   You stated that you had Mr. David Donnie Williams

 3        trespassed from your house.  Is that what you

 4        testified to?

 5   A.   Yes, I did.

 6   Q.   Now, let me ask you this:  Can you produce a

 7        warrant, an affidavit for examination by this jury

 8        showing that you swore out a warrant against him

 9        for trespassing?

10   A.   I did at the circuit clerk's office.  I know I did

11        it.

12   Q.   Where is it?

13   A.   I don't have it with me, but I did.

14   Q.   It just disappeared out of thin air.

15             You knew you were scheduled to be in court

16        today, didn't you?

17   A.   Yes, I know that.

18   Q.   Can you produce a court order that states that he

19        was trespassed away from your person or residence

20        or your job?  Have you got something I can show the

21        ladies and gentlemen of the jury?

22   A.   I've got some witnesses about my job.

23   Q.   My question to you is:  Is there is a court order

24        that would prove the application for trespassing

25        warrant?
```

```
 1    A.   Repeat that again.

 2    Q.   Is there a court order that I can show the ladies

 3         and gentlemen of the jury that states that he was

 4         trespassed away from your person?

 5    A.   No.

 6    Q.   You got a court order saying he was trespassed away

 7         from your residence?

 8    A.   No.

 9    Q.   You got a trespassing order showing he was

10         trespassed away from Wayne Farms?

11    A.   No.

12    Q.   In fact, he worked at Wayne Farms; is that correct?

13    A.   He got fired at the time he kept harassing me and

14         wasn't allowed on the property.

15    Q.   Were you there when he had a communication with his

16         boss, the last time he had communication with his

17         boss?

18    A.   Say that again.  I don't understand.

19    Q.   Were you physically there when he last spoke with

20         his boss?  The last time he was physically on the

21         premises at Wayne Farms, were you there?

22    A.   I don't understand what you are saying.

23    Q.   Let me ask you:  Can you see through walls?

24    A.   No, I can't.

25    Q.   Can you be in two or more places at one time?
```

```
 1    A.   No.

 2    Q.   When he last spoke with his boss, the last time you

 3         saw him there, were you in the middle of that

 4         conversation?  Were you right there listening

 5         between him and his boss speaking?

 6    A.   I don't know where the conversation was made.  I

 7         don't think I was there.

 8    Q.   So when you testified that he got fired, you don't

 9         have any information to back that up, personal

10         information, do you?

11    A.   No, I don't.

12    Q.   You know that when you get on this stand you are

13         supposed to be speaking truth.  Do you know what it

14         means to tell the truth?

15    A.   Yes, I do.

16    Q.   You knew that Donnie met somebody else.

17             Let's talk about it now.

18    A.   Met somebody else?  What you talking about?

19    Q.   Let me set the stage for you.

20             March 30th, you knew Donnie was involved with

21         somebody else?

22    A.   No, I didn't.

23    Q.   Yeah.  You didn't?

24    A.   No.  He did not tell me that.

25    Q.   March 25th did you know Donnie was involved with
```

1        anybody else?

2   A.   No.  He didn't tell me that.

3   Q.   He didn't tell you that?

4   A.   No.

5   Q.   You found out about it though?

6   A.   No, I didn't.  I didn't know nothing about that.

7   Q.   Now, you would see Donnie at Wayne Farm; am I

8        right?

9   A.   There was one particular day.

10   Q.   Now, what shift did you work at Wayne Farm?

11   A.   Second shift.

12   Q.   What hours would that encompass?

13   A.   From 4:15 until whenever we got off, all different

14        time.

15   Q.   What shift did Donnie work?

16   A.   Same shift I was working.

17   Q.   Y'all had a breakroom?

18   A.   Yes.

19   Q.   You know and I know, and the ladies and gentlemen

20        of the jury need to know that you saw Donnie in the

21        breakroom talking to other women from time to time.

22   A.   No, I didn't.  Because where I was sitting, I was

23        sitting behind a wall and couldn't see Donnie over

24        there.  That is not true.

25   Q.   You never saw Donnie talking to other women?

```
 1    A.    No, I didn't.

 2    Q.    You had a jealous spirit, didn't you?

 3    A.    No.  Donnie was jealous of me.  He told me he was

 4          jealous of me.

 5    Q.    This crack addict, physically abusive man, stalker

 6          you couldn't let go of him, could you?

 7    A.    He couldn't let go of me; because I wasn't

 8          bothering him.  He accused me of other men's (sic)

 9          on my job, and I was only speaking to them.  He

10          have always accused me of them.  He threatened to

11          kill my cousin.  He said he better not catch

12          neither one of them at my house.  He have told me

13          that several times since he got out in 2004.  He

14          accused me of going with my cousin.

15    Q.    Where do you work?

16    A.    Wayne Farms.

17    Q.    You have a second employment, don't you?  You write

18          short stories, fiction?

19    A.    No, I don't.

20    Q.    Because that's what's coming out of your mouth

21          right now is fiction.

22             Can you produce a warrant to the ladies and

23          gentlemen of the jury where your brother swore out

24          a warrant against him for stalking?

25    A.    No.  Because I don't tell my brother my business.
```

```
 1              I don't get my people involved like he did.
 2     Q.      You sit up there cozy like you a victim.  Is that
 3             what you wan the ladies and gentlemen of the jury
 4             to know?
 5                  Look them over there in the eye.
 6     A.      (Witness complies.)
 7     Q.      You call yourself a victim.  Isn't that what the
 8             State called you?
 9     A.      Yes.
10     Q.      The same victim that you admit was not rational in
11             getting some help; isn't that right?
12     A.      Yes.
13     Q.      The same victim that for seven long years put up
14             with a stalker.  That ain't rational; am I right?
15     A.      You right.  But you don't know what go on behind
16             closed doors unless you tell it.
17     Q.      This same victim (sic) that you contend was a crack
18             addict, crack abuser, and he put up with it for
19             seven years?
20     A.      Yeah.
21                  Did he tell you he was a crack head?  He didn't
22             tell you that, did he?
23     Q.      That ain't rational, is it?
24     A.      (No response.)
25     Q.      I notice you made a statement -- you wrote out a
```

```
 1        statement.  Am I right about this?

 2   A.   About what?

 3   Q.   Nowhere in your statement do you mention anything

 4        about that he asked you to take him to pick up some

 5        crack?

 6   A.   No, I didn't.  I wasn't going to do that.  I know

 7        better than to do that.  I'm not that type of

 8        person.

 9   Q.   Not that type of person.  You just hauled him

10        around to get his crack?

11   A.   I don't haul no one around.

12   Q.   How many kids you got?

13   A.   Three.

14   Q.   What ages are your minor children?

15   A.   One of them is 21.  The next one is 14, and the

16        next one is eight.

17   Q.   You know and I know and the ladies and gentlemen of

18        the jury know about the plague that crack cocaine

19        and other drugs have had on our society.

20             You know about that, don't you?

21   A.   Yes, I do.

22   Q.   You are raising small children; am I right about

23        that?

24   A.   Yes.

25   Q.   You are not going to put them into a position where
```

```
 1            here it is, they be exposed to that threat, are
 2            you, of somebody using or abuse, are you?
 3    A.      No.
 4    Q.      But yet the very man you contend was a crack
 5            addict, crack abuser had a key to your place and
 6            you held on to him for seven years?
 7    A.      He didn't have a key to my house all the time.  I
 8            stated that earlier.
 9    Q.      Now, you know during the time of your and Donnie
10            being together over the last seven years, you
11            know he has loved your children like they were his
12            own.  You know that?  Am I right about that?
13    A.      Well, my oldest daughter, one time he didn't like
14            her; he called her a bitch.  That ain't liking her
15            when you call them a bitch.  And he jumped on her
16            several times.  Yes, he did.
17    Q.      What year was that?
18    A.      At home.  I had just got off of my job, two times
19            he did it at night.
20    Q.      What year was it you say he jumped on your
21            daughter?
22    A.      I can't remember the years, but he have did it.
23                He wait until I come off of work to start
24            arguing and fussing.  And my daughter be trying to
25            help me out.  And that's the time he jump on her.
```

```
 1          I can't remember the years that he did.  He know he
 2          did it.
 3     Q.   You got a warrant and affidavit that you can show
 4          the ladies and gentlemen of the jury?
 5     A.   No.
 6     Q.   You got a court order for petition for protection
 7          from abuse where you wanted to stop this abuser
 8          from assaulting your daughter?
 9     A.   No.
10     Q.   Can you produce a 911 audiotape recording where you
11          call 911 and say, get out here; I got an abusive
12          man assaulting my daughter?
13     A.   No.  But everyone around here know him.  They know
14          he's a crack head.  Everyone know him.
15     Q.   Well, let me ask you this:  What are you if you
16          have a man as awful as he is, and you are still
17          there with him?
18     A.   I told you the man was threatening me.  I didn't
19          have no other choice.  He said he would kill me and
20          kill the man first.  And he meant that.  Don't
21          nobody know what was going on behind closed doors.
22     Q.   Don't nobody know?
23     A.   He was very abusive to me.
24     Q.   Let me ask you this:  Do you have one medical
25          report showing that you suffered physical abuse
```

```
 1        from this young man?
 2   A.   No.  I can tell you one incident he did to me back
 3        in '98.  I didn't go because he didn't let me go.
 4   Q.   Ma'am, my question to you is:  Do you have one
 5        medical report where we can see even a small bruise
 6        that he committed against your person?
 7   A.   No.  You won't let me tell you.  I'll tell you what
 8        he did.
 9   Q.   You got a photograph we can see?
10   A.   No.  Because he wouldn't let me do none of it;
11        that's why.
12   Q.   You want us to believe that he shouted at you 24
13        hours a day, seven days a week sometimes, the last
14        seven years?
15   A.   No.
16   Q.   Because isn't it a fact that if he physically
17        assaulted you to where you suffered physical
18        injury, that at some point you had an opportunity
19        to escape that assault and go to the hospital and
20        get some treatment?
21   A.   When a person won't let you go, how was you going
22        to go and go out the door or nothing.
23             That man messed up my face in 1998 because I
24        couldn't go to my job.  And I went to the doctor to
25        get an excuse so I wouldn't get fired.
```

85

```
 1   Q.   You went to the doctor to get an excuse?

 2   A.   Yes.

 3   Q.   Let me ask you:  That same doctor you went to to

 4        get an excuse, did you tell them you had been

 5        physically battered?

 6   A.   Yes, I told that to them.  Yes, I did.

 7   Q.   Where is the report?

 8   A.   I don't have it.  He did that.  His family know

 9        about it.  I told them about it.  He wouldn't allow

10        me to go out the house.  I called them up and told

11        them about it.

12   Q.   So we have a crack addict, crack abuser; we've got

13        a stalker, a batterer.  What else you want to call

14        him?  And you stayed with him?

15   A.   He was staying with me.  He wouldn't leave.  He

16        said he wasn't going nowhere.  He told me to go

17        back to my daughter's house to stay.  He told me he

18        wasn't going nowhere.  He was following me,

19        harassing me.  I wasn't going to none of his

20        relatives' houses trying to contact him in no way

21        when I left him.

22   Q.   Now, let me turn your attention to the two

23        contentions that are before this Court.

24             Stalking:  You agree there ain't no court order

25        that you can offer up to the ladies and gentlemen
```

```
 1              of the jury to where you have an injunction that
 2              says he can't come near your person, near your
 3              residence or near your job?
 4                   It doesn't exist, does it?
 5    A.   I did a criminal trespass that he is not allowed
 6         back to my property.  He is not allowed back down
 7         there.
 8    Q.   Let me ask you this -- I haven't seen one.
 9    A.   Well, I did one.  It was on March 30th when he got
10         my baby off that bus.  I went down there before I
11         went to my job.
12    Q.   The State of Alabama gave me discovery, which they
13         are required to do to show me everything they
14         intend to offer into evidence.
15    A.   Well, I did one on March 24th and did another one,
16         criminal trespass, on March 30th.
17    Q.   Well, let me ask you this:  What is he charged with
18         today?
19    A.   Harassment and stalking.
20    Q.   Did I hear a third charge, criminal trespassing?
21    A.   I did a criminal trespass against him on March
22         30th, yes, I did.
23    Q.   Let me ask you this:  Is there two indictments, one
24         for stalking and one for harassment?  Is that
25         right?
```

87

```
 1   A.   I guess so.
 2   Q.   There ain't any third one, is it, for criminal
 3        trespass?
 4   A.   I know I did one.
 5   Q.   You did, huh?
 6   A.   Yes.
 7   Q.   Have you ever been diagnosed with amnesia?
 8   A.   No.
 9   Q.   Your memory is real selective, though, isn't it?
10   A.   No.  I could remember.
11   Q.   You can?
12   A.   Yes, I can.
13   Q.   Let me test you on it.
14             When is the last time you had sexual relations
15        with Mr. Donnie Williams?
16   A.   It was March.  I think it was March 18th when we
17        broke up.
18   Q.   March the 18th?
19   A.   Yes.
20   Q.   Did that take place at your house?
21   A.   Yes.
22   Q.   He didn't force himself on you, now, did he?
23   A.   Yes, he did.
24   Q.   He did?
25   A.   Yes.
```

```
 1   Q.   This gets good.  You got a rape complaint against
 2        Mr. Donnie Williams?
 3   A.   No.
 4   Q.   Were you raped?
 5   A.   I didn't say I was raped.
 6   Q.   Were you?
 7   A.   No.
 8   Q.   Did you consent to sex?
 9   A.   No, I didn't.  It was him that want it; I didn't.
10   Q.   Did you tell him, stop, Donnie, I don't want to do
11        this?
12   A.   I be telling him a lot of times I don't want to be
13        bothered because I be tired.
14   Q.   Let me ask you this:  Did you tell him that on that
15        date?
16   A.   He get mad if I do it.  Which he have accused me of
17        being with other men, but I be on my job.
18   Q.   Did you tell him on that date, no, I don't want to
19        have sex with you; don't touch me?
20   A.   I be telling him I was tired.
21   Q.   Did you tell him that?
22   A.   Yes, I did.
23   Q.   But he had sex with you anyway?
24   A.   Yes.
25   Q.   You didn't swear out a rape complaint?
```

88

```
 1   A.   Just like I told you, he say I've been with another
 2        man if I didn't.  He have always accused me of
 3        another man.
 4   Q.   You get violated, and you want the ladies and
 5        gentlemen of the jury to believe that the only
 6        reason why you didn't swear out a warrant is he
 7        will accuse you of being with another man?
 8   A.   He have told me that.
 9   Q.   And this is the same man you have been testifying
10        to all morning long you didn't want to have no
11        dealings with.  Does that make is sense?
12   A.   To me it do.
13   Q.   If he thought you was with another man, maybe
14        that's the reason he left you alone?
15   A.   But he is lying because I haven't been with another
16        man since I've been dating him.
17   Q.   You going to do everything you can to prove your
18        loyalty to this man because you don't want Donnie
19        to leave?
20   A.   Donnie is a big liar.
21   Q.   Is that not what this is about?  What happened in
22        this case is Donnie told you he was leaving you.
23   A.   No, he didn't.  He have never told me that.
24   Q.   Seven years of a relationship going nowhere --
25             MRS. PENN:  Your Honor, I object.  If he wants
```

```
 1          to ask a question, he can ask a question, but don't

 2          testify.

 3               THE COURT:  Sustained.

 4     Q.   You agree it was seven years of a relationship

 5          going nowhere?  You didn't marry Donnie, did you?

 6     A.   He didn't want to go nowhere.  I was in my house.

 7          He was living with me.  He said he wasn't going

 8          nowhere.  That's what he stated to me.  I

 9          volunteered to leave my house and go to my sister

10          and them, and he came to my house and jumped on me

11          that day and stole her purse.  And I had to leave

12          my house for six long weeks.  And he know he did

13          this to me.  I was afraid to stay in my house then.

14     Q.   And you got back with him, didn't you?

15     A.   He came to my house.  He had broke out of

16          prison -- out of jail up here.

17     Q.   And you got back with him?

18     A.   He was hanging around my house that night.  Folks

19          didn't know -- he was hanging around; he left and

20          went to Atlanta.

21     Q.   And he was hanging around your house and you opened

22          up the door and --

23     A.   He wouldn't leave my residence.  And he kept

24          disturbing me.  And he said he wanted to talk, and

25          I let him in.
```

```
 1    Q.    The same person that you said had been violent to
 2          you over the years, you let him in?
 3    A.    Yes, because he wouldn't leave my door.
 4    Q.    Does that make sense?
 5    A.    No, it don't.
 6    Q.    To let the threat in if you are afraid of the
 7          threat, does that make sense?
 8    A.    If I didn't open the door, he was going to break up
 9          in there like he had done, breaking up in there.
10          He don't have a key.
11    Q.    You got a warrant and affidavit to back all of this
12          up?  You don't got nothing, do you?
13    A.    No.
14    Q.    I thought so.
15              Now, you know and I know and the ladies and
16          gentlemen of the jury know that the only reason you
17          were able to get a stalking warrant and affidavit
18          and a harassment warrant and affidavit is because
19          you went to your friend --
20              MRS. PENN:  He is testifying and I object.  He
21          is testifying.
22              THE COURT:  Finish the question.
23    Q.    You went to your friend to get this, didn't you?
24    A.    Yeah, he my friend.  He's my landlord.  I'm
25          supposed to be a friend.  I'm living in his house.
```

```
 1   Q.   Uh-huh (affirmative response).

 2             Now, you said earlier that Donnie grabbed

 3        you -- what date was that on?

 4   A.   On the 24th.

 5   Q.   The 24th?

 6   A.   Yes, on my job, on my white smock.  And he got

 7        caught doing it.  And they have a policy, husband

 8        and wife not supposed to do that on my job.  And

 9        David Donnie Williams knows this.  He was trying to

10        make me lose my job like he said to me at my

11        daughter's on March 19th.

12   Q.   That offended you, didn't it?

13   A.   Yes, it did.

14   Q.   And hurt you when he physically grabbed you?

15   A.   Yes, it hurt me, in feeling it hurt me, not

16        physically.

17   Q.   Did you swear out a warrant on him on March 25th?

18   A.   I had did one earlier before I went to work.

19   Q.   Answer my question.  Did you swear out a warrant on

20        March 25th?

21   A.   This was on my job.  I couldn't do it at work.

22   Q.   My question to you is a yes or no.

23   A.   No.  I couldn't do it right then.  I was on my job.

24   Q.   You got off work?

25   A.   It was late at night when I did.
```

1  Q.   You couldn't do no warrant late at night?

2  A.   No.

3  Q.   You couldn't go down -- Let me ask you this:  The

4       police department, the last time I checked, I think

5       they were open 24 hours a day, seven days a week?

6  A.   I said a warrant, not no police report.

7  Q.   Well, where do you think you go to get it?

8  A.   (No response.)

9  Q.   Now, did you call 911 on March 24th?

10 A.   No, I didn't.

11 Q.   Now, you said Donnie -- Donnie stalked you; isn't

12      that what you said?

13 A.   Yes.

14 Q.   That's why we are here.  That's one of the reasons

15      why we are here because you said, Donnie stalked

16      me.  Am I right?

17 A.   Yes.

18 Q.   You have been with this man for seven years.  Am I

19      right about this?

20 A.   We wasn't together when none of these incidents

21      happened.  I had left him.

22 Q.   Now, I want you to look the ladies and gentlemen of

23      the jury in the eyes with a straight face.

24 A.   (Witness complies.)

25 Q.   Did you play any role in this relationship?

```
 1    A.    I didn't play no roles in the relationship.

 2    Q.    Going off the base -- You kept letting him back all

 3          of these years even though he was a crack addict

 4          you contend; am I right?

 5    A.    I kept telling you I did it because he was

 6          threatening me.

 7    Q.    You kept letting him back even though you contend

 8          he was physically abusing you all of these years;

 9          am I right?

10    A.    He was begging to come back, too.  And he was

11          threatening me.

12    Q.    And you kept letting him back even though he was

13          physically abusing your kids all of these years?

14    A.    Yes.

15    Q.    And you kept letting him back even though he was

16          stalking you all of these years?

17    A.    He was on my premises.  I wasn't bothering him.  He

18          was bothering me on my premises.  I wasn't

19          bothering him.  I wasn't going nowhere near him.

20    Q.    I tell you what:  Help us out, if you will.  I want

21          to know, and I know the ladies and gentlemen of the

22          jury want to know, and I don't mean to embarrass

23          you.  Was it the sex?

24    A.    No.  No.

25    Q.    It wasn't the sex?
```

95

```
 1   A.   No.  No, it wasn't.

 2   Q.   Was it money?

 3   A.   No.  Because he didn't have no money because the

 4        crack was getting it.

 5   Q.   Crack getting his money?

 6   A.   Yes.

 7   Q.   Sex was bad.  Why did you stay?

 8   A.   I was at my own house.  He was at my house.

 9             I wasn't living with him.  He was living with

10        me.

11   Q.   From what I'm understanding, this relationship

12        didn't have one redeeming quality about it?

13   A.   I told you earlier he said he didn't want to see me

14        with nary another man.  That's what I told you.  He

15        kept coming back to me.

16   Q.   Broke all the time, sex bad, stalking, batterer,

17        won't marry you?

18   A.   He have asked me to marry me.  We've been engaged

19        twice.  I broke it.

20   Q.   Sneaking off with your kids.

21             I draw a line with positive and negative.  And

22        if what you say is true, there wasn't one redeeming

23        quality about this man that kept you interested in

24        him over the last seven years.

25             Is that rational staying in a relationship with
```

96

```
 1            somebody that ain't doing you a bit of good?
 2   A.   Somebody threatening you, you don't have a choice.
 3   Q.   He been threatening you the past seven years and
 4            not one time -- Are you still breathing this air
 5            right now?
 6   A.   Yeah, I'm still breathing the air.  Because I was
 7            running for my life, that's why.
 8   Q.   You've been running for your life the last seven
 9            years because you're telling us he has been abusing
10            you the last seven years?
11   A.   He have been abusing me the last seven years.  He
12            started in '98.
13   Q.   That doesn't make sense.  Now, I'm going to have
14            witnesses to take the stand.
15               You know Donnie's mama?
16   A.   Yes.
17   Q.   That ain't one of them.
18               You know Donnie's sister Lynn?
19   A.   Yes.
20   Q.   You know Robert; Lynn's boyfriend Robert?
21   A.   Yes.
22   Q.   Isn't it true that you have gone to Lynn's place,
23            Carrie's place and picked up Donnie's stuff and
24            moved him back in?
25   A.   I'm going to tell you what happened.
```

```
 1   Q.   Answer my question, yes or no.

 2   A.   Yes.

 3   Q.   And you have done it many times, haven't you?

 4   A.   I ain't did it over twice.

 5   Q.   Twice.  Crack addict is out your hair; is that not

 6        right?  Isn't that right at one time he was out

 7        your hair?  Is that not right?

 8   A.   He came back to my house asking me to take him over

 9        there to get his clothes because he had to go to

10        work.  That was this year after he got out.

11   Q.   And then you moved him on back in?

12   A.   I didn't move him back in.  I told him don't go

13        over there and get them clothes if he wasn't going

14        to do right.

15             I'm going to do right this time; I promise you.

16   Q.   And you let him back?

17   A.   Yes, I did.  I wasn't bothering Donnie.  He came

18        over and asked me to take him to get his clothes.

19        I wasn't bothering Donnie.

20   Q.   Let me ask you this:  Do you like R and B music?

21   A.   I don't understand.

22             MRS. PENN:  I object; irrelevant.

23   Q.   You ever heard of Keith Sweat?

24   A.   Yes.

25   Q.   Well, let me ask you this:  Donnie about as good as
```

```
 1            Keith Sweat, isn't he?  He begged you all these
 2            years and you took him back?
 3    A.      His people don't like me anyway.  I found that out.
 4            They are two-faced.
 5    Q.      His people are two-faced?
 6    A.      Yes, they is.
 7    Q.      I've taken you over your testimony, and it looks
 8            like the only person that's two-faced is you.
 9    A.      I am not two-faced.  It's David Donnie Williams.
10            He talk about his people to me and then go back to
11            them and tell lies on me.
12                Did he ever tell you when his sister and mom
13            called over there to see if he was there to tell
14            them he wasn't there?
15                MR. AUSBORN:  I move to strike that as
16            nonresponsive.
17                THE COURT:  Granted.  Let's move it along.
18                MR. AUSBORN:  Thank you.
19    Q.      Now, the incident where Donnie picked your daughter
20            up, is that the eight year old?
21    A.      Yes.
22    Q.      Isn't what happened on that date, you left your
23            daughter out on the porch unattended?
24    A.      No, I didn't.
25    Q.      And Donnie saw her sitting out on the porch in a
```

```
 1            bad area and was concerned about her safety and
 2            picked her up because he was concerned about her
 3            welfare.  Is that not right?
 4       A.   No, I didn't leave her unattended.  I was coming to
 5            pick her up and Donnie was trespassed off my
 6            property.
 7                 He wasn't supposed to be down there.  He saw my
 8            daughter standing by my door, and we pulled up to
 9            get her, and I believe Donnie done got her.  And
10            when she got off the bus, my daughter told me she
11            was knocking on the door.
12       Q.   Now, let me ask you this here:  You weren't there?
13       A.   No, I wasn't.  It was two minutes later.
14       Q.   You weren't there when the daughter ran to the car
15            because she was scared; Mama ain't here?
16                 MRS. PENN:  Your Honor, I object.  He is
17            testifying.  If he wants to ask a question, he can
18            ask a question, but don't testify.
19                 THE COURT:  Sustained.
20       Q.   You weren't there, were you?
21       A.   I was coming to pick her up because I couldn't live
22            there.  I couldn't live there in my house at the
23            time.  That's why I wasn't there to pick her up on
24            time.  I have to go pick her up.  It was two
25            minutes after she had got off the bus, 2:52.
```

```
 1              He was trespassed away.  He wasn't supposed to

 2         be there.  And that wasn't his child to pick up.

 3         She told me, I wasn't scared, Mama; David told me

 4         to get in the car, and I got in the car.

 5              He had no business being there at the time no

 6         way.  He wasn't living there at the time.

 7    Q.    You keep saying trespass.  Ain't nobody trespassed

 8         from your property, is there?

 9    A.    I know what he did.  You can get my friend up here

10         and testify for me.  He'll do it.

11    Q.    You talk about your friend?

12    A.    He supposed to be my friend; he's my landlord.

13    Q.    I know Mr. Jernigan.  He is a person of integrity.

14         And you played on that integrity, didn't you?

15    A.    No, I didn't.

16    Q.    And every time you went to Mr. Jernigan and said,

17         Mr. Jernigan, Donnie Williams is threatening me and

18         abusing me, he believed you.  He believed you,

19         didn't he?

20              Not one time did you tell him about all of the

21         times that you were picking up his stuff and

22         bringing him back?

23    A.    That was this year, the only time, 2004, when he

24         first got out.  All the other time I don't know

25         nothing about it because I didn't go.
```

```
 1   Q.   You didn't tell him about all through the years
 2        that y'all would break up and make up and break up
 3        and make up?
 4   A.   That's with him coming to my property.  I wasn't
 5        going around him, period.  He was coming to my
 6        property.  I was in my house on my property.  I
 7        wasn't bothering David Donnie Williams.
 8   Q.   You said there wasn't nothing redeeming about him;
 9        crack addict, abuser, stalker, harasser, broke.
10        Let me ask you this:  You must have been doing
11        something real good to get Donnie to come back?
12   A.   He said I was a good woman.  He didn't tell you
13        that, did he?
14   Q.   Good woman?
15   A.   Yes.  He said I was the best woman he ever have.
16        Yes, he have told me this.
17   Q.   Look at the ladies and gentlemen of the jury.
18        Look them in the face.
19   A.   (Witness complies.)
20   Q.   The reason we are here.
21        MRS. PENN:  Your Honor, if he is going to ask
22        her a question --
23        MR. AUSBORN:  Let me ask a question:
24   Q.   Seven whole years you felt the need to try to prove
25        to Donnie that you was a good woman?
```

```
 1   A.   I didn't try to prove it to Donnie.  Donnie was
 2        behind Callie.
 3             Like I said earlier, I was sitting on my step
 4        in June of '97.  Donnie was with his nephew.  I
 5        wasn't looking for no man.
 6   Q.   You weren't looking for no man?
 7   A.   No, I sure wasn't.  I had just got over a
 8        relationship with my baby daddy.  I wasn't looking
 9        for no man.  He was at Callie.  I was at my own
10        house.
11   Q.   That crack addict meet your needs?
12   A.   No, he had no needs for me.  He had nothing to give
13        me.  When I asked him for a dollar, he couldn't
14        give me a dollar.  No.  He used to come to me and
15        ask me for money.
16   Q.   That broke man meet your needs?
17   A.   No.
18   Q.   That physical batterer/abuser meet your needs?
19   A.   No.
20   Q.   That stalker meet your needs?
21   A.   No.
22   Q.   Yet you stayed with him seven years?
23   A.   Because he was threatening me.  I had no other
24        choice.  He would stay out watching my house at
25        night.
```

| 1 | Q. | Now, when you say you didn't have no other choice, |
| 2 | | do you believe that? |
| 3 | A. | I believe that man will kill me for real, yes.  He |
| 4 | | have a bad record.  I didn't know that until I got |
| 5 | | involved with him. |
| 6 | Q. | Okay.  Now, the same individual who you say you |
| 7 | | believe will kill you, you can't show us one |
| 8 | | photograph to where he ever assaulted you, not one? |
| 9 | | MRS. PENN:  Your Honor, asked and answered. |
| 10 | | THE COURT:  Sustained. |
| 11 | | MR. AUSBORN:  I'm going to wrap it up.  I'm |
| 12 | | going to mark this as Defendant's Exhibit 1. |
| 13 | | (Defendant's Exhibit No. 1 was |
| 14 | | marked for identification.) |
| 15 | Q. | That's the offense report, March 25th, '04.  You |
| 16 | | signed that, didn't you?  Is that your signature? |
| 17 | A. | I can't read that far.  I can't see what's on the |
| 18 | | paper. |
| 19 | Q. | Let me help you.  I'm showing you now what is |
| 20 | | tendered to be marked Defendant's Exhibit 1. |
| 21 | | That's the offense report for March 25th, 2004. |
| 22 | | I'll let you examine the front and back of that. |
| 23 | A. | Yes, he did this.  That's what I told them. |
| 24 | Q. | You stated that Donnie had been harassing you March |
| 25 | | 25th; is that right? |

```
1   A.   Yes, as I was getting on my job.

2             MRS. PENN:  Your Honor, may we approach

3             (Whereupon a Bench conference was held

4              outside the hearing of the reporter and the

5              jury.)

6   Q.   (By Mr. Ausborn:) Now, this Defendant's Exhibit 1,

7        the offense report for March 25th, '04, is this a

8        complete and accurate representation of the report

9        you filled out on March 25th?

10  A.   Yes.

11  Q.   That's your signature down at the bottom?

12  A.   Yes, that's my signature.

13  Q.   Lieutenant James Finney?

14  A.   Yes.

15  Q.   Who does he work with?

16  A.   Police department.

17  Q.   Union Springs Police Department?

18  A.   Yes.

19  Q.   Why didn't you get a warrant and affidavit from the

20       police?  You were right down there with them?

21  A.   I didn't know they do all of that.  I didn't know

22       that.

23  Q.   You were right there with the police and didn't get

24       a warrant?

25  A.   I didn't know I could do a warrant at the police
```

```
 1              station.  I didn't know that.

 2    Q.   But you knew you could get it from your buddy,

 3         though, didn't you; you knew that?

 4    A.   He the circuit clerk.  He supposed to write me out

 5         one.

 6    Q.   Mr. Jernigan don't pack a gun, do he?

 7    A.   No, I don't think so.

 8    Q.   Who you think is in the best position to be able to

 9         protect you from a person who has threatened to

10         kill you for the last seven years, the clerk of

11         court, who don't pack a gun, or the lieutenant, who

12         packs a gun?

13    A.   Lieutenant.

14    Q.   Does that make sense that you didn't get protection

15         from the lieutenant that you were right down there

16         in front of?

17    A.   I didn't know that at the time.  I was very scared.

18    Q.   You were scared at the police station right there

19         in front of the lieutenant?

20    A.   He had already followed me to the police station.

21         And I was scared to get out the car.

22    Q.   Let me ask you:  Was he there when you met with the

23         lieutenant?

24    A.   No.  Because we left.  We went around town to

25         follow the police; we blowed.  And I was afraid to
```

```
 1        get out.

 2            What he said he was going to do to me, he was

 3        going to do it when I was coming out the gate at

 4        work.  He came up to me and Glads (phonetic) was

 5        the guard that night.  And he supposed to show a

 6        picture ID, and he wasn't at work that day, anyway.

 7   Q.   You agree that it is kind of ridiculous to be

 8        scared when you are in front of a lieutenant who's

 9        packing heat?

10   A.   Well, I didn't know they would do a warrant.  I

11        didn't know that.  Because if I did, I would have

12        did it.

13            MR. AUSBORN:  Your Honor, we offer into

14        evidence Defendant's Exhibit 1.

15            MRS. PENN:  The best evidence of that is what

16        she testified.

17            MR. AUSBORN:  Any objection?

18            MRS. PENN:  Yeah, I am objecting.  The best

19        evidence --

20            MR. AUSBORN:  It's been authenticated.

21            THE COURT:  Admitted.

22            (Defendant's Exhibit No. 1 was offered

23            and received into evidence.)

24            MR. AUSBORN:  Permission to publish, Your

25        Honor.
```

```
 1              THE COURT:  Granted.
 2              (Whereupon Defendant's Exhibit No. 1
 3               was published to the jury.)
 4              (Defendant's Exhibit No. 2 was
 5               marked for identification.)
 6    Q.   (By Mr. Ausborn:) Now, Defendant's Exhibit Number
 7         2, this is the March 30th, 2004, incident report
 8         for criminal mischief.
 9              I am going to ask that you examine that
10         document.
11    A.   (Witness complies.)
12    Q.   Is that your signature ton back?
13    A.   Yes, that's my signature.
14    Q.   Does this document accurately reflect the incident
15         report that you filled out on March 30, 2004?
16    A.   Repeat that again.  I didn't hear what you said.
17    Q.   Does this incident report dated March 24th (sic)
18         for criminal mischief, signed by you on the rear,
19         does it accurately reflect what you communicated to
20         law enforcement on that date?
21    A.   I still don't understand.
22    Q.   You told them what was in this report; right?
23    A.   Yes.
24    Q.   Now, did you fill in criminal mischief or did the
25         officer fill that?
```

108

```
1    A.   The officer did because I told him what happened.
2    Q.   You know what the definition of criminal mischief
3         is?
4    A.   Not exactly.
5    Q.   Uh-huh (affirmative response).  Stalking ain't
6         criminal mischief, is it?
7    A.   I don't understand what you are saying.  What you
8         saying?
9    Q.   The type of incident offense is labeled criminal
10        mischief; isn't that right?  Isn't that what it
11        says?
12   A.   Yes, yes.
13   Q.   That's on the first page; isn't that right?
14   A.   Yes.
15   Q.   And on the second page, you go into an explanation
16        that Donnie was trespassed from your residence,
17        keeps coming around harassing you and stalking you.
18             Isn't that what you wrote out?
19   A.   The officer wrote it out and I signed it.  I told
20        him what happened, yes.
21   Q.   And did you read it and sign it?
22   A.   Yes, I signed it.
23   Q.   Were you under the influence of narcotics?
24   A.   No.
25   Q.   Alcohol or anything --
```

| | | |
|---|---|---|
| 1 | A. | No.  I don't drink. |
| 2 | Q. | Before you signed off of this -- |
| 3 | A. | No, I don't drink. |
| 4 | Q. | Had no problem reading it? |
| 5 | A. | No. |
| 6 | Q. | You didn't tell him about no criminal mischief, did |
| 7 | | you? |
| 8 | A. | Tell who about that? |
| 9 | Q. | The officer. |
| 10 | A. | That's what he wrote on the paper. |
| 11 | Q. | Huh? |
| 12 | A. | He wrote that on the paper. |
| 13 | Q. | You didn't swear out a warrant against him for |
| 14 | | criminal mischief, did you? |
| 15 | A. | To who? |
| 16 | Q. | Against David. |
| 17 | A. | To the officer? |
| 18 | Q. | Did you swear out a warrant against David for |
| 19 | | criminal mischief, too? |
| 20 | A. | Him? |
| 21 | Q. | Are we here on a criminal mischief case? |
| 22 | A. | I guess so. |
| 23 | Q. | We are not here on a criminal mischief case, are |
| 24 | | we? |
| 25 | A. | I don't know. |

```
 1    Q.   You know that one of the charges is stalking, don't

 2         you?

 3    A.   Oh, yes.

 4    Q.   You know that the other one is harassment, don't

 5         you?

 6    A.   Yes.

 7    Q.   Criminal mischief ain't one of them, is it?

 8    A.   I didn't put that on there.  The officer put that

 9         on there.

10    Q.   Now, Officer N. Williams and Officer Jay Horne,

11         Junior, where do they work at?

12    A.   The police department.

13    Q.   Union Springs Police Department?

14    A.   Yes.

15    Q.   You told them Donnie had been stalking you?

16    A.   Yes.

17    Q.   And had been harassing you?

18    A.   Yes.

19    Q.   Trespassing against you?

20    A.   Yes.

21    Q.   Your person and your residence?

22    A.   Yes.

23    Q.   Where is your trespassing warrant?

24    A.   I don't know.  I don't have it.

25    Q.   I notice in the offense report -- Did you give any
```

```
 1          date?  Is there a date in here when he was
 2          allegedly doing all of this?  There ain't no date
 3          plugged in here, is there?
 4     A.   I didn't write that.
 5     Q.   Is there a date in here?
 6     A.   It's supposed to be on the front page.
 7               It's supposed to be.
 8     Q.   Let's see.  Date and time of this report.  It's got
 9          a date that the report is given.  Am I right about
10          that?  You agree with that; right here in the left
11          corner?
12     A.   Yes, that's what time it happened.  Yes.
13     Q.   Now, that's the date and time of the report?
14     A.   Yes, police report.
15     Q.   That ain't the date and time of the alleged
16          incident, is it?
17     A.   That's what I told had happened, yes, that on the
18          paper.
19     Q.   Did you tell the officer at that time that you were
20          fearful of your safety, help me get a protection
21          from abuse?
22     A.   Yes, I told him I was afraid.  I told him.
23     Q.   Did you ask him, how can I get a protection order?
24     A.   No, I didn't ask him that.
25     Q.   You knew about a protection order.  You said that
```

```
 1        earlier, that you knew about it.  You knew about

 2        it, didn't you?

 3   A.   Yes.

 4   Q.   You didn't want to really be protected from Donnie

 5        Williams, did you?

 6   A.   When someone leave them alone, that means he should

 7        leave me alone.  I didn't want to have to go

 8        through all that.  He should have left me alone.  I

 9        did it the easy way; I left him home.

10   Q.   You liked Donnie chasing behind you, didn't you?

11   A.   No, I don't.

12   Q.   It made you feel like a real woman, didn't it?

13   A.   No.

14   Q.   Didn't it?

15   A.   No.

16   Q.   It felt good to be wanted, didn't it?

17   A.   No.

18   Q.   After all you hadn't been involved in another

19        relationship for the last seven years; isn't that

20        right?

21   A.   I was afraid to be in another relationship.  He

22        said he would kill me and the man both.  You would

23        be afraid if a man tell you that.  You don't know

24        what he got on when he come up there; especially on

25        crack.  He might have a click in a minute and don't
```

```
 1              know what he doing.
 2    Q.    You ever turned in this crack addict?
 3    A.    The police -- every police in this town know about
 4          David Donnie Williams.  I don't have to have no
 5          proof to show them.
 6              MR. AUSBORN:  Your Honor, I offer into evidence
 7          Defendant's Exhibit 2.
 8              THE COURT:  Any objection?
 9              MRS. PENN:  No.
10              THE COURT:  Admitted without objection.
11              MR. AUSBORN:  Permission to publish, Your
12          Honor?
13              THE COURT:  Go ahead.
14              (Defendant's Exhibit No. 2 was offered,
15               received into evidence, and published
16               to the jury.)
17    Q.    You gave a statement to the Union Springs Police
18          Department; is that right?
19    A.    Yes.
20    Q.    Now, did you give that statement on April 17th,
21          2004?
22    A.    Yes, to the police department.
23              (Defendant's Exhibit No. 3 was
24               marked for identification.)
25    Q.    I am going to show you what's marked Defendant's
```

1        Exhibit 3 and ask you to look at that and see if

2        that's correct?

3  A.   Yes, I wrote this.  This is my handwriting.

4  Q.   Now, look on page 3 of that exhibit and tell me

5        whether or not that statement is signed.

6  A.   Yes, I signed that.

7  Q.   Would you agree that that statement accurately

8        reflects everything that you told them on April

9        17th, 2004?

10  A.   Yes.

11  Q.   Let me get that back from you.  Thank you so much.

12          You sure about that?

13  A.   Yes, everything happened that I wrote on the paper.

14  Q.   Now, when you wrote this statement out, how many

15        officers was present?

16  A.   Cherlyn Dean is the one that gave me the paper to

17        write it down.

18  Q.   Who did?

19  A.   Cher Dean.  That's the only one that was in there

20        at the time.

21  Q.   Only one?

22  A.   Yes, that I saw then.

23  Q.   Now, you knew if you juiced up this statement, you

24        figured I'll probably get some attention out of it,

25        so you put stuff in it that really didn't happen.

```
 1              Isn't that what you did?
 2    A.    Everything I have in that police report happened.
 3          Everything happened.
 4    Q.    Now, do you have a witness that's going to come
 5          forth other than small kids or your daughter that's
 6          going to back you up on April 17th?
 7    A.    Yes.  My 14-year-old son was around me right there,
 8          and I think Anthony Blake Williams was in the car
 9          with David Williams when it happened.
10    Q.    Now, let me ask you this:  Have you talked to your
11          son about this case?  Have you sat down and talked
12          to the kids and given them an idea why you are back
13          and forth in court?
14    A.    I have told them what was going on and not to be
15          afraid when they get up there, just to tell what
16          they saw happen.
17    Q.    You talked to your child about his testimony,
18          didn't you?
19    A.    No.
20    Q.    Didn't you talk to him and tell him what they
21          needed to say?
22    A.    They told me to ask him if he remembered what
23          happened.  And he said, yes.
24    Q.    Did you tell him what to say?
25    A.    I didn't tell him what to say.
```

| | | |
|---|---|---|
| 1 | Q. | Did you rehearse his testimony with him? |
| 2 | A. | No, I didn't. |
| 3 | Q. | Let me ask you this:  We are talking about |
| 4 | | something way back in April, and this is November? |
| 5 | A. | Yes. |
| 6 | Q. | May, June, July, August, September, October, |
| 7 | | November, seven whole months.  Seven is a good |
| 8 | | number? |
| 9 | A. | Yes. |
| 10 | Q. | Seven years with Donnie and seven years after this |
| 11 | | incident.  Seven is your lucky number. |
| 12 | | Let me ask you this:  You telling us you didn't |
| 13 | | have to talk to these kids about what happened? |
| 14 | A. | No, I didn't talk to them. |
| 15 | Q. | About an incident that occurred seven months |
| 16 | | earlier? |
| 17 | A. | No, I didn't. |
| 18 | Q. | You didn't? |
| 19 | A. | No. |
| 20 | Q. | Let me ask you this here:  In order for you to come |
| 21 | | forth today, have you met with anybody to talk |
| 22 | | about this case? |
| 23 | A. | No, I didn't. |
| 24 | Q. | Mrs. Penn, have you met with Mrs. Penn about this |
| 25 | | case? |

```
 1    A.    Yes, I talked to her.

 2    Q.    Have you met with the investigators about this

 3          case?

 4    A.    I haven't talked to them since I did the police

 5          report.

 6    Q.    What about the officers?

 7    A.    I haven't talked to them since I did the police

 8          report.

 9    Q.    You are telling us the only person you met with in

10          anticipation of your testimony was Mrs. Penn?

11    A.    Yes, that's it.

12    Q.    That's the only person you talked to about it?

13    A.    Yes.

14    Q.    Did she go over your testimony with you?

15    A.    Yes.

16    Q.    You going to do just what she told you to do, what

17          y'all talked about?

18    A.    Yeah, she told me, yes.

19    Q.    And that's exactly what you are going to do today,

20          you are going to testify just like she told you to.

21          Am I right about that?

22    A.    Yeah.  But she didn't tell me to tell no lie.  I'm

23          telling the truth.  She told me to tell what

24          happened, and I'm telling what happened.

25              MR. AUSBORN:  Your Honor, I offer Defendant's
```

```
 1        Exhibit 3.

 2              THE COURT:  Any objection?

 3        MRS. PENN:  No.

 4        THE COURT:  Admitted.

 5        MR. AUSBORN:  Permission to publish?

 6        THE COURT:  Granted.

 7              (Defendant's Exhibit No. 3 was offered,

 8              received into evidence, and published to

 9              the jury.)

10   Q.   (By Mr. Ausborn:) Now, the warrant and affidavit

11        that you swore out in these cases, you gave no

12        details on either one of the warrant and

13        affidavits?

14   A.   Repeat what you said.

15   Q.   You didn't give no details -- Did you sign the

16        warrant and the complaint for harassment?

17   A.   Yes, I did.

18   Q.   Now, as I close, look at the ladies and gentlemen

19        of the jury now.

20   A.   (Witness complies.)

21   Q.   You know and I know and they need to know, you

22        could have handled this a whole lot better and we

23        wouldn't be here now, isn't that true?

24   A.   When you threatened by a person, you can't do no

25        more.
```

1  Q.  You threatened by a person the first time, the
2      second time you cut them off, don't you?  That's
3      what a rational person would do; they would cut
4      them off, wouldn't they?  Wouldn't they?
5  A.  Yes.  But when they keep coming back begging you to
6      take them back and threatening you.  That's the
7      problem.
8  Q.  And when you are beat up by a person the first
9      time, the second time, a rational person would cut
10     them off, wouldn't they?
11 A.  Yes, that's true.
12 Q.  And when that person beats up on your kids, who you
13     as a parent have a legal and moral obligation to
14     protect, you cut them off, that's what a rational
15     personal would do, wouldn't they?
16 A.  Yes.
17 Q.  And when you are stalked by a person the first
18     time, the second time and many, many other times,
19     you call 911, don't you?
20 A.  Yes.  When you are afraid, you have no choice but
21     to do what you were doing.
22 Q.  And that's what a rational person does, isn't it?
23 A.  Yes.
24 Q.  You didn't call 911?
25 A.  No.

| 1  | Q. | And when you are in fear of your safety because a |
|----|----|---------------------------------------------------|
| 2  |    | person has told you over and over again, I'm going |
| 3  |    | to kill you, over and over again, this same person |
| 4  |    | you contend has battered you many times, numerous |
| 5  |    | times over the years, you go to the courts and you |
| 6  |    | get protection from that person.  Isn't that what a |
| 7  |    | rational person does? |
| 8  | A. | That's true. |
| 9  | Q. | You didn't do that, did you? |
| 10 | A. | No. |
| 11 | Q. | And when you are right there in front of law |
| 12 |    | enforcement who are packing heat, Glocks, |
| 13 |    | Beretta's, trained with many, many years of |
| 14 |    | expertise on firearms, and you got a person who is |
| 15 |    | threatening to kill you, been stalking you only |
| 16 |    | minutes before you got to the station, you will |
| 17 |    | swear out a warrant on them.  That's what a |
| 18 |    | rational person does, isn't it? |
| 19 | A. | Yes. |
| 20 | Q. | You didn't do that, did you? |
| 21 | A. | No. |
| 22 | Q. | Crack addict, smoking drugs, seven years of hell |
| 23 |    | around you and your kids, you cut them off.  That's |
| 24 |    | what a rational person does, isn't it? |
| 25 | A. | Yes.  But when they keep coming back and begging |

121

```
 1        you, promises, that's what I am trying to get you
 2        to see.  He kept coming to my residence.  I wasn't
 3        going to him trying to contact him.  He kept coming
 4        to where I was at.
 5   Q.   Now, rational person who has zero tolerance for
 6        drugs, I don't care what it is, crack, marijuana,
 7        heroin, LSD, meth, you don't chauffeur somebody
 8        around to get drugs, do you/, a rational person
 9        don't do that, do you?
10   A.   I wasn't doing that.
11   Q.   Didn't you testify that you were going to take him
12        to get the drugs?
13   A.   I didn't say that.
14   Q.   The ladies and gentlemen of the jury will remember
15        your testimony.
16   A.   I didn't take him to get no drugs.  No, I didn't.
17        I said a jersey, a jersey, what to wear, a jersey.
18   Q.   A rational person, a man shacking up with you over
19        your kids, whatever example that may be, beating
20        you up, stalking you, eating up food in the house,
21        not paying bills, not even a cable, you kick them
22        out and you say, you ain't coming back.  Isn't that
23        what a rational person does?
24   A.   When they break up in your house and you don't let
25        them in there, what other choice have they got?
```

```
 1            That's what David Donnie Williams was doing.

 2                 THE COURT:  Have you got a new question?  We've

 3            had that last one 30 times.  Let's go.

 4    Q.     Now, finally:  You have not dealt justly with this

 5            situation?

 6    A.     I did my part.  I kept going to the police station

 7            doing what I was supposed to do.  I didn't know

 8            what else to do.  I have to see about my kids going

 9            to school and stuff.  I didn't know nothing else to

10            do but go to the police station and do a report.

11    Q.     You could have gotten out of the relationship?

12    A.     I had gotten out of the relationship.  He was

13            harassing and stalking me.  I was out of this

14            relationship.  He wouldn't leave me alone.

15                 THE COURT:  Redirect.

16                 MRS. PENN:  Your Honor, please forgive me.  I

17            almost don't want to ask any more questions, but I

18            am going to ask a few.

19                    REDIRECT EXAMINATION

20    BY MRS. PENN:

21    Q.     We agree that it wasn't rational for all of that?

22            Every 30 or 40 times he asked you that, we agree

23            that it wasn't rational; is that correct?

24    A.     Okay.

25    Q.     Does it mean that David Donnie Williams didn't do
```

```
 1        what you said he did on March 25th, April 17th, and
 2        March 30th?
 3   A.   Yes.
 4   Q.   Did he do those things to you?
 5   A.   Yes.  Everything I said he did, he did it.
 6   Q.   You agree you weren't rational?
 7   A.   Yes.
 8   Q.   And are you rational now?
 9   A.   No.
10   Q.   Are you following through with the charges you
11        filed against David Donnie Williams for harassing
12        and stalking you?
13   A.   Yes.
14   Q.   You are not backing down from that, are you?
15   A.   No, I'm not.
16   Q.   Each time he called you irrational, he did it?
17   A.   Yes, he did.
18   Q.   Can you tell the ladies and gentlemen of the jury
19        if everything you filed on this police report going
20        back to 2001 was correct?
21   A.   Yes, it was.
22   Q.   Donnie did all of these things to you.
23            This is a serious case to you, would you agree?
24   A.   Yes.  My life was in danger.
25   Q.   Was there anything funny?
```

```
 1   A.   Ain't nothing funny.  My life was very important to
 2        me.  I have kids to raise.  And my family love me
 3        just the way David Donnie Williams' family love
 4        him.  They help him out in his lies, hold him up
 5        and stuff.
 6   Q.   Let me ask you:  He classified his client as a
 7        crack addict, abuser, crack addict, broke.  That is
 8        true, isn't it?
 9   A.   Yes.
10   Q.   And everything is true, isn't it?
11   A.   Yes.
12   Q.   Including a stalker?
13   A.   Yes.
14   Q.   Let me ask you about in 2001 where he says you
15        filed false charges.
16            Is that your understanding of what they said
17        happened in court, that you filed false charges?
18            MR. AUSBORN:  Objection.
19            THE COURT:  She can answer that.
20   A.   Repeat that again.
21   Q.   Did they tell you in 2001 that you had filed false
22        charges?
23   A.   No.
24   Q.   Have you ever been charged with making a false
25        report at the police department?
```

1   A.   No.

2   Q.   Have you ever been convicted of doing that?

3   A.   No.

4   Q.   So you didn't file any false charges in 2001, did

5        you?

6   A.   No, I didn't.

7   Q.   Everything you said in that report, was true,

8        wasn't it?

9   A.   That's true.

10  Q.   He asked you about a protection from abuse.  You

11       didn't do one of those, did you?

12  A.   No, I didn't know about that.

13  Q.   Tell me what it is.

14  A.   Something about getting protection from -- keeping

15       a man to bother you.

16  Q.   Where do you go to do that?

17  A.   I didn't know where to go to do that.

18  Q.   So when you said you knew what it was but you

19       didn't do it, you didn't know what it was, did you?

20  A.   Just what I just said.

21  Q.   When you did that trespass warrant, did you

22       consider --

23  A.   That's supposed to keep a person off from around

24       your property, around you, period.

25  Q.   So as far as you are concerned, you did the

1        protection from abuse; correct?

2   A.   Yes.

3   Q.   And did the trespass from your property tell him to

4        stay away from you?

5   A.   Yes.

6   Q.   That's what you signed?

7   A.   Yes.

8   Q.   And as far as you are concerned, that's a

9        protection from abuse?

10   A.   Yes.

11   Q.   Does the same thing?

12   A.   Yes.

13   Q.   Do you know how many times you called police and

14        filed reports on David Donnie Williams?

15   A.   I can't remember.  It's been several times.  I

16        can't remember.

17   Q.   Not just these charges?

18   A.   There was more times I had called.

19   Q.   And just because that paper says criminal mischief,

20        you didn't go up there and tell them David Donnie

21        Williams committed criminal mischief; you told them

22        what happened?

23   A.   I told them what happened.

24   Q.   And whatever they wrote out on there, you signed

25        your name?

127

```
 1   A.   Yes.
 2   Q.   And you don't have any idea what criminal mischief
 3        is, do you?
 4   A.   Not really.
 5   Q.   Tell me what criminal mischief is.
 6   A.   I don't know.
 7   Q.   You didn't file a criminal mischief charge against
 8        David Williams, did you?
 9   A.   No.
10   Q.   You filed charges for stalking you, harassing you,
11        grabbing on you?
12   A.   Yes.
13   Q.   And threatening to kill you?
14   A.   Yes.
15   Q.   Isn't that what you filed charges against David
16        Donnie Williams for?
17   A.   Yes.
18   Q.   Isn't that what you told the police about?
19   A.   Yes.
20   Q.   How many times have I talked to you about this
21        case?
22   A.   I think two times.
23   Q.   When was the first time?
24   A.   It was last Tuesday.
25   Q.   Did I tell you anything to do in this case?
```

```
 1    A.    No, you didn't.

 2    Q.    When was the second time I talked to you about it?

 3    A.    This morning.

 4    Q.    Did I talk to you any time between then and this

 5          morning?

 6    A.    No.

 7    Q.    Did I tell you anything to say up here on this

 8          stand?

 9    A.    No, you didn't.

10    Q.    Did I tell you to tell the truth?

11    A.    You told me to tell the truth; tell them what

12          happened.

13    Q.    Is that the only thing I told you to say in this

14          case?

15    A.    Yes.

16    Q.    He asked you about making a warrant at the police

17          department, and you said you didn't know anything

18          about it; is that right?

19    A.    About a warrant?

20    Q.    A warrant at the police department.

21    A.    I didn't know nothing about it at the police

22          department.

23    Q.    Did you know that the police officers do not issue

24          warrants?

25    A.    I knew that.
```

1          MR. AUSBORN:  I object to that.

2    Q.    That's why you didn't?

3          THE COURT:  She said, do you know they do not

4    issue warrants at the police department.  And she

5    said, yes.

6          MR. AUSBORN:  She is not in a position to

7    answer that question.  She never sought it from the

8    police department.

9          THE COURT:  If she knows they don't issue it

10   from there, I think she can answer the question.

11         MR. AUSBORN:  Okay.

12   Q.    (By Mrs. Penn:) Where did you go to have the

13   warrant issued?

14   A.    What kind of warrant?

15   Q.    Any warrant that you signed?

16   A.    I know I went on March 25th.

17   Q.    Where did you go?

18   A.    To the circuit clerk's office.

19   Q.    And is that your understanding of where you are

20   supposed to go when you want a warrant done?

21   A.    Yes, that was for trespassing.

22   Q.    And you don't have a copy of that document with

23   you, do you?

24   A.    Not with me.

25   Q.    Doesn't mean it wasn't done; is that correct?

1   A.   No, it doesn't mean it wasn't done.

2   Q.   Mr. Jernigan would have a copy of that, wouldn't

3        me?

4   A.   Yes.

5        MRS. PENN:   We will see about getting that in

6        here.

7   Q.   The defense has introduced police reports and the

8        jury has them in their possession.   They have

9        already been introduced into evidence; is that

10       correct?

11  A.   Yes.

12  Q.   Did you tell the police officer what happened on

13       each one of those cases?

14  A.   Yes, I did.

15  Q.   Let me ask you something else.   Defendant's Exhibit

16       Number 2, is that your writing in the narrative

17       part of that?

18  A.   That's not my writing.   A police officer wrote it

19       for me, and then I signed it.   I read it first

20       before I signed it.

21  Q.   Does that say every word -- Does this narrative

22       have every word in it that you told the police?

23  A.   Yes.

24  Q.   Does it have every word that you told them in there

25       that happened?

```
 1   A.   Yes.

 2   Q.   What about the one on the 24th?  This is Exhibit

 3        Number 1.  Is that your writing?

 4   A.   No, that's not my writing there.  I signed it.

 5   Q.   And that's what you told them; right?

 6   A.   Yes.

 7   Q.   Let me ask you something else.  Did you walk into

 8        the police department and say:  On 3/24/04 about

 9        1:15 a.m., Mrs. Williams stated --

10             You didn't say that, did you?

11   A.   No.

12   Q.   They summarized what you said, didn't they?

13   A.   Yes.

14   Q.   So this is not every word that you said?

15   A.   Okay.

16   Q.   Same thing happened in Defendant's Exhibit 2?

17   A.   (Witness nods affirmatively.)

18   Q.   They summarized what you said.  That's not what you

19        said, is it?

20             It's a narrative of what you said, but that's

21        not exactly what you said?

22   A.   Okay.

23   Q.   Is it?  Is that right?

24   A.   Yes.

25   Q.   Just a moment.  Let me ask you something:  Were you
```

```
 1            anywhere around David Donnie Williams when he was

 2            arrested on these charges?

 3    A.    No.

 4    Q.    I think the defense attorney eluded that y'all were

 5            together --

 6            MR. AUSBORN:  Your Honor, this is improper

 7      examination that has not been offered into

 8      evidence.  And she is restricted on redirect to the

 9      examinations, she cannot raise a new line of

10      questioning.

11            THE COURT:  Y'all approach.

12            (Whereupon a Bench conference was held

13              outside the hearing of the reporter and

14              the jury.)

15    Q.    Thank you, Callie.  That's all the questions I

16            have.

17            THE COURT:  Recross.

18            MR. AUSBORN:  Nothing further.

19            THE COURT:  Thank you.  You may step down.

20            (Whereupon the witness left the stand.)

21            THE COURT:  Let's take a lunch break until

22      1:30.  Keep in mind the recess instruction.  Come

23      back to the jury room at 1:30.

24            (Whereupon the jury left the courtroom, a

25              lunch recess was taken by all, after which
```

```
 1              the following proceedings were had in open

 2              court:)

 3              (Defendant present with counsel.)

 4              THE COURT:  Bring them in.

 5              (Whereupon the jury returned to the jury box,

 6              and the following proceedings were had in open

 7              court:)

 8              THE COURT:  Ladies and gentlemen of the jury,

 9       has anyone received any information about this case

10       other than the testimony and exhibits that have

11       been received at trial?

12              (Negative response from the jury.)

13              THE COURT:  Call your next witness.

14              MRS. PENN:  The state calls Johnnie Moore.

15                    JOHNNIE MOORE BAKER COLEMAN

16       having first been duly sworn, testified as follows:

17                         DIRECT EXAMINATION

18  BY MRS. PENN:

19  Q.    I'm going to ask you some questions, and I need you

20        to answer yes or no.

21              State your name for the Record, please.

22  A.    Johnnie Baker.  A lot of people know me as Moore.

23  Q.    What do you do, Ms. Baker?

24  A.    I am a security officer at Wayne Farm.

25  Q.    What do you do?
```

134

```
 1   A.   I'm a security officer from 2:00 until 10:00 at
 2        night.
 3   Q.   How long have you been performing that job?
 4   A.   March will be ten years.
 5   Q.   Do you know David Donnie Williams?
 6   A.   Not really.  Know of him.
 7   Q.   Can you explain to the ladies and gentlemen of the
 8        jury how it is that you know of him?
 9   A.   Well, I was born in Union Springs.  I guess he was
10        too; from being around.  I knew the face, but I
11        didn't know a name to put with the face until...
12   Q.   Until?  I'm sorry.  I cut you off.
13   A.   Until I started seeing him with Ms. Williams.
14   Q.   So at some point you began seeing him with
15        Ms. Callie Williams?
16   A.   Yes.
17   Q.   Did you ever see him in the course of your
18        employment?
19   A.   Yes.
20   Q.   And how would that be?  Is it because he just came
21        by?  Or did he work there?  Or tell me how did you
22        see him in the course of your employment.
23   A.   He worked there.
24   Q.   Were you working security at the time he worked
25        there?
```

```
 1   A.   It's been so long, I think so.  I think they would
 2        come through the gate together.  I had to check
 3        IDs.
 4   Q.   And at some point in time, did you become aware of
 5        the name David Donnie Williams as it relates to
 6        your job as a security officer at Wayne Farms?
 7   A.   Yes.
 8   Q.   Explain to the ladies and gentlemen of the jury
 9        what made you aware of that name in your job as a
10        security officer.
11   A.   Well, security get notes; practically 90 percent of
12        them on termination, and an employee who has been
13        terminated and not allowed back on Wayne Farms
14        premises, we have to post a note inside the guard
15        shack.  That's how I became aware of the name to
16        put with the person.
17   Q.   So in the course of your job, you received a note
18        that David Donnie Williams was not to be back on
19        the premises of Wayne Farms?
20   A.   Yes, I did.
21   Q.   Do you know what month that was?
22   A.   I don't remember.  It's been a while.
23   Q.   Sometime in 2004?
24   A.   Yes.
25   Q.   And after receiving that note, do you recall seeing
```

```
 1            David Donnie Williams anywhere on or near the
 2            premises of Wayne Farms?
 3     A.     Yes.
 4     Q.     Where did you see him?
 5     A.     Coming down through the park lot and he stopped as
 6            if to pick someone up on break.  And he sat there
 7            for a few minutes and he left.
 8     Q.     So he didn't pick up anyone?
 9     A.     The note had not been posted at that time.
10     Q.     Tell me how the guard shack is situated as far as
11            people entering and exiting the plant.
12                Do you have to go through there to get to the
13            plant?
14     A.     Yes.   Employees come in -- There is two gates.
15            They come in the second gate, and they have to come
16            right past the guard shack in order to enter.
17     Q.     And at the time you saw him sitting there, had he
18            come into the yard to your security booth?
19     A.     Not to my booth, no.
20     Q.     So he was?
21     A.     He came -- He would have to pass the booth
22            department because they don't allow him parking on
23            fences.   And he came down through there two or
24            three times.   The note got posted, and when he came
25            through again, I made him aware that he was not
```

VOL. 2

COURT OF CRIMINAL APPEALS NO. CR 04-0846

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _____Bullock_____ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC-2004-144__

CIRCUIT JUDGE __Hon. L. Bernard Smithart__

Type of Conviction / Order Appealed From: __Stalking__

Sentence Imposed: __38 years__

Defendant Indigent: [X] YES [ ] NO

David Donnie Williams

NAME OF APPELLANT

Hon. Donald E. Spencer    334-269-1934
(Appellant's Attorney)                    (Telephone No.)
547 S. Lawrence Street
(Address)
Montgomery, AL  36104
(City)              (State)              (Zip Code)

V.

STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

EXHIBIT

A

PENGAD 800-631-6989

```
 1        allowed on Wayne Farms' premise.

 2   Q.   Now, tell me about the two or three times that he

 3        came down through there.  Did he actually pick

 4        somebody up or did he just sit there?

 5   A.   He sat there like he was waiting on someone to come

 6        out on break.  And I told him that Ms. Williams was

 7        on the line working, and that they could only be

 8        called in case of emergency.

 9   Q.   So he came down and specifically asked for you to

10        call Ms. Callie Williams?

11   A.   Yes.

12   Q.   And at that point you did not call her but told him

13        you couldn't do that?

14   A.   Right.

15   Q.   Is that the time after the note was posted, or did

16        he come back another time?

17   A.   No.  That was before the note.

18   Q.   Before the note was posted.

19             And at some point after that time you got a

20        note?

21   A.   Uh-huh (affirmative response).

22   Q.   Do you remember what the substance of that note

23        was?

24   A.   The note was David Donnie Williams was no longer

25        employed at Wayne Farms, and he was not allowed on
```

1      the premise.

2  Q.  And did he come on the Wayne Farms premises or try

3      to come on the premises at any time after the note

4      was posted?

5  A.  Yes, he did.

6  Q.  And while you were on duty, how many times do you

7      remember him trying to come in after the note was

8      posted?

9  A.  After the note posted, he got about two times

10     because the third time, when I seen him cruising

11     down, I went out to the car where he was and told

12     him he was not allowed to come on the premise.

13  Q.  So this is I count, you help me out, about six

14     times now that he sat and watched and had no

15     business over there?

16  A.  Right.

17  Q.  Didn't get out to go to work?

18  A.  No.

19  Q.  And didn't pick anybody up?

20  A.  No.

21  Q.  And didn't say anything to anybody?

22  A.  No.

23  Q.  But on the third occasion he asked you about

24     Ms. Callie Williams?

25  A.  Yes.

1   Q.   After you approached him in the vehicle and told

2        him that he was not to be on the premises anymore,

3        did he say anything to you?

4   A.   He said --

5   Q.   I don't want to know what he said.  I just want to

6        know if he said anything to you.

7   A.   He just replied back.

8   Q.   Did he leave?

9   A.   He left.

10   Q.   Did he come on the premises any further while you

11        were on duty?

12   A.   Not on my shift.

13   Q.   And are you aware of any other time he might have

14        come when you weren't on duty?

15   A.   Well, I've heard.

16   Q.   I don't want to know what anybody said.  I just

17        want to know --

18   A.   I'm not aware.  Because when I leave at ten, I'm

19        gone.

20   Q.   Yes, ma'am.  I understand.

21        Now that you have told me he did not come back

22        into the yard, I need to know if you saw him

23        anywhere in the vicinity of Wayne Farms as it

24        relates to you seeing him from the guard shack

25        after you told him not to come back on the

```
 1        premises?

 2   A.   Yes.  Riding around the road, riding around the

 3        street.  And that happened several times after I

 4        told him he was not allowed.

 5   Q.   And I'm sure the ladies and gentlemen of the jury

 6        know where Wayne Farms is, but can you tell me what

 7        else is on that road where he was?

 8   A.   Um, nothing but some houses.  And from the guard

 9        shack I can see the vehicles coming and going.  I

10        have a clear view of them.

11   Q.   So he was just passing -- Was it in a back and

12        forth motion, or did you just see him go by?

13   A.   Just cruising by.

14   Q.   And can you tell me how many times you would have

15        noticed that after he had been terminated and was

16        informed not to be back on the premises?

17   A.   Well, several times.  I can't --

18   Q.   Was it more than five?

19   A.   Maybe.

20             MRS. PENN:  That's all.

21             THE COURT:  Cross.

22                    CROSS-EXAMINATION

23   BY MR. AUSBORN:

24   Q.   May it please the Court, prosecution.

25             Mrs. Coleman, I represent David Williams, and
```

```
 1            I'm going to ask you some questions.  And if you

 2            don't understand me, let me know, and I'll try to

 3            clarify that for you.

 4                 How long have you been in law enforcement?

 5   A.   March will be six years.  When I put ten years at

 6            Wayne, I should have put six.

 7   Q.   Has all of your law enforcement experience been at

 8            Wayne Farms?

 9   A.   At Wayne Farms, yes.

10   Q.   Let's talk about your training, okay.

11   A.   Uh-huh (affirmative response).

12   Q.   What type of formal training did you go through?

13   A.   We had exams, watch tv, tapes.

14            At Wayne Farms we are just guards posted there

15            to -- it is more so like office work.

16            We don't carry weapons and things at Wayne

17            Farms, and we don't have to get into any heavy

18            training.  But previously I did take criminology in

19            Tuskegee because I started to be a police officer

20            but I changed my mind.

21   Q.   Okay.  Criminology at Tuskegee, outstanding.

22            Now, six years of law enforcement with Wayne

23            Farms; is that right?

24   A.   Yes.

25   Q.   And then criminology at Tuskegee; is that correct?
```

```
 1   A.    Uh-huh (affirmative response).

 2   Q.    How many hours a week do you work at Wayne Farms?

 3   A.    I work 40.

 4   Q.    And that's generally 52 weeks out of a year; is

 5         that correct?

 6   A.    (Witness nods affirmatively.)

 7   Q.    And would you agree with me that out of that 52

 8         weeks in a year, you see hundreds, if not

 9         thousands, of people coming back and forth?

10   A.    I do.

11   Q.    In a year's time; is that correct?

12   A.    Yes, I do.  Everybody that comes there and is

13         employed there come by me at one time or another

14         day after day, and I begin to know all faces.

15              I know immediately if somebody comes through

16         that gate who doesn't belong in there.

17   Q.    Now, who subpoenaed you to be in court today?

18   A.    I guess...

19   Q.    The State of Alabama subpoenaed you.

20   A.    I'm not sure.  I have the subpoena.

21   Q.    You did get a subpoena?

22   A.    Yes, I did.

23              MR. AUSBORN:  The Court can take judicial

24         notice that the defense did not subpoena the

25         witness.
```

```
 1  Q.   Now, I think you stated on direct examination that
 2       you didn't know Mr. Donnie William previously; is
 3       that right?
 4  A.   I knew the face.  I didn't know the person.
 5  Q.   What about Ms. Callie Williams?  You knew her face
 6       as well but didn't know the person?
 7  A.   I knew her.
 8  Q.   How is it that you knew Ms. Callie Williams?
 9  A.   Because her sister is married into my family on the
10       Davis side, not on the Coleman side.
11  Q.   Tell us a little bit about that.  Now he is related
12       to?
13  A.   I don't know anything.  The only thing I know about
14       Ms. Williams is her sister is my cousin's husband.
15       And as far as associating with her, that has never
16       happened.
17  Q.   Well, he is family; is that not right?
18  A.   No, not to me.  She is family to him.  I doesn't
19       know anything about her or her family.
20  Q.   Family by marriage?
21  A.   I know her sister.
22           She doesn't attend any affairs or anything that
23       we give.  We do not visit or talk on the phone or
24       associate.  I just know her.
25  Q.   Let me ask you this:  How far did you go in school?
```

1    12 years of high school education; is that right?

2    A.    Two years Alabama State and a year and half LPN and

3    about six months of criminology, Tuskegee.

4    Q.    Outstanding.    Outstanding.

5    Now, I want to turn your attention directly at

6    this particular point to Mr. Donnie Williams.

7    Now, for the purpose of your testimony today,

8    did you bring any documents with you?

9    A.    No, I didn't bring documents.    What kind of

10    documents do I need?

11    Q.    Let's talk about that.

12    Now, you have admitted up under examination,

13    cross-examination that you work 40 hours a week; is

14    that correct?

15    A.    That's correct.

16    Q.    52 weeks out of a year?

17    A.    Yes, 52 weeks a year.

18    Q.    And you have been doing that about six or seven

19    years; is that right?

20    A.    Yes.

21    Q.    And you have run across hundreds if not thousands

22    of people; is that correct?

23    A.    Correct.

24    Q.    You didn't know Donnie.    You knew his face but

25    didn't know much about him that you knew of; is

```
 1          that correct?
 2   A.     That's correct.
 3   Q.     Now, in your training in law enforcement, okay, you
 4          would agree that in order to be an effective
 5          security guard, it is a necessity to be accurate?
 6          Would you agree with that?
 7   A.     Of course.
 8   Q.     And you would agree that in order to be
 9          accurate -- Have you ever heard of the terminology
10          a short pencil is better than a long memory?
11               Have you ever heard of that?
12   A.     Sure.
13   Q.     Let's talk about that.  As a security guard, do you
14          keep a logbook?
15   A.     Logbook on what?
16   Q.     Do you keep a logbook at your station?
17   A.     Yes, that we log the trucks in and out.
18   Q.     Let's talk about that logbook.
19               With respect to that logbook, is there a
20          logbook that you can log various incidents?
21   A.     We have incident reports.  And we don't write
22          incidents unless an indent really happen
23          and --
24   Q.     Let's talk about that, okay?
25   A.     Okay.
```

1  Q.  Now, you stated earlier upon the examination that

2      you recall something coming across the guard shack

3      about Mr. Donnie Williams being terminated and

4      enjoined.  Do you recall that?

5  A.  Yes.

6  Q.  What day did that come across?

7  A.  What day?

8  Q.  Yes.

9  A.  I don't remember what day.  I don't remember what

10     month.

11         The only thing I remember is what was posted in

12     the guard shack, and I followed procedure by

13     telling him -- informing him that he was not

14     allowed there, and if he had came back I would have

15     to call the cops.

16 Q.  So you don't remember what day that was?

17 A.  No, I don't.

18 Q.  You don't remember what month; is that correct?

19 A.  Yeah.

20 Q.  Now, you still agree that a short pencil is better

21     than a long memory?  That is one example.

22 A.  In some cases -- I follow my orders as to what I'm

23     supposed to do.  I know my job; I know it well.

24     And no one told us that we had to follow procedure

25     about writing down a date whenever we get a note

```
1         posted, because we get them often, and we don't

2         have to keep tabs on that.  That is done, I assume,

3         through the front.

4    Q.   Now, so we got a situation where you say that you

5         recall a note coming across the guard shack

6         crossing your eyes.  You don't remember what date

7         and you don't remember what month; is that correct?

8    A.   No, I don't.  Would you if it had been almost a

9         year, I assume.

10   Q.   All right.  You state -- would you agree -- we are

11        talking about -- Would you agree with me that one's

12        ability to remember increases when the correlate

13        is -- the time proximity is closer to the event?

14             In other words, the closer the event is to that

15        point in time, the better your ability to be able

16        to recall; is that correct?

17   A.   Well, I didn't have to remember that.

18   Q.   You didn't have to remember?

19   A.   I didn't have to.

20   Q.   You stated earlier, okay, on direct examination

21        that you recall Mr. Donnie Williams coming by after

22        he was barred from Wayne Farms about six to seven

23        times.  Was that your testimony?

24   A.   I said he came by, yes, three times on my shift

25        before and maybe three or four times after the note
```

```
 1              was posted, and I was able to stop him and tell him
 2              that he was not allowed.
 3      Q.      Let's talk about that incident, number one.  What
 4              day did that happen?
 5      A.      I didn't record it.  Like I said, that wasn't my
 6              job.
 7                   When I am at Wayne Farms, I'm there doing a
 8              job, and that's the job Wayne Farms require me to
 9              do.  And as far as rules and regulations, I know
10              them all and that wasn't part of it.
11                   When I'm in the guard shack, my job is to check
12              IDs, log trucks in and out, sign in visitors and
13              things.  I have my duties, and I did not write down
14              what date or time that Mr. Williams came through
15              because when he came through, I was not aware that
16              anything was going on.  Even if I was aware, it
17              still wasn't my job to write down a date and a time
18              that he came through there.  I get paid to do Wayne
19              Farms work.
20      Q.      Let me stop you there, Ms. Coleman.  Are you
21              telling this Court that it is not your job when you
22              have a direct order from the company baring the
23              person from the premises of territory, that it is
24              not your job to stop that person?
25      A.      I did my job when I told him he was no longer
```

1       allowed on the premises.  That was my job, and when

2       I did that, he did not come past me no more.

3           He rode around the roadway.  He was still

4       riding around the road.

5           I don't have anything to do with that until you

6       come on Wayne Farms' premise.

7  Q.  Now, you state that the first time he attempted to

8       come through you stopped him.  What date was that?

9  A.  I didn't stop him the first time.

10  Q.  That you stopped him the first time?

11  A.  No, I didn't.

12          He came through three times before we got the

13       notice in the guard shack that he was not allowed

14       there.

15          And the next two times he came through, I was

16       pretty busy.  And when I did get to speak to him, I

17       told him he was not allowed there.  Some people

18       ride by and sit for a minute.

19          I caught him at his car, and I told him, he was

20       not allowed on the premise.  A lot of times people

21       come in, and I'm busy with the truck driver.

22  Q.  Now, you stated a moment ago that he came through

23       before you got the note; isn't that correct?

24  A.  Yes, he did.

25  Q.  Isn't it possible that he came through prior to him

| | | |
|---|---|---|
| 1 | | being bared from the premises?  Because you don't |
| 2 | | recall the exact date that he got bared from the |
| 3 | | premises, do you not? |
| 4 | A. | I'm not sure about that.  All I know is when the |
| 5 | | notice was posted in the guard shack, I did my job, |
| 6 | | and that was to inform him that he was not allowed |
| 7 | | on the premises. |
| 8 | Q. | Let me ask you this:  The note that you allege came |
| 9 | | across the guard shack, was it signed by Mr. Donnie |
| 10 | | Williams? |
| 11 | A. | Mr. Williams doesn't sign anything over there. |
| 12 | Q. | Okay.  So that being the case, isn't it probable |
| 13 | | that Mr. Williams didn't know he was bared from the |
| 14 | | premise? |
| 15 | A. | He said he didn't know when I told him, and he said |
| 16 | | he wouldn't come back; and he didn't on my shift. |
| 17 | | But what happened after my shift, I don't know.  I |
| 18 | | wasn't there. |
| 19 | Q. | So we have a situation where you don't recall the |
| 20 | | date and the month when the note came across the |
| 21 | | guard shack.  Is that not right?  We agree with |
| 22 | | that?  Is that not right? |
| 23 | A. | Yes. |
| 24 | Q. | And we've got a situation where you don't recall |
| 25 | | the date and or date where he allegedly came by the |

```
 1          premises?  You don't recall any of those dates; is
 2          that not right?
 3    A.    I assume it was when whatever it was going on.  I
 4          don't know what his reason was for riding around.
 5    Q.    Isn't it possible to the extent that he did come by
 6          and you don't have a logbook that would
 7          substantiate your testimony that he did in fact
 8          come through; isn't that correct?
 9    A.    I don't keep records of who is terminated.  Those
10          are kept in the front office.  We don't keep
11          records of that.
12    Q.    Now, you are not here today testifying before the
13          ladies and gentlemen of the jury that Mr. Donnie
14          Williams committed a criminal act by making one or
15          more trips back up to Wayne Farms?  You are not
16          testifying to that; is that correct?
17    A.    I'm telling what I seen on my shift.
18    Q.    My question to you, okay --
19    A.    Okay.  What is it?
20    Q.    You are not here testifying that he violated the
21          law to the extent to which the jury believes what
22          you are saying, that he came through one or more
23          times after he was terminated.  You are not saying
24          he violated the law.
25               You are not saying that, are you?
```

```
 1    A.    I'm not, no.  I'm not the law.  All I said was he

 2          came through and I informed him he was not allowed

 3          and I didn't see him on my shift anymore.

 4    Q.    And once you told him he was not allowed, he

 5          respected that; am I not right?

 6    A.    Yes.  When I informed him of that, I had done my

 7          job.

 8    Q.    And once you put him on oral notice that he is not

 9          allowed back through, okay, he didn't come back

10          through.  Isn't that what you are telling the

11          ladies and gentlemen of the jury?

12    A.    I said he did not come back through on my shift.

13          There is another shift after I leave.  I don't

14          know what happened on that shift.

15    Q.    Okay.

16          You agree that your working knowledge only

17          applies to your sensory perception, what you see

18          and what you hear; isn't that correct?

19    A.    What --

20    Q.    You never saw him come back through after you told

21          him he wasn't allowed; isn't that correct?

22    A.    I said he did not come back on my shift, on my

23          shift.

24    Q.    And you would agree you never heard them come back

25          through after you told him that he wasn't allowed;
```

```
 1        isn't that correct?
 2   A.   No, I didn't say that.  Because I did hear that he
 3        came back through, but it wasn't on my shift.  I
 4        only go by what happened on my shift.  I don't
 5        speak hearsay.  I came up here to answer the
 6        questions that I was asked.
 7   Q.   And as far as your working knowledge is concerned,
 8        he strictly obeyed the command of Wayne Farms by
 9        not coming back through as far as you know; is that
10        right?
11   A.   On my shift.
12   Q.   Do you know why we are here today, what this case
13        is about?
14   A.   I've heard.
15   Q.   Let's talk about that.  You talk to your cousin
16        about this case?
17   A.   Sure.  I didn't talk to her about this case because
18        there was no case.  But when Mr. Williams came
19        through at one time, I asked her was anything going
20        on.
21             Her children came down with the police
22        following them, and that's why they were afraid
23        because he had threatened her.  Like I say, I don't
24        talk about hearsay, but you are asking the
25        questions, and I'm going to answer them.
```

```
 1              And after the cops came down through there,
 2         Ms. Williams came through the gate one day, and I
 3         asked her was anything going on with her and
 4         Mr. Williams, and she said, yes, and she began to
 5         tell me parts about it.  And I said, you don't have
 6         to worry about him coming back on my shift because
 7         if he come back on my shift, he will be arrested
 8         because my job is to call the police.
 9    Q.   Now.  I thank you for that clarification.
10              You know that Mr. David Donnie Williams is
11         charged with stalking.  You do know that?
12    A.   That's what the subpoena say.
13    Q.   And you also know that Mr. David Donnie Williams is
14         charged with harassment under the domestic violence
15         law; is that right?
16    A.   That's what the subpoena say.
17    Q.   Look at the ladies and gentlemen of the jury.
18              Can you tell either one of these people that
19         you know conclusively a hundred percent that David
20         Donnie Williams stalked this young lady?
21              You never saw him stalking this young lady; is
22         that not correct?
23    A.   It depends on what you mean by stalking.
24    Q.   Did let me ask you that.
25              Did you see this young man stalking?
```

```
 1   A.   I seen him riding a lot if that's under the
 2        category of stalking.  He did a lot of riding.
 3   Q.   Well, I do a lot of riding and I'm sure you do to.
 4   A.   I don't just ride around a place I'm not working.
 5        And I know he was looking for her.
 6   Q.   You ever heard of a constitutional right of
 7        association, freedom of travel?
 8   A.   Yeah, that's what I'm saying.  I can't say he was
 9        stalking her and that he wasn't.  Because what he
10        was doing fits as far as what I am familiar with
11        stalking.
12   Q.   Let me ask you this:  Did you ever see David Donnie
13        Williams in the company of this young lady during
14        the time you were at the guard shack where here it
15        is he was harassing her?
16   A.   She was never out when he came by.
17   Q.   Answer my question yes or no.
18   A.   No.  She wasn't there.
19   Q.   So you would agree you never seen him stalking her.
20        Would you agree with that?
21   A.   I didn't say that.  I said it depends on what you
22        mean by stalking.
23            What is stalking?
24   Q.   In order to stalk somebody, you have to be right
25        there on them.
```

1  A.   I don't agree with that.  You can stalk a person

2       and you don't have to be right there.  The stalking

3       I am familiar with, you can be out waiting for

4       somebody to try to catch them, to wait and do

5       whatever you want to do.  That's the stalking I am

6       familiar with.  That's why I ask you what you mean

7       by stalking.

8  Q.   Do you know of any law against a person sitting and

9       watching somebody?

10 A.   Well, I wouldn't feel comfortable -- if I was

11      having problems and I went to the law on a person

12      and they still follow me around, and everywhere I

13      go, they showing up.  Yes, I would feel

14      uncomfortable.

15 Q.   Let me ask you:  You said a person going to the

16      law; is that what you said?

17 A.   Yes, I said.

18 Q.   Are you saying that he went to the law?

19 A.   I don't know where she went.

20           I later learned after I found out about this

21      stuff that there was problems with them and he had

22      been trespassed from her.

23 Q.   Let me ask you this:  You only talked to her; am I

24      right about that?

25 A.   No.  I've heard in other place.

1  Q.  My question to you is:  You only heard about her

2      version of events; is that correct?  Yes?

3  A.  Yes, when I asked her if she was having problem.

4  Q.  Did you talk to her about her version of events in

5      terms of what was happening?

6  A.  Not everything.

7  Q.  Just answer my question.

8  A.  I asked her if she was having problems after the

9      cops came out.

10         I didn't know anything about what was going on

11     before then as far as they were concerned.

12  Q.  Did you talk to this young man?  Did you ask him,

13     Donnie, what's going on with you and Ms. Callie

14     here and all?

15         You never spoke to him about this, did you?

16  A.  I only informed him that he was not allowed on the

17     premises.  And I told him that.

18  Q.  Now, wouldn't you agree there is always two sides

19     to every story?

20  A.  But like I said, if you will listen, during the

21     time I informed him that he was not allowed on the

22     premises, I didn't know anything was going on.

23  Q.  Okay.  Let me ask you this:  She told you after he

24     was not allowed on the premises that something was

25     going on?

```
 1   A.   She -- No.  No, she didn't tell me anything.
 2             When the cops came out -- When her daughter
 3        brought the cops out because she was afraid or
 4        something --
 5   Q.   Stop right there.
 6   A.   I asked her -- I stopped and asked her was anything
 7        going on.
 8   Q.   Let me ask you this right here:  Are you inside her
 9        head to know exactly what she is feeling?
10   A.   I didn't say I was.  I said the conversation with
11        her was limited.
12   Q.   You said she was afraid.  How would you know that?
13   A.   She told me what things were going on after I
14        stopped her and addressed this to her.  And I would
15        be afraid too.
16   Q.   Do you believe she was afraid?
17   A.   Yes.  She did seem afraid several days when she'
18        came through there.  She acted like she was afraid
19        of something.  She didn't come back out on breaks,
20        and her daughter brought food to her.
21   Q.   Let me test you on that.
22   A.   I'm taking a test?  I'm not on trial.
23   Q.   You said she was afraid.
24             Is it rational that if a person is being
25        stalked and in fear of bodily harm that they would
```

|  |  |  |
|---|---|---|
| 1 |  | not call 911?  Is that rational? |
| 2 | A. | I don't know anything about that. |
| 3 |  | I told you my version of what stalking meant to |
| 4 |  | me.  I don't know anything else of all this stuff |
| 5 |  | you are talking about.  I answered your questions. |
| 6 | Q. | Isn't that what people do when they call -- |
| 7 | A. | I don't know.  I know what I would do. |
| 8 | Q. | Would you call the law? |
| 9 | A. | Sure, I would call them if I was scared. |
| 10 | Q. | Would you call 911? |
| 11 | A. | I've never been in that position when I was scared. |
| 12 |  | I don't know what I would do.  I may call them and |
| 13 |  | I may panic and not do nothing.  I may just sit |
| 14 |  | there scared.  I don't know what I would do. |
| 15 | Q. | Let me ask you:  If somebody is stalking you, |
| 16 |  | wouldn't you seek redress of that through the |
| 17 |  | courts, if you can, to get protection from abuse, |
| 18 |  | to put this to rest to stop this?  Wouldn't you do |
| 19 |  | that? |
| 20 | A. | I mean, how they going to stop a person?  Just |
| 21 |  | because you go get a court order, a piece of paper, |
| 22 |  | that doesn't stop anyone.  They are going to keep |
| 23 |  | right on doing what they want to do. |
| 24 |  | I've heard several cases where this happened |
| 25 |  | and the person end up getting killed.  They went |

```
 1        through the Court, but they didn't stop it, and

 2        something bad came out of it.

 3             I don't know what to say because I don't know

 4        anything about it.  Like I say, it never happened

 5        to me.  I only know in certain incidents you are

 6        scared, and I don't know what your mind tell you.

 7        I don't know.  Mine might tell me to shoot.  'Cause

 8        I'm not going to let nobody terrorize me.

 9   Q.   Now, you would agree that a person who is in fear

10        of their safety and bodily harm, unless they

11        welcome this aggression, a rational, reasonable

12        person would take some effort to stop it, would

13        they not?

14   A.   I can't answer that.  I can't answer for some other

15        person.

16   Q.   You would, wouldn't you?

17   A.   Any way I had to stop it, I would.

18   Q.   One way of you stopping it would be to go to the

19        courts and get a court order, forbidding that

20        person to have contact?

21   A.   That's one way, but that's no guarantee.

22   Q.   The other way is to call 911 and have police come

23        out.  Isn't that one way?

24   A.   I assume so, yes.

25   Q.   Another way is to go down to the police station and
```

```
 1            speak to a magistrate and get a criminal warrant
 2            against that person.  That's another way to stop
 3            it; isn't that correct?
 4    A.      Um, during a lot of times when this stalking was
 5            supposed to be going on, this young lady was in
 6            there working.  She didn't even know he was riding
 7            out there.
 8    Q.      That's not the question I asked you.  I want a
 9            direct answer to my question.
10                Isn't it a fact that one way to stop it is to
11            go and get a warrant through the police department
12            through a magistrate?
13    A.      Yeah, that's one way.
14    Q.      And another way to stop it is to arm yourself; is
15            that not right?
16    A.      That's right.
17    Q.      And go and get a pistol permit in accordance with a
18            weapon is one way to stop it, isn't it?
19    A.      Yeah, that's a way of stopping it.
20    Q.      Another way to stop it is to arm yourself with a
21            knife or something.  Isn't that a way to stop it?
22    A.      It is.
23    Q.      And another way to stop it is that person who's
24            being aggressive towards you, you don't welcome
25            them back; isn't that right?  That's not rational,
```

```
 1        is it?
 2   A.   I don't know.
 3   Q.   If a person is harassing you and you don't want to
 4        be bothered --
 5   A.   You are harassing me.
 6   Q.   I'm harassing you?
 7   A.   Yes, you are.
 8            MRS. PENN:  I object to badgering the witness.
 9   A.   And I don't like you harassing me.  I've answered
10        all of your questions; everything I know.
11   Q.   I'll be brief.  I promise you.
12            You would agree that if you have an unwanted
13        intrusion, a person stalking you for lack of a
14        better terminology, you don't welcome that
15        aggression back into your life continually over and
16        over again?  That's not rational, is it?  Isn't
17        that right?
18   A.   I guess not.
19   Q.   Wouldn't you agree with that; that's not rational,
20        is it?
21   A.   Are you speaking on my behalf or her?  Are you
22        talking to me or are you talking about her?
23   Q.   Let me ask you:  Do you consider yourself a
24        rational being?
25   A.   Tell me what you mean rational.
```

1    Q.    Reasonable, prudent.

2    A.    I consider myself as honest and fair.  I was taught

3          that way, and I am not going to sit here and say

4          something because you are trying to trick me up and

5          make me say something that you want me to say.  I'm

6          not going to do it.

7    Q.    I'm not trying to trap you I'm just trying to get

8          the truth out you.

9    A.    I'm telling you the truth.

10   Q.    Let me ask you:  If you have a person who is being

11         aggressive towards you, stalking you, and you are

12         in fear of bodily harm, not only yourself but your

13         kids, you don't continually over and over again let

14         that person come back and forth in your life, do

15         you?

16   A.    My kids was grown.  That didn't happen when my kids

17         were small.  I didn't have that problem.  I left my

18         kids' father when my baby was six months old, and I

19         raised my kids.  And I didn't have no men in my

20         home.  And I worked for my kids and I took care of

21         them, so I don't know how to answer that.

22   Q.    Let me ask you this question:  You have been

23         knowing her for how many years, Ms. Callie

24         Williams?

25   A.    For a while.

```
 1   Q.   Five years?

 2   A.   It's been longer than that.  But me and Ms.

 3        Williams does not hold conversations socially.  I

 4        just know her.

 5   Q.   How long have you been knowing her socially?

 6   A.   The way I know her is when my cousin and her sister

 7        got married.

 8   Q.   About ten years?

 9   A.   I didn't know her before that.

10   Q.   About ten years?

11   A.   It's been longer than that.

12   Q.   You wouldn't consider it rational for a person to

13        put their kids in harm's way year after year after

14        year, would you?

15   A.   What's that got to do with me?  I don't know what

16        she's putting her kids in.

17   Q.   Uh-huh (affirmative response).  Now, you do know

18        and I know, and ladies and gentlemen of the jury

19        need to know, you have heard of situations where

20        people make up stuff.  You know that?

21   A.   And I know that -- Yes, people make up stuff, and I

22        know that I don't know what Ms. Williams did as far

23        as her kids in this situation, because like I said,

24        I didn't know anything was going on.

25             I only know what situation my kids was in, and
```

```
 1           that was a safe environment.
 2    Q.     Now, you would agree that it is possible that
 3           Ms. Williams contending that she had been stalked
 4           by my client Mr. David Donnie Williams was made up?
 5           That's possible, isn't it?
 6    A.     I don't know.
 7                I didn't bring you no hearsay to this court,
 8           and I heard plenty of hearsay.  I can't answer that
 9           question for Ms. Williams.
10    Q.     My question to you is:  You weren't there when the
11           alleged stalking took place?
12    A.     How I'm going to be there?
13    Q.     You weren't there?
14    A.     Why I'm going to be there?
15    Q.     Am I right about that, you wasn't there; am I
16           right?
17    A.     Like I said, you can watch somebody follow people
18           around, and as far as I am familiar with it would
19           be stalking because you are looking for them.
20                I've answered that about five times.
21    Q.     Okay.
22                Have you seen the indictment in this case?
23    A.     What you mean?
24    Q.     Have you seen the indictment, the date the
25           indictment says Ms. Williams got stalked by my
```

```
 1          client?
 2   A.     I just got a subpoena.
 3   Q.     So you don't know the date that Ms. Williams
 4          contends?
 5   A.     I don't know.  Maybe she did get stalked.
 6   Q.     April 17th, 2004.  You weren't around Ms. Callie
 7          Williams on April 17th, 2004, were you?
 8   A.     I don't know unless she passed through the guard
 9          shack coming to work and I had to check her ID.
10   Q.     Did you see Ms. Callie Williams and Mr. David
11          Donnie Williams together on April 17, 2004?
12   A.     I don't know.
13   Q.     Okay.  Now, that's the date that the State of
14          Alabama contends that my client stalked
15          Ms. Williams.
16              You didn't see him stalking Ms. Williams on
17          April 17th, 2004, did you?
18   A.     Just because I didn't see it.  Maybe someone else
19          did.  I don't know what day was April 17th.
20   Q.     And you are only here today to testify about your
21          personal knowledge; isn't that correct?
22   A.     That's what I thought I did.
23   Q.     So as far as the ladies and gentlemen of the jury
24          are concerned, April 17th, 2004, you never saw
25          Mr. David Donnie Williams stalk Ms. Callie
```

```
 1        Williams; isn't that correct?  Yes or no?
 2   A.   Yeah, you are correct.  I can't say what date.  I
 3        can't say I seen him stalking her at all.
 4   Q.   Okay.  Now, March 30, 2004, you didn't see
 5        Mr. David Donnie Williams harass Ms. Callie
 6        Williams by putting his hands on her person?  You
 7        didn't see that, now, did you?
 8   A.   Where was that supposed to happen?
 9   Q.   My question to you is:  Did you see him commit
10        domestic violence against her on March the 30th,
11        2004?
12   A.   I don't be around her.  I don't know what he did.
13   Q.   Is that a yes or no?
14   A.   No, I didn't see it.
15   Q.   Then that's a no.  Am I right about that?
16            Isn't it a fact that the reason you are here
17        today is because the State of Alabama is attempting
18        to bolster its case by having you subpoenaed here
19        and to give uncorroborated testimony that you have
20        not one single document to back up your testimony
21        with?
22            MRS. PENN:  Your Honor, I object.
23   A.   There is no document.  We don't write documents on
24        that.  That is not in my job description to write
25        documents on that.
```

| | | |
|---|---|---|
| 1 | Q. | And, again, why should this jury believe you; you |
| 2 | | are related to her by marriage? |
| 3 | A. | I'm not related to her at all.  My cousin's wife is |
| 4 | | not related to me.  She is just in the family. |
| 5 | Q. | And, again, you have been knowing her for more than |
| 6 | | ten years.  You don't even know this man other than |
| 7 | | just seeing him.  You know her better than you know |
| 8 | | him; isn't that correct? |
| 9 | A. | I know of both of them.  When you live in a small |
| 10 | | town, you will know a lot about people.  That don't |
| 11 | | think -- That don't mean you have to associate and |
| 12 | | be friends with them.  I know a lot of hearsay. |
| 13 | Q. | Again, your testimony today is colored by one sided |
| 14 | | investigation and information. |
| 15 | | You spoke to her and got her version of events, |
| 16 | | but you didn't humble yourself to speak to this |
| 17 | | young man and get his version, did you? |
| 18 | A. | The only thing I could tell him was he was not |
| 19 | | allowed on the premises.  And the only other time I |
| 20 | | seen him was riding.  And I did what I was supposed |
| 21 | | to do. |
| 22 | | Like I said, when the police came through and |
| 23 | | her daughter brought them through there, it was my |
| 24 | | job to find out what was going on.  Because if |
| 25 | | anything happened on the premises, I would have |

```
 1            called the police.

 2   Q.    You agree that it is critically important that you

 3          remain objective and neutral?

 4   A.    I agree.  And that's why I am not telling you a

 5          lot of history and answering the questions you are

 6          asking.

 7   Q.    And just like you went to here and got here side of

 8          the story, you technically should have done the

 9          same thing to him; isn't that correct?

10   A.    I didn't go to her and get her side of the story.

11   Q.    She came to you?

12   A.    I was at work.  And, like I said, the case with the

13          cops, I stopped her and asked her if she was having

14          any problems.

15   Q.    So you stopped her?

16   A.    Yes, I did.

17   Q.    Why didn't you stop him?

18   A.    Because I spoke to the cops and they told me a

19          little version of what was going on with them.  He

20          wasn't there to stop.  I told him what all I needed

21          to tell him.  And if he had came through again on

22          my shift, I was just going to pick up the

23          telephone.

24   Q.    Let me ask you this:  Are you married?  Single?

25          Widows?  Separated?
```

1    A.    Separated.

2    Q.    How long you been separated?

3    A.    About eight and a half years.  It's been so long, I

4          can't remember.

5    Q.    You don't like men, do you?

6    A.    Love them to death.

7          MR. AUSBORN:  Nothing further for this witness,

8          Your Honor.

9          THE COURT:  I believe I would quit there, too.

10         Anything else, Ms. Pen?

11         MRS. PENN:  No.

12         (The witness was excused from the stand.)

13         THE COURT:  Next witness.

14         MRS. PENN:  Johnnie Taylor.

15                        JOHN TAYLOR

16    having first been duly sworn, testified as follows:

17                     DIRECT EXAMINATION

18    BY MRS. PENN:

19    Q.    State your name, please.

20    A.    John Taylor.

21    Q.    Where are you residing?

22    A.    Bullock County Jail.

23    Q.    And while you have been incarcerated at the Bullock

24          County Jail, have you had any contact with David

25          Donnie Williams?

```
 1   A.   Yes, I have.

 2   Q.   And who was there first?  Did you come in and he

 3        was there or did he come in and you were there?

 4   A.   He was there when I got there.

 5   Q.   He was there when you got there?

 6   A.   Yes.

 7   Q.   And have you had any conversations with

 8        Mr. Williams?

 9   A.   Yes.

10   Q.   Have you had any conversations with Mr. Williams

11        regarding the charges of domestic violence and

12        harassment where Ms. Callie William is the victim?

13   A.   Yes.

14   Q.   What was the substance of those conversations?

15   A.   He explained to me about she had put a no trespass

16        on him and that he wanted me to tell that I was

17        there when it happened at the store.

18   Q.   This would be the AG?

19   A.   AG right.

20   Q.   We are talking about an incident that happened at

21        that time AG, formerly known as the Big Bear?

22   A.   Right.

23   Q.   Did you agree to do that?

24   A.   Yes, I did.

25              (State's Exhibit No. 1 was
```

1          marked for identification.)

2     Q.   I'm going to show you State's Exhibit Number 1 and

3          ask if you can identify that piece of paper?

4     A.   Yes.

5     Q.   What is it?  Tell the ladies and gentlemen of the

6          jury what it is.

7     A.   This is what Mr. Williams wrote and want me to say

8          to the parole office or parole board about this

9          case.

10    Q.   Did you bring this document with you today?

11    A.   Yes, I did.

12    Q.   And is this a fair and accurate depiction of what

13         you brought to me today when you came?

14    A.   Yes, it is.

15             MRS. PENN:  Your Honor, I would like to admit

16         State's Exhibit Number 1.

17             MR. AUSBORN:  Subject to cross-examination.

18             THE COURT:  Admitted.

19             MRS. PENN:  May I publish to the jury?

20             THE COURT:  Yes, ma'am.

21             (State's Exhibit No. 1 was offered, received

22              into evidence and published to the jury.)

23    Q.   And he was asking you to say that you were at the

24         store, at AG I think you were saying?

25    A.   Right.

```
 1   Q.   And were you indeed at the AG?

 2   A.   No.

 3   Q.   Never saw him and Ms. Callie Williams down at the

 4        AG Grocery Store?

 5   A.   No.

 6   Q.   But did you tell somebody that?

 7   A.   Yes, I did.

 8   Q.   You did give a statement regarding that to someone?

 9   A.   Right.

10   Q.   And did you talk to David Donnie Williams after

11        giving that statement?  Have you talked to him

12        after that regarding these charges?

13   A.   Not right after I didn't, but later on I did after

14        he came back from prison.

15   Q.   Was it something regarding these charges?

16   A.   Yep.

17   Q.   Was he asking you to do the same thing you did

18        before for him, to make that statement?

19   A.   Not that statement, another statement.  He wanted

20        me to change my statement.

21   Q.   He wanted you to change your statement?

22   A.   Right.

23   Q.   Do you know Callie Williams?

24   A.   Yes, I know her.

25   Q.   How do you know her?
```

| | | |
|---|---|---|
| 1 | A. | I went to her house one day with Donnie in the car. |
| 2 | | I sat out in the car.  And I heard them one night |
| 3 | | arguing. |
| 4 | Q. | Do you know about when that was? |
| 5 | A. | That was before this even took place. |
| 6 | Q. | That was before all of this took place? |
| 7 | A. | Yes. |
| 8 | Q. | That was before he was trespassed? |
| 9 | A. | Right. |
| 10 | Q. | When did he tell you he had been trespassed? |
| 11 | A. | I was at home one day, and I seen the cops stopped |
| 12 | | over there in front of Charles', his brother, house |
| 13 | | and I seen the car.  The officers gave him a piece |
| 14 | | of paper.  And when the officer left, I went down |
| 15 | | and asked him did he get a ticket.  And he informed |
| 16 | | me that Ms. Williams had trespassed him from the |
| 17 | | house. |
| 18 | Q. | But you don't know when that was? |
| 19 | A. | Not right off, no. |
| 20 | Q. | Was it sometime in 2004? |
| 21 | A. | Yeah. |
| 22 | Q. | Earlier this year? |
| 23 | A. | Right. |
| 24 | Q. | Tell me how it is that you know David Donnie |
| 25 | | Williams. |

```
 1   A.   I've been knowing his family really all my life.
 2   Q.   How old are you?
 3   A.   Forty-eight.
 4   Q.   So you have been knowing the Williams family nearly
 5        all of your life, which is 48 years?
 6   A.   Me and his brother went to school together.
 7   Q.   You went to school with his brother?
 8   A.   Yeah.
 9   Q.   Do you call David Donnie Williams a friend?
10   A.   Yeah.  Me and him became pretty close.
11   Q.   And when you lived -- When you weren't in jail, did
12        you live anywhere near where he lived?
13   A.   Yeah, right across the street.
14   Q.   You lived right across the street from him.  How
15        long did you live across the street from him?
16   A.   Since I got back in 2000.
17   Q.   So he was your neighbor and you became close
18        friends?
19   A.   When Donnie got out -- When Donnie got out, I was
20        in prison.  When I got out of incarceration, then
21        he was out.
22   Q.   What about prior to that?
23   A.   Yeah.  He wasn't staying there.  He was living with
24        Callie.
25   Q.   So you were his neighbor, became close friends with
```

```
 1        him and knew him before you went to jail?

 2   A.   Yeah.   I remember Donnie as a little young boy,

 3        little bitty boy.

 4   Q.   So you have known him a long time?

 5   A.   Yeah.

 6   Q.   And you can look at these ladies and gentlemen of

 7        the jury and tell them that David Donnie Williams

 8        asked you to lie under oath in court for him

 9        regarding what happened at the AG?

10   A.   Yes, he did.

11   Q.   He wanted you to say that you were there and saw

12        it?

13   A.   Yes.

14   Q.   And this is a letter, State's Exhibit Number 1,

15        that he wrote to you?

16   A.   That's what I did in front of the board.

17   Q.   In front of the parole board?

18   A.   Right.

19   Q.   And he wanted you to say something different in the

20        courtroom?

21   A.   Right, right.

22   Q.   What did he want you to tell?

23   A.   He wanted me to say that he was sitting in the car,

24        and the guy that arrived with him went inside the

25        store, and when he got ready to come out the store,
```

| 1  |    | Ms. Williams followed the guy out the store, and |
|----|----|--------------------------------------------------|
| 2  |    | Ms. Williams started arguing with him. |
| 3  | Q. | And that's what he wanted you to say? |
| 4  | A. | Yeah.  I don't know the guy's name. |
| 5  | Q. | Is he sitting in the witness room with you? |
| 6  | A. | Right. |
| 7  |    | MRS. PENN:  No further questions. |
| 8  |    | CROSS-EXAMINATION |
| 9  | BY MR. AUSBORN: | |
| 10 | Q. | May it please the Court, State of Alabama. |
| 11 |    | Mr. Taylor, I am Keith Ausborn, and I represent |
| 12 |    | David Donnie Williams.  If I ask you a question and |
| 13 |    | you don't quite understand it, let me know and I'll |
| 14 |    | clarify that for you. |
| 15 |    | What are you locked up for right now? |
| 16 | A. | Theft of property. |
| 17 | Q. | Theft of property.  What degree? |
| 18 | A. | First. |
| 19 | Q. | That means you stole something of value equal to a |
| 20 |    | value of a thousand dollars or more? |
| 21 | A. | Yes. |
| 22 | Q. | That's what they contend; is that correct? |
| 23 | A. | Yes. |
| 24 | Q. | What do they contend that you stole? |
| 25 | A. | Old furniture in a tore up house. |

```
 1   Q.   Old furniture in a house?

 2   A.   Right.

 3   Q.   You pled guilty in that case?

 4   A.   Yes, I did.

 5   Q.   Furniture that didn't belong to you, and you took

 6        it?

 7   A.   That's right.  The guy I was with said they were

 8        going to tear the house down, and he had spoke to

 9        the person, which I didn't know at the time.

10   Q.   You pled guilty to that case; right?

11   A.   Yes.

12   Q.   And you are not sitting here today and testifying

13        under oath that you are not guilty?

14             You were in fact guilty of that charge;

15        correct?

16   A.   Yes, sir.

17   Q.   When was this?

18   A.   2004, this year.

19   Q.   That's your first felony?

20   A.   (Witness shakes head negatively.)

21   Q.   Let's move to the second one.  What else you got on

22        your record?

23   A.   Breaking into a vehicle.

24   Q.   Breaking into a motor vehicle.

25             I better get my pad to keep up with you.  Let's
```

```
 1          start out -- Let me do this in chronological order.
 2               The first felony that you picked up was what?
 3    A.    That was it, motor vehicle.
 4    Q.    Breaking into a motor vehicle.  What year was that?
 5    A.    '98.
 6    Q.    How many charges -- How many counts did you have?
 7    A.    One.
 8    Q.    Your second felony, you pled guilty in that case or
 9          you went to trial?
10    A.    I didn't go to trial.  My lawyer -- I got
11          probation.
12    Q.    So you pled guilty?
13    A.    (Witness nods affirmatively.)
14    Q.    Second felony?
15    A.    That's it right there.
16    Q.    Theft of Property, First Degree; is that right?
17    A.    Right.
18    Q.    You do know and I know, and the ladies and
19          gentlemen of the jury need to know that theft is a
20          crime of voracity, of dishonesty; isn't that
21          correct, sir?
22    A.    If you say so.
23    Q.    You don't disagree with that; to take something
24          that doesn't belong to you is dishonest?
25    A.    Is it wrong?  It's wrong.
```

```
 1   Q.   You did that not one time, but you did it twice?

 2   A.   Yes, sir.

 3   Q.   You have done it more than two times, you just

 4        haven't been caught; correct?  You are under oath.

 5   A.   Not to my knowledge.

 6   Q.   You are not telling the ladies and gentlemen of the

 7        jury that '98 and 2000 were the only two brushes

 8        with the law that you've had.  You have stolen many

 9        other times and were just savvy enough not to get

10        caught.

11   A.   (Witness shakes head negatively.)

12   Q.   Are you disagreeing with that?

13   A.   Yes, I am.

14   Q.   I'll come back to it.

15   A.   I ain't saying nothing.  You are telling them.

16   Q.   What sentence are you on right now?

17   A.   Straight ten.

18   Q.   A straight ten?

19   A.   Yes, sir.

20   Q.   Where you locked up at?

21   A.   I just told you the Bullock County Jail.

22   Q.   At the county jail?

23   A.   Yes, sir.

24   Q.   When have you been sentenced?

25   A.   I haven't been sentenced yet.
```

1    Q.    When are you going to be sentenced?

2    A.    My sentencing is December 9th.

3    Q.    Mrs. Carmella Penn, was she your prosecutor?

4    A.    Yes, she was.

5    Q.    You know and I know that Mrs. Carmella Penn has a

6          recommendation that she can give to this Honorable

7          Court on December 9th?

8    A.    Ain't nobody informed me of it.

9    Q.    You are the veteran.  You don't know that the

10         prosecutor can recommend a particular sentence to

11         the Court?

12   A.    A veteran?  Yes, I was in the Army.  I am a

13         veteran.

14   Q.    You are veteran felon, too, aren't you?

15   A.    Oh, oh.

16   Q.    Am I right?

17   A.    Yes, sir.

18   Q.    And a veteran felon like you knows that at the date

19         of your sentence, this prosecutor can stand up in

20         open court and recommend a sentence up or down.

21   A.    See, I've never been in court that many times.  You

22         understand what I am saying?  I don't work the

23         system.  I don't know the system.

24   Q.    Stay right there.  Don't move.

25              Ten years is what you pled guilty to; is that

```
 1        right?
 2   A.   That's what my lawyer brought to me.
 3   Q.   Did you plead guilty up under a plea agreement or
 4        did you plead blind?
 5   A.   No, I didn't plead blind.
 6   Q.   You pled in a plea agreement; isn't that right?
 7   A.   (Witness nods affirmatively.)
 8   Q.   And was your plea agreement ten years straight?
 9   A.   Straight ten.
10   Q.   With an application for probation, am I right about
11        that?
12   A.   That's right.
13   Q.   You are hoping to get probation?
14   A.   Well, whatever way it goes.  If I don't, I got to
15        do the time.
16   Q.   You got a family?
17   A.   Yeah, everybody got a family.
18   Q.   You married?
19   A.   Separated.
20   Q.   You got any kids?
21   A.   I supposed to.  They say I did.
22   Q.   They say you did?
23   A.   Yes, sir.
24   Q.   Not supporting the kids that they say you have, are
25        you?
```

```
 1    A.    How?  I'm locked up.

 2    Q.    Before you were locked up?

 3    A.    Was I supporting them?  Yeah, you know that.  I

 4          give them a little something something; keep the

 5          man off me just in case they are mine.

 6    Q.    You have been skating all your life, haven't you?

 7    A.    Skating?  I don't understand what you are saying.

 8    Q.    Let me break that down for you.

 9          You have been pimping the system out all your

10          life?

11    A.    Pimping the system?

12    Q.    Any way you can.

13    A.    They told me you was good.

14    Q.    Now, you are under oath right now; isn't that

15          right?

16    A.    Yes, sir.

17    Q.    Do you know what it means to be up under oath, sir?

18    A.    To tell the truth.

19    Q.    You raise your right hand to --

20    A.    Tell the truth.

21    Q.    -- to God to tell the truth, nothing but the truth,

22          so help you God; isn't that right?

23    A.    (Witness nods affirmatively.)

24    Q.    You know that when you raise your right hand and

25          here it is when it's determined that you have
```

```
 1        testified falsely, you know that that's perjury;
 2        isn't that correct?  You are subject to the
 3        sanctions of perjury, are you not?
 4   A.   That's true.  That's why I came and told the truth.
 5   Q.   All right.  Now, I'm going to back you up a minute.
 6            You testified that you went to the parole board
 7        and you testified on behalf of Mr. David Donnie
 8        Williams; is that correct?
 9   A.   I did.
10   Q.   You raised your right hand in front of that hearing
11        officer to tell the truth, nothing but the truth,
12        so help you good?
13   A.   No, I didn't.  They didn't ask me to raise my hand.
14        They didn't ask me to raise my hand when I was in
15        there.
16   Q.   Let me ask you this:  You know that that was an
17        official hearing; is that not correct?
18   A.   I don't know.
19   Q.   You knew that.
20            You had like a judge, a hearing officer, and it
21        was a hearing with sworn testimony, and you
22        came --
23   A.   They didn't swear me because they didn't make me
24        raise my right hand.  They wanted me to make a
25        statement; I made a statement.
```

```
 1    Q.   Let me ask you something here because I am incensed
 2         behind this:  You are telling the ladies and
 3         gentlemen of the jury and this Court that you felt
 4         empowered to lie because somebody didn't have you
 5         to raise your right hand?  Is that what you are
 6         telling us?
 7    A.   No.  I made a bad judgment.
 8    Q.   A bad judgment?
 9    A.   Yeah.
10    Q.   A bad judgment and knew it was wrong?
11    A.   And knew it was wrong.
12    Q.   You were doing a good deed when you stole
13         somebody's property.  That was a good deed, too,
14         wasn't it?
15    A.   I thought I came here for him.  I am not on trial.
16    Q.   Just answer my question.  You were doing a good
17         deed then, too, weren't you?
18    A.   No, I was not.
19    Q.   You remember doing a good deed when you broke in to
20         someone's vehicle and divested them of their
21         property?
22    A.   I didn't break in to it because it wasn't locked.
23    Q.   So you felt privileged to break in to it because
24         they happened to leave the security disarmed, and
25         you just helped yourself to somebody else's
```

```
 1        property interest?
 2   A.   No, they didn't get nothing.
 3   Q.   It is all about you, isn't it, Jonathan?
 4   A.   John.
 5   Q.   John.  I like John.  That's a Bible name;  Brother
 6        John?
 7   A.   No, just John; John Taylor.
 8   Q.   It's all about you, isn't it?
 9   A.   (Witness shakes head negatively.)
10   Q.   Whenever it's convenient for you to go left, you go
11        left; isn't that right?
12   A.   I suppose.
13   Q.   And when it is convenient for you to go right, you
14        go right; isn't that right, sir?
15   A.   Right.
16   Q.   You got a little sweetheart deal right now with the
17        State of Alabama as it relates to your sentencing
18        on December 9th, don't you?
19   A.   No, sir, I do not.
20   Q.   You telling us that this prosecutor here or her
21        office has not approached you about leniency if you
22        come forth and testify under oath today?
23   A.   They have not.
24   Q.   You are doing this because you are a good citizen?
25   A.   No, I'm doing this because I didn't want to perjure
```

```
 1        myself and get no more added to what I got.

 2              It's all right to be a fool but, I don't want

 3        to be no stupid fool.

 4    Q.  Stay right there.  Don't move.

 5              You looked that hearing officer dead in the eye

 6        when questions were asked of you, and you looked

 7        him dead in the eye, and you swore up and down that

 8        X-Y-Z took place?

 9    A.  I didn't look him in the eye.

10    Q.  You looked away?

11    A.  Yeah, because I was lying.  But I'm looking you in

12        the eye because I'm telling you the truth.

13    Q.  You are so gifted when it comes to lying that you

14        can look me dead in the eye and you are lying

15        through your teeth.  You have learned to do that,

16        haven't you?

17    A.  I don't know what you mean there.

18    Q.  Now, you say that you got a letter from David

19        Donnie Williams; that's what you say?

20    A.  Yes, sir.

21    Q.  Does it surprise you to know that I questioned

22        David Donnie Williams about that --

23              MRS. PENN:  I object.  Your Honor, anything he

24        is about to say --

25              MR. AUSBORN:  Okay.  I can get around it.
```

```
 1   Q.   Did you see David Donnie Williams write that

 2        letter, yes or no?

 3   A.   I saw David Donnie Williams pass it to me.

 4   Q.   Answer my question.

 5   A.   No, I did not.

 6   Q.   Did you see David Donnie Williams write that

 7        letter?

 8   A.   No, sir, I did not.

 9   Q.   Is it possible that somebody other than David

10        Donnie Williams wrote that letter?

11   A.   It's possible.  Probably couldn't write and got

12        somebody to write it for him.

13   Q.   So when you come forth today and try to color your

14        testimony to the ladies and gentlemen of the jury,

15        like here it is David Donnie Williams pimp you out

16        and got you to lie by telling you what to say,

17        that's not true.  Because you know and I know, and

18        the ladies and gentlemen of the jury need to know,

19        you never saw him write that letter; isn't that

20        true, sir?

21   A.   The reason I did, sir, is because I thought I was

22        helping a friend.

23   Q.   Isn't that true?

24   A.   I didn't see him write the letter.

25   Q.   And it is possible that somebody other than David
```

```
 1        Donnie Williams wrote that letter?
 2   A.   It is possible.
 3   Q.   And it is possible that David Donnie Williams never
 4        read that letter, much less saw it; isn't that
 5        right?
 6   A.   Oh, he read that letter.
 7   Q.   Isn't that true?
 8   A.   He read that letter.
 9   Q.   He read it?
10   A.   Yeah.
11   Q.   Let me ask you this:  How you know he can read?
12   A.   Because when he passed it to me, he told me that's
13        what I want you to say right there.
14   Q.   That's what he want you to say?
15   A.   Yeah.
16   Q.   That doesn't mean he read it.
17   A.   Well, he must be a mind reader then.  He want me to
18        read it and don't know what's on there.
19            I said he probably can't write.  I didn't say
20        nothing about read, now.
21   Q.   Let me ask you this right here, now:
22            Illiterate means that possibly a person can't
23        read or write; isn't that right?
24   A.   It's possible.  They could have had bad penmanship.
25            I don't know why.
```

```
 1    Q.   Uh-huh.  Now, I've looked at that letter -- Would
 2         it surprise you to know that you weren't on my
 3         witness list?
 4              You say that David Donnie Williams wanted you
 5         to come forth and testify for the defense.  Let me
 6         ask you this here:
 7              When did I contact you and tell you that you
 8         were going to be part of my case?
 9    A.   I ain't said nary a time you were calling me.
10    Q.   Do you know I am calling the shots on the defense'
11         case?
12    A.   You supposed to.  He paying you.
13    Q.   Donnie don't call the shots on witnesses; I'm
14         calling the shots.  You ain't on my witness list.
15    A.   That's why.  I'd made you got me off of it.
16    Q.   I ain't never seen you.
17    A.   You know why you got me off.  I guess because what
18         the prosecutor presented for you.  You know why.
19    Q.   Would it surprise you that I don't need you on my
20         list?
21    A.   I know you, you Ausborn out of Montgomery.  You
22         "Mad Dog".
23    Q.   Now, you are on the State's list; ain't that right?
24    A.   I don't know how I got on there.
25    Q.   You got on there because you got a sweet deal?
```

```
 1   A.    I ain't got no sweet deal.  Ain't nobody brought
 2         nothing to the table.
 3   Q.    You are just for sale to the highest bidder, aren't
 4         you?
 5   A.    You good, aren't you?
 6   Q.    Isn't that what it is with you?  You are just up
 7         for auction to the highest bidder; isn't that
 8         right?  Isn't that what this is about?
 9   A.    No, it is not.
10   Q.    You are just a hired gun up for sale to the highest
11         bidder?
12   A.    Um.
13   Q.    One minute you say you are going for Donnie, and
14         the next minute you pull a 180, and you are going
15         for the State.
16             Where is your integrity?
17   A.    I guess it was in me.
18             Don't try to make me look like the villain.  I
19         ain't stalking nobody.
20   Q.    Okay.  Let's talk about that.
21             How long you been locked up?
22   A.    Who, me?
23   Q.    Yeah.
24   A.    27th of this month would be seven months.
25   Q.    What day did you go up under lockup?
```

```
 1   A.    27th of April.

 2   Q.    27th of April.  All right.  You just said something

 3         that really intrigued me and I want to test you.

 4               You said, well, I'm not the one stalking

 5         somebody.  Isn't that what I heard you say?

 6   A.    Yeah.  That's what I read on my subpoena was

 7         stalking.

 8   Q.    Now.  Okay.  Are you saying that David Donnie

 9         Williams stalked somebody?

10   A.    I didn't say.  I said I'm not the one.  I didn't

11         say he was.

12   Q.    Exactly.

13   A.    That's right.

14   Q.    Look the ladies and gentlemen of the jury in the

15         eyes and tell them you don't know nothing about

16         Donnie Williams stalking Callie Williams?

17   A.    I don't know nothing about him stalking her.

18   Q.    And look them dead in the eye.

19               Furthermore, you don't know nothing about him

20         harassing her domestic violence; is that not

21         correct?

22   A.    No.  I heard them argue one time; that's it.

23               The only thing I know is what he want me to

24         say.

25   Q.    Let me test you on that.
```

```
 1              Have you seen the indictment in this case?
 2    A.   No, I haven't.
 3    Q.   March the 30th, 2004, were you locked up?
 4    A.   I told you I got locked up April 27th?
 5    Q.   That's right.  And let me ask you:  Were you with
 6         Donnie Williams on March 30th, 2004?
 7    A.   I don't know.  I couldn't tell you back then, man.
 8    Q.   Were you with Donnie Williams on March 30, 2004,
 9         when he was with Ms. Callie Williams?
10    A.   I don't think so.
11    Q.   I ask you to note that that's the date the State of
12         Alabama said this harassment took place?
13    A.   If they did, I wasn't with him then.
14    Q.   You don't back up the contentions that he harassed
15         Callie Williams on March 30, 2004, because you
16         never saw that?
17    A.   I wasn't with him.
18    Q.   April 17, 2004, stalking, you aren't here to say
19         that Mr. Williams stalked Callie Williams, because
20         you don't know that?
21    A.   I didn't say he stalked Ms. Williams.
22    Q.   You never saw him stalk her on those dates?
23    A.   No.
24    Q.   You never heard on those dates him stalking her;
25         isn't that right?
```

1          On those dates, were you physically present

2     where you heard in your ears him state conduct that

3     warranted a stalking or harassment?  You weren't

4     there; is that right?

5  A.  I was not there.

6          The only thing I know is I seen the police

7     officer bring the paper to him, trespassing paper.

8          THE COURT:  How much more you got, Keith?

9  Q.  Now, you say you got a trespassing paper on what

10     date?

11  A.  I couldn't tell you what date it was.  It had to be

12     in March.

13  Q.  Had to be in March?

14  A.  Yeah.

15  Q.  Did you know it was 31 days in March?

16  A.  Sure enough.

17  Q.  Which one?  Which day in March?

18  A.  I couldn't tell you.

19  Q.  First week, second week, third week, fourth week,

20     fifth week.  Do you know which week?

21  A.  I couldn't tell you.

22  Q.  You making this stuff up?

23  A.  When the officer dropped it off, I went across the

24     street and approached Mr. Williams.  I said, you

25     got a ticket?  He responded, no.  He showed me,

```
 1              talking about, I got trespassed.
 2      Q.      Did you see the paper?
 3      A.      It was in his hand.
 4      Q.      Did you read it?
 5      A.      No.
 6      Q.      You ain't nothing but a parrot today.
 7      A.      Sure enough?
 8      Q.      Whatever they tell you to say, that's what you are
 9              pecking through the stand now.
10                  You are just a parrot, aren't you?
11      A.      I thought I was a human being.
12      Q.      Whatever they tell you to say, that's what you are
13              pecking with because you are hoping to get freedom
14              December 9th?
15      A.      Or the time.  It will be all good.  I did the crime
16              I'll be man enough to do the time.
17      Q.      You going to apply for probation?
18      A.      I get denied, I get denied.
19      Q.      You going to apply for it?
20      A.      I already applied for it before this even came up.
21      Q.      You know that the prosecutor has got the power to
22              make you or break you on this probation --
23                  MRS. PENN:  Objection.
24                  THE COURT:  Sustained.  Let's move along.
25      Q.      You have been knowing David Donnie Williams for
```

| 1 | | many, many years; is that right? |
|---|---|---|
| 2 | A. | True. |
| 3 | Q. | It don't add up that you have an ax to grind with |
| 4 | | him in this courtroom unless you are being heavily |
| 5 | | regarded by the state. |
| 6 | | MRS. PENN: Your Honor, objection. It's been |
| 7 | | asked and answered. |
| 8 | | THE COURT: Sustained. |
| 9 | Q. | And you are sure that you remember not being up |
| 10 | | under oath at the parole board? |
| 11 | A. | I was not. I didn't raise my hand. |
| 12 | Q. | I'm going to check that. |
| 13 | A. | Check it out. They didn't ask me no questions. |
| 14 | Q. | They didn't ask you no questions? |
| 15 | A. | No. |
| 16 | Q. | You didn't testify? |
| 17 | A. | The only thing he asked -- him, Mr. Williams, asked |
| 18 | | me. |
| 19 | Q. | Did they ask you anything? |
| 20 | A. | Mr. Williams asked me in front of them the |
| 21 | | questions; Mr. Williams did. |
| 22 | Q. | And you gave testimony? |
| 23 | A. | Right. |
| 24 | Q. | You are saying that you today is more credible than |
| 25 | | you back then, back in July? |

```
 1   A.   Yes, sir, I am.  Because I was lying.  And she knew
 2        I was lying because she made a statement in front
 3        of the folks and said he wasn't even there.  And
 4        she was telling the truth.  And the guy that was in
 5        the car with Mr. Williams, he knew I wasn't there.
 6   Q.   But despite that, you persisted with your lie; hell
 7        hath no fury for a liar.  You still persisted with
 8        your lie?
 9   A.   That's what you get paid for is to ask me these
10        questions.  Put a good show on.
11   Q.   Look them over there and look them in the eye.
12             You want them to believe you today?
13   A.   I'm telling you the truth.
14   Q.   A two-time convicted felon loser, the highest
15        proportion?
16   A.   What about your client?  What's your client's
17        rap sheet?  And you're worried about me.
18             MR. AUSBORN:  And he wants you to believe him.
19             Nothing further.
20                     REDIRECT EXAMINATION
21   BY MRS. PENN:
22   Q.   Have you ever contacted me regarding Donnie
23        Williams?
24   A.   No, I have not.
25   Q.   Do you have any idea how I got your name to be a
```

```
 1           witness in this case?

 2    A.     I do not.

 3    Q.     Would it surprise you to know that the defense

 4           attorney himself is the one that gave your name as

 5           a witness in this case?

 6                  MR. AUSBORN:  I object to that.

 7    A.     I just got a subpoena.

 8    Q.     Did they ask you to testify?

 9    A.     He didn't tell me he didn't want me to come.

10           When I got the subpoena, I thought I got it

11           from them.

12    Q.     Because you were expecting that, weren't you?

13    A.     Yes, I was.

14    Q.     Exactly.  A subpoena from the defense?

15    A.     Yes.

16    Q.     Did I talk to you today?

17    A.     Yes.

18    Q.     What did I say to you?

19    A.     You asked me what did I know about this case.  And

20           you wanted me to tell the truth.  And you asked me

21           about that letter.

22    Q.     And I asked you about this letter, didn't I?

23    A.     Right.

24    Q.     When was the first time that you brought this

25           letter and showed it to anybody in my office?
```

```
1    A.    Today.

2    Q.    I didn't know anything about this, did I?

3    A.    Didn't nobody know about it.

4    Q.    And you were never ever in the vicinity of Callie

5          Williams when David Donnie Williams was stalking

6          her, harassing her and assaulting her, were you?

7    A.    No.

8                MR. AUSBORN:  I object, Your Honor.  That's

9          obviously assuming facts not established by

10         evidence.

11               THE COURT:  As to the assault?

12               MR. AUSBORN:  And the stalking.  I move to

13         strike it.

14               MRS. PENN:  The testimony is that he grabbed

15         her.

16               THE COURT:  Objection sustained as to the

17         assault portion of the other question.

18               MRS. PENN:  Thank you, Judge.

19   Q.    So how would I know to subpoena you and call you as

20         a witness?

21   A.    Got to get it from him.

22   Q.    You've got some charges that you said I was a

23         prosecutor on.  Is it something -- Are you pleing

24         to a deal that I worked out with you?

25   A.    I ain't asked for no deal.
```

```
 1   Q.   Tell the ladies and gentlemen of the jury what my
 2        role was that day when you came into court and pled
 3        guilty and told the truth, that you were guilty of
 4        the charges that you were charged with.  Tell them
 5        what my role was in this court.
 6   A.   I had five charges -- my lawyer got --
 7   Q.   What did I do?
 8   A.   What did you do?  I forgot here.
 9   Q.   Did I talk to your lawyer?
10   A.   No.
11   Q.   Did I talk to you?
12   A.   No.
13            You didn't talk to my lawyer or me.
14   Q.   Wasn't involved in any negotiations in any form or
15        fashion, was I?
16   A.   I was sitting back there, and my lawyer called me
17        back there and brought me the plea.
18   Q.   You never saw him talk to me?
19   A.   No.
20   Q.   And never talked to you about a deal or probation,
21        have I?
22   A.   No.
23   Q.   As far as you know, I don't even know you are
24        coming up for probation on December 9th, do I?
25   A.   No.
```

| | | |
|---|---|---|
| 1 | Q. | Tell me what pimping the system out means because I |
| 2 | | don't know what that is. |
| 3 | A. | I don't know either.  That's my first time hearing |
| 4 | | that statement. |
| 5 | Q. | I was just trying to figure it out because I needed |
| 6 | | to know for clarification of the jury to know. |
| 7 | A. | I don't know.  He asking the wrong man. |
| 8 | Q. | You don't know what pimping the system out means? |
| 9 | A. | No.  I haven't been in the system long enough to |
| 10 | | know what that means.  He need to ask somebody |
| 11 | | further advance than me that. |
| 12 | Q. | David Donnie Williams handed you State's Exhibit |
| 13 | | Number 1, didn't he? |
| 14 | A. | Excuse me. |
| 15 | Q. | David Donnie Williams handed you this piece of |
| 16 | | paper, didn't he? |
| 17 | A. | Yes, he did. |
| 18 | Q. | And we are talking about you giving testimony.  And |
| 19 | | I don't know if you know what testimony is, but |
| 20 | | when he asked you about testifying, tell me exactly |
| 21 | | where you were when this testimony occurred. |
| 22 | A. | Down in the county jail in the MP room. |
| 23 | Q. | At the county jail? |
| 24 | A. | Right. |
| 25 | Q. | Was there a judge there? |

```
 1   A.   No.
 2   Q.   Was there somebody sitting there taking --
 3   A.   Stenographer was not there.
 4   Q.   Anybody telling you to raise your hand?
 5   A.   No.
 6   Q.   And the lady recording it?
 7   A.   She had a tape recorder.
 8   Q.   And you made that statement because you thought you
 9        were helping a friend, didn't you?
10   A.   Right.
11   Q.   But now you see what kind of friend he is, don't
12        you?
13   A.   When he came and asked me to change it.  And I knew
14        they had it on tape the first time and I knew I
15        wasn't fixing to perjure myself.  I know you got
16        that statement I made.
17             THE COURT:  Wait for a question.
18   Q.   Those are all of the questions I have, Mr. Taylor.
19             THE COURT:  Recross.
20             MR. AUSBORN:  Your Honor, a quick question.
21                     RECROSS-EXAMINATION
22   BY MR. AUSBORN:
23   Q.   Your Honor, a quick question.  Did I understand you
24        said you had five charges?
25             When you just pled guilty, how many charges did
```

```
 1        you initially have?
 2   A.   You heard me correct, five.
 3   Q.   Now, I asked you earlier under oath --
 4   A.   You asked me had I been convicted.  You asked me
 5        how many I had been convicted.
 6   Q.   Don't move.  I asked you earlier up under oath,
 7        other than the Theft of Property First Degree and
 8        the Breaking and Entering of a Motor Vehicle, were
 9        there any other charges that you had or any other
10        offenses that you had committed that you had gotten
11        away with, and you said, no.
12   A.   I thought you asked me if I had been convicted.
13   Q.   Let me back you up then now that we are on the same
14        page.
15            How many other crimes have you committed that
16        you didn't get convicted of?
17            You are 48 years old; right?
18   A.   Yeah.
19   Q.   How many times have you been committing crimes,
20        sir?
21   A.   Me?
22   Q.   Yeah.
23   A.   I've been working mostly all my life.
24   Q.   You been working?
25   A.   Mostly all of my life.
```

```
 1    Q.    You get in the criminal game, what, back in
 2          '72?
 3    A.    In '72 I was in high school.
 4    Q.    High school?
 5    A.    Right.
 6    Q.    What year you get in the crime game?
 7    A.    I ain't never got in no crime game.
 8    Q.    When did you commit your first criminal offense
 9          that you got away with?  Statute of limitations is
10          over, by the way.
11    A.    You never get away with no crime.  You always get
12          caught.
13    Q.    Tell us about these other four charges that got
14          throwed out.
15    A.    Misdemeanor.
16    Q.    What were they for?
17    A.    I got to look at my paper.  I done forgot.
18    Q.    Wait a minute.  You got amnesia now?
19    A.    No.  You done gave me a headache up here.
20    Q.    You mean to tell me you just pled guilty and you
21          don't know what you pled guilty to the charges that
22          got thrown out.
23          You got selective amnesia right now, brother?
24          What four charges got throwed out?
25    A.    Let me think.
```

```
 1   Q.   You don't know?

 2   A.   Receiving Stolen Property, misdemeanor.

 3   Q.   Receiving Stolen Property?

 4   A.   Uh-huh (affirmative response).

 5   Q.   What did you steal?  What was stolen and given to

 6        you?

 7   A.   A safe.  You know what a safe is; right?

 8   Q.   Safe, where you keep your goods in?

 9   A.   A safe like a cabinet.

10   Q.   That's number one.  What's the next one?

11   A.   Theft of Property Second.

12   Q.   Second?  What did you steal there?

13   A.   I didn't steal nothing.

14   Q.   They threw it out because you pled guilty?  They

15        gave you a sweetheart deal.

16            My lawyer came to me and said they dropped the

17        four charges.

18            Let me ask you this:  The four charges that

19        they dropped, what was the item that was stolen

20        there?

21   A.   Some old wagon wheel or something like that.

22   Q.   All right.  Let's talk about number three.  What

23        was the third one?

24   A.   Well, the other two, they go in with the theft of

25        property.
```

```
 1   Q.   So we had Burglary Third.

 2   A.   They were in with the top first and Theft of

 3        Property Second.

 4   Q.   So we've got two theft of properties -- three theft

 5        of properties and receiving?

 6   A.   No.  You ain't listening.  Two theft of properties,

 7        two burglaries, receiving stolen.

 8   Q.   Two burglaries, two stolen and one receiving?

 9   A.   Right.

10   Q.   Different victims; am I right about that?

11   A.   Huh-uh (negative response).

12   Q.   They happened at different locations?

13   A.   Just two; isn't that right.

14   Q.   You are out here plaguing society as a menace

15        stealing at the point to where you are just

16        unconscious in the process and you want to look

17        these ladies and gentlemen of the jury in the eye

18        and say, I'm credible, you can believe me?

19   A.   At least I own up to what I did.

20        I'm not denying it.

21   Q.   I hope you do real good on December 9th.

22        Nothing further.

23        MRS. PENN:  Nothing further, Judge.

24        THE COURT:  Thank you, Mr. Taylor.

25        (The witness left the witness stand.)
```

1       THE COURT:  Fifteen minute recess.  Y'all walk

2   around some.  Keep in mind the recess instruction.

3       (Whereupon a short recess was taken, after

4        which the following proceedings were had in

5        open court:)

6       THE COURT:  Call your next witness.

7       MRS. PENN:  Wilbert Jernigan.

                        WILBERT JERNIGAN

9   having first been duly sworn, testified as follows:

                        DIRECT EXAMINATION

11  BY MRS. PENN:

12  Q.   Mr. Jernigan, what's your occupation?

13  A.   Bullock County Circuit Clerk.

14  Q.   What is your job in that occupation?

15  A.   Well, we do everything concerning -- to get in the

16       court system, you have to come through the circuit

17       clerk's office.

18           So we deal with small claims, district criminal

19       and circuit criminal and everything pertaining to

20       the court system.  I'm the custodian of records.

21  Q.   Do you issue warrants?

22  A.   Yes, ma'am.

23  Q.   What other agency within Bullock County can issue

24       warrants?

25  A.   I'm the only agency.

| 1 | Q. | Okay. So if someone had a complaint and they |
| 2 | | needed a warrant signed, could they get that signed |
| 3 | | down at the Union Springs Police Department? |
| 4 | A. | No, ma'am. Even the police department will |
| 5 | | sometime make a warrant, but they have to come to |
| 6 | | me to get it sworn in. |
| 7 | Q. | So you are the only one who can issue a warrant? |
| 8 | A. | Yes, ma'am. |
| 9 | Q. | Do you know Ms. Callie Williams? |
| 10 | A. | Yes, ma'am. |
| 11 | Q. | Tell me how you know Callie Williams. |
| 12 | A. | Callie Williams has been a tenant of mine for |
| 13 | | approximately 15 years. |
| 14 | Q. | What's the address where she is living now? |
| 15 | A. | 1010 Martin Luther King Boulevard and that's |
| 16 | | Comfort Trailer Park. |
| 17 | Q. | And that's one of your mobile homes? |
| 18 | A. | Yes, ma'am. |
| 19 | Q. | Do you know David Donnie Williams? |
| 20 | A. | Yes, ma'am. |
| 21 | Q. | How do you know David Donnie Williams? |
| 22 | A. | Well, I knew Donnie for several years; even before |
| 23 | | he got involved with Ms. Williams. |
| 24 | Q. | Have you ever issued any warrants for Ms. Callie |
| 25 | | Williams against David Donnie Williams? |

| | | |
|---|---|---|
| 1 | A. | You mean for Ms. Williams against -- Yes, ma'am. |
| 2 | Q. | Do you know approximately how many you've issued? |
| 3 | A. | Let's see.  Approximately three or four. |
| 4 | Q. | And has Ms. Williams ever come to you and you |
| 5 | | didn't give her a warrant? |
| 6 | A. | Yes, ma'am. |
| 7 | Q. | So she has come to you on numerous occasions to |
| 8 | | issue warrants against David Donnie Williams? |
| 9 | A. | Yes, ma'am. |
| 10 | Q. | And on some of them you didn't give her warrants? |
| 11 | A. | Yes, ma'am. |
| 12 | Q. | But you have given her approximately three or four? |
| 13 | A. | Yes, ma'am. |
| 14 | Q. | What about trespass warrants?  Does your office do |
| 15 | | that? |
| 16 | A. | Yes, ma'am. |
| 17 | Q. | What is that called.  Give us the correct |
| 18 | | terminology. |
| 19 | A. | This -- You issue what you call a trespass notice. |
| 20 | | And to be a little bit more specific, if someone |
| 21 | | don't want me at their house, they can come into my |
| 22 | | office and do a trespass notice and the trespass |
| 23 | | notice is then served on that individual. |
| 24 | | Once the trespassing notice is served, then the |
| 25 | | person know that he's not welcome; he is trespassed |

```
 1        from that residence.

 2   Q.   Have you ever done such notice for Ms. Callie

 3        Williams?

 4   A.   Yes, ma'am.

 5   Q.   Against Mr. David Donnie Williams?

 6   A.   Yes, ma'am.

 7   Q.   About how many do you think you have done?

 8   A.   I believe two.

 9   Q.   I see you came into court holding something in your

10        hand.  Would you mind telling us what that is?

11   A.   This is one deposition this year.

12   Q.   I'm going to label this State's Exhibit 2.  And I'm

13        sorry, I didn't hear what you said it was.

14   A.   This trespassing notice was issued March 24, 2004.

15   Q.   Okay.  So that was done at the request of

16        Ms. Callie Williams against Donnie Williams on

17        March 24, 2004?

18   A.   Yes, ma'am.

19   Q.   And the other one, you said you don't think it was

20        done this year?

21   A.   Yes, ma'am, I don't think the other one was this

22        year.

23   Q.   In any event, did you find a copy of it?

24   A.   The old one?

25   Q.   Yes.
```

1   A.   No, ma'am.

2   Q.   Is this a fair and accurate copy of that

3        trespassing notice that you issued?

4   A.   Yes, ma'am.

5   Q.   There is a check mark on the bottom of State's

6        Exhibit Number 2.  What does that mean?

7   A.   That means that it goes to the police department.

8             MRS. PENN:  Your Honor, I would offer State's

9        Exhibit Number 2.

10            THE COURT:  Any objection?

11            MR. AUSBORN:  Subject to cross-examination,

12       Your Honor.

13            THE COURT:  Admitted.

14            (State's Exhibit No. 2 was marked for

15             identification, offered and received

16             into evidence.)

17            MRS. PENN:  May I establish to the jury, Your

18       Honor?

19            THE COURT:  Go ahead.

20            (Whereupon State's Exhibit No. 2 was

21             Published to the jury.)

22  Q.   And this was a trespass notice at 1010 Martin

23       Luther King; correct?

24  A.   Yes, ma'am.

25  Q.   Now, I know this is your tenant and you are the

| 1 | | circuit clerk.  Tell me this:  Do you just pass out |
| 2 | | warrants willy-nilly? |
| 3 | A. | No, ma'am.  Usually when a person come to do a |
| 4 | | warrant, I require that they have a police report. |
| 5 | | And not only a police report, I converse with the |
| 6 | | police department also. |
| 7 | Q. | So if Callie Williams came in and asked you for a |
| 8 | | warrant and you go, this is my tenant, do you do |
| 9 | | that? |
| 10 | A. | No, ma'am.  I can't be partial like that. |
| 11 | Q. | So you follow the same kind of procedures each time |
| 12 | | someone comes in to sign a warrant? |
| 13 | A. | Yes, ma'am. |
| 14 | Q. | So you would have either seen a police report or |
| 15 | | conversed with the police department before issuing |
| 16 | | that trespass notice? |
| 17 | A. | Usually on a trespass notice, I do not converse |
| 18 | | with the police department.  But any time with a |
| 19 | | warrant, warrant of arrest, then I require a police |
| 20 | | report. |
| 21 | Q. | All right.  Thank you very much. |
| 22 | | I want to take you back to April the 17th and |
| 23 | | ask you if you have any independent recollection of |
| 24 | | that date? |
| 25 | A. | April 17th of this year? |

```
 1    Q.   Yes, sir.

 2    A.   Not right offhand I don't.

 3    Q.   Do you recall a day where you were at the Comfort

 4         Motel Trailer Park?

 5    A.   Yes, ma'am.

 6    Q.   And saw David Donnie Williams over there?

 7    A.   There was -- I know one Saturday.  I don't know

 8         what date.  I know it was a Saturday morning I was

 9         down there working.  We were removing some tin and

10         David Donnie Williams rode by a couple of times,

11         and then after he rode by, he stopped on Martin

12         Luther King Boulevard for a few minutes.

13    Q.   And tell me where on Martin Luther King Boulevard

14         you saw him stop.

15    A.   It was just before you get to the driveway to come

16         to the trailer park, but it's called headed north

17         or Martin Luther Boulevard.

18    Q.   North going towards Tuskegee?

19    A.   Yes, ma'am.

20    Q.   And it was parked on the left-hand side of the

21         street?

22    A.   No, ma'am.  Right-hand side.

23    Q.   Parked on the right-hand side going north?

24    A.   Yes, ma'am.

25    Q.   And it sat there approximately how long?
```

| | | |
|---|---|---|
| 1 | A. | Few minutes.  It wasn't long. |
| 2 | Q. | And did you see what happened -- what kind of car |
| 3 | | was it?  Do you remember that? |
| 4 | A. | I know it was a small sedan.  I don't know whether |
| 5 | | it was a Toyota or Nissan.  I don't know. |
| 6 | Q. | It sat there for a few minutes, and then I assume |
| 7 | | it left? |
| 8 | A. | Yes, ma'am. |
| 9 | Q. | Did you see what direction it went or he went? |
| 10 | A. | He went up and they went into the Union Springs AG |
| 11 | | parking lot. |
| 12 | Q. | And did he get out of the car at the parking lot or |
| 13 | | did you see what he did in the parking lot? |
| 14 | A. | No, ma'am.  He sat in the car and was looking at |
| 15 | | the house. |
| 16 | Q. | Did he park on the end -- I don't know -- give |
| 17 | | us -- At the AG, you got the store -- you are |
| 18 | | facing it on the right-hand end, and then you have |
| 19 | | a part of the building that there was nothing but |
| 20 | | concrete block.  Was he parked more towards the |
| 21 | | store or the concrete block end? |
| 22 | A. | More towards the trailer park. |
| 23 | Q. | So not towards the store but closer to the left |
| 24 | | towards the trailer? |
| 25 | A. | Yes, ma'am. |

| | | |
|---|---|---|
| 1 | Q. | And did you ever see him exit the vehicle? |
| 2 | A. | No, ma'am. |
| 3 | Q. | He just sat there and looked? |
| 4 | A. | Yes, ma'am. |
| 5 | Q. | Did you see Ms. Callie Williams around that time? |
| 6 | A. | Mr. Williams pulled off. He left. I don't know |
| 7 | | where he went. And then a little while later, |
| 8 | | we -- The reason I'm saying we, is Early Harris and |
| 9 | | Charles Stromble (phonetic) was with me. |
| 10 | Q. | So somebody was helping you work? |
| 11 | A. | Right. And we saw Ms. Williams exit her house. |
| 12 | | She got into her car and left. |
| 13 | Q. | Where did she go? |
| 14 | A. | I don't know. |
| 15 | Q. | And did you at any point see David Donnie Williams |
| 16 | | or Callie Williams after that time? |
| 17 | A. | Well, after Callie left, a few minutes later, we |
| 18 | | heard a car going real fast, and we looked up and |
| 19 | | Donnie Williams was going south on Martin Luther |
| 20 | | King Boulevard, and the police was right behind |
| 21 | | him. |
| 22 | Q. | Okay. And this is not something somebody told you. |
| 23 | | This is something that you saw; is that correct? |
| 24 | A. | Yes, ma'am. |
| 25 | Q. | And I know Ms. Callie is your tenant, but would you |

1    get up on this stand and perjure yourself for

2    Callie Williams?

3  A.   No, ma'am.

4  Q.   Do you have any reason to get on the stand and lie

5    and make up stuff on David Donnie Williams?

6  A.   No, ma'am.

7  Q.   If you would, answer Mr. Ausborn's questions.

8        THE COURT:  Cross.

9        MR. AUSBORN:   Thank you.

                    **CROSS-EXAMINATION**

11  **BY MR. AUSBORN:**

12  Q.   Good afternoon, Mr. Jernigan.  I'm going to try to

13    be as brief as I can, Mr. Jernigan.

14  A.   All right.

15  Q.   Mr. Jernigan, tell the ladies and gentlemen of the

16    jury how long you have been in the capacity of

17    clerk of court.

18  A.   This is my tenth year.

19  Q.   And prior to you becoming clerk of court, you

20    severed in the capacity of law enforcement; is that

21    correct?

22  A.   Yes, sir.

23  Q.   And law enforcement, was that with the Union

24    Springs Police Department?

25  A.   Yes, sir.

```
 1   Q.   And tell us, if you will, what you did.  What was
 2        your retiring rank with the police department?
 3   A.   I was a captain with the Union Springs Police
 4        Department when I retired.
 5   Q.   Help us, if you will, now, of course it has already
 6        been clarified -- you knew, of course, Ms. Callie
 7        Williams?
 8   A.   Yes, sir.
 9   Q.   And you candidly admitted that question, I have
10        been knowing her for, what, 15 years; she has been
11        a tenant of yours?
12   A.   Yes, approximately 15 years.  It could have been a
13        little bit more or little bit less.
14   Q.   How much is her monthly rent at your place?
15   A.   Two twenty-five.
16   Q.   Two twenty-five?
17   A.   Yes, sir.
18   Q.   She is on a lease agreement with you; is that
19        correct?
20   A.   Yes, sir.
21   Q.   Now, Mr. Jernigan, in your capacity as clerk of
22        court, you stated that the standard operating
23        procedure in terms of a person procuring a warrant
24        and affidavit is that you require that they first
25        of all go and get a police report; is that correct?
```

1  A.  That is correct.

2  Q.  Now, help us out, if you will, in your capacity as

3      clerk of court, I'm sure you've had occasion to

4      where you've seen on one or more instances where a

5      person has procured a false warrant and affidavit

6      based upon trumped up charges?

7  A.  That is correct.

8  Q.  And it would also be safe to conclude that if a

9      person wanted to do that, it would be pretty easy

10     to do that, go down to the police station, make out

11     a bogus incident report and then come to you and

12     back that bogus incident report up with a bogus

13     complaint in order to procure a warrant?

14 A.  Well, that's why I converse with the police

15     department or the sheriff's department because

16     sometimes a person comes to the office, and I call

17     them and they say, oh, no, don't do that.  We are

18     still investigating it or that's not true.

19         But there have been some cases of where there

20     have been some warrants that shouldn't have been

21     issued.

22 Q.  Now, you further agree in the area of domestic

23     relations, this would be one such area in which it

24     would be a prime opportunity for one mate to

25     leverage another mate through a false allegation?

```
 1        I mean a husband and wife, boyfriend, girlfriend
 2        get into it, arguing quibbling, the girlfriend
 3        wants to get back at the boyfriend, so she goes and
 4        trumps up a false charge against him as a means of
 5        being vindictive.
 6            You have seen instances in which that has
 7        happened?
 8   A.   Yes, sir.
 9   Q.   And I say off the top, and I want to put this on
10        the Record, I've been knowing you for the last 13
11        years.  And I state on the Record your integrity is
12        not being brought into question before this Court.
13   A.   Thank you.
14   Q.   Now, with respect to Ms. Callie Williams, you
15        stated that you had a business relationship with
16        her.  She has been your tenant; is that correct?
17   A.   That is correct, yes, sir.
18   Q.   Now, I want to turn your attention to the two
19        indictments that are before this Court.
20            No doubt you are aware that my client Mr. David
21        Donnie Williams has been indicted on two different
22        charges, one being stalking and the other one being
23        harassment, i. e. domestic violence?
24   A.   Yes, sir.
25   Q.   Now, as commencement of those indictments at the
```

```
 1          district court stage, that was predicated based
 2          upon a warrant and affidavit that was, of course,
 3          issued by your office; that, of course, being
 4          specifically yourself; is that correct?
 5    A.    Yes, sir.
 6    Q.    Now, on the dates in which those warrants and
 7          affidavits were given the protocol was that you met
 8          with Ms. Callie Williams; is that correct?
 9    A.    Well, to do a warrant, yes, sir, they have to come
10          in my office.
11    Q.    Now, just for clarification, you would agree,
12          Mr. Jernigan, you are not here to testify to the
13          ladies and gentlemen of the jury that I know that
14          Mr. Donnie Williams committed stalking against
15          Ms. Callie Williams because, first of all, you
16          would agree, you never observed that happening
17          yourself?
18    A.    No, sir.
19    Q.    Okay.  And, furthermore, you never heard those
20          events, alleged events, occur as they were
21          unfolding as well; is that correct?
22    A.    No, sir, I did not.
23    Q.    Okay.  And likewise with the harassing/domestic
24          violence, same questions:  You are not here to
25          affirm that those happened either; is that correct?
```

```
 1    A.    That's correct.

 2    Q.    Your role as clerk of court is to maintain

 3          objectivity, neutrality and allow the trier of

 4          fact, which is of course the honorable ladies and

 5          gentlemen of the jury, decide the issue of guilt or

 6          innocence based upon the trial being presided over

 7          by Your Honor; is that correct?

 8    A.    That is correct.

 9    Q.    The warrant and affidavit and the subsequent

10          indictment are necessarily only the vehicles by

11          which we get here today for the trial; is that

12          correct?

13    A.    Yes, that is correct.

14    Q.    Now, specifically as it relates to this case, I

15          want to talk to you about the trespassing notice?

16    A.    Okay.

17    Q.    Now, a trespassing notice -- Clarify, if you will,

18          a trespassing notice is not a trespassing order; is

19          that correct?

20    A.    That is correct.

21    Q.    A trespassing order, as it is relevant to this

22          case, would be one that is issued by way of Your

23          Honor based upon a petition application for a

24          protection order; is that correct?

25    A.    You talking about a trespassing order?
```

```
 1   Q.   Yeah, yeah, the order.

 2   A.   Yes, sir, the order has to be issued by the judge.

 3   Q.   Now, a trespassing notice is something that is

 4        entirely distinguished and different.

 5             That is basically just something where one

 6        person puts in a request to enjoin another person

 7        from having any contact with them and basically

 8        they come to you saying, hey, I want so and so to

 9        stay away from me.  They give you the name without

10        benefit of you going through the allegations?

11   A.   That's right.

12   Q.   In other words, anybody -- In other words, I can go

13        and say I want a trespassing notice against

14        anybody.  That's my right?

15   A.   That is correct.

16   Q.   And whether or not the alleged facts that surround

17        that, there is no requirement that they be proven

18        or corroborated in order to get a trespassing

19        notice; that's your right?

20   A.   Uh-huh (affirmative response).

21   Q.   Now, in this case, and you stated one means of

22        weeding out a person and/or persons from trumping

23        up allegations is that you require that they first

24        of all go to the police department and get an

25        incident report; is that correct?
```

| 1 | A. | That is correct. |
| 2 | Q. | And would it be safe to conclude that with respect |
| 3 | | to that incident report, that person who's |
| 4 | | requisitioning that incident report, giving that |
| 5 | | report, should give a thorough, accurate -- a |
| 6 | | complete recitation of all facts, circumstances and |
| 7 | | events that will subsequently support the warrant |
| 8 | | and affidavit? |
| 9 | A. | That is correct, sir. |
| 10 | Q. | And then basically what would happen at that |
| 11 | | particular point is that they then will bring the |
| 12 | | incident report to you, you'd look at the incident |
| 13 | | report, and based upon the contentions that are |
| 14 | | raised in the incident report, you then in your |
| 15 | | capacity then would make a professional decision as |
| 16 | | to what warrant, if any, that person is entitled to |
| 17 | | and so issue; is that correct? |
| 18 | A. | Except that I do converse with the police |
| 19 | | department or the sheriff's department.  Whoever |
| 20 | | officer's name is on the incident report, I ask |
| 21 | | them have you done any investigation, and we go |
| 22 | | through that. |
| 23 | Q. | Now, one further way of eliminating/reducing the |
| 24 | | possibility and probability of a person trumping up |
| 25 | | charges against another person is for the arm of |

```
 1            law enforcement to do a detailed objective

 2            investigative neutral investigation; is that

 3            correct?

 4     A.     That would help a lot, yes, sir.

 5     Q.     And in your capacity as captain, retired captain of

 6            the Union Springs Police Department, that's what

 7            you did.  In other words, an alleged victim comes

 8            in, makes an allegation, and certainly one

 9            amounting to a felony, before you issue that

10            warrant, you go and you speak to the alleged

11            perpetrator and get their version of events.  And

12            then based upon that, make some sort of surmise as

13            to whether or not there is probable cause or prima

14            facie showing as to whether or not a warrant and

15            affidavit is issued.  Is that the protocol?

16     A.     That is the protocol.  And you speak to witnesses,

17            neighbors, anybody around.

18               You try to do an investigation to really find

19            out the truth.

20     Q.     Okay.  Now, as it relates to the trespassing

21            notice, there is no dispute -- the State has

22            entered into evidence their contention that you

23            issued a trespassing notice and you have so

24            testified to that.  We have no problem with that

25            trespassing notice.
```

| 1 | | Now, however, once that trespassing notice |
|---|---|---|
| 2 | | leaves your hand and leaves your office, you are |
| 3 | | not responsible for the execution of that |
| 4 | | trespassing notice; is that correct? |
| 5 | A. | That is correct. |
| 6 | Q. | Now, so that being the case -- In fact, I see on |
| 7 | | the trespassing notice that the order of |
| 8 | | distribution is that one copy goes to the sheriff's |
| 9 | | department, and one copy goes to the chief of |
| 10 | | police.  They are the auspices that are tasked with |
| 11 | | the execution of that trespassing notice; is that |
| 12 | | correct; they serve it? |
| 13 | A. | That is correct.  But if a person live in the city |
| 14 | | limits or city jurisdiction, then that trespassing |
| 15 | | notice will go to the police department.  If they |
| 16 | | live outside of the city limits in the county, then |
| 17 | | it would go to the sheriff's department. |
| 18 | Q. | I appreciate you clarifying that.  That's |
| 19 | | absolutely accurate. |
| 20 | | Now, just as a matter of Record, the address |
| 21 | | that Ms. Callie Williams resides at, the property |
| 22 | | that is titled to you and leased to her, what |
| 23 | | address is that -- is that inside the city limits? |
| 24 | A. | Yes, sir. |
| 25 | Q. | So the jurisdiction for service on that trespassing |

1      notice for all practical purposes should have fell

2      on the chief of police office, the Union Springs

3      Police Department?

4  A.   That is correct.

5  Q.   Even though a copy of that would have been flagged

6      to the sheriff's department as well; is that

7      correct?

8  A.   No, sir.

9  Q.   So it would just be the chief of police; is that

10     right, the city?

11  A.   That is correct.

12  Q.   Now, you are not here to testify that that trespass

13     notice ever got served on Mr. David Donnie Williams

14     because once it left your office and your hand, you

15     no longer have any accountability for it; is that

16     correct?

17  A.   That is correct.

18  Q.   And you would agree that with respect to that

19     trespass notice, the enforcement of that trespass

20     notice is only as good as the service which back it

21     up?

22        In other words, that trespassing notice is a

23     request by the alleged victim in this case, that

24     being Ms. Callie Williams, to trespass Mr. David

25     Donnie Williams from her residence.  But if

1       Mr. David Donnie Williams never received it, he is

2       never put on notice that that was ever issued.

3          Would you agree with that?

4  A.   I agree.

5  Q.   Now, if a person is being stalked, there are

6       several remedies that a person can exercise in

7       terms of eliminating, reducing the risk of that

8       particular conduct.

9          Now, one such remedy, and I may add a highly

10      effective remedy, is for that person to file a

11      petition application for protection from abuse

12      which would warrant this Honorable Court issuing a

13      TRO, a temporary restraining order without benefit

14      of a hearing, an upfront hearing stopping that

15      conduct based upon the mere contention of the

16      alleged victim that they are being stalked; is that

17      correct?

18  A.   That is correct.

19  Q.   And once that temporary injunction is placed into

20      effect, what happens next is that alleged

21      perpetrator is served a copy of that petition for

22      protection from abuse, and there is that ex parte

23      record, which for purposes of clarification is an

24      order without notice. And then Your Honor is then

25      required to set a hearing, a formal hearing on the

```
 1        merits within ten days; isn't that also correct?
 2   A.   Yes, sir.
 3   Q.   And at that particular hearing, the alleged
 4        perpetrator and the alleged victim then come forth
 5        before a trier of fact, and that would be this
 6        Honorable Court, put on whatever testimony,
 7        whatever witnesses that they have, and then Your
 8        Honor, as a person of neutrality as a trier of
 9        fact, would then make an objective decision as to
10        whether or not an injunction should be issued; is
11        that also correct?
12   A.   Yes, sir.
13   Q.   To the best of your knowledge, Ms. Callie Williams
14        never applied for an injunction, a petition
15        application for protection from abuse; is that
16        correct?
17   A.   Not to my knowledge.
18   Q.   And if she were to apply for that, would that
19        application be placed through your office?
20   A.   Yes, sir.
21   Q.   And to the best of your knowledge and information
22        and belief, that remedy was never sought by her?
23   A.   That is correct.
24   Q.   Now, another remedy that a person has to avail
25        themselves of -- obviously, if a person is being
```

1     stalked -- Okay.  It is elementary that if a person

2     is being stalked, you call 911, which is a synonym

3     for help.  It doesn't take a rocket scientist to

4     know if you need help to dial 911.  That's one

5     other remedy; is that correct?

6  A.    Yes, sir.

7  Q.    Now, with respect to Mr. Donnie Williams and

8     Ms. Callie Williams, you are aware that they have

9     had a romantic involvement, a relationship with one

10     another, for about the last seven years?

11  A.    I don't remember exactly how long it was, but I do

12     know, yes, sir, they had a romance.

13  Q.    And in your capacity as landlord, you had occasion

14     to go by the premises in which are titled to you

15     and leased to her, and didn't you on occasion see

16     Mr. Donnie Williams at the house?

17  A.    Yes, sir.

18  Q.    Did you ever go by there and see Mr. Donnie

19     Williams assaulting Ms. Callie Williams?

20  A.    No, sir, I never seen him assault her.

21  Q.    And when ever you went by there, did you ever see

22     any instances in which Ms. Callie Williams had

23     bruises on her person, looked like she had been

24     battered?

25  A.    I can't remember ever seeing where she had some

```
 1         bruises.

 2    Q.   Now, had that been the case, and I know how sharp

 3         you are Mr. Jernigan, no doubt you probably would

 4         have reported that because that's exceptional?

 5              If you see evidence of somebody with a black

 6         eye, swollen cheek, busted lip, or something like

 7         that on somebody you have known in a professional

 8         capacity over the last fifteen years, that would

 9         stand out in your mind, and you would recall that,

10         would you agree?

11    A.   I'm sure it would.

12    Q.   Now, an interesting thing happened that I

13         discovered over the break.  I took a long look back

14         over the records, and I appreciate you clarifying

15         what the protocol was in terms of getting the

16         warrant.

17              MR. AUSBORN:  Your Honor, may I approach the

18         witness, please?

19              THE COURT:  Yes.

20    Q.   Now, you stated previously that before you allow a

21         person to execute a warrant and affidavit, you

22         first require that they go down to the police

23         department and give a detailed report; isn't that

24         correct?

25    A.   Well, I demand a report when they come into the
```

```
 1            office, yes, sir.
 2    Q.      And then as a follow-up, you then will confer back
 3            with law enforcement to talk about the nuances of
 4            the case and then at that time you make a
 5            determination as to whether or not there will be a
 6            warrant given; is that correct?
 7    A.      That is correct.
 8    Q.      Now, I'm going to show you what we now mark as
 9            Defendant's Exhibit Number 2, the warrant and
10            affidavit on the March 30 domestic violence, and
11            ask that you exam that document and tell us whether
12            or not that is the warrant that you allowed Ms.
13            Callie Williams to take out against Mr. Donnie
14            Williams?
15    A.      Yes, sir.
16    Q.      And that document, likewise, has your signature as
17            the authenticating official authenticating the
18            signature of Ms. Callie Williams; is that correct?
19    A.      Yes, sir.
20    Q.      I'm going to show you the incident report.
21                I believe this is already in evidence.  I
22            believe it's going to be Defendant's Exhibit Number
23            2 and ask that you take a look in the top left
24            corner and see what date is on that incident
25            report.
```

```
 1   A.    It says 3/30/04.

 2   Q.    Now, that incident report parallels the warrant and

 3         affidavit of March 30th; is that correct?  In other

 4         words, they both were taken out on the same date?

 5   A.    That is correct.

 6   Q.    Now, very interesting things occurred when I looked

 7         at that with closer scrutiny.

 8               If you look at the incident report of March

 9         30th, '04, look at the second page of the incident

10         report.

11               It is signed by Ms. Callie M. Williams; is that

12         correct?

13   A.    Yes, sir.

14   Q.    Now, I want to read into the record what Ms. Callie

15         Williams signed off to.

16               Ms. Williams advised that she had Donnie

17         Williams trespassed from her residence and he still

18         comes around harassing her and stalking her.

19               Also, he has made threatening remarks towards

20         her life, and it is signed by her and then, of

21         course, authenticated in the right-hand corner by

22         two separate officers; would you agree with that,

23         sir?

24   A.    Yes, sir.

25   Q.    Very important point that came up in my examination
```

```
 1              of the correlation between these two documents.

 2                  Would you agree that no where in the incident

 3              report does she mention that she was assaulted by

 4              Mr. David Donnie Williams?

 5     A.       No, sir.

 6     Q.       Now, we would agree that when you place an incident

 7              report with law enforcement, it is critically

 8              important that you be truthful?  Would you agree

 9              with that?

10     A.       Yes, sir.

11     Q.       You be accurate; is that correct?

12     A.       Yes, sir.

13     Q.       And you be complete in terms of your recitation of

14              the events; is that correct?

15     A.       Yes, sir.

16     Q.       You would agree that if a person has been

17              physically assaulted, that in and of itself is

18              critical material event and occurrence that should

19              have been placed in that incident report?

20     A.       Should have, yes, sir.

21     Q.       And in this case, it's not in there; is that

22              correct?

23     A.       I don't see nothing here about an assault, no, sir.

24     Q.       Now, is it possible in this case that when Ms.

25              Callie Williams came to you in order to -- let me
```

```
 1              back up here.
 2                   What's the time on the incident report?  I
 3              believe that's in the top left corner.  Is that
 4              3:23?
 5    A.        Yes, 3:23 p.m.
 6    Q.        Now, let's look at the warrant and affidavit to see
 7              if there is a time on the warrant and affidavit?
 8    A.        There is a time on the deposition.
 9    Q.        Uh-huh (affirmative response), the deposition.
10              Okay.
11                   Is there a time on it?
12    A.        Yes, sir.
13    Q.        And what time is that?
14    A.        She advised me 3:05 p.m.
15    Q.        Now, 3:23 on the incident report and 3:05 on the
16              deposition.
17                   Now, that 3:05, is that 3:05 a.m. or is that
18              p.m.?
19    A.        P.m.
20    Q.        Now, in this case, we've got a situation in which
21              protocol was breached, would you agree?  Because as
22              you have testified, the normal protocol is that a
23              person has to go and get the incident report first,
24              then the incident report is brought to your office,
25              and then you independently confer with law
```

1        enforcement and then and only then is a warrant and

2        affidavit issued.  That's what you testified to

3        previously; is that correct?

4    A.  That is correct.

5    Q.  Now, in this case, it flipped.  The warrant and

6        affidavit, the deposition, was issued before the

7        incident report was ever sought and issued by Ms.

8        Callie Williams; is that correct?

9    A.  No, sir.

10   Q.  If we look at that dates, both of them are 3/30/04;

11       is that correct?

12   A.  That is correct.

13   Q.  Now, the incident report has a date of 3/23?

14   A.  Yes, sir.

15   Q.  Now, the deposition has a date of 3/30 and 3:05; is

16       that correct?

17   A.  Yes, sir.

18   Q.  3:05 p.m. central standard time predates 3:23 p.m.

19       central standard time; is that correct, sir?

20   A.  That is correct.

21   Q.  So in this case, since the latter date is on the

22       incident report and not the deposition, it is safe

23       to conclude and infer that the warrant was issued

24       before the deposition; is that correct, sir?

25   A.  No, sir.

```
 1              Regardless whatever the time on here, even when
 2         a person comes in the office, I ask them personally
 3         what time it was.  I had the incident report.
 4              Regardless of what the time is on here, I had
 5         one.  I didn't issue the warrant and then go get a
 6         incident report.  I require an incident report at
 7         the time of the warrant issued.
 8              Now, the time is different, but I had a copy of
 9         the incident report.  It should be in the file.  It
10         should be attached to the warrant.
11    Q.   Now, in this case you would necessarily agree that
12         there is a tremendous disparity between the warrant
13         and affidavit and deposition in comparison with the
14         incident report, because in the incident report,
15         she never mentioned she was the victim of domestic
16         violence?
17              She never mentioned that in the incident
18         report; is that correct, sir?
19    A.   Well, she said he has made threatening remarks
20         towards her life and that he is harassing her.  And
21         that's what the deposition is for is domestic
22         violence, harassment, but it is not for no kind of
23         assault.
24    Q.   Okay.  And you would agree that that was critical;
25         it should have been in there in the incident report
```

1         that she had been the victim of an actual assault?

2   A.    Well, if she come down to get a warrant for

3         harassment, then, no, sir, it would haven't to be

4         in the incident report that she was assaulted. But

5         if she would want to do a warrant for any kind of

6         assault, then there would have to be some type

7         probable cause, what you were talking about the

8         black eye or something to where I would have a

9         right to issue warrants and check with the officers

10        to see what was what. It just all depends.

11   Q.    Now, nowhere in the incident report does she

12        mention that Mr. David Donnie Williams grabbed her

13        about her person, attempted to yank her out of the

14        car or anything like that; nowhere is that

15        mentioned?

16   A.    That is correct.

17   Q.    In fact, it is nowhere mentioned that he even had

18        any actual physical contact with her person other

19        than her alleging that he proposed prospective

20        contact with her person? In other words, I'm going

21        to hurt you in the future, not that I have already

22        attacked you?

23   A.    That is correct.

24   Q.    Okay.

25          Finally, Mr. Jernigan, notwithstanding the fact

```
 1          that you have known this young lady for fifteen
 2          years, you have known Mr. David Donnie Williams for
 3          a number of years as well, still, you cannot -- you
 4          would not look this jury in the eye and say with
 5          any degree of conviction David Donnie Williams
 6          assaulted or stalked Ms. Callie Williams?  You
 7          can't say that, can you, sir?
 8   A.     Somethings I can say like I said before.  I seen
 9          Donnie riding around the trailer park.  I seen him
10          parked and looking at that, but as far as
11          assaulting her, I can't say that.
12   Q.     And as it relates to the indictment and the
13          indictment alleging that on April 17, 2004, that
14          David Donnie Williams committed stalking against
15          the alleged victim, Ms. Callie Williams, you can't
16          testify to that; is that correct, sir?
17   A.     I can only testify to what I seen him, riding that
18          day, but that's all I can testify to.
19   Q.     And there could have been a perfectly plausible
20          explanation behind him riding on the days in which
21          you saw him; is that correct, sir?
22   A.     Could be, yes, sir.
23   Q.     And likewise, with respect to the harassment, March
24          30th, you likewise cannot testify with any degree
25          of conviction that Mr. David Donnie Williams
```

| 1 | | committed harassment, domestic violence against Ms. |
|---|---|---|
| 2 | | Callie Williams; is that also correct, sir? |
| 3 | A. | I got a sworn deposition that she swore to and |
| 4 | | which the police advised me they had been getting a |
| 5 | | lot of calls down there. |
| 6 | Q. | Now, likewise, in that deposition, it is in direct |
| 7 | | conflict with the incident report? |
| 8 | A. | Yes, sir. |
| 9 | Q. | And you would agree, given that conflict between |
| 10 | | the two, obviously, doubt creeps in, in terms of |
| 11 | | the validity of the deposition because they both |
| 12 | | can't be right? |
| 13 | | One, either she was assaulted, she was the |
| 14 | | victim of domestic violence by physical contact as |
| 15 | | noted in the deposition, or, likewise, she was not |
| 16 | | the victim of harassment, domestic violence, but |
| 17 | | was the future recipient, if you believe her |
| 18 | | testimony that he made a future threat? |
| 19 | | They are diametrically opposed to one another; |
| 20 | | would you agree with that, sir? |
| 21 | A. | I guess so, sir. |
| 22 | Q. | Okay.  One says proposes a future event, the |
| 23 | | incident report and the deposition says the event |
| 24 | | is past tense; you would agree with that, wouldn't |
| 25 | | you, sir? |

```
 1    A.    Yes, sir.

 2    Q.    Yesterday and tomorrow are not one in the same;

 3          would you agree with that, sir?

 4    A.    Yes, sir.

 5                MR. AUSBORN:  Thank you, so much, Mr. Jernigan.

 6                THE COURT:  Redirect.

 7                      REDIRECT EXAMINATION

 8    BY MRS. PENN:

 9    Q.    May it please the Court.  Let me clear up this time

10          difference for Mr. Ausborn, because we got it

11          right.  You got it right.  The Union Springs Police

12          Department got it right.  He got it wrong.

13                Are you looking at a copy of the incident

14          report?

15    A.    I'm looking at a copy of one for March 30th, '04.

16    Q.    March 30th, '04?

17    A.    Yes, ma'am.

18    Q.    Date and time of this report where you were

19          reading, 3/30/04, 3:23 p.m.; is that correct?

20    A.    Yes, ma'am.

21    Q.    Will you go down further to the center of the page

22          where it says, occurred on or between?

23    A.    3/30/04 between 3:00 p.m. and 3:05 p.m.

24    Q.    Now, let's go back to the deposition and the

25          warrant.  The line where you have 3/30/04 and 3:05
```

```
 1            p.m., what does that say?

 2   A.    Date and time of offense.

 3   Q.    What is confusing about that?

 4   A.    What attorney --

 5   Q.    The date and time of occurrence on each report is

 6         the same, isn't it?

 7   A.    Yes, ma'am.

 8   Q.    And on the police report, it is between 3:00 and

 9         3:05 and on yours it is 3:05; is that correct?

10   A.    Yes, ma'am.

11   Q.    And 3:23 indicates the time she made that report at

12         the police department; is that correct?

13   A.    Yes, ma'am.

14            MRS. PENN:  Thank you.

15            THE COURT:  Recross.

16   Q.    (By Mrs. Penn:)And I want to also clear -- just so

17         this jury don't get sidetracked about assault and

18         harassment and domestic violence, the domestic

19         violence harassment, does that fit the police

20         report that was made?

21            MR. AUSBORN:   Asked and answered, Judge.

22   A.    Yes, ma'am.

23   Q.    In other words, does there have to be an assault?

24   A.    No, ma'am.

25   Q.    If she says he assaulted me, you didn't have to
```

| 1 | | give her a warrant for assault, did you? |
| 2 | A. | No, ma'am. |
| 3 | Q. | Doesn't mean he is not guilty of harassing her, |
| 4 | | does it? |
| 5 | A. | Yeah, you right. |
| 6 | Q. | So they are not diametrically opposed, are they? |
| 7 | | It's one in the same. She made a report, you |
| 8 | | issued a warrant, the facts in the report match the |
| 9 | | charges that you charged -- that you issued the |
| 10 | | warrant on? Is that correct? |
| 11 | A. | That is correct. The police department said |
| 12 | | harassing but I asked for more detail and that's |
| 13 | | when she told me about pulling her out -- trying to |
| 14 | | pull her out of the car. |
| 15 | Q. | So no diametrical opposition, is it? |
| 16 | A. | No, ma'am. |
| 17 | Q. | Everything is in line, isn't it? |
| 18 | A. | Yes, ma'am. |
| 19 | | MRS. PENN: Thank you. |
| 20 | | MR. AUSBORN: No further cross, Your Honor. |
| 21 | | THE COURT: Thank you, Mr. Jernigan. |
| 22 | | You can go. |
| 23 | | (Whereupon the witness left the stand.) |
| 24 | | THE COURT: It is clear we can't finish today. |
| 25 | | We will start back tomorrow morning. Does anybody |

```
 1        have a problem with starting at 8:00 in the morning
 2        instead of 8:30?  Maybe if we start a little
 3        earlier -- I want the lawyers here at 7:00.
 4             Y'all bee here at 8:00 and we will be sure to
 5        start on time.
 6             Thank you.  Keep in mind the recess
 7        instruction.
 8             (Whereupon the jury left the courtroom.)
 9             (End of proceedings for November 22, 2004.)
10                  * * * * * * * * * *
11             (The following proceedings were held November
12               23, 2004 outside the presence of the jury:)
13             (Defendant present with counsel.)
14             THE COURT:  Before we put her on, let's go on
15        the Record for a minute.
16             MRS. PENN:  N-A-R-K-E-S-H-A Williams.
17             THE COURT:  And this is Callie Williams'
18        daughter?
19             MRS. PENN:  Yes.
20             THE COURT:  How old?
21             MRS. PENN:  Eight.
22             THE COURT:  Where is she in school?
23             MRS. PENN:  Union Springs Elementary.
24             THE COURT:  Have you talked to her --
25             MRS. PENN:  Yeah.
```

```
 1              THE COURT:  -- to make an evaluation about

 2       whether she understands the difference about

 3       telling the truth and telling a lie?

 4              MRS. PENN:  Yes.

 5              THE COURT:  Do you want me to do that on the

 6       Record?

 7              MR. AUSBORN:  No.  We're satisfied.

 8              THE COURT:  All right.  Go on and put her on

 9       the stand, and we'll start as soon as the jury gets

10       in.

11              (Whereupon, the jury returned to the jury box,

12               and the following proceedings were had in open

13               court:)

14              THE COURT:  Good morning.  During the breaks

15       and other times during the trial, I've asked you

16       this question, and I need to ask you again before

17       we start this morning:  Has anybody received any

18       information about this trial other than the

19       testimony and the exhibits and arguments of the

20       lawyers that have been presented to you?

21          The next witness for the State is Narkesha

22       Williams, the eight-year-old daughter.

23                     NARKESHA WILLIAMS

24            having previously been qualified,

25              was sworn and testified as follows:
```

<u>DIRECT EXAMINATION</u>

<u>BY MRS. PENN:</u>

Q.  Tell the ladies and gentlemen of the jury your name
    and tell them loud enough for them to hear you,
    okay.

A.  Narkesha Williams.

Q.  Howl old are you Narkesha?

A.  Eight.

Q.  Where do you go to school?

A.  Elementary school.

Q.  Union Springs?

A.  Yes.

Q.  What grade are you in?

A.  Third.

Q.  Do you know Callie Williams?

A.  Yes.

Q.  Who is Callie Williams to you?

A.  My mom.

Q.  That's your mother.  Do you know why we are here
    today?  Do you understand that I am going to be
    asking you some questions; right?

A.  (Witness nods affirmatively.)

Q.  And those questions are going to be about something
    that happened between your mother and David Donnie
    Williams; you understand that, right?

```
 1   A.    (Witness nods affirmatively.)
 2   Q.    And have I talked to you about this case?  Answer
 3         out loud so they can hear you.
 4   A.    Yes.
 5   Q.    And at any time that I talked to you have I ever
 6         told you to say anything other than what was true?
 7         Did I ask you to tell the truth?
 8   A.    Yes.
 9   Q.    Now, we are going to be talking about a day when
10         you rode the bus home and Donnie got you from your
11         front doorstep, okay.
12   A.    (Witness nods affirmatively.)
13   Q.    Do you remember that day?
14   A.    (Witness nods affirmatively.)
15   Q.    She can't write down what you are doing.  You have
16         to say it out loud, okay?
17   A.    (Witness nods affirmatively.)
18   Q.    Do you remember that day?
19   A.    Yes.
20   Q.    You ride the bus home that day?
21   A.    Yes.
22   Q.    And when you got there, was anybody at home?
23   A.    No.
24   Q.    And who came there and picked you up after the bus
25         brought you home?
```

| | | |
|---|---|---|
| 1 | A. | Donnie. |
| 2 | Q. | Donnie? |
| 3 | A. | (Witness nods affirmatively.) |
| 4 | Q. | And did he just call you to the car or did he get |
| 5 | | out of the car? |
| 6 | A. | Called me to the car. |
| 7 | Q. | You didn't just run over there on your own? |
| 8 | A. | (Witness shakes head.) |
| 9 | Q. | He called you to the car? |
| 10 | A. | (Witness nods affirmatively.) |
| 11 | Q. | What did he say to you when you got to the car?  Do |
| 12 | | you remember what he said to you? |
| 13 | A. | No. |
| 14 | Q. | What did you do after he called you to the car? |
| 15 | A. | Got in. |
| 16 | Q. | You got in the car.  Where did you go?  Did you go |
| 17 | | to the store? |
| 18 | A. | (Witness shakes head.) |
| 19 | Q. | Did you go to somebody's house? |
| 20 | A. | No. |
| 21 | Q. | Did you just ride around?  You didn't go anywhere |
| 22 | | and get out?  I know it's been a long time. |
| 23 | | Do you remember where you went? |
| 24 | A. | (Witness nods affirmatively.) |
| 25 | Q. | Where did you go? |

| 1 | A. | Down to the railroad. |
| 2 | Q. | Down to the railroad. |
| 3 | | Is that the railroad across the street from the |
| 4 | | AG? |
| 5 | A. | (Witness nods affirmatively.) |
| 6 | Q. | So you just drove down there? |
| 7 | A. | Yes. |
| 8 | Q. | And you didn't go to anybody's house, did you? |
| 9 | A. | No. |
| 10 | Q. | And did you see your mom that day?  Did you see her |
| 11 | | when she came home? |
| 12 | A. | (Witness nods affirmatively.) |
| 13 | Q. | Were you sitting so that you could see the trailer? |
| 14 | | Across the railroad tracks where you were in the |
| 15 | | car, could you see your mother's house? |
| 16 | A. | Yes. |
| 17 | Q. | Did you see her when she came home? |
| 18 | A. | Yes. |
| 19 | Q. | And look out there so they can hear what you are |
| 20 | | saying, okay. |
| 21 | | When she came home, what did you and Donnie do? |
| 22 | A. | We got in the car. |
| 23 | Q. | Where did you get out of the car at?  Did you get |
| 24 | | out back over by the railroad tracks? |
| 25 | A. | (Witness shakes head.) |

```
 1    Q.    Where did you get out at?

 2    A.    At my mama's house.

 3    Q.    Did you get out of the car by yourself?

 4    A.    Yes.

 5    Q.    Did anybody else get out of the car with you?  Did

 6          David Donnie Williams get out of the car?

 7    A.    (Witness nods affirmatively.)

 8    Q.    Did he say anything to your mother?

 9    A.    (Witness nods affirmatively.)

10    Q.    Do you remember what he said to your mother?  I

11          can't tell whether you nodded yes or you are still

12          thinking about it.

13               Did he say anything to your mother?

14    A.    Yes.

15    Q.    Do you remember what he said to your mother?

16    A.    (Witness shakes head.)

17    Q.    You don't remember what he said to your mom?

18    A.    (Witness shakes head.)

19    Q.    Was he saying good things to your mother?

20    A.    (Witness shakes head.)

21    Q.    Was he saying bad things to your mom?

22    A.    Yes.

23    Q.    Can you remember any of what he said to your mom?

24          And it's okay.  You don't have to say the bad

25          words.  You can tell us anything you remember that
```

```
 1           he said to your mother, okay.

 2                Tell them what he said to your mom.  You told

 3           us he said bad things; right?  Did those thing that

 4           he said scare you?  Are you thinking about it?

 5    A.     (No response.)

 6    Q.     Did the things he say scare you?  Are you a little

 7           scared today?

 8    A.     (Witness shakes head negatively.)

 9    Q.     Okay.  Well, look over there and tell the ladies

10           and gentlemen of the jury if the things that Donnie

11           said to your mom that day scared you?

12    A.     He said the "B" word.

13    Q.     He said the "B" word?

14    A.     (Witness nods affirmatively.)

15    Q.     Did he say anything with the "B" word?

16    A.     (Witness nods affirmatively.)

17    Q.     He did?

18    A.     (Witness nods affirmatively.)

19    Q.     Can you remember now what he said with the "B"

20           word?  I'll let you think about that for a few

21           minutes, all right.

22    A.     (Witness nods affirmatively.)

23    Q.     Did he allow you to get into the car?

24    A.     Yes.

25    Q.     He did.  As soon as you got out of the car, you
```

```
 1          were able to get into the car with your mom?
 2    A.    (Witness shakes head.)
 3    Q.    Why not?
 4    A.    Because he was pulling on my mama.
 5    Q.    He was pulling on your mama.  Tell me about that.
 6          Tell me when you saw him pulling on your mother.
 7          Was the window down?
 8    A.    No.
 9    Q.    How was he pulling on your mom then?  Did he open
10          her door?  What happened?
11    A.    My nephew had opened the back door.
12    Q.    Tell them again.
13    A.    My nephew had opened the back door.
14    Q.    Your nephew opened the back door?
15    A.    (Witness nods affirmatively.)
16    Q.    And that's when he pulled on your mama?
17    A.    Yes.
18    Q.    Yes?
19    A.    Yes.
20    Q.    Was he saying bad things to your mom at that time?
21    A.    Yes.
22    Q.    Do you remember anything that he said to her when
23          he was pulling on her?
24    A.    (Witness nods affirmatively.)
25    Q.    Yes?  Tell them what you remember him saying when
```

```
1            he was pulling on her.

2    A.     He said the "B" word.

3    Q.     He said the "B" word?  Is the "B" word a bad word?

4    A.     Yes.

5    Q.     Do you remember anything else he said with the "B"

6           word?

7    A.     (Witness shakes head.)

8    Q.     No.

9               But the stuff he was saying, was it bad things?

10   A.     (Witness nods affirmatively.)

11   Q.     Now, look over there, were you afraid about the

12          things he was saying?

13   A.     (Witness nods affirmatively.)

14   Q.     Did they scare you?

15   A.     No.

16   Q.     Did he let you get in the car eventually?

17              Were you able to get in the car with your mom

18          then?

19   A.     (Witness shakes head.)

20   Q.     After he pulled on her, how about that, after he

21          was trying to pull her through the open door that

22          you remember nephew opened, did he let you get in

23          the car?  Did you leave the trailer with your mom

24          that day?

25   A.     (Witness nods affirmatively.)
```

```
 1   Q.   You did?

 2   A.   Yes.

 3   Q.   So you did get in the car with your mother?

 4   A.   Yes.

 5   Q.   And you were able to leave; is that right?

 6   A.   (Witness nods affirmatively.)

 7   Q.   Okay.

 8          I'm not going to ask you any more questions

 9        right now, but he is going to be able to ask you

10        some questions.

11          THE COURT:  Go ahead, Mr. Ausborn.

12                     CROSS-EXAMINATION

13   BY MR. AUSBORN:

14   Q.   Lakeisha; is that right?

15   A.   Narkesha.

16   Q.   How are you doing this morning?

17   A.   Fine.

18   Q.   I'm Keith.  I am going to just ask you some

19        questions.  So you can just stay relaxed.

20          Are you in school at Union Springs Elementary?

21   A.   Yes.

22   Q.   Out for Thanksgiving; is that right?

23   A.   (Witness nods affirmatively.)

24   Q.   Now, you have been knowing David ever since you

25        were born or maybe shortly after you were born; is
```

```
 1            that right?

 2     A.     (Witness nods affirmatively.)

 3     Q.     Has David been like a father to you, daddy to you?

 4     A.     (Witness shakes head.)

 5     Q.     Has he stayed at the house with you, your brother

 6            and your mother?

 7     A.     No.

 8     Q.     Has he lived with you-all on and off?

 9     A.     No.

10     Q.     What's that?  He has not?

11     A.     (Witness shakes head.)

12     Q.     He has never lived with you?

13     A.     (Witness shakes head.)

14     Q.     You are sure about that?

15     A.     (Witness nods affirmatively.)

16     Q.     So David has never lived with you?

17     A.     (Witness shakes head.)

18     Q.     Now, let me ask you this:  Now, in school, whenever

19            you have an assignment at school, you get

20            assignments from your teacher; right?

21     A.     (Witness nods affirmatively.)

22     Q.     You have homework and stuff like that; is that

23            right?

24     A.     (Witness nods affirmatively.)

25     Q.     You have spelling, reading, and math and stuff like
```

```
 1            that?  You have like lessons like that; is that
 2            right?
 3    A.      (Witness nods affirmatively.)
 4    Q.      Does your mother help you with your homework
 5            sometimes?
 6    A.      Yes.
 7    Q.      Does your teacher help you with your homework
 8            sometimes?
 9    A.      (Witness shakes head.)
10    Q.      Does she help you in class with your assignments?
11    A.      Yes.
12    Q.      Now, for today, in order for you to testify today,
13            you sat down and talked to your mother; is that
14            right?  You sat down with your mother and you
15            talked to your mother and she explained to you that
16            you had to come to court; y'all talked about that?
17    A.      (Witness nods affirmatively.)
18    Q.      And did your mother help you to remember your
19            testimony?  Did your mother help you with that?
20            Did your mother go over your testimony with you and
21            tell you this is what you've got to say and help
22            you to remember it?  Did she help you with that?
23            Did your mother help you with that?  It's okay.
24            Did your mother help you with that?
25    A.      (Witness nods affirmatively.)
```

```
 1   Q.   Now, you and your mother, y'all talked about your
 2        testimony.  Did she help you quite a bit?  Did you
 3        talk quite a few times about it?  She told you that
 4        you would be coming to court and told you you were
 5        going to get on the stand and they were going to
 6        ask you some questions.
 7             Did your mother help you with that?
 8   A.   Yes.
 9   Q.   Now, Mrs. Penn, you have met Mrs. Penn before; is
10        that right, the prosecutor right here, Mrs. Penn?
11        This is not the first time you met her?  You have
12        met her before today; is that right?
13   A.   (Witness nods affirmatively.)
14   Q.   And Mrs. Penn also helped you with your testimony;
15        is that right?  It's okay.  You can answer that?
16   A.   (No response.)
17   Q.   Did she help you with your testimony, too?  It's
18        hard to remember stuff; isn't that right?
19   A.   (Witness nods affirmatively.)
20   Q.   And they sat down with you and they talked to you
21        about your testimony and told you this is what you
22        need to say?  They helped you with that; is that
23        right?
24   A.   (Witness nods affirmatively.)
25   Q.   And, now, what you are trying to do right now, it
```

```
 1         is tough on you because you are trying to remember
 2         everything, you are trying to remember to say
 3         everything that they told you you had to say?
 4         That's kind of tough, isn't it?
 5    A.   (Witness nods affirmatively.)
 6    Q.   Some of it you remember what they told you to say
 7         and some of it you are forgetting; is that right?
 8    A.   (Witness nods affirmatively.)
 9    Q.   Now, David, has David been like -- has David been
10         like a daddy to you?
11              MRS. PENN:  Asked and answered.
12              THE COURT:  Sustained.
13    Q.   Okay.  Has David ever helped you with your
14         homework?
15    A.   No.
16    Q.   He has not helped you with your homework, okay.
17              Has he like taken you places, like to the park
18         or to the movies, taken you shopping or stuff like
19         that?
20    A.   No.
21    Q.   Has he played sports with you, kickball or
22         something like that?
23    A.   (Witness shakes head.)
24    Q.   Now, your mother and David, were they dating one
25         another, like girlfriend and boyfriend?
```

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | They were never dating one another? |
| 3 | A. | No. |
| 4 | Q. | You are sure about that? |
| 5 | A. | Yes. |
| 6 | Q. | Did David ever spend the night at your mother's |
| 7 | | house? |
| 8 | A. | No. |
| 9 | Q. | Is that no?  He never spent the night? |
| 10 | A. | (Witness shakes head.) |
| 11 | Q. | And you are sure about that? |
| 12 | A. | (Witness nods affirmatively.) |
| 13 | Q. | Okay.  Now, has David -- now, when you do bad |
| 14 | | things, what type of punishment does your mother |
| 15 | | use against you?  Does she put you in time-out? |
| 16 | | Have you ever heard of time-out?  Like if you are |
| 17 | | doing something bad, your mother says, time-out, |
| 18 | | and she sends you to a room and you know, you can't |
| 19 | | watch TV or listen to the radio, you can't talk on |
| 20 | | the phone.  Does your mother put you in time-out |
| 21 | | sometimes when you are bad? |
| 22 | A. | No. |
| 23 | Q. | Does your mother spank you when you are bad? |
| 24 | A. | Witness -- |
| 25 | Q. | Has David ever spanked you? |

```
 1   A.   No.

 2   Q.   David has never laid a hand on you; is that right?

 3   A.   (Witness nods affirmatively.)

 4   Q.   Is that right, he has never touched you or anything

 5        like that; is that right?

 6   A.   (Witness shakes head.)

 7   Q.   Now, how many brothers and sisters do you have?

 8   A.   One sister and one brother.

 9   Q.   And your brother, what's your brother's name?

10   A.   Quadarius.

11   Q.   And how old is he, about fourteen?

12   A.   Yes.

13   Q.   Now, when he gets in trouble, does your mother

14        spank him also?

15   A.   No.

16   Q.   Does she put him in time-out or take away his

17        activities?

18   A.   No.

19   Q.   Maybe take away his computer?

20   A.   No.

21   Q.   Computer games?

22   A.   No.

23   Q.   Take away his television or won't let him go

24        outside and play?  Is that how she punishes him

25        when he is in trouble?
```

```
 1    A.    No.

 2    Q.    How does she punish him when he's in trouble?

 3          MRS. PENN:  I object, Your Honor.  He has gone

 4          beyond the scope of what this case is.

 5          MR. AUSBORN: Give me a little latitude.  I

 6          promise I'll tie it in.

 7    Q.    How does she punish him when he's in trouble?

 8    A.    (No response.)

 9    Q.    Have you ever seen her punish him?

10    A.    (Witness nods affirmatively.)

11    Q.    What does she do?  Does she put a belt to him?

12    A.    (Witness nods affirmatively.)

13    Q.    Okay.  And that's a yes; is that right?

14    A.    Yes.

15    Q.    Now, David, has David ever spanked your brother?

16    A.    No.

17    Q.    He has never spanked your brother; is that right?

18    A.    (Witness nods affirmatively.)

19    Q.    Now, you ever -- in order for you to -- you love

20          your mother; is that right?

21    A.    Yes.

22    Q.    And you want to do all that you can to please your

23          mother; is that right?

24    A.    (Witness nods affirmatively.)

25    Q.    And make your mother happy; is that right?
```

```
 1   A.   Yes.

 2   Q.   And make your mother proud; is that right?

 3   A.   Yes.

 4   Q.   Has your mother told you bad things about David?

 5        Is that yes?

 6   A.   (Witness shakes head.)

 7   Q.   She has not told you bad things about David?

 8   A.   (Witness shakes head.)

 9   Q.   Now, on the day that you got in the car with David,

10        you were out on the porch by yourself; is that

11        right?

12   A.   (Witness nods affirmatively.)

13   Q.   You were scared; is that right?

14   A.   (Witness shakes head.)

15   Q.   Your mother normally picks you up on time; is that

16        right?

17   A.   Yes.

18   Q.   That day she was late; is that right?

19   A.   Yes.

20   Q.   Now, David drove by and saw you on the porch by

21        yourself; is that right?

22   A.   Yes.

23   Q.   Was it dark at that time?  Was it a little dark or

24        was it still daylight?

25   A.   Still daylight.
```

```
 1    Q.   And he stopped the car and you walked up to the
 2         car; is that right?
 3    A.   (Witness nods affirmatively.)
 4    Q.   And when you walked up to the car, he asked where
 5         was your mother, and you said she hadn't gotten
 6         home; is that right?
 7    A.   (Witness nods affirmatively.)
 8    Q.   And you got in the car by yourself; is that right?
 9    A.   (Witness nods affirmatively.)
10    Q.   Was he going to take you somewhere?  Was he going
11         to take you to your sister's house?
12    A.   (Witness shakes head.)
13    Q.   Where was he going to take you?  Do you know?  Or
14         was he just going to stay there and keep you in the
15         car until your mother got there?  Was that what he
16         was going to do?
17    A.   (Witness shakes head.)
18    Q.   Did he tell you where he was going to take you?
19    A.   (Witness shakes head.)
20    Q.   He has taken you places before; is that right?  Is
21         that a yes?
22    A.   (Witness shakes head.)
23    Q.   Now, have you ever heard your mother use a bad word
24         when she talked to David?  Does your mother every
25         now and then get upset and lose her temper and say
```

|    |    |                                                                    |
|----|----|--------------------------------------------------------------------|
| 1  |    | bad stuff to David?  You've heard your mother say                  |
| 2  |    | bad stuff to David -- it's okay -- haven't you?  Is                |
| 3  |    | that right?  You've heard your mother?  It's okay.                 |
| 4  |    | You are not going to get in trouble by telling the                 |
| 5  |    | truth.  You've heard your mother say bad stuff to                  |
| 6  |    | David; is that right?                                              |
| 7  | A. | (Witness nods affirmatively.)                                      |
| 8  | Q. | And your mother has used bad words when she talked                 |
| 9  |    | to David?  It's okay.                                              |
| 10 |    | You have heard her say bad words; is that                          |
| 11 |    | right?                                                             |
| 12 | A. | (Witness nods affirmatively.)                                      |
| 13 | Q. | And your mother, on that day when David picked you                 |
| 14 |    | up, your mother said some bad words to David that                  |
| 15 |    | day because he picked you up?  She was upset                       |
| 16 |    | because David had picked you up; is that right?                    |
| 17 | A. | Uh-huh (affirmative response).  (Witness nods                      |
| 18 |    | affirmatively.)                                                    |
| 19 | Q. | And she said some bad things to David that day; is                 |
| 20 |    | that right?  Is that right?  It's okay.  You can                   |
| 21 |    | tell the truth.                                                    |
| 22 | A. | (Witness nods affirmatively.)                                      |
| 23 | Q. | She said some bad things to David that day?                        |
| 24 | A. | Yes.                                                               |
| 25 | Q. | Is that yes?                                                       |

```
 1    A.    Yes.

 2    Q.    Now, on that day, tell us, if you will, did she use

 3          the "B" word to David that day?  It's okay.  You

 4          can tell us.  It's okay to tell the truth.

 5                She used the "B" word that day?

 6    A.    (Witness nods affirmatively.)

 7    Q.    And that's what she called David; is that right?

 8          She used the "B" word on David; is that right?

 9          It's okay to tell the truth.  You are not going to

10          get in trouble for telling the truth.

11                She used the "B" word on David; is that right?

12          Is that yes?

13    A.    Yes.

14    Q.    Now, did she use another word on David also?

15    A.    Yes.

16    Q.    Did she use the "MF" word or anything like that on

17          David?

18    A.    No.

19    Q.    She did not?

20    A.    No.

21    Q.    Now, David opened the car door for you to get into

22          the car; is that right?

23    A.    (Witness shakes head.)

24    Q.    Did you open the car -- after your mother pulled up

25          and David let you out of his car, did he open the
```

```
 1         car to your sister's -- open the door to your
 2         sister's car so you could get in?
 3    A.   My nephew did.
 4    Q.   What's that now?
 5    A.   My nephew.
 6    Q.   Your nephew did?
 7    A.   Yes.
 8    Q.   David never tried to stop you from getting in the
 9         car; is that right?  He let you get in the car; is
10         that right?  He wasn't trying to keep you from
11         getting in your nephew's car; is that right -- I
12         mean, your sister's car; is that right?  It's okay
13         to tell truth.  He never told you, you can't get
14         out of my car, stay in my car?  He never said that,
15         did he?
16    A.   No.
17    Q.   Now, after you got in the car, your mother was
18         angry with David that day; is that right?  She was
19         upset.  You've seen your mother upset before; is
20         that right?
21    A.   Yes.
22    Q.   And when your mother gets upset, does she have like
23         a temper?  When she gets upset, she gets kind of
24         angry and says bad words and stuff like that when
25         she gets upset?  It's okay to tell the truth.
```

```
 1              Is that right?
 2   A.   (Witness nods affirmatively.)
 3   Q.   That's yes?
 4   A.   Yes.
 5   Q.   Okay.  Now, the court reporter needs to take down
 6        what you are saying.
 7   A.   (Witness nods affirmatively.)
 8   Q.   Is that yes?
 9   A.   Yes.
10   Q.   Now, and your mother got upset that day; is that
11        right?
12   A.   (Witness nods affirmatively.)
13   Q.   And that's when she used the "B" word and some
14        other bad words; is that right?
15   A.   (Witness nods affirmatively.)
16             MRS. PENN:  Your Honor, I am going to object.
17        He is putting words in her mouth.  She said she
18        used the "B" word and didn't use any other bad
19        words.  That was her testimony.
20             MR. AUSBORN:  I think she said the "B" word.  I
21        didn't elicit any other bad words.
22             THE COURT:  You suggested some, and I don't
23        know where we were on that, but I know it's time to
24        end this witness.
25             MR. AUSBORN:  Thank you so much.
```

1       THE COURT:  Anything else?

2       MR. AUSBORN:  I'm about to wrap up.

3   Q.  You never saw your mother and David, you never saw

4       them fighting one another; is that right?  They

5       didn't fight one another, did they?

6   A.  (Witness nods affirmatively.)

7   Q.  Did you ever see them fighting one another?

8   A.  (Witness shakes head.)

9   Q.  And on that day, you never saw them fighting one

10      another either; is that right?  It's okay to tell

11      the truth.

12      They weren't fighting that day; is that right?

13  A.  (Witness nods affirmatively.)

14  Q.  They weren't fighting one another?

15  A.  (Witness nods affirmatively.)

16  Q.  Were they fighting or not fighting?  You didn't see

17      them fight?

18  A.  (Witness shakes head.)

19  Q.  Okay.  All right.

20      MR. AUSBORN:  Nothing further.  Thank you.

21      THE COURT:  Anything else?

22      MRS. PENN:  Yes.

23              REDIRECT EXAMINATION

24  BY MRS. PENN:

25  Q.  Now, he asked you if you saw them fighting one

```
 1         another.
 2              Let me ask that simply:  Did you see your
 3         mother hit David Donnie Williams?
 4    A.   (Witness shakes head.)
 5    Q.   Did you see David hit your mama?  Look over there
 6         and tell them.  Did you see David hit your mother
 7         that day that he got you off the bus?
 8              Narkesha, let me ask you this first, just to
 9         clear up something.  When you were in my office,
10         did I ever tell you what to come up here and say?
11         Did I tell you to come in here and say that Donnie
12         took you off the bus?
13    A.   (Witness nods affirmatively.)
14    Q.   Did I tell you to say that or is that what you told
15         me happened?
16              MR. AUSBORN:  Asked and answered.
17              THE COURT:  I don't think that's been asked
18         about taking off the bus.
19    Q.   Narkesha, when I talked to you, did I ask you what
20         happened or did I tell you to come in here and say
21         Donnie took you off the bus?
22              Did you tell me what happened?
23    A.   (Witness nods affirmatively.)
24    Q.   And I asked you what happened.  Isn't that what I
25         asked you?
```

```
 1   A.    (Witness nods affirmatively.)

 2   Q.    And you told me what happened; right?

 3   A.    Yes.

 4   Q.    I wasn't there.  I don't know what happened.

 5         I didn't tell you what to come in here and say,

 6         did I?

 7   A.    (Witness shakes head.)

 8   Q.    Did I tell you to come in here and say that Donnie

 9         said the "B" word?

10         Did I say, Narkesha, go in there and tell the

11         jury that Donnie said the "B" word?

12   A.    Yes.

13   Q.    Did I tell you to say that?

14         MR. AUSBORN:  Your Honor, that's been asked and

15         answered.

16         THE COURT:  Sustained.

17   Q.    Did you tell me that that's what Donnie said?

18         I don't want the ladies and gentlemen of the

19         jury to think that I'm telling you to come in here

20         and tell a lie.

21         MR. AUSBORN:  Your Honor, I object to counsel

22         testifying.

23   Q.    Did I tell you to come in here and tell a lie?

24   A.    No.

25   Q.    Did I tell you to come in here and say anything
```

```
 1        that wasn't true?
 2   A.   No.
 3   Q.   Did your mama tell you to come in here and lie?
 4   A.   No.
 5   Q.   Did she tell you to come in here and say anything
 6        that was not true?  Do you know what the truth is?
 7        Do you know what to tell the truth means?
 8   A.   Yes.
 9   Q.   You do?  Do you understand each and every question
10        that we both have asked you here today?
11   A.   (Witness nods affirmatively.)
12   Q.   Were there some things that you didn't understand
13        or did you understand everything?  It's okay if you
14        didn't understand everything.  You can tell them.
15             Did you understand everything that we asked
16        you?
17   A.   Yes.
18   Q.   You did.
19             Now, did you -- and I may have mischaracterized
20        your testimony when I said "hit your mom."
21             Did you see Donnie grab your mother the day he
22        took you off the bus?
23   A.   Yes.
24   Q.   Tell them that.  Tell them that will like you mean
25        it.  F did you see Donnie hit your mother the day
```

```
1           he took you off the step?

2    A.     Yes.

3    Q.     And I didn't tell you that, did I?  You saw that

4           didn't you?  Everything that you are telling you

5           saw is that correct?

6    A.     (Witness nods affirmatively.)

7    Q.     You saw what happened that day, didn't you?

8    A.     Yes.

9    Q.     Thank you, Narkesha.

10             MRS. PENN:  Nothing further.

11             THE COURT:  I got a question for you, Narkesha:

12      Where did you get those cool boots you got on?

13             That's all the questions they are going to ask

14      you, and you don't have to go back to school.

15             You can go on back out with the folks.

16             Who is she with?

17             MRS. PENN:  Her sister.

18             THE COURT:  Thank you, Narkesha.

19             (Whereupon the witness left the stand.)

20             THE COURT:  Next witness.

21             (Whereupon Quadarius Williams, a minor,

22              took the witness stand.)

23             THE COURT:  How old are you?

24             THE WITNESS:  Fourteen.

25             THE COURT:  She is going to swear you in and
```

```
 1        give you the oath to testify and then the lawyers

 2        will ask you some questions.

 3             Let me tell you this, Quadarius:  If they ask

 4        you something you don't understand, tell them you

 5        don't understand it.  If they ask you something you

 6        don't know the answer to, tell them you don't know.

 7                        QUADARIUS WILLIAMS

 8                  having first been duly qualified,

 9                 was sworn and testified as follows:

10                        DIRECT EXAMINATION

11   BY MRS. PENN:

12   Q.   And when you talk, turn that way so they -- when I

13        ask you a question, turn that way so they can hear

14        you.

15   A.   Okay.

16   Q.   How is Ms. Callie Williams related to you?  What is

17        she to you?

18   A.   My mom.

19   Q.   She is your mom.  How old did you say you were?

20   A.   Fourteen.

21   Q.   Do you know the difference between the truth and

22        what is not true, the difference between the truth

23        and a lie?

24   A.   Yes.

25   Q.   And you are here to testify in this case about
```

```
 1        something that happened between your mother and
 2        Donnie Williams.  You understand that; correct?
 3   A.   Yes.
 4   Q.   And you met with me about this case, didn't you?
 5   A.   Yes.
 6   Q.   And when you were in my office and we talked about
 7        this case, did I ever tell you what to say?
 8   A.   No, ma'am.
 9   Q.   Did I tell anybody in that office what to say?
10   A.   No, ma'am.
11   Q.   Were you there when I talked to your sister
12        Narkesha?
13   A.   Yes.
14   Q.   Did I tell her what to say?
15   A.   No, ma'am.
16   Q.   Has your mother told you what to say?
17   A.   No, ma'am.
18   Q.   You have talked with her about coming up here; is
19        that correct?
20   A.   Yes, it is.
21   Q.   And you understand why you are here?
22   A.   Yes.
23   Q.   Did she tell you -- did she tell you to come up
24        here and say what you are supposed to say?
25   A.   Yes.
```

| | | |
|---|---|---|
| 1 | Q. | She did.  What did she do to help you come up here |
| 2 | | and tell what you are supposed to say?  Did she |
| 3 | | tell you what to say? |
| 4 | A. | No, ma'am. |
| 5 | Q. | What did she tell you to do when you got up here? |
| 6 | A. | Tell the truth. |
| 7 | Q. | Did I tell you to tell the truth when you got up |
| 8 | | here? |
| 9 | A. | Yes, ma'am. |
| 10 | Q. | Do you know David Donnie Williams? |
| 11 | A. | Yes. |
| 12 | Q. | How do you know him?  Is he your mother's boyfriend |
| 13 | | or was he your mother's boyfriend? |
| 14 | A. | He was. |
| 15 | Q. | But he is not anymore; is that right? |
| 16 | A. | Nope. |
| 17 | Q. | Has he lived with you-all over the years? |
| 18 | A. | Sometimes. |
| 19 | Q. | Off and on; is that correct?  He has spent the |
| 20 | | night at your house; is that right? |
| 21 | A. | (Witness nods affirmatively.) |
| 22 | Q. | Stayed in the house with your mom and your sister |
| 23 | | and you; is that right? |
| 24 | A. | Yes, ma'am. |
| 25 | Q. | And I want to specifically call your attention to |

| | | |
|---|---|---|
| 1 | | the date that you and your mom went to AG's grocery |
| 2 | | and you saw David Donnie Williams, okay? |
| 3 | A. | Yes. |
| 4 | Q. | Do you know what you were doing prior to going to |
| 5 | | the AG?  Who was with you? |
| 6 | A. | My mom. |
| 7 | Q. | And where were you coming from? |
| 8 | A. | My mom's house. |
| 9 | Q. | And you went straight over to AG's grocery store? |
| 10 | A. | Yes. |
| 11 | Q. | And did you see David Donnie Williams when you |
| 12 | | pulled up? |
| 13 | A. | I saw him before I went in the store, but I didn't |
| 14 | | know if that was him or not.  He went down towards |
| 15 | | my mama's house and he came back down toward the |
| 16 | | AG.  And when we came back out, he was backed up in |
| 17 | | there, backed up beside the car. |
| 18 | Q. | Let me stop you for a minute. |
| 19 | | Did your mother tell you to say that? |
| 20 | A. | No, ma'am. |
| 21 | Q. | Is that something that you remember seeing? |
| 22 | A. | Yes. |
| 23 | Q. | And when you say you saw him go down towards your |
| 24 | | mother's house and come back up, did you tell your |
| 25 | | mother at that time that you had seen him? |

```
 1   A.   I told her when I came out the store.
 2   Q.   When you came out of the store you told her.  You
 3        didn't tell her before you went in?
 4   A.   (Witness shakes head.)
 5   Q.   And when you came out of the store, you said he was
 6        backed up.  What car were you in?
 7   A.   My sister's car.
 8   Q.   What color is it?
 9   A.   White.
10   Q.   And you came out of the store.
11            Did you see Donnie when you came out of the
12        store?
13   A.   Yes.
14   Q.   Where was he?
15   A.   He was backed up, parked beside the car.
16   Q.   Was he parked to the passenger's side on the side
17        where you get in, or was he parked to the driver's
18        side?
19   A.   On the driver's side.
20   Q.   The driver's side?
21   A.   Yes.
22   Q.   And when you came out of the store, did he say
23        anything to you or your mom?
24   A.   Well, to me.  He said -- cause I said, Leave my
25        mama alone.
```

```
 1   Q.   Let me back up.  Had he said something to make you
 2        say that?
 3   A.   No, ma'am.
 4   Q.   And you told him to leave your mama alone?
 5   A.   Yes.
 6   Q.   And then what did he say to you?
 7   A.   He said he would "F" me up.
 8   Q.   Tell them what he told you?
 9   A.   He would "F" me up.
10   Q.   "F" you up.
11             Is that the first letter of a bad word?
12   A.   Yes.
13   Q.   Did your mother tell you to come in here and say
14        that?
15   A.   No, ma'am.
16   Q.   And you love your mother; right?
17   A.   Yes.
18   Q.   And you would do what you can to help her; is that
19        right?
20   A.   Yes.
21   Q.   Would you come in here and lie for her?
22   A.   No.
23   Q.   Did she tell you to come in here and lie for her?
24   A.   No.
25   Q.   You heard him say I will "F" you up to you?
```

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | What did he say to your mother? |
| 3 | A. | "B" I'll kill you.  I'll meet you in heaven. |
| 4 | Q. | Tell them.  I am sure they can't hear you. |
| 5 | A. | He said, "B" I will kill you.  I will meet you in |
| 6 | | heaven or hell. |
| 7 | Q. | Did your mother tell you that? |
| 8 | A. | No, ma'am. |
| 9 | Q. | Is that something you heard David Donnie Williams |
| 10 | | say? |
| 11 | A. | Yes, ma'am. |
| 12 | Q. | And this was on April 17th? |
| 13 | A. | Yes. |
| 14 | Q. | What did your mom say to him? |
| 15 | A. | I don't know what she said to him. |
| 16 | Q. | You can tell them.  You don't know what she said to |
| 17 | | him? |
| 18 | A. | No. |
| 19 | Q. | But you heard him say that to your mom? |
| 20 | A. | Yes. |
| 21 | Q. | What happened after he said that?  Did y'all stay |
| 22 | | outside the car or did Donnie pull off?  What |
| 23 | | happened after he said that to your mom? |
| 24 | A. | He pulled off first. |
| 25 | Q. | Did you say -- I'm sorry. |

```
 1            Talk loud?
 2   A.   He pulled off first.
 3   Q.   He pulled off.  Which way did he go?
 4   A.   He went down the road.  And then when my mama left,
 5        we went in the parking lot.
 6   Q.   Let me stop you.  I don't know if they understand
 7        what you are saying or not.
 8            You said your mom left?
 9   A.   Yes.
10   Q.   And tell me if I say something you didn't say, all
11        right?
12            You said you went down to the middle of the
13        parking lot?
14   A.   Yes.
15   Q.   And then what happened?
16   A.   Donnie came back and came up behind us, and then my
17        mom called the police.  And when he saw that, he
18        went by us.
19   Q.   I want you to put your fingers down.
20            I know you might be a little nervous but talk
21        to them for me, okay.
22            He saw the police and what happened?
23   A.   He saw the police and then he ran down the road
24        with the car.
25   Q.   Ran down the road with the car.
```

```
 1              He was in the car; is that what you are saying?

 2   A.   Yes.

 3   Q.   And he drove off?

 4   A.   Yes.

 5   Q.   And what did the police do?

 6   A.   Chased him.

 7   Q.   They chased him.

 8              Have you ever seen your mom and Donnie fight?

 9   A.   No.

10   Q.   Haven't seen them fighting?

11   A.   (Witness shakes head.)

12   Q.   And have you ever seen your mom get mad?

13   A.   Yes.

14   Q.   And does she ever punish you?

15   A.   No.

16   Q.   She doesn't punish you, does she?

17   A.   No, ma'am.

18   Q.   Have you ever been bad enough for her to give you a

19        spanking?

20   A.   Yes.

21   Q.   You get spankings, don't you?

22              Would she spank you for not telling the truth?

23   A.   Yes.

24   Q.   And you can look at the ladies and gentlemen of the

25        jury today and tell them, look over there at them,
```

```
 1        can you tell them that your mother did not tell you

 2        to say the things you are saying today?

 3   A.   No.

 4   Q.   Is that true?

 5   A.   Yes, ma'am.

 6   Q.   And you are only telling us what you saw; is that

 7        correct?

 8   A.   Yes, ma'am.

 9             MRS. PENN:   I'm going to let you answer the

10        questions from Mr. Ausborn, okay.   That's this

11        gentleman right here.   Remember to look over there

12        and talk to the jury, okay.

13             THE COURT:   Mr. Ausborn.

14                      CROSS EXAMINATION

15   BY MR. AUSBORN:

16   Q.   Good morning.   I am Keith Ausborn.   I'm going to

17        ask you some questions.   If I ask you some

18        questions that you don't quite understand, just let

19        me know, okay?

20   A.   Okay.

21   Q.   You are not nervous are you?

22   A.   No.

23   Q.   What's your first name again?

24   A.   Quadarius.

25   Q.   It is Quadarius Williams; is that right?   Is that
```

| 1  |    | close? |
|----|----|--------|
| 2  | A. | It's Williams. |
| 3  | Q. | You love your mother, don't you? |
| 4  | A. | Yes. |
| 5  | Q. | And as a son, you want to do everything you can to |
| 6  |    | try to please your mother and keep her happy; is |
| 7  |    | that right? |
| 8  | A. | Yes, ma'am -- sir. |
| 9  | Q. | What grade are you in in school? |
| 10 | A. | Ninth. |
| 11 | Q. | Ninth grade? |
| 12 | A. | Yes. |
| 13 | Q. | Take a lot of subjects.  Name some of the subjects |
| 14 |    | that you take? |
| 15 | A. | English, science, social studies, health care. |
| 16 | Q. | English, science, social studies. |
| 17 |    | Okay.  Now, these are tough subjects? |
| 18 | A. | Yes. |
| 19 | Q. | And with these subjects, it is not easy a lot of |
| 20 |    | times to remember everything; is that right? |
| 21 |    | Sometimes you forget stuff like with social |
| 22 |    | studies, they got dates you know. |
| 23 |    | It is not easy to remember all of the dates and |
| 24 |    | everything; is that right? |
| 25 | A. | Yes. |

```
 1   Q.   And the same with science, you can't remember
 2        everything in science; is that right?
 3   A.   Yes.
 4   Q.   And, likewise, with English, you can't remember
 5        everything in English; is that right?
 6   A.   Yes.
 7   Q.   April the 17th, did somebody tell you that date?
 8        Did somebody tell you that something happened on
 9        April 17th?   Somebody told you that that was the
10        date, April 17th; is that right?
11   A.   Yes.
12   Q.   Who told you -- somebody told you that something
13        happened on April 17th; is that right?
14   A.   Yes.
15   Q.   Who told you something happened on April 17th?
16   A.   My mother.
17   Q.   Who?
18   A.   My mother.
19   Q.   Your brother?
20   A.   I said my mom.
21   Q.   So your mother told you that something happened on
22        April 17th; is that right?
23   A.   Yes, sir.
24   Q.   You can't recall that date yourself.   Your mama
25        told you about that date; is that right?
```

```
 1    A.    Yes.

 2    Q.    Has Donnie been like a daddy to you?

 3    A.    No.

 4    Q.    He has not?

 5    A.    No.

 6    Q.    Do you like Donnie?

 7    A.    No.

 8    Q.    You don't?

 9    A.    No.

10    Q.    Donnie, did he live with y'all on and off?

11    A.    Sometimes.

12    Q.    You say that your mother spanks you when you are

13          bad.  Donnie has never spanked you or anything, has

14          he?

15    A.    No.

16    Q.    You never saw Donnie spank your sister either; is

17          that right?

18    A.    No.

19    Q.    You never saw Donnie and your mother fighting, have

20          you?

21    A.    No.

22    Q.    You never saw Donnie hit your mother or anything,

23          have you?

24    A.    No.

25    Q.    Now, you know your mother loves you; is that right?
```

```
 1    A.    Yes.

 2    Q.    But even with mama's loving us, sometimes they get

 3          upset with us over stuff sometimes; is that right?

 4    A.    Yes.

 5    Q.    And you have seen your mother get upset; is that

 6          right?

 7    A.    Yes.

 8    Q.    And when your mother gets upset, she uses bad words

 9          sometime; is that right?

10    A.    Yes.

11    Q.    And you've heard your mother use bad words

12          sometimes; is that right?

13    A.    Yes.

14    Q.    Have you ever heard your mother use the "B" word?

15    A.    No.

16    Q.    Have you ever heard your mother use the "MF" word?

17    A.    No.

18    Q.    But you have heard your mother use curse words; is

19          that right?

20    A.    Yes.

21    Q.    And you have heard your mother use those words

22          towards Donnie; is that right?  You have heard your

23          mother get upset?

24    A.    Yes.

25    Q.    And use those words towards Donnie; is that right?
```

```
 1    A.    Yes.

 2    Q.    Now, even though you have heard your mama use those

 3          words towards Donnie, Donnie never hit your mama

 4          after she used those words?  Donnie never hit your

 5          mama, is that not right?

 6    A.    No.

 7    Q.    You never saw your mother with a black eye or

 8          anything like that, did you?

 9    A.    No.

10    Q.    You never saw your mama with a busted lip or

11          anything like that, did you?

12    A.    No.

13    Q.    You never saw your mother with bruises on her face

14          or anything like that, did you?

15    A.    No.

16    Q.    Your mother never told you that she had to go to

17          the doctor because somebody beat her up or

18          anything?  She never told you that, did she?

19    A.    No.

20    Q.    When -- now, in order for you to come here today,

21          you sat down and talked to your mother about what

22          all of this is about.  Your mother sat down and

23          said, Q, you got to come to court, you got to

24          testify.  She told you that; isn't that right?

25    A.    Yes.
```

1    Q.   And your mama sat down with you and she went over

2        your testimony; is that right?

3    A.   Yes.

4    Q.   And she went over your testimony quite a few times

5        to make sure you got your testimony down; isn't

6        that right?

7    A.   Yes.

8    Q.   Now, is it safe to conclude that your mother went

9        over your testimony about ten times or more than

10       ten?

11   A.   Ten.

12   Q.   Ten.

13        Okay.   And every time she went over your

14       testimony, she would tell you, you got to remember

15       to say this; is that right?

16   A.   No.

17   Q.   Is that what she did?   Isn't that what your mother

18       told you?

19        MRS. PENN:  Asked and answered.

20        MR. AUSBORN:  Has it?

21        MRS. PENN:  He answered.

22        THE COURT:  Yes.

23   Q.   And your mother went over your testimony because

24       she wanted you to know what to say in court; isn't

25       that right?

```
 1            MRS. PENN:   I object, Your Honor.  He can't
 2       possibly know.
 3            THE COURT:   Sustained.
 4  Q.   You needed your mother's help to remember what to
 5       say; isn't that right?
 6  A.   No.
 7  Q.   But your mama kept going over your testimony like
 8       ten times; is that right?
 9  A.   Yes.
10  Q.   Now, Mrs. Penn right here also went over your
11       testimony with you; is that right?
12  A.   Yes.
13  Q.   Now, she also went over your testimony about ten
14       times, too; is that right?
15  A.   Yes.
16  Q.   With them going over your testimony about -- ten
17       plus ten is twenty; is that right?
18  A.   Yes.
19  Q.   With them going over your testimony about twenty
20       times, it made you remember what to say today; is
21       that right?
22  A.   Yes.
23  Q.   And that helps you to testify today, them having
24       gone over your testimony about twenty times; is
25       that right?
```

```
 1   A.   Yes.

 2   Q.   It could have been more than twenty times, is that

 3        right, that they went over your testimony?

 4   A.   Yes.

 5   Q.   Could have been fifty times; is that right?

 6   A.   Yes.

 7   Q.   The more they went over your testimony, the better

 8        you remembered it; is that right?

 9   A.   Yes.

10   Q.   Because that's how it is in school:  When the

11        teacher goes over your lesson over and over and

12        over again, that's how you learn stuff; is that

13        right?

14   A.   Yes.

15   Q.   And your mother, by going over your testimony about

16        twenty times, Mrs. Penn going over your testimony

17        about twenty times, fifty times or so, it made sure

18        you remembered what to say, just like it is in

19        school; is that right?

20   A.   Yes.

21   Q.   Your mama told you that David is a bad person; is

22        that right?

23   A.   Yes.

24   Q.   You had never seen David being bad to your mother.

25             You never saw David attack your mother; is that
```

```
 1              right?

 2    A.    No.

 3    Q.    And you never saw David attack your sister and he

 4          never attacked you; is that right?

 5    A.    No.

 6    Q.    Okay.  David has always respected you; is that

 7          right?

 8    A.    No.

 9    Q.    Say what now?

10    A.    No.

11    Q.    He has not?

12    A.    No.

13    Q.    You don't know why -- you will say David

14          disrespected you.  He disrespected you before?

15    A.    No.

16    Q.    He never disrespected you, did he?

17    A.    Yes.

18    Q.    Did he ever disrespect you?

19    A.    Yes.

20    Q.    Okay.  When did he disrespect you?

21    A.    Lots of times.

22    Q.    Excuse me?

23    A.    Lots of times.

24    Q.    Lots of times?

25    A.    Yes.
```

291

```
1    Q.   When he disrespected you, how did he do it?

2    A.   I don't know.

3    Q.   When we say "disrespect," really you don't quite

4         understand the meaning of that word; is that right?

5    A.   Yes.

6    Q.   You don't understand the meaning of that word; is

7         that right?

8    A.   No.

9    Q.   Are you agreeing with me that you don't understand

10        the meaning of it; is that right?

11   A.   No.

12   Q.   Now, David -- David had a key to the house?

13   A.   No.

14   Q.   Now, he lived with your mother, lived with y'all on

15        and off over the last several years; is that right?

16   A.   Yes.

17   Q.   Did he ever have a key, that you know of, where he

18        could let himself in and out?

19   A.   No.

20   Q.   Never had a key?

21   A.   No.

22   Q.   You are sure of that?

23   A.   Yes.

24   Q.   You ever let David in the house when your mama

25        wasn't there?
```

```
1    A.    No.

2    Q.    Has your sister ever let David in the house when

3          your mother wasn't there and you were there?

4    A.    No.

5    Q.    Has David ever gotten in the house while you were

6          there, while your sister was there, and your mother

7          not be there?

8    A.    Well, he got in from the back door.

9    Q.    Excuse me?

10   A.    He got in from the back door.

11   Q.    He came in through the back door?

12   A.    Yes.

13   Q.    Was it unlocked?

14   A.    No.  It was locked.

15   Q.    It was locked?

16   A.    Yes.

17   Q.    You are saying he broke in?

18   A.    Yes.

19   Q.    Did your mama know that he would sometimes break in

20         to get in there?

21   A.    Yes.

22   Q.    And she was okay with that; is that right?

23   A.    Yes.

24   Q.    When she didn't give him a key, he had to use

25         whatever means he could to get in and your mama
```

```
 1          knew about that and that was okay with her; is that
 2          right?
 3    A.    Yes.
 4    Q.    Did David ever prepare meals at the house?
 5    A.    Sometimes.
 6    Q.    Like breakfast, did he ever help out with
 7          breakfast?
 8    A.    Sometimes.
 9    Q.    Did he ever like make sandwiches for lunch and
10          stuff like this?
11    A.    Yes.
12    Q.    What about for dinner, did he ever kind of cook
13          dinner sometimes, maybe make some hamburgers or hot
14          dogs or something like that, fry some chicken and
15          stuff like that?
16    A.    Yes.
17    Q.    Wasn't the best cook then; is that right?
18    A.    (Witness laughing.)
19    Q.    Did David ever take you places?
20    A.    No.
21    Q.    You like sports?  Looks like you are in pretty good
22          shape there.  You like sports?
23    A.    Yes.
24    Q.    What kind of sports do you like?
25    A.    Basketball.
```

294

```
 1   Q.   I like basketball, too.  I'm not any good.
 2             David ever shoot hoops with you sometimes?
 3   A.   No.
 4   Q.   Never shot hoops with you?  Did he ever take you to
 5        play basketball?
 6   A.   No.
 7   Q.   Your mother, you said that you have seen your
 8        mother upset and heard her upset and use bad words;
 9        is that right?
10   A.   Yes.
11   Q.   And you have seen her use bad words and her to use
12        bad words to David; is that right?
13             MRS. PENN:  Asked and answered.
14             THE COURT:  Sustained.
15   Q.   Has your mother also been upset and used bad words
16        to you?
17   A.   Yes.
18   Q.   And has she also been upset and used bad words to
19        your sister?
20   A.   Yes.
21   Q.   Ever used the "B" word to you when she's upset?
22   A.   No.
23   Q.   Has she ever used the "MF" word?
24   A.   No.
25   Q.   What words does she use?  It's okay to tell them.
```

```
 1        Has she ever used the "S" word?

 2   A.   Yes.

 3   Q.   What other words does she use?

 4   A.   That's all I know.

 5   Q.   Huh?

 6   A.   The "A" word.

 7   Q.   Which word is that?

 8   A.   The "A" word.

 9   Q.   You can go ahead and tell us.  It's okay.  Go ahead

10        and tell us what she said.  Asshole; is that right?

11   A.   Just A-S-S.

12   Q.   And she used that on you; is that right?

13   A.   Yes.

14   Q.   And used it on your sister?

15   A.   Yes.

16   Q.   And used it on David?

17   A.   Yes.

18   Q.   Now, when your mama gets upset, mama gets a temper;

19        is that right?

20   A.   Yes.

21   Q.   You have seen your mama get upset; is that right?

22             MRS. PENN:  Asked and answered.

23             THE COURT:  Sustained.

24             MR. AUSBORN:  I'm about to wrap it up.

25   Q.   When your mama gets upset, she throws stuff?  You
```

1    have seen her throw stuff; isn't that right?

2  A.    No, sir.

3  Q.    It's okay to tell the truth.

4        MRS. PENN:  He answered.

5  Q.    Is that yes?

6  A.    No.

7  Q.    Ever seen her throw stuff?

8  A.    No.

9  Q.    She ever pick up stuff and like get ready to hit

10       you with it?

11 A.    No.

12       MR. AUSBORN: Nothing further.  Thank you.

13       THE COURT:  Redirect.

14                   REDIRECT EXAMINATION

15 BY MRS. PENN:

16 Q.    Tell me the fifty times that you went over the

17       story.  I want you to tell me what days they were

18       and how many times each day.

19 A.    It was every day.

20 Q.    Every day.  I talked to you every day?

21 A.    I'm talking about me and my mom.

22 Q.    Huh?

23 A.    I'm talking about me and my mom.

24 Q.    What about me and you?  How many times did you talk

25       to me?

```
 1   A.   About two times.

 2   Q.   Two times.  What days were they?

 3   A.   Yesterday and today.

 4   Q.   Yesterday and today.  About how much time did we

 5        spend talking about this case?  Do you know what

 6        time you came to the office yesterday?

 7   A.   Yes.

 8   Q.   What time?

 9   A.   7:30.

10   Q.   And did I talk to you the entire time?  Did I make

11        you go over and over and over what you were going

12        to say?

13   A.   No.

14   Q.   As a matter of fact, how many people did I have to

15        talk to?

16   A.   Four.

17   Q.   Okay.  I didn't go over your story with you ten

18        times, did I?

19   A.   No.

20   Q.   What about this morning?

21   A.   One.

22   Q.   So that's about how many times do you count?

23   A.   Five.

24   Q.   You count five.

25             How many times did I talk to you yesterday?
```

1    A.    One.

2    Q.    And I talked to you how many times today?

3    A.    One.

4    Q.    And you are telling me, when I talked to you

5          yesterday, I went over your testimony with you five

6          times?  That's not true mis it?  It's okay.  You

7          can tell them the truth.

8              MR. AUSBORN:  I'm going to interface an

9          objection here.  I think this is improper.

10             THE COURT:  Sustained.  Let's move on.

11   Q.    In fact, I haven't talked to you ten times, have I?

12   A.    No.

13   Q.    And you haven't gone over your story ten times with

14         me, have you?

15   A.    No.

16   Q.    And not twenty-five times, have you?

17   A.    No.

18   Q.    And was your mother trying to get away from Donnie?

19   A.    Yes.

20   Q.    Did you ever have to stay with somebody else?

21   A.    Yes.

22   Q.    Who do you stay with?

23   A.    My sister.

24   Q.    Anybody else?

25   A.    No.

| | | |
|---|---|---|
| 1 | Q. | How long did you stay with your sister? |
| 2 | A. | About four months. |
| 3 | Q. | About four months? |
| 4 | A. | Yes. |
| 5 | Q. | You said you went over your testimony with your |
| 6 | | mom? |
| 7 | A. | Yes. |
| 8 | Q. | And you said that was about fifty times? |
| 9 | A. | (Witness laughs.)   No. |
| 10 | Q. | Huh?   That's what he said, isn't it?   You didn't go |
| 11 | | over your testimony fifty times with your mama, did |
| 12 | | you? |
| 13 | A. | No. |
| 14 | Q. | It wasn't that many times.   And each time when you |
| 15 | | went over it, did she say -- did she sit down and |
| 16 | | say, this is what you will have to say? |
| 17 | A. | No. |
| 18 | Q. | Did you remember that by yourself? |
| 19 | A. | Yes. |
| 20 | Q. | Tell me why you would have remembered that by |
| 21 | | yourself?   What made that stand out in your mind? |
| 22 | A. | Because I think about it every day. |
| 23 | Q. | You think about it every day.   What do you think |
| 24 | | about it every day?   Were you afraid? |
| 25 | A. | Nope. |

```
 1   Q.   Did you think about it because he was threatening
 2        to kill your mama?
 3   A.   Yes.
 4   Q.   Was he threatening to fuck you up?
 5   A.   Yes.
 6   Q.   That's why you think about it, ain't it?
 7   A.   Yes.
 8   Q.   And that's what he told you, isn't it?
 9   A.   Yes.
10   Q.   And that's nothing your mama told you to say, is
11        it?
12   A.   No.
13   Q.   And I want you to be honest with these ladies and
14        gentlemen of the jury.  I know Mr. Ausborn is
15        smooth talking and he got you to say some stuff,
16        but just tell them point blank if your mama asked
17        you to get up here and lie or say anything that
18        wasn't true.  Tell them.
19            Did she ask you to say something that wasn't
20        true?
21   A.   No.
22   Q.   You sure?
23   A.   Uh-huh (affirmative response).
24   Q.   You just thinking about everything that you talked
25        about with her?
```

```
 1    A.    Yes.

 2    Q.    Has any of it been a lie?

 3    A.    No.

 4    Q.    Did you tell these ladies and gentlemen of the jury

 5          a lie when you told them what David Donnie Williams

 6          did down at the AG on April 17th?  Did you tell

 7          them a lie?

 8    A.    No.

 9    Q.    No.  Tell them.  Tell them no.

10          If you didn't lie, say, I did not lie to you.

11          Tell them.

12    A.    I did not lie.

13    Q.    Look at them and tell them.

14    A.    I did not lie.

15    Q.    You didn't lie for your mama?

16    A.    No.

17    Q.    You didn't lie for David Donnie Williams?

18    A.    No.

19    Q.    You didn't lie for anybody, did you?

20    A.    No.

21    Q.    And you came up here and told the truth.  And you

22          know what the truth is, don't you?

23    A.    Yes.

24                    RECROSS EXAMINATION

25    BY MR AUSBORN:
```

```
 1   Q.   "Q", you don't want to -- you are trying to get
 2        through this.
 3            This is the first time you have ever been on
 4        the stand testifying before; is that right?
 5            Not an everyday occurrence for you; is that
 6        right?
 7   A.   Yes.
 8   Q.   Now, when I asked you earlier, of course you know
 9        what it means to be up under oath and to tell the
10        truth and nothing but the truth; is that right?
11        You understand that; is that right?
12   A.   Yes.
13   Q.   When you have testified, everything that you said
14        on the stand has been the truth; is that right?
15   A.   Yes.
16   Q.   As best you can recall it; is that right?
17   A.   Yes.
18   Q.   And when I asked you questions, you understood
19        those questions; is that right?
20   A.   Yes.
21   Q.   And the answers that you gave me were answers that
22        you, in your heart, you, in your mind, gave because
23        you knew and thought that these were correct; is
24        that right?
25   A.   Yes.
```

```
 1    Q.    And when you told me that your mom and Mrs. Penn
 2          had gone over your testimony about fifty times, you
 3          didn't count all of the times but you knew that
 4          fifty was about a close number and you knew that;
 5          isn't that right?
 6    A.    Yes.
 7    Q.    Your mama has been going over your testimony for
 8          months now; is that right?
 9    A.    Yes.
10    Q.    And when she has been going over your testimony now
11          for months, like every day, she'd say, Quin (sic),
12          make sure you tell the Court, and she would tell
13          you, make sure you tell them this and make sure you
14          tell them that; is that right?
15    A.    Yes.
16    Q.    And so when your mama reminds you day in and day
17          out this is what you need to say, that's what
18          sticks out in your mind; is that right?  That's
19          what sticks out in your mind because your mama
20          keeps telling you about it; is that right?
21    A.    Yes.
22    Q.    And so when you are on the stand today, you don't
23          have a problem with telling the ladies and
24          gentlemen of the jury what happened because your
25          mama made sure you memorized that by going over it
```

| | | |
|---|---|---|
| 1 | | day in and day out; is that right? |
| 2 | A. | Yes. |
| 3 | Q. | Now, when Mrs. Penn went over your testimony with |
| 4 | | you, she told you to remember to say what mama had |
| 5 | | already told you to say; is that right? |
| 6 | A. | No. |
| 7 | Q. | Huh?  It's okay to tell the truth.  Isn't that |
| 8 | | right? |
| 9 | | In other words, your mama told you what to say, |
| 10 | | and then when you talked to Mrs. Penn.  And |
| 11 | | Mrs. Penn reminded you to say what mama had already |
| 12 | | told you to say; is that right? |
| 13 | A. | No. |
| 14 | Q. | She didn't tell you to say anything different, |
| 15 | | though, than what mom had already told you to say; |
| 16 | | is that right?  They pretty much told you to say |
| 17 | | the same thing; is that right? |
| 18 | A. | No. |
| 19 | Q. | Now, did they tell you they were out to get David? |
| 20 | A. | Yeah. |
| 21 | Q. | You know David is on trial; right? |
| 22 | A. | Yes. |
| 23 | Q. | And they told you they was out to get David; is |
| 24 | | that right? |
| 25 | A. | Yes. |

```
 1    Q.   And they told you that they was out to get David
 2         and they was going to try to send David to prison
 3         or jail; is that right?
 4    A.   Yes.
 5    Q.   And they told you they needed your help; am I right
 6         about that?
 7    A.   Yes.
 8    Q.   And you love your mama; am I right about that?
 9    A.   Yes.
10    Q.   And loving your mama means you are going to do
11         whatever it takes to help your mama; am I right
12         about that?
13    A.   Yes.
14    Q.   Because you don't want to disappoint mama; am I
15         right about that?
16    A.   Yes.
17    Q.   So when mama tells you, we going to get David, and
18         she tells you, remember to say this, that's what
19         you going to do; am I right about that?  It's okay
20         to tell the truth.
21              That's what you are going to say; isn't that
22         right?  You are keeping your commitment to mama in
23         helping to get David; am I right about that?
24    A.   Yes.
25    Q.   And that's why you are here; am I right about that?
```

```
 1  A.    Yes.

 2        MR. AUSBORN:  Nothing further.  Thank you.

 3             FURTHER REDIRECT EXAMINATION

 4  BY MRS. PENN:

 5  Q.    Quadarius, when did I tell you we were out to get

 6        David Donnie Williams?  Did I tell you that this

 7        morning?  Did I tell you that yesterday?  I have

 8        never told you that, have I?  It's okay for you to

 9        tell the truth.

10             I have never told you that we were out to get

11        David Donnie Williams, did I?  I know you told him

12        one thing, but look over there.  Don't even look at

13        me.  Tell the ladies and gentlemen of the jury the

14        truth, because they need to know.  Did I tell you

15        that we were out to get David Donnie Williams?

16  A.    Yes.

17  Q.    When?  Think back and tell me when.  I want you to

18        take as much time as you need, and I know you can't

19        remember everything and I know you are answering

20        his questions because you think you got to say --

21        you are answering questions because he is being

22        real polite; isn't that right?  But I want you to

23        tell them when I told you we were out to get David

24        Donnie Williams.  Can you remember that?

25  A.    No.
```

```
 1    Q.    Why did you tell him that that's what I told you?
 2            MR. AUSBORN:  I think this is asked and
 3          answered.
 4            THE COURT:  Sustained.
 5            MRS. PENN:  Did I ask him that?
 6            THE COURT:  Any other questions?
 7            MRS. PENN:  I appreciate it.
 8            THE COURT:  Next witness.
 9          (Whereupon the witness left the stand.)
10                    ANTHONY BLAKELY
11      having first been duly sworn, testified as follows:
12                    DIRECT EXAMINATION
13    BY MRS. PENN:
14    Q.    State your name for the jury, please.
15    A.    Anthony Blakely.
16    Q.    Talk loud so she can hear you and she can write it
17          on her machine.
18    A.    Anthony Blakely.
19    Q.    What kind of work do you do?
20    A.    Construction.
21    Q.    How do you know David Donnie Williams?
22    A.    We went to school together.
23    Q.    How long have you known him?
24    A.    Just about my whole life.
25    Q.    Just about your whole life.
```

```
 1              Do you consider him a friend of yours?
 2   A.    Yes, ma'am.
 3   Q.    Do you remember specifically the date of April 17th
 4         of this year?
 5   A.    Yes, ma'am.
 6   Q.    Why do you remember the date April 17th?
 7   A.    Yes, ma'am.
 8   Q.    Why do you remember that day?
 9   A.    I like to have lost my life that day.
10   Q.    Why did you almost lose your life?  Who almost
11         caused you to lose your life?
12   A.    Donnie Williams.
13   Q.    I am holding a statement that you wrote on April
14         17th, 2002.  Look over that and make sure it is
15         your statement?
16            THE COURT:  '04 or '02.  You said '02.  Did you
17         mean '04?
18            MRS. PENN:  '04.  Thank you.
19   Q.    What is that to you?
20   A.    This is the statement that I wrote.
21   Q.    And is that your signature on the statement?
22   A.    Yes, ma'am.
23   Q.    And that is on April 17th?
24   A.    Yes, ma'am.
25   Q.    Does that fairly and accurately depict the
```

```
 1           statement that you gave to the police officers that

 2           day?

 3    A.     Yes, ma'am.

 4                MRS. PENN:  Your Honor, I am marking this as

 5           State's Exhibit 3 and offer it into evidence.

 6                MR. AUSBORN:  No objection.

 7                MRS. PENN:  Permission to publish.

 8    Q.     First of all, let me do this so we won't be here

 9           two hours when we get to cross-examination.

10                Do you have a criminal record?

11    A.     Yes, ma'am.

12    Q.     And what is that for?

13    A.     Burglary.

14    Q.     Burglary?

15    A.     Yes, sir.

16    Q.     And you know that has to do with you not telling

17           the truth, you breaking in and stealing something?

18    A.     Yes, ma'am.

19    Q.     And you went to prison for that?

20    A.     Yes, ma'am.

21    Q.     And served time for it?

22    A.     Yes, ma'am.

23    Q.     So you are a convicted felon?

24    A.     Yes, ma'am.

25    Q.     Is it just one time?
```

```
 1   A.   Four times.

 2   Q.   You are a four-time convicted felon?

 3   A.   Yes, ma'am.

 4   Q.   Did I talk to you prior to you coming in here to

 5        testify?

 6   A.   Yesterday is when I first seen you.

 7   Q.   Did I put words in your mouth?  Did I tell you what

 8        to say when you got up here on the stand?

 9   A.   No, ma'am.

10   Q.   What did I ask you to do?

11   A.   Tell the truth.

12   Q.   To come in here and tell the truth.  And it is

13        important that these ladies and gentlemen of the

14        jury know that.

15             Do you know what the truth is?

16   A.   Yes, ma'am.

17   Q.   When you were convicted of burglary four times, did

18        you plead guilty?

19   A.   Yes, ma'am.

20   Q.   Why?

21   A.   Because I was guilty.

22   Q.   Because you did it.  And you came in here and told

23        the truth about it, didn't you?

24   A.   Yes, ma'am.

25   Q.   And on April 17th, who were you with?
```

1   A.   Donnie.

2   Q.   Donnie Williams.

3        Tell me where you met up with Donnie.

4   A.   We came down to the Big Bear and I asked him

5        because -- I wanted him to drop me off.

6   Q.   Where did you want him to drop you off at?

7   A.   Down in the bottom.

8   Q.   But you made a detour to the Big Bear; is that

9        right?

10  A.   Yeah.

11  Q.   Now known as AG's Grocery?

12  A.   Right.

13  Q.   Who did you see down there?

14  A.   I seen her down there.

15  Q.   And was she already there when you pulled up?

16  A.   Yes, ma'am.

17  Q.   Who was driving in your vehicle?

18  A.   Donnie.

19  Q.   And you were a passenger?

20  A.   Yes, ma'am.

21  Q.   How did you pull into the parking space?

22  A.   We pulled in, and I told him I wanted him to drop

23       me off.  I wanted him to go in the store and get me

24       some matches because my hip was hurting me and

25       that's why I couldn't walk.

| | | |
|---|---|---|
| 1 | Q. | Did you get out and go in the store? |
| 2 | A. | Yes, ma'am, I did. |
| 3 | Q. | And tell us what happened. |
| 4 | A. | I went in and got me some matches, and I came out. |
| 5 | | When I came out, I told him I wanted him to drop me |
| 6 | | off because my hip was hurting, because I don't |
| 7 | | know her.  You know, what I am saying.  But they |
| 8 | | was talking.  I didn't hear no threats or nothing |
| 9 | | like that. |
| 10 | Q. | You didn't hear no threats? |
| 11 | A. | No, ma'am. |
| 12 | Q. | And this is your friend, isn't it? |
| 13 | A. | Yes. |
| 14 | Q. | But you knew they were at the Big Bear; right? |
| 15 | A. | Say that again. |
| 16 | Q. | You know they were down at the Big Bear? |
| 17 | A. | Yeah, because I was there. |
| 18 | Q. | Because you were in the car, weren't you? |
| 19 | A. | Yes. |
| 20 | Q. | Tell me where you went when you left the Big Bear. |
| 21 | | Who pulled out first, you or Ms. Williams? |
| 22 | A. | Who pulled out? |
| 23 | Q. | Uh-huh (affirmative response). |
| 24 | A. | I think we did. |
| 25 | Q. | And which way did you go? |

1   A.   We was going like towards -- back towards the

2        trailer park.

3   Q.   Okay.  Now, tell me why would you tell me that you

4        didn't hear any threats or anything.

5             Why you felt like that was important for you to

6        say?

7   A.   Because I didn't.

8   Q.   But I haven't even asked you about that.  I want to

9        know why you thought that was important to say.

10  A.   Because of what this case is about.

11  Q.   Okay.  So I never asked you about any threats.  You

12       just decided to tell me that; is that correct?

13  A.   Yeah.

14  Q.   And you didn't hear anything, did you?

15  A.   No, I didn't hear either one of them.

16  Q.   You didn't hear not a word that was said?

17  A.   I didn't hear either one of them make no threats.

18       They was talking, you know, how a man and woman

19       talk.

20  Q.   Were they fussing?

21  A.   A little bit.

22  Q.   You didn't hear any cuss words, did you?

23  A.   A little bit.

24  Q.   What cuss words did you hear?

25  A.   I can't remember exactly.

```
 1    Q.    I understand, but you heard some curse words,

 2          didn't you?

 3    A.    A little bit.

 4    Q.    You are going to tell me you didn't hear Donnie

 5          tell her fourteen-year-old son, I'll fuck you up?

 6    A.    No, I didn't.

 7    Q.    And you are going to sit there and tell me that

 8          under oath?

 9    A.    No, I didn't.

10    Q.    And you didn't hear him tell Ms. Callie Williams,

11          I'll kill you?  Bitch, I'll kill you?

12    A.    No, ma'am.

13    Q.    And you were right there in the car with Donnie,

14          weren't you?

15    A.    Yes, ma'am, I was.

16    Q.    And when you left, you said you went towards the

17          trailer park; is that right?

18    A.    Yes, ma'am.

19    Q.    And what did you do when you went that way?

20    A.    That's when, you know, we took off in the

21          high-speed car chase there.

22    Q.    What in the world -- what was going on?

23    A.    I don't know.

24    Q.    You don't know why you were running from the

25          police?
```

| | | |
|---|---|---|
| 1 | A. | No, I just got caught... |
| 2 | Q. | They just got behind y'all because y'all went to |
| 3 | | Big Bear to get some matches? |
| 4 | A. | No.  I just got caught in the middle. |
| 5 | Q. | Caught up in what? |
| 6 | A. | I reckon a disagreement. |
| 7 | Q. | A disagreement that you didn't even know went on, |
| 8 | | did you? |
| 9 | A. | No, really I don't. |
| 10 | Q. | Tell me about the high-speed chase. |
| 11 | A. | Well, we got in a high-speed chase. |
| 12 | Q. | Did you ask Donnie what was going on? |
| 13 | A. | I asked him, I said, what's going on?  And I asked |
| 14 | | him several times you know, let me out.  My life |
| 15 | | was in danger.  I ain't never been into nothing |
| 16 | | like that before. |
| 17 | Q. | Did he let you out? |
| 18 | A. | No, I couldn't get out. |
| 19 | Q. | Why not? |
| 20 | A. | Because we were running too fast. |
| 21 | Q. | Any idea about how fast you were going? |
| 22 | A. | About ninety-five or a hundred. |
| 23 | Q. | Who was chasing you? |
| 24 | A. | Mr. Freeman. |
| 25 | Q. | You did have some indication that something bad was |

```
 1           going on since you were involved in a high-speed
 2           chase, didn't you?
 3    A.     Definitely, yeah.
 4    Q.     Had you run the stop sign?
 5    A.     (No response.)
 6    Q.     I mean before the high-speed chase, had you run a
 7           stop sign?
 8    A.     Before the high speed chase?
 9    Q.     Yeah, before the high-speed chase.  Did you run
10           through the traffic light?
11    A.     No, it wasn't no traffic light.
12    Q.     Did you steal something out of the AG?
13    A.     No.
14    Q.     Just running from the police and you don't have any
15           idea why?
16    A.     No, I didn't.
17    Q.     And tell us where all you went on the high-speed
18           chase and about how long it lasted?
19    A.     I'd say about fifteen or twenty minutes.
20    Q.     Fifteen to twenty minutes.
21               Where all did you go?
22    A.     Well, we went down 29.  The next thing I know, we
23           end up on County Road 61.
24    Q.     What happened on 61?
25    A.     We crashed.  We crashed twice, though.
```

```
 1    Q.   You crashed twice.  Tell us about the first crash.

 2    A.   When we crashed into the telephone pole.

 3    Q.   Crashed into a telegram pole and didn't stop?

 4    A.   You know, the car spinned about two or three times.

 5    Q.   And he didn't stop and let you out or wait for the

 6         police to come or any medical attention?  Didn't do

 7         any of that, did you?

 8    A.   No.

 9    Q.   What happened after you crashed into the telegram

10         pole and spun around two or three times in the

11         road?

12    A.   Took off again.

13    Q.   And then you had another crash?

14    A.   Yeah.

15    Q.   Where did you crash the second time?

16    A.   Like on the dirt road where Mr. Red Williams live

17         at.

18    Q.   That's on County Road 61?

19    A.   61, right.

20    Q.   What did you crash into that time?

21    A.   We crashed into some wire fences or trees.

22    Q.   Did you jump a ditch or was the wire fence and

23         ditch in the road?

24    A.   It was on the side of the road, because it like

25         knocked me unconscious for a minute.
```

```
 1    Q.   Knocked you unconscious?

 2    A.   Yeah.

 3    Q.   When you came to, who did you see?

 4    A.   Mr. Freeman.

 5    Q.   What about David Donnie Williams?

 6    A.   I didn't see him.

 7    Q.   Nowhere to be seen, was he?

 8    A.   No, ma'am.

 9    Q.   When was the next time you seen David Donnie

10         Williams?

11    A.   It had been a minute.  It had been a minute.

12    Q.   Knocked you unconscious, your friend, and he didn't

13         stick around to see if you were all right, did he?

14    A.   No.

15    Q.   And let me get this out in the open, so we can take

16         up a little less time on cross.

17              Have I promised you anything for this?

18    A.   No, ma'am.

19    Q.   Are you in trouble right now?

20    A.   No, ma'am.

21    Q.   Do you have a case pending?

22    A.   No, ma'am.

23    Q.   You ain't coming up for probation on December 9th?

24    A.   December 9th?

25    Q.   Yes.
```

```
 1    A.    No.

 2    Q.    And the first time you heard from me about this

 3          case was when?

 4    A.    Yesterday.

 5    Q.    Yesterday.  And you did get a subpoena, didn't you?

 6    A.    Yes, ma'am.

 7    Q.    And did I talk to you before you got your subpoena?

 8    A.    No, ma'am.

 9    Q.    Who gave you your subpoena?

10    A.    Mr. Williams.

11    Q.    Deputy Williams?

12    A.    Deputy Williams.

13    Q.    Deputy sheriff brought you your subpoena?

14    A.    Right.

15    Q.    And the first time I talked to you about that was

16          yesterday morning; is that correct?

17    A.    Yes, ma'am.

18    Q.    The next time you saw Donnie, where was he?

19    A.    Ma'am?

20    Q.    When was the next -- when and where was the next

21          time you saw Donnie?  I know you said it had been a

22          minute.  When was the next time?

23    A.    Yesterday.

24    Q.    That's the next time you seen him since the crash?

25    A.    Yes, ma'am.
```

1   Q.   Did he talk to you?

2   A.   No, ma'am.

3   Q.   Didn't attempt to talk to you?

4   A.   No, ma'am.

5   Q.   Talk to his lawyer?

6   A.   No, ma'am.

7   Q.   You didn't talk to anybody.

8        What about John Taylor?  John Taylor?  Do you

9        know John Taylor?

10  A.   Yeah, I know him.

11  Q.   Did you talk to him?

12  A.   Who, I did?

13  Q.   Yes.

14  A.   Yes, ma'am.  We was talking.

15  Q.   Did you talk about this case?

16  A.   Yeah, some of it was.

17  Q.   But you haven't seen Donnie, have you?

18  A.   No, ma'am.

19  Q.   Haven't seen him since you were knocked unconscious

20       on that day?

21  A.   Right.

22  Q.   And how long had you been at the Big Bear?  And

23       tell me what happened before you actually went

24       into the store to get matches.

25  A.   Nothing.

1    Q.    Nothing happened?

2    A.    No, ma'am.

3    Q.    Where did Donnie pick you up at?

4    A.    We was over on Johnson Street.

5    Q.    On Johnson Street?

6    A.    Yes, ma'am.

7    Q.    Where did you go when you left Johnson Street?

8    A.    We went to car wash to clean his car out and then

9          we went to the Big Bear and then I told him to drop

10         me off down in the bottom.

11   Q.    And let me ask you about after you left the car

12         wash en route to the Big Bear.

13              Which car wash did you go to?

14   A.    The old one.

15   Q.    What's the old one?  The Robo?

16   A.    Yes, ma'am.

17   Q.    And is that right here across from CVS?

18   A.    Yes, ma'am.

19   Q.    And when you left the car wash, you went straight

20         to the AG?

21   A.    Yes, ma'am.

22   Q.    By what route?  Which way did you take to get to

23         the AG?

24   A.    Let's see.  We came back out and then came back --

25         I can't name the streets, but then we came back

```
 1              over the overhead bridge.

 2      Q.      Overhead bridge?

 3      A.      Yeah.

 4      Q.      When you left the Robo, did you take a right or

 5              left?

 6      A.      Took a left.

 7      Q.      And took that left right there by Greenway?

 8      A.      No, before we got to Greenway.

 9      Q.      Took a left before you got to Greenway?

10      A.      Right.

11      Q.      And you went down, what was that?  Montgomery

12              Avenue?

13      A.      Yeah, I think so.

14      Q.      Would that be down by the park?

15      A.      Right.

16      Q.      And then which way did you go?

17      A.      Then we got to the top of the hill, took a right

18              and then we took another left.

19      Q.      Took a right at the top of the hill?

20      A.      No.

21      Q.      You came up by Carter Funeral Home?

22      A.      No.  Hold on.  When we got to the top of the hill,

23              we took a right at the old motel and went straight

24              down.

25      Q.      Are you on Prairie Street now?
```

```
 1   A.   Right.  We are on the main street now.
 2   Q.   And you go down to where?
 3   A.   All the way down to like where the old motel was,
 4        took a left and everything.
 5   Q.   Okay.  And you turned right there where that gas
 6        station was?
 7   A.   Yeah, took a left.
 8   Q.   The Amoco service station?
 9   A.   Yeah.
10   Q.   Did you at any time park on the roadway in front of
11        Ms. Callie Williams' house?
12   A.   No, ma'am.
13   Q.   Never did that?
14   A.   No, ma'am.
15   Q.   So if another witness come in here and said, I saw
16        Donnie Williams sitting across the street from
17        Callie Williams' house, you are calling them a lie;
18        is that correct?
19   A.   Calling Donnie a lie?
20   Q.   No, huh-uh.  If a witness came in here and said, I
21        saw Donnie Williams, on that day that he got in the
22        chase with the police, parked right across the
23        street from Ms. Callie Williams' house, that would
24        be a lie?
25   A.   Yeah, I would call them a lie.
```

```
 1   Q.   You would call them a lie?

 2   A.   Yes, I would.

 3   Q.   And how long did you sit in the Big Bear parking

 4        lot?

 5   A.   We was sitting for a minute, because they was

 6        talking.  They was in that little discussion.  I

 7        really wasn't into it.

 8   Q.   Was she there when you pulled up?

 9   A.   Yeah, I think she was.

10   Q.   Was she in the store or sitting in the car?

11   A.   I think she was inside the store.

12   Q.   She was inside the store.  You gave this statement

13        to the police officer on that day; is that correct?

14   A.   Yes, ma'am.

15   Q.   Would you tell me in there where it says you got

16        out and went in the store and bought some matches

17        and when you came back out, David Donnie Williams

18        was talking to a woman?

19   A.   No, but I did go in the store.

20   Q.   I want to know if it says that in your statement?

21   A.   No, it is not in the statement.

22   Q.   So your memory is more fresh today than it was on

23        April 17th when you gave this statement to the

24        police?

25   A.   No.  It was really fresh that day.
```

```
 1   Q.   You said, I asked Donnie to drop me off in the
 2        bottom, and the next thing I know, he started
 3        talking to this woman?
 4   A.   Right.
 5             MRS. PENN:  No further questions.
 6             THE COURT:  Cross.
 7                      CROSS-EXAMINATION
 8   BY MR. AUSBORN:
 9   Q.   Mr. Blakely, I didn't subpoena you to be here
10        today; is that right?
11   A.   No.
12   Q.   The State subpoenaed you to be here; is that right?
13   A.   Okay.
14   Q.   You've seen me around the courthouse before is that
15        right?
16   A.   Yes, sir.
17   Q.   And as you testified, you are an acquaintance of
18        Mr. David Donnie Williams; is that right?
19   A.   Yes, sir.
20   Q.   That friendship, that association, is not going to
21        justify you taking the stand and lying for Mr.
22        Donnie Williams, is it?
23   A.   No.  No, sir.
24   Q.   And it is not going to justify you taking the stand
25        and lying for the State of Alabama either; is that
```

```
1         right?

2    A.   No, sir.

3    Q.   You're neutral in this case.  You are not for David

4         Donnie Williams and you are not for the State of

5         Alabama; is that right?

6    A.   Yes, sir.

7    Q.   I appreciate your candidness and this court does

8         likewise in telling us about your prior criminal

9         history.  That's behind you; right?

10   A.   Yes, sir.

11   Q.   And you have paid your debt to society and that's

12        behind you; is that right?

13   A.   Yes, sir.

14   Q.   Now, when you gave your statement, everything that

15        happened that date is not in this statement; is

16        that right?

17   A.   No, sir.

18   Q.   In other words, every little detail --

19   A.   Right.

20   Q.   -- is not in the statement; is that right?

21   A.   Yes, sir.

22   Q.   And as you have testified, him dropping you off to

23        get some matches, that's a little minor detail that

24        was conveniently left out; is that right?

25   A.   Yes, sir.
```

```
 1   Q.   You being knocked unconscious and et cetera, that's
 2        also a detail that was left out; is that right?
 3   A.   Yes, sir.
 4   Q.   So it is fair to say that every detail that
 5        happened, it is not within the statement; is that
 6        right?
 7   A.   Yes, sir.
 8   Q.   Okay.
 9             Nobody -- did you write this or did an officer
10        write it for you?
11   A.   I wrote it, yes, sir.
12   Q.   Okay.
13             The officer never told you, tell me every
14        detail, whether minor or major, what happened?
15             He never told you that; is that right?
16   A.   No, sir.
17   Q.   He just said something to the effect of give me an
18        idea of what happened that day, just give me a
19        short statement?
20   A.   Statement.
21   Q.   And that's what you did; is that right?
22   A.   Yes, sir.
23   Q.   I want to take you back to that date.
24             Before Donnie picked you up, was he upset?
25   A.   No, sir.
```

1    Q.   Was he in a foul mood or anything like that?

2    A.   No.

3    Q.   You've fellowshipped (sic) with Donnie in the past.

4         Is Donnie an easy-going type fellow for the most

5         part?

6    A.   Yes, he is.

7    Q.   He is not a temperamental type?

8    A.   No, not really.

9    Q.   A person that gets riled up easily?

10   A.   No.

11   Q.   Now, when you stopped off at the store after you

12        left the car wash, you told Donnie you needed to

13        stop off at the store to get some matches; is that

14        right?

15   A.   Yes, sir.

16   Q.   Donnie, didn't make the decision that, hey, I need

17        to stop here at the store; you directed Donnie, can

18        you stop by the store and get some matches; is that

19        right?

20   A.   Yes, sir.

21   Q.   That was not Donnie's decision; that was your

22        decision?

23   A.   Right.

24   Q.   And Donnie did that; is that right?

25   A.   Yes, sir.

329

```
 1   Q.   Now, when you stopped, Ms. Williams was coming out
 2        of the store; is that right?
 3   A.   Yes, she was.
 4   Q.   Had you already gone in the store to get your
 5        matches and when you were coming out, she was
 6        coming out?
 7   A.   Right.
 8   Q.   And did Donnie get out of the car at that point or
 9        was he already out of the car?
10   A.   No.  I didn't see Donnie get out of the car.  He
11        was sitting in the car.
12   Q.   Now, at that point, did Ms. Williams come over to
13        Donnie's car?
14   A.   No.
15   Q.   The cars proximity-wise, were they parked parallel
16        to one another?
17   A.   Kind of parallel.  She was parked in like that and
18        we was like that (indicating).
19   Q.   Okay.
20            Now, did I understand you to say that Donnie
21        was in the car or he was out of the car?
22   A.   He was sitting inside the car.
23   Q.   He was like leaning up against the car?
24   A.   No.  He was sitting inside.
25   Q.   He was inside the car?
```

```
 1   A.    Right.

 2   Q.    Did he get out of the car at any time?

 3   A.    No, I didn't see him get out.

 4   Q.    And as Ms. Williams was getting in their car, did

 5         they start communicating with one another?  Is that

 6         what happened?

 7   A.    Yeah, they was talking.

 8   Q.    You didn't see Donnie get out of the car and get

 9         aggressive with Ms. Williams or anything like that,

10         did you?

11   A.    No, sir.

12   Q.    And you were physically right there to where, if

13         something like that would have happened, you would

14         have had a perfect observation of that as it

15         occurred; right?

16   A.    Right.

17   Q.    Now, proximity-wise, the door is right here, tell

18         us how far Donnie was to Ms. Callie Williams as

19         they were talking.  Do I need to go further up or

20         do I need to go back, in terms of how close they

21         were to one another?

22   A.    About a distance like that.

23   Q.    About right here?

24   A.    Yeah, about right there to right there.

25   Q.    So he was sitting in his car and then she was
```

1    standing right there outside of the car; is that

2    right?

3  A.   Yeah, she was standing outside of her car.

4  Q.   Outside of her car?

5  A.   Right.

6  Q.   And they started communicating with one another; is

7       that right?

8  A.   Yeah, they was talking.

9  Q.   And you could hear that there was some

10      communication, but exactly what was happening, you

11      weren't trying to focus in on what was happening

12      because that's their business; is that right?

13 A.   Right.

14 Q.   But, clearly, had Mr. David Donnie Williams made a

15      threat to Ms. Callie Williams, you would have heard

16      that, isn't that right?

17      MRS. PENN:   I object, Your Honor.  He has

18      already said he didn't hear.

19      MR. AUSBORN:   I didn't ask him that question,

20      though.

21      THE COURT:   He can answer that.

22 Q.   Now, you never heard Mr. David Donnie Williams

23      trying to restrain Ms. Callie Williams from leaving

24      telling her, you ain't going anywhere or anything

25      like that?

332

| | | |
|---|---|---|
| 1 | A. | Nah.  I wasn't really in to it, because I was |
| 2 | | intoxicated too, a little bit. |
| 3 | Q. | You were intoxicated? |
| 4 | A. | Yeah, I was intoxicated a little bit. |
| 5 | Q. | Okay.  Let's talk about that. |
| 6 | | Now, when you say intoxicated -- |
| 7 | A. | Alcohol. |
| 8 | Q. | -- do you mean you had a little buzz or was you |
| 9 | | really drunk, because there is a big difference in |
| 10 | | the two? |
| 11 | A. | Well, I had been drinking. |
| 12 | Q. | You had a little buzz? |
| 13 | A. | Yeah. |
| 14 | Q. | So, really, intoxication is kind of like an |
| 15 | | overstatement? |
| 16 | A. | Right. |
| 17 | Q. | Had a little buzz; is that right? |
| 18 | A. | Yeah. |
| 19 | Q. | Feeling good on that day? |
| 20 | A. | Right. |
| 21 | Q. | But notwithstanding the fact that you had a buss |
| 22 | | that day, it didn't affect your memory and does not |
| 23 | | affect your memory today in terms of what happened; |
| 24 | | is that right? |
| 25 | A. | No, sir. |

```
 1   Q.   When you got knocked out that day, you weren't
 2        knocked out because you had an after effect from
 3        the alcohol or anything like that, was you?
 4   A.   No.  It came from the crash.
 5   Q.   Now, you've heard of instances -- and I know you
 6        paid your debt to society.  You've heard of
 7        instances where you know people, when the police
 8        come around, people kind of get nervous?  You have
 9        seen that, haven't you?
10   A.   True.
11   Q.   And you know of instances when the police come
12        around in Bullock County, people get nervous?
13            MRS. PENN:  Your Honor, I object.
14   A.   Yes, sir.
15            THE COURT:  Go ahead.
16   Q.   Bullock County law enforcement come around, nothing
17        unusual about people getting nervous and
18        scattering?
19   A.   Yes, sir.
20   Q.   And that's what Donnie did on that day; is that
21        right?
22   A.   Yes, sir.
23   Q.   Donnie Williams, to the best of your knowledge,
24        based upon your past association with Donnie, you
25        don't think Donnie would have deliberately put his
```

| | | |
|---|---|---|
| 1 | | safety and your safety at risk? |
| 2 | A. | No, I don't think he would have. |
| 3 | Q. | I know that he sped off, you know, and was trying |
| 4 | | to get away, but you know, people do reckless and |
| 5 | | foolish things? |
| 6 | A. | Yeah, it freaked me out that day for real. |
| 7 | Q. | And that was out of character for Donnie; is that |
| 8 | | right? |
| 9 | A. | Yes, sir. |
| 10 | Q. | And you rode in the car before with Donnie? |
| 11 | A. | Yes, sir. |
| 12 | Q. | Nothing like that ever happened before; is that |
| 13 | | right? |
| 14 | A. | No, sir. |
| 15 | Q. | Did you ever hear Ms. Callie Williams tell Donnie |
| 16 | | on that day, Leave me alone?  Have you ever heard |
| 17 | | her say anything like that? |
| 18 | A. | Yes, she did. |
| 19 | Q. | She did? |
| 20 | A. | Yes, sir. |
| 21 | Q. | She told Donnie to leave her alone on that day? |
| 22 | A. | She said she didn't want him no more. |
| 23 | Q. | She said she didn't want him no more? |
| 24 | A. | Yes, sir. |
| 25 | Q. | Okay.  Let's talk about that.  Now, did you hear |

```
 1        Donnie tell her, I don't want you?  Did Donnie tell
 2        her that, he don't want her?
 3   A.   No, he didn't.
 4   Q.   Could it have been that Donnie told her that and
 5        you didn't hear it?
 6             MRS. PENN:  I object, Your Honor.  He already
 7        said he didn't hear it.
 8             MR. AUSBORN:  It's a fair question, Counselor.
 9             THE COURT:  Restate the question.
10   Q.   Now, before you heard her say, I don't want you no
11        more, you didn't immediately hear what Donnie had
12        told her?
13   A.   No, not really, because like I said, I wasn't
14        really in to it.  I could hear some things, but I
15        wasn't listening.
16   Q.   And it is possible that Donnie may have told her, I
17        don't want you, leave me alone?
18             MRS. PENN:   I object, Your Honor.  He has
19        already said he didn't hear it.
20             THE COURT:  Sustained.
21   Q.   Now, Donnie and after she told Donnie, I don't want
22        you anymore, you will didn't see Donnie get out of
23        the car and say, Callie, no, you ain't leaving me?
24        He didn't do nothing like that, did he?
25   A.   No, sir.
```

```
 1    Q.   He didn't try to stop her from getting in her car,
 2         did he?
 3    A.   No, sir.
 4    Q.   He didn't get in his car and trail her, did he?
 5    A.   No, sir, we turned around.
 6    Q.   In fact, he left before she left; isn't that right?
 7    A.   Right, we did.
 8    Q.   You didn't hear her say, I'm going to call the
 9         police on you, leave me alone?  She didn't say
10         nothing like that, did she?
11    A.   No, I didn't hear her say that.
12    Q.   And when you saw the police, Mr. Freeman, when
13         y'all first -- he first made contact with you-all,
14         did he have his lights on first before Donnie
15         started speeding or Donnie started speeding first
16         and then he blue-lighted him?
17    A.   He started speeding first.
18    Q.   First?
19    A.   Right.
20    Q.   Nothing unusual about a police officer --
21    A.   Right.
22    Q.   -- enforcing the law?
23    A.   Right.
24    Q.   You speed, they stop you; am I right about that?
25    A.   Yeah, you are right about that.
```

337

```
 1    Q.    So he started speeding and he got blue-lighted and
 2          the chase was on; is that right?
 3    A.    Yes, sir.
 4    Q.    You've heard about people committing traffic
 5          violations, speeding, running a red light, don't
 6          want a ticket, so they figure my engine can outrun
 7          law enforcement engine and then at some point
 8          realize they made a poor calculation and get
 9          stopped?
10              That's what happened in this case; is that
11          right?
12    A.    Yes, sir.
13    Q.    He thought he could outrun Mr. Freeman; is that
14          right?
15    A.    Yes, sir.
16    Q.    And he wasn't successful; is that right?
17    A.    No, sir.
18    Q.    Could you tell it was Mr. Freeman behind you?
19    A.    I seen Mr. Freeman when we pulled out.
20    Q.    When you pulled off?
21    A.    Yes, sir.
22    Q.    Now, Mr. Freeman, tell us about Mr. Freeman.  Is he
23          a tough-minded officer?
24    A.    He's a good person.
25    Q.    He's a good person.
```

COURT OF CRIMINAL APPEALS NO. CR 04-0846

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

CIRCUIT COURT OF _____Bullock_____ COUNTY, ALABAMA

CIRCUIT COURT NO. CC-2004-144

CIRCUIT JUDGE Hon. L. Bernard Smithart

Type of Conviction / Order Appealed From: Stalking

Sentence Imposed: 38 years

Defendant Indigent: [X] YES [ ] NO

David Donnie Williams
_____ NAME OF APPELLANT

Hon. Donald E. Spencer    334-269-1934
(Appellant's Attorney)                    (Telephone No.)
547 S. Lawrence Street
(Address)
Montgomery, AL  36104
(City)          (State)          (Zip Code)

V.

STATE OF ALABAMA
_____ NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

EXHIBIT

A

PENGAD 800-631-6889

```
 1              Kind of strange Donnie taking off when he sees
 2         Mr. Freeman.  You don't know what type of past
 3         association Freeman has had with Donnie; is that
 4         right?
 5    A.   No, sir.
 6              MR. AUSBORN:  Nothing further from this
 7         witness, Your Honor.
 8              MRS. PENN:  Your Honor, may we approach.
 9              (Whereupon a bench conference was held outside
10               the hearing of the reporter and the jury.)
11                        REDIRECT EXAMINATION
12    BY MRS. PENN:
13    Q.   You said that it was out of character for Donnie to
14         run from the police.
15              Has he ever run from the police any time before
16         that you are aware of?
17    A.   No, ma'am.
18    Q.   Not that you are aware?
19    A.   No, ma'am.
20    Q.   Doesn't mean that he hasn't done it; is that right?
21    A.   Excuse me?
22    Q.   Doesn't mean he hasn't done it; you are just not
23         aware of it?
24    A.   Right.
25    Q.   So how can you speak to what's out of character for
```

```
 1          Mr. Williams?
 2     A.   Well, as long as we have been friends, you know, I
 3          know Mr. Williams have a criminal record, but he's
 4          a good person.
 5              MRS. PENN: That's all.
 6              MR. AUSBORN:  Nothing further.
 7              THE COURT:  Thank you.  Y'all take a 15-minute
 8          break.
 9              (Whereupon a short recess was taken, after
10               which the jury returned to the courtroom, and
11                the following proceedings were had in open
12                court:)
13                    LIEUTENANT DURWOOD FREEMAN
14      having first been duly sworn, testified as follows:
15                       DIRECT EXAMINATION
16     BY MRS. PENN:
17     Q.   State your name for the ladies and gentlemen of the
18          jury.
19     A.   Lieutenant Thomas D. Freeman.
20     Q.   What's your occupation?
21     A.   Police officer for the City of Union Springs.
22     Q.   How long have you been acting in that capacity?
23     A.   Twenty-two and a half years.
24     Q.   Were you acting in that capacity on April 17th,
25          2004?
```

```
 1   A.   Yes, I was.

 2   Q.   And do you know Callie Williams?

 3   A.   Yes, ma'am, I do.

 4   Q.   Please explain to the ladies and gentlemen of the

 5        jury how you know Callie Williams.

 6   A.   Ms. Williams, we have had some problems at their

 7        residence with David Donnie Williams.  We have gone

 8        down and removed him as early as March, April of

 9        this year, escorted him out of the house.

10   Q.   Escorted him out of her house?

11   A.   Yes, ma'am.

12   Q.   And that's how you know her?

13   A.   Yes, I do.

14   Q.   And you know David Donnie Williams?

15   A.   I sure do.

16   Q.   And how do you know David Donnie Williams?

17   A.   We have had several occasions to meet according to

18        our job and I have been knowing him a good many

19        years.

20   Q.   I'm going to ask you specifically about April 17,

21        2004.  Does that date stand out in your mind for

22        any reason?

23   A.   Yes, it does.

24   Q.   Where were you on April 17th, 2004?

25   A.   I was working from 6:00 a.m. that morning until
```

```
 1          2:00 p.m. that afternoon.
 2   Q.    Did you have occasion to come in to contact with
 3          David Donnie Williams?
 4   A.    Yes, I did.
 5   Q.    Would you explain to the ladies and gentlemen of
 6          the jury how you came in to contact with David
 7          Donnie Williams?
 8   A.    Our dispatcher gave us a call to go down to the AG
 9          Grocery.
10              MR. AUSBORN:  Your Honor, before he goes into
11          that, I object to obviously hearsay.  He is going
12          to go into what dispatch --
13              THE COURT:  You are objecting to hearsay that
14          dispatch said.  Without going in to what you were
15          told, tell me what you observed and what happened
16          when you got there.
17   A.    Yes, sir.  We were dispatched to AG Grocery.  When
18          I arrived, I observed Mr. Williams and a gentleman
19          that was in the vehicle with him leaving the south
20          end of the parking lot.  That gave me other
21          information received that I needed to talk with
22          Donnie Williams.
23              I turned the police car around, turned the blue
24          lights on, and at that time, he proceeded to
25          accelerate.
```

```
 1    Q.   Now, let me ask you this:  We've had some testimony
 2         earlier today from other witnesses.  Which way were
 3         you coming from when you saw him?
 4    A.   I came from 29, the south end of MLK Boulevard.
 5    Q.   You came from the main street and headed straight
 6         down by the old building supply and made a left?
 7    A.   That's right.
 8    Q.   And you saw him in the parking lot or had he
 9         already exited the parking lot?
10    A.   He was in the parking lot.
11    Q.   And where did you turn around?
12    A.   I turned around right behind him at about the old
13         co-op building in the parking lot, the last
14         building on the left if you enter from the south
15         end.
16    Q.   And where was David when you turned around?
17    A.   He was headed south in the parking lot.  He was
18         going towards the trailer park, Jernigan's trailer
19         park there behind the old Comfort Motel.
20    Q.   And I want to clarify whether or not you observed
21         him speeding before or after you turned your blue
22         lights on?
23    A.   He was leaving the lot about probably 20 miles an
24         hour.  When I turned around, he accelerated.
25    Q.   And you, in your testimony, you were travelling and
```

```
1          you passed in front of him?

2     A.   We pass -- I passed to my right and he came by me,

3          and I looked directly into the vehicle at Mr.

4          Williams.

5     Q.   And once you turned around and turned on your blue

6          lights, he accelerated?

7     A.   Yes, he did.

8     Q.   And then tell me what happened after he

9          accelerated?

10    A.   I pursued.  I went what we would call a 10-100.

11         That means I am in pursuit of a vehicle.  The

12         vehicle is not stopping.  He got to the stop sign

13         at the old builder's supply and made a left turn

14         without stopping at the stop sign.  He passed at

15         least one vehicle, went on down 29 to where the old

16         green's motel used to be, where Thomas May lives

17         now.  There at the two ponds, he passed another

18         vehicle, double yellow lines, in a curve, and

19         proceeded south to County Road 61; made a left turn

20         on County Road 61.  He dead-ended at that next

21         intersection several miles down the road.  When he

22         made that left turn, we had reached speeds up to

23         100, 110 miles an hour and lights and siren on the

24         police car on.  He went into a curve and there was

25         gravel in the curve, the dirt road came up into the
```

```
 1          road and they had graveled it, and he lost control

 2          of his vehicle and slid backwards into a pine tree.

 3    Q.    Did he stop?

 4    A.    He had to stop.  He exited the vehicle and fled on

 5          foot.

 6    Q.    Now, how -- tell me -- I apologize.  I wasn't

 7          really listening about how many years you have been

 8          acting as a police officer with the Union Springs

 9          Police Department.

10    A.    The exact months?

11    Q.    It doesn't have to be exact months?

12    A.    Twenty-two and a half years.

13    Q.    Twenty-two and a half years?

14    A.    Yes, ma'am.

15    Q.    Have you been in police chases before?

16    A.    Yes, ma'am.

17    Q.    When you have been in a police chase before, are

18          you typically chasing someone who hasn't done

19          anything?

20    A.    No, ma'am.  They have done something for me to

21          pursue them for.

22    Q.    And you testified that he reached speeds of up to

23          110 miles per hour?

24    A.    Yes, ma'am.

25    Q.    Did you -- when you -- did you see him wreck?
```

```
 1   A.   Yes, ma'am, I was there right after.  I wasn't far
 2        behind him.  I was very close.
 3   Q.   And what did he do after he wrecked?
 4   A.   He exited the car.  He stirred up a lot of dust,
 5        but he got out of the car before I could actually
 6        get mine stopped.  He got out of the vehicle, went
 7        across the fence and down through a pasture.
 8   Q.   Did you pursue him on foot?
 9   A.   No, ma'am.
10   Q.   Was there anyone else in the car with him?
11   A.   Mr. Blakely.
12   Q.   Anthony Blakely?
13   A.   Yes, ma'am.
14   Q.   Did you observe him when you exited your car?
15   A.   Yes, ma'am.  He got out.  He was pretty well shook
16        up.
17   Q.   He got out of the car?
18   A.   Yes, ma'am.
19   Q.   Did he at any time let you know that he had been
20        knocked unconscious?
21   A.   I am not sure if he was unconscious or not.  It
22        took a pretty good lick, the vehicle did.
23   Q.   He got out of the car and you said he was shook up?
24   A.   Yes, ma'am.
25   Q.   Did you take him into custody?
```

| | | |
|---|---|---|
| 1 | A. | We put him in the car, yes, ma'am.  We sat him down |
| 2 | | in the police car.  I didn't arrest him.  He wasn't |
| 3 | | the man driving. |
| 4 | Q. | Okay.  And did he make any statements? |
| 5 | A. | He advised that Donnie fled and he tried to get him |
| 6 | | to stop and let him out of the vehicle; he just |
| 7 | | wouldn't stop. |
| 8 | Q. | I introduce State's Exhibit 3 and ask you if that's |
| 9 | | the statement he reduced to writing. |
| 10 | A. | Yes, ma'am. |
| 11 | Q. | Were you the person that he told what happened? |
| 12 | A. | He talked with corporal Sharon Dean.  I was |
| 13 | | standing by until -- Sharon Dean brought him back |
| 14 | | to Union Springs, and she took a statement from |
| 15 | | him. |
| 16 | Q. | With you present? |
| 17 | A. | No, ma'am. |
| 18 | Q. | Did he ever communicate with you what he was doing |
| 19 | | in the car with Donnie Williams? |
| 20 | A. | He advised. |
| 21 | Q. | Just if he did? |
| 22 | A. | He did tell me what he was doing in the car. |
| 23 | | MR. AUSBORN:  Your Honor, I'm going to |
| 24 | | interpose an objection here.  It is obvious |
| 25 | | hearsay. |

```
 1              MRS. PENN: Didn't ask what he said.

 2              THE COURT:  She didn't ask what he said.

 3         That's overruled.

 4    Q.   And did you arrest David Donnie Williams that day?

 5    A.   No, ma'am.

 6    Q.   Why not?

 7    A.   Couldn't find him.

 8    Q.   How long did it take you to find and arrest him?

 9    A.   This happened on a Saturday morning, and I rode

10         through Johnson Street on a Monday morning, and

11         Donnie was standing in of his mother's house on

12         Johnson Street.  I told him he needed to come on

13         and get in the car.  I needed to issue him some

14         tickets.  We found papers that were on Donnie.  So

15         we held him -- we contacted his parole officer,

16         probation officer.

17              She advised that she would have some

18         paperwork, we could hold him; she was going to

19         revoke his probation.

20    Q.   So you arrested him the next Monday?

21    A.   Yes, ma'am.

22    Q.   What kind of car was Donnie driving?

23    A.   A small blue car.

24    Q.   Was it a sports car?

25    A.   It's a Nissan, something along that line.  I didn't
```

1    bring that information this morning.

2    Q.    Was it an older model car or a relatively new model

3    car?

4    A.    It wasn't an old model car, but it wasn't a new.  I

5    would say maybe eight to ten years old.

6    Q.    And you were driving a police car?

7    A.    Yes, ma'am.

8    Q.    Tell me about the engines in those cars?

9    A.    The one I was driving runs pretty good.

10   Q.    Do you think David Donnie Williams thought he could

11   outrun you to keep from getting a ticket in that

12   car he was driving?

13        MR. AUSBORN:  I object to his mental operation.

14        THE COURT:  Sustained.

15   Q.    When you say you had been over to remove David

16   Donnie Williams from Ms. Callie Williams' house,

17   would that have been before April 17th or after

18   April 17th?

19   A.    Let me make a notation -- I believe it was in the

20   second or third month, I believe.  I thought I had

21   written that down in my notes, but it was Ms. Joley

22   and Nathan Williams went down.

23        There was a trespass paper issued that he

24   should not go back to Ms. Williams' residence.

25        We went down and told Donnie, all three of us,

```
 1          verbally, not to go back to the residence.    And I
 2          am not sure which officer, they didn't put it on
 3          the trespass paper.  He was given a copy of the
 4          trespass notice later.
 5   Q.    But you did verbally tell him not to go back?
 6   A.    Yes, ma'am.
 7   Q.    And at that time you removed him?
 8   A.    We were there until he left the premises, yes,
 9          ma'am.
10   Q.    And that would have been in close proximity to what
11          occurred on April 17th?
12   A.    Prior to that date, yes, ma'am.
13   Q.    Who ultimately arrested David Donnie Williams?
14   A.    I picked him up on that morning, early that morning
15          on the 19th of April.
16   Q.    Did you arrest him at Ms. Callie Williams' house?
17   A.    No, ma'am, on Johnson Street.
18   Q.    Does Mrs. Johnson stay on Johnson Street?
19   A.    No, ma'am, she doesn't.
20   Q.    What was he doing when you arrested him?
21   A.    He was just standing there next to a car.
22   Q.    So he wasn't in bed when you arrested him?
23   A.    No, ma'am.
24   Q.    Have you taken statements from Ms. Callie Williams?
25   A.    Corporal Dean took statements from her on the same
```

```
 1           day we had the speed chase with him.

 2   Q.    Did you have a chance to talk to her?

 3   A.    Not that morning.

 4   Q.    Have you ever had a chance to observe her after

 5           having been called down to the house with some

 6           domestic violence with her and David Donnie

 7           Williams?

 8   A.    We have seen her a time or two but not to actually

 9           have a conversation.

10   Q.    Okay.  When you stayed there until Donnie Williams

11           left that day, did you see Ms. Callie Williams

12           there?

13   A.    She was in the residence, I believe.  I didn't go

14           in, but I stood on the steps outside.  The children

15           were there.

16   Q.    And when was the first time you talked to me about

17           this case?

18   A.    I think I talked to you yesterday morning.

19               I'm not sure about any of the others, but

20           probably on a previous occasion.  We've had a lot

21           going on.

22   Q.    Have I ever suggested to you what to say when you

23           got on the stand?

24   A.    No, ma'am.

25   Q.    Have you ever had to arrest Ms. Callie Williams for
```

```
 1            anything?
 2   A.   Not to my knowledge.
 3   Q.   Is it your understanding that she was at fault in
 4            anything that occurred on April 17th, 2004?
 5   A.   No, ma'am.
 6   Q.   Whenever you've had to go over to her residence to
 7            remove Donnie Williams, was there ever any
 8            indication that Ms. Callie Williams was at fault?
 9   A.   No, ma'am.
10   Q.   Nobody ever told you that she did anything to him,
11            did they?
12   A.   No, ma'am.
13   Q.   Tell me what the purpose of a trespass paper that
14            was issued -- what's the purpose of that piece of
15            paper?
16   A.   That's to keep anyone from going back to a
17            residence or to keep them away from a residence.
18   Q.   Are you familiar with a PFA?
19   A.   Repeat the question.
20   Q.   Protection from abuse?
21   A.   I understand that there are papers that are served
22            or issued to keep people from being harassed or
23            abused by others, yes, ma'am.
24   Q.   And you kind of said the same thing.  I want to
25            know if they are basically the same thing.
```

```
 1   A.    Trespass, the way I understand it, is issued by the
 2         circuit clerk, which we deal with more than we do
 3         anything else.  We have judges to sign orders to
 4         keep people away.  This is basically served by the
 5         circuit clerk.
 6   Q.    But their purpose is the same?
 7   A.    Yes, ma'am.
 8   Q.    Have you ever told Ms. Williams to go up and file
 9         for a protection from abuse?
10   A.    I don't think I ever mentioned that to her.
11   Q.    Okay.  And whether or not there was a PPFA or
12         trespass notice, both of them mean the same thing,
13         they are both pieces of paper, aren't they?
14   A.    Yes, ma'am.
15   Q.    They don't physically stop anyone from doing
16         anything, do they?
17   A.    Not physically, no, ma'am.
18   Q.    Have you ever had to escort any of Ms. Williams'
19         children?
20   A.    No, ma'am.
21   Q.    I know you said you had dealings in the past with
22         Donnie.  I don't want to know what they are.  But I
23         want to know if there is any reason why you would
24         have a bone to pick with Donnie or be out to get
25         him?
```

```
 1   A.   Not just out to get him, no, ma'am.

 2   Q.   He hadn't done anything to you and you told him,

 3        I'm coming to get you Donnie?

 4   A.   No, ma'am.

 5   Q.   I haven't told you anything like, We are going to

 6        get Donnie Williams, have I?

 7   A.   No, ma'am.

 8   Q.   You have been in court with me on a number of

 9        occasions, haven't you?

10   A.   Yes, ma'am.

11   Q.   Have I ever said anything like that?

12   A.   No, ma'am, not to my knowledge, no.

13             MRS. PENN:  Those are all of the questions I

14        have at this time.  Thank you.

15                     CROSS EXAMINATION

16   BY MR. AUSBORN:

17   Q.   Mr. Freeman, I'm Keith Ausborn, and if ask you a

18        question you don't understand, bring it to my

19        attention and I'll be glad to clarify that.

20             I represent Donnie Williams.  Have you and I

21        ever met before, that you recall?

22   A.   No, sir, not that I recall.

23   Q.   Now, have you seen the indictments, the two

24        indictments in this case?  Has anybody showed you

25        the two indictments in the case?
```

```
 1   A.   No, sir.

 2   Q.   Has the State of Alabama informed you of the fact

 3        that Mr. Donnie Williams has been indicted on two

 4        separate charges?

 5   A.   I have not seen any indictments on that.

 6   Q.   Do you know what he is charged with, by the way?

 7   A.   Only that I am here to testify on what I had to

 8        deal with on the 17th.

 9   Q.   Now, and the 17th, let's talk about that.

10             The 17th, I want to take you back to the 17th.

11        You testified previously -- of course, you knew Mr.

12        Donnie Williams; is that right?

13   A.   Yes, sir.

14   Q.   Y'all had worked together; is that correct?

15   A.   We worked together, yes, sir.

16   Q.   Now, where was that, by the way?

17   A.   Johnson's Foodland, a grocery store.

18   Q.   Okay.  April 17th, 2004, the State of Alabama has

19        accused my client, Mr. David Donnie Williams, for

20        stalking Callie Williams on April 17, 2004.

21             You didn't see that, did you?  Am I right about

22        that?

23   A.   I didn't see that, no, sir.

24   Q.   The State of Alabama has accused my client, Mr.

25        David Donnie Williams, for harassment, i.e.,
```

```
 1              domestic violence against Callie Williams on March
 2              30th.  You didn't see that either; am I correct?
 3    A.        I didn't see it, no, sir.
 4    Q.        You have been in law enforcement for about
 5              twenty-nine years; is that correct?
 6    A.        Twenty-two and a half.
 7    Q.        And in that capacity, would you agree, you have
 8              seen a lot of strange stuff come up in law
 9              enforcement?
10    A.        Yes, sir.
11    Q.        One of those phenomenons that come up in law
12              enforcement is that people sometimes, many times,
13              will unfairly use and exploit the system, the
14              criminal justice system for their own personal
15              gain.  You have seen that?
16    A.        Yes, sir, I have seen some things.
17    Q.        And one example of that is if I have got a beef --
18              if a person has a beef -- Party A has a beef with
19              Party B, one way in which they may use to exploit
20              the system is to allege and file false charges
21              against that person in order to vendetta against
22              that person, and they use the system as the
23              leveraging tool.  You have seen that happen, have
24              you not?
25    A.        I have seen the system misused, yes, sir.
```

```
 1   Q.   And in this case, you don't know whether or not
 2        that happened in this case?  It is just possible
 3        that's what happened and that's what's happening in
 4        this case?  Am I correct about that?
 5   A.   I can't say that it's happened in this case.
 6   Q.   But it could be?  Because, again, as you testified
 7        to, I didn't see Mr. David Donnie Williams harass
 8        her, domestic violence against her on March 30th?
 9            You admit that?
10   A.   I didn't see it.
11   Q.   I didn't see Mr. David Donnie Williams stalk her on
12        April 17th, 2004; you admit that?
13   A.   I didn't see it.
14   Q.   So as far as you know, it is possible she could
15        have made up these allegations, that's possible;
16        isn't that correct?
17   A.   It's possible.
18   Q.   And you would agree that the image many times that
19        a person portrays in public, many times is
20        significantly different than the private image; am
21        I right?
22            MRS. PENN:  I object, Your Honor.
23            MR. AUSBORN:  I didn't ask that question.
24            THE COURT:  Let's hear the question again.
25            Whose public image?  That might help.
```

| | | |
|---|---|---|
| 1 | Q. | In this case, you knew Mrs. Callie Williams; is |
| 2 | | that correct? |
| 3 | A. | Yes, sir. |
| 4 | Q. | Openly, it was rumored -- |
| 5 | | MRS. PENN: I object, Your Honor. |
| 6 | | MR. AUSBORN: Okay. Okay. I can get around |
| 7 | | it. |
| 8 | Q. | Now, April 17th, you got a call from dispatch; is |
| 9 | | that correct? |
| 10 | A. | (Witness nods affirmatively.) |
| 11 | Q. | And you were dispatched to AG's Grocery; is that |
| 12 | | correct? |
| 13 | A. | Yes, sir. |
| 14 | Q. | And were you dispatched to AG's Grocery as a result |
| 15 | | of Ms. Callie Williams? |
| 16 | A. | I received a call that Ms. Callie Williams called |
| 17 | | -- that Ms. Callie had called. |
| 18 | Q. | She apparently had called in to the police? |
| 19 | A. | Yes, sir, that's what we were advised. |
| 20 | Q. | Now, April 17th, help us out, if you will, you |
| 21 | | didn't have an arrest warrant for Donnie Williams |
| 22 | | on April 17th; is that correct? |
| 23 | A. | That's correct. |
| 24 | Q. | So Mr. Donnie Williams wasn't running from the law |
| 25 | | because he had an arrest warrant and he knew you |

```
 1          had an arrest warrant for him, because that's
 2          impossible; is that correct?
 3   A.     I didn't know about a warrant until later.
 4   Q.     Now, the question has come up in my mind and the
 5          question has come up in the jury's mind as to why
 6          he ran, why he took off.  Let's see if you can help
 7          us with that.
 8              David Donnie Williams previously in the past --
 9              MRS. PENN:   I don't want you to testify.  I
10          just want you to ask a question.  That's my
11          objection.
12              MR. AUSBORN:  Okay.
13   Q.     Have you ever made a traffic stop on David Donnie
14          Williams in the past for improper equipment,
15          improper tag, or anything like that?
16   A.     Yes, sir.  I have written him several tickets.
17   Q.     And, furthermore, one or more other tickets you
18          might have written on him, correct me if I am
19          wrong, is driving while suspended or revoked?
20   A.     That's correct.
21   Q.     In your experience in law enforcement, twenty-two
22          years seniority here, have you seen instances in
23          which a person continues to drive without a license
24          and then when they see the police, they take off
25          because they don't want to be stopped again and
```

```
 1        arrested for driving while revoked?

 2   A.   Yes.

 3   Q.   You have seen that happen?

 4   A.   Yes, sir.

 5   Q.   In this case, is it not possible that when he saw

 6        you and knew it was you and knew you had stopped

 7        him before for driving while revoked, arrestable

 8        offense, he took off, that's possible?

 9   A.   It's possible.

10   Q.   And that, of course, would give rise and

11        explanation in terms of why he took off, reasonable

12        explanation; isn't that correct?

13   A.   Could be, yes, sir.

14   Q.   Now, let's talk about the trespass notice.

15             You didn't serve that on Donnie Williams; is

16        that not right?

17   A.   I didn't serve the paper on him, no, sir.

18   Q.   And you would agree that you didn't issue that --

19        to the best of your knowledge and information, you

20        understand that Mr. Jernigan issued that trespass

21        notice and issued it to the Union Springs Police

22        Department to be served; is that correct?

23   A.   Yes.

24   Q.   And as you correctly stated, you never served it;

25        is that correct?
```

```
 1   A.   I didn't serve it.

 2   Q.   You would agree that since you were not there on

 3        the date in which it is alleged and reputed that it

 4        was served, you cannot confirm that it was, in

 5        fact, served; you agree with that?

 6   A.   Yes, sir.

 7   Q.   Wouldn't you further agree that if it is not

 8        served, he is not put on notice, because his

 9        ability to be noticed of it is directly attributed

10        to it being properly served?  You agree with that?

11   A.   No, sir.  I gave him verbal notice.

12   Q.   Let's talk about that.

13             When you gave him verbal notice, you didn't

14        have it in your hand?

15   A.   That's correct.

16   Q.   And you obviously couldn't break it out and say,

17        okay, I've got a trespass notice signed by Mr.

18        Wilbert Jernigan saying you are enjoined from

19        having any further contact at such and such address

20        with Ms. Callie Williams; is that correct?

21   A.   We didn't serve the paper.

22   Q.   Now, there is a difference, a major difference,

23        between a trespass notice and an injunction issued

24        by this court; namely an ex parte order grating

25        protection from abuse.  They are like night and
```

```
 1          day; you would agree with that?
 2   A.    They are both paper, but there is differences, yes,
 3          sir.
 4   Q.    One of the differences is that a trespass notice is
 5          not sanctionable by this court if it is violated,
 6          but an ex parte --
 7              MRS. PENN:    I object, Your Honor.  He is
 8          testifying.  He can ask a question of whether or
 9          not he knows.
10              THE COURT:    Ask a question.
11   Q.    Are you aware that a trespass notice is not
12          sanctionable by this court if it is violated, but,
13          yet, an ex parte order, if it is violated, it is
14          sanctionable by this court?
15   A.    Yes, sir.
16   Q.    And to the best of your recollection, no
17          application was sought by Ms. Callie Williams for a
18          petition for an order of protection from abuse; is
19          that correct?
20   A.    Not to my knowledge.
21   Q.    Did you tell her that this was a remedy, a relief
22          that she was entitled to?
23   A.    I have had very little communication with her about
24          it.  I don't remember me having told her anything
25          about it.
```

```
 1    Q.   And to the best of your knowledge, information and

 2         belief, she didn't seek that remedy, did she?

 3    A.   I don't know what she did as far as that's

 4         concerned, no, sir.  I don't have knowledge of

 5         that.

 6    Q.   Now, in your experiences, twenty-two years, you

 7         have seen instances in which a person says, I don't

 8         want to have anymore contact with that person?

 9         That's what they represent to law enforcement, but,

10         yet, on the other hand, secretly and privately,

11         they continue to engage contact with that person?

12         You have seen that?

13    A.   Yes, sir.

14    Q.   And it is possible that in this case that's exactly

15         what was happening; she could have still be having

16         contact with him?  That's possible?

17    A.   Yes, sir, it's possible.

18    Q.   And if she's having contact with him, okay, that's

19         not a violation by him of any notice because she's

20         engaging him; wouldn't you agree with that?

21    A.   Yes, sir.

22    Q.   Now, April the 19th, when you finally caught up

23         with Mr. Williams, he wasn't in his car at that

24         time, was he?

25    A.   No, sir.
```

```
 1   Q.   And on that date, you spoke with him and you did

 2        ascertain that he was driving the car on April

 3        17th; is that correct?

 4   A.   Yes, sir, he admitted it.

 5   Q.   And Donnie candidly admitted that.  And did you

 6        give him two tickets at that time?

 7   A.   Yes, I did.

 8   Q.   And one ticket you gave him, was it driving while

 9        revoked or suspended?

10   A.   I gave him two tickets:  One was for attempting to

11        elude and one was for reckless driving.

12   Q.   And to the best of your knowledge or information,

13        he didn't have a current driver's license; is that

14        correct?

15   A.   I didn't run a current check on him.  I had the

16        other basic information.  I did not write him a

17        ticket for that.

18   Q.   And you would agree that was one such ticket you

19        could have written; is that correct?

20   A.   I could have.

21   Q.   In fact, even on April 17th, just him being behind

22        the wheel of a car?

23           MRS. PENN:   I object, Your Honor.  Assuming

24        facts not in evidence.

25           MR. AUSBORN:   That's in evidence.  We stipulate
```

```
 1         that he was driving the vehicle.

 2              THE COURT:  Could you have written him a ticket

 3         for driving while revoked?

 4              THE WITNESS:  Yes, sir.

 5              THE COURT:  Next question.

 6    Q.   Now, you obviously are not here to color or slant

 7         your testimony in favor of the State, or for that

 8         matter, in favor of the defense; is that correct?

 9    A.   I'm here to tell the truth.

10    Q.   Tell the truth.

11              And in summation, if we cook your testimony

12         down to two precepts, they would be, one, I cannot

13         say that Donnie Williams stalked Ms. Callie

14         Williams on April 17th.  That's Point Number 1.

15              You agree with that?

16    A.   I didn't see him.

17    Q.   And you didn't see him stalk her on April 17th,

18         2004, nor did you hear him stalking her on April

19         17, 2004; isn't that true?

20    A.   That's true.

21    Q.   And precept Number 2, March 30, 2004, I did not see

22         Mr. David Donnie Williams harass, i.e., commit

23         domestic violence against the person of Ms. Callie

24         Williams; that's also correct?

25    A.   I didn't see it.
```

```
 1    Q.    And, likewise, you didn't hear that; isn't that
 2          correct?
 3    A.    That's right.
 4              MR. AUSBORN:  Nothing further for this witness,
 5          Your Honor.
 6              THE COURT:  Redirect.
 7                        REDIRECT EXAMINATION
 8    BY MR. PENN:
 9    Q.    Do you think Callie Williams exploited the system
10          when she filed these charges against Donnie
11          Williams?  Do you have any reason to believe that?
12              MR. AUSBORN:  I don't know if he can accurately
13          answer that question.
14              He can only testify to what is in his --
15              THE COURT:  I think you laid the foundation
16          when you asked the question about had the system
17          been exploited.
18    Q.    Do you believe that in this situation Callie
19          Williams exploited the system?
20    A.    I don't think so.  My personal opinion, no.
21    Q.    In your opinion as a police officer, do you have
22          any reason to believe that Callie Williams
23          exploited the system?
24              MR. AUSBORN:  I think this is objectionable
25          also.  He's not an expert, so I don't believe he is
```

```
 1              qualified.
 2                   THE COURT:   It's been asked and answered.
 3              Next question.
 4    Q.   I think you were asked if this court could sanction
 5         the violation of a trespass notice and you said no;
 6         is that correct?
 7    A.   The way that I probably perceive that would be the
 8         trespass would be, no, it would be up to the
 9         officers to press the charges to do something
10         different.
11    Q.   So, in fact, if you were to go out and tell someone
12         that they have trespassed from being in places that
13         is just as effective as serving a piece of paper?
14    A.   Yes, ma'am.
15    Q.   And after you have told that person that, if they
16         are in a place that you have told them they have no
17         business being, when you go out there, can you
18         arrest them?
19    A.   Yes, ma'am.
20    Q.   And who will hear that case?
21    A.   Our judges.
22    Q.   In this court; is that correct?
23    A.   That's correct.
24    Q.   So a trespass notice, verbally or written, is
25         sanctionable by this court; is that correct?
```

```
 1    A.    Yes, ma'am, it is.

 2    Q.    Whether or not Callie Williams had him back at her

 3          house -- and I'm not saying that she did -- after

 4          she had him trespassed, but whether or not she

 5          said, Donnie, come back over here, it is not your

 6          testimony that he's not in violation of the

 7          trespass if he comes over there?

 8    A.    If he goes back over there after being told not to,

 9          he's in violation.

10              MRS. PENN:  Those are all of the questions I

11          have.

12                        RECROSS EXAMINATION

13    BY MR. AUSBORN:

14    Q.    Officer Freeman, you were asked the question about

15          in terms of trespass notice, whether or not it is

16          violated, if it is sanctionable by the court.

17              To the best of your knowledge, has Mr. David

18          Donnie Williams ever been charged with trespassing

19          in violation of that notice of trespass?

20    A.    I don't remember if there has been a criminal

21          trespass charge on him or not.  I don't remember.

22    Q.    And I think the record will reflect that he is not

23          on trial for trespassing, and you have no

24          information that would dispute that fact?

25    A.    I don't have anything that I know of right now, no,
```

```
 1          sir.
 2               MR. AUSBORN:  Okay.  No further questions.
 3               MRS. PENN:  I don't have anything else for this
 4          witness.
 5               THE COURT:  Thank you, Lieutenant.  Next
 6          witness.
 7               MRS. PENN:  The state calls Lakeisha Williams.
 8                      LAKEISHA WILLIAMS
 9      having first been duly sworn, testified as follows:
10                      DIRECT EXAMINATION
11    BY MRS. PENN:
12    Q.    Good morning.  How are you?
13    A.    Good morning.
14    Q.    Tell the ladies and gentlemen of the jury your
15          name, please.
16    A.    Lakeisha Williams.
17    Q.    Are you related at all to Ms. Callie Williams?
18    A.    Yes, that's my mother.
19    Q.    That's your mother?
20    A.    Yes.
21    Q.    How old are you?
22    A.    Twenty-one.
23    Q.    How do you know Donnie?
24    A.    I remember when he used to date my mom.
25    Q.    He used to date your mother?
```

```
 1    A.    Yes.

 2    Q.    Tell me about the relationship between your mother

 3          and David Donnie Williams.

 4    A.    At the time while they was going together -- at

 5          first, it started off well, but I guess it started

 6          getting all confused and then he started fighting

 7          her and just --

 8    Q.    When you say he was fighting her, would there be

 9          instances where you actually witnessed that?

10              I am not talking about anything your mama told

11          you.

12    A.    Yes.

13    Q.    You actually witnessed the fighting?

14    A.    Yes.

15    Q.    Before I let you go on, let me clear this up before

16          I forget.  I talked to you, didn't I?

17    A.    Yeah.

18    Q.    I have talked to you about this case, haven't I?

19    A.    Yes.

20    Q.    And tell the ladies and gentlemen of the jury how

21          many times I talked to you.

22    A.    You talked to me and you told me to tell the truth.

23    Q.    I want to know how many times I talked to you,

24          though.

25    A.    One time.
```

```
 1    Q.    And when was that?

 2    A.    It was yesterday.

 3    Q.    I didn't even talk to you this morning when you

 4          came in, did I?

 5    A.    No.

 6    Q.    Were you in there yesterday when I talked to your

 7          sister and your brother?

 8    A.    No.

 9    Q.    In my office yesterday morning when I talked to

10          your sister and brother?

11    A.    No.

12    Q.    Do you recall when I -- what time did you come to

13          my office yesterday morning?

14    A.    Around 7:30.

15    Q.    Who came with you?

16    A.    Myself, my mom.

17    Q.    And who else?

18    A.    And my sister and my brother.

19    Q.    All of y'all came together; right?

20    A.    Yeah.

21    Q.    Is there any time that I took Quadarius or Narkesha

22          out of the room where we were all sitting?

23    A.    Yes.

24    Q.    I took them out of the room?

25    A.    Yes.
```

```
 1   Q.   Where did I take them to?

 2   A.   You took them outside to sit on the bench outside.

 3   Q.   And did I talk to your mom at that point?

 4   A.   You talked to her before me.

 5   Q.   I talked to her before you?

 6   A.   Yes.

 7   Q.   Did you hear me say anything to your sister and

 8        brother?

 9   A.   No.

10   Q.   Have they ever told you that I told them to say

11        something that wasn't true?

12   A.   No.

13   Q.   When I talked to you about this case, did I tell

14        you what to say?

15   A.   No.

16   Q.   Tell the ladies and gentlemen of the jury what I

17        said to you when I talked to you.

18   A.   Well, she told me to tell the truth and that was it

19        and tell what I know.

20   Q.   Tell what you know.

21             And when I said, tell what you know, I said I

22        want to know what you saw and what you heard; is

23        that correct?

24   A.   Yes.

25   Q.   And I didn't want to know anything that anybody
```

```
 1            told you, did I?

 2    A.      Right.

 3    Q.      And you said that you were present when David

 4            Donnie Williams and your mother had fights?

 5    A.      Yes.

 6    Q.      Can you tell me any recent events?  You know what

 7            we are here about, don't you?

 8    A.      Yes.

 9    Q.      We are here about complaints that your mom made on

10            March 25th, the 30th, and April 17th.

11               Do you remember those dates?

12    A.      Yes.

13    Q.      Was your mother living with you during that time?

14    A.      Yes.

15    Q.      And were you a witness to any of the events that

16            occurred during that time span?

17    A.      Yes, except for the 17th of April.

18    Q.      You were not there on the 17th, were you?

19    A.      No.

20    Q.      And you don't know what happened on the 17th, do

21            you?

22    A.      No.

23    Q.      And you can't testify to that, can you?

24    A.      No.

25    Q.      Tell me what date that I mentioned that you can
```

| | | |
|---|---|---|
| 1 | | testify to. |
| 2 | A. | March 25th and March 30th. |
| 3 | Q. | Tell the ladies and gentlemen of the jury what |
| 4 | | happened on March 25th. |
| 5 | A. | On March 25th, I went to pick up my mom from work, |
| 6 | | and he was standing out there -- David was standing |
| 7 | | out there at the guard shack.  I guess he was |
| 8 | | waiting on her to come out. |
| 9 | | And when I pulled up, she was afraid to come to |
| 10 | | the car because she thought he was going to jump on |
| 11 | | her or whatever, and somebody pulled him away or |
| 12 | | whatever, and she got in the car.  And after we |
| 13 | | pulled off, then he followed us around town.  So we |
| 14 | | went to the police station about that. |
| 15 | Q. | Okay.  And your mom made a report that night, |
| 16 | | didn't she? |
| 17 | A. | Yes. |
| 18 | Q. | And I'm going to show you what's been marked |
| 19 | | Defendant's Exhibit 1. |
| 20 | | There is a date in the top left-hand corner if |
| 21 | | you are facing it.  What's the date on that report, |
| 22 | | top left corner? |
| 23 | A. | March 25th. |
| 24 | Q. | And what time is next to that? |
| 25 | A. | 1:00 -- 1:15. |

```
 1   Q.   A.m. or p.m.?

 2   A.   A.m.

 3   Q.   So that's 1:15 in the morning; is that correct?

 4   A.   Yes.

 5   Q.   How long was he following you after you picked your

 6        mom up from work?

 7   A.   He followed us for about ten minutes because we

 8        were trying to get away from him.

 9   Q.   And then you went up to the police station?

10   A.   Yes.

11   Q.   Tell the ladies and gentlemen of the jury if that

12        was a regular occurrence.

13   A.   Yes, it was, daily.

14   Q.   I'm sorry?

15   A.   It was daily.

16   Q.   I didn't understand what you said.

17   A.   It was daily.  He followed us on a regular basis.

18   Q.   It was daily.

19             What would be some of the places he would

20        follow you from or to?

21   A.   He would follow me in the morning time when I would

22        take my son to school, and he would follow me in

23        the evening time when she would pick her children

24        up.  And one night he followed me down Sardis Road,

25        past Sardis, trying to run me off the road.
```

```
 1   Q.   Tell me about that date.  Do you remember the date?

 2   A.   No, I don't remember the date, but I remember when

 3        it happened.

 4   Q.   Was it after March 25th?

 5   A.   I don't remember.

 6   Q.   And was he just following you?  Tell me how fast

 7        you were going.

 8   A.   I went up to almost 100 miles an hour trying to get

 9        away.  He got on the left side of the road, trying

10        to push me off the road.  And so I kept going until

11        I decided that I was going to try to slow down, and

12        he was going to keep going.  So I turned around in

13        the road.  And after I turned around, he got back

14        on the left side of the road.  And all of a sudden,

15        he had a blow out.

16   Q.   So he is traveling beside you?

17   A.   Yes.

18   Q.   And you are speeding, trying to get away from him?

19   A.   Yes.

20   Q.   And he is in the wrong lane?

21   A.   Yes.

22   Q.   And tell us how you turned around in the road.

23   A.   I just turned around in the middle of the road.

24   Q.   You pulled over and you turned around in the middle

25        of the road?
```

```
 1    A.    Yes.

 2    Q.    And were you heading back towards town at that

 3          time?

 4    A.    Yes.

 5    Q.    And did he turn around to follow you?

 6    A.    Yes.

 7    Q.    And did I understand your testimony to be, that

 8          once you were heading back to town, he proceeded to

 9          get on the wrong side of the road again?

10    A.    Yes.

11    Q.    And how long did that last?

12    A.    It lasted for about fifteen minutes.

13    Q.    About fifteen minutes from start to finish?

14    A.    Uh-huh (affirmative response).

15    Q.    And he had a blow out?

16    A.    Yes.

17    Q.    And did you go to the police at that point?

18    A.    Yes.

19    Q.    You did?

20    A.    Uh-huh (affirmative response).

21    Q.    Did anybody go with you?

22    A.    Nobody but my son.

23    Q.    Did you fill out a complaint and warrant?

24    A.    Yes.

25    Q.    Has that been heard in court yet?
```

```
 1    A.    No.
 2    Q.    I know about that time.  And you also said he used
 3          to follow you on a daily basis, and I know you told
 4          me he would follow you to take your son to school
 5          and he would follow your mother in the afternoons
 6          when she picked up the kids.
 7                Is there any other time he would follow?
 8    A.    If he would see her in the street anywhere, he
 9          would get behind her and start following her; even
10          me.
11    Q.    Did your mother have a vehicle?
12    A.    No, she was using my car.
13    Q.    Would there be times that you were in the car with
14          her when he was following?
15    A.    No.
16    Q.    She was by herself?
17    A.    Yes.
18    Q.    Tell me about what you know and when you were in
19          the car with her, okay.
20    A.    Okay.
21    Q.    Has there ever been a time that he followed her
22          when you were in the car?
23    A.    No.
24    Q.    But he has followed you?
25    A.    Yes.
```

```
 1   Q.   And you love your mother, don't you?

 2   A.   Yes.

 3   Q.   And you would do whatever it is to help her; is

 4        that correct?

 5   A.   Yes.

 6   Q.   Does that include lying in here today?

 7   A.   No.

 8   Q.   Are you here lying for your mother?

 9   A.   No.

10   Q.   Can you look these ladies and gentlemen of the jury

11        in the eye and tell them that you are telling the

12        truth?  Can you do that?

13   A.   Yes.

14   Q.   Tell me -- you said there were other instances

15        where you saw them fighting?

16   A.   Yes.

17   Q.   Can you tell me about any of those instances?

18   A.   Well, he used to fight her after she get off work,

19        accusing her of things that didn't happen, accusing

20        her of men, going places she didn't go and stuff.

21   Q.   And that would be after she got off work?

22   A.   Uh-huh (affirmative response).

23   Q.   And that would have been the same shift she was

24        working on March 21st?

25   A.   Yes.
```

```
 1    Q.   When you say fight her, did he physically touch
 2         her?
 3    A.   Yes.
 4    Q.   Did you see that?
 5    A.   Yes, plenty of times I seen it.
 6    Q.   Did you hear what was going on?
 7    A.   Yeah.
 8    Q.   Did you ever hear him threatening her?
 9    A.   Yes, all the time.
10    Q.   Tell me about the threats.
11    A.   Well, he be telling her, I'll kill you and I'll do
12         this and that, and I'll kill myself after I kill
13         you, and I'll kill your whole family.
14    Q.   Was there any times that you can recall that David
15         Donnie Williams said Callie, I don't want you?
16    A.   No.
17    Q.   Do you need to take a little break?
18    A.   (Witness shakes head.)
19    Q.   So he never told your mother that he didn't want
20         her?
21    A.   No.  She told him that she didn't want him anymore.
22    Q.   Has there ever been a time that your mother had to
23         leave her house?
24    A.   Yes.
25    Q.   Where did she go?
```

```
 1   A.   My house.

 2   Q.   And how long did she stay with you?

 3   A.   Until they locked him up.

 4   Q.   Until they locked him up?

 5   A.   (Witness nods affirmatively.)

 6   Q.   Was she afraid?

 7   A.   Yes.

 8   Q.   What was she afraid of?

 9   A.   He was talking about he was going to kill her and

10        stuff.

11   Q.   And she was afraid of him, wasn't she?

12   A.   Yes.

13   Q.   And she stayed at your house?

14   A.   Yes.

15   Q.   Did Donnie Williams ever come to your house?

16   A.   Yeah, he would knock on my windows and stuff and

17        knock on my door real loud, and I had neighbors and

18        stuff.  Sometimes it was real early in the morning.

19   Q.   I want to take you specifically to April 17th.

20             Do you remember that date?

21   A.   No, I don't remember that date.

22   Q.   Let me ask you specifically when you were with your

23        mom and you went to pick your sister up.

24             Do you remember that?

25   A.   Yes.
```

```
 1   Q.   Was there ever a time you went to pick your sister
 2        up and she wasn't there?
 3   A.   Sometimes I would go pick her up.
 4   Q.   Was there ever a time when you went with your
 5        mother to pick up Narkesha getting off the bus and
 6        she wasn't there?
 7   A.   Yeah, it was one time.
 8   Q.   And who was with you that time?
 9   A.   My mom.
10   Q.   Was anybody else with you?
11   A.   No, nobody but my son.
12   Q.   How old is your son?
13   A.   Five.
14   Q.   When you got to the house and she wasn't there, did
15        either of you get out of the car?
16   A.   No.  We locked the doors.
17   Q.   Did you leave?
18   A.   No.
19   Q.   About how long did you sit and wait before you saw
20        Narkesha?
21   A.   About two or three minutes.
22   Q.   And when you saw her, where did you see her?
23   A.   Well, at first we seen him across the railroad.  We
24        saw him coming from over there.
25   Q.   Did you know Narkesha was in the car?
```

```
 1   A.   Yeah, because we seen her in the backseat.

 2   Q.   And did he come straight over to where your mom

 3        lived?

 4   A.   Yeah.

 5   Q.   Where did he park?

 6   A.   Beside the road.

 7   Q.   Parked beside the road.

 8        And I think there has been some testimony that

 9        your mom was in that very first trailer beside the

10        roadway; is that correct?

11   A.   Yes.

12   Q.   Did David Donnie Williams get out of the car?

13   A.   Yes.

14   Q.   Did your sister get out of the car?

15   A.   Yeah, she got out.

16   Q.   Did she proceed to go and get in the car?

17   A.   He had her by the hand.  She couldn't get in the

18        car.

19   Q.   Was there anything that David Donnie Williams said

20        that day that you recall?

21   A.   Yeah, he was threatening her about her trespassing

22        him away from her properties, talking about I'll

23        kill you and all.

24   Q.   So he called her a bad name and told her he would

25        kill her?
```

```
 1    A.    Yes.

 2    Q.    Was there anything else that David Donnie Williams

 3          said that day?

 4    A.    No.

 5    Q.    Who opened the door?

 6    A.    My son opened the back door by mistake.

 7    Q.    Your son opened the back door?

 8    A.    Yes.

 9    Q.    Did Narkesha get in the car at that time?

10    A.    Well, he had her by the hand, and he grabbed my mom

11          through the back door, pulling on her shirt and

12          stuff.

13    Q.    Grabbed your mom,  pulling on her shirt through the

14          back door?

15    A.    (Witness nods affirmatively.)

16    Q.    And was the window down?

17    A.    No.

18    Q.    And she had her door locked?

19    A.    Yes.

20    Q.    Was she saying anything when he was pulling on her

21          shirt?

22    A.    That's when she was saying he was trespassing on

23          the property and calling her names and stuff.

24    Q.    That's when he was threatening her because she had

25          trespassed away from the property.
```

```
 1            And that's something you heard him say?
 2   A.   Yes.
 3   Q.   And you were driving the car that day?
 4   A.   Yes.
 5   Q.   Was he able to pull your mother out of the car?
 6   A.   No, he couldn't pull her out.
 7   Q.   What happened after he wasn't able to pull her out?
 8   A.   He just went ahead and let my sister get in the
 9        car.
10   Q.   And did you leave at that point?
11   A.   Yes.  And when I was trying to leave out the yard,
12        he pulled in front of me so I couldn't leave out
13        the yard.  I had to go around him.
14   Q.   Was he still on the roadway?
15   A.   Yeah.
16   Q.   Pulled across and blocked the driveway.
17            Was there ever a time when he was out of the
18        car that he walked up into your mother's yard?
19   A.   That's when he walked up in the yard when my sister
20        went to get in the car, and he pulled her by the
21        hand.
22   Q.   And we are talking about April 17th; is that
23        correct??  You told me you didn't know what day it
24        was, but you remember the incident; is that
25        correct?
```

```
 1    A.   Yes, uh-huh (affirmative response).

 2    Q.   Let me ask you this:  Can you count for me about

 3         how many times David Donnie Williams followed you?

 4    A.   It was every day.

 5    Q.   On a daily basis?

 6    A.   Yes.

 7    Q.   There has been some testimony in court about some

 8         charges that were filed in 2001.

 9              Are you familiar with those charges?

10    A.   Yes.

11    Q.   Who was the victim in those charges?

12    A.   Me and my mom.

13    Q.   Did you sign a complaint and warrant against Donnie

14         Williams?

15    A.   Yes.

16    Q.   Why?

17    A.   Because he had stolen property of mine and he

18         fought me.

19    Q.   He fought you?

20    A.   Yes.

21    Q.   Where did he fight you?

22    A.   In my mom's house.

23    Q.   Were those charges false?

24    A.   No.

25    Q.   When you filed them, did you just make that up?
```

```
 1    A.    No.

 2    Q.    And I think you said your mom was the victim.

 3          Did you see him do anything to her?

 4    A.    Yeah, he was at her at the time and that's when I

 5          jumped in the situation, because I didn't want him

 6          hitting on my mom.

 7    Q.    So you jumped in to help your mom?

 8    A.    Yes.

 9    Q.    And he fought you, too, didn't he?

10    A.    Yes.

11    Q.    And those weren't false charges, were they?

12    A.    No.

13    Q.    Have you told me all of the things that you

14          witnessed between David Donnie Williams and Callie

15          Williams between March 25th, March 30th and April

16          17th?

17    A.    Say what now?

18    Q.    Have you told me all you know about what happened

19          between March 25th, March 30th and April 17th?

20    A.    Yes.

21          MS. PENN:  Those are all of the questions I

22          have.

23          THE COURT:  Cross.

24                    CROSS-EXAMINATION

25    BY MR. AUSBORN:
```

```
 1   Q.   Ms. Williams, I am Keith Ausborn, and, of course, I
 2        represent David Donnie Williams.
 3             If I ask you a question and you don't
 4        understand it, bring it to my attention and I'll
 5        clear it up for you.
 6             Have you ever heard of the phrase, if you tell
 7        one lie, you got to tell two more to cover it up?
 8             Have you ever heard of something like that?
 9   A.   Yes.
10   Q.   Now, you love your mother?
11   A.   Yes.
12   Q.   You hate Donnie Williams?
13   A.   I don't hate him.
14   Q.   Now, your brother, Quadarius, I call him, do you
15        consider him being an honest individual?
16   A.   Yes.
17   Q.   Your sister -- is it Narkeisha?
18   A.   Yes.
19   Q.   Do you consider her as being honest?
20   A.   Yes.
21   Q.   Now, your mother has always had physical custody of
22        your two smaller siblings; is that right?
23   A.   Yes.
24   Q.   They have always stayed up under your mother's
25        roof; is that right?
```

```
 1   A.   Yes.

 2   Q.   Now, David Donnie Williams, is it your contention

 3        that he is a violent man?

 4   A.   Yes.

 5   Q.   Is that your contention?

 6   A.   (Witness nods affirmatively.)

 7   Q.   Is it your contention that he has a pattern of

 8        physically abusing your mother?

 9   A.   Yes.

10   Q.   Is it also your contention that he has a pattern of

11        physically abusing you?

12   A.   Yes.

13   Q.   Is it also your contention that he has a pattern of

14        abusing your younger brother?

15   A.   Yes.

16   Q.   And abusing your younger sister?

17   A.   Yes.

18   Q.   Is that your contention?

19   A.   Yes.

20   Q.   Now, you admitted your younger brother is honest?

21   A.   Yes.

22   Q.   And you don't know of any reason he would come in

23        to court under oath and lie; do you agree with

24        that?

25   A.   Yes.
```

```
 1    Q.    Am I right?

 2    A.    Uh-huh (affirmative response).

 3    Q.    Is it your contention that David Donnie Williams

 4          has physically abused your brother?  That's what

 5          you are testifying to; is that right?

 6    A.    Yes.

 7    Q.    Would it surprise you if your brother testified

 8          under oath that David Donnie Williams never laid a

 9          hand on him?

10          You are surprised to hear that, aren't you?

11    A.    He would if he could.

12    Q.    Would he be making that up?

13    A.    Huh-uh.

14    Q.    Surely, if David Donnie Williams has physically

15          abused him in the past, he would remember that,

16          wouldn't he?  You know of no memory lapse that your

17          brother has, do you?

18    A.    Huh-uh.

19    Q.    You don't know of any memory lapse, do you?

20    A.    No.

21    Q.    Your sister, would it surprise you to know that she

22          testified under oath that David Donnie Williams has

23          never attacked her or abused her in the past?

24          You know of no memory lapse that she has, do

25          you?
```

```
 1    A.    Nope.

 2    Q.    Would it surprise you to know your brother

 3          testified he has never, ever saw David Donnie

 4          Williams lay a hand on your mother?  Would that

 5          surprise you?  You know of no memory lapse in that

 6          respect either, do you?

 7    A.    (No response.)

 8    Q.    Would it surprise you to know your sister testified

 9          that she has never saw David Donnie Williams lay a

10          hand on your mother.  You know of no memory lapse

11          with respect to her testifying like that either; is

12          that not correct?

13    A.    Huh-uh (negative response).

14    Q.    Now, you are testifying openly in this court to the

15          ladies and gentlemen of the jury that David Donnie

16          Williams has physically assaulted with a pattern

17          your mother; is that what you are saying?

18    A.    Yes.

19    Q.    And, likewise, David Donnie Williams has a pattern

20          of physically assaulting you; is that what you are

21          saying?

22    A.    Yes.

23    Q.    And, likewise, your brother and your sister; is

24          that right?

25    A.    Yes.
```

```
 1   Q.   And isn't it strange that your brother, who you say
 2        is honest, and your sister, who you say is honest,
 3        their testimony is entirely different than your
 4        mother and your testimony?  That's odd; isn't that
 5        right?
 6   A.   No.
 7   Q.   Which one is true?  Who should this court believe,
 8        the two kids who say, I never saw David Donnie
 9        Williams hit my mama?  Or should they believe you,
10        who say, I seen him attack my mama all the time?
11        They both can't be right, can they?
12   A.   Well --
13   Q.   Something's wrong, something's odd, isn't it?  Now,
14        you say also that David Donnie Williams has beat
15        your mama up.  If I may characterize that and he
16        has done that all the time is that right?
17   A.   Uh-huh (affirmative response).
18   Q.   She has got off work and he just beat her up,
19        accuse her of sleeping with another man and all of
20        the sudden attack her; is that right?
21   A.   Yes.
22   Q.   You saw that happen?
23   A.   Yes.
24   Q.   Would it surprise you to know that your mother
25        never produced a single photograph showing a black
```

```
 1        eye.

 2              Did your mama suffer a black eye?

 3   A.   Yeah, she suffered one.

 4   Q.   She did?

 5   A.   Yes.

 6   Q.   Was her lip busted?

 7   A.   Plenty of times.

 8   Q.   Was she bruised in the face?

 9   A.   She had plenty of bruise marks.

10   Q.   Was she swollen?

11   A.   (Witness nods affirmatively.)

12   Q.   Is that your contention?

13   A.   (Witness nods affirmatively.)

14   Q.   Would it surprise you to know that your brother

15        stated he ain't never seen your mama with a black

16        eye?  Isn't that shocking?  He was there because

17        you admitted that at all times your brother has

18        stayed up under the same roof with your mother;

19        isn't that true?

20   A.   Yes.

21   Q.   If she had a black eye, he would know it because he

22        would see it?  Wouldn't you agree with that?

23   A.   (Witness nods affirmatively.)

24   Q.   That's a yes?  Am I right about that?

25   A.   Yes.
```

```
 1    Q.   Your brother don't wear glasses, do he?

 2    A.   Not at the moment.

 3    Q.   If your mama had a black eye, you know of no visual

 4         restriction that would stop him from seeing a black

 5         eye, do you?  You saw the black eye, you are saying

 6         that?

 7    A.   Yeah, I saw it.

 8    Q.   Can you tell us how it is that you saw it and Q

 9         didn't see it?

10    A.   I seen it with my own eyes.

11    Q.   Can you tell us how you saw it and Narkesha didn't

12         see it?

13    A.   She was a younger child then.  She didn't

14         understand then.

15.   Q.   She didn't understand?

16    A.   Nope.

17    Q.   You testified that this physical abuse has gone on

18         over the last seven years; isn't that your

19         testimony?

20    A.   Yes.

21    Q.   Has he beat your mama up in 2004?

22    A.   He has tried to.

23    Q.   Has he beat her up in 2003?

24    A.   Uh-huh (affirmative response).

25    Q.   Did she suffer bruises?
```

```
 1    A.    Yeah.

 2    Q.    A black eye?

 3    A.    Uh-huh (affirmative response).  In 2001 she did.

 4    Q.    Busted lip and everything else; is that what you

 5          are contending?

 6    A.    Uh-huh (affirmative response).

 7    Q.    Now, Narkesha would remember that, wouldn't she?

 8    A.    Yeah, but she was younger then.  She is a child and

 9          she don't understand.

10    Q.    Q wasn't a child then.  He'd know about it.  Now,

11          what this case is about, you talked to your mother

12          many times about this case, about Donnie Williams,

13          haven't you?

14    A.    Huh-uh.

15    Q.    You ain't never talked to your mama about Donnie?

16    A.    Not about this case.

17    Q.    What about Donnie?  Have you ever told your mama,

18          mama you ought to leave him alone, he ain't no

19          good?  You ever told your mama that?

20    A.    Yeah.

21    Q.    Many times, haven't you?

22    A.    Uh-huh (affirmative response).

23    Q.    You dating anybody right now?

24    A.    (Witness nods affirmatively.)

25    Q.    You are.
```

```
 1              You didn't approve of your mama shacking up
 2         with Donnie, did you?
 3              MRS. PENN:  I object, Your Honor; irrelevant.
 4              MR. AUSBORN:  That's a good question.
 5              THE COURT:  She can answer it.
 6    Q.   Did you?
 7    A.   Well, that right there wasn't none of my business.
 8    Q.   Excuse me?
 9    A.   It wasn't none of my business.
10    Q.   Okay.  Now, mama is a good person.  You agree with
11         that?
12    A.   Yes.
13    Q.   Mama is a smart person?
14    A.   (Witness nods affirmatively.)
15    Q.   Reasonable person?
16    A.   (Witness nods affirmatively.)
17    Q.   Is that a question?
18    A.   Uh-huh (affirmative response).
19    Q.   Rational person
20    A.   (Witness nods affirmatively.)
21    Q.   Is that a question?
22    A.   Yes.
23    Q.   Can you explain to these ladies and gentlemen of
24         the jury why mama, being a reasonable and rational
25         person, stayed with a man that beat her up over the
```

```
 1            last seven years?
 2    A.      Because she was in love with him.
 3    Q.      In love?
 4    A.      And he had talked her in many times of going back
 5            with him while he was locked up.
 6    Q.      In love.  So in love with a man to where when he
 7            wants to break the relationship off, mama comes up
 8            with these bogus charges to make sho' he don't
 9            leave?
10                MRS. PENN:  Your Honor, first of all he is
11            testifying.  And they are facts not in evidence.
12                THE COURT:  Sustained.
13    Q.      Have you ever heard the term crazy in love?  Ever
14            heard of that?
15    A.      Yeah.
16    Q.      Crazy in love means you do some crazy things while
17            you are in love.
18                That's basically what it means doesn't it?
19    A.      Yeah.
20    Q.      It is crazy to stay with a man who has beat you up
21            for the last seven years; that's crazy, ain't it?
22    A.      Yeah, it's crazy.  But when she try to work it out
23            then --
24    Q.      It is crazy to stay with a man you contend don't
25            pay you one dime towards bills or anything.  Isn't
```

```
 1        that crazy?

 2   A.   (Witness nods affirmatively.)

 3   Q.   That's crazy, isn't it?

 4   A.   It's crazy.  But when you love somebody, you love

 5        somebody.  And when they beat on you, you are not

 6        going to take it.

 7   Q.   It is crazy to stay with a man bringing crack

 8        around you and your kids, isn't it?

 9             MRS. PENN:  He is arguing facts not in

10        evidence.

11             THE COURT:  Sustained.

12   Q.   It is crazy to stay with a man that violently

13        assaults your kids.  Ain't that crazy?

14   A.   Yes.

15   Q.   You said Donnie ran you off the road?

16   A.   No.  He almost ran me off the road.

17   Q.   Almost ran you off the road.

18             What day was that?

19   A.   It was on a Saturday, but I don't remember the

20        date.  And my child was in the car.

21   Q.   You don't remember the date?

22   A.   No, I don't.

23   Q.   Do you remember the month?

24   A.   I remember what happened.

25   Q.   Donnie ain't on trial for harassment of you?
```

```
 1    A.    Yes, he have.  When he tries to run me off the road
 2          and my child is in the car and my child is in
 3          danger.
 4    Q.    My question to you is this:  You know that Donnie
 5          is on trial for harassment, domestic violence
 6          against your mother.  Am I right about that?
 7    A.    Right.
 8    Q.    And Donnie is on trial for stalking your mother;
 9          isn't that right?
10    A.    Right.
11    Q.    Donnie is not on trial for stalking you?
12    A.    He was doing that just to get her.
13    Q.    Answer my question.
14              Is Donnie on trial for stalking you?
15    A.    No, he is not.
16    Q.    Is Donnie on trial for committing harassment
17          domestic violence against you?
18    A.    No, he is not.
19    Q.    What this case is about, is about you and your
20          mother getting together and conspiring, talking
21          about how you can take down Donnie Williams because
22          you talked about it many, many times?
23    A.    No, we didn't.
24    Q.    Did you not?
25    A.    No, we didn't.  I don't know how we going to take
```

```
 1        him down.  Whatever happens, happens.  What he did,

 2        he did it.

 3   Q.   He did it.  He beat your mama up.  Were you brother

 4        and sister around when he beat your mama up?

 5   A.   Half of the time they was.  They couldn't sleep;

 6        lay there at night when she got off work.

 7   Q.   Couldn't sleep?

 8   A.   School nights.

 9   Q.   But they don't remember.  That's odd, isn't it?

10   A.   (No response.)

11   Q.   Is it possible that they don't remember because it

12        never happened?

13            That's the explanation for why they didn't

14        recall it and testify because it never happened;

15        isn't that right?

16   A.   No.

17   Q.   You say he has beat you up?

18   A.   Yes, he did.

19   Q.   Let me see one photograph showing you suffered an

20        injury at the hand of Mr. David Donnie?

21   A.   I didn't have any injury, but I had some scratches

22        and took it to the human resources.

23   Q.   Okay.  How tall are you?

24   A.   5' 5.

25   Q.   How much do you weigh?
```

```
 1    A.    105.

 2          MR. AUSBORN:  David, stand up a minute, please.

 3    Q.    David is about 5'10.

 4          MR. AUSBORN:  How tall are you?

 5          THE DEFENDANT:  5' 10.

 6          THE COURT:  He is not under oath.  If you want

 7          to put him on the stand --

 8    Q.    David is a whole lot bigger than you; am I right?

 9    A.    Uh-huh (affirmative response).

10    Q.    You said he attacked you?

11    A.    Uh-huh (affirmative response).

12    Q.    Did he hit you with fist?

13    A.    Yeah, I had scratches on my face.

14    Q.    Did he slap you like that or like that?  Which one?

15    A.    Both of them.

16    Q.    Both.  Beat you down like a man.  Is that what you

17          are telling this Court?

18    A.    Uh-huh (affirmative response).

19    Q.    Let me see your medical report that backs up your

20          injuries.

21    A.    I didn't have any injury.

22    Q.    He beat you up like that and you didn't have any

23          injuries?

24    A.    Because I defended myself.  I'm not going to sit up

25          and let him fight me.
```

```
1   Q.   You pretty strong?

2   A.   (Witness nods affirmatively.)

3   Q.   Did you get the best of David on that day when

4        y'all fought?

5   A.   I tried.

6   Q.   You tried to?

7   A.   (Witness nods affirmatively.)

8   Q.   Look like David -- You agree you got the best of

9        David and David ought to be in fear of you and not

10       you of David?  You agree with that?

11  A.   (Witness nods affirmatively.)

12  Q.   You in school right now?

13  A.   No.

14  Q.   How far did you go in school?

15  A.   To the 12th grade.  I graduated.

16  Q.   12th grade.  You ever had a subject, literature?

17  A.   Yes.

18  Q.   That's what you are doing right now.  You are story

19       telling right now, aren't you?

20  A.   No.

21  Q.   You ever took theater?

22  A.   Who?

23  Q.   You ever took theater in high school?

24  A.   No.

25  Q.   You ever aspired to be an actress?
```

```
 1    A.    No.

 2    Q.    You ought to check in to that one.

 3           You were asked on direct examination by

 4          Mrs. Penn about the 2001 ordeal when David

 5          violently assaulted you and your mom.  Do you

 6          recall that?

 7    A.    Uh-huh (affirmative response), yeah.

 8    Q.    David was not found guilty of assault against you

 9          and your mama.  You can't disagree with that;

10          that's the truth.  He wasn't found guilty of

11          assault; that's true.  Am I right about that?

12    A.    No.

13    Q.    Show me one court order that adjudicated David

14          Donnie Williams guilty of assault against your mama

15          in 2001.

16           You got one?

17    A.    (Witness shakes head negatively.)

18    Q.    Show me one court order adjudicating David Donnie

19          Williams guilty of assault in 2001 against

20          yourself.

21           You got one?  Yes or not, you got one?

22    A.    I don't have it with me.

23    Q.    You don't have it with you?

24    A.    (Witness shakes head negatively.)

25    Q.    The clerk's office may be closed right now, but I
```

```
 1              bet you they open up at 1:30.  You think you can go

 2              get me a court order saying he was found guilty of

 3              assault against you and your mama in 2001?  You

 4              think you can find that?  You think you can?

 5    A.        (No response.)

 6    Q.        You ain't going to find that because it don't

 7              exist; isn't that right.

 8                   MRS. PENN:  He is testifying.

 9                   MR. AUSBORN:  That's a question I'm asking,

10              counselor.

11                   MRS. PENN:  He's testifying.

12    Q.        Does it exist?

13    A.        It exist.  I know it do.

14    Q.        It does.  We'd like to see it.

15                   Now, you said David Donnie Williams had a

16              pattern of harassing you and harassing your mama

17              every day.  That's what you said, isn't it?

18    A.        Uh-huh (affirmative response).

19    Q.        Show me a warrant and affidavit where you filed

20              harassment charges against David Donnie Williams.

21                   You got one?

22    A.        (Witness nods affirmatively.)

23    Q.        You got one?

24    A.        Yeah.

25    Q.        Is that a yes?
```

```
 1   A.    Yeah.

 2   Q.    Can I see it so I can show it to the ladies and

 3         gentlemen of the jury?  Have you got it with you

 4         today?

 5   A.    Huh-uh (negative response).

 6   Q.    Did you ever go to the police station and ask for a

 7         trespassing, or go to the clerk's office and ask

 8         for a trespassing notice against Mr. David Donnie

 9         Williams to stop him from harassing you?

10   A.    I went to the police station.

11   Q.    Excuse me.

12   A.    I went to the police station and they should have

13         it on file.

14   Q.    You got a trespass notice that enjoins him from

15         having any contact with you?  You got that?

16   A.    (Witness nods affirmatively.)

17   Q.    I'd like to see it.

18             Did you ever go to this court clerk's office

19         and applicate, petition an order for protection

20         from domestic abuse against this young man you

21         contend has violently beat you over the last ten

22         years?  You ever did that?

23   A.    Yeah, I did.

24   Q.    I would like to see it.  So you say you've got a

25         petition for protection from abuse?
```

```
 1   A.   When he fought me in 2001, I do.

 2   Q.   And you got a notice of trespass.  You got that; is

 3        that right?  Is that right?

 4   A.   (Witness nods affirmatively.)

 5   Q.   Is that a yes?

 6   A.   Yeah.

 7   Q.   And you got a warrant and affidavit for harassment?

 8   A.   Yeah.

 9   Q.   You got that?

10   A.   Yeah.

11   Q.   We'd like to see it.

12             You know it is something serious when you got a

13        young man on trial for these trumped up charges

14        right here that you can't prove.  Tell the truth

15        and shame the devil.

16             Did your mama tell you to take this stand and

17        build a railroad around David Williams?

18   A.   Huh-uh (negative response).  I volunteered.

19   Q.   She didn't tell you that.

20             How did you come up with this?

21   A.   I didn't come up with anything.

22   Q.   And you still say you don't hate him?

23   A.   I don't hate anybody.

24   Q.   Whew, I'd hate to be your friend.  Whew.

25             And it is your testimony up under oath that
```

```
 1            everything you said is the truth and nothing but
 2            the truth?
 3    A.      (Witness nods affirmatively.)
 4    Q.      Now, finally, you testified that you saw this
 5            prosecutor, Mrs. Honorable Penn meet with your
 6            brother and sister separately.  You admitted that,
 7            didn't you?  Am I right about that?
 8    A.      (Witness nods affirmatively.)
 9    Q.      Is that a yes?
10    A.      She didn't talk to them.  She just told them to
11            tell the truth.
12    Q.      Hold on a minute, now.  Don't get ahead of me.
13                Did you see Mrs. Penn meet with "Q" and
14            Narkesha separately from you and your mama?
15    A.      I didn't see it.
16    Q.      You saw her -- Was it your testimony that you did
17            see her in the company of your brother and sister
18            separate from you and your mama?  You testified to
19            that?
20    A.      (Witness nods affirmatively.)
21    Q.      Am I right?
22    A.      (Witness nods affirmatively.)
23    Q.      Is that a yes?
24    A.      Yes.
25    Q.      Unless you was a little fly on the wall, you don't
```

```
 1          know what this prosecutor told Narkesha and "Q", do
 2          you?  You don't know, do you?  Am I right about
 3          that?  You don't know what she told them, do you?
 4          Do you?
 5               Is that a yes, you agree with that, you don't
 6          know?  Say I don't know.
 7               You're a big girl.  Go ahead and tell us the
 8          truth.
 9               Say I don't know.  Go ahead and look them in
10          the eye and tell them.  Say I don't know.
11     A.   I know one thing.  She didn't talk about this case.
12     Q.   Hold on.  I want you to tell them that.
13               Say, ladies and gentlemen of the jury, I don't
14          know what she told them.  Look them in the eye.  Go
15          ahead.  It's okay.  They regular folks just like
16          you and I.
17               Look them in the eye.  Can you do it?
18     A.   I don't know.
19     Q.   They want to see your eyes.  They want to make
20          contact with you.
21               Can you do it?
22     A.   I don't know.
23     Q.   My mama and dad always told me if a person can't
24          make --
25               MRS. PENN:  I object.
```

```
 1              MR. AUSBORN:  It's a question.  I'm going to
 2         frame it as a question.
 3    Q.   Mama and dad always told me if you can't look a
 4         person in the eye, you must got something to hide.
 5              Have you ever heard of that?
 6    A.   I don't have anything to hide.
 7    Q.   Have you ever heard of that, though?
 8    A.   Yeah, I've heard of it.
 9    Q.   Let's test you.
10              Look them in the eye and tell them, I don't
11         know what this prosecutor told my brother and
12         sister.
13    A.   I don't know what the prosecutor told my brother or
14         sister.
15              MR. AUSBORN:  No further questions of this
16         witness, Your Honor.
17              THE COURT:  Mrs. Penn, anything?
18              MRS. PENN:  Just a few follow-up questions,
19         Judge.
20                     REDIRECT EXAMINATION
21    BY MRS. PENN:
22    Q.   I want you to look over here.  Look at each one of
23         these jurors individually.  Look at them.  Tell
24         them that you lied to them about what happened on
25         April 17th.  Tell them.
```

```
 1   A.   (Witness laughs.)

 2   Q.   Is that what you did?  Did you lie to them about

 3        what happened on April 17th?

 4   A.   No, because I don't know what happened on April

 5        17th.

 6   Q.   Tell them that you lied to them about what happened

 7        when you got to that house and your sister was not

 8        there.  Can you tell them that you lied to them

 9        about that?

10   A.   No, because I didn't lie.

11   Q.   Do you have any idea why your sister and brother

12        would get up on the stand and tell anything that

13        wasn't true?

14   A.   I don't know because whatever they saw I believe

15        they would tell it, whatever they saw.

16   Q.   Were they nervous about coming up here today?

17   A.   A little bit.

18   Q.   And on April 17th when Donnie Williams brought your

19        sister back to the trailer, did you see him?  I

20        don't want to know what nobody else told you.

21            MR. AUSBORN:  Your Honor, I interpose an

22        objection.  It wasn't April 17th.  April 17th

23        wasn't the date.  It was actually March 30th.  We

24        just want it characterized --

25            THE COURT:  Sustained.
```

```
 1   Q.   March 30th, did you see exactly what you told the
 2        ladies and gentlemen of the jury?
 3   A.   Yes, I did.
 4   Q.   And several times it's been made to look like I've
 5        done something improper.
 6            When I talk to you about this case, was it a
 7        long talk?
 8   A.   No.
 9   Q.   Did I suggest to you that you needed to say that
10        Donnie had done anything to your mama?
11   A.   No.
12   Q.   I want you to think very carefully about this.  And
13        I know that you've talked to your mama about what
14        has happened in all of this.  You had to have
15        because she was staying with you; is that correct?
16   A.   Yes.
17   Q.   Tell the ladies and gentlemen of the jury if it is
18        true.  I want you to tell them that everything you
19        told us, your mama told you to say?
20   A.   My mama didn't tell me to say anything.  The only
21        thing she told me was to tell the truth and tell
22        what I saw.
23   Q.   And you are speaking the truth about what you saw?
24   A.   Yes.
25   Q.   You not speaking the truth about what Quadarius
```

```
 1          saw.  You are not speaking the truth about what
 2          Narkesha saw.  You can only tell us what you saw;
 3          is that correct?
 4   A.     Yes.
 5   Q.     And you saw what happened to your mother on March
 6          30th; is that correct?
 7   A.     Yes.
 8   Q.     And did you see any physical contact between her
 9          and Donnie on March 30th?
10   A.     Say that again.
11   Q.     On the day that he brought Narkesha back after
12          taking her from the front doorsteps, did you see
13          any physical contact between Donnie and your
14          mother?
15   A.     Yes.  He was pulling on her --
16   Q.     Sit here and look in the eyes of these jurors and
17          tell them that's what you saw?
18   A.     Yes, that's what I saw.
19   Q.     And you saw and heard Donnie Williams beating on
20          your door and on your window?
21   A.     Yes.
22   Q.     This stuff happened.  You are not a fiction writer,
23          are you?
24   A.     No.
25   Q.     Did you just make this up?
```

```
 1   A.   No.

 2   Q.   And how long has your mother and Donnie been

 3        dating?

 4   A.   It's been like -- I'm not sure; about six or seven

 5        years.

 6   Q.   Okay.  And Donnie has stayed with you on occasion;

 7        is that correct?

 8   A.   Not with me.

 9   Q.   Not with you, but with your mom?

10   A.   Yes.

11   Q.   And you said the relationship started out good at

12        first but soon went bad, did it not?

13   A.   Yes.

14   Q.   Six or seven years ago would have been what year if

15        you count back from 1997 -- seven years ago, 1998

16        six years ago.

17            It took from 1997 or 8 to 2004 for you to come

18        up with a story that David Donnie Williams harassed

19        and stalked your mother?

20   A.   No.

21   Q.   In fact, it's not a story, is it?

22   A.   No.

23   Q.   And you didn't make any of this up?

24   A.   No.

25            MRS. PENN:  That's all I have.
```

<u>RECROSS-EXAMINATION</u>

<u>BY MR. AUSBORN</u>:

Q.   Miss Williams, I notice that when you're questioned
     concerning the violent assault against you and your
     mother in the past, that hurts you.

          I notice that you -- you started to get teary
     eyed and break down and et cetera.  Would you agree
     with that?

          But I notice that when you did that, you only
     did that when this talented prosecutor questioned
     you.  You never did that when I questioned you.

A.   Can you tone your voice a little bit?

Q.   Excuse me.

A.   Can you tone your voice.

Q.   Now, who told you to do that?

A.   Nobody.  You getting rowdy with me like I said
     something wrong.

Q.   Who told you how to testify, break down in court
     and get the sympathy of this Court?

A.   Nobody.

Q.   Nobody told you that.

          You see that on tv?

A.   No.

Q.   You learn that on your own?  Don't you know if you
     are trying to get the sympathy from the Court, from

1      the ladies and gentlemen of the jury, you got to be

2      consistent?  You didn't break down when I

3      questioned you about this violent assault against

4      your mama?  I saw not one tear emerge from your

5      face.  But yet every time this prosecutor

6      questioned --

7            MRS. PENN:  Your Honor, I object to

8      mischaracterizing what happened here in court.

9            MR. AUSBORN:  The jury will remember, Your

10     Honor.

11           MRS. PENN:  You said every time.  Make it

12     right.

13           THE COURT:  Sustained.

14  Q.  Can you explain that?

15  A.  Explain what.

16  Q.  Did she do a better job of making you remember this

17     assault than I did?

18  A.  No.  It is what I saw and not what I heard and what

19     she told me.

20  Q.  She can break you down, but I can't?  She can make

21     you cry but I can't?

22           MRS. PENN:  Your Honor, asked and answered.

23           THE COURT:  Sustained.

24           MR. AUSBORN:  Nothing further or this witness,

25     Your Honor.

1      THE COURT:  Anything else for the prosecution?

2      MRS. PENN:  No.

3      THE COURT:  Hurry up and get down before they

4   ask you something.

5      (Whereupon the witness left the stand.)

6      THE COURT:  Come back at 1:30.  Keep in mind

7   the recess instruction.

8      (Whereupon the jury was given a lunch recess,

9       left the courtroom, and the following

10      proceedings were had outside the presence of

11      the jury:)

12                    **MOTIONS**

13      THE COURT:  For the Record, the State has

14   rested.

15      MRS. PENN:  Yes, Judge.

16      MR. AUSBORN:  May it please the Court.  At this

17   time, Your Honor, on behalf of the defendant David

18   Donnie, we would move for judgment of acquittal as

19   to both charges of the two respective indictments.

20      We believe that the State has woefully failed

21   to meet its requisite burden of proof by proving

22   beyond a reasonable doubt and by the smaller

23   standard of prima facie of showing that Mr. David

24   Donnie Williams has committed the two offenses with

25   which he is charged.

1    We reference to the Court that as to the

2    stalking case specifically, that the state has

3    failed to show that David Donnie Williams stalked

4    the respective victim on April 17th and would elude

5    to this Court that the State has called a number of

6    witnesses, all of which who have stated up under

7    oath could not testify that any stalking took place

8    on April 17th.  So therefore the alleged

9    contentions of the alleged victim are

10   uncorroborated.

11   We would further elude to this Court that the

12   credibility of the victim in this case has been no

13   doubt attacked and attacked with utmost vigor.

14   THE COURT:  You mentioned corroboration.

15   With regard to the stalking charge, do you have

16   any case that has a corroboration element,

17   something like the co-defendant's testimony?

18   MR. AUSBORN:  What's that, Your Honor?

19   THE COURT:  You mentioned corroboration as if

20   it is some sort of element like you would have in a

21   co-defendant situation.

22   MR. AUSBORN:  What we have, Your Honor, is the

23   law does not requisite that the testimony be

24   corroborated by the victim.  However, as the Court

25   is aware, when the victim and/or witness takes the

1    stand at all times that particular witness'

2    voracity is called into question.

3        So, therefore, in this case, if we have

4    effectively challenged, undermined, discredited the

5    testimony of the victim in this case, there is no

6    supporting testimony that would bolster, buttress

7    the State's contention.  And the State's charge in

8    stalking fails evidently because there is no

9    witness who can affirm that my client did in fact

10   stalk her on April 17th.

11       We further would indicate to the Court that by

12   the victim's own testimony, these parties had a

13   long-standing history of an on-and-off

14   relationship.  And the victim's witnesses, in fact,

15   have affirmed and the victim herself has affirmed

16   that he would come and go in her life.  And we

17   contend in this case that even if the State has

18   proven to the satisfaction of this Court either

19   conclusively or by prima facie showing that she had

20   an intent to enjoin him from having any contact, we

21   state that that nexis was breeched when she

22   effectively got back with him.  So, therefore, that

23   constitutes as far as the defense is concerned a

24   forgiveness, a condemnation as far as the charge of

25   harassment is concerned.

1    The State indicted my client under harassment,

2    i.e. the domestic violence part of the statute.

3    And that part is discredited because the victim has

4    produced no tangible evidence that would, of

5    course, confirm or corroborate that she suffered

6    any injuries in this case. And although I know

7    that is not a requisite that she have injuries, but

8    we think her credibility has been assailed by that

9    virtue as well; namely, by the State's own two

10   witnesses who have testified and accurately contend

11   that my client has never laid a hand on the alleged

12   victim; and, for that matter, the two children or

13   the daughter.

14       We believe that using the standard of totality

15   of the circumstances in this case that it certainly

16   would be a reasonable conclusion for this Court to

17   believe that the State has not met its requisite

18   burden of proof; and, therefore, judgment of

19   acquittal apply under requisite standard of law be

20   granted on behalf of the defendant.

21       MRS. PENN: Your Honor, I don't believe the

22   State's standard is beyond a reasonable doubt. The

23   state has met its burden of prima facie case. We

24   placed witnesses on the stand and those witnesses

25   have testified to the events of March 25th, 30th

1    and April 17th.  While their voracity may be in

2    question, that is a question of fact for the jury

3    and not a question of law that is to be dismissed

4    at this point.  That is for the jury to decide at

5    this time, and the State has met its burden of

6    proof, and I know of no law that requires

7    corroboration on the part of the plaintiff.  And in

8    any case, if you are on the opposing side, you are

9    indeed supposed to test the evidence or test the

10   witness and their voracity, but that does not mean

11   the State has not met its prima facie burden.

12   There is no burden upon the State to show that

13   there are any injuries to the defendant.

14        Indeed, I have no idea where counsel is coming

15   from with that argument.  That is not one of the

16   charges in this case.  And whether or not she had

17   injuries is something that is brought up on the

18   stand and can be taken into consideration in the

19   jury, whether or not they believe there was.  And

20   it could indeed be seen as circumstantial evidence

21   in this case whether or not they believe it, but it

22   has no bearing on the prima facie case that the

23   State has to present to this Honorable Court to

24   surmount the burden that is placed on them in this

25   type of motion to dismiss.

```
 1          THE COURT:  Anything else?

 2          MR. AUSBORN:  Nothing further.

 3          THE COURT:  The terms motion for acquittal is

 4     taken as a motion to the general affirmative charge

 5     and is therefore denied.

 6          MR. AUSBORN:  Thank you, Judge.

 7          THE COURT:  Y'all get your witnesses up.

 8          (Whereupon a lunch recess was taken by all.)

 9          (Whereupon the jury returned to the jury box,

10           and the following proceedings were had in open

11           court:)

12          (Defendant present with counsel.)

13          THE COURT:  The two jurors on the end, y'all

14     make sure your chair is not too close to that edge

15     back there.  I'd hate for you to fall off the jury

16     stand.

17          Ladies and gentlemen, the State has rested and

18     the defense will call their first witness.

19          Go ahead, Mr. Ausborn.

20          MR. AUSBORN:  May it please the court.  We call

21     Robert Edwards.

22                    ROBERT EDWARDS

23     having first been duly sworn, testified as follows:

24                   DIRECT EXAMINATION

25     BY MR. AUSBORN:
```

```
 1   Q.   State your full name for the Record, please.

 2   A.   Robert Earl Edwards.

 3   Q.   Mr. Edwards, state your current address.

 4   A.   788 Cherokee Trail, Tallassee, Alabama.

 5   Q.   And are you employed?  Are you currently employed?

 6   A.   Nope.

 7   Q.   Do you know the alleged victim in the case, that

 8        being Ms. Callie Williams?

 9   A.   Yes.

10   Q.   Are you related to her by blood or marriage?

11   A.   No.

12   Q.   Do you know the alleged defendant in the case, that

13        being Mister --

14   A.   Yes, sir.

15   Q.   -- David Donnie Williams?

16   A.   Yes, sir.

17   Q.   Are you related to him by blood or marriage?

18   A.   No.

19   Q.   How long have you known Ms. Callie Williams?

20   A.   About six or seven years.

21   Q.   Six or seven years.  How long have you known my

22        client Mr. David, Donnie Williams?

23   A.   About the same.

24   Q.   About the same.  Okay.

25             Now I asked you to come here today in order to
```

```
 1            give sworn testimony, okay.  Have I promised you
 2            any hope of a reward, incentive or benefit in order
 3            for you to come here today and give testimony?
 4    A.      No.
 5    Q.      Likewise, have I made any threats, placed you up
 6            under duress or coercion in order to get you to
 7            come here and testify?
 8    A.      No.
 9    Q.      I did not subpoena you to get you to come here; is
10            that correct?
11    A.      That's correct.
12    Q.      You come in here freely of your own volition; is
13            that correct?
14    A.      Right.
15    Q.      Now, you know in this case that my client Mr. David
16            Donnie Williams is charged with two indictments;
17            one for stalking; is that correct?
18    A.      Yes.
19    Q.      You know that there is a second indictment in this
20            case where he is charged with harassment, i. e.
21            domestic violence?
22    A.      Yes.
23    Q.      Now, in interest of expediency, I'm going to take
24            you directly to the core issues in the case, and
25            that's stalking and domestic violence.
```

423

```
 1            In the time in which you have been affiliated

 2      with Mr. David Donnie Williams and Ms. Callie

 3      Williams, tell the ladies and gentlemen of the jury

 4      have you ever seen Mr. David Donnie Williams stalk

 5      Ms. Callie Williams.

 6   A.  No.  No.

 7   Q.  In the time in which you have been affiliated with

 8      my client Mr. David Donnie Williams and Ms. Callie

 9      Williams, have you ever seen my client Mr. David

10      Donnie Williams harass, i.e. commit domestic

11      violence against Ms. Callie Williams?

12   A.  No.

13   Q.  How often would you see -- Let me stop you.

14            During the six to seven years that you have

15      been acquainted with Mr. David Donnie Williams and

16      Ms. Callie Williams, did they live together?

17   A.  Yes.

18   Q.  Did they live together the whole time or was it on

19      and off living arrangement?

20   A.  On and off.

21   Q.  During that duration of time, six, seven years or

22      so, how frequently would you see David and Callie?

23   A.  Just about every day.

24   Q.  Every day.  Okay.  Tell us how it was that you

25      would see them virtually every day.  Would they
```

```
 1              come to the place you were staying at or visiting

 2              at?  Or would you go to their place?  Or would it

 3              be a combination of the two?

 4    A.        It would be a combination.  Most of the time I went

 5              and carried them to work.

 6    Q.        When you say, carried them to work, was that

 7              carrying Donnie or Callie?

 8    A.        Both of them.

 9    Q.        They worked at the same location, that being Wayne

10              Farms; is that correct?

11    A.        Yes.

12    Q.        You are not here for David Donnie Williams, are

13              you?

14    A.        No.  I'm just here to tell the truth about it.

15    Q.        You are not here -- Likewise, you are not here for

16              Ms. Callie Williams; right?

17    A.        Right.

18    Q.        You are here for the truth.  You are here for

19              justice.

20                   Now, in the time frame in which you came in to

21              physical contact with Ms. Callie Williams over the

22              last six or seven years and Mr. Donnie Williams,

23              tell the ladies and gentlemen of the jury, did you

24              ever see her with a black eye?

25    A.        No.
```

1   Q.   Did you ever see her with a busted lip?

2   A.   No.

3   Q.   You ever see her with bruises on her cheeks?

4   A.   No, sir.

5   Q.   Did she ever one time complain to you that she had

6        been violently assaulted by Mr. David Donnie

7        Williams?

8   A.   No.

9   Q.   Were you close enough to her to where if she was

10       experiencing a problem with Mr. David Donnie

11       Williams she would confide in you and tell you, can

12       you talk to David, he's beating me up or I'm having

13       a problem with him?

14            Do you feel like she would be close enough to

15       you where she would talk to you about that?  Were

16       you close enough to where you would talk to her?

17  A.   We were close enough, but she didn't ever talk

18       about anything like that.

19  Q.   And as far as you could observe, there was no

20       reason to?

21  A.   That's right.

22  Q.   Did she ever come to you and say, Robert, tell

23       Donnie to leave me alone and get out of my life; I

24       don't want him no more.

25            Has she ever told you that?

```
 1   A.    No.
 2   Q.    Has she ever told you, Robert, get David out of my
 3         house, he assaulted my kids, beating up my kids.
 4              Has she ever told you that?
 5   A.    No.
 6   Q.    Were you -- You know her kids; is that right?
 7   A.    Yes.
 8   Q.    I believe Quantarius -- Narkesha --
 9              MRS. PENN:  I object, Your Honor.  If he is
10         going to ask a question, ask a question.
11              Don't tell him the names of the children.
12   Q.    Do you know the names of the kids?
13   A.    Not really.
14   Q.    You know them when you see them; right?
15   A.    Yes, sir.
16   Q.    Do you ever see the eight-year-old girl?
17   A.    Uh-huh (affirmative response).
18   Q.    Beat up?
19   A.    No.
20   Q.    Bruises on her?
21   A.    No.
22   Q.    Did you ever see the 14-year-old son beat up,
23         bruises on him?
24   A.    No, sir.
25   Q.    You know the 21-year-old daughter that she has,
```

```
 1            Lakeisha?
 2    A.      Yes.
 3    Q.      Did you ever see her with bruises on her, sir?
 4    A.      No.
 5    Q.      Likewise, did you come into contact with them
 6            frequently also?
 7    A.      Yes.
 8    Q.      Would they be at the house?
 9    A.      They would be at the house.  And sometimes they
10            would be over at Mr. Donnie William's mother's
11            house.
12    Q.      Did the kids ever come to you and say, David is
13            beating up on me?
14    A.      No.
15    Q.      Now, did David and Callie feel close enough to you
16            to where when they were having problems they'd sit
17            down and they'd talk to you and get some brotherly
18            advice?
19    A.      Yes.
20    Q.      Do you recall one or more occasions in which they
21            came to you, they both came to you and told
22            you --
23            MRS. PENN:  I object, Your Honor, if he is
24            going to --
25            MR. AUSBORN:  I can lay a predicate.  They are
```

```
 1         witnesses.   They are parties.
 2              THE COURT:   The way you started is leading,
 3         but...
 4    Q.   Were you close enough to where they would come to
 5         you from time to time and talk to you about
 6         problems they were having?
 7    A.   Yes.
 8    Q.   Did David ever come to you and tell you that he
 9         wanted to break the relationship off with Callie?
10    A.   Yes.
11    Q.   How often did he approach you about that?
12    A.   Several times.
13    Q.   Let's lay a time frame.
14              What year was that he came to you or what years
15         was it?
16    A.   March of 2003.
17    Q.   March of 2003.   Now this is 2004 here.
18              Are you saying it was March of last year or
19         March of this year?
20    A.   March of last year.
21    Q.   Have you ever been around David and Callie at the
22         same time?
23    A.   Yes.
24    Q.   And heard David tell Callie that he wanted to break
25         the relationship off?
```

```
 1    A.    Yes.

 2    Q.    How would she respond when she heard that?

 3    A.    She would go crazy; acting up.

 4    Q.    Would she get upset?

 5    A.    Yes.

 6    Q.    Help us, if you will.  When she got upset, would

 7          she get teary eyed, start to cry?

 8    A.    Yes.

 9    Q.    Would she get angry?

10    A.    Right.

11    Q.    When she got angry -- Was she a temperamental type

12          person, easy to get angered?

13    A.    Yes.

14    Q.    When she got angry, how would she respond?  Would

15          she go to cursing?

16    A.    Go to cussing and saying all different kinds of

17          cuss words.

18    Q.    Now, when you heard Donnie tell her he wanted to

19          break the relationship off, tell the ladies and

20          gentlemen of the jury how she would respond.

21    A.    Before she have him she would send him to prison.

22    Q.    Excuse me.

23    A.    Before she would have him, she would just get rid

24          of him, send him to prison before she would let

25          anybody else have him.
```

```
 1   Q.   Now, were there times -- So she made a statement
 2        before I let you get out of my life, I'll see you
 3        in prison?
 4   A.   Yes.
 5   Q.   That's what you heard her say.  Was she joking when
 6        she said that?
 7   A.   No.
 8   Q.   She was serious?
 9   A.   Yes.
10   Q.   You've been around her long enough to know when she
11        makes a statement whether or not it is one made in
12        jest or whether it is one that is serious?
13   A.   Yes, sir.
14   Q.   And that was a serious threat?
15   A.   Right.
16   Q.   Did Donnie hear that threat?
17   A.   Yes.
18   Q.   Now, you know he has been charged with stalking?
19   A.   Yes.
20   Q.   You know that he has been charged with
21        harassment/ domestic violence?
22   A.   Yes.
23   Q.   These are serious charges?
24   A.   Right.
25   Q.   And, of course, I don't want to invade the province
```

431

```
 1          of this Court because that is under the auspices of
 2          this Court in terms of what the sanctions would be
 3          if he is convicted, but is the fact that we are
 4          here based upon the charges sworn out by her in
 5          your mind based upon what you heard, is strong
 6          evidence on her trying to make good on her threat?
 7   A.     Yes.
 8   Q.     Now, did y'all ever go out together like couples
 9          type thing or stuff like that?
10   A.     No, sir.  Mostly she would come over to his mama's
11          house, and I would go down there all the time and
12          take them to work or take Mr. Davis cigarettes.
13          Sometimes he would call me and be out.
14   Q.     Now, you testified earlier they break -- they make
15          up, break up, make up, break back up?
16   A.     Yes.  She would bring his clothes up to his mama's
17          house and put him out.  She would call -- The next
18          day she would call and ask where Donnie was, and
19          the next day she drive up picking up his clothes.
20   Q.     So when she put him out, she put him out?
21   A.     Yes, sir.
22   Q.     A day later she would be back up to the house
23          picking him back up, picking his personal
24          belongings back up?
25   A.     Yes, sir.
```

```
 1    Q.   Were there ever times when he left on his own
 2         accord?  Ever seen instances where he moved back in
 3         at home without her putting him out?
 4    A.   Yes.
 5    Q.   Were there ever times after he no longer resided
 6         with her you, physically yourself, would take his
 7         belongings and take them back over to her house?
 8              Did you ever do that?  Ever move him back over
 9         to her house?
10    A.   Yes.
11    Q.   How many times would you say you did that?
12    A.   About seven.
13    Q.   So you say about seven or so times she has put him
14         out?
15    A.   Yes.
16    Q.   And came back and got him, and then about another
17         seven times, you have taken him and his belongings
18         back over to her?
19    A.   Yes.
20    Q.   Seven plus seven is about fourteen; would you agree
21         with that?
22    A.   Yes, sir.
23    Q.   Are those conservative numbers?  In other words,
24         those are like any other numbers; could have been
25         more like fourteen times?
```

1          You didn't keep an accurate count, did you?

2  A.    No, sir.

3  Q.    Did she have little -- play little love games with

4        Donnie; call Donnie my husband?

5  A.    Yes.

6  Q.    Would she introduce Donnie to other people as

7        that's my husband?

8  A.    Yes.

9  Q.    You heard her do that?

10  A.    (Witness nods affirmatively.)

11  Q.    As far as you observed, you see anything on the

12        outside wrong with this relationship between the

13        two?  You didn't see nothing that was wrong with it

14        on the outside?

15        In other words, it appeared that everything was

16        okay; is that right?

17  A.    Yes.

18  Q.    2004.  Bring you forward here; March, April, 2004.

19        Did you come into information that Donnie was

20        going back to his baby mother?  I think that's been

21        Ms. Linda Caldwell, that they were trying to get

22        their relationship back together?

23  A.    Yes.

24  Q.    Were you present back in March of this year when

25        Donnie had a discussion with Ms. Callie Williams

1    and told her that he wanted to end the relationship

2    because he was trying to make a reconciliation with

3    his baby's mama?

4        Were you present?

5  A.  Yes, sir.

6  Q.  March 23rd, is that the date that took place?

7  A.  Yes, sir.

8  Q.  Whose birthday is march 23rd?

9  A.  His mama.

10  Q.  Is that the reason why you can vividly recall that

11    happened because it occurred on the mother's

12    birthday that this discussion took place?

13  A.  Yes.

14  Q.  How did she respond when he told her I'm going to

15    back to my baby's mama?

16  A.  She just got all upset.

17  Q.  When she got upset, did you hear her trying to

18    persuade Donnie, baby, don't do that; I love you;

19    baby, don't leave me?

20  A.  Yes.

21  Q.  You heard her say something like that trying to

22    persuade.  Did you hear her say --

23        MRS. PENN:  I object, your Honor; leading the

24    witness.

25        THE COURT:  Sustained.

```
 1   Q.   Did you ever hear her trying to stop Donnie from
 2        going back to his baby's mama?
 3   A.   Yes.
 4   Q.   She tried to stop him.  Did you ever hear her tell
 5        him go back to your baby's mama?
 6   A.   No.
 7             MRS. PENN:  I object, Your Honor.  It is
 8        leading the witness.  If you want to ask that, ask
 9        it, but don't tell him what he's asking.
10             THE COURT:  Sustained.
11   Q.   Did Donnie tell her --
12             MRS. PENN:  Your Honor.
13   Q.   I tell you what, let me preface it.
14             March the 23rd, what was Donnie's final
15        decision?
16   A.   No.  He was just going to break it off because they
17        argue and stuff all the time.
18   Q.   Callie was present; is that right?
19   A.   Yes.
20   Q.   David was present?
21   A.   Yes, sir.
22   Q.   You were present?
23   A.   Yes.
24   Q.   Was mama present?
25   A.   Yes, sir.
```

```
 1   Q.   Was sister present, that being miss --

 2   A.   Yes, sir.

 3   Q.   Is that Lynn?

 4   A.   Right.

 5   Q.   Y'all were in one room?

 6   A.   Yes.

 7   Q.   Discussion going around the circle; is that right?

 8   A.   Yes, sir.

 9        MRS. PENN:  Your Honor, I make a continuing

10   objection.  He is leading the witness.

11        If he wants to ask a question, ask it.  Let the

12   witness tell.

13        THE COURT:  Sustained.

14        MR. AUSBORN:  I apologize, Counselor.

15   Q.   Decision made; is that right?

16   A.   Yes, sir.

17        MR. AUSBORN:  Nothing further for this witness.

18        THE COURT:  Cross.

19                   CROSS-EXAMINATION

20   BY MRS. PENN:

21   Q.   Mr. Edwards, my name is Carmella Penn, and I'm the

22   prosecutor in this case.

23        Now, I understand that your testimony is you

24   were in Union Springs on a daily basis?

25   A.   Right.
```

```
 1    Q.    Every day?

 2    A.    Just about it.  A few days I wasn't.

 3    Q.    A few days you weren't.  So have you ever worked

 4          during the time these two individuals were dating?

 5    A.    No, sir.

 6    Q.    Never worked.

 7                What did you do for a living?

 8    A.    (Witness shakes head.)

 9    Q.    Nothing.

10                How did you get money?

11    A.    Disability.

12    Q.    What's your disability?

13    A.    Ma'am?

14    Q.    What is your disability?

15    A.    Like what?  Money wise?

16    Q.    You look fine to me.  I want to know what's wrong

17          with you.

18    A.    Back.  L4 and L5 lower part of my back.

19    Q.    Have you ever resided, slept in any place besides

20          Tallassee?

21    A.    Slipped.

22    Q.    Slept, went to sleep any place besides this place

23          in Tallassee?

24    A.    Yeah.

25    Q.    Where?
```

```
 1    A.    130 Montgomery Street.

 2    Q.    Where is that?

 3    A.    Union Springs.

 4    Q.    Whose residence is that?

 5    A.    Lynn Jones.

 6    Q.    Is Lynn Jones related to Donnie?

 7    A.    Yes.

 8    Q.    What relation?

 9    A.    Sister.

10    Q.    How often do you say you stay over there?

11    A.    All the time.

12    Q.    When was the last time you spoke with Donnie?

13    A.    Last Sunday.

14    Q.    You say you never heard Callie say she wanted to

15          break up with Donnie?  You don't know nothing about

16          that; is that correct?

17    A.    Phrase that again.

18    Q.    You don't know nothing about Callie wanting to

19          break up with Donnie; is that correct?

20    A.    Right.

21    Q.    Never heard of that proposition at all?

22    A.    No.

23    Q.    Are you aware that he had been trespassed from her

24          residence?

25    A.    No.
```

439

| | | |
|---|---|---|
| 1 | Q. | So you couldn't have been seeing them on a daily |
| 2 | | basis if you weren't aware of that? |
| 3 | A. | Well, she said he was trespassed, but I used to |
| 4 | | take Donnie down there. |
| 5 | Q. | Where did you take Donnie? |
| 6 | A. | I took Donnie over to her daughter's house so he |
| 7 | | could take a bath, and she followed him home.  And |
| 8 | | she got out of the car and let him in. |
| 9 | Q. | She was staying at her daughter's house, wasn't |
| 10 | | she? |
| 11 | A. | No. |
| 12 | Q. | What was she doing over there? |
| 13 | A. | I don't know; probably was visiting. |
| 14 | Q. | She never lived at her daughter's house? |
| 15 | A. | I don't know. |
| 16 | Q. | You see them on a daily basis; you got to know |
| 17 | | where she was living? |
| 18 | A. | She was living down there. |
| 19 | Q. | Down there where she was living? |
| 20 | A. | By Big Bear. |
| 21 | Q. | She never lived anywhere else during this |
| 22 | | relationship? |
| 23 | A. | No. |
| 24 | Q. | Never lived anywhere else? |
| 25 | A. | I don't know.  She might have spent a night or two |

```
 1          with her daughter.

 2     Q.   But you talked to her and Donnie on a daily basis,

 3          did you not?

 4     A.   Just about every day.  I see Donnie every day.

 5     Q.   I think you told us Donnie told Callie he didn't

 6          want Callie?

 7     A.   Yeah.

 8     Q.   Can you tell me when that was?

 9     A.   March 23rd.

10     Q.   Of this year?

11     A.   Last year, 2003.

12     Q.   Where was Donnie when he told her that?

13     A.   At his mama's house.

14     Q.   You sure about that?

15              I want to know when you heard Donnie Williams

16          tell Callie before I let you go -- what did she

17          say, before I let you go.  I'll do what?

18     A.   Send him to prison get rid of him.

19     Q.   When was that?

20     A.   I don't have no regular date about that.

21     Q.   You don't know that date, but you know March 23rd,

22          2003?

23     A.   Yeah, I know that date because it was the day

24          before his mama's birthday.

25     Q.   The day before his mama's birthday, that's why you
```

```
 1              know that.  And all of you were together at the
 2              same place?
 3    A.        Right.
 4    Q.        Where was that?
 5    A.        Lynn Jones' house at 130 Montgomery Street.
 6    Q.        And that's Donnie's sister; is that correct?
 7    A.        Sister and mother.
 8    Q.        And you know Donnie and seen him on a regular basis
 9              just about every day.  What time period?
10    A.        Just about everu -- all time period.  Every time he
11              had to go to work.
12    Q.        Years that you saw him on a daily basis?
13    A.        I don't know that now.  I can't keep up with the
14              years.  I told you how many years I been knowing
15              Donnie; six or seven years.
16    Q.        So over the six or seven years you have known him,
17              you have seen him on almost a daily basis?
18    A.        Yes, ma'am.  Because he come see his mother every
19              day.
20    Q.        Every day for the last six or seven years, you are
21              telling us you seen Donnie on a daily basis?
22    A.        Yes.
23    Q.        Is that your answer?
24    A.        Yes.  I don't see him every day; most of them.
25    Q.        Okay.  If Donnie wanted to break it off with
```

```
 1              Callie, why were you continually taking him over to
 2              her house, to her daughter's house?  Why were you
 3              doing that if she hadn't broke it off?
 4    A.   Because she hadn't broke it off with him.  During
 5              that time they were living together.
 6    Q.   And he said he wanted to break it off, and you were
 7              still taking him over there?
 8    A.   When I took him to Callie's house, Callie was over
 9              there, and Donnie didn't have no way to get in, and
10              his clothes were at her house.   And he asked
11              Callie to and Callie followed her over there, and
12              he took a bath and --
13    Q.   I thought you were taking him back over there?
14    A.    I did that some too.
15    Q.   You said you would take him six or seven times,
16              didn't you?
17    A.    I did that some too.
18    Q.   How is it that you expect the jury to believe that
19              Donnie didn't want Callie, but you could take him
20              over there to take a bath, put on his clothes, had
21              an opportunity to get his clothes and wouldn't get
22              them, and every time she put him out, she would
23              take him right back?
24    A.   He didn't have an opportunity to get them.
25    Q.   How was it she stopped him from getting his
```

443

```
 1           clothes?

 2   A.      She was going to come back the next day and get

 3           'em.

 4   Q.      I want to know how she stopped him from getting his

 5           clothes?

 6   A.      When he took them away, she would go right back the

 7           next day and get 'em.

 8   Q.      Mr. Edwards?

 9   A.      Yes.

10   Q.      I'm sorry, but I find what you are saying hard to

11           believe.

12               Is it the truth?

13   A.      It's the truth.

14   Q.      Everything you have said up here today is the

15           truth?

16   A.      Right.

17   Q.      So if I brought somebody in here and they said

18           something different, they would be lying, wouldn't

19           they?

20   A.      I don't know.  I can't call an exact date on

21           everything.

22   Q.      I didn't ask you for any exact date but one.  You

23           gave me March 23rd, and I asked you for one more

24           date.  Is that not what I did?

25   A.      You asked me for the year.
```

```
 1   Q.   You are not related to Ms. Callie, are you?

 2   A.   No.

 3   Q.   Would you say y'all are friends or whose friend

 4        would you have been?  Donnie's?

 5   A.   Yeah.  I talk to Callie.

 6   Q.   Would you call her your friend or is Donnie your

 7        friend?

 8   A.   No, I wouldn't call her my friend because that was

 9        Donnie's friend, but I can associate with her.

10   Q.   Let me ask you this:  Since you saw them just about

11        every day for the last six or seven years, were you

12        aware that he assaulted her daughter in 2001?

13   A.   No.

14             MR. AUSBORN:  Your Honor, I object to this.

15        That is obviously a fact that's not been

16        established and move to strike it.

17             THE COURT:  He can answer that if he knows it.

18   Q.   You are not aware of that?

19   A.   No, sir.

20   Q.   You are not aware if he has assaulted Ms. Callie,

21        are you?

22   A.   He never assaulted Ms. Callie.

23   Q.   Are you aware if he has ever done anything to

24        Ms. Callie Williams?

25   A.   He ain't never done nothing to her.
```

445

| | | |
|---|---|---|
| 1 | Q. | Are you aware of all of the nights that he would |
| 2 | | ride behind her after work? |
| 3 | A. | How he going to ride behind her after work and he |
| 4 | | was working with her? |
| 5 | Q. | So he continued to work with her all the way up |
| 6 | | through April 17th? |
| 7 | A. | I can't answer that.  I don't know when he quit |
| 8 | | work.  I don't know the exact day. |
| 9 | Q. | So what you are saying is if he worked with her, |
| 10 | | there is no way he could have followed her after |
| 11 | | work? |
| 12 | A. | How he going to follow her when he take her home? |
| 13 | Q. | So he took her home every night? |
| 14 | A. | I ain't going to say every night.  I wasn't there |
| 15 | | every night. |
| 16 | Q. | Were you there any night? |
| 17 | A. | No. |
| 18 | Q. | Were you? |
| 19 | A. | But I took them to work a lot of days. |
| 20 | Q. | I understand.  Just hold on for just a second. |
| 21 | | Were you with Callie and Donnie Williams on |
| 22 | | March 25th when they were at work? |
| 23 | A. | (Witness shakes head.) |
| 24 | Q. | Did you see him pulling on her at work? |
| 25 | A. | No. |

```
 1    Q.    Can you say he didn't pull on her at work?

 2    A.    No, I can't say that.  I wasn't at work.

 3    Q.    Were you there to see him following Ms. Callie on

 4          the 24th after she got off work?

 5    A.    No.

 6    Q.    You weren't even with them, were you?

 7    A.    No.

 8    Q.    Were you with them on March 30th when he went and

 9          got Narkesha off the front step of her house?

10    A.    No.  He told me about it.  She wasn't at home and

11          the baby was there on the step.

12    Q.    Hold up.

13    A.    Why you tell me to hold up?  You ask me the

14          question and --

15              MRS. PENN:  Your Honor, ask for the witness to

16          just answer the question.

17              THE COURT:  You have to answer the question

18          that's asked.

19    Q.    Were you there on March 30th when David Donnie

20          Williams took Narkesha from her front door?

21    A.    No.

22    Q.    Were you with Callie Williams?

23    A.    No.

24    Q.    Were you there on April 17th at the AG?

25    A.    No.
```

```
 1   Q.   In fact, you don't know one thing about March 30th,

 2        March 25th or April 17th, do you?  You don't know

 3        anything about this, do you?

 4   A.   I don't know nothing about that --

 5   Q.   That's a yes or no?

 6   A.   No.

 7   Q.   The only thing you are here to do is to come up

 8        here and try to help get him off; is that correct?

 9   A.   No.  I came to tell the truth about what I know.

10   Q.   You telling exactly what he told you to say; is

11        that correct?

12   A.   No.

13   Q.   Did you get a letter like this right here saying

14        this is what I want you to say?

15   A.   No, I did not.

16             MR. AUSBORN:  Your Honor, I obviously object.

17             MRS. PENN:  I'm done, Your Honor.  Nothing

18        further for this witness.

19             THE COURT:  Next witness.

20             (The witness left the witness stand.)

21             MR. AUSBORN:  Lynn Jones.

22                         LYNN JONES

23     having first been duly sworn, testified as follows:

24                     DIRECT EXAMINATION

25   BY MR. AUSBORN:
```

```
 1   Q.   May it please the Court.

 2        State your full name for the Record.

 3   A.   Lynn M. Jones.

 4   Q.   Ms. Jones, I want you to lift your voice up and

 5        make sure the ladies and gentlemen of the jury,

 6        prosecution, and the defense can hear you testify.

 7   A.   Okay.

 8   Q.   That was Lynn Jones?

 9   A.   Lynn M. Jones.

10   Q.   Okay.

11        Ms. Jones, do you know the alleged victim in

12        the case, that being Ms. Callie Williams?

13   A.   Yes.

14   Q.   Are you related to her by blood or marriage?

15   A.   No, neither.

16   Q.   Do you know the alleged defendant in the case, that

17        being Mr. David Donnie Williams?

18   A.   Yes.

19   Q.   Are you related to him by blood or marriage?

20   A.   Yes, my brother.

21   Q.   Now, did myself, Donnie or anybody connected with

22        the defense threaten you, coerce you, intimidate

23        you in order to get you to come here and testify

24        today?

25   A.   No.
```

| 1  | Q. | Is that no?                                            |
|----|----|-------------------------------------------------------|
| 2  | A. | No.                                                   |
| 3  | Q. | Did I, Donnie, or anybody connected with the          |
| 4  |    | defense promise you a reward, incentive or benefit    |
| 5  |    | in order to get you to testify today?                 |
| 6  | A. | No.                                                   |
| 7  | Q. | Even though as you have testified, my client, the     |
| 8  |    | defendant on trial is, in fact, your brother, would   |
| 9  |    | you take this stand and lie to help him?              |
| 10 | A. | No, I wouldn't lie to help him or to help her         |
| 11 |    | either.                                               |
| 12 | Q. | Are you here to tell the truth and nothing but the    |
| 13 |    | truth so help you God?                                |
| 14 | A. | Yes.                                                  |
| 15 | Q. | Do you have an ax to grind against Ms. Callie         |
| 16 |    | Williams?                                             |
| 17 | A. | No.                                                   |
| 18 | Q. | Do you have a bone to pick with Ms. Callie            |
| 19 |    | Williams?                                             |
| 20 | A. | No.                                                   |
| 21 | Q. | Do you have any animosity in your heart direct        |
| 22 |    | today for Callie Williams?                            |
| 23 | A. | No.                                                   |
| 24 | Q. | You know that in this case my client, your brother,   |
| 25 |    | is charged up under two indictments, one for          |

```
 1          stalking on April 17th, 2004?  And you do know
 2          that's one indictment; is that correct?
 3     A.   Correct.
 4     Q.   He is indicted for stalking.
 5               You know that he is charged with stalking?
 6     A.   No.
 7     Q.   Do you know he is on trial for domestic violence,
 8          harassment?  Did anybody tell you that?
 9     A.   No.
10     Q.   What did you think he was on trial for?  Did you
11          think it was something connected with Ms. Callie
12          Williams?
13     A.   Yes.
14     Q.   What did you think he was on trial for?
15     A.   Because she is jealous --
16               MRS. PENN:  Your Honor, first of all --
17               THE COURT:  Sustained.
18     Q.   Let me ask you this:  Have you -- you know what
19          stalking is?
20     A.   Yes.
21     Q.   To the best of your knowledge, information and
22          belief, if they been dating over the last six or
23          seven years --
24     A.   Yes.
25     Q.   -- on and off?
```

```
 1   A.   Yes.
 2   Q.   Have you ever seen David Donnie Williams stalk
 3        Ms. Callie Williams any time over the last six or
 4        seven years?
 5   A.   No.
 6   Q.   Do you know what domestic violence is?
 7   A.   Yes.
 8   Q.   Over the last six or seven years, have you ever
 9        seen Ms. Callie Williams with a black eye?
10   A.   No, never.
11   Q.   You ever seen her with a busted lip?
12   A.   No.
13   Q.   Swollen cheek bones?
14   A.   Never.
15   Q.   How often would you see Callie and David?
16   A.   Every other day because they would come to my
17        house.
18   Q.   And would you from time to time go to their place?
19   A.   Yes.
20   Q.   Would y'all talk on the phone?
21   A.   Yes.
22   Q.   Were there times when Callie would confide in you
23        like a friend, ask your advice on stuff and share
24        secrets with you, confidences or something like
25        that?
```

```
 1   A.   No.

 2   Q.   Was she close to you?

 3   A.   No.

 4   Q.   Now, what's your mother's name?

 5   A.   Carrie Odessa Williams.

 6   Q.   Now, what's her date of birth?

 7   A.   March 23rd, 1929.

 8   Q.   Now, have you ever heard Callie tell Donnie in your

 9        presence, Donnie, I don't want you, get out of my

10        life?  Have you ever heard her say that to Donnie?

11   A.   Yes.

12   Q.   She's told Donnie that?

13   A.   Donnie told her that.

14   Q.   Let me get this clarified.  Donnie has told her

15        that?

16   A.   Yes.

17   Q.   Have you ever heard her tell Donnie that?

18   A.   She would tell him she didn't want him and he would

19        tell her he didn't want her, and she would say I

20        don't want you either.

21   Q.   So it was a flip-flop relationship.  One minute she

22        don't want him and they get back together?

23   A.   Yes.

24   Q.   And one minute he don't want her and they get back

25        together?
```

```
 1    A.    Yes.

 2    Q.    It's been on and off for the last six or seven

 3          years?

 4    A.    Yes.

 5    Q.    Linda Caldwell, does that name ring a bell?

 6    A.    Yes.

 7    Q.    In relation to Donnie, what is Linda Caldwell's

 8          relationship to Donnie?

 9    A.    Girlfriend.

10    Q.    His girlfriend.

11                Does she have any children by him?

12    A.    Yes.

13    Q.    This year, do you recall Donnie telling you or

14          telling Callie in your company that he no longer

15          wanted this relationship, that he wanted to go back

16          to Linda?

17    A.    Yes.

18    Q.    What month was that?

19    A.    That was March at my mother's birthday party, the

20          23rd.

21    Q.    March the 23rd?

22    A.    Yes.

23    Q.    Where did this take place at?

24    A.    At my home.

25    Q.    State that address for the Record.
```

```
 1   A.    1308 Montgomery Street, Union Springs, Alabama

 2         36089.

 3   Q.    Did she get upset?

 4   A.    Yes, she did, very upset.

 5   Q.    Did she start crying?

 6   A.    Yes.

 7   Q.    Did she try to beg, plead with him not to do that;

 8         stay with me?

 9   A.    Yes.

10   Q.    What did she say?

11   A.    She said if he didn't that she would --

12              MRS. PENN:  Your Honor, I object to hearsay.

13              MR. AUSBORN:  It is not hearsay, she is here.

14              THE COURT:  It is not an exception to the

15         hearsay rule.  Rephrase the question.

16   Q.    Did you hear her make any threats to Donnie?

17   A.    Yes.

18   Q.    What did she say?

19              MRS. PENN:  Object, Your Honor.

20              MR. AUSBORN:  Your Honor, this is a probative

21         line of questioning.  It establishes motivation

22         behind why we are here.

23              THE COURT:  You are asking about something that

24         Ms. Callie Williams said?  Is it a statement

25         against her interest?  Is she a principle or party
```

```
 1              in the case?
 2                   I'll allow it.  That was the hint.
 3                   MR. AUSBORN:  Thank you so much.
 4      Q.   Tell us what she said.
 5      A.   She said, hell, before I let you have somebody
 6           else, I'll put your damn ass in jail.  I have --
 7      Q.   Before I let you have anybody else, I'll put your
 8           damn ass in jail?
 9      A.   That's what she said.
10      Q.   Was she laughing when she said that?
11      A.   No, she was mad.  She meant just what she said.
12      Q.   Did she say it in a low tone or did she scream it
13           at him?
14      A.   She screamed it at him.
15      Q.   Was she crying when she said that?
16      A.   Yes.  She was mad.
17      Q.   Now, were there times when they would break up?
18           Has there ever been a time when you would take
19           Donnie's belongings and take them back over to her
20           house when he would move back in?
21      A.   Yes, a lot of times.
22      Q.   A lot of times?
23      A.   Yes, and she would come back and get them.
24      Q.   There have been times when she has come back and
25           gotten his stuff?
```

1  A.  Yes.

2  Q.  Did she ever tell you, I don't want no Donnie; make

3      him leave me alone?  Has she ever told you that?

4  A.  No.

5  Q.  But you have heard him say I don't want you?

6  A.  Yes.  He would come to my house and try to hide

7      from her, and she would come looking for him and

8      calling over to my house for him.

9  Q.  Okay.  Crazy in love.  Is that what it sound like

10     to you?

11 A.  Yes.

12 Q.  You ever heard her introduce Donnie as my husband?

13 A.  Yes, plenty times.

14 Q.  Plenty of times?

15 A.  Yes.

16 Q.  You ever heard her say that Donnie was like a

17     father, recognized father of her children, two

18     small children?

19 A.  Yes.  Yes.

20     MRS. PENN:  I object.  He has been leading the

21     witness for quite some time.  I've been trying to

22     let it go, but...

23     MR. AUSBORN:  Okay.  I'll back that out.

24 Q.  Did you ever see the eight-year-old daughter with

25     bruises on her person?

457

```
 1    A.    No.
 2    Q.    Did you ever see the 14-year-old son with bruises
 3          on his person?
 4    A.    No.
 5    Q.    The 21-year-old daughter, Lakeisha, have you ever
 6          seen her with bruises on her person?
 7    A.    No.
 8    Q.    Ever been to her place, Lakeisha?
 9    A.    No.
10    Q.    You ever talk with her?
11    A.    Yes.
12    Q.    Has she ever mentioned to you that Donnie had been
13          beating up on her?
14    A.    No, never.
15    Q.    That Donnie had been beating up on her mama?
16    A.    No.
17    Q.    Beating up on her little brother?
18    A.    No.
19    Q.    Beating up on her little sister?
20    A.    No.
21              MR. AUSBORN:  Nothing further for this witness,
22          Your Honor.
23              THE COURT:  Cross.
24                          CROSS-EXAMINATION
25    BY MRS. PENN:
```

458

```
 1   Q.   Are you hear to tell me that you have never heard
 2        that Donnie assaulted Lakeisha Williams in February
 3        of 2001?
 4   A.   Yes, I have.
 5   Q.   Never heard anything about that?
 6   A.   No.
 7   Q.   Never saw any bruises on Lakeisha?
 8   A.   Never.
 9   Q.   If you never saw them, does that mean they didn't
10        exist?
11   A.   I don't know if they existed or not, but I never
12        seen them.
13   Q.   But it is your testimony today that Donnie has
14        never touched Lakeisha Williams?
15   A.   Right.
16   Q.   You don't need any money to come in here and
17        testify for your brother, do you?
18   A.   No.
19   Q.   You do it just because he's your brother; ain't
20        that right?
21   A.   I'd do it for Callie, and I'd do it for him.
22   Q.   You do it for Callie?
23   A.   Yes; anything if it's right.
24   Q.   Tell us about the times she had to call you to get
25        Donnie away from her apartment.
```

459

| 1 | A. | She never called me. |
| 2 | Q. | She never called you and said she didn't want |
| 3 | | Donnie, to come get him? |
| 4 | A. | No. |
| 5 | Q. | But Donnie has told you that? |
| 6 | A. | Yes. |
| 7 | Q. | Let's talk about this March 23rd date.  You were at |
| 8 | | your house for your mama's birthday? |
| 9 | A. | Right. |
| 10 | Q. | Donnie was there? |
| 11 | A. | Yes.  Callie was there also. |
| 12 | Q. | And Callie was there and he told Callie in front of |
| 13 | | you he didn't want her? |
| 14 | A. | They were discussing that in front of all of us. |
| 15 | Q. | And that was March 23rd, 2003? |
| 16 | A. | Right. |
| 17 | | MRS. PENN:  I don't have any more questions for |
| 18 | | this witness, Judge. |
| 19 | | MR. AUSBORN:  Your Honor, at this time I would |
| 20 | | like to call the last witness as a rebuttal |
| 21 | | witness.  That would be Ms. Callie Williams. |
| 22 | | CALLIE WILLIAMS |
| 23 | | having previously been sworn, retook the stand |
| 24 | | and continued to testify as follows: |
| 25 | | RECROSS-EXAMINATION |

```
 1   BY MR. AUSBORN:

 2   Q.   Ms. Callie, you testified at length yesterday; is

 3        that correct?

 4   A.   Yes.

 5   Q.   Is it your contention that everything that came

 6        forth out of your mouth from that witness stand on

 7        yesterday was the truth?

 8   A.   Yes, it was.

 9   Q.   And nothing but the truth, so help you God; is that

10        your contention?

11   A.   It was.

12   Q.   You stated up under oath that Donnie Williams had

13        beat your children.  Isn't that what you said?

14   A.   I told you my 21-year-old daughter.  That's what I

15        said.

16   Q.   Has Donnie ever beat your 14-year-old boy?

17   A.   I didn't tell you that.  No, he haven't.

18   Q.   Has Donnie ever beat your eight-year-old daughter?

19   A.   No, he haven't.

20   Q.   You said that Donnie beat you frequently?

21   A.   Yes, he did, behind close door.

22   Q.   Behind closed doors.

23            Your eight-year-old daughter and 14-year-old

24        son, they've always stayed with you since they have

25        been birthed into this world; is that not correct?
```

```
 1   A.   Yes, they have.

 2   Q.   You have never surrendered temporary custody over

 3        to another person, have you?

 4   A.   No, I haven't.

 5   Q.   You say you suffered a black eye when Donnie beat

 6        you?

 7   A.   Yes, I did.  Back in 1998 he had me off my job for

 8        four days.

 9   Q.   And you said you suffered a busted lip?

10   A.   Yes, I did.

11   Q.   And you said you had bruises on your cheeks?

12   A.   I did.

13   Q.   Your eight-year-old daughter, she's honest?

14   A.   My kids was afraid when they got up here on this

15        stand.  That's why they did what they did.  They

16        was afraid and they was frightened and scared.

17   Q.   Don't get ahead of me.

18             My question to you:  Your eight-year-old

19        daughter, is she an honest child?

20   A.   Yes, in certain things; yes, she is.

21   Q.   Okay.  You were right here when your daughter took

22        the stand after being sworn in by this court; is

23        that correct?

24   A.   Yes, I was.

25   Q.   Did she lie up under oath?
```

```
 1   A.   Well, she did lie about some things; about she
 2        didn't see him beat me up.
 3             They was afraid and scared the way you were
 4        asking them the questions.  They didn't understand
 5        the question.  They really didn't.
 6             And I didn't like the way you were asking the
 7        questions to my kids.  You know they are young and
 8        they don't understand the life of an adult.  They
 9        don't understand a life like that.
10   Q.   I'm going to test you on it.
11             You heard me ask your daughter several times
12        the line of questions have you ever seen your
13        mother with a black eye.  What did she say?
14   A.   She said, no.  But she can't remember back then.
15   Q.   Hold on.  Stop right there.
16             You heard me ask her have you ever seen your
17        mother with a busted lip.  What did she say?
18   A.   She said, no.
19   Q.   You heard me ask her have you ever seen your mother
20        with bruised cheeks.  What did she say?
21   A.   She said, no.  She wasn't nothing but three years
22        old when that happened.
23   Q.   You heard me ask her have you ever seen David
24        Donnie Williams lay a hand on her mother.  What did
25        she say?
```

463

```
 1    A.    She said, no.

 2    Q.    You heard me ask her has Donnie Williams ever laid

 3          a hand on her.  What did she say?

 4    A.    She said, no.

 5    Q.    You heard me ask your son has he ever seen mama

 6          with a busted lip.  What did he say?

 7    A.    He said, no.

 8    Q.    You heard me ask him have you ever seen mama with a

 9          black eye.  What did he say?

10    A.    He said, no.

11    Q.    You heard me ask him have you ever seen mama with

12          swollen cheeks.  What did he say?

13    A.    He said, no.

14    Q.    You heard me ask him did David Donnie Williams ever

15          lay a hand on him.  And what did he say?

16    A.    He said, no.  And he told the truth about that.

17    Q.    You heard me ask him had he ever seen David Donnie

18          Williams touch you?

19    A.    Say that question again.

20    Q.    You heard me ask him had he ever seen David Donnie

21          Williams ever lay a hand on you.  And what did he

22          say?

23    A.    He said, no.

24    Q.    Now, this is the same child that you testified to

25          up under oath on March 30th -- you contend that
```

464

```
 1        Donnie Williams made a threat, I'll fuck you up?
 2   A.   It was the 17th.  And he did say that.  Yes, he
 3        did.
 4   Q.   That don't add up.
 5   A.   Yes, he said that.  Why am I going to get up here
 6        and tell a lie on my child?  Everything he say, he
 7        did.
 8             THE COURT:  Hold on, Ms. Williams.
 9   Q.   Now, your daughter, she said she saw you with black
10        eyes, busted lips and bruises and all of this other
11        stuff; is that right?  You heard her say that?
12   A.   Yes, she did.
13   Q.   She said she suffered some of the same injuries.
14        You heard her say that?
15   A.   She did.
16   Q.   I say you get the Oscar for best actress, and she
17        gets best support.
18             MRS. PENN:  Object.
19             THE COURT:  Sustained.
20   A.   My 21-year-old daughter doesn't have no reason to
21        lie.  She told the truth and nothing but the truth.
22             David Donnie William is the one lying.
23   Q.   I asked you up under oath, show me one photograph
24        showing injuries.  What did you say?
25   A.   I told you at the time you wouldn't let me go get
```

```
 1            no photos.  He wouldn't let me out the house.

 2   Q.   Let me ask you:  You don't have any, do you?

 3   A.   No, I don't, but he did it.

 4   Q.   And your daughter doesn't have any either, do she?

 5   A.   No, she don't.

 6   Q.   I asked you for one medical record.  What did you

 7            say?  You didn't have any, did you?

 8   A.   No, I didn't.

 9   Q.   And I asked your daughter.  She didn't have any,

10            did she?

11   A.   No, she didn't.

12   Q.   I ask you for one conviction showing that you

13            prosecuted David Donnie Williams successfully for

14            assault.  You did haven't any, did you?

15   A.   No.

16   Q.   I asked her the same thing.  She didn't have any

17            either, did she?

18   A.   No.

19   Q.   I asked you to produce an application for petition

20            for protection order against this violent man who

21            has been --

22   A.   No.

23   Q.   I asked her the same thing, to produce a protection

24            from abuse for this violent man who has been

25            assaulting her over the last six or seven years.
```

```
 1                She didn't produce one either, did she?

 2    A.    No.

 3    Q.    We are getting somewhere now.

 4                You were crazy in love for this man right here?

 5    A.    At first I was.

 6    Q.    And you still are?

 7    A.    No, I'm not.  I guarantee you that.

 8    Q.    I'll test you on that.

 9                You met him in 1997?

10    A.    Yes, I did.

11    Q.    Crazy in love for him in 1997?

12    A.    We didn't get together right off.  We started

13          talking at first as friends.

14    Q.    Let's -- A little love for him in 1997?

15    A.    Yes.

16    Q.    Not at the crazy stage then?  Crazy in love in

17          1998?

18    A.    We were getting there, yes.

19    Q.    Crazy in love in 1999?

20    A.    We got in engaged in 1998.

21    Q.    Crazy in love in 2000?

22    A.    We were breaking up the relationship then.

23    Q.    Crazy in love in 2002?

24    A.    She was locked up.

25    Q.    Crazy in love in 2003?
```

```
 1   A.   He was locked up.

 2   Q.   All right.  I'll come back to that.

 3        You got the same last name as David Donnie

 4        Williams, don't you?

 5   A.   Yes.  But we never been married.

 6   Q.   Never been married.  You wanted to be?

 7   A.   That was then.

 8   Q.   So you wanted --

 9   A.   I broke the relationship off.

10        He was rushing me in to it, but I told him I

11        wasn't ready for that.

12   Q.   Stay right there.

13        What year did you break the engagement off?

14   A.   Back as I can remember, the year 2001, when he

15        first got locked up.

16   Q.   2001.  And I want you to just stay with my

17        questions.  I don't want you to volunteer no

18        information other than to the question I asked you.

19        After 2001, did you get back engaged with David

20        Donnie Williams?

21   A.   Yes.  Yes, I did.

22   Q.   What year was that?

23   A.   I can't remember what year.

24   Q.   Now, you have come before this Court and testified

25        under oath that you couldn't get away from David
```

468

```
 1         Donnie Williams.  Is that your testimony?
 2    A.   I did get away from him.  He wouldn't leave me
 3         alone.  He kept following and harassing me.
 4    Q.   So at what point did you make up your mind, David,
 5         I don't want you no more and you had just
 6         completely cut him off and didn't want no more to
 7         do with him?
 8    A.   I broke it off completely March of this year at my
 9         house.
10    Q.   March of this year?
11    A.   Yes.  And he didn't want to agree to that.
12    Q.   Now, you heard my witnesses come forth?
13    A.   He lied.  He lied because Donnie told him what to
14         say.
15    Q.   You know Robert, don't you, a little bit?
16    A.   I don't know too much about him.
17    Q.   You know Robert has been by the house?
18    A.   Yes, a couple of times with Donnie.
19    Q.   And you know you have been by Donnie's mama's house
20         and Robert has been there?
21    A.   We ain't never met at Donnie's mama house.  That
22         was at his sister Lynn's house.  He lied.
23    Q.   You heard him say, I took them to work some?
24    A.   That was every now and then.  My daughter took me
25         to work.
```

```
 1    Q.   And you heard Robert say, I've taken Donnie's
 2         belongings and moved them out of her house and
 3         moved them back into her house?
 4    A.   Because Donnie told him to bring them back.  That's
 5         why he brought them back.
 6    Q.   And did you stand in the door and say, wait a
 7         minute, Robert, you can't move that stuff back in
 8         here?
 9    A.   Because some of the times I was at work.
10    Q.   Let me ask you this:  When you was at work, who let
11         him in?
12    A.   At a certain time, he had a key to my house; at a
13         certain time.  And I took the key from him.
14    Q.   In 2001, my recollection is that is the last year
15         he had a key to your place?
16    A.   Sure had.
17    Q.   After 2001 he no longer had a key?
18    A.   No.
19    Q.   But you have been back and forth from 2001 up to
20         spring of this year; is that right?
21    A.   Yes.
22    Q.   He has moved his stuff in and out since 2001 all
23         the way up to spring of this year?
24    A.   I tell him not to bring it back, and I look, and he
25         has brought it back to my house.
```

```
 1   Q.   And then you get a little weak in the knees, don't
 2        you?
 3   A.   No, I don't.
 4   Q.   When you see David?
 5   A.   No, I don't.  But I am afraid of him.  That man has
 6        threatened my life several times.
 7   Q.   What you are afraid of is David going forward and
 8        living his life without you?
 9   A.   He can go ahead on.  If he had went ahead and left
10        me alone, wouldn't no warrants been signed against
11        him.  He wouldn't leave me alone.
12   Q.   You feel less than a woman without that man right
13        there?
14   A.   I'm a full woman.
15   Q.   In fact, you introduced him as your husband?
16   A.   No, I did not.  I said boyfriend.  His sister and
17        boyfriend said that they told him to say that.
18   Q.   You and Donnie had pet games; you would say stuff
19        like my husband and he'd say my wife?
20   A.   I have never said that.  I said boyfriend.  He
21        called me his wife.  He have told several people
22        his wife.
23   Q.   Have you ever told people your husband?
24   A.   I ain't never told Donnie that.
25   Q.   You sure.  You are under oath now?
```

471

```
 1    A.    I ain't never told Donnie that.

 2    Q.    Never in your life?

 3    A.    No, I haven't.

 4    Q.    You ever sent Donnie letters, cards?

 5    A.    Every now and then.  He told me to buy a card with

 6          wife wrote on it.

 7    Q.    Stay right there.

 8                Now, you recognize Donnie has been like a

 9          father of your two kids, little small ones.  He was

10          like daddy in their life; isn't that right?

11    A.    No, he wasn't.

12    Q.    You sure about that?

13    A.    He wasn't doing nothing for my kids.  He wasn't

14          doing nothing for his own.

15    Q.    Okay.  All right.  I'll come back to it.

16                You testified up under examination yesterday

17          that sex was bad with this man.  Isn't that what

18          you said?

19    A.    At times it was.  Because he was on that crack so

20          bad.

21    Q.    You testified that this man was a crack addict?

22    A.    He was.

23    Q.    You testified that this man was just financially

24          irresponsible.

25                He ain't paid one dime towards your well being.
```

```
 1              Isn't that what you are saying?
 2    A.    He didn't.  He have not.
 3    Q.    You testified that you no longer loved this man and
 4          you just wanted him to leave you alone?
 5    A.    Yes, I did.
 6    Q.    Now, I'm going to take you back.  I'm going to give
 7          you an opportunity right now to take back anything
 8          that you said to me moments ago that you testified
 9          to.
10              Have you lied up under oath at any time?
11    A.    What are you talking about?
12    Q.    I asked you have you ever mentioned to Donnie that
13          he was your husband?
14    A.    Didn't I told you he forced me to say that.
15              He really did force me to say it.
16    Q.    And have you ever mentioned to Donnie that you was
17          his wife?
18    A.    Did I tell Donnie that?
19    Q.    Yes.
20    A.    No, I didn't.
21    Q.    You sure about that?
22    A.    He told me I was his wife.
23    Q.    Okay.
24              You need time to confer with your counsel
25          before I come at you on this?
```

```
 1    A.    I don't need no counsel.  David Donnie Williams
 2          need one.
 3    Q.    You sure?
 4    A.    I'm fine.
 5    Q.    Okay.  I'll test you on this.  Now, you sent Donnie
 6          pictures, didn't you?
 7    A.    Because he asked me to send them.  He begged me to
 8          send them.
 9    Q.    Stay right there.  Stay right there.  Don't move.
10          When you sent Donnie pictures, did Donnie have
11          a gun to your head and say, send me a picture?
12    A.    No, he didn't.
13    Q.    Did he have a knife to your throat and say, send me
14          a picture?
15    A.    No, he didn't.
16    Q.    Did Donnie say to you, you better say I'm your
17          husband?
18    A.    No he didn't.
19    Q.    Did he say to you, you better say you're my wife?
20          Did he say that?
21    A.    He didn't tell me that.
22    Q.    Now, I asked you earlier have you ever said to
23          Donnie that he was your husband.  And you said, no,
24          I never --
25    A.    He told me to put that on them pictures and stuff.
```

```
 1              I know what Donnie told me.

 2                 I have letters at home of everything he wrote

 3         me if you give me a chance to go get them.

 4    Q.   I'm going to ask you to take a look at these

 5         pictures right here?

 6    A.   Yes, that's what he told me to write on the back of

 7         them.

 8    Q.   Stay right there.  I'm going to ask you a question.

 9    A.   Yes, that's what he told me to write on the back of

10         them.

11    Q.   Who is that a picture of?

12    A.   Me.

13    Q.   That's a picture of you?

14    A.   Yes.

15    Q.   I'm going to label them one by one.

16                 I'm going to label these as Defendant's

17         Composite Exhibit Number 5.  Pretty picture I may

18         add.  You look good.

19                 Read the back of that picture for me into the

20         Record slowly and loudly.

21    A.   To my husband, David Williams.

22    Q.   Stay right there.  Slow down.

23    A.   To my husband David Williams from your wife Callie

24         Williams.

25    Q.   You wrote that?
```

```
 1    A.    Yeah, I wrote that because he told me to write that

 2          on the back of them when I sent them.

 3    Q.    That looks good.  And that's a picture of you?

 4    A.    Yes.

 5    Q.    That's your handwriting?

 6    A.    Yes, that's my handwriting.

 7    Q.    Now, here's another pretty picture of you.

 8              That looks good.  Look at the back of that one.

 9          Read the back of that one into the Record.

10    A.    To my husband David Williams from your wife Callie

11          Williams.

12    Q.    That's a different picture from that one right

13          there, the first one, isn't it?

14    A.    Yes.  All of them was sent to him at the same time.

15    Q.    All right.  Stay right there.  That's your

16          handwriting and photograph right there; is that

17          correct?

18    A.    Yes.

19    Q.    Here is another pretty picture of you.

20              That looks good.  Take a look at that one.

21          Read that one into the Record.

22    A.    To my husband David Williams from your wife Callie

23          Williams.

24    Q.    Okay.  Now, that's a picture of you and that's your

25          handwriting; is that right?
```

|    |    |    |
|----|----|----|
| 1  | A. | Yes. |
| 2  | Q. | In all of those pictures, that's you smiling real |
| 3  |    | good, aren't you?  Isn't that you smiling?  Looks |
| 4  |    | like you are proud to be sending these to your |
| 5  |    | husband? |
| 6  | A. | Not really. |
| 7  | Q. | A picture is worth a thousand words. |
| 8  |    | You don't have an angry face like, hum, don't |
| 9  |    | make me write this.  You don't have an angry face? |
| 10 | A. | I'm supposed to smile in a picture.  I'm not |
| 11 |    | supposed to look sad. |
| 12 | Q. | Neither one of those pictures look like a victim |
| 13 |    | whose been violently assaulted over the last six or |
| 14 |    | seven years? |
| 15 | A. | No.  Because he was locked up when I took those. |
| 16 | Q. | Well, let me ask you this right here:  You got a |
| 17 |    | black eye here? |
| 18 | A. | No.  Because I took them when he was locked up. |
| 19 | Q. | Okay.  Stay right here. |
| 20 |    | Here is another one of you right here.  Read |
| 21 |    | the back of that one into the record? |
| 22 | A. | To my husband David Williams from your wife Callie |
| 23 |    | Williams. |
| 24 | Q. | That's you? |
| 25 | A. | Yes. |

```
 1    Q.    That's your handwriting?

 2    A.    Yes.

 3    Q.    Are you smiling on that one?

 4    A.    Yes.

 5    Q.    Felt good to be sending your husband that doesn't

 6          it?  Am I right about that?

 7                MR. AUSBORN: Permission to publish, Your Honor.

 8    Q.    Now, take a look at that picture.

 9                Tell me who that is a picture of right there.

10    A.    This was my 14-year-old son.  At the time I think

11          he was 12 when he took this picture.

12    Q.    All right.  He's smiling too, isn't he?

13    A.    Yes.

14    Q.    Take a look at that picture and tell me who that

15          is.

16    A.    This is my eight-year-old daughter.  I think she

17          was about six when she took this.

18    Q.    She's smiling too.  One big happy family all these

19          pictures sent to husband, isn't it?

20    A.    Those pictures were taken when he was locked up.

21          Wasn't no picture taken.  He was locked up.

22                THE COURT:  Exhibit 5 is a composite of those

23          six photos?

24                MR. AUSBORN:  Yes.

25                THE COURT:  Any objection?
```

```
 1              MRS. PENN:  No.

 2              THE COURT:  Admitted without objection.

 3              (Defendant's Exhibit No. 5 was marked for

 4               identification, offered and received into

 5               evidence.)

 6   Q.    Now, this is a good one.

 7         Now, you never sent Donnie cards?

 8   A.    Every now and then, not that regular.

 9   Q.    I want to show you the first one.  I'm going to

10         label the cards as being Defendant's Composite

11         Exhibit 6, all of them six.

12              I'm going to ask you to take a look at this

13         card right here and tell me if that's a card you

14         sent to Donnie.

15              MR. AUSBORN:  If she would stipulate to these

16         cards I can save some time.

17              THE COURT:  Let her look through them.  How

18         many of them are there?

19              MR. AUSBORN:  Six cards, Your Honor.

20              THE COURT:  Look through them, Ms. Williams,

21         and see if you can identify them all.

22              THE WITNESS:  Yes.

23              THE COURT:  As to the six cards, can you

24         identify them all?

25              THE WITNESS:  Yes.  I sent them to him.  That's
```

```
 1          my signature on the inside.

 2               THE COURT:  Any objection to Composite 6?

 3          MRS. PENN:  No.

 4               THE COURT:  All of these cards are cards you

 5          sent to David Donnie Williams?

 6               THE WITNESS:  Yes.

 7               THE COURT:  Admitted.

 8               (Defendant's Exhibit No. 6 was marked for

 9                identification, offered and received into

10                evidence.)

11               MR. AUSBORN:  Now, without benefit of going

12          directly to the specifics of every one of them, you

13          sent them?  And the jury will take a look at this.

14          You sent him a card, Happy Father's Day, am I

15          right?  You sent him another one for the special

16          man in my life.  The moments we share are special

17          because of the love.  That's yours too, isn't that

18          right?

19     A.   Yes.

20     Q.   This is my favorite here.  For my sweetheart, happy

21          birthday; my love always.  That's you?

22     A.   Yes.

23     Q.   This is another one of my favorites.  For a loving

24          husband at Christmas.

25               That's another one of yours; is that right?
```

```
 1    A.   Yes.

 2    Q.   And this is another one, to my loving husband on

 3         Valentine's Day; is that right?

 4    A.   Yes.

 5    Q.   Now, this is my granddaddy favorite of all.  I

 6         saved my best for last.  For my husband with love

 7         at Christmas.  Your love is the greatest gift of

 8         all.  You sent him that one?

 9    A.   Yes.  That's when we was engaged.  That's why I

10         sent them kind of cards.  We was engaged.

11    Q.   When did you break the engagement off?

12    A.   I broke it off in 2001.  And we gotten engaged

13         again when he was locked up.

14    Q.   When did you break that engagement up?

15    A.   The who?

16    Q.   The last engagement got broken off when?

17    A.   2004 of this year.

18    Q.   2004.

19              MR. AUSBORN:  Permission to publish, Your

20         Honor.

21    Q.   Now, this is what I don't understand.  And you can

22         help us out, if you got a man who has violently

23         abused you over the last six or seven years, is it

24         smart, rational, reasonable and prudent for you to

25         engage yourself to this man to be wed?
```

```
 1   A.   I had told you we broke off and got back engaged

 2        again.  You don't understand what I'm saying.

 3   Q.   Stay right there.

 4             You say he beat you up all the way from the

 5        point you got together all the way up to 2004?

 6   A.   I didn't say beat me for no seven years.  I didn't

 7        say that.

 8   Q.   Did he beat you six out of the seven years?

 9   A.   I can't remember how many times it was.  He was

10        locked up some.  I ain't going to lie about that.

11   Q.   Was it 5, 4, 3, 2?

12   A.   I can't remember.

13   Q.   Two?  Your daughter remembered real well.  She said

14        you been beaten up, a victim of domestic violence

15        over the last six or seven years.  Her memory

16        didn't suffer from amnesia.

17             Was her memory better than yours?

18   A.   I didn't say that.

19   Q.   Was she lying when she testified?

20   A.   She wasn't lying.  She told the truth.

21   Q.   She said you got beat up for the last six or seven

22        years?

23   A.   I don't remember her saying no six or seven.

24   Q.   Now, you sent some of these cards this year; this

25        year 2004?
```

1    A.    Donnie got out on January 15th.

2    Q.    My question to you is this --

3    A.    I didn't send him no card this year.

4    Q.    Stay right there.

5          You are saying you didn't send nothing in 2004?

6    A.    No, I haven't.

7    Q.    Now, does it make sense.

8          This is the man you testified to up under oath

9          won't leave me alone, won't get out of my life and

10         stay out of my life, that you'd send him memoirs of

11         affection like I have over here?

12   A.    I told you we was engaged at the time.  That's why

13         I sent that.

14   Q.    Now, let me ask you this:  Show me one card that

15         Donnie sent to you.

16   A.    Mine's is at the house.  I can't go get them right

17         now.  I got several cards, lot of cards and letters

18         too where he threatened me on.  I have several to

19         show.

20   Q.    You ever heard of the phrase money is in the bank,

21         check's in the mail.

22         That's what you are trying to say now.  You got

23         the goods but --

24   A.    It at home.  I got every letter he have ever wrote

25         me since he been locked up and the cards too.  But

```
 1              I can't go get them right now.

 2    Q.    Let me ask you this:  You developed a history with

 3          this man you'd love to forget; isn't that right?

 4    A.    Rephrase that.  Say that again.

 5    Q.    Let me ask you this right here.

 6              Didn't you say that this man was a crack

 7          addict, been a crack addict over the last six or

 8          seven years?

 9    A.    He have.  But the year he was locked up, he wasn't.

10    Q.    Didn't you say that this man's beat you up for all

11          of these years?

12    A.    I didn't say for no seven years.

13    Q.    Didn't your daughter say he has beaten you up all

14          these years?

15    A.    I don't remember her saying that.  She said several

16          times.  I don't remember her saying that.

17    Q.    Didn't you say this man was a dead beet that didn't

18          help you out?

19    A.    He wasn't helping me.  His money went to crack.

20    Q.    Didn't you say that that man was giving you bad

21          sex?

22    A.    At the time he was on the crack, he was.

23              MRS. PENN:  Asked and answered, Judge.  If he

24          has something new.

25    Q.    He must have been doing something right for you to
```

```
 1         glorify and gratify him with these here?

 2    A.   I keep telling you we was engaged at the time.

 3    Q.   When people are dedicating themselves -- Have you

 4         ever been married before?

 5    A.   No, I haven't.

 6    Q.   When people are dedicating themselves to a person

 7         by way of engagement, I consider themselves to be a

 8         couple?

 9              MRS. PENN:  Objection, Your Honor.  Tell a

10         story.  Ask a question.

11    Q.   When you got engaged to him, was it your

12         intention -- What was your intention?  To spend

13         your life with him?

14    A.   At first I didn't know about his past when we got

15         engaged in '98.  I didn't know about his past.  We

16         got engaged on Mother's Day.

17    Q.   Stay right there.  You -- you -- These cards don't

18         lie.  When you went to the store, did you look

19         through the rack of cards?

20    A.   I read my cards before I buy them.

21    Q.   And when you selected these cards, David didn't

22         tell you pick that one?

23    A.   No, he didn't.  He told me to get some with wife on

24         it or husband on it.  I know what he told me.

25    Q.   Stay right there.
```

485

```
 1              You and you alone made the decision about
 2         chosing the card with the inscriptions; is that
 3         right?
 4    A.    I read the inside on it, yes.
 5    Q.    And when you selected these cards, you wanted to
 6         encompass a message that spoke personally about
 7         your sentiments towards that man right there; isn't
 8         that right?
 9    A.    Rephrase that again.  Say that again.
10    Q.    These cards indicated what you felt about that man
11         right there; isn't that right?
12    A.    I told you we was engaged at the time.
13    Q.    Now, let me ask you this right here.  Show me one
14         card because I didn't run across one card.
15              Show me one card, one letter, one memoir,
16         anything that you sent to that man saying that you
17         didn't want him to have nothing else to do with
18         you?
19    A.    We was engaged at the time.  Most of the time he
20         was locked up.  I'm telling you we was engaged.
21    Q.    It's all good, isn't it?
22    A.    At the time.  That ain't got nothing to do with
23         these cases, stalking and harassment.  That ain't
24         got nothing to do with this.
25    Q.    Now, Callie, I want you to look right over here to
```

486

```
 1              these ladies and gentlemen of the jury.  They have

 2              been very patient over the last two days.

 3                   You tell them -- You telling them you weren't

 4              crazy in love with that man right there?

 5    A.        I told you certain times we was engaged.

 6    Q.        And you heard Lynn testify.  Am I right about that?

 7    A.        She lied.

 8    Q.        You heard Robert testify?

 9    A.        He lied.

10    Q.        You heard them say that you said to David, you

11              ain't getting out of my life.  If I can't have you,

12              ain't nobody going to have you.  I'm going to send

13              you to prison?

14    A.        They lied.  You know why they lied?

15    Q.        That's exactly what you said, didn't you?

16    A.        I didn't tell them that because on March 23, 2003,

17              Donnie was locked up.  They lied.  That's why I

18              know they lied.

19    Q.        Let me ask you this right here:  March 23rd, that's

20              his mama's birthday; you know that?

21    A.        I was living at my daughter's house.  I broke up

22              with Donnie on March 19th.

23                   They lied about that too.

24    Q.        Now, it's something strange that on the day that

25              his family indicated that he broke it off with you,
```

```
 1              one day later, the 24th --
 2                   MRS. PENN:  Your Honor, I object.
 3                   THE COURT:  Sustained.
 4    Q.   Now, Callie, you still got love for that man right
 5         there?
 6    A.   No, I don't.  It is over, final.
 7    Q.   Sure?
 8    A.   Yes.  And I have told him that on April 17th down
 9         to the grocery store and on March 25th on my job.
10    Q.   Now, Callie, over the last six or seven years when
11         you marched that man's possessions out your place,
12         every time you did that, you told him it's over,
13         didn't you?
14    A.   Yes.  And he kept coming back knocking on my door.
15         If you don't let him in, he'll break in.  I told
16         you, he have no key to my house a lot of time.
17    Q.   Knocking on your door and there you are, knock
18         knock, knock, welcoming him straight back with open
19         arms?
20    A.   Didn't I tell you open the door or he would break
21         in?  Yeah, I've did it several times.
22              I don't have to lie.  And he know I'm telling
23         the truth.  You don't know nothing about him.  You
24         really don't.
25    Q.   I don't?
```

```
 1    A.    You search his records in the past.  You will see

 2          what type of person he is.

 3    Q.    Stay right there. I don't want you to volunteer any

 4          information in this courtroom.  I just want you to

 5          answer my questions.

 6    A.    I don't like the way you talk to me and keep asking

 7          me the same questions over and over.  And I have

 8          answered your questions.  I don't like the way you

 9          are talking to me.

10    Q.    You swore out two warrants and affidavits against

11          my client, didn't you?

12    A.    What did you say?

13    Q.    You swore out two affidavits and warrants against

14          my client, didn't you?

15    A.    Stop him from harassing me.

16    Q.    And on behalf of the State of Alabama, he got

17          indicted on those two offenses, didn't he?

18    A.    I know he did.  I don't have to get on that stand

19          and lie.

20    Q.    And I say to you, as long as that young man's guilt

21          or innocence is before this Court, you will answer

22          my questions.

23    A.    I don't like the way you are talking to me.  I just

24          don't really like that.

25                MR. AUSBORN:  Nothing further for her.
```

1    THE COURT:  Do you have anything?

2    MRS. PENN:  I do.

3    THE COURT:  Y'all take a short break.

4        (Whereupon the jury left the courtroom, and the

5        following Bench conference was held outside

6        the hearing of the jury:)

7    MR. AUSBORN:  Your Honor, unless the State and

8    defense can reach some kind of stipulation as to

9    how many of these come in, but this is coming to a

10    point where it is becoming cumulative evidence.

11    THE COURT:  I don't know why you would offer

12    any more than one which rebuts the position that

13    you are trying to rebut, which means this letter

14    and picture are clear.

15    I think to do a lot more than that would be

16    cumulative.  I suggest pick a couple and put them

17    in, and I think that gets your point there in a big

18    way.

19    MR. AUSBORN:  That one is okay, 2001, that way

20    the envelope with the prison markings doesn't come

21    in.

22        (Whereupon the jury returned to the jury box,

23        and the following proceedings were had in open

24        court:)

25    THE COURT:  Ms. Williams, you are still under

```
 1          oath.
 2              Ladies and gentlemen of the jury, has anyone
 3          received any information other than testimony and
 4          exhibits and arguments from the lawyers?
 5              (Negative response from the jury.)
 6                  FURTHER REDIRECT EXAMINATION
 7   BY MRS. PENN:
 8   Q.   Ms. Williams, you were asked some questions
 9        regarding cards you sent to Mr. Donnie Williams; is
10        that correct?
11   A.   Yes.
12   Q.   And didn't he ask for something that Donnie sent to
13        you?
14   A.   No.
15   Q.   Did Donnie write any letters to you?
16   A.   Yes.
17   Q.   Did he send you any cards?
18   A.   Yes.
19   Q.   Can you count the number of letters he wrote to
20        you?
21   A.   It's so many.
22   Q.   Can you count the number of cards he sent to you?
23   A.   No.
24              (State's Exhibit No. 4 was marked
25                for identification.)
```

1    Q.    Let me show you what I've marked as State's Exhibit

2           Number 4 and ask you if you can identify that

3           please.

4              What is that, Callie?

5    A.    This is a card that Donnie sent me.

6    Q.    When did he send that to you?

7    A.    I forgot what year he sent it to me.

8    Q.    Is there something on the front of that card?

9    A.    I think it was 2003.

10    Q.    2003.  I think we put a sticky note on the front of

11           that to help us remember when it was; is that

12           correct?

13    A.    Yes.

14    Q.    What is the date on that sticky note?

15    A.    I can't understand his writing.

16    Q.    August 19, 2003.

17          Is that a fair and accurate representation of

18           the card that you got on that date on the purple,

19           sticky note?

20    A.    Yes.

21    Q.    Is that a card you received from David Donnie

22           Williams?

23    A.    Yes.

24    Q.    One of many, isn't it?

25    A.    Yes.

1    MRS. PENN:  Your Honor, I would like to

2    introduce State's Exhibit Number 4.

3    MR. AUSBORN:  Your Honor, can I quickly voir

4    dire?

5    THE COURT:  Yeah, go ahead.

6    VOIR DIRE EXAMINATION

7    BY MR. AUSBORN:

8    Q.   Ms. Callie, you weren't there when this card was

9         signed; is that right?  You weren't there when it

10        was signed; is that correct?

11   A.   No.  But that's Donnie's writing.

12   Q.   And and you've seen Donnie's writing and you are

13        sure that's Donnie's writing right here?

14   A.   That's his writing at the bottom because I've been

15        with him several years, and I know his

16        handwriting.

17   Q.   Just out of curiosity, whenever Donnie is writing

18        something to you, he always signs it; is that

19        correct?

20   A.   Yes.

21   Q.   And you know that to be a fact because that's what

22        he has done all these years, he signs his stuff?

23        MR. AUSBORN:  We stipulate to this, Your Honor.

24   FURTHER REDIRECT EXAMINATION (Cont'd)

25   BY MRS. PENN:

493

```
 1              (State's Exhibit No. 5 was
 2              marked for identification.)
 3    Q.   I'm going to show you State's Exhibit 5 and tell me
 4         what that is.
 5    A.   This is a card that he sent me on May 2003.
 6    Q.   May 2003, he sent it to you?
 7    A.   Yes.
 8    Q.   He couldn't be with you?
 9    A.   No.
10    Q.   So he sent you a card?
11    A.   Yes.
12    Q.   Let me ask you this:  Was he able to be with you in
13         March of 2003?
14    A.   No.  Because he was in prison.
15    Q.   Were you at his mother's house in March of 2004?
16    A.   No, I wasn't.
17    Q.   So when Lynn and Robert got up here and testified
18         that they heard what Donnie told you in March of
19         2003, they are lying?
20    A.   Yeah, they lied.  Because he was locked up.
21    Q.   You said that was a Mother's Day card?
22    A.   Yes.
23    Q.   And it was sent in May of 2003; is that correct?
24    A.   Yes.
25    Q.   That's sometime after March of 2003; is that
```

```
 1           correct?

 2   A.      Yes.

 3   Q.      Why don't you read it for the ladies and gentlemen

 4           of the jury?

 5   A.      Today is your day.  You are the same mother every

 6           day.  When I think of Mother's Day, I think of one

 7           of the most loving and caring persons in the world

 8           to me.  With love, Donnie.

 9   Q.      Does that sound like he wanted to break up to you?

10   A.      No.

11   Q.      He ever indicate to you that he wanted to break up?

12   A.      No, he haven't told me that.

13   Q.      Now --

14           MR. AUSBORN:  Can I voir dire as to 5?

15           THE COURT:  Voir dire on 5?  Go ahead.

16                    VOIR DIRE EXAMINATION

17   BY MR. AUSBORN:

18   Q.      Ms. Callie, at the bottom, is that card also

19           signed?

20   A.      Yeah, he signed it.  But that other writing is

21           different.  That other writing is somebody else's,

22           but it has his signature trademark; love, Donnie?

23   A.      Yes.

24   Q.      That's how he signs all of his communications to

25           you; is that correct?
```

1    A.    Yes.

2    Q.    And this is how Number 5 is signed and how Number 3

3          is signed?

4          THE COURT:  Four is signed; is that correct?

5          THE WITNESS:  Yes.

6    Q.    That's his trademark?

7    A.    Yes.

8          MR. AUSBORN:  Thank you, Your Honor.

9          THE COURT:  Stipulate to the objection of 5?

10         MR. AUSBORN:  Yes.

11         THE COURT:  Admitted without objection.

12         (State's Exhibit No. 5 was offered

13          and received into evidence.)

14         (State's Exhibit No. 6 was marked

15          for identification.)

16         FURTHER REDIRECT EXAMINATION (Cont'd)

17   BY MRS. PENN:

18   Q.    This is a composite exhibit that I've marked as

19         State's Exhibit Number 6 and ask you if you can

20         identify that?

21   A.    Yes.   This is Donnie's handwriting.

22   Q.    Okay.  Is that signed, love, Donnie?

23   A.    Not on this one.

24   Q.    And what year did you receive that in?

25   A.    The year 2001;  But I can't remember what month.

```
 1   Q.   Can't remember what month.
 2             And did that come in an envelope addressed to
 3        you from Donnie?
 4   A.   Yes.
 5   Q.   And there are some pictures behind the letter.
 6        Those letters come -- Did those pictures come in
 7        the envelope with the letter?
 8   A.   Yes.
 9   Q.   Please describe for the ladies and gentlemen of the
10        jury what is contained in the three pictures that
11        was enclosed in that letter that Donnie sent to
12        you.
13   A.   He blacked my face with an ink pen and said that's
14        the way he would fuck my face when he get out of
15        prison.
16   Q.   He painted your face with an ink pen and said
17        that's the way he would fuck your face up when he
18        got out of prison?
19   A.   Yeah, that's what he --
20   Q.   Did he call you on the phone to tell you that?
21   A.   No.
22             MRS. PENN:  Your Honor, I move to admit State's
23        Exhibit Number 6.
24             MR. AUSBORN:  Voir dire real quick, Your Honor.
25             THE COURT:  Okay.
```

1     <u>VOIR DIRE EXAMINATION</u>

2   <u>BY MR. AUSBORN:</u>

3   Q.   Let me take a look at that, Ms. Callie, if you

4        will, and ask you some questions about that.

5        State's Exhibit Number 4, 5 and 6, and focus on

6        those quickly.

7             MRS. PENN:  You going to voir dire on 4 and 5

8        again?

9             MR. AUSBORN:  I want to make a comparison real

10       quick.

11  Q.   I want to hand you all three exhibits and ask you

12       some questions concerning the penmanship.

13            State's Exhibit Number 4, 5 and 6, are they all

14       from different handwritings?  In looking at the

15       handwriting, they are all different handwritings;

16       isn't that correct?

17  A.   Yes, but he signed it.

18  Q.   Stay right there.

19            Now, Number 4 is signed by the person that

20       wrote that, love, Donnie; is that right?

21  A.   He signed it.

22  Q.   Now, you have testified up under oath that Donnie's

23       trademark in communicating with you, he would

24       always sign, love, Donnie.  That's what he did, and

25       that's what he did all through the years; is that

```
 1              not correct?
 2    A.    Yes, but this one letter he didn't say that.
 3    Q.    Don't get ahead of me.
 4              That's what you testified to; is that correct?
 5    A.    Yes.
 6    Q.    Number 5 is a different handwriting than Number 4;
 7          is that correct?? Number 5 is the next card?
 8    A.    Number 5 right there, somebody else wrote it, but
 9          he signed it.
10    Q.    Now, this card right here, that handwriting is
11          different than Number 4; is that correct?
12    A.    Yes.
13    Q.    Number 5 also has Donnie's trademark signature,
14          love, Donnie --
15              MRS. PENN:  Your Honor, I object to trademark.
16              THE COURT:  Sustained.
17              MRS. PENN:  It is not a trademark.
18    Q.    Let me ask you:  One thing about Donnie, when he
19          communicated to you in letter form, he had a habit
20          and this habit is all of his communications and
21          writing would end, love, Donnie?
22    A.    Yes.
23    Q.    Now, Number 5, how does it end?
24    A.    It say, love, Donnie.
25    Q.    Love, Donnie.
```

499

```
 1            Now I want to talk to you about Number 6.  The
 2      penmanship in Number 6 in comparison with Number 4,
 3      is it different than Number 4, the small card?
 4  A.  He didn't sign Number 6.
 5  Q.  Stay right there before you get ahead of me.
 6            I want you to focus on the penmanship.
 7            Is it from a different author?  Does it appear
 8      to be written from a different author than the pen
 9      that wrote State's Exhibit 4?  You agree with that;
10      is that right?
11  A.  Yes.
12  Q.  State's Exhibit Number 6, in comparison with
13      State's Exhibit Number 5, the bigger card, the
14      penmanship in that card is different than State's
15      Exhibit Number 6; isn't that also correct?
16  A.  Yes.  That's his handwriting, what he signed, Love,
17      Donnie.
18  Q.  My question to you is:  I don't want to talk about
19      how it ends first.  I want to talk about the
20      quality of the penmanship.
21            The penmanship is different in State's Exhibit
22      Number 5 compared to State's Exhibit Number 6.
23            You would agree with that, wouldn't you; the
24      handwriting, the cursive is different?
25  A.  Yeah, sometimes I write different in cursive.
```

500

```
 1    Q.    I don't want you to explain anything.  I just want
 2          you to agree or disagree.
 3                You agree that the penmanship --
 4                MRS. PENN:  Objection.
 5                THE COURT:  Sustained.
 6                MRS. PENN:  If he wants to let me get it in,
 7          but this is voir dire.
 8                MR. AUSBORN:  They are attributing three
 9          communications to Donnie, and what I'm trying to
10          clarify is whether or not in fact all three came
11          from Donnie.
12                THE COURT:  Why don't we ask that?
13    Q.    Two of the communications, 4 and 5, came from
14          Donnie; is that right?
15    A.    Yes.
16    Q.    And we know that because the ending of those
17          communications ends the way Donnie has always wrote
18          to you, and it says, love, Donnie; is that right?
19    A.    Yes.
20    Q.    Now, Number 6, okay, at the bottom of that it says,
21          love, Donnie.
22                Does it say that?
23    A.    Not on this one.
24    Q.    That's something highly irregular and different
25          about that communication compared to all the
```

501

```
 1           countless numbers of communication you've gotten

 2           from Donnie over the years.

 3                THE COURT:  Is that a question?

 4                MR. AUSBORN:  Yes.

 5     Q.    It is something highly irregular from prior

 6           communications with Donnie because it doesn't end

 7           the way Donnie's prior communications end?  Because

 8           they always end with, love, Donnie; is that right?

 9     A.    Yes.

10     Q.    That is different than prior?

11     A.    Nobody signed it.

12     Q.    Now, when this alleged communication was written,

13           you weren't there watching the author write that

14           letter, were you?

15     A.    No.

16     Q.    You weren't there?

17     A.    No.

18     Q.    So you can't testify with any degree of certainty

19           or conviction that David Donnie Williams wrote that

20           letter because you weren't there, am I right?

21     A.    No, but I know his handwriting.

22     Q.    And you know that letter ends entirely different

23           than every other countless communications he has

24           written to you.  You would agree with that?

25           Correct?
```

1   A.   Say that again.

2   Q.   That letter ends entirely different than every

3        other countless communication he sent you.

4             All the others said, love, Donnie.   That one

5        does not?

6   A.   Yes, because he was mad with me.   That's why.

7             MR. AUSBORN:   Your Honor, we would respectfully

8        oppose State's Exhibit Number 6 coming forth

9        because there has been no predicate establishing

10       the fact that that communication --

11            THE COURT:   Let me ask her a couple of

12       questions.

13                        EXAMINATION

14  BY THE COURT:

15  Q.   Ms. Williams, with respect to State's Exhibit 6 and

16       the photographs, did you receive it in the same

17       manner that you received the others?

18  A.   Yes, came from the same address.

19  Q.   And the same return address?

20  A.   Yes.

21  Q.   And was that return address the same address you

22       knew to be the residence of Donnie Williams?

23  A.   Yes.

24            THE COURT:   You move to admit Number 6?

25            MRS. PENN:   Yes.

```
 1              THE COURT:  State's 6 is admitted.

 2              (State's Exhibit No. 6 was offered

 3               and received into evidence.)

 4              MR. AUSBORN:  Would you give a limiting

 5         instruction?

 6              THE COURT:  No.  You can cross her on it if you

 7         want to.

 8              FURTHER REDIRECT EXAMINATION (Cont'd)

 9    BY MRS. PENN:

10    Q.   Callie, read State's Exhibit Number 6 to the jury.

11    A.   Hi, Bitch Callie, I know about that shit you been

12         doing.  But I just want you to know that you ain't

13         shit, and when I get out you and that nigger need

14         to be gone because bitch don't nobody fuck with me

15         like you do.  You knew what you -- I think he

16         missed some words out right here -- you knew what

17         you was doing when you had me locked up.  And guess

18         what, I am getting out -- that you was making a

19         fool out of me, didn't you, but you just didn't

20         know what you had gotten yourself in.  If the -- he

21         missed some words up right here.  -- the list of

22         thing I do, bitch, am going to get your ass and

23         that nigger.  I told you don't fuck with me.  And

24         then -- (inaudible), but you did know it's time to

25         show you who I am -- all that shit I sent you, take
```

504

```
 1          it back to my sister, that gold chain I give you at
 2          Christmas, take it to -- (inaudible).  Yes, bitch,
 3          I know about that nigger.  I knew.  I just wasn't
 4          going to say nothing until I got out, but you need
 5          to leave town because I will be to see you and good
 6          thing you don't know when; ha, ha.  I see you,
 7          bitch.
 8    Q.    Good thing you don't know when; is that correct?
 9    A.    That's what he said on the letter.
10    Q.    These pictures came in that letter?
11    A.    Yes.
12    Q.    Are these pictures that you sent to David Donnie
13          Williams?
14    A.    Yes, he had pictures, photos I sent to him.
15    Q.    Tell -- Describe the pictures for me, please.
16    A.    How you want me to describe them?
17    Q.    Who's in the picture?
18    A.    It's me.  And on one of them, my grandbaby.  And
19          then my daughter, my son and grandbaby in one of
20          them, and I'm by myself in one.
21    Q.    If I looked at that picture, would I be able to
22          tell that that's you?
23    A.    I don't know.
24    Q.    Why don't you know?
25    A.    Because he colored my face with an ink pen saying
```

```
 1          how he going to fuck my face up.
 2   Q.     Flip that on the back.  Is there anything on the
 3          back of those pictures?
 4   A.     I think all three of them state the same.
 5   Q.     Do you know what that means?  What did you think
 6          that meant?
 7   A.     That he was going to fuck --
 8               MR. AUSBORN:  Your Honor, I object.
 9               THE COURT:  Sustained.
10               MR. AUSBORN:  Your Honor, can we ask that 4 and
11          5 be published also?
12               THE COURT:  4 and 5 published also.
13               MRS. PENN:  You can publish when you cross.
14   Q.     And these letters are indicative of your
15          relationship with Donnie, isn't it?
16   A.     Yes.
17   Q.     Kind of love/hate?
18   A.     Yes.
19   Q.     Back and forth?
20   A.     Yes.
21   Q.     Crazy in love; that's what he said.
22               You were, weren't you?
23   A.     Off and on.
24   Q.     Crazy in love off and on.  At least that's what you
25          thought it was, didn't you?
```

```
 1   A.   Yes, that's what I thought it was.

 2   Q.   Insane, irrational, that's what you have been

 3        described as.  And you agreed with the defense

 4        attorney, didn't you?

 5   A.   Yes.

 6   Q.   But you got your sanity about yourself now, don't

 7        you?

 8   A.   Yes.

 9   Q.   Is that why you are not backing down off of these

10        charges?

11   A.   I am not backing down on no charges because he have

12        threatened my life.

13   Q.   You don't have one single letter or card that

14        Donnie sent to you.  It is not just one, is it?

15   A.   No.  It's several, a lot of them.

16   Q.   Lots of them.

17             So many that you can't count, can you?

18   A.   No, I can't count them.

19   Q.   But we can count these, can't we?

20   A.   Yes.

21   Q.   How many did we count on these six?

22   A.   I think it was six right there.

23   Q.   Does that sound like a man trying to break it off?

24   A.   No.  Because he sent me more than I sent him.

25   Q.   On the -- You were asked about were you abused over
```

```
 1              and -- were you abused for six or seven years?
 2    A.    It was off and on, not every year.
 3    Q.    Not every year, was it?
 4    A.    I know.
 5    Q.    Because you didn't see him every year, did you?
 6    A.    No.
 7    Q.    But you were in a relationship with him for six or
 8          seven years; is that correct?
 9    A.    Yes.
10    Q.    You are not saying that when you saw him he wasn't
11          abusive to you -- what you're telling the
12          Court -- Tell them what you are saying.
13              Why didn't you say he abused you for six or
14          seven years?
15    A.    He didn't abuse me for six or seven years because
16          most of the time he was locked up in prison.
17    Q.    You got pictures that you took, Defendant's Exhibit
18          Number 5, beautiful pictures; I agree with
19          Mr. Ausborn.  He said you were one big happy
20          family.  Is that what he said?
21    A.    Yes.
22    Q.    Is David Donnie Williams in those pictures?
23    A.    No, he is not.
24    Q.    As a matter of fact, he was nowhere to be found,
25          was he?
```

```
 1   A.   No.

 2   Q.   You had all the reason in the world to be smiling,

 3        didn't you?

 4   A.   Yes.

 5   Q.   As a matter of fact, he couldn't do anything to

 6        you, could he?

 7   A.   No.

 8   Q.   But threaten you as he normally did, isn't that

 9        correct?

10   A.   Yes.  Yes.

11   Q.   Can you count the number of times Donnie has

12        threatened to kill you?

13   A.   He have told me several times.  I just can't

14        remember how many times.

15   Q.   But we do remember April 17th?

16   A.   Yeah, I remember April 17th.

17   Q.   March the 30th?

18   A.   Yes.

19   Q.   March the 24th?

20   A.   Yes.

21   Q.   You remember those dates?

22   A.   Yes.

23   Q.   And we are here about that today; is that correct?

24   A.   Yes.

25   Q.   May I see those cards, please?
```

1    A.    (Witness complies.)

2    Q.    These are all handmade cards, aren't they?

3    A.    Yes.

4    Q.    And you know that's not Donnie's handwriting, is

5          it?

6    A.    No, that's not his handwriting.

7    Q.    And the wording on the inside, that's not

8          Donnie's handwriting, is it?

9    A.    No.

10   Q.    That's not Donnie's handwriting either, is it?

11   A.    No.

12   Q.    But you know the address on the envelope addressed

13         to you was Donnie Williams address, wasn't it?

14   A.    Yes.

15   Q.    And it is not just over a few months, is it?

16   A.    Say that again.

17   Q.    Those cards and letters didn't come just over a few

18         months, did they?

19   A.    No.

20   Q.    You heard your 21-year-old say that Donnie beat

21         you; correct?

22   A.    Yes.

23   Q.    Heard her say that Donnie fought her, caused some

24         scratches on her face.  You heard that, didn't you?

25   A.    Yes.

1    Q.    Is that the truth?

2    A.    That's the truth.

3    Q.    You heard the 21-year-old daughter say he not only

4          did that to me; I saw him hit my brother.  She told

5          them that, didn't she?

6    A.    No, she didn't say that.

7    Q.    She didn't say that.  You sure she didn't say that?

8    A.    I don't remember her saying hitting her brother.

9          MRS. PENN:   That's all.

10   FURTHER RECROSS EXAMINATION

11   BY MR. AUSBORN:

12   Q.    Now, Ms. Callie, State's Exhibit Number 4 and 5

13         forwarded to you in 2003; is that right?

14   A.    What did you say?

15   Q.    State's Exhibit 4 and 5 were forwarded to you in

16         2003; is that right?

17   A.    Yes.

18   Q.    Love notes, love cards; you would agree with it?

19   A.    They were supposed to have been.

20   Q.    Signed by Donnie's signature in the, love, Donnie;

21         is that right?

22   A.    Yes.

23   Q.    And State's Exhibit 6, unsigned.  Donnie never sent

24         you anything unsigned.  That's a fact; isn't that

25         right?

| | | |
|---|---|---|
| 1 | | MRS. PENN:  You asking a question or |
| 2 | | testifying? |
| 3 | | MR. AUSBORN:  That's a question. |
| 4 | A. | The reason he didn't sign that -- |
| 5 | Q. | My question to you, again is, a yes or no response. |
| 6 | A. | No, he hasn't said nothing to me about it being |
| 7 | | signed, about that letter right there. |
| 8 | Q. | For all you know, because you weren't there when |
| 9 | | that letter was written, you don't know who |
| 10 | | authored that letter because you weren't there when |
| 11 | | it was written; isn't that also true? |
| 12 | A. | Yes, but -- |
| 13 | Q. | And for all you know, you don't know who authored |
| 14 | | that letter because that letter is missing a |
| 15 | | critically important ending, and that's, love, |
| 16 | | Donnie; that's also correct? |
| 17 | A. | Yes. |
| 18 | | MR. AUSBORN:  Nothing further for this witness, |
| 19 | | Your Honor. |
| 20 | | THE COURT:  Any other? |
| 21 | | MRS. PENN:  Nothing further, Your Honor. |
| 22 | | (Whereupon the witness left the stand.) |
| 23 | | THE COURT:  Okay.  Mr. Ausborn, any other |
| 24 | | witnesses? |
| 25 | | MR. AUSBORN:  Your Honor, may we quickly |

```
 1          approach?
 2               (Whereupon a Bench conference was held
 3                outside the hearing of the reporter and
 4                jury.)
 5               (The following Bench conference was held
 6                outside the hearing of the jury:)
 7          MR. AUSBORN:  Your Honor, motion renewed.
 8          THE COURT:  Same ruling.
 9          Any rebuttal, Mrs. Penn?
10          MR. AUSBORN:  The defense rests, also.
11          MRS. PENN:  Jenny Renfroe.
12          THE COURT:  Call her.
13               (The following proceedings were held
14                within the hearing of the jury:)
15          THE COURT:  Ladies and gentlemen, the defense
16     has rested and the state has one rebuttal witness
17     to call.
18          MRS. PENN:  The State calls Jenny Renfroe.
19                         JENNY RENFROE
20     having first been duly sworn, testified as follows:
21                      DIRECT EXAMINATION
22  BY MRS. PENN:
23  Q.   State your name for the ladies and gentlemen of the
24       jury, please.
25  A.   Jenny Renfroe.
```

```
 1   Q.   What is your occupation, Mrs. Renfroe?

 2   A.   Social worker at the Department of Human Resources

 3        in Bullock County.

 4   Q.   Were you working in that capacity in February of

 5        2001?

 6   A.   Yes.

 7   Q.   Did you have the opportunity to take or to make an

 8        investigation regarding Callie Williams and her

 9        children?

10   A.   Yes.

11   Q.   Who would have been the perpetrator, the alleged

12        perpetrator in that investigation?

13   A.   Mr. Donnie Williams.

14             (State's Exhibit Number 7 was

15              marked for identification.)

16        MR. AUSBORN:  Your Honor, may we approach the

17   Court, please?

18             (The following Bench conference was

19              held outside the hearing of the jury:)

20        MR. AUSBORN:  Your Honor, I have not seen this.

21             First of all, it is highly irregular.

22             We filed for discovery, and I am entitled to

23   get this stuff.  This witness is not relevant to

24   the two cases before this Court, April 17, 2004,

25   and March 30th, 20004.  This is way back in 2001.
```

1    It is highly prejudicial.

2        THE COURT:  As her daughter testified about

3    this abuse in February of 2001, you challenged her

4    to bring forth any document related to that.

5        Are these those documents?

6        MRS. PENN:  Yes, Your Honor.  And we had no

7    idea they existed until she got on the stand and

8    stated DHR.

9        THE COURT:  And in response to that question,

10   you said, you don't have any documents to show

11   that, do you.

12       Are you going to offer the documents or just

13   ask the questions?

14       MRS. PENN:  I'm offering them.

15       THE COURT:  Give him a chance to look at it.

16       MR. AUSBORN:  At any rate, the Court would give

17   limiting instruction that this ain't got nothing to

18   do with what --

19       THE COURT:  It is offered as rebuttal, and I'll

20   give a limiting instruction.

21       You want me to give it now.

22       MR. AUSBORN:  Yes, please.

23       (The following proceedings were had

24        within the hearing of the jury:)

25       THE COURT:  Ladies and gentlemen, this witness

```
 1        is offered to rebut Ms. Callie Williams offered

 2        that there was a DHR report about her being abused

 3        by Mr. David Donnie Williams, and Mr. Ausborn

 4        challenged her to produce a document that

 5        substantiated that claim.  And in response to that,

 6        Mrs. Renfroe from DHR is called to produce that.

 7        And it is offered only for that purpose; not to say

 8        that Mr. Williams is guilty of anything that is

 9        before you in this trial, but just to rebut the

10        testimony that's been illicited.

11             MR. AUSBORN:  Thank you.

12             THE COURT:  Go ahead.

13                  DIRECT EXAMINATION (Cont'd)

14   BY MRS. PENN:

15   Q.   I believe you told us you did make an investigation

16        regarding a report of abuse regarding Callie

17        Williams and/or her children?

18   A.   Yes.

19   Q.   And in your investigation, you talked to Mrs.

20        Callie Williams, didn't you?

21   A.   Yes.

22   Q.   Who else did you speak to?

23   A.   The children.

24   Q.   And is there anybody else you spoke to?

25   A.   Mr. Williams.
```

1    Q.    And at the end of your investigation, did you make

2          a finding?

3    A.    Yes.

4    Q.    A conclusion based on what you found out in your

5          investigation?

6    A.    Yes.

7    Q.    And what was that conclusion or finding?

8    A.    The report was indicated.

9    Q.    Tell the ladies and gentlemen of the jury what

10         indicated means.

11   A.    Indicated means that we found proof that we could

12         say it did happen.

13   Q.    And let me ask you one more question, and then I'm

14         going to stop because it is getting late.

15            Did you see any evidence of injury to Lakeisha

16         Williams?

17   A.    Yes.

18   Q.    Thank you.

19            MRS. PENN:   Those are all of if questions I

20         have, Your Honor.   I move to admit State's Exhibit

21         Number 7.

22            MR. AUSBORN:   Your Honor, that exhibit is

23         opposed by counsel at this time subject to

24         cross-examination.

25            THE COURT:   Let me see it.   You oppose the

1   whole thing or just the findings?

2       MR. AUSBORN:  I oppose the whole thing.  It is

3   irrelevant, immaterial not probative and highly

4   prejudicial.

5       THE COURT:  I'll withhold ruling until cross.

6                   CROSS-EXAMINATION

7   BY MR. AUSBORN:

8   Q.  State your full name again for the Record.

9   A.  Jenny Renfroe.

10  Q.  Okay.  Mrs. Renfroe, I am attorney Keith Ausborn,

11      and I represent the defendant David Donnie

12      Williams.

13      If I ask you a question and you don't quite

14      understand the question, bring it to my attention,

15      and I'll be happy to clarify that.

16      Were you subpoenaed to be here today?

17  A.  Yes.

18  Q.  You were?

19  A.  (Witness nods affirmatively.)

20  Q.  And the State subpoenaed you to be here; is that

21      correct?

22  A.  Through the Court.

23  Q.  The State of Alabama?

24  A.  Yes.

25  Q.  Not the defense; is that correct?

518

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Now, you're employed with the Department of Human |
| 3 | | Resources? |
| 4 | A. | Yes. |
| 5 | Q. | And how long have you been employed with the |
| 6 | | Department of Human Resources? |
| 7 | A. | Six years. |
| 8 | Q. | And you were employed with them back in 2001; is |
| 9 | | that right? |
| 10 | A. | Yes. |
| 11 | Q. | Did you conduct this investigation yourself? |
| 12 | A. | I did. |
| 13 | Q. | Now, you know why we're here today? |
| 14 | | Has the State told you why we are on trial |
| 15 | | today? |
| 16 | A. | No. |
| 17 | Q. | Now, for clarification to you, David Donnie |
| 18 | | Williams is charged with stalking the alleged |
| 19 | | victim, Ms. Callie Williams, April 17, 2004. |
| 20 | | You know nothing about that; is that right? |
| 21 | A. | No. |
| 22 | Q. | David Donnie Williams is charged with |
| 23 | | harassment/domestic violence of Ms. Callie Williams |
| 24 | | March 30, 2004. |
| 25 | | You know nothing about that? |

```
 1   A.   No.
 2   Q.   This alleged investigation that you conducted back
 3        in 2001 has absolutely nothing to do with stalking
 4        that allegedly occurred April 17, 2004; isn't that
 5        true?  You agree with that?  They are totally
 6        separate and independent?
 7   A.   Yes.
 8   Q.   And this alleged investigation that took place in
 9        2001 is totally separate and has nothing to do with
10        the alleged harassment/domestic violence that
11        allegedly took place March 30, 2004; is that
12        correct?
13   A.   No.
14   Q.   So they have nothing to do with one another; isn't
15        that also correct?  They have nothing to do with
16        one another; your investigation back in 2001 is
17        totally separate and unrelated to a claim of
18        harassment/domestic violence that allegedly took
19        place March 30 of 2004?
20             You agree with that?
21   A.   It has to do with domestic violence.
22   Q.   But what I'm saying is they are two totally
23        separate events?
24   A.   Yes.
25   Q.   Totally unrelated to one another; is that correct?
```

520

```
 1    A.    No, not unrelated but the time.

 2    Q.    Let's talk about that.

 3          You said you interviewed Mr. David Donnie

 4          Williams back in 2001?

 5    A.    Yes.

 6    Q.    Was it recorded?

 7    A.    No.

 8    Q.    Was it videotaped?

 9    A.    No.

10    Q.    He didn't admit that he committed domestic violence

11          against anybody; isn't that true?

12    A.    I don't remember.

13    Q.    You don't remember?

14    A.    No.

15    Q.    You conducted this investigation and you don't

16          remember.  You just spoke about the findings.

17    A.    If I can refer to my report, I can let you know.

18    Q.    Yeah, please.  Take your time.

19    A.    Can you repeat your question?

20    Q.    Now, David Donnie Williams never admitted that he

21          committed domestic violence against Lakeisha

22          Williams; is that not correct?

23    A.    That's right.

24    Q.    And David Donnie Williams never admitted that he

25          committed domestic violence against Ms. Callie
```

```
 1              Williams; is that correct?
 2    A.    That's right.
 3    Q.    You have your report in front of you.  He never
 4          admitted he committed domestic violence against
 5          either one of them; isn't that correct?
 6    A.    Yes.
 7    Q.    Now, you know and I know, and this jury needs to
 8          know, there are two sides to every story; isn't
 9          that correct?
10    A.    Yes.
11    Q.    And you didn't know Callie Williams back in 2001
12          before this complaint came to you that was handed
13          to DHR and told to investigate this?  You didn't
14          know her before then?
15    A.    That's right.
16    Q.    You didn't know Lakeisha Williams prior to then; is
17          that right?
18    A.    That's right.
19    Q.    And you didn't know David Donnie Williams prior to
20          then; is that right?
21    A.    That's right.
22    Q.    So you can't say that Callie Williams at that time
23          was more credible than David or David more credible
24          than Callie because you knew neither one of the
25          two; is that right?
```

```
 1    A.    That's right.

 2    Q.    And likewise you can't say that Lakeisha was more

 3          credible than Donnie or Donnie was more credible

 4          than her because you knew neither of the two at

 5          that time; is that right?

 6    A.    That's right.

 7    Q.    Now, when you say that here it is, you investigated

 8          the case and you found that it was indicated, which

 9          means it was proven as factually correct and true,

10          you are not saying that David Donnie Williams

11          abused Lakeisha because he denied that he did that;

12          isn't that right?

13    A.    He denied it.

14    Q.    And you are not saying that David Donnie Williams

15          abused Ms. Callie Williams in 2001 because he

16          denied that also; isn't that correct?

17    A.    He denied it.

18    Q.    And you would agree that abuse, physical abuse on

19          another person is a criminal offense; isn't that

20          right, it is a criminal offense?  Unwarranted

21          touching against another person's person is a

22          criminal offense.  Do you agree with that?

23    A.    Yes.

24    Q.    You know and I know, and this jury needs to know,

25          no formal charges were ever prosecuted successfully
```

```
 1              against that young man right there for assault in
 2              2001.  You know that to be a fact; isn't that
 3              correct?  He was never found guilty of assault on
 4              Lakeisha Williams; is that not true?
 5    A.        It is not in my report.
 6    Q.        And he was never found guilty of assault on
 7              Ms. Callie Williams; isn't that true?
 8    A.        It is not in my report.
 9    Q.        Now, you weren't there when this alleged abuse took
10              place; isn't that right?
11    A.        No.
12    Q.        And likewise, in your report, how many pictures of
13              this alleged abuse are part of your report?
14    A.        There were no pictures.
15    Q.        You would agree that you've heard of the adage, a
16              picture speaks a thousand words.  You would agree
17              with that; you've herd of that?
18    A.        Yes.
19    Q.        There is no picture that speaks any words because
20              there were no pictures that were part of your
21              investigation; is that correct?
22    A.        There were no pictures.
23    Q.        You would agree that in order to do a thorough
24              investigation, pictures should have been taken;
25              isn't that right?
```

```
 1   A.   It was based on what I observed.

 2   Q.   But you would agree that observations are

 3        subjective.

 4             In other words, what you may have observed in

 5        comparison with what the next person may have

 6        observed may be two different horses.  Two people

 7        see one accident, and they both come away with a

 8        different obversation.  Do you agree with that?

 9   A.   Yes.

10   Q.   You would agree to eliminate any confusion, any

11        doubt concerning whether or not somebody suffered

12        any injuries, the prudent thing to do would have

13        been for you to take pictures of these alleged

14        injuries and then incorporate them in as part of

15        your investigation.  That's what should have been

16        done; you agree with that?

17             And it's okay to make a mistake.  We all do.

18             You agree with that?

19   A.   No.

20   Q.   You don't agree with that?

21   A.   No.

22   Q.   Do you have access to a camera?

23   A.   Yes.

24   Q.   Did you have access to a camera at that time?

25   A.   A Polaroid.
```

```
 1   Q.   You did?

 2   A.   Yes.

 3   Q.   Have you been told by the Department of Human

 4        Resources you can't use the department's camera?

 5   A.   No.

 6   Q.   Were you told at that time you couldn't use the

 7        department's camera?

 8   A.   No.

 9   Q.   Wouldn't you agree that had you taken a photograph

10        of these alleged injuries that were suffered by

11        Ms. Callie Williams as well as Lakeisha Williams,

12        it would clarify whether or not they in fact

13        suffered any injuries because we can in fact look

14        at the pictures and see for ourselves?

15   A.   Yes.

16   Q.   You didn't do that?

17   A.   No.

18   Q.   And that's not a good thing; you would agree with

19        that?

20   A.   No.

21   Q.   Now, do you have any medical records that show that

22        Ms. Callie Williams was treated medically for those

23        alleged injuries?

24   A.   No.

25   Q.   Do you have any medical records that show that
```

```
 1        violence occurred, and that man right there
 2        committed that violent act?  That's not the
 3        conclusion you made.
 4            The conclusion you made was, yes, I believe
 5        violence occurred.
 6            MRS. PENN:  Your Honor, would you instruct the
 7        attorney to ask a question and let her answer.
 8            MR. AUSBORN:  I'm trying to.
 9            THE COURT:  Objection sustained.
10   Q.   Did you make the conclusion that, yes, violence
11        occurred, but I don't know who committed it?  Is
12        that the conclusion you reached?
13   A.   No.
14   Q.   Did you make the conclusion that, yes, violence
15        occurred and that man right there David Donnie
16        Williams committed it?
17   A.   Yes.
18   Q.   So you believe her over him, Callie Williams over
19        him, even though you didn't know either of the two
20        at the time?
21   A.   It was based on interview.
22   Q.   Excuse me.
23   A.   It was based on interviews and what I observed.
24   Q.   Based on interviews?
25   A.   Interviews and what I observed.
```

```
 1    Q.    You didn't observe this act take place.

 2          If you were in here and an accident occurs

 3          outside and you go outside afterwards, you can't

 4          say with any degree of conviction as to who caused

 5          it because you were not there when it occurred.

 6          You weren't there when this alleged domestic

 7          violence occurred; isn't that correct?

 8    A.    No, I was not there.

 9    Q.    Are you a medical doctor?

10    A.    No.

11    Q.    Do you have any degree of medical expertise to

12          where you can draw some sort of conviction in terms

13          of how a person acquired injuries?

14    A.    No.

15    Q.    Are you psychic?

16          MRS. PENN:  Your Honor, I object; badgering the

17          witness.

18          THE COURT:  Sustained.

19          MRS. PENN:  She has told you what the

20          investigation was based on.  She didn't say she was

21          psychic.

22    Q.    Okay.  Let me ask you:  Do you operate through the

23          gift of discernment, spiritual discernment, where

24          you can look at a person?

25          MRS. PENN:  Your Honor, I object.
```

```
 1              THE COURT:  Sustained.  Sustained.
 2   Q.   Tell us, if you will, why you believed Callie
 3        Williams over David Donnie Williams.
 4              THE COURT:  It's been asked and answered.  Next
 5        question.
 6              MR. AUSBORN:  That's all.
 7                         EXAMINATION
 8   BY THE COURT:
 9   Q.   Mrs. Renfroe, let me ask you this about this one
10        page:
11              This is a page titled, Worker Assessment.  Is
12        this your finding by you in May of 2001?
13   A.   It is.
14   Q.   And this is the part of the report you draw your
15        conclusion with regard to the investigation?
16   A.   Yes.
17              THE COURT:  With regard to Exhibit 7, I'm going
18        to allow the page that's her finding.  The other is
19        irrelevant.
20              (State's Exhibit Number 7 was offered
21               offered and received into evidence.)
22              THE COURT:  Ladies and gentlemen, for the
23        purpose of this testimony and exhibit, it is
24        offered to rebut the defense's position with the
25        victim Callie Williams and her daughter that there
```

```
 1        were no documentations of this alleged abuse in

 2        2001.  That's the only purpose it is offered for,

 3        not for any inference concerning the charges

 4        pending against Mr. Williams and the cases we are

 5        here on today.

 6             Does everybody understand that instruction?

 7             (Affirmative response from the jury.)

 8             THE COURT:  Now, if there is testimony

 9        concerning some of the other, you can go in to it.

10                     REDIRECT EXAMINATION

11   BY MRS. PENN:

12   Q.   You said you questioned David Donnie Williams; is

13        that correct?

14   A.   Yes.

15   Q.   Did you send him notice that you had found this

16        complaint indicated?

17   A.   Yes.

18   Q.   And did he ever respond?

19   A.   No.

20   Q.   And in that letter that you sent to him, did you

21        tell him he could appeal that decision?

22   A.   Yes.

23   Q.   Was there ever any appeal?

24   A.   No.

25             MRS. PENN:  That's all.
```

531

```
 1              MR. AUSBORN:  One final question.

 2                     RECROSS-EXAMINATION

 3   BY MR. AUSBORN:

 4   Q.    With respect to the notice you sent to David Donnie

 5         Williams, did you send it certified?

 6   A.    Yes.

 7   Q.    Do you have a copy of the certified delivery

 8         showing it was received by him?

 9   A.    It's in the record.

10   Q.    Is it in this record right here saying that he

11         signed for it?

12   A.    May I refer to this?

13   Q.    Sure; go ahead.

14              While you are thumbing through there, what we

15         are looking for is a copy of the actual signature

16         card.

17   A.    That is in the record at the office.

18   Q.    It is not here today?

19   A.    No.  But there is a statement in here that says he

20         received it.

21   Q.    But my question is:  Is there a copy of the

22         signature card?

23   A.    It's in the office.

24   Q.    And is there a copy of the letter that you sent him

25         to dispute -- to repute the contentions?
```

```
 1    A.    Yes.

 2    Q.    And you addressed that out to David Donnie

 3          Williams; is that right?

 4    A.    Mr. David Donnie Williams.

 5    Q.    Hardaway Street, 114?

 6    A.    Jail.

 7    Q.    But you don't have the certified card here that he

 8          signed it?

 9    A.    Not that he signed it or that Mr. Hudson signed it.

10          MR. AUSBORN:  Your Honor, we would object again

11    other than that one page coming forward with the

12    limiting instruction.

13          THE COURT:  Anything else?

14          MRS. PENN:  Nothing further, Judge.

15          THE COURT:  You better get down before they get

16    something else.

17          (Whereupon the witness left the stand.)

18          THE COURT:  Next witness.

19          MRS. PENN:  That's it.  State rests.

20          THE COURT:  Pardon?  Any other witnesses?

21          MRS. PENN:  No.  The State rests.

22          THE COURT:  Let me talk to y'all about what's

23    left.

24          What's left in this trial is a time limited

25    closing argument from each side that's going to be
```

1       15 minutes a piece.

2           The state can divide theirs up how they want

3       to, and the defense can divide theirs up how they

4       want to.  The State goes first, the defense goes

5       second and the state goes third.  They have a total

6       of 15 minutes.  And then a charge from me of the

7       law.

8           I think I've got it summarized down.  It might

9       take 10 or 15 minutes.  That's 45 minutes total

10      when you do it all together.

11          Do you want to stay today and do that or come

12      back tomorrow?  Y'all want to keep going?

13          (Affirmative response from the jury.)

14          THE COURT:  Does anybody need to make any phone

15      calls and get children picked up or anything like

16      that?

17          (Negative response from the jury.)

18          THE COURT:  All right.  Closing from the State.

19                     CLOSING ARGUMENTS

20          (Whereupon Mrs. Penn presented her closing

21           arguments on the behalf of the State and no

22           objections were made thereto.)

23          THE COURT:  Defense.

24          (Whereupon Mr. Ausborn presented his closing

25           arguments to the jury on behalf of the

```
 1        defendant, and no objections were made
 2        thereto.)
 3   THE COURT:  Final close from the State.
 4        (Whereupon Mrs. Penn presented her final
 5        closing arguments to the jury on behalf of the
 6        State and no objections were made thereto.)
 7   THE COURT:  Ladies and gentlemen, do you want
 8   to take a break before you get the charge?  Y'all
 9   need a bathroom break.
10        (Affirmative response from some jurors.)
11   THE COURT:  Take ten minutes.  Come straight
12   back in here when you finish your break.
13   Everybody else remain seated in the courtroom.
14        (Whereupon the jury was given a break, left the
15        courtroom, and the following proceedings were
16        held outside the presence of the jury:)
17   THE COURT:  Have you checked the exhibits?
18   MR. AUSBORN:  Just about.  Okay.  Go ahead.
19   THE COURT:  Carmella, after that is put on one
20   form, is the State satisfied?
21   MRS. PENN:  State is satisfied.
22   THE COURT:  Defense?
23   MR. AUSBORN:  Yes, yes.
24   THE COURT:  Are have you confirmed that all of
25   the exhibits that are properly admitted are there.
```

1       MRS. PENN:  Yes.

2       MR. AUSBORN:  Yes.

3       THE COURT:  And the alternate is this person;

4    and what I do is put her in my office where she is

5    by herself.  And if there is a need for us to put

6    her on, we can.

7       MR. AUSBORN:  Okay.

8       (Whereupon the jury returned to the jury box,

9        and the following proceedings were had in open

10       court:)

11      THE COURT:  All right.  Last time I have to ask

12    you this, ladies and gentlemen:  Have you received

13    any evidence or information concerning this case

14    other than the arguments presented to you and the

15    evidence and testimony?

16      (Negative response from the jury.)

17                    **JURY CHARGE**

18      THE COURT:  It is time for me to give you

19    what's called the charge or the law that you are to

20    apply in this case.

21      I'll go through this charge kind of in three

22    sections.  First is just some instructions

23    generally about the law and some instructions about

24    deliberations or what you are doing.

25      The middle part is the actual law on the

1    charges that are before you and the elements of

2    those charges.  And, finally, I'll talk to you

3    about the procedure you will employ when you go

4    back to the jury room.

5         As I told you before the trial started, you

6    will be the sole and exclusive judges of the facts

7    of this case.

8         It's your duty to attempt to reconcile the

9    testimony of all of the witness so as to make them

10   all speak the truth if that can reasonably be done.

11        If you cannot reasonably reconcile all the

12   testimony of all of the witnesses, then it is your

13   duty to determine what the true facts are.   In

14   doing that, you may reject or accept any part of

15   any testimony of any witness and keep only the part

16   of the testimony that you consider to be worthy of

17   belief.

18        In determining what the true facts are from the

19   evidence, you may take into account and into

20   consideration any natural interest or bias a

21   witness may have as a result to his or her

22   connection with the case.

23        You may take into account any interest or bias

24   the witness may have shown while testifying.

25        You may take into consideration the demeanor of

1    the witness as to whether the witness has testified

2    frankly or evasively.

3        You may take into consideration any matter

4    which you would use in your everyday affairs in

5    passing upon the truthfulness and accuracy of

6    someone's testimony.

7        Weigh the testimony that you have heard in this

8    trial in light of your common observations and

9    everyday experiences and reach a verdict based upon

10   the truth as you determine it from all of the

11   evidence.  In this case your verdict must be

12   unanimous.

13       In arriving at verdict in this case, you must

14   not permit sympathy, prejudice or emotion to

15   influence you in any way.

16       The judge is not permitted by law to express

17   his opinion or comment on the effect of the

18   evidence that has been presented to you during this

19   trial or express an opinion as to the credibility

20   of any of the witnesses that have testified in this

21   case.

22       Therefore, any ruling, statement or expression

23   which may have been made by me during the course of

24   this trial is not to be considered by you as any

25   effort on my part to convey to you any feeling or

1    opinion about the facts of the case or the

2    credibility of any of the witnesses.

3        In this case the State of Alabama has the

4    burden of proving that the defendant is guilty as

5    charged and that burden rests upon the state.

6        Before a conviction can be had in this case,

7    the State must satisfy each and every member of the

8    jury of the defendant's guilt.  Unless the State

9    satisfies you of the defendant's guilt beyond a

10   reasonable doubt, then he is entitled to an

11   acquittal.

12       The phrase reasonable doubt is

13   self-explanatory. Efforts to define it do not

14   always clarify the term, but it may help you some

15   to say that the doubt which would justify an

16   acquittal must be an actual doubt and not a mere

17   guess or surmise.  It is not a forced or captious

18   doubt.  The reasonable doubt which entitles an

19   accused to an acquittal is not a mere, fanciful,

20   vague, conjectural or speculative doubt.  It is a

21   doubt which arises from all or part of the evidence

22   or from lack of evidence or from contradictory

23   evidence and remains after careful consideration of

24   the testimony.

25       So you will observe, the State is not required

COURT OF CRIMINAL APPEALS NO. _CR 04- 0846_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _____Bullock_____ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC-2004-144_

CIRCUIT JUDGE _Hon. L. Bernard Smithart_

Type of Conviction / Order Appealed From: _Stalking_

Sentence Imposed: _38 years_

Defendant Indigent: [X] YES [ ] NO

David Donnie Williams
_____

Hon. Donald E. Spencer   334-269-1934
(Appellant's Attorney)                    (Telephone No.)
547 S. Lawrence Street
(Address)
Montgomery, AL  36104
(City)          (State)          (Zip Code)

NAME OF APPELLANT

V.

## STATE OF ALABAMA

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

_____

NAME OF APPELLEE

(For Court of Criminal Appeals Use Only)

EXHIBIT

A

 1    to convince you of the defendant's guilt beyond all

 2    doubt but simply beyond a reasonable doubt.  Of

 3    course, evidence which merely gives rise to a

 4    surmise, conjecture or suspicion of guilt is

 5    insufficient.

 6        Ladies and gentlemen of the jury, some of the

 7    evidence that you have heard in this case is what's

 8    called circumstantial evidence.  Circumstantial

 9    evidence is defined by law as positive proof of

10    circumstances or facts which tend to prove the

11    existence of other facts that are sought to be

12    proven.  Circumstantial evidence comes to you from

13    an inference that is drawn from certain physical

14    facts that are found by you as a result of direct

15    evidence.

16        When a part or all of the evidence relied upon

17    by the prosecution is circumstantial evidence, the

18    chain of circumstances must be so complete and of

19    such character so as to convince you beyond a

20    reasonable doubt of the defendant's guilt.

21        A conviction may be had upon evidence which is

22    circumstantial so long as the evidence is so strong

23    and cognitive as to prove the defendant's guilt

24    beyond a reasonable doubt.

25        A conviction may not be had upon circumstantial

1     evidence if there is an inference consistent with

2     the innocence of the defendant.  Evidence of a

3     circumstantial nature may be sufficient to convict

4     a defendant only if such evidence convinces you of

5     the defendant's guilt beyond a reasonable doubt.

6         In this case, Mr. David Donnie Williams, the

7     defendant, has exercised his constitutional right

8     not to take the stand and testify in the case.

9         I told you at the beginning of the trial that

10     the defendant is presumed innocent and that

11     presumption never changes until the State proves

12     beyond a reasonable doubt his guilt.

13         The burden of proof is on the State, and I've

14     explain that burden to you; and it remains with the

15     State throughout the trial.

16         You are not to attach any significance or any

17     weight or use in any way the fact that the

18     defendant did not testify against him.  It is not

19     his burden and never becomes his burden.

20         The defendant in this case is charged with

21     stalking.  A person commits the crime of stalking

22     if he intentionally and repeatedly follows or

23     harasses another person and makes a credible

24     threat, either expressed or implied, with the

25     intent to place that person in a reasonable fear of

1    death or serious bodily harm.

2         To convict, the State must prove beyond a

3    reasonable doubt each of the following elements of

4    stalking:

5         One, that the defendant, David Donnie Williams,

6    intentionally and repeatedly followed the victim

7    Callie Williams.  Two, that the defendant made an

8    expressed or implied credible threat.  And, three,

9    that the defendant did so with the intent to place

10   Callie Williams in reasonable fear of death or

11   serious bodily injury.

12        To harass is to engage in an intentional course

13   of conduct directed at a specified person which

14   alarms or annoys that person or interferes with the

15   freedom of movement of that person and which serves

16   no legitimate purpose.

17        The course of conduct must be of such as would

18   cause a reasonable person to suffer substantial

19   emotional distress and must actually cause

20   substantial emotional distress.  And course of

21   conduct is a pattern of conduct composed of a

22   series of acts over a period of time which

23   evidences a continuity of purpose.

24        A credible threat is an expressed or implied

25   threat made with the intent and the apparent

1       ability to carry out the threat so as to cause a

2       person who is the target of the threat to fear for

3       his or her safety or the safety of a family member

4       and to cause reasonable mental anxiety, anguish or

5       fear.

6           A person acts intentionally with respect to a

7       result or to conduct when his purpose is to cause

8       that result or engage in that conduct.

9           If you find from the evidence that the State

10      has proved beyond a reasonable doubt each of the

11      above elements of the offense of stalking as

12      charged, then you shall find the defendant guilty

13      of stalking.

14          If you find that the State has failed to prove

15      beyond a reasonable doubt any one or more of the

16      elements of stalking, then you cannot find the

17      defendant guilty of stalking.

18          Next, the defendant is charged with domestic

19      violence/harassment.

20          A person commits domestic violence in the third

21      degree if that person commits the crime of

22      harassment pursuant to Subsection A of 13-A-811,

23      and the victim is a current or former spouse,

24      parent, child, any person with whom the defendant

25      has a child in common, a present or former

1     household member, or a person who has or had a

2     dating or engagement relationship with the

3     defendant.

4        Harassment:  There are two kinds.  A person

5     commits the crime of harassment if with the intent

6     to harass, annoy or alarm another person, he

7     strikes, shoves, kicks or otherwise touches a

8     person or subjects him to physical contact.

9        Also, harassment can be:  A person commits the

10    crime of harassment if with the intent to harass,

11    annoy or alarm another person, he directs abusive

12    or obscene language or makes an obscene gesture

13    toward another person.

14       Obscene means that to the average person

15    applying contemporary community standards, the work

16    or performance taken as a whole appeals to the

17    purian interest.  The work or performance deicts or

18    describes in a patently offensive way sexual

19    conduct, actual or stimulated, normal or perverted;

20    and the work or performance taken as a whole lacks

21    serious literary, artistic, political or scientific

22    value.

23       If you find from the evidence that the State

24    has proved beyond a reasonable doubt each of the

25    above elements of the offense harassment/domestic

1       violence as charged, then you shall find the

2       defendant guilty of harassment/domestic violence.

3           If you find that the State has failed to prove

4       beyond a reasonable doubt any one or more of the

5       elements of harassment/domestic violence, then you

6       cannot find the defendant guilty of

7       harassment/ domestic violence.

8           Ladies and gentlemen, for your purposes, a

9       verdict form has been prepared for your use in the

10      deliberation process.

11          Don't read anything in to the order that I put

12      the verdicts.  One had to be first and one second.

13          There is a guilty and not guilty verdict for

14      each charge.

15          The verdict form in Case Number 144 and 145

16      reads as follows:  We, the jury, find the

17      defendant, David Donnie Williams, guilty of the

18      offense of stalking as charged in the indictment;

19      and has a place for the foreperson to sign.

20          The second verdict would be:  We, the jury,

21      find the defendant, David Donnie Williams, not

22      guilty of the offense of stalking; place for the

23      foreperson to sign.

24          Next, you are to consider the offense

25      harassment/domestic violence.  We, the jury, find

1    the defendant, David Donnie Williams, guilty of the

2    offense harassment/domestic violence as charged in

3    the indictment.  And I have to put a place for the

4    foreperson to sign that one.  Everybody missed

5    that.

6        And then the last one for not guilty

7    harassment/domestic violence says:  We, the jury,

8    find the defendant, David Donnie Williams, not

9    guilty of the offense harassment/domestic violence.

10       During your deliberations, you will go back to

11   the jury room.  The first thing you will do is

12   elect one of your number as the foreperson of this

13   jury.  It will be that person's job to sign and

14   return the verdict form once you've reached a

15   unanimous verdict.  It is also that person's job to

16   moderate discussions.

17       Did anyone take any notes?  I didn't see

18   anybody.

19        (Negative response from the jury.)

20       THE COURT:  If you need to take a break during

21   the deliberations, you have to knock on the door so

22   that Mr. Smith can let us know and we can put it on

23   the Record that you are taking a break.

24       If and when you take a break, deliberations

25   have to stop until all twelve of you are back in

```
 1        the jury room.  So if you are not all in the room,

 2        you can't talk about the case.

 3             All right.  Let me see the lawyers and the

 4        court reporter right back here.

 5             (The following conference was held outside

 6              the hearing of the jury:)

 7             THE COURT:  The jury having been charged except

 8        for the changes in the verdict form, any objections

 9        from the State?

10             MRS. PENN:  None, Your Honor.

11             THE COURT:  Satisfied?

12             MRS. PENN:  Yes.

13             MR. AUSBORN:  Satisfied with the verdict form,

14        Your Honor, but we were wondering if the Court

15        would be inclined to give a charge about

16        inconsistent statements given by one of the

17        victims, because there are inconsistent statements,

18        and there is a charge that addresses that.  But it

19        is essentially that if you find a witness gives a

20        statement ...

21             THE COURT:  Something other than what I gave

22        them?  You listen to all of the witnesses and

23        accept what you consider to be worthy of belief;

24        you throw out what you don't want.

25             Something other than that?
```

```
 1          MR. AUSBORN:  Oh, that's fine, Judge.

 2          THE COURT:  Other than that line that was

 3     missing from the guilty verdict -- domestic

 4     violence, not guilty which I'm about to have

 5     inserted, everybody satisfied?

 6          MRS. AUSBORN:  Yes, Judge.

 7          MRS. PENN:  State's satisfied, Judge.

 8          THE COURT:  And then the alternate is Beverly

 9     Rotten Chruchwell.

10          MR. AUSBORN:  That's correct, Your Honor.

11          MRS. PENN:  Right.

12          (The following proceedings were had

13           within the hearing of the jury:)

14          THE COURT:  Okay.  With the exception of

15     Mrs. Beverly Churchwell on the front right -- You

16     stay where you are seated.  -- everyone else return

17     to the jury room.  But don't start deliberations

18     until Mr. Smith brings in exhibits, and this

19     verdict form, okay?

20          (Whereupon the jury retired to the

21           jury room at 5:30 p.m.)

22          The jury began deliberations at 5:33 p.m.)

23          (Whereupon at 5:42 p.m., the jury notified

24           the baliff they had a question.)

25          THE COURT:  Question from the jury.
```

```
 1          The question reads:  What is the sentence of
 2     each offense?
 3          What I normally do is put a response on here
 4     that we can all agree to.
 5          How about, It is not proper to answer that at
 6     this time?
 7          MR. AUSBORN:  That's fine.
 8          THE COURT:  The response agreed on by the
 9     parties says, it is not proper to answer this at
10     this time written on the bottom of the note that
11     they have sent out.  I'll give it to the bailiff to
12     give to them.
13          Is that approved by the state?
14          MRS. PENN:  Yes.
15          THE COURT:  Defense?
16          MR. AUSBORN:  Yes.
17          (Whereupon the Court sent the response back in
18           to the jury deliberation room at 5:45 p.m.)
19          (Whereupon at 6:15 p.m. the jury
20           sent another note out.)
21          THE COURT:  I want y'all to see this:  It's got
22     some vote numbers on it.
23          The note reads -- It gives some numbers on
24     where they are on domestic violence.  How should we
25     go about resolving this issue?
```

```
 1              They seem to be split on that.

 2              MR. AUSBORN:  On behalf of the defense, I

 3       recommend they continue deliberating.

 4              THE COURT:  Same from the State?

 5              MRS. PENN:  Yes.

 6              MR. AUSBORN:  Yes.

 7              THE COURT:  I'm just going to write that they

 8       continue deliberations.

 9              (Whereupon the note with the Court's

10               response was sent back in to the jury room.)

11              (At 6:25 p.m., the jury informed the baliff

12               they needed a break, and a break was given.)

13              (Whereupon the jury returned from their break

14               and resumed deliberations at 6:35 p.m.)

15              (Whereupon the jury informed the bailiff they

16               had reached a verdict at 6:45 p.m.)

17              THE COURT:  Ladies and gentlemen, the jury has

18       reached a verdict, and I'll bring the jury back in,

19       and we'll read the verdict.  And I want everybody

20       to remain calm.  After the verdict is read, the

21       jury will go back to the jury room, and then you

22       will be released for the evening.

23              Bring them in.

24              (Whereupon the jury returned to the jury box,

25               and the following proceedings were had in
```

```
1              open court:)

2                   VERDICT

3        THE COURT:  Ladies and gentlemen of the jury,

4    it is my understanding that you have reached a

5    verdict, and that verdict will be read into the

6    Record.

7        State of Alabama versus David Donnie Williams,

8    Case Numbers CC-04-144 and 145:  We, the jury, find

9    the defendant, David Donnie Williams, guilty of the

10   offense of stalking as charged by the indictment

11   signed by the foreperson.

12       Next:  We, the jury, find the defendant David

13   Williams not guilty of harassment/domestic

14   violence, signed and dated by the foreperson,

15   November 23, 2004.

16       THE COURT:  Request polling of the jury?

17       MR. AUSBORN:  Yes, sir.

18       (Whereupon the jury was polled, and

19         all responded in the affirmative.)

20       THE COURT:  If you would, ladies and gentlemen,

21   go back to the jury room one minute, and I'll be in

22   there in just a minute to dismiss you.

23       (Whereupon the jury left the courtroom, and the

24         following proceedings were had outside the

25         presence of the jury:)
```

1          THE COURT:  Defendant approach.

2          (The defendant approaches with counsel.)

3          THE COURT:  Mr. David Donnie Williams, in Case

4     Number CC-04-144, a jury of your peers in Bullock

5     County, Alabama on this date, November 23, 2004,

6     has found you guilty of the offense Stalking, as

7     charged in the indictment, and this Court does now

8     adjudge you guilty of stalking as charged in the

9     indictment.

10         The jury has found you not guilty and acquitted

11    you of the misdemeanor harassment/domestic

12    violence.

13         Request pre-sentence report?

14         MR. AUSBORN:  Yes, Your Honor.

15         THE COURT:  The pre-sentence report has been

16    done.  They will come and interview

17    Mr. Williams.

18         You will need to fill out some forms; victim

19    impact statements and anything they want considered

20    for sentencing, which will be set for December 9th.

21         THE COURT:  Any questions, Mr. Williams?

22         THE DEFENDANT:  I don't feel that I was judged

23    fairly.

24         THE COURT:  Okay.  Anything else?

25         THE DEFENDANT:  No.

```
 1        Mr. Donnie would like to quickly address the Court,

 2        and I also have the sister.

 3            THE COURT:  Let me take his statements last.  I

 4        also have attached to the report of investigation

 5        the victim's impact statement.

 6            Does the State have anything other than that?

 7            MRS. PENN:  No, Your Honor.  After trial there

 8        were some things said, and she was already very

 9        frightened, and we wanted to put her statement in.

10        And you heard her testify at trial.

11            THE COURT:  Okay.  As to the stalking --

12            MRS. PENN:  That's a Class C felony.  And we

13        have provided Your Honor, as well as defense

14        counsel, with certified copies of five priors.  And

15        Section 13-A-59-C1, Code of Alabama, states that in

16        all cases when it is shown that a criminal

17        defendant has been previously convicted of any

18        three felonies, and after such has committed

19        another felony, should he should be punished as

20        follows:  For a class C felony which is for life or

21        any term not more than 99 years, but not less than

22        15 years.

23            THE COURT:  That's based on the '92 Escape

24        Third Degree, a '95 Distribution, a '99 Burglary

25        Third, and a 2001 Theft of Property Second, and
```

554

```
 1        2001 Escape Second?
 2             MRS. PENN:  Yes, Judge.
 3             THE COURT:  Those are the five priors?
 4             MRS. PENN:  Yes.
 5             THE COURT:  With regard the the enhancement,
 6        Mr. Ausborn?
 7             MR. AUSBORN:  Your Honor, the State has
 8        provided us copies of those, and I reviewed those
 9        with my client and discussed them in detail, and he
10        does stipulate that he does has five priors and
11        recognizes that the Court is mandated in applying
12        the Habitual Offender Act.  However, he would like
13        to, of course, petition the Court for the downward
14        departure on sentencing and not do the standard
15        enhancement.
16             THE COURT:  For the Record, on the Habitual
17        Offender Form 13-A-59, three prior felonies and a
18        Class C felony would take it to a range of 15 to 99
19        years or life in the state penitentiary and a fine
20        up to $20,000.
21             Does everybody agree that's the proper range?
22             MR. AUSBORN:  Yes.
23             THE COURT:  Anything else?
24             MR. AUSBORN:  Ms. Daisy would like to address
25        the Court, please.
```

```
 1                          DAISY ELLIS
 2      having first been duly sworn, testified as follows:
 3              THE COURT:   What's your name?
 4              THE WITNESS:   I am Daisy Ellis.
 5              THE COURT:   How are you related to the
 6      defendant?
 7              THE WITNESS:   David Donnie Williams is my
 8      brother.
 9              THE COURT:   Tell me what you want me to know.
10      You understand what I am deciding today is
11      Mr. Williams' sentence?
12              THE WITNESS:   Yes.
13              THE COURT:   You can tell me anything you want
14      to tell me about that.
15              THE WITNESS:   I'm asking the Court to please
16      have mercy on my brother David Donnie Williams for
17      what he may have done wrong and not give him life
18      in prison; to give him parole because he is a good
19      person and he would never harm anyone.
20              THE COURT:   Thank you, Ms. Ellis.
21              Anybody else?
22              THE DEFENDANT:   I want to address the Court.
23              My name is David Donnie Williams.  This
24      incident that took place was between me and a girl
25      that I had been living with for the last seven
```

1    years.  And I never really brought her any bodily

2    harm.  I always cared for her and her kids, and it

3    was a relationship that went bad.

4         And when the incident took place, really, I was

5    just trying to make amends to her and talk to her,

6    and she was just scared.  I never laid a hand on

7    her and never wanted to lay a hand on her, and I

8    was just explaining to her that I wanted to go my

9    way and she go hers.  And she was probably scared

10   of me because of the things I used to do.

11        And I want to address the Court that I used to

12   do a lot of things in my past and I used drugs and

13   so forth.  But I had just got out of prison, and I

14   was really trying to straighten my life up and go

15   on with my life.  And I wasn't trying to bring

16   anyone any harm.  The only thing I wanted to do was

17   live my life, and if I did anything wrong, I want

18   to say I'm sorry.

19        THE COURT:  Do you want to say anything with

20   regard to your prior record, Mr. Williams?

21        THE DEFENDANT:  I would like the Court to give

22   me something that I can deal with while I am in

23   prison.  I want to go on with my life.  I am not

24   planning on living in Alabama when I get out.  I'm

25   in prison now, and the reason I went back to prison

1    is because she signed the warrants; I was revoked.

2    I wasn't trying to do any harm.  I was working.  I

3    was trying to do what was right.  And it just

4    wasn't enough for her and she kept arguing.  And I

5    just wanted to split because it was driving me back

6    to the life I used to live.  And I was constantly

7    trying to explain it to her.  And every time we

8    talk, we get upset and have few words.  But I never

9    wanted to give any harm to her.  If I would have, I

10   would've did it in the past.

11         And she was like, you said you was going to do

12   this to me.  And I said, if I was going to do, I

13   would have done it in the past.  We sleep together

14   every night.  I always loved her and loved her kids

15   as if they were my own.  That's why I wouldn't

16   leave the little kid on the step when she was there

17   by herself.  I loved that little girl.  I raised

18   her from a baby.

19         I wasn't trying to bring anybody no bodily harm

20   in that house.  I seen it wasn't going to work.

21   And so I was trying to go on about my business.  I

22   am not trying to do anything to her.  I want to

23   stay away from her and make sure I stay away

24   because I am going to leave town when I get out of

25   prison.  That's the truth, and the Lord knows

1   that's the truth.

2       MR. AUSBORN:  I would like to indicate to

3   correct the record, he stated he had been revoked

4   by DOC.  He was not revoked, he was declared in

5   the delinquency status pending the disposition of

6   the case that's before the Court.

7       I would also like to note to the Court as the

8   Court saw, my client was exonerated and acquitted

9   of the domestic violence/harassment case, and I

10  looked through his prior criminal history, and he

11  has never been convicted of a violent offense.

12      Stalking, for all practice purposes, is more

13  correlated to an act of violence.  This technically

14  is his first and only offense that is relative to a

15  potential act of violence.

16      The Court heard the testimony in this case.

17  This was an indictment that was aggressively

18  prosecuted and defended.  It could have gone either

19  way.  Unfortunately, the scales tipped in the

20  State's favor.  We accept that, but I think now the

21  Court is tasked with the dubious task of trying to

22  come up with a sentence that speaks to justice.

23      I don't think this is a young man that the

24  State can argue or the victim can argue is an

25  individual that the Court should bring a heavy

1    hand.   The appropriate sentence in this case is 15

2    to life.   I believe this young man here, given the

3    fact he has been locked up, is remorseful, he is

4    repentant.   I think this is a young man who

5    ought to be considered for the base minimum in this

6    case, and that's a 15.   And we go one step further

7    by virtue of our filing and ask the Court to

8    consider a reverse split in this case.   He stated

9    that he doesn't want any further contact with the

10   victim.   And the victim doesn't want to have any

11   further contact with him.   He's got a solid home

12   plan and will establish a solid vocation plan, et

13   cetera.   I think if the Court were to consider him

14   for a reverse split, the leash would be short on

15   him to where if he created any problems, the Court

16   would be empowered, and I know the State would

17   surely ensure this, that he would be snatched up in

18   a heartbeat.

19       But I believe this young man ought to be given

20   some consideration.   He has had his name drug

21   through the mud in this community, and he has

22   obviously absolved himself of a relationship with a

23   young lady he loved and spent seven years with, et

24   cetera.   And we just ask the Court to be very

25   considerate of those facts.

```
 1          THE COURT:  Mrs. Penn?

 2          MRS. PENN:  Your Honor, I want to address this

 3     motion that the defense has termed, Petition for

 4     Mercy.  I would ask the Court to take note that

 5     even though Mr. Williams is asking for leniency in

 6     this case.  He is not being entirely truthful. In

 7     the motion, it says, he has accepted responsibility

 8     for his criminal wrongdoing.  In his statement

 9     today, he has not accepted any type of criminal

10     responsibility.

11          And I think that if you take note of everything

12     that transpired in the trial, even though there

13     were no convictions, there were charges brought and

14     dismissed for the victim being afraid, and nol

15     prossing of charges on other charges.  So we ask

16     the Court take judicial notice of the fact that

17     even though he was not convicted of these offenses,

18     DHR indicated him for being positive of physical

19     abuse toward the victim and the children.  It is

20     documented in the DHR records and in this case.  So

21     I wanted to correct the Record about no violence in

22     this case.  The judge was here and there was

23     testimony about what he told the little boy.

24          David Donnie Williams has had time and time and

25     time again to become a productive citizen.  And
```

1    each time he went into the penitentiary and came

2    out, I don't think there was a year lapse from the

3    time he went in and came out.  I think it is time

4    he go in and serve his time.  And we are asking

5    that the Court sentence him to the maximum of 99 or

6    life in this case.

7         THE COURT:  Anything else?

8         MR. AUSBORN:  I'm speechless.  He is a young

9    man that doesn't even come close to swinging to the

10   high end of the pendulum, Your Honor.  And we ask

11   the Court to grant him some mercy.

12        THE COURT:  Mr. Williams, a jury of your peers

13   has found you guilty of the Class C felony of

14   Stalking.  Your lawyer and you have reviewed the

15   pardons and parole report and the notice of

16   enhancement and stipulated to five prior felony

17   convictions.

18        Under the Alabama Code, it takes you to a

19   sentencing range of a minimum of 15 years up to

20   life or 99, and a minimum fine up to $20,000.

21        Do you understand all of that?

22        THE DEFENDANT:  Yes, sir.

23        THE COURT:  Anything else you want to say

24   before pronouncement of sentence?

25        THE DEFENDANT:  Yes, sir.  I never meant to

1    bother or hurt this woman.  If I did something

2    wrong, I'm sorry.  I used to babysit the kids every

3    night, and they knew I would never do anything to

4    hurt them.  I babysit those kids when she was

5    working at night and I worked in the daytime.

6        If the Court feel I did something wrong, I'm

7    sorry.  The only thing I never tried to do was love

8    them.  That's all.

9        I've had a past history of using drugs.  I was

10   trying to get my life together.  I am 40 years old

11   now, and I have been to prison several times,

12   numerous times.  And for once in my life I want to

13   try to get my life together.  I am not trying to

14   keep being stuck in prison.  And I'm trying to do

15   my time.  And I realize when I'm not on drugs, I am

16   a good person.  I don't don't mean anybody any

17   bodily harm.  I've got a straight record in prison

18   and not a violent person in prison because I am not

19   drinking or on drugs.

20       I realize that was my problem.  I don't want to

21   be affiliated with that anymore, and I want the

22   Court to give me a chance to get out and do

23   something else with the rest of my life.  That's

24   all I want to say.

25       THE COURT:  As to restitution, is there any

1    claim for restitution?

2         MRS. PENN:  We don't have any at this time.

3         THE COURT:  Having considered the testimony

4    given here today, the testimony and evidence

5    presented at trial and the jury's verdict, the

6    Court sentences you, Mr. David Donnie Williams, to

7    38 years in the state penitentiary.  The Court

8    orders that you attend the Dual Diagnosis Program,

9    Substance Abuse Program, and the Anger and Stress

10   Management Program.  The Court fines you $5,000,

11   zero restitution, victim's comp, court costs, and

12   no attorneys fees since your attorney was privately

13   hired.  Do you understand your sentence, Mr.

14   Williams?

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  Do you have any questions about it?

17        THE DEFENDANT:  (Defendant shakes head.)

18        THE COURT:  You have a right to appeal your

19   sentence and the decision of the jury.  Your lawyer

20   will discuss those options with you and the time

21   standards that apply.

22        (End of proceedings.)

23

24

25

CRIMINAL APPEALS NUMBER: CR-2004-0846

---

IN THE COURT OF CRIMINAL APPEALS
FOR THE STATE OF ALABAMA

---

DAVID DONNIE WILLIAMS

Appellant

v.

STATE OF ALABAMA

Appellee

---

ON APPEAL FROM THE CIRCUIT COURT OF

BULLOCK COUNTY, ALABAMA

---

BRIEF OF THE APPELLANT

---

DONALD EUGENE SPENCER, JR.    (SPE046)
Gene Spencer, Attorney At Law, LLC
547 South Lawrence Street
Montgomery, Alabama 36104
(334) 269-1934
(334) 832-4527 fax

EXHIBIT
B

# Table of Contents

|  | Page |
|---|---|
| Table of Authorities | ii |
| Statement of the Case | 1 |
| Statement of the Issues | 3 |
| Statement of Facts | 4 |
| Statement of the Standard of Review | 13 |
| Summary of the Argument | 14 |
| Argument | 15 |
| Conclusion | 26 |
| Certificate of Service | 27 |

i

## Table of Authorities

*Clark v. United States*, 293 F.2d 445 (5th Cir. 1961).

................14

*Davis v. State* 598 So.2d 1054 (Ala.Crm. App. 1992).

................13

*Faircloth v. State*, 471 So.2d 485 (Ala.Crm. App. 1984)

................13

*United States v. Black*, 497 F.2d 1039 (5th Cir. 1974)

.............. 14

*United States v. McGlamory*, 441 F.2d 130 (5th Cir. 1969)

.............. 14

## Statement of the Case

A warrant was signed against David Donnie Williams on April 14, 2004, by Callie Williams for the charge of "Stalking" in violation of §13A-6-90, <u>Code of Alabama, 1975</u>, and for "Domestic Violence-3rd degree" in violation of §13A-6-132, of the <u>Code of Alabama, 1975</u>. Williams was indicted by the Bullock County Grand Jury on these charges and on November 15, 2004, Williams was arraigned and entered a plea of not guilty on each charge.

A trial on the merits was held on November 22nd and 23rd of 2004, and a duly empaneled jury returned a verdict of guilty against Williams on the stalking charge, which is a "Class C" felony and, a verdict of not guilty on the domestic violence charge.

Williams' sentencing was held on December 9, 2004, at which time Williams and his counsel stipulated to 5 (five) prior adult felony convictions. Under the Habitual Felony Offender Act, the sentencing range for Williams was from 15 to 99 years, or life in prison. Williams was sentenced to a term of 38 years in the State Penitentiary on the stalking charge; to attend and complete the Dual

1

Diagnosis Program, Substance Abuse Program and the Anger and Stress Management Program. Also Williams was fined $5,000.00, court costs, $50.00 to the crime victims' compensation fund, and zero dollars in restitution.

Motions for "Reconsideration & Reduction of 38 Year Sentence", "Motion For Judgment Notwithstanding Order of Verdict", "Motion For Trail De Novo Proceeding", and "Motion for Stay of 38 Year Sentence Pending Disposition of All Post Judgment Motions" were filed by Williams' trial counsel on January 10, 2005, thereby suspending the running of the time for filing an appeal. The State filed its "Response to Defendant's Motions" on January 14, 2005.

On January 18, 2005, the Court denied all post-judgment motions filed by counsel on Williams' behalf.

On January 28, 2005, Williams filed a letter with the Bullock County Clerk of Court stating his request to "appeal his sentence". The "Notice of Appeal" as such was timely filed.

2

## Statement of the Issues

Whether the evidence adduced at trial was sufficient to sustain a conviction on the charge of "Stalking" in violation of §13A-6-90, <u>Code of Alabama, 1975</u>.

## **Statement of Facts**

Mr. David Donnie Williams and Ms. Callie M. Williams had an on-going relationship for approximately 6 or 7 years. During that time, there were a number of occasions in which the parties have broke up and/or separated because of discord in the relationship. Some of those separations were because Mr. Williams was and had been incarcerated. For the most part, the couple have lived together throughout their relationship. They were never ceremonially married and Ms. Callie Williams claims that she and Williams are not common law husband and wife.

According to Ms. Callie Williams, she and Williams had gotten off from work at Wayne Farm in the early morning hours of the March 19, 2004. They had gotten paid and Williams had given Ms. Callie Williams some money to hold for him and told her (Callie Williams) that he would be back shortly. Williams was gone for a few hours and when he did come back he was high on crack according to Ms. Williams. Callie Williams stated that Mr. Williams wanted the rest of his money. Callie Williams tried to keep him from taking the money because she thought that

4

he was going to buy more drugs with it. At that point she told Mr. Williams that she was breaking up with him because of his continued use of illegal drugs, specifically, crack cocaine.

Callie Williams testified that she told Williams that she did not want him (Williams) anymore because he had gotten back on drugs; that he was not doing better nor was he changing as he had promised her he would do. After several hours, Ms. Callie Williams left the area of Wayne Farm and went to her daughter's (Lakeisha Williams)home to sleep.

Later in the day, Williams' brother-in-law brought him over to Lakeisha Williams' house. At that point, Ms. Callie Williams and Williams drove to her house to pick up her children where they got off of the school bus. Ms. Callie Williams asked Williams for her cell phone which he had taken earlier the night before. Williams asked Callie Williams to come into the house with him but Callie refused because she was afraid of him because he was high on crack. Again, Callie Williams told Williams that she did not want him anymore because he had gotten back on crack cocaine.

5

Callie Williams testified that she then left and went back to her daughter's house. Approximately five or six times during that evening, March 19, 2004, Williams came to Lakeisha Williams' home wanting Callie Williams to go back with him. Each time, Ms. Callie Williams told him no. Callie Williams testified that she was afraid to return to her own house because Williams was high on crack and staying there.

Callie Williams next saw Williams on March 24, 2004, at her job at Wayne Farm, where Williams was also employed. Callie Williams stated that just before work started on the 24th, she encountered Williams in the break room. At that point, Williams said to Callie Williams "bitch, you don't ; I'll hurt you. I don't like what you did". (R. 29) as he grabbed the back of her smock. Callie Williams further stated that Williams stated to her that "he was going to make her lose her job".(R. 29)  Ms. Callie Williams testified that she thought that this was in retaliation for her calling Mr. Williams parole officer. (R. 29)

Later that same evening a second incident occurred

6

while still at work. Williams came up behind Callie Williams and again grabbed her smock. According to Ms. Williams, her supervisor, Anthony, saw this incident occur.

A third incident occurred at work on March 24, 2004 at approximately 10:00 P.M. in the break room of Wayne Farm. Ms. Callie Williams stated that Williams again came up behind her and said "I went and told your mama what you did". Ms. Williams again told Williams to leave her alone and kept walking away.

After getting off of work on the March 24, 2004, Callie Williams called her daughter Lakeisha Williams, to come pick her up from work. Callie Williams went home with Lakeisha and was living there at the time on a temporary basis because David Donnie Williams was living in her house. Later that evening, Williams came over to Lakeisha's house where Callie Williams was staying and knocked on the door. No one would open the door for him.

Callie Williams next saw Williams on the 26th of March, 2004. He again came over to Lakeisha's house and knocked on the door and again no one would let him in. In

7

fact, Callie Williams stated that she did not speak at all because she did not want him (Williams) to know that she was in the house.

On March 27, 2004, Callie Williams again encountered Williams. Callie Williams had gone to her home to get her and her children a change of clothes when she saw that Williams' car was parked at her house. Ms. Williams did not enter the house but instead called the Union Springs police because she had signed a "trespass" against Williams on March 24, 2004, which meant that he was not to come back on her property.

When the police arrived, they went in the house and found Williams sleeping. They woke him up and made him leave. Later that same day, March 27th, Callie Williams went to a restaurant, "Smokey O's" to get some food. While Ms. Williams, was in the restaurant ordering some food, Williams came inside and approached Callie Williams. Ms. Williams testified that Williams told her "bitch, I don't like what you did to me". (R. 40) Ms. Williams had ordered her food, paid for it and then walked out of the restaurant. Mr. Williams followed directly behind her. Ms. Callie Williams testified that

8

as she was getting into her car Williams told her "bitch, I will kill you". Ms. Williams testified that her response was "Donnie if you are gonna do it, do it right here. I'm tired of you threatening my life". (R. 41) At that point, Mr. Williams got in his car and left.

The next time that Ms. Callie Williams saw David Donnie Williams was at her house on March 30, 2004. Lakeisha Williams and her child had taken Callie Williams to her house to pick up her (Callie's) daughter, Narkesha, after school. The school bus drops Narkesha off in front of Callie Williams residence each day. When Ms. Williams arrived her daughter was not there. About two minutes later Williams pulled up across the road with the eight year old daughter of Callie Williams (Narkesha Williams) in his car.

Ms. Callie Williams pulled across the road to where Mr. Williams and the child were. Williams got out of the car holding the child's (Narkesha) hand, preventing her from coming to her mother, Ms. Callie Williams. Callie Williams did not get out of the car but her grandson accidently opened the backdoor. Ms. Williams said that

Williams told her "bitch, I don't like what you did to me and pulled my sweatshirt trying to get me out of the car". (R. 44) Callie Williams further stated that David Donnie Williams at that point said he would kill her. Williams let the child go and she got into the car with her mother, Callie Williams, and they left.

Ms. Callie Williams went to the Union Springs Police Department and filed a report of the incident on March 30, 2004.

On April 17, 2004, Callie Williams and her 14 year old son Quadarius, had gone to her house to wash clothes. She was still not living there because she was afraid of Williams. Ms. Williams and Quadarius drove to the AG grocery which is located one block from their house. The vehicle driven by Ms. Callie Williams was a white Plymouth Lancer owned by her daughter, Lakeisha, and is well known by Williams.

When Ms. Callie Williams went into the AG grocery store, she stated that she did not see Williams or his car anywhere around. After purchasing some orange juice, she and Quadarius came out of the store and started

toward their car. They saw that Williams had backed into the space next to her car. Another man by the name of Anthony Blakeley was in the car with Mr. Williams. Ms. Williams stated that she paused for a minute because she was scared". (R. 51) As she was getting into her car, Williams said "bitch, I don't like what you did to me". Ms. Williams told Mr. Williams to leave her alone. At that point, Ms. Callie Williams' son, Quadarius, ask Williams, "why don't you leave my momma alone?" to which Mr. Williams responded "shut up before I fuck you up". Ms. Williams told her son to not say anything else and get in the car. Ms. Williams stated that at that point David Donnie Williams said that "if you mess around with me, I'd rather see you in heaven or hell". (R. 51) Williams drove away at that point.

When Ms. Callie Williams left the store and entered the roadway she saw Mr. Williams coming up behind her in his car very fast. She called the police on her phone and the police arrived almost immediately. The police attempted to pull Williams over and he fled at a high rate of speed. A police chase ensued.

Later that same day, April 17, 2004, Callie Williams

filed an incident report with the Union Springs Police Department against Williams. A statement was taken from Callie Williams wherein she related the incident that she and her son, Quadarius, had encountered with David Donnie Williams at the AG grocery store.

## Statement of the Standard of Review

The standard of review in determining the sufficiency of the evidence to sustain a conviction, is that a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. *Faircloth v. State,* 471 So.2d 485 (Ala.Crm. App. 1984). The function of the Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. *Davis v. State* 598 So.2d 1054 (Ala.Crm. App. 1992). In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.

13

*United States v. Black*, 497 F.2d 1039 (5th Cir. 1974);

*United States v. McGlamory*, 441 F.2d 130 (5th Cir. 1969);

*Clark v. United States*, 293 F.2d 445 (5th Cir. 1961).

## Summary of the Argument

The State's failure to produce credible witnesses in addition to the insufficiency of the State's evidence requires that Mr. David Donnie Williams conviction be reversed and his sentence vacated based on the insufficiency of evidence on which to sustain a conviction.

## Argument

At trial, Ms. Callie Williams was the State's first witness and took the witness stand testifying as to the facts previously set forth in the Statement of Facts.

The State next called Ms. Johnnie Baker as their 2nd witness. Ms. Baker is a Security Guard employed at Wayne Farm in Union Springs, Alabama. Her testimony was that Williams had been an employee of Wayne Farm at some point because she recognized his face but never knew his name until his employment was terminated. At that point, a note was sent to her post in the Guard Shack that David Williams was not to be allowed back on company property. (R. 135) Ms. Baker further testified that she had seen Williams in the parking lot of Wayne farm property. The third (3rd) time this occurred after the note was posted, Baker stated that she went out to the parking lot to advise Williams to stay off of the property. (R. 138) Baker stated that Williams did ask about Callie Williams

and complied with Ms. Baker's instructions to leave the premises. Mr. Williams complied without incident. Ms. Baker did testify that she later saw Mr. Williams drive by her post at the Guard Shack on the roadway in front of Wayne Farm several times, but that he never came back on Wayne Farm property. During cross examination of Ms. Baker by counsel for Williams, counsel asked "You never saw him stalking this young lady; is that not correct?" Ms. Baker answered "it depends on what you mean by stalking". (R. 154 )Further, Ms. Baker stated in her testimony that:

> "   Q.   April 17, 2004. You weren't around
>           Ms. Callie Williams on April 17, 2004
>           were you?
>
>     A.   I don't know unless she passed through
>           the Guard Shack coming to work and I
>           had to check her ID.
>
>     Q.   Did you see Ms. Callie Williams and
>           Mr. David Donnie Williams together
>           on April 17, 2004?
>
>     A.   I don't know.
>
>     Q.   Now that's the date that the State
>           of Alabama contends that my client
>           stalked Ms. Williams. You didn't
>           see him stalking Ms. Williams on
>           April 17, 2004, did you?
>
>     A.   Just because I didn't see it, maybe
>           someone else did. I don't know what

16

day was April 17th. "

(R. 166)

" Q.  So as far as the ladies and gentlemen
       of the jury are concerned, April 17,
       2004, you never saw Mr. David
       Donnie Williams stalk Callie
       Williams; isn't that correct?
       Yes or no?

  A.   Yeah, you are correct. I can't
       say what date. I can't say I
       seen him stalking her at all."

(R. 166-167)

The third witness called by the State was Johnny
Taylor. Taylor who is a convicted felon with convictions
for Theft of Property, a crime of moral turpitude. Mr.
Taylor testified that Williams got him to testify in
front of the Parole Board that he, Mr. Taylor, was at the
AG grocery store on April 17, 2004, and that "... he was
sitting in the car, and the guy that arrived with him
went inside the store, and when he got ready to come out
of the store, Ms. Williams followed the guy out the
store, and Ms. Williams started arguing with him."

(R. 176-177)

Mr. Taylor recanted that statement in his testimony.
Mr. Taylor bears no credibility as a witness because
according to himself, he lied to the Parole Board and now

17

has changed his story for the District Attorney. However, in later testimony, Mr. Taylor stated that "I don't know noting about him stalking her." (R. 192)

The State's fourth witness was Mr. Wilbert Jernigan, the Clerk of Court for Bullock County, Alabama. Mr. Jernigan could not offer any evidence of the charges against Mr. Williams, as shown by his testimony:

> "    Q.    Now just for clarification, you
>            would agree, Mr. Jernigan, you are
>            not here to testify to the ladies
>            and gentlemen of the jury that I
>            Know that Mr. David Donnie Williams
>            committed stalking against Ms. Callie
>            Williams because, first of all, you
>            would agree, you never observed
>            that happening yourself?
>
>      A.    No sir.
>
>      Q.    Okay. And furthermore, you never
>            heard those events, alleged events,
>            occur as they were unfolding as well;
>            is that correct?
>
>      A.    No sir, I did not."

(R. 220)

The State's fifth witness was Narkesha Williams, the eight-year old daughter of Callie Williams. On direct examination by the State, Narkesha Williams testified

18

that she heard Williams say the "B" word. (R. 252)
Narkesha further testified that when Williams picked her
up after school, that she, Narkesha willingly got into
the car with Williams. (R. 262) Also, Narkesha testified
that her mother, Callie Williams, was also cursing at
Williams in the incident where Narkesha got into the car
with Williams after school. (R. 264)

The States' sixth witness was Quadarius Williams,
Callie Williams' 14-year old son. Although Quadarius
Williams' testimony mirrored that of his mother Callie
Williams regarding the events of April 17, 2004 at the AG
grocery store, Quadarius admitted in his testimony that
"he does not like Donnie Williams". (R. 284)(Emphasis
added) Furthermore, Quadarius testified that his mother
Callie Williams had gone over his testimony with him
about 50 times to prepare him for court and to help him
learn his story. (R. 288-289) On re-cross examination by
counsel for the defendant, Quadarius again admitted that
he had memorized his testimony.

> "    Q.   And so when you are on the stand
>           today, you don't have a problem

19

```
          telling the ladies and gentlemen
          of the jury what happened because
          your momma made sure you memorized
          that by going over it day in and
          day out; is that right?

     A.   Yes.   "
```

     (R. 303-304)


     And again on re-cross by counsel for the defendant,

Quadarius testified that they were out to get David

Donnie Williams and send him to prison.


```
   "   Q.   Now did they tell you they
           (Callie Williams mother and
           prosecutor sic)were out to
           get David?

       A.   Yeah.

       Q.   You know David is on trial, right?

       A.   Yes.

       Q.   And they told you they was
           out to get David, is that right?

       A.   Yes.

       Q.   And they told you that they was
           out to get David and they was going
           to try to send David to prison or
           jail, is that right?

       A.   Yes.

       Q.   And they told you they needed your
           help; am I right about that?
```

A.   Yes.

Q.   And you love your mama; am I
     right about that?

A.   Yes.

Q.   So when your mama tells you, we
     going to get David, ans she
     tells you, remember to say this,
     that's what you going to do; am
     I right about that? It's okay to
     tell the truth. That's what you
     are going to say; isn't that right?
     You are keeping your commitment to
     mama in helping to get David; am
     I right about that?

A.   Yes.

Q.   And that's why you are here; am
     I right about that?

A.   Yes. "

(R. 304-306)


On redirect examination by the prosecution Quadarius

Williams further testified that they were out to get

David Donnie Williams.


     "  Q.   Quadarius, when did I tell you
             we were out to get David Donnie
             Williams? Did I tell you that this
             morning? Did I tell you that
             yesterday? I have never told you
             that, have I? It's okay for you to
             tell the truth. I have never told

21

you that we were out to get David
Donnie Williams, did I? I know
you told him one thing, but
look over there. Don't even look
at me. Tell the ladies and gentlemen
of the jury the truth, because they
need to know. Did I tell you that
we were out to get David Donnie
Williams?

A.   Yes.

Q.   When? Think back and tell me when.
I want you to take as much time
as you need, and I know you can't
remember everything and I know
you are answering his questions
because you think you got to say –
– you are answering questions because
he is being real polite; isn't that
right? But I want you to tell them
when I told you we were out to
get David Donnie Williams. Can you
remember that?

A.   No. "

(R. 306)

The seventh witness called by the State was Anthony

Blakeley. Mr. Blakeley testified that he was <u>in the car</u>

(Emphasis added) with David Donnie Williams on April 17,

2004, the date the State alleges that Williams stalked

Callie Williams. Mr. Blakeley testified that he did not

hear Williams make any kind of threats to Callie Williams

or to her son, Quadarius Williams. Mr. Blakeley further

22

testified that he was in the car with Williams and he did not hear Williams tell Callie Williams that he would "kill her bitch". (R. 314) The only other testimony Blakeley offered at the direction of the prosecution was that they were in a high speed car chase with the Union Springs Police Department on that same day, shortly after leaving the AG grocery store.

On cross examination by counsel for the defendant, Mr. Blakeley stated that it was his idea to stop at the AG grocery and not David Donnie Williams. (R. 328)

The State called its eight witness, Lt. Durwood Freeman of the Union Springs Police Department. Lt. Freeman's testimony was to that of the high speed chase involving Williams on April 17, 2004 and his testimony corroborated the fact that Anthony Blakeley was in the car with Williams. No testimony was solicited by the prosecutor or offered by the witness to substantiate the stalking charge.

The ninth witness called by the State was Lakeisha Williams, the 21-year old adult daughter of Callie

Williams. Ms. Narkeisha Williams could not testify to the events of April 17, 2004 which occurred at the AG grocery store as she was not present. She however, did testify to almost a mirror image of the remainder of her mother's (Callie Williams) testimony regarding the other issues.

In summary, the testimony of the witnesses for the State did not prove the State's case beyond a reasonable doubt. Starting with Ms. Baker, the Security Guard, she could not testify that she had ever seen Williams stalk Callie Williams. Also, Johnny Taylor stated that he had lied before to the Pardon and Parole Board on Williams behalf. However, Taylor has been convicted of crimes of moral turpitude and as such he has no credibility. Furthermore, Taylor offered no evidence of stalking on the part of Williams.

Mr. Jernigan was called by the State and did not offer any testimony or evidence of stalking on the part of Williams. The younger children of Callie Williams, Quadarius (14) and Narkeisha (8), both offered testimony that was favorable to Williams' defense. Narkeisha stated that she had heard her mother and Williams cursing

24

each other during quarrels and Quadarius testified that
<u>his mother and the prosecutor had helped him memorize his</u>
<u>testimony so that they could get David Donnie Williams</u>
<u>and send him to prison and that they needed his help to</u>
<u>do so</u>.(Emphasis added)

Anthony Blakeley testified that he was in the car
with Williams at the time the alleged stalking took place
and that at no time did he ever hear any type of threat
made by Williams. Additionally, Lt. Freeman testified
that his only involvement was that of a high speed chase
with Williams concerning traffic violations; that he
never observed any stalking by Williams.

In fact, the only witness, other than Callie
Williams herself, who gave any type of testimony
favorable to the State was Lakeisha Williams, who is the
adult (21-year old) daughter of Callie Williams, and her
testimony closely mirrored that of her mother.

As such, the only conclusion that can be derived
from these facts is that a reasonable jury could not have
convicted Williams based on such insufficient evidence as
was presented at trial. It is clear that the evidence was
of such an insufficient degree that Williams is due a

25

reversal because the jury's decision was completely contrary to the great weight of the evidence.

## Conclusion

For the foregoing reasons and based on the foregoing authority and testimony, the Appellant believes that the evidence produced at trial is woefully insufficient to support a conviction for "Stalking". The Appellant respectfully requests that his conviction be reversed and his sentence vacated by this Honorable Court.

## Certificate of Service

I hereby certify that I have served a copy of the foregoing brief and argument of Appellant by placing same in the United States mail, postage prepaid, and properly addresses on this the 4th day of August, 2005, upon the following:

    Honorable Troy King
    Alabama Attorney General
    11 South Union Street
    3rd Floor
    Montgomery, AL 36130-0061

Gene Spencer        (SPE046)
Attorney for Appellant

27

CR-04-0846

In the *COURT of CRIMINAL APPEALS*
*of ALABAMA*

◆

DAVID DONNIE WILLIAMS,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

◆

*On Appeal From the Circuit Court of*
Bullock County
(CC-04-144)

**BRIEF OF APPELLEE**

Troy King
*Attorney General*

Beth Slate Poe
*Assistant Attorney General*

Audrey Jordan
*Assistant Attorney General*
Counsel of Record*

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama   36130-0152
(334) 242-7300*

September 2, 2005

EXHIBIT
*C*

PENGAD 800-631-6989

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary.  "The facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided" by an additional evaluation of the evidence and case law.  Ala. R. App. P. 34(a)(3).

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT........................ i

TABLE OF CONTENTS........................................ ii

TABLE OF CASES AND AUTHORITIES.......................... iii

STATEMENT OF THE CASE.................................... 1

ISSUES PRESENTED FOR REVIEW.............................. 3

STATEMENT OF THE FACTS.................................. 4

STANDARD OF REVIEW...................................... 11

SUMMARY OF THE ARGUMENT................................. 12

ARGUMENT................................................ 13

I.    Williams's Contention That There Was Insufficient
      Evidence To Support His Conviction For Stalking Is
      Waived Pursuant To Rule 28(a)(10) Of The Alabama
      Rules of Appellate Procedure And Thus Is Not
      Properly Before This Court For Appellate Review..... 13

II.   This Court Will Not Reweigh Witnesses' Credibility
      And Substitute Its Judgment For That Of The Jury
      Because The Weight Of The Evidence Is A Question Of
      Fact To Be Resolved By The Jury..................... 15

CONCLUSION.............................................. 22

CERTIFICATE OF SERVICE................................. 23

## TABLE OF CASES AND AUTHORITIES

### Cases

Bartlett v. State, 71 So. 2d 305, 308 (Ala. Crim.
   App. 1997) .......................................... 16

Blount v. State, 876 So. 2d 509, 512 (Ala. Crim.
   App. 2003) .......................................... 17

Hart v. State, 852 So. 2d 839, 848 (Ala. Crim. App. 2002) 14

Hayes v. State, 717 So. 2d 30, 36 (Ala. Crim. App. 1997). 16

Hodges v. State, CR-03-1461, 2005 WL 995440, at *11
   (Ala. Crim. App. Apr. 29, 2005) ...................... 14

Jones v. State, CR-03-1179, 2005 WL 1252756, at *6
   (Ala. Crim. App. May 27, 2005) ....................... 15

Jones v. State, CR-03-1179, 2005 WL 1252756, at 4-5
   (Ala. Crim. App. May 27, 2005) ....................... 17

Perry v. State, 861 So. 2d 1, 2 (Ala. Crim. App. 2002)... 14

Rowell v. State, 647 So. 2d 67, 69-70 (Ala. Crim.
   App. 1994) .......................................... 16

Smith v. State, 745 So. 2d 922, 934 (Ala. Crim.
   App. 1999) .......................................... 16

### Other Authorities

Code of Alabama (1975),

   Section 13A-6-90(a) ................................. 17

### Rules

Alabama Rules of Appellate Procedure,

   Rule 28(a)(10) ...................................... 13

## STATEMENT OF THE CASE

This is an appeal from a stalking conviction in the Circuit Court of Bullock County, Alabama (CC-2004-144). Judge L. Bernard Smithart presided.

David Donnie Williams, the appellant in this case, was indicted by a Bullock County Grand Jury on October 19, 2004, and charged with one count of stalking in violation of Section 13A-6-90 of the Code of Alabama (1975).  (C. 12-13)  On November 9, 2004, Williams waived arraignment and entered a plea of not guilty.  (C. 1, 14)

On November 22, 2004, trial commenced and on November 23, 2004, the jury found Williams guilty of one count of stalking.  (C. 34; R. 550)  On December 9, 2004, the trial court sentenced Williams to thirty-eight years' imprisonment.  (C. 37; R. 563)  The trial court ordered Williams to attend the Duel Diagnosis Program, Substance Abuse Program, and the Anger and Stress Management Program.  (C. 37; R. 563)  The trial court imposed a fine of $5,000 and ordered Williams to pay $50 to the Crime Victims Compensation Fund.  (C. 37; R. 563)

On January 10, 2005, Williams filed a motion for reconsideration and reduction of his sentence, a motion for

reconsideration and reduction of his sentence, a motion for a judgment notwithstanding order of verdict, and a motion for a trial de novo. (C. 39-47) The trial court denied Williams's motions on January 18, 2005. (C. 39-47) On February 9, 2005, the clerk's notice of appeal was filed. (C. 2) On February 24, 2005, an amended notice of appeal was filed. (C. 2)

## ISSUES PRESENTED FOR REVIEW

I.   Is Williams's contention that there was insufficient evidence properly before this Court for appellate review?

II.  Can this Court reweigh evidence presented at trial?

## STATEMENT OF THE FACTS

Callie Williams and Donnie Williams dated off and on from 1997 to 2004.[1]  (R. 20-21)  Donnie periodically lived with Callie at her home in Comfort Motel Trailer Park until March 2004.  (R. 469)  Both Callie and Donnie worked at Wayne Farms.  (R. 20-22)  After receiving their paychecks the previous day, Donnie gave Callie money to "hold" for him on March 19, 2004.  (R. 21-22)  Throughout the day, Donnie left and returned to Callie's residence several times.  (R. 22)  During one of the instances when he was present with Callie, Donnie took Callie's cellular telephone.  (R. 23)  Believing Donnie was buying and using crack cocaine, Callie called her twenty-one-year-old daughter, Lakeisha Williams, to pick her up.  (R. 22)  Callie stayed the night at her daughter's apartment.  (R. 22)  When Callie saw Donnie next, she asked him to return her cellular telephone and informed him that she no longer wanted to see him because he was using drugs.  (R. 23)

---

[1] The record indicates that Callie and Williams were never married.

4

Later that day, Callie left her residence and drove to the high school to pick up her fourteen-year-old son Q.W.[2] When she returned to her residence, Donnie asked her to drive him to Hendley.  (R. 24-25)  Callie drove him, and once they arrived, Donnie informed her that it was the wrong place and instructed her to drive him down a dirt road.  (R. 25)  Believing he planned to kill her because he was using crack cocaine, Callie refused and returned Donnie to her residence.  (R. 26)  Callie then drove to her daughter's apartment.  (R. 26)  Donnie came to Lakeisha's residence that night five or six times, attempting to persuade Callie to return to her residence.  (R. 23-24, 27)

On March 24, 2004, while standing in the break room at Wayne Farms, Donnie approached Callie and stated "Bitch, you don't know; I'll hurt you."  (R. 29)  Donnie grabbed Callie's sweatshirt and repeated the statement.  (R. 29) He further stated "I don't like what you did."  (R. 29) Donnie grabbed her cellular telephone and stated he was "going to make [her] lose [her] job."  (R. 29)  Callie returned to the floor for work and requested to go to the

---

[2] Pursuant to Rule 52 of the Alabama Rules of Appellate Procedure, the initials of any minors will be used to protect their anonymity.

5

office.  (R. 30)  While in route, Donnie came up behind
Callie and pulled on her smock.  (R. 31)  Callie reported
the incidents to her second shift supervisor who later
spoke with Donnie.  (R. 31-32)

Later that evening, Donnie again approached Callie
while she was on her lunch break in the break room.  (R.
33)  Donnie stated that he "went and told [her] moma what
[she] did."  (R. 33)  Callie told him to leave her alone,
walked away, and reported the confrontation to her
supervisor.  (R. 33-34)  When Callie's shift ended,
Lakeisha picked her up and drove Callie to her apartment.
(R. 35)  Donnie came by Lakeisha's apartment and knocked on
the door, but neither Lakeisha nor Callie answered.  (R.
35)  Callie had the circuit clerk, Wilbert Jernigan, who is
also her landlord, issue a trespassing notice against
Donnie.  Donnie returned to Lakeisha's apartment on March
26, 2004, knocking on the door; however, Callie – again --
did not answer.  (R. 36)

On March 27, 2004, Callie returned to her residence to
get clothing for herself and her children.  (R. 37)  When
she arrived, she observed Donnie's vehicle outside the

6

residence.  (R. 37)  Callie contacted the police.  (R. 38)

When they arrived, the police found Donnie asleep inside

the residence.  (R. 38)  He was escorted out of the

residence and informed of the trespass notice.  (R. 38,

349)  Later that evening, Callie went to Smokey O's

Restaurant, and while inside ordering food, Donnie walked

in the restaurant.  (R. 39-40)  Donnie stated to Callie

"Bitch, I don't like what you did to me" and – again --

Callie told him to leave her alone.  (R. 40)  Callie

immediately left the restaurant.  (R. 41)  As she was

getting into her vehicle, Donnie told her "Bitch, I will

kill you."  (R. 41) Callie responded "If you are going to

do it, do it right here.  I'm tired of you threatening my

life."  (R. 41)

      On the afternoon of March 30, 2004, Callie and Lakeisha

drove to Callie's residence to pick up Callie's daughter,

N.W.  (R. 42)  When they arrived, N.W. was not there.  (R.

42)  After waiting two or three minutes, Donnie drove up

with N.W. in the backseat.  (R. 43)  When they got out of

the vehicle, Donnie held N.W.'s hand preventing her from

going to Callie.  (R. 43, 250-5)  Lakeisha's son, who was

7

sitting on the back passenger seat, accidentally opened his car door. (R. 44, 383) At that time, Donnie grabbed Callie's sweatshirt and attempted to pull her out of the vehicle through the back door. (R. 44) Callie told Donnie to let N.W. go and Donnie replied "Bitch, I don't like what you did." (R. 44) Donnie told Callie he was going to kill her. (R. 45) Eventually, Donnie released N.W.'s hand and she managed to escape into the car. (R. 45) As Callie attempted to leave her residence, Donnie pulled his vehicle in front of hers. (R. 45) After leaving, Callie went to the police department and filed a report. (R. 46)

On April 17, 2004, Callie and her son Q.W. were at Callie's residence washing clothes. (R. 48) They decided to drive next door to the AG Grocery Store for orange juice. (R. 49) When Callie and Q.W. walked out of the store, Donnie and Anthony Blakely were parked in the space beside Callie's vehicle. (R. 50-51) As Callie approached her vehicle, Donnie stated "Bitch, I don't like what you did." (R. 51) Callie replied "Why don't you leave me alone. I ain't bothering you." (R. 51) At that time, Q.W. told Donnie "Why don't you leave moma alone." (R. 51)

8

Donnie threatened "Shut up before I fuck you up." (R. 51)
Donnie then told Callie that "if you mess around with me,
I'd rather see you in heaven or hell." (R. 51) Donnie
then drove off. (R. 52) Callie got into her vehicle and
began to drive away when she observed Donnie pull up behind
her. (R. 53) Callie stopped in the parking lot and called
the police. (R. 53)

Lieutenant Durwood Freeman of the Union Springs Police
Department received a dispatch call to go to AG Grocery
Store and speak with Donnie. (R. 341) When he arrived,
Lieutenant Freeman observed Donnie and another male leaving
the south end of the parking lot driving towards the
trailer park. (R. 341-42) After passing Donnie's vehicle,
Lieutenant Freeman turned his patrol car around and
initiated his blue lights. (R. 341, 343) Rather than
stop, Donnie accelerated resulting in Lieutenant Freeman
pursuing him. (R. 341, 343) While in pursuit, Lieutenant
Freeman observed Donnie fail to stop at a stop sign, pass
another vehicle in a curve and reach speeds of about 100 to
110 miles per hour. (R. 343) When Donnie went into a
curve, he hit loose gravel, lost control of the vehicle,

and slid backwards into a pine tree. (R. 343-44) After the vehicle stopped, Donnie jumped out and fled on foot. (R. 344) Blakely also jumped out of the vehicle and appeared to be "shook up." (R. 345) When Lieutenant Freeman placed Blakely in his patrol car, Blakely informed him that "Donnie fled and [Blakely] tried to get him to stop and let him out of the vehicle." (R. 346) Two days following the chase, Lieutenant Freeman found Donnie standing outside his mother's home on Johnson Street. (R. 347) Lieutenant Freeman issued Donnie a ticket for reckless driving and attempting to elude police, and took Donnie into custody pursuant to Donnie's parole officer's request. (R. 363, 347)

## STANDARD OF REVIEW

I.  This Court will not review an appellant's argument when there is no authority cited pursuant to Rule 28(a)(10) of the Alabama Rules of Appellate Procedure to support his claim.  *See* Hodges v. State, CR-03-1461, 2005 WL 995440, at *11 (Ala. Crim. App. Apr. 29, 2005).

II.  This Court will not reweigh evidence presented at trial when the State has presented a prima facie case.  *See* Jones v. State, CR-03-1179, 2005 WL 1252756, at *6 (Ala. Crim. App. May 27, 2005).

11

## SUMMARY OF THE ARGUMENT

Williams's contention that there was insufficient evidence to support his conviction is waived pursuant to Rule 28(a)(10) of the Alabama Rules of Appellate Procedure. Williams failed to present any authority that demonstrates how the trial court erred in his case.

Furthermore, Williams's contention, although couched as a sufficiency claim, actually argues the weight and credibility of the evidence presented. This Court, however, will not reweigh evidence presented at trial. Because the State presented a prima facie case of stalking, the issue was properly submitted to the jury.

12

## ARGUMENT

I.  **Williams's Contention That There Was Insufficient Evidence To Support His Conviction For Stalking Is Waived Pursuant To Rule 28(a)(10) Of The Alabama Rules of Appellate Procedure And Thus Is Not Properly Before This Court For Appellate Review.**

Williams contends that the State failed to present sufficient evidence of stalking.  Because Williams has failed to cite to any rule, code section, or case law in support of his contention, he has waived this argument pursuant to Rule 28(a)(10) of the Alabama Rules of Appellate Procedure.  Thus, this issue is not properly before this Court for appellate review.

Rule 28(a)(10) requires that "[a]n argument containing the contentions of the appellant with respect to the issues presented, and the reasons therfor, [must contain] citations to the cases, statutes, other authorities, and parts of the record relied on."  This Court has noted that "[i]t is not the job of the appellate courts to do a party's legal research.  Nor is it the function of the appellate courts to 'make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.'"  <u>Hodges v. State</u>, CR-03-1461, 2005 WL 995440, at *11 (Ala. Crim. App.

13

Apr. 29, 2005).  *See also* <u>Perry v. State</u>, 861 So. 2d 1, 2
(Ala. Crim. App. 2002) ("Recitation of allegations without
citation to any legal authority and without adequate
recitation of the facts relied upon had been deemed a
waiver of the arguments listed."); <u>Hart v. State</u>, 852 So.
2d 839, 848 (Ala. Crim. App. 2002) (appellant failed to
cite any citations to the record and thus waived appellate
review of his claim).

In this case, Williams does not cite *any* authority that
demonstrates how the trial court erred.  Because he has
failed to provide any authority to support his contention,
his argument is waived on appeal.

14

II.   **This Court Will Not Reweigh Witnesses' Credibility And Substitute Its Judgment For That Of The Jury Because The Weight Of The Evidence Is A Question Of Fact To Be Resolved By The Jury.**

Williams contends that there was insufficient evidence to establish that he stalked Callie Williams.  He argues that the State failed to produce credible witnesses to support his conviction.  (Williams's brief, pgs. 14, 26.) Although couched as a sufficiency claim, the crux of Williams's argument appears to be credibility and weight of the evidence presented to the jury.  This Court has repeatedly held that it will not reweigh evidence presented at trial.  *See* Jones v. State, CR-03-1179, 2005 WL 1252756, at *6 (Ala. Crim. App. May 27, 2005).

This Court has previously noted that:

> The *weight* of the evidence is clearly a different matter from the *sufficiency* of the evidence.  The sufficiency of the evidence concerns the question of whether, viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.
>
> In contrast, the 'weight of the evidence' refers to a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.  '[This Court] ha[s] repeatedly held that it is not the province of this [C]ourt to reweigh the evidence presented at trial.'  'The credibility of witnesses and the weight or probative force of

15

testimony is for the jury to judge and determine.'
Conflicting evidence presents a jury question not
subject to review on appeal, provided the State's
evidence establishes a prima facie case.

Smith v. State, 745 So. 2d 922, 934 (Ala. Crim. App. 1999)

(emphasis in original).

In this case, Williams challenges the credibility and

evidence of each State witness.  As noted above, any

conflicting testimony presented at trial goes "to the

weight of the evidence and create[s] questions of fact to

be resolved by the jury." Rowell v. State, 647 So. 2d 67,

69-70 (Ala. Crim. App. 1994).  *See also* Hayes v. State, 717

So. 2d 30, 36 (Ala. Crim. App. 1997) (question of fact for

the jury's determination as to whether stalking victim had

improper motives for filing complaint); Bartlett v. State,

71 So. 2d 305, 308 (Ala. Crim. App. 1997).  Consequently,

Williams's contention that the State failed to present

credible witnesses in its case-in-chief is a question of

fact to be determined by the jury.

Furthermore, Williams's contention that the State

failed to present sufficient evidence is without merit.

When determining the sufficiency of evidence, this Court

must decide whether in "viewing the evidence in the light

16

most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt." Blount v. State, 876 So. 2d 509, 512 (Ala. Crim. App. 2003). This Court may not determine what the facts are, but must "judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Id.

Section 13A-6-90(a) of the Code of Alabama (1975), provides that "[a] person who intentionally and repeatedly follows or harasses another person and who makes a credible threat, either expressed or implied, with the intent to place that person in reasonable fear of death or serious bodily harm is guilty of the crime of stalking." See also Hayes, 717 So. 2d at 33; Jones v. State, CR-03-1179, 2005 WL 1252756, at 4-5 (Ala. Crim. App. May 27, 2005) (evidence of defendant's subsequent bad acts were admissible to show intent to place victim in reasonable fear and showed a repetitive pattern of bad behavior towards the victim). Usually intent cannot be shown by direct evidence and is "left to the province of the jury." Id. at 35. This Court has held that the "testimony of the victim by itself is

17

sufficient to establish a prima facie case." <u>Bartlett</u>, 701
So. 2d at 308.

The record shows that, on numerous occasions, Williams
followed, confronted, and threatened Callie Williams.
Callie testified that, once she broke off their
relationship on March 19, 2004, she began to stay at her
daughter's apartment. (R. 26) That same night, Williams
came to the apartment five or six times attempting to
persuade Callie to return to her home. (R. 23-24, 27) On
March 24, 2004, Callie went to the circuit clerk's office
to obtain a trespass notice against Williams. Later,
Williams confronted her on three separate occasions while
she was at work. (R. 29-36) During those confrontations,
Williams pulled on Callie's clothing and he told her that
he did not like what she had done and that he would make
her lose her job. (R. 29-36) When Callie returned to her
daughter's apartment after work, Williams again came by
attempting to persuade Callie to come outside. (R. 35)
Williams returned to the apartment again on March 26, 2004,
but Callie acted like no one was home and did not open the
door. (R. 36)

## CONCLUSION

Based on the foregoing, this case is due to be affirmed on appeal.

Respectfully submitted,

Troy King
*Attorney General*

_____
Audrey Jordan
*Assistant Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>2nd</u> day of September, 2005, I did serve a copy of the foregoing on the attorney for Williams, by placing the same in the United States Mail,

> Donald Eugene Spencer, Jr.
> 547 South Lawrence Street
> Montgomery, Alabama  36104


Audrey Jordan
Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300


217874/77038

23

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**

RELEASED
DEC 16 2005
CLERK
ALA COURT CRIMINAL APPEALS

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Sonja McKnight
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

### MEMORANDUM

CR-04-0846                     Bullock Circuit Court CC-04-144

David Donnie Williams v. State of Alabama

WISE, Judge.

The appellant, David Donnie Williams, was convicted of stalking, a violation of § 13A-6-90, Ala. Code 1975. Williams was sentenced as an habitual felony offender to 38 years' imprisonment, ordered to pay a $5,000 fine, $50 to the crime victim compensation fund, and ordered to attend the Duel Diagnosis Program, Substance Abuse Program and the Anger and Stress Management Program. This appeal followed.

The evidence at trial tended to establish that Donnie and Callie Williams worked together at Wayne Farms and also periodically lived together in the Comfort Motel Trailer Park from 1997 until March 2004. During this time, Donnie

1



EXHIBIT
D

intentionally and repeatedly harassed Callie.  On March 19, 2004, Donnie left and returned to Callie's residence several times.  On one of these occasions, Donnie took Callie's cellular telephone.  Callie became suspicious that Donnie was buying and using crack cocaine so she decided to stay with her daughter, Lakiesha Williams.  Callie then informed Donnie that he needed to return her phone; she further advised him that she no longer wanted to see him because of his drug use.  Later that day, Callie agreed to drive Donnie to Hendley.  Before arriving at their destination, Donnie instructed Callie to turn down a dirt road.  Callie refused and instead drove back home, believing that Donnie would kill her if she drove down the dirt road.  Callie then went to her daughter's apartment.   That night, Donnie came to her daughter's apartment five or six times in an attempt to persuade Callie to return home.

On March 24, Donnie approached Callie at work and said, "Bitch, you don't know; I'll hurt you," then grabbed Callie's shirt and repeated the statement.  Callie told Donnie that she wanted her phone back and that if he did not let her go that she would lose her job.  Later that day, as Callie walked to the office, Donnie grabbed her again.  Callie reported the incident to her supervisor, who spoke with Donnie.  Again that night Donnie approached Callie and said that he "...went and told momma what [you] did..."  Callie asked Donnie to leave her alone and again reported the confrontation to her supervisor.  After work, Callie returned to her daughter's apartment.  Later, Donnie came to the apartment in search of Callie, but no one responded when he knocked on the door.  Callie asked her landlord at the trailer park to issue a trespass notice against Donnie, which he did.  On March 26, 2004, Donnie returned to Lakeisha's apartment, but nobody answered the door.

On March 27, 2004, Callie returned to her residence at the trailer park to get clothing for herself and her children.  Upon arrival, she observed Donnie's vehicle parked outside the trailer.  She contacted the police who arrived, found Donnie asleep inside, escorted him outside and informed him of the trespass notice filed against him.  Later that night, Donnie confronted Callie at a local restaurant and said, "Bitch, I don't like what you did to me."  Again, Callie told him to leave her alone and immediately left the restaurant.  Donnie

2

followed her outside and said, "Bitch, I will kill you." Callie responded, "If you are going to do it, do it right here. I'm tired of you threatening my life."

On the afternoon of March 30, 2004, Callie and Lakeisha went home to pick up her daughter, N.W. N.W. was not there when they arrived. A few minutes later, Donnie drove up with N.W. in the backseat of his truck. Upon getting out of the vehicle, Donnie held N.W.'s hand, preventing her from going to Callie. Donnie then grabbed Callie's shirt and attempted to pull her out of the vehicle. Callie told Donnie to let N.W. go and he replied, "Bitch, I don't like what you did..." and threatened to kill her. When Donnie finally released N.W.'s hand, she ran to her Callie. They attempted to drive away, but Donnie pulled his truck in front of theirs, preventing their escape. After Callie managed to escape, she drove to the police station and filed a police report.

On April 17, 2004, Callie and her son Q.W. traveled to the AG Grocery Store for orange juice. Upon leaving the store, Donnie was parked in the space behind her and said, "Bitch, I don't like what you did." Callie replied, "Why don't you leave me alone. I ain't bothering you." At this point, Q.W. said to Donnie, "Why don't you leave my momma alone?" Donnie replied to Q.W., "Why don't you shut up before I fuck you up." Donnie then stated to Callie, "...if you mess around with me, I'd rather see you in heaven or hell." Donnie then drove away, as did Callie. After traveling a short way Callie noticed Donnie was following her, so she pulled over and called the police.

Lieutenant Durwood Freeman of the Union Springs Police Department responded to the call. When Freeman arrived at the scene, he observed Donnie driving away and heading towards the trailer park. Freeman turned on his blue lights in order to pull Donnie over but Donnie accelerated and kept going -- reaching speeds in excess of 100 mph. After failing to stop at a stop sign and passing a vehicle in a curve, Donnie lost control of the vehicle, crashed into a pine tree, and fled on foot. Two days after the chase, Freeman located Donnie outside his mother's home. Freeman issued Donnie a ticket for reckless driving and attempting to elude police; he then arrested Donnie pursuant to Donnie's parole officer's request.

At trial, Donnie attempted to discredit the testimony of the nine witnesses who testified for the State. He argued that the only witness who provided any evidence favorable to the State was Lakeisha Williams, who was biased in favor of her mother. Donnie further alleged that the only conclusion that could be derived from these facts is that there was insufficient evidence to sustain his conviction. Alternatively, he argued that the verdict was contrary to the great weight of the evidence.

Williams argues that the evidence presented at trial was insufficient to sustain a conviction for stalking. Initially, we note that Williams's claims are precluded from appellate review as he has failed to comply with Rule 28(a)(10), Ala.R.App.P. by not including the required citation to appropriate authority in support of his contentions. Harrison v. State, 905 So. 2d 858, 860 (Ala.Crim.App. 2005).

In any event, Williams's claim is without merit. Section 13A-6-90, Ala. Code 1975 states, in pertinent part:

> "(a) A person who intentionally and repeatedly follows or harasses another person and who makes a credible threat, either expressed or implied, with the intent to place that person in reasonable fear of death or serious bodily harm is guilty of the crime of stalking."

See also Mims v. State, 816 So. 2d 509, 513 (Ala.Crim.App. 2001).

"'In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State, 720 So. 2d 1033, 1034 (Ala. Crim. App. 1998), quoting Faircloth v. State, 471 So. 2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So. 2d 493 (Ala. 1985). "'The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So. 2d 497, 498 (Ala. Crim. App. 1997), quoting O'Neal v.

4

State, 602 So. 2d 462, 464 (Ala. Crim. App. 1992). "'When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So. 2d 691, 696 (Ala. Crim. App. 1998), quoting Ward v. State, 557 So. 2d 848, 850 (Ala. Crim. App. 1990). "The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So. 2d 1040, 1042 (Ala. 1978). (Emphasis in Bankston.)

Moreover, this Court has stated:

"In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be viewed in a light most favorable to the prosecution, and conflicting evidence presents a jury question not subject to review on appeal, provided the State's evidence established a prima facie case. Williams v. State, 710 So. 2d 1296, 1337 (Ala.Crim.App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997); Cumbo v. State, 368 So. 2d 871 (Ala.Crim.App. 1978). The action of the trial court in denying a motion for judgment of acquittal or a motion for new trial must be reviewed by determining whether there existed legal evidence from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Williams v. State, 710 So. 2d at 1337; Willis v. State, 447 So. 2d 199 (Ala.Crim.App. 1983). When the evidence raised questions of fact for the jury and such evidence, if believed, was sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal or a motion for new trial on the ground of insufficiency of the evidence does not constitute error. See Williams."

Breckenridge v. State, 628 So. 2d 1012, 1018 (Ala.Crim.App. 1993).

Lastly, any "inconsistencies and contradictions in the

5

State's evidence, as well as [any] conflict between the State's evidence and that offered by the appellant, goes to the weight of the evidence and [creates a question] of fact to be resolved by the jury." <u>Roswell v. State</u>, 647 So. 2d 67, 69-70 (Ala. Crim. App. 1994).

The evidence adduced at trial showed Donnie Williams intentionally and repeatedly followed, harassed, and expressly threatened Callie Williams with the intent to place her in reasonable fear of death or serious bodily injury. As described above, this occurred no less than six times. Based on the evidence presented at trial, the jury could have reasonably concluded that Donnie Williams stalked Callie Williams.

Based on the foregoing, the judgment of the trial court is affirmed.

**AFFIRMED.**

McMillan, P.J., and Cobb, J., concur. Baschab and Shaw, JJ., concur in the result.

6

"ATTORNEY GENERAL'S COPY"

Jordan
77038

FILED

DEC 28 2005

CLERK
ALA COURT CRIMINAL APPEALS

CRIMINAL APPEALS NUMBER: CR-04-0846

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

DAVID DONNIE WILLIAMS,

Appellant,

vs.

STATE OF ALABAMA,

Appellee.

On Appeal from the Circuit Court of
Bullock County, Alabama (CC-04-144)

APPLICATION FOR REHEARING
RULE 39(K) REQUEST FOR ADDITIONAL FACTS
REHEARING BRIEF

David Donnie Williams
Pro Se, Appellant
AIS #169189, G2-C-136
1000 St. Clair Road
Springville, AL 35146-5582



EXHIBIT
E

## TABLE OF CONTENTS

| | Page |
|---|---|
| APPLICATION FOR REHEARING............................. | ii |
| RULE 39(K), ARAP, REQUEST FOR ADDITIONAL FACTS......... | iii |
| TABLE OF AUTHORITIES................................... | v |
| STATEMENT OF FACTS..................................... | 1 |
| ISSUES................................................ | 2 |
| ARGUMENT.............................................. | 3 |
| CONCLUSION............................................ | 4 |
| CERTIFICATE OF SERVICE................................. | 5 |

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

DAVID DONNIE WILLIAMS,              )
                                    )
            Appellant,              )
                                    )
vs.                                 )    CRIMINAL APPEALS NUMBER:
                                    )     CR-04-0846
STATE OF ALABAMA,                   )
                                    )
            Appellee.               )

### APPLICATION FOR REHEARING

Appellant, David Donnie Williams, respectfully requests a rehearing in the above-styled cause on the following grounds:

1. This Court erred in holding that the evidence was sufficient to support the Appellant's conviction of stalking.

David D. Williams
Pro Se, Appellant
AIS #169189, G2-C-136
1000 St. Clair Road
Springville, AL 35146-5582

-ii-

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

DAVID DONNIE WILLIAMS,     )
                         )
       Appellant,      )
                         )
vs.                    )  CRIMINAL APPEALS NUMBER:
                         )  CR-04-0846
STATE OF ALABAMA,        )
                         )
       Appellee.       )

### RULE 39(K), ARAP, REQUEST FOR ADDITIONAL FACTS

Comes now, David Donnie Williams, and respectfully requests that the Court add the following facts to it's opinion:

### STATEMENT OF FACTS

On April 17, 2004, Callie Williams and her 14 year old son Quadarius, had gone to her house to wash clothes. She was still not living there because she was afraid of Williams. Ms. Williams and Quadarius drove to the AG grocery which is located one block from their house. The vehicle driven by Ms. Callie Williams was a white plymouth Lancer owned by her daughter, Lakeisha, and is well known by Williams.

When Ms. Callie Williams went into the AG grocery store, she stated that she did not see Williams or his car anywhere around. After purchasing some orange juice, she and Quadarius came out of the store and started toward their car. They saw that Williams had backed into the space next to her car. Another man by the name of Anthony Blakeley was in the car with Mr. Williams. Ms. Williams stated that she paused for a minute because she was scared".

-iii-

(R. 51) As she was getting into her car, Williams said "bitch, I don't like what you did to me". Ms. Williams told Mr. Williams to leave her alone. At that point, Ms. Callie Williams' son, Quadarius, ask Williams, "why don't you leave my momma alone?" to which Mr. Williams responded "shut up before I fuck you up". Ms. Williams told her son to not say anything else and get in the car. Ms. Williams stated that at that point David Donnie Williams said that "if you mess around with me, I'd rather see you in heaven or hell". (R. 51) Williams drove away at that point.

When Ms. Callie Williams left the store and entered the roadway she saw Mr. Williams coming up behind her in his car very fast. She called the police on her phone and the police arrived almost immediately. The police attempted to pull Williams over and he fled at a high rate of speed. A police chase ensued.

Later that same day, April 17, 2004, Callie Williams filed an incident report with the Union Srpings Police Department against Williams. A statement was taken from Callie Williams wherein she related the incident that she and her son, Quadarius, had encountered with David Donnie Williams at the AG grocery store.

David D. Williams
Pro Se, Appellant
AIS #169189, G2-C-136
1000 St. Clair Road
Springville, AL 35146-5582

-iv-

## TABLE OF AUTHORITIES

Page

Ruffin v. State, 513 So.2d 63
    (Ala.Crim.App. 1987)................................    4

-v-

## STATEMENT OF FACTS

Appellant incorporates herein the Rule 39(K), ARAP, Request for Additional Facts.

<u>ISSUES</u>

WAS THE EVIDENCE SUFFICIENT TO SUPPORT THE JURY'S VERDICT
FINDING THE APPELLANT GUILTY OF STALKING?

-2-

ARGUMENT

This Court in it's discussion of the sufficiency of the evidence to sustain a conviction stated that the evidence adduced at trial showed that the Appellant intentionally and repeatedly followed, harassed, and expressly threatened the alleged victim with the intent to place her in reasonable fear of death or serious bodily injury"..."  This is a mistatement of the evidence presented in that there is no evidence that the Appellant intentionally and repeatedly followed, harassed, and expressly threatened the alleged victim with the intent to place her in reasonable fear of death or serious bodily injury.

The Appellant respectfully requests that this Court again review the evidence presented by the State. A review of the evidence reveals that the alleged incident that support to had taken placed on April 17, 2004, between the Appellant and the alleged victim, occurred "only once" and not "repeatedly" (R.51); as previously set forth in the Statement of Facts, that same day, April 17, 2004, the alleged victim filed an incident report with the Union Springs Police Department against the Appellant. A statement was taken from the alleged victim wherein she related the incident that she and her son, Q.W, had encountered with the Appellant at the AG grocery store (R.51) The State simply failed to prove the necessary element of stalking that the accused intentionally and repeatedly followed or harassed another person.

-3-

CONCLUSION

The State in a criminal case bears a heavy burden. Evidence which allows only speculation, conjecture or surmise as to guilt is not sufficient to sustain the State's burden. Ruffin v. State, 513 So.2d 63 (Ala.Crim.App. 1987).  The Appellant respectfully requests that this Court will again review the record of the evidence presented and that it would then enter an order reversing the Appellant's conviction.

David D. Williams
Pro Se, Appellant
AIS #169189, G2-C-136
1000 St. Clair Road
Springville, AL 35146-5582

-4-

CERTIFICATE OF SERVICE

    I certify that a copy of the foregoing has been delivered to the Court of Criminal Appeals for service on the Attorney General, this 28th day of December, 2005.


David D. Williams
Pro Se, Appellant

-5-

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA



Lane W. Mann
Clerk
Sonja McKnight
Assistant Clerk

P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

January 13, 2006

**CR-04-0846**

David Donnie Williams v. State of Alabama  (Appeal from Bullock  Circuit Court: CC04-144)

## NOTICE

You are hereby notified that on January 13, 2006 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

**cc:** Hon. Wilbert M. Jernigan, Circuit Clerk
Donald E. Spencer, Jr., Attorney
Hon. Audrey Jordan, Asst. Attorney General

EXHIBIT

_F_

PENGAD 800-631-6989

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
## THE ALABAMA COURT OF CRIMINAL APPEALS

**CR-04-0846**

David Donnie Williams v. State of Alabama  (Appeal from Bullock  Circuit Court: CC04-144)

## CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on December 16th 2005:

### Affirmed by Memorandum.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure, it is hereby certified that the aforesaid judgment is final.

**Witness. Lane W. Mann, Clerk**
**Court of Criminal Appeals, on this**
**the 1st day of February, 2006.**

**Clerk**
**Court of Criminal Appeals**
**State of Alabama**

cc: Hon. L. Bernard Smithart, Circuit Judge
    Hon. Wilbert M. Jernigan, Circuit Clerk
    Donald E. Spencer, Jr., Attorney
    Hon. Audrey Jordan, Asst. Attorney General

EXHIBIT
G

COURT OF CRIMINAL APPEALS NO. _____ CR05-1451

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

CIRCUIT COURT OF ___Bullock___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC - 2004 - 144.60___

CIRCUIT JUDGE ___Hon. L. Bernard Smithart___

Type of Conviction / Order Appealed From: ___Rule 32 Petition___

Sentence Imposed: ___Dismissed___

Defendant Indigent: [X] YES  [ ] NO

___David Donnie Williams___

NAME OF APPELLANT

(Appellant's Attorney) _____  (Telephone No.) _____

(Address) _____

(City) _____ (State) _____ (Zip Code) _____

### V.

STATE OF ALABAMA _____

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

EXHIBIT
H

I N D E X

DAVID DONNIE WILLIAMS          VS          STATE OF ALABAMA
CC- 2004 - 144.60

CAS                                                                    1

RULE 32 PETITION                                                     2 - 49

IN FORMA PAUPERIS DECLARATION                                       50 - 52

MOTION TO DISMISS PETITION FOR RELIEF FROM CONVICTION OR
SENTENCE                                                            53 - 58

ORDER                                                              59 - 60

PETIONER 'S RESPONSE AS TO WHY HIS PETITION SHOULD NOT
BE DISMISSED                                                       61 - 64

NOTICE OF APPEAL                                                   65 - 68

CLERK'S NOTICE OF APPEAL                                            69

LETTER OF TRANSMITTAL                                               70

CERTIFICATE OF COMPLETION                                           71

```
:C   72              ALABAMA JUDICIAL INFORMATION SYSTEM    CASE: CC 2004 000144.60
:PL   CEC                    CASE ACTION SUMMARY
:AGE:   1                    CIRCUIT   CRIMINAL               RUN DATE: 04/03/2006
==================================================================================
:N THE CIRCUIT COURT OF   BULLOCK                               JUDGE: LBS
:TATE OF ALABAMA                    VS      WILLIAMS DAVID DONNIE
                                            505 JOHNSON STREET
:ASE: CC 2004 000144.60
                                            UNION SPRINGS , AL  36089 0000
:OB: 08/14/1965        SEX: M  RACE: B  HT: 5 06  WT: 140  HR: BLK EYES: BRO
:SN: 014622787  ALIAS NAMES:
==================================================================================
:HARGE01: STALKING           CODE01: STAL  LIT: STALKING        TYP: F #: 001
:FFENSE DATE:                       AGENCY/OFFICER: 0090000
:ATE WAR/CAP ISS:                   DATE ARRESTED:
:ATE    INDICTED:                   DATE     FILED: 03/31/2006
:ATE   RELEASED:                    DATE  HEARING:
:OND    AMOUNT:        $.00             SURETIES:
:ATE 1:         DESC:               TIME: 0000
:ATE 2:         DESC:               TIME: 0000
:RACKING NOS: CC 2004 000144 00  /                  /
  DEF/ATY: BRUNSON PAUL W JR       TYPE: A                      TYPE:
          P.O. BOX 475
          CLAYTON      AL 36016                    00000
:ROSECUTOR: REEVES BENJAMIN C JR
==================================================================================
:TH CSE: CC200400014400 CHK/TICKET NO:             GRAND JURY:
:OF   REPORTER:                  SID NO:    000169189
:E   TATUS: PRISON              DEMAND:                    OPER: CEC
==================================================================================
:ATE      ACTIONS, JUDGEMENTS, AND NOTES
==================================================================================
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|---|---|
| 3-31-06 | Petition for Relief from Conviction or Sentence filed, Copy to DA |
| 4-1-06 | Informal Handelen Ehrnofid; Copy to D.A. |
| 4-18-06 | Motion to dismiss Petition for Relief from Conviction... filed, Corr. filed |
| 4-20-06 | |
| 4-25-06 | Order filed Copy to Parties. |
| 4-27-06 | Petitioner's Response as to Why his petition should not be dismissed |
| 5-2-06 | Notice of Appeal filed |
| 5-4-06 | Clerk's Notice of Appeal filed — forwarded to def, AG, DA, Court of Criminal Appeals) |

# PETITION FOR RELIEF FROM
# CONVICTION OR SENTENCE

(Pursuant to Rule 32,

Alabama Rules of Criminal Procedure)

Case Number

| CC | 04 | 144 |
|----|----|-----|
| ID | YR | NUMBER |

IN THE _____ CIRCUIT _____ COURT OF ___ BULLOCK ___, ALABAMA

DAVID DONNIE WILLIAMS _____ vs. ___ STATE OF ALABAMA ___

Petitioner (Full Name)                                Respondent

[Indicate either the "State" or,
if filed in municipal court, the
name of the "Municipality"]

Prison Number ___ AIS 169189 ___ Place of Confinement ___ St. Clair Corr. Fac. ___

County of conviction ___ Bullock County ___

NOTICE:  BEFORE COMPLETING THIS FORM, READ CAREFULLY
THE ACCOMPANYING INSTRUCTIONS.

1.  Name and location (city and county) of court which entered the judgment of conviction
or sentence under attack ___ Circuit Court of Bullock County, Union Springs, ___
___ Alabama ___

2.  Date of judgment of conviction ___ November 23, 2004 ___

3.  Length of sentence ___ 38 years ___

4.  Nature of offense involved (all counts) ___ Stalking ___

5.  What was your plea?   (Check one)

(a)  Guilty _____

(b)  Not guilty ___ X ___

(c)  Not guilty by reason of mental disease or defect _____

(d)  Not guilty and not guilty by reason of mental disease or defect _____

6. Kind of trial: (Check one)

(a) Jury __X__        (b) Judge only _____

7. Did you testify at the trial?

Yes _____        No __X__

8. Did you appeal from the judgment of conviction?

Yes __X__        No _____

9. If you did appeal, answer the following:

(a) As to the state court to which you first appealed, give the following information:

(1) Name of court ___Alabama Court of Criminal Appeals___

(2) Result ___Affirmed___

(3) Date of result ___December 16, 2005___

(b) If you appealed to any other court, then as to the second court to which you appealed, give the following information:

(1) Name of court ___Alabama Court of Criminal Appeals___

(2) Result ___Rehearing Overruled___

(3) Date of result ___January 13, 2006___

(c) If you appealed to any other court, then as to the third court to which you appealed, give the following information:

(1) Name of court ___None___

(2) Result _____

(3) Date of result _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you filed any petitions, applications, or motions with respect to this judgme in any court, state or federal?

Yes _____          No __X__

11. If your answer to Question 10 was "yes", then give the following information in regard to the first such petition, application, or motion you filed:

   (a)  (1)  Name of court _____ N/A _____

        (2)  Nature of proceeding _____

        (3)  Grounds raised _____

                 _____

                 _____

                 _____

                 _____

        (attach additional sheets if necessary)

        (4)  Did you receive an evidentiary hearing on your petition, application, or motion?

            Yes _____          No _____

        (5)  Result _____

        (6)  Date of result _____

   (b)  As to any second petition, application, or motion, give the same information:

        (1)  Name of court _____ N/A _____

        (2)  Nature of proceeding _____

        (3)  Grounds raised _____

                 _____

                 _____

                 _____

                 _____

        (attach additional sheets if necessary)

        (4)  Did you receive an evidentiary hearing on your petition, application, or motion?

            Yes _____          No _____

        (5)  Result _____

        (6)  Date of result _____

   (c)  As to any third petition, application, or motion, give the same information (attach additional sheets giving the same information for any subsequent petitions, applications, or motions):

        (1)  Name of court _____ N/A _____

(2)   Nature of proceeding _____

(3)   Grounds raised _____

_____

_____

_____

_____

(attach additional sheets if necessary)

(4)   Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____          No _____

(5)   Result _____

(6)   Date of result _____

(d)   Did you appeal to any appellate court the result of the action taken on any petition, application, or motion?

(1)   First petition, etc.          Yes _____          No _____

(2)   Second petition, etc.          Yes _____          No _____

(2)   Third petition, etc.          Yes _____          No _____

**ATTACH ADDITIONAL SHEETS GIVING THE SAME INFORMATION
FOR ANY SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS.**

(e)   If you did not appeal when you lost on any petition, application, or motion, explain briefly why you did not:

N/A

_____

_____

_____

12.   Specify every ground on which you claim that you are being held unlawfully, by placing a check mark on the appropriate line(s) below and providing the required information. Include all facts. If necessary, you may attach pages stating additional grounds and the facts supporting them.

# GROUNDS OF PETITION

Listed below are the possible grounds for relief under Rule 32. Check the ground(s) that apply in your case, and follow the instruction under the ground(s):

____X____   A.   The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

For your information, the following is a list of the most frequently raised claims of constitutional violation:.

4

(1)   Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(2)   Conviction obtained by use of coerced confession.

(3)   Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(4)   Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(5)   Conviction obtained by a violation of the privilege against self-incrimination.

(6)   Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(7)   Conviction obtained by a violation of the protection against double jeopardy.

(8)   Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(9)   Denial of effective assistance of counsel.

This list is not a complete listing of all possible constitutional violations.

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each constitutional violation that you claim, whether or not it is one of the nine listed above, and include under it each and every fact you feel supports this claim. Be specific and give details.

____X____  B.   The court was without jurisdiction to render the judgment or to impose the sentence.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____  C.   The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____  D.   Petitioner is being held in custody after his sentence has expired.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____  E.   Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:

The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable diligence; and

The facts are not merely cumulative to other facts that were known; and

5

The facts do not merely amount to impeachment evidence; and

If the facts had been known at the time of trial or sentencing, the result would probably have been different; and

The facts establish that petitioner is innocent of the crime for which he was convicted or should not have received the sentence that he did.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____ F.    The petitioner failed to appeal within the prescribed time and that failure was without fault on petitioner's part.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

13.    IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS RULE 32.2(b) LIMITS YOU TO ONLY ONE PETITION IN MOST CIRCUMSTANCES. IT PROVIDES:

"Successive Petitions. The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exist why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

A.    Other than an appeal to the Alabama Court of Criminal Appeals or the Alabama Supreme Court, have you filed in state court any petition attacking this conviction or sentence?

Yes _____                    No X_____

B.    If you checked "Yes," give the following information as to earlier petition attacking this conviction or sentence:

(a)    Name of court _____ N/A _____

(b)    Result _____

(c)    Date of result _____
(attach additional sheets if necessary)

C.    If you checked the "Yes" line in 13A, above, and this petition contains a different ground or grounds of relief from an earlier petition or petitions you filed, attach a separate sheet or sheets labeled: "EXPLANATION FOR NEW GROUND(S) OF RELIEF."

On the separate sheet(s) explain why "good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and [why] failure to entertain [this] petition will result in a miscarriage of justice."

14.    Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes _____                    No X_____

15. Give the name and address, if known, of each attorney who represents you at the following stages of the case that resulted in the judgment under attack:

(a) At preliminary hearing ___Paul W. Brunson, Jr., Esq., P.O. Box 475,___
Clayton, Alabama 36016

(b) At arraignment and plea ___Keith Ausborn, Esq., 1224 Ryan Street,___
Montgomery, Alabama 36107

(c) At trial ___Keith Ausborn, Esq., 1224 Ryan Street, Montgomery,___
Alabama 36107

(d) At sentencing ___Keith Ausborn, Esq., 1224 Ryan Street, Montgomery,___
Alabama 36107

(e) On appeal ___Donald Eugene Spencer, Jr., Esq., 547 South Lawrence___
Street, Montgomery, Alabama 36104

(f) In any post-conviction proceeding ___N/A___

___

___

(g) On appeal from adverse ruling in a post-conviction proceeding ___

___

___N/A___

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes _____    No __X__

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes _____    No __X__

(a) If so, give name and location of court which imposed sentence to be served in the future: _____
___N/A___

(b) And give date and length of sentence to be served in the future: ___

___

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes _____    No _____

18. What date is this petition being mailed?

___3-28-06___

Wherefore, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

7

# PETITIONER'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I swear (or affirm) under penalty of perjury that the foregoing is true and correct.

Executed on _MArch  28 , 2006_ .
(Date)

_Daniel Wilkins_
Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this the _28th_ day of _March_ _2006_

_Cleo Wilkins_
Notary Public

## OR *

## ATTORNEY'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I Swear (or affirm) under penalty of perjury that, upon information and belief, the foregoing is true

and correct. Executed on _____ .
(Date)

_____
Signature of Petitioner's Attorney

SWORN TO AND SUBSCRIBED before me this the _____ day of _____ , _____

_____
Notary Public

Name and address of attorney representing petitioner
in this proceeding (if any)

_____

_____

_____

_____

_____

* If petitioner is represented by counsel, Rule 32.6(a) permits either petitioner or counsel to verify the petition.

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

DAVID DONNIE WILLIAMS,       )

           Petitioner,       )

                      )

vs.       )       CASE NO. CC-04-144 .60

                      )

STATE OF ALABAMA,       )

           Respondent.       )

## BRIEF AND EVIDENTIARY SUBMISSIONS IN SUPPORT OF PETITION FOR RELIEF FROM CONVICTION FILED UNDER RULE 32 OF THE ALABAMA RULES OF CRIMINAL PROCEDURE

Comes now the Petitioner in this matter and submits the following in support of his request for relief from conviction. The Petitioner states as follows:

1.  Petitioner contends that the trial court erred when the jury informed the trial court that it was deadlocked. Attached and incorporated by reference is page 547-549 during the course of its deliberations, the jury sent word to the trial court, through the bailiff, stating that it could not reach a unanimous decision. The trial court "sent word back to them to keep on deliberating," but gave no further instructions to the jury. Petitioner further contends that, upon learning that the jury was at an impasse, the trial court should have ordered the jury into the courtroom and addressed the jury personally, and that this should have been done in the presence of the Petitioner and his attorney.

In addition to the above, Petitioner claims his trial counsel was ineffectual in that he do not object to the trial court's

actions regarding this situation when it occurred. The record is empty of any objection by his counsel. <u>Ford v. State</u>, 687 So.2d 1258 (Ala.Crim.App. 1996). His failure to object resulted in this case being improperly tried. Further, by not requiring the trial court to order the jury into the courtroom and address the jury personally in the presence of the Petitioner and his counsel, his counsel was ineffectual thereby denying the Petitioner a fair trial. A new trial is needed to protect the rights of the Petitioner.

2. Petitioner contends that the trial court had been without jurisdiction to adjudicate him guilty of the greater offense of stalking because he was acquitted of the lesser-included offense of the misdemeanor harassment/domestic violence. Specifically, Petitioner contends that, because harassment was a lesser-included offense of the greater offense of stalking, his conviction is void because it is impossible to commit the greater offense of stalking without first having committed the lesser-included offense of harassment. Attached and incorporated by reference is page 550-551, 34 jury verdict finding the Petitioner guilty of the offense of stalking, as charged in the indictment and not guilty of the offense of harrassment/domestic violence. Pursuant to Rule 2.2 (a) of the Alabama Rules of Criminal Procedure "all felony charges and misdemeanor or ordinance violations which are lesser included offenses within a felony charge or which arise from the same

incident as a felony charge <u>Shall</u> be prosecuted in circuit court,

except ... (b)(1) ... (2) <u>misdemeanors that are lesser included</u>

<u>offenses within a felony charge</u> as to which concurrent jurisdiction

as described in Rule 2.2(a) has not been exercised." As the Alabama

Supreme Court explained in <u>Ex parte N.W.</u>, 748 So.2d 199 (Ala.

1999) citing <u>Chambers v. City of Opelika</u>, 698 So.2d 792, 794(Ala.

Crim.App. 1996):

> "'where all the elements of an offense separate
> from the offense charged are present in or are
> included among elements of [the] charged offense,
> such separate offense is a lesser included offense
> for which [the] defendant may be convicted, though
> acquitted of the offense charged.  <u>To be necessarily</u>
> <u>included in the greater offense, the lesser must be</u>
> <u>such that it is impossible to commit the greater</u>
> <u>without first having committed the lesser</u>.'"

(Quoting <u>Sharpe v. State</u>, 340 So.2d 885, 887 (Ala.Crim.App.) cert.

denied, 340 So.2d 889 (Ala. 1976))(emphasis added in <u>Chambers</u>).

<u>This issue was never raised by the counsel appointed to represent</u>

<u>the Appellant on his direct appeal</u>.  The issue is so clear that

the failure to recognize it and present it on appeal rendered

ineffectual assistance for the Petitioner.

　　　3.  Petitioner contends that his appellate counsel was

ineffectual in his appeal to the Alabama Court of Criminal Appeals.

Said appeal raised only one issue, the sufficiency of evidence when

other issues were available.  Further, the brief written in support

of the one issue was written in a manner to be totally incomprehen-

sible.  Attached and incorporated by reference is said brief.

-3-

WHEREFORE, THE PREMISES CONSIDERED, Petitioner asks this Court to grant his Petition.

Respectfully submitted, this the _28_ day of _March_, 2006.

_David D. Williams_
David D. Williams
Pro Se, Petitioner
AIS #169189, G1-B-220
St. Clair Correctional Facility
1000 St. Clair Road
Springville, AL 35146-5582

-4-

```
 1          MR. AUSBORN:  Oh, that's fine, Judge.

 2          THE COURT:  Other than that line that was

 3     missing from the guilty verdict -- domestic

 4     violence, not guilty which I'm about to have

 5     inserted, everybody satisfied?

 6          MRS. AUSBORN:  Yes, Judge.

 7          MRS. PENN:  State's satisfied, Judge.

 8          THE COURT:  And then the alternate is Beverly

 9     Rotten Chruchwell.

10          MR. AUSBORN:  That's correct, Your Honor.

11          MRS. PENN:  Right.

12          (The following proceedings were had

13           within the hearing of the jury:)

14          THE COURT:  Okay.  With the exception of

15     Mrs. Beverly Churchwell on the front right -- You

16     stay where you are seated.  -- everyone else return

17     to the jury room.  But don't start deliberations

18     until Mr. Smith brings in exhibits, and this

19     verdict form, okay?

20          (Whereupon the jury retired to the

21           jury room at 5:30 p.m.)

22          The jury began deliberations at 5:33 p.m.)

23          (Whereupon at 5:42 p.m., the jury notified

24           the baliff they had a question.)

25          THE COURT:  Question from the jury.
```

1      The question reads:  What is the sentence of

2  each offense?

3      What I normally do is put a response on here

4  that we can all agree to.

5      How about, It is not proper to answer that at

6  this time?

7      MR. AUSBORN:  That's fine.

8      THE COURT:  The response agreed on by the

9  parties says, it is not proper to answer this at

10  this time written on the bottom of the note that

11  they have sent out.  I'll give it to the bailiff to

12  give to them.

13      Is that approved by the state?

14      MRS. PENN:  Yes.

15      THE COURT:  Defense?

16      MR. AUSBORN:  Yes.

17      (Whereupon the Court sent the response back in

18       to the jury deliberation room at 5:45 p.m.)

19      (Whereupon at 6:15 p.m. the jury

20       sent another note out.)

21      THE COURT:  I want y'all to see this.  It's got

22  some vote numbers on it.

23      The note reads -- It gives some numbers on

24  where they are on domestic violence.  How should we

25  go about resolving this issue?

1          They seem to be split on that.

2          MR. AUSBORN:  On behalf of the defense, I

3     recommend they continue deliberating.

4          THE COURT:  Same from the State?

5          MRS. PENN:  Yes.

6          MR. AUSBORN:  Yes.

7          THE COURT:  I'm just going to write that they

8     continue deliberations.

9          (Whereupon the note with the Court's

10          response was sent back in to the jury room.)

11          (At 6:25 p.m., the jury informed the baliff

12          they needed a break, and a break was given.)

13          (Whereupon the jury returned from their break

14          and resumed deliberations at 6:35 p.m.)

15          (Whereupon the jury informed the bailiff they

16          had reached a verdict at 6:45 p.m.)

17          THE COURT:  Ladies and gentlemen, the jury has

18     reached a verdict, and I'll bring the jury back in,

19     and we'll read the verdict.  And I want everybody

20     to remain calm.  After the verdict is read, the

21     jury will go back to the jury room, and then you

22     will be released for the evening.

23          Bring them in.

24          (Whereupon the jury returned to the jury box,

25          and the following proceedings were had in

1    open court:)

2                           ## VERDICT

3        THE COURT:  Ladies and gentlemen of the jury,

4    it is my understanding that you have reached a

5    verdict, and that verdict will be read into the

6    Record.

7        State of Alabama versus David Donnie Williams,

8    Case Numbers CC-04-144 and 145:  We, the jury, find

9    the defendant, David Donnie Williams, guilty of the

10   offense of stalking as charged by the indictment

11   signed by the foreperson.

12       Next:  We, the jury, find the defendant David

13   Williams not guilty of harassment/domestic

14   violence, signed and dated by the foreperson,

15   November 23, 2004.

16       THE COURT:  Request polling of the jury?

17       MR. AUSBORN:  Yes, sir.

18       (Whereupon the jury was polled, and

19         all responded in the affirmative.)

20       THE COURT:  If you would, ladies and gentlemen,

21   go back to the jury room one minute, and I'll be in

22   there in just a minute to dismiss you.

23       (Whereupon the jury left the courtroom, and the

24         following proceedings were had outside the

25         presence of the jury:)

1       THE COURT:   Defendant approach.

2       (The defendant approaches with counsel.)

3       THE COURT:  Mr. David Donnie Williams, in Case

4   Number CC-04-144, a jury of your peers in Bullock

5   County, Alabama on this date, November 23, 2004,

6   has found you guilty of the offense Stalking, as

7   charged in the indictment, and this Court does now

8   adjudge you guilty of stalking as charged in the

9   indictment.

10      The jury has found you not guilty and acquitted

11  you of the misdemeanor harassment/domestic

12  violence.

13      Request pre-sentence report?

14      MR. AUSBORN:  Yes, Your Honor.

15      THE COURT:  The pre-sentence report has been

16  done.  They will come and interview

17  Mr. Williams.

18      You will need to fill out some forms; victim

19  impact statements and anything they want considered

20  for sentencing, which will be set for December 9th.

21      THE COURT:  Any questions, Mr. Williams?

22      THE DEFENDANT:  I don't feel that I was judged

23  fairly.

24      THE COURT:  Okay.  Anything else?

25      THE DEFENDANT:  No.

## IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

STATE OF ALABAMA,    )
   Plaintiff,      )
vs.          )  CASE NO. CC-2004-144 & 145
DAVID DONNIE WILLIAMS,  )
   Defendant.     )

### JURY VERDICT

### GUILTY VERDICT

We, the Jury, find the Defendant, David Donnie Williams, guilty of the offense of

Stalking, as charged in the Indictment.

_____
Foreperson

### NOT GUILTY VERDICT

We, the jury, find the Defendant, David Donnie Williams, not guilty of the offense of

stalking.

_____
Foreperson

### GUILTY VERDICT

We, the jury, find the Defendant, David Donnie Williams, guilty of the offense of

Harrassment/Domestic violence as charged in the Indictment.

_____
Foreperson

### NOT GUILTY VERDICT

We, the jury, find the Defendant, David Donnie Williams, not guilty of the offense of

Harrassment/Domestic violence.

_____
Foreperson

So Say We All.
November 23, 2004

CRIMINAL APPEALS NUMBER: CR-2004-0846

---

IN THE COURT OF CRIMINAL APPEALS
FOR THE STATE OF ALABAMA

---

DAVID DONNIE WILLIAMS

Appellant

v.

STATE OF ALABAMA

Appellee

---

ON APPEAL FROM THE CIRCUIT COURT OF

BULLOCK COUNTY, ALABAMA

---

BRIEF OF THE APPELLANT

---

DONALD EUGENE SPENCER, JR.   (SPE046)
Gene Spencer, Attorney At Law, LLC
547 South Lawrence Street
Montgomery, Alabama 36104
(334) 269-1934
(334) 832-4527 fax

21

# Table of Contents

|                                          | Page |
|------------------------------------------|------|
| Table of Authorities                     | ii   |
| Statement of the Case                    | 1    |
| Statement of the Issues                  | 3    |
| Statement of Facts                       | 4    |
| Statement of the Standard of Review      | 13   |
| Summary of the Argument                  | 14   |
| Argument                                 | 15   |
| Conclusion                               | 26   |
| Certificate of Service                   | 27   |

# Table of Authorities

*Clark v. United States*, 293 F.2d 445 (5th Cir. 1961).

. . . . . . . . . . . . . . . .14


*Davis v. State* 598 So.2d 1054 (Ala.Crm. App. 1992).

. . . . . . . . . . . . . . . .13


*Faircloth v. State*, 471 So.2d 485 (Ala.Crm. App. 1984)

. . . . . . . . . . . . . . . .13


*United States v. Black*, 497 F.2d 1039 (5th Cir. 1974)

. . . . . . . . . . . . . . : 14


*United States v. McGlamory*, 441 F.2d 130 (5th Cir. 1969)

. . . . . . . . . . . . . . 14

## Statement of the Case

A warrant was signed against David Donnie Williams on April 14, 2004, by Callie Williams for the charge of "Stalking" in violation of §13A-6-90, Code of Alabama, 1975, and for "Domestic Violence-3rd degree" in violation of §13A-6-132, of the Code of Alabama, 1975. Williams was indicted by the Bullock County Grand Jury on these charges and on November 15, 2004, Williams was arraigned and entered a plea of not guilty on each charge.

A trial on the merits was held on November 22nd and 23rd of 2004, and a duly empaneled jury returned a verdict of guilty against Williams on the stalking charge, which is a "Class C" felony and, a verdict of not guilty on the domestic violence charge.

Williams' sentencing was held on December 9, 2004, at which time Williams and his counsel stipulated to 5 (five) prior adult felony convictions. Under the Habitual Felony Offender Act, the sentencing range for Williams was from 15 to 99 years, or life in prison. Williams was sentenced to a term of 38 years in the State Penitentiary on the stalking charge; to attend and complete the Dual

1

Diagnosis Program, Substance Abuse Program and the Anger and Stress Management Program. Also Williams was fined $5,000.00, court costs, $50.00 to the crime victims' compensation fund, and zero dollars in restitution.

Motions for "Reconsideration & Reduction of 38 Year Sentence", "Motion For Judgment Notwithstanding Order of Verdict", "Motion For Trail De Novo Proceeding", and "Motion for Stay of 38 Year Sentence Pending Disposition of All Post Judgment Motions" were filed by Williams' trial counsel on January 10, 2005, thereby suspending the running of the time for filing an appeal. The State filed its "Response to Defendant's Motions" on January 14, 2005.

On January 18, 2005, the Court denied all post-judgment motions filed by counsel on Williams' behalf.

On January 28, 2005, Williams filed a letter with the Bullock County Clerk of Court stating his request to "appeal his sentence". The "Notice of Appeal" as such was timely filed.

2

25

## Statement of the Issues

Whether the evidence adduced at trial was sufficient to sustain a conviction on the charge of "Stalking" in violation of §13A-6-90, <u>Code of Alabama, 1975</u>.

## Statement of Facts

Mr. David Donnie Williams and Ms. Callie M. Williams had an on-going relationship for approximately 6 or 7 years. During that time, there were a number of occasions in which the parties have broke up and/or separated because of discord in the relationship. Some of those separations were because Mr. Williams was and had been incarcerated. For the most part, the couple have lived together throughout their relationship. They were never ceremonially married and Ms. Callie Williams claims that she and Williams are not common law husband and wife.

According to Ms. Callie Williams, she and Williams had gotten off from work at Wayne Farm in the early morning hours of the March 19, 2004. They had gotten paid and Williams had given Ms. Callie Williams some money to hold for him and told her (Callie Williams) that he would be back shortly. Williams was gone for a few hours and when he did come back he was high on crack according to Ms. Williams. Callie Williams stated that Mr. Williams wanted the rest of his money. Callie Williams tried to keep him from taking the money because she thought that

he was going to buy more drugs with it. At that point she told Mr. Williams that she was breaking up with him because of his continued use of illegal drugs, specifically, crack cocaine.

Callie Williams testified that she told Williams that she did not want him (Williams) anymore because he had gotten back on drugs; that he was not doing better nor was he changing as he had promised her he would do. After several hours, Ms. Callie Williams left the area of Wayne Farm and went to her daughter's (Lakeisha Williams) home to sleep.

Later in the day, Williams' brother-in-law brought him over to Lakeisha Williams' house. At that point, Ms. Callie Williams and Williams drove to her house to pick up her children where they got off of the school bus. Ms. Callie Williams asked Williams for her cell phone which he had taken earlier the night before. Williams asked Callie Williams to come into the house with him but Callie refused because she was afraid of him because he was high on crack. Again, Callie Williams told Williams that she did not want him anymore because he had gotten back on crack cocaine.

5

Callie Williams testified that she then left and went back to her daughter's house. Approximately five or six times during that evening, March 19, 2004, Williams came to Lakeisha Williams' home wanting Callie Williams to go back with him. Each time, Ms. Callie Williams told him no. Callie Williams testified that she was afraid to return to her own house because Williams was high on crack and staying there.

Callie Williams next saw Williams on March 24, 2004, at her job at Wayne Farm, where Williams was also employed. Callie Williams stated that just before work started on the 24th, she encountered Williams in the break room. At that point, Williams said to Callie Williams "bitch, you don't ; I'll hurt you. I don't like what you did". (R. 29) as he grabbed the back of her smock. Callie Williams further stated that Williams stated to her that "he was going to make her lose her job". (R. 29)   Ms. Callie Williams testified that she thought that this was in retaliation for her calling Mr. Williams parole officer. (R. 29)

Later that same evening a second incident occurred

6

while still at work. Williams came up behind Callie Williams and again grabbed her smock. According to Ms. Williams, her supervisor, Anthony, saw this incident occur.

A third incident occurred at work on March 24, 2004 at approximately 10:00 P.M. in the break room of Wayne Farm. Ms. Callie Williams stated that Williams again came up behind her and said "I went and told your mama what you did". Ms. Williams again told Williams to leave her alone and kept walking away.

After getting off of work on the March 24, 2004, Callie Williams called her daughter Lakeisha Williams, to come pick her up from work. Callie Williams went home with Lakeisha and was living there at the time on a temporary basis because David Donnie Williams was living in her house. Later that evening, Williams came over to Lakeisha's house where Callie Williams was staying and knocked on the door. No one would open the door for him.

Callie Williams next saw Williams on the 26th of March, 2004. He again came over to Lakeisha's house and knocked on the door and again no one would let him in. In

7

fact, Callie Williams stated that she did not speak at all because she did not want him (Williams) to know that she was in the house.

On March 27, 2004, Callie Williams again encountered Williams. Callie Williams had gone to her home to get her and her children a change of clothes when she saw that Williams' car was parked at her house. Ms. Williams did not enter the house but instead called the Union Springs police because she had signed a "trespass" against Williams on March 24, 2004, which meant that he was not to come back on her property.

When the police arrived, they went in the house and found Williams sleeping. They woke him up and made him leave. Later that same day, March 27th, Callie Williams went to a restaurant, "Smokey O's" to get some food. While Ms. Williams, was in the restaurant ordering some food, Williams came inside and approached Callie Williams. Ms. Williams testified that Williams told her "bitch, I don't like what you did to me". (R. 40) Ms. Williams had ordered her food, paid for it and then walked out of the restaurant. Mr. Williams followed directly behind her. Ms. Callie Williams testified that

8

as she was getting into her car Williams told her "bitch, I will kill you". Ms. Williams testified that her response was "Donnie if you are gonna do it, do it right here. I'm tired of you threatening my life". (R. 41) At that point, Mr. Williams got in his car and left.

The next time that Ms. Callie Williams saw David Donnie Williams was at her house on March 30, 2004. Lakeisha Williams and her child had taken Callie Williams to her house to pick up her (Callie's) daughter, Narkesha, after school. The school bus drops Narkesha off in front of Callie Williams residence each day. When Ms. Williams arrived her daughter was not there. About two minutes later Williams pulled up across the road with the eight year old daughter of Callie Williams (Narkesha Williams) in his car.

Ms. Callie Williams pulled across the road to where Mr. Williams and the child were. Williams got out of the car holding the child's (Narkesha) hand, preventing her from coming to her mother, Ms. Callie Williams. Callie Williams did not get out of the car but her grandson accidently opened the backdoor. Ms. Williams said that

9

Williams told her "bitch, I don't like what you did to me and pulled my sweatshirt trying to get me out of the car". (R. 44) Callie Williams further stated that David Donnie Williams at that point said he would kill her. Williams let the child go and she got into the car with her mother, Callie Williams, and they left.

Ms. Callie Williams went to the Union Springs Police Department and filed a report of the incident on March 30, 2004.


On April 17, 2004, Callie Williams and her 14 year old son Quadarius, had gone to her house to wash clothes. She was still not living there because she was afraid of Williams. Ms. Williams and Quadarius drove to the AG grocery which is located one block from their house. The vehicle driven by Ms. Callie Williams was a white Plymouth Lancer owned by her daughter, Lakeisha, and is well known by Williams.

When Ms. Callie Williams went into the AG grocery store, she stated that she did not see Williams or his car anywhere around. After purchasing some orange juice, she and Quadarius came out of the store and started

10

toward their car. They saw that Williams had backed into the space next to her car. Another man by the name of Anthony Blakeley was in the car with Mr. Williams. Ms. Williams stated that she paused for a minute because she was scared". (R. 51) As she was getting into her car, Williams said "bitch, I don't like what you did to me". Ms. Williams told Mr. Williams to leave her alone. At that point, Ms. Callie Williams' son, Quadarius, ask Williams, "why don't you leave my momma alone?" to which Mr. Williams responded "shut up before I fuck you up". Ms. Williams told her son to not say anything else and get in the car. Ms. Williams stated that at that point David Donnie Williams said that "if you mess around with me, I'd rather see you in heaven or hell". (R. 51) Williams drove away at that point.

When Ms. Callie Williams left the store and entered the roadway she saw Mr. Williams coming up behind her in his car very fast. She called the police on her phone and the police arrived almost immediately. The police attempted to pull Williams over and he fled at a high rate of speed. A police chase ensued.

Later that same day, April 17, 2004, Callie Williams

11

34

filed an incident report with the Union Springs Police Department against Williams. A statement was taken from Callie Williams wherein she related the incident that she and her son, Quadarius, had encountered with David Donnie Williams at the AG grocery store.

## <u>Statement of the Standard of Review</u>

The standard of review in determining the sufficiency of the evidence to sustain a conviction, is that a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. *Faircloth v. State,* 471 So.2d 485 (Ala.Crm. App. 1984). The function of the Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. *Davis v. State* 598 So.2d 1054 (Ala.Crm. App. 1992). In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.

13

*United States v. Black*, 497 F.2d 1039 (5th Cir. 1974);

*United States v. McGlamory*, 441 F.2d 130 (5th Cir. 1969);

*Clark v. United States*, 293 F.2d 445 (5th Cir. 1961).

## Summary of the Argument

The State's failure to produce credible witnesses in addition to the insufficiency of the State's evidence requires that Mr. David Donnie Williams conviction be reversed and his sentence vacated based on the insufficiency of evidence on which to sustain a conviction.

### Argument

At trial, Ms. Callie Williams was the State's first witness and took the witness stand testifying as to the facts previously set forth in the Statement of Facts.

The State next called Ms. Johnnie Baker as their 2nd witness. Ms. Baker is a Security Guard employed at Wayne Farm in Union Springs, Alabama. Her testimony was that Williams had been an employee of Wayne Farm at some point because she recognized his face but never knew his name until his employment was terminated. At that point, a note was sent to her post in the Guard Shack that David Williams was not to be allowed back on company property. (R. 135) Ms. Baker further testified that she had seen Williams in the parking lot of Wayne farm property. The third (3rd) time this occurred after the note was posted, Baker stated that she went out to the parking lot to advise Williams to stay off of the property. (R. 138) Baker stated that Williams did ask about Callie Williams

and complied with Ms. Baker's instructions to leave the premises. Mr. Williams complied without incident. Ms. Baker did testify that she later saw Mr. Williams drive by her post at the Guard Shack on the roadway in front of Wayne Farm several times, but that he never came back on Wayne Farm property. During cross examination of Ms. Baker by counsel for Williams, counsel asked "You never saw him stalking this young lady; is that not correct?" Ms. Baker answered "it depends on what you mean by stalking". (R. 154 )Further, Ms. Baker stated in her testimony that:

> "   Q.   April 17, 2004. You weren't around
>         Ms. Callie Williams on April 17, 2004
>         were you?
>
>     A.   I don't know unless she passed through
>         the Guard Shack coming to work and I
>         had to check her ID.
>
>     Q.   Did you see Ms. Callie Williams and
>         Mr. David Donnie Williams together
>         on April 17, 2004?
>
>     A.   I don't know.
>
>     Q.   Now that's the date that the State
>         of Alabama contends that my client
>         stalked Ms. Williams. You didn't
>         see him stalking Ms. Williams on
>         April 17, 2004, did you?
>
>     A.   Just because I didn't see it, maybe
>         someone else did. I don't know what

16

day was April 17th. "

(R. 166)

" . Q. So as far as the ladies and gentlemen
of the jury are concerned, April 17,
2004, you never saw Mr. David
Donnie Williams stalk Callie
Williams; isn't that correct?
Yes or no?

A. Yeah, you are correct. I can't
say what date. I can't say I
seen him stalking her at all."

(R. 166-167)

The third witness called by the State was Johnny

Taylor. Taylor who is a convicted felon with convictions

for Theft of Property, a crime of moral turpitude. Mr.

Taylor testified that Williams got him to testify in

front of the Parole Board that he, Mr. Taylor, was at the

AG grocery store on April 17, 2004, and that "... he was

sitting in the car, and the guy that arrived with him

went inside the store, and when he got ready to come out

of the store, Ms. Williams followed the guy out the

store, and Ms. Williams started arguing with him."

(R. 176-177)

Mr. Taylor recanted that statement in his testimony.

Mr. Taylor bears no credibility as a witness because

according to himself, he lied to the Parole Board and now

17

has changed his story for the District Attorney. However,
in later testimony, Mr. Taylor stated that "I don't know
noting about him stalking her." (R. 192)


The State's fourth witness was Mr. Wilbert Jernigan,
the Clerk of Court for Bullock County, Alabama. Mr.
Jernigan could not offer any evidence of the charges
against Mr. Williams, as shown by his testimony:

> Q.   Now just for clarification, you
>      would agree, Mr. Jernigan, you are
>      not here to testify to the ladies
>      and gentlemen of the jury that I
>      Know that Mr. David Donnie Williams
>      committed stalking against Ms. Callie
>      Williams because, first of all, you
>      would agree, you never observed
>      that happening yourself?
>
> A.   No sir.
>
> Q.   Okay. And furthermore, you never
>      heard those events, alleged events,
>      occur as they were unfolding as well;
>      is that correct?
>
> A.   No sir, I did not."

(R. 220)

The State's fifth witness was Narkesha Williams, the
eight-year old daughter of Callie Williams. On direct
examination by the State, Narkesha Williams testified

that she heard Williams say the "B" word. (R. 252) Narkesha further testified that when Williams picked her up after school, that she, Narkesha willingly got into the car with Williams. (R. 262) Also, Narkesha testified that her mother, Callie Williams, was also cursing at Williams in the incident where Narkesha got into the car with Williams after school. (R. 264)

The States' sixth witness was Quadarius Williams, Callie Williams' 14-year old son. Although Quadarius Williams' testimony mirrored that of his mother Callie Williams regarding the events of April 17, 2004 at the AG grocery store, Quadarius admitted in his testimony that "he does not like Donnie Williams". (R. 284)(Emphasis added) Furthermore, Quadarius testified that his mother Callie Williams had gone over his testimony with him about 50 times to prepare him for court and to help him learn his story. (R. 288-289) On re-cross examination by counsel for the defendant, Quadarius again admitted that he had memorized his testimony.

> Q. And so when you are on the stand today, you don't have a problem

19

> telling the ladies and gentlemen
> of the jury what happened because
> your momma made sure you memorized
> that by going over it day in and
> day out; is that right?

A.   Yes.  "

(R. 303-304)

And again on re-cross by counsel for the defendant,
Quadarius testified that they were out to get David
Donnie Williams and send him to prison.

"  Q.   Now did they tell you they
         (Callie Williams mother and
         prosecutor sic)were out to
         get David?

   A.   Yeah.

   Q.   You know David is on trial, right?

   A.   Yes.

   Q.   And they told you they was
         out to get David; is that right?

   A.   Yes.

   Q.   And they told you that they was
         out to get David and they was going
         to try to send David to prison or
         jail, is that right?

   A.   Yes.

   Q.   And they told you they needed your
         help; am I right about that?

20

A.   Yes.

Q.   And you love your mama; am I
     right about that?

A.   Yes.

Q.   So when your mama tells you, we
     going to get David, ans she
     tells you, remember to say this,
     that's what you going to do; am
     I right about that? It's okay to
     tell the truth. That's what you
     are going to say; isn't that right?
     You are keeping your commitment to
     mama in helping to get David; am
     I right about that?

A.   Yes.

Q.   And that's why you are here; am
     I right about that?

A.   Yes. "

(R. 304-306)


On redirect examination by the prosecution Quadarius

Williams further testified that they were out to get

David Donnie Williams.


"    Q.   Quadarius, when did I tell you
          we were out to get David Donnie
          Williams? Did I tell you that this
          morning? Did I tell you that
          yesterday? I have never told you
          that, have I? It's okay for you to
          tell the truth. I have never told

21

Q.  you that we were out to get David
Donnie Williams, did I? I know
you told him one thing, but
look over there. Don't even look
at me. Tell the ladies and gentlemen
of the jury the truth, because they
need to know. Did I tell you that
we were out to get David Donnie
Williams?

A.  Yes.

Q.  When? Think back and tell me when.
I want you to take as much time
as you need, and I know you can't
remember everything and I know
you are answering his questions
because you think you got to say —
— you are answering questions because
he is being real polite; isn't that
right? But I want you to tell them
when I told you we were out to
get David Donnie Williams. Can you
remember that?

A.  No. "

(R. 306).

The seventh witness called by the State was Anthony

Blakeley. Mr. Blakeley testified that he was <u>in the car</u>

(Emphasis added) with David Donnie Williams on April 17,

2004, the date the State alleges that Williams stalked

Callie Williams. Mr. Blakeley testified that he did not

hear Williams make any kind of threats to Callie Williams

or to her son, Quadarius Williams. Mr. Blakeley further

22

testified that he was in the car with Williams and he did not hear Williams tell Callie Williams that he would "kill her bitch". (R. 314) The only other testimony Blakeley offered at the direction of the prosecution was that they were in a high speed car chase with the Union Springs Police Department on that same day, shortly after leaving the AG grocery store.

On cross examination by counsel for the defendant, Mr. Blakeley stated that it was his idea to stop at the AG grocery and not David Donnie Williams. (R. 328)

The State called its eight witness, Lt. Durwood Freeman of the Union Springs Police Department. Lt. Freeman's testimony was to that of the high speed chase involving Williams on April 17, 2004 and his testimony corroborated the fact that Anthony Blakeley was in the car with Williams. No testimony was solicited by the prosecutor or offered by the witness to substantiate the stalking charge.

The ninth witness called by the State was Lakeisha Williams, the 21-year old adult daughter of Callie

23

Williams. Ms. Narkeisha Williams could not testify to the events of April 17, 2004 which occurred at the AG grocery store as she was not present. She however, did testify to almost a mirror image of the remainder of her mother's (Callie Williams) testimony regarding the other issues.

In summary, the testimony of the witnesses for the State did not prove the State's case beyond a reasonable doubt. Starting with Ms. Baker, the Security Guard, she could not testify that she had ever seen Williams stalk Callie Williams. Also, Johnny Taylor stated that he had lied before to the Pardon and Parole Board on Williams behalf. However, Taylor has been convicted of crimes of moral turpitude and as such he has no credibility. Furthermore, Taylor offered no evidence of stalking on the part of Williams.

Mr. Jernigan was called by the State and did not offer any testimony or evidence of stalking on the part of Williams. The younger children of Callie Williams, Quadarius (14) and Narkeisha (8), both offered testimony that was favorable to Williams' defense. Narkeisha stated that she had heard her mother and Williams cursing

24

each other during quarrels and Quadarius testified that <u>his mother and the prosecutor had helped him memorize his</u> <u>testimony so that they could get David Donnie Williams</u> <u>and send him to prison and that they needed his help to</u> <u>do so</u>.(Emphasis added)

Anthony Blakeley testified that he was in the car with Williams at the time the alleged stalking took place and that at no time did he ever hear any type of threat made by Williams. Additionally, Lt. Freeman testified that his only involvement was that of a high speed chase with Williams concerning traffic violations; that he never observed any stalking by Williams.

In fact, the only witness, other than Callie Williams herself, who gave any type of testimony favorable to the State was Lakeisha Williams, who is the adult (21-year old) daughter of Callie Williams, and her testimony closely mirrored that of her mother.

As such, the only conclusion that can be derived from these facts is that a reasonable jury could not have convicted Williams based on such insufficient evidence as was presented at trial. It is clear that the evidence was of such an insufficient degree that Williams is due a

48

reversal because the jury's decision was completely contrary to the great weight of the evidence.

## Conclusion

For the foregoing reasons and based on the foregoing authority and testimony, the Appellant believes that the evidence produced at trial is woefully insufficient to support a conviction for "Stalking". The Appellant respectfully requests that his conviction be reversed and his sentence vacated by this Honorable Court.

## Certificate of Service

I hereby certify that I have served a copy of the foregoing brief and argument of Appellant by placing same in the United States mail, postage prepaid, and properly addresses on this the 4th day of August, 2005, upon the following:

    Honorable Troy King
    Alabama Attorney General
    11 South Union Street
    3rd Floor
    Montgomery, AL 36130-0061


                                    Gene Spencer        (SPE046)
                                    Attorney for Appellant

27

50

Case Number

*CC 04 144.60*

ID    YR    NUMBER

(To be completed
by Court Clerk)

# IN FORMA PAUPERIS DECLARATION

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

[Insert appropriate court]

DAVID DONNIE WILLIAMS

(Petitioner)

vs.

STATE OF ALABAMA

(Respondent(s)

## DECLARATION IN SUPPORT OF REQUEST TO PROCEED
## IN FORMA PAUPERIS

I, _____David Donnie Williams_____, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs, or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.[1]

1. Are you presently employed?    Yes _____    No __X__

   a. If the answer is "yes", state the amount of your salary or wages per month, and give the name and address of your employer.

   _____N/A_____

   b. If the answer is "no", state the date of last employment and the amount of the salary and wages per month which you received.

   _____N/A_____

2. Have you received within the past twelve months any money from any of the following sources?

   a. Business, profession, or other form of self-employment?

      Yes _____        No __X__

   b. Rent payments, interest, or dividends?

      Yes _____        No __X__

   c. Pensions, annuities, or life insurance payments?

      Yes _____        No __X__

   d. Gifts or inheritances?

      Yes _____        No __X__

   e. Any other sources?

      Yes _____        No __X__

*4-11-06*

*In Forma Pauperis*

*Granted*

2

If the answer to any of th  bove is "yes", describe each source   money and state the amount received from each during the past twelve months.

_____

_____

Not applicable.

_____

_____

3. Do you own cash, or do you have money in a checking or savings account?

Yes __X__          No _____

(Include any funds in prison accounts.)

If the answer is "yes", state the total value of the items owned.

_____

(See Certified Statement Below)

_____

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?

Yes _____          No __X__

If the answer is "yes", describe the property and state its approximate value.

_____

Not applicable.

_____

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

_____

NONE

_____

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on __March 22, 2006__

(Date)

_David Williams_

Signature of Petitioner  AIS 169189

## CERTIFICATE

I hereby certify that the petitioner herein has the sum of $ __.03¢__ on account to his credit at the institution where he is confined. I further certify that petitioner likewise has the foregoing securities to his credit according to the records of said __St. Clair Corr. Fac.__ institution:

_____

✗ _No Transactions Available For Past 12 Months._

_____

__3/22/06__
DATE

_Lydia Peoples Account Clerk_

AUTHORIZED OFFICER OF INSTITUTION

MAR. 22, 2006                 USER: LYDIA PEOPLES                    INMADB
                        COMPUTE AVERAGE DAILY BALANCE


              ENTER THE INMATE'S AIS NUMBER ===>   169189

           ENTER THE 'AS OF' DATE (CCYYMMDD) ===>   20060322


             NO RECORDS FOUND WITHIN THE LAST 12 MONTHS
                     PRESS ENTER TO CONTINUE

IN THE CIRCUIT COURT OF BULLOCK COUNTY **FILED IN OFFICE**

DAVID DONNIE WILLIAMS, AIS#169189,   )

      )

     Petitioner,     )

      )

Vs.      )

      )

STATE OF ALABAMA,     )

      )

     Respondent     )

**APR 1 8 2006**

**CLERK-REGISTER, BULLOCK CO., ALA.**

CASE NO.: 2004-144.60

## MOTION TO DISMISS PETITION FOR
## RELIEF FROM CONVICTION OR SENTENCE
### (PURSUANT TO RULE 32)

Comes now the State of Alabama, by and through its Assistant District Attorney, Boyd Whigham, and says as follows:

1.    The pending Petition dated March 28, 2006 and in forma pauperis status granted April 11, 2006, states that the ground for the Petition was a follows:

### ISSUES PRESENTED FOR REVIEW

_____    A.    <u>The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.</u>

_____    B.    <u>The court was without jurisdiction to render the judgment or to impose the sentence.</u>

    If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

2.    The Petitioner attached a 4 page brief with attachment from the brief in the Court of Criminal Appeal and portions of the transcript.

3.    The Petitioner raises the issue that the Trial Judge on Notice from the jury that they could not reach a decision and the Trial Judge sent word back to the jury "to keep deliberating".

4.    This response was proper and within the discretion of the Trial Judge. The Trial Judge is not required to bring the jury back into the Court for any instruction, when he merely instructs them by a note to keep deliberating.

5.    The next allegation by Petitioner is that it was ineffective assistance of counsel for Petitioner's Trial counsel not to have objected. The issue is precluded pursuant to Rule 32.2(a)(5) which could have been raised on appeal. Since counsel were not the same attorney. Even if not precluded it is not a valid issue because the trial courts action was proper.

6.    Petitioner claim that the jury verdict form found him not guilty of a "lesser included offence" relating to the felony charge of stalking. This is not the circumstances of the trial.

7.    Petitioner was charged in case number CC-2004-145 with Domestic Violence 3rd Degree/Harassment and in case number CC-2004-144 with stalking and both case were tried together and the Petitioner was found not guilty of "harassment/domestic violence". See Exhibit "A".

8.    The Petitioner was represented by capable counsel on appeal and nothing in the record would indicate that appeal counsel was ineffective. The issue that the Petitioner sets forth is "ineffective assistance of counsel", which fails to meet the requirements of Rule 32.6(b). The grounds raised as to ineffective assistance of counsel fail to rise to the level that the courts have recognized as ineffective.

9.   In order to constitute cause sufficient to overcome procedural default, a counsel's performance must be <u>constitutionally</u> ineffective under the standards of <u>Strickland v. Washington</u>, 466 U. S. 6689, 104 S. Ct. 2052, 80L. Ed 2d 674 (1984). <u>Jackson v. Herring</u>, 42 F. 3d 1350, 1358 (11th Cir. 1995); <u>Devier v. Zant</u>, 3F. 3d 1445, 1456 (11th Cir. 1993); <u>Smelchor v. Attorney General of Alabama</u>, 947 F. 2d 1472, 1475 (11th Cir. 1991).

In <u>Strickland</u> the Court set forth the text for determining whether counsel's performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Id</u>, 466, 104 S. Ct. at 2064. This test has two prongs:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixty Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable.

Under <u>Strickland</u>, counsel's performance is measured for "reasonableness under professional prevailing norms".

10.   The claim of ineffective assistance of counsel is without merit.

> *"When reviewing whether an attorney is effective, courts 'should always presume strongly that counsel's performance was reasonable and adequate'."* <u>Rogers v. Zant</u>, *13 F. 3d 384, 386 (11th Cir. 1994).*

The court has full knowledge of the Attorney's performance, which was reasonable and adequate.

11.   The Petitioner fails to state a claim upon which relief may be granted.

12.    No material issues of fact of law exists which would entitle the Petitioner to relief.

That the Petition should be dismissed or in the alternative each ground should be denied.

Respectfully submitted this *18* day of April, 2006.

Boyd Whigham, Assistant District Attorney
Post Office Box 61
Eufaula, AL  36027

## CERTIFICATE OF SERVICE

I hereby certify that I have this *18* day of April, 2006, served a copy of the above and foregoing pleading on David Donnie Williams AIS # 169189, by placing a copy of same in the United States Mail, postage prepaid and addressed to him in care of St. Clair Correctional Facility, 1000 St. Clair Road, Springville, Alabama  35146.

Boyd Whigham, Assistant District Attorney

Exhibit "A"

NO.:_____

G. J. No. BF-04-035

A TRUE BILL, presented to the judge Presiding in open Court by the Foreperson of this Grand Jury, and filed in open court this ___ day of _____, ____.

_Leon Battle_
Grand Jury Foreman

_____
Clerk of the Circuit Court
of Bullock County
Third Judicial Circuit

_10/19/04_
Date

# INDICTMENT

## THE STATE OF ALABAMA
*vs.*
### DAVID DONNIE WILLIAMS

*Address: 505 JOHNSON STREET, UNION SPRINGS, AL 36089*
*alias*
*None Reported*

**CHARGES:**          **CLASS**    **TYPE**
DOMESTIC VIOLENCE THIRD DEGREE - HARASSMENT(13A-6-132)    A    M

**WITNESSES:**

CALLIE WILLIAMS, 1010 MLK BLVD, LOT #2, UNION SPRINGS, AL 36089
LAKISHA WILLIAMS, 1010 MLK BLVD, LOT 2, UNION SPRINGS, AL 36089

Previous Bond $_____ Bail fixed at $_____ this _____ day of _____, _____

_____
**Judge Presiding**

**THE STATE OF ALABAMA**
**Bullock COUNTY**

**CIRCUIT COURT**
**2004**

**BOYD WHIGHAM**
**DISTRICT ATTORNEY**
**THIRD JUDICIAL CIRCUIT**

NO. : _____

G. J. No. BF-04-035

THE STATE OF ALABAMA, Bullock COUNTY

Circuit Court – Third Judical Circuit

## COUNT 1

The Grand Jury of said county charge that, before the finding of this indictment, DAVID DONNIE WILLIAMS, whose name is otherwise unknown to the Grand Jury, did on or about March 30, 2004, commit the crime of Harassment (Section 13A-11-8 of the Code of Alabama), with intent to harass, annoy, or alarm another person, to-wit: CALLIE WILLIAMS, did direct a threat, verbal or nonverbal, to-wit: grabbed her by her clothes and verbally threatened her, with the intent to carry out the threat, toward another person, to-wit: CALLIE WILLIAMS, a reasonable person and target of the threat, causing her to fear for her safety, with the victim being a current or former spouse, parent, child, a person with whom he/she has a child in common, a present or former household member, or a person whom he/she has or had a dating relationship, in violation of Section 13A-6-132 of the Code of Alabama,

against the peace and dignity of the State of Alabama.

BOYD WHIGHAM
District Attorney
Third Judicial Circuit

Ben C. Reeves, Jr.
Chief Asst. Dist. Atty.

IN THE CIRCUIT COURT OF BULLOCK COUNTY FILED IN OFFICE

| | | |
|---|---|---|
| DAVID DONNIE WILLIAMS, AIS#169189, | ) | APR 2 5 2006 |
| | ) | |
| Petitioner, | ) | CLERK-REGISTER, BULLOCK CO., ALA. |
| | ) | |
| Vs. | ) | CASE NO.: 2004-144.60 |
| | ) | |
| STATE OF ALABAMA, | ) | |
| | ) | |
| Respondent | ) | |

## ORDER

This matter coming before the Court on Rule 32 Petition and response by the State, the Court makes findings of facts and conclusion of law as follows:

The Court finds that the note from the jury that they could not reach a decision and the response by the Trial Court was proper. The failure of the Trial counsel to object to the courts handling of this matter does not show ineffective assistance of trial counsel.

The Court further finds that ineffective assistance of trial counsel is precluded under the provisions of Rule 32.2(a)(5) in that appeal counsel could have raised this matter on appeal.

The Court finds that the Petition is without merit, in that the Petitioner was represented by an experienced attorney, and the records does not support the allegations of ineffective assistance of counsel. Ineffective assistance of appeal counsel as it relates to the jury verdict on two cases on one verdict form is not error and does not indicate ineffective assistance of counsel.

The Petitioner has failed to meet his burden of proof as provided by Rule 32.3.

It is therefore, **ORDERED** and **ADJUDGED** that the Petition be dismissed pursuant to the provisions of Rule 32.3(a)(5) and 32.3.   All issues are hereby **DISMISSED** pursuant to Rule 32.7(d), Alabama Rules of Criminal Procedure.

**ORDERED** and **ADJUDGED** this _____25ᵗʰ_____ day of April, 2005.

Burt Smithart, Circuit Court Judge

*61*

FILED IN OFFICE

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

APR 2 7 2006

CLERK-REGISTER, BULLOCK CO., ALA.

DAVID DONNIE WILLIAMS,     )
                           )
            Petitioner,    )
                           )
vs.                        )  CASE NO. CC-04-144.60
                           )
STATE OF ALABAMA,          )
                           )
            Respondent.    )

PETITIONER'S RESPONSE AS TO WHY
HIS PETITION SHOULD NOT BE DISMISSED

Comes now, David Donnie Williams, proceeding pro se, and files his response as to WHY HIS PETITION SHOULD NOT BE DISMISSED.

DISCUSSION

A.

Specifically, the State asserts that the Petitioner's court's instruction issue was proper and within the discretion of the trial judge. However, this argument ignores the fact that the Petitioner argues that the circuit court improperly coerced the jury into returing a guilty verdict after the jury told the court that it was hopelessly dead-locked. Specifically, the Petitioner contends that the court's instruction violated the Supreme Court's holding in Ex parte Giles, 554 So.2d 1089 (Ala. 1987).

B.

Specifically, the State contends that the Petitioner's misdemeanor harassment/domestic violence issue was not a lesser-included offense of the greater offense of stalking. See Rule 2.2(a); Ex parte N.W., 748 So.2d 199 (Ala. 1999); see also

Brewster v. State, 875 So.2d 1230 (Ala.Crim.App. 2003)(holding that, factual allegations contained in postconviction-relief petition were taken as true, where State's response to petition was general denial); King v. State, 881 So.2d 542 (Ala.Crim.App. 2002)(holding that allegations contained in petition for post-conviction relief had to be accepted as true, where State did not refute petitioner's allegations in its motion to dismiss); Grady v. State, 831 So.2d 646 (Ala.Crim.App. 2001)(holding that when the State does not respond to a petitioner's allegations in a petition for postconviction relief, the unrefuted statement of facts must be taken as true); Scroggins v. State, 827 So.2d 878 (Ala.Crim.App. 2001)(holding that when the state does not respond to a postconviction relief petitioner's allegations, the unrefuted statement of facts must be taken as true); Whitaker v. State, 686 So.2d 1262 (Ala.Crim.App. 1995)(holding that factual allegations in petition for post-conviction relief would be taken as true, where state's motion to dismiss petition did not refute allegations); Rice v. State, 682 So.2d 484 (Ala.Crim.App. 1995)(holding that defendant's allegations in his petition for postconviction relief must be accepted as true where State failed to properly address merit of arguments in defendant's petition); and Monroe v. State, 659 So.2d 975 (Ala.Crim.App. 1994)(holding that because state's response to petition for postconviction relief did not specifically address grounds supporting petitioner's claim, petition was

-2-

meritorious on its face, thus warranting evidentiary hearing).

### C.

The State maintains in its motion to dismiss that the issue that the Petitioner sets forth is "ineffective assistance of counsel," which fails to meet the requirements of Rule 32.6(b). However, that argument ignores the obvious purpose behind the assignment of the requirements of Rule 32.6(b). Rule requiring petition for post-conviction relief to contain specific statement of grounds upon which relief is sought was inapplicable since petitioner's allegations in memorandum of law attached to petition appeared to be meritorious on their face. <u>Nunley v. State</u>. 722 So.2d 802 (Ala.Cri.App. 1998).

In further response to the State's motion to dismiss, the Petitioner re-adopts and incorporates the arguments and issues set forth in its initial memorandum as if fully set out herein.

### CONCLUSION

The Court should grant the petition in this case since it is clear that the Petitioner's conviction is void and that he was denied effective assistance of counsel.

Respectfully submitted,

David D. Williams
AIS #169189, G2-C-132
St. Clair Correctional Facility
1000 St. Clair Road
Springville, AL 35146-5582

-3-

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the following person on the 21st day of April, 2006:

    Honorable Boyd Whigham
    Assistant District Attorney
    Post Office Box 61
    Eufaula, AL 36027

_David D. Williams_

David D. Williams

DAVID DONNIE WILLIAMS,    )    IN THE CIRCUIT COURT OF

        Appellant,    )    BULLOCK COUNTY, ALABAMA

vs.    )

STATE OF ALABAMA,    )    CASE NO. CC-04-144.60

        Appellee.    )

## NOTICE OF APPEAL TO
## THE COURT OF CRIMINAL APPEALS OF ALABAMA

Notice is hereby given that David Donnie Williams appeals to the above named court from this Court's dismissal of his Petition for Relief from Conviction or Sentence entered on April 25, 2006.

In addition, David Donnie Williams requests that his appeal be in forma pauperis, and notes that he is incarcerated in the State Penal System and that the Court has determined that Petitioner is indigent, and he was allowed to proceed in forma pauperis.

Respectfully submitted this the 2nd day of May, 2006.

David D. Williams
Pro Se, Appellant
AIS #169189-G2-C-132
1000 St. Clair Road
Springville, AL 35146-5582

## CERTIFICATE OF SERVICE

Comes now the Petitioner and hereby certifies he has served a copy of the foregoing document upon opposing counsel on this the 2nd day of May, 2006.

David D. Williams
Pro Se, Appellant

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 26 (front)    8/91. | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br><br>_____ |

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT   ☐ DISTRICT COURT   ☐ JUVENILE COURT OF _____ BULLOCK _____ COUNTY

DAVID DONNIE WILLIAMS _____, Appellant

v.   ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF _____

| Case Number<br>CC-04-144.60 | Date of Complaint or Indictment<br>03/28/06 (Complaint) | Date of Judgment/Sentence/Order<br>04/25/06 (Order) |
| Number of Days of Trial/Hearing<br>"0"    Days | Date of Notice of Appeal<br>Oral: | Written: 05/02/06 |

Indigent Status Requested:  ☒ Yes  ☐ No          Indigent Status Granted:  ☒ Yes  ☐ No

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?  ☐ Appointed  ☐ Retained.     If no attorney, will appellant represent self?  ☒ Yes  ☐ No

| Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)<br><br>David Donnie Williams (Pro Se) | Telephone Number<br><br>(205) 467-6111 |
| Address 1000 St. Clair Rd. | City Springvile | State Alabama | Zip Code 35146-55582 |

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant          NONE | Case Number |
| Codefendant | Case Number |
| Codefendant | Case Number |

**D. TYPE OF APPEAL:** Please check the applicable block.

1 ☐ State Conviction
2 ☒ Post-Conviction Remedy
3 ☐ Probation Revocation
4 ☐ Pretrial Order
5 ☐ Contempt Adjudication
6 ☐ Municipal Conviction
7 ☐ Juvenile Transfer Order
8 ☐ Juvenile Delinquency
9 ☐ Habeas Corpus Petition
10 ☐ Other (Specify) _____

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____
2 ☐ Homicide - § _____
3 ☐ Assault - § _____
4 ☐ Kidnapping/Unlawful Imprisonment - § _____
5 ☐ Drug Possession - § _____
6 ☐ Trafficking in Drugs - § _____
7 ☐ Theft - § _____
8 ☐ Damage or Intrusion to Property - § _____
9 ☐ Escape - § _____
10 ☐ Weapons/Firearms - § _____
11 ☐ Fraudulent Practices - § _____
12 ☐ Offense Against Family - § _____
13 ☐ Traffic - DUI - § _____
14 ☐ Traffic - Other - § _____
15 ☒ Miscellaneous (Specify): Stalking - § 13A-6-90

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes  ☒ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript?  ☐ Yes  ☒ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _____ (Date)
3. If the answer to question "1" is "No":
   (a)  Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes  ☒ No   Will the trial court certify the questions?  ☐ Yes  ☒ No
   (b)  Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☐ Yes  ☒ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive

Form ARAP-26 (back)    8/91    COURT OF CRIMINAL APPEAL. DOCKETING STATEMENT

H. POST-JUDGMENT MOTIONS: List all post-judgment motions by date of filing, type, and date of disposition
(whether by trial court order or by the provisions of Rules 20.1 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
| Month | Day | Year | | Month | Day | Year |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | N/A | | | |
| | | | | | | |
| | | | | | | |

I. NATURE OF THE CASE: Without argument, briefly summarize the facts of the case.

Appellant was denied of Petition for Relief from Conviction
or Sentence filed pursuant to Rule 32, Alabama Rules of Criminal
Procedure, Appellant asserts that he was denied effective assistance
of counsel and that the trial court had been without jurisdiction to
adjudicate him guilty of Stalking.

J. ISSUE(S) ON APPEAL: Briefly state the anticipated issues that will be presented on appeal. (Attach additional pages if necessary.)

The trial court's dismissal of the Appellant's Petition for
Relief from Conviction or Sentence.

K. SIGNATURE:

May 2, 2006

_____
Date

_____
Signature of Attorney/ Party Filing this Form

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C          8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br>___ - ___ |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

[X] CIRCUIT COURT  [ ] DISTRICT COURT  [ ] JUVENILE COURT OF          **BULLOCK**
_____ , COUNTY

**DAVID DONNIE WILLIAMS**
_____ , Appellant

v. . [X] STATE OF ALABAMA  [ ] MUNICIPALITY OF _____

| Case Number<br>**CC-04-144.60** | Date of Judgment/Sentence/Order<br>**04/25/06(Order)** |
| Date of Notice of Appeal<br>Oral:                          Written:   **05/02/06** | Indigent Status Granted:<br>[X] Yes    [ ] No |

PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

| _David O Williams_ | **05/02/06** | **David Donnie Williams** |
| Signature | Date | Print or Type Name |

PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED. Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                                      COURT REPORTER(S)

A. [ ] TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence
proceedings, a transcript of the organization of the jury and arguments of counsel must
be designated separately.                                              _____

B. [ ] ORGANIZATION OF THE JURY - This designation will include voir dire examination and
challenges for cause. Note that in noncapital cases the voir dire of the jury will not be
recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)    _____

C. [ ] ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will
not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)  _____

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
| D. _____ | _____ | _____ |
| E. _____ | _____ | _____ |
| F. _____ | _____ | _____ |
| G. _____ | _____ | _____ |

IMPORTANT NOTICE: The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

| _____ | _____ | _____ |
| Signature | Date | Print or Type Name |

DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to:   (1) Clerk of the Court of Criminal Appeals,  (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney, and the court

69

## NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
### BY THE TRIAL COURT CLERK

David Donnie Williams                    v.     [X] STATE OF ALABAMA
_____                [ ] CITY OF _____
**APPELLANT'S NAME**
(as it appears in the indictment)                                **APPELLEE**
                                                          Bullock
[X] CIRCUIT   [ ] DISTRICT   [ ] JUVENILE COURT OF _____ COUNTY

CIRCUIT/DISTRICT/JUVENILE JUDGE:  Honorable L. Bernard Smithart

---

DATE OF NOTICE OF APPEAL:  May 2, 2006
(NOTE: If the appellant is incarcerated and files notice of appeal, this date should be the date on the certificate of service, or if there was no certificate of service, use the postmark date on the envelope.)

---

INDIGENCY STATUS:
  Granted Indigency Status at Trial Court:                 [X] Yes  [ ] No
  Appointed Trial Counsel Permitted to Withdraw on Appeal:  [ ] Yes  [X] No
  Indigent Status Revoked on Appeal:                        [ ] Yes  [X] No

DEATH PENALTY:
  Does this appeal involve a case where the death penalty has been imposed?   [ ] Yes  [X] No

TYPE OF APPEAL: (Please check the appropriate block.)
  [ ] State Conviction          [ ] Pretrial Appeal by State    [ ] Juvenile Transfer Order
  [X] Rule 32 Petition          [ ] Contempt Adjudication       [ ] Juvenile Delinquency
  [ ] Probation Revocation      [ ] Municipal Conviction        [ ] Habeas Corpus Petition
  [ ] Mandamus Petition         [ ] Writ of Certiorari          [ ] Other(specify) _____

---

IF THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E., RULE 32 PETITION, WRIT OF HABEAS CORPUS, ETC.) OR FROM ANY OTHER ORDER ISSUED BY THE TRIAL JUDGE, COMPLETE THE FOLLOWING:

TRIAL COURT CASE NO.:  CC 2004-144.60

DATE ORDER WAS ENTERED:  April 25, 2006       PETITION: [X] Dismissed  [ ] Denied  [ ] Granted

---

IF THIS IS AN APPEAL FROM A CONVICTION, COMPLETE THE FOLLOWING:

DATE OF CONVICTION: _____       DATE OF SENTENCE: _____

YOUTHFUL OFFENDER STATUS:
  Requested:  [ ] Yes [ ] No     Granted:  [ ] Yes [ ] No

LIST EACH CONVICTION BELOW: *(attach additional page if necessary)*
1.  Trial Court Case No. _____   CONVICTION: _____
    Sentence: _____
2.  Trial Court Case No. _____   CONVICTION: _____
    Sentence: _____
3.  Trial Court Case No. _____   CONVICTION: _____
    Sentence: _____

---

| POST-JUDGMENT MOTIONS FILED: (complete as appropriate) | Date Filed | Date Denied | Continued by Agreement To *(Date)* |
|---|---|---|---|
| [ ] Motion for New Trial | _____ | _____ | _____ |
| [ ] Motion for Judgment of Acquittal | _____ | _____ | _____ |
| [ ] Motion to Withdraw Guilty Plea | _____ | _____ | _____ |
| [ ] Motion in Arrest of Judgment | _____ | _____ | _____ |
| [ ] Other | _____ | _____ | _____ |

---

COURT REPORTER(S): ......... _____
ADDRESS: .................. _____

APPELLATE COUNSEL: ........ _____
ADDRESS: .................. _____

APPELLANT: (IF PRO SE) ...... AIS# 169189
ADDRESS: .................. 1000 St. Clair Road
                           Springville, AL  35146

APPELLEE (IF CITY APPEAL): .. _____
ADDRESS: .................. _____

---

I certify that the information provided above is accurate
to the best of my knowledge and I have served a copy of this
Notice of Appeal on all parties to this action on
this  4th  day of  May , 2006 .



Wilbert M. Jernigan
CIRCUIT COURT CLERK

AP 12-3 Letter of Transmittal of Notice of Appeal to the Court of Criminal Appeals by Trial Clerk    Printed and for Sale by Roberts & Son, Birmingham

## LETTER OF TRANSMITTAL OF NOTICE OF APPEAL TO
## THE COURT OF CRIMINAL APPEALS BY
## TRIAL CLERK

David Donnie Williams
_____
Appellant

V.

STATE OF ALABAMA
Appellee

Offense ___Rule 32 Petition___

Sentence ___Dismissed___

Notice of Appeal ___May 2, 2006___
Date Filed
Judgement Entry ___April 25, 2006___
Date Entered

[   ] Oral notice of appeal has been given prior to or on the date of entry of the judgment of conviction in this cause,

[ X ] Written notice of appeal has been filed on the date indicated hereon (within 42 days from the entry of judgment or the order overruling a post conviction motion),

A certified copy of the entry of record of the oral notice of appeal or the written notice of appeal is forwarded herewith for filing with the Court of Criminal Appeals.

I certify that I have served a copy of this letter of transmittal along with a copy of the notice of appeal on each of the following:

1. Court Reporter (Name and address) _____
2. Defendant
3. Defendant's appellate counsel. (Name and address)_____
4. District Attorney
5. Attorney General

DATED this ___17th___ day of ___May___ XXX 2006

_Wilbert M. Jernigan_
Circuit Clerk

71

CERTIFICATE OF COMPLETION AND
TRANSMITTAL OF RECORD ON APPEAL
BY TRIAL CLERK

David Donnie Williams
APPELLANT
v.

State Of Alabama
APPELLEE

TO:  The Clerk Of the Court of
     Criminal Appeals of Alabama

CASE NO.:  CC - 2004 - 144.60

DATE OF NOTICE OF APPEAL: 5-2-06

    I certify that I have this date completed and transmitted
herewith to the appellate court the record on appeal by assembling
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX one volume of __71__ pages)
the clerk's record and the reporter's transcript and that one copy
each of the record on appeal has been served on the defendant and
the Attorney General of the State of Alabama for the preparation of
briefs.

    I certify that a copy of this certificate has this date been
served on counsel for each party the appeal.

    DATED this __17th__ day of ___May___, XXX 2006 .

_Wilbert M. Jernigan_
Circuit Clerk

_____Bullock_____
County

"ATTORNEY GENERAL'S COPY"

FILED

MAY 3 1 2006

CLERK
ALA COURT CRIMINAL APPEALS

CRIMINAL APPEALS NO. CR-05-1451

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

DAVID DONNIE WILLIAMS,

Appellant,

vs.

STATE OF ALABAMA,

Appellee.

On Appeal from the Circuit Court of
Bullock County, Alabama (CC04-144.60)

**Brief of the Appellant**

David Donnie Williams
Pro Se, Appellant
AIS #169189, G2-C-132
1000 St. Clair Road
Springville, AL 35146-5582

EXHIBIT
I

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested by the Appellant.

## TABLE OF CONTENTS

Page

Statement Regarding Oral Argument...................... i

Table of Contents...................................... ii

Table of Authorities................................... iii

Statement of the Case.................................. 1

Statement of the Issue................................. 3

Statement of the Facts................................. 4

Statement of the Standard of Review.................... 6

Summary of the Argument................................ 7

Argument............................................... 8

Conclusion............................................. 12

Certificate of Service................................. 13

Appendix............................................... 14

## TABLE OF AUTHORITIES

Page(s)

Ex parte Giles, 554 So.2d 1089 (Ala. 1987)............    9

Ex parte N.W., 748 So.2d 190 (Ala. 1999) citing
    Chambers v. City of Opelika, 698 So.2d 792,
    794 (Ala.Crim.App. 1996)(Quoting Sharpe v.
    State, 340 So.2d 885, 887 (Ala.Crim.App.).
    cert. denied, 340 So.2d 889 (Ala. 1976))
    (emphassis added in Chambers)...................    10

Gibby v. State, 753 So.2d 1206 (Ala.Crim.App.
    1999) citing Humphrey v. State, 605 So.2d
    848 (Ala.Cr.App. 1992); and Strickland v.
    Washington, 466 U.S. 668, 104 S.Ct. 2052,
    80 L.Ed.2d 674 (1984)...........................    9,11

Johnson v. State, 835 So.2d 1077
    (Ala.Crim.App. 2001)............................    10

Jones v. State, 816 So.2d 1067
    (Ala.Crim.App. 2000)............................    10

Payne v. State, 791 So.2d 383
    (Ala.Crim.App. 1999)............................    6

Rice v. State, 682 So.2d 484
    (Ala.Crim.App. 1995)............................    11

Rule 32.7(d), Alabama Rules of Criminal Procedure.....    8

## STATEMENT OF THE CASE

Appellant, David Donnie Williams, appeals from a ruling of the Circuit Court of Bullock County, Alabama, Hon. L. Bernard Smithart presiding, dismissing the Appellant's Rule 32 petition.

In the instant case, the Appellant was indicted by the Bullock County Grand Jury in two separate indictments for one count of Stalking in violation of §13A-6-90, Ala. Code §13A-6-90 and for one count of Domestic Violence 3rd Degree/Harassment in violation of Ala. Code §13A-6-132. (C. 23,57) The two separate count indictments were then officially docketed as Bullock County Circuit Cases CC-2004-145 and CC-2004-144. (C. 19)

Pursuant to Rule 2.2(a) of ARCP a trial on the merits was held on November 22nd and 23rd of 2004, and a duly empaneled jury returned a verdict of guilty against the Appellant on the stalking charge, which is a "Class C" felony and, a verdict of not guilty on the harassment/domestic violence charge, which is a "Class A" misdemeanor. (C. 17-18)

On March 31, 2006, Appellant filed a Rule 32 petition in the Bullock County Circuit Court attacking his 2004 conviction for stalking. (C. 1) This petition was based on the petitioner's ineffective-assistance claims against trial and appellate counsel for their failure to properly preserve and raise claims on these grounds: (1) that the trial court erred in reacting to the jury's communication that it could not reach an unanimous verdict, and

-1-

(2) that the trial court was without jurisdiction to adjudge the petitioner guilty of the greater offense of stalking because he was acquitted of the lesser-included offense of harassment relating to that charge, in which the underlying lesser-included offense of harassment was used to establish an element of the stalking charge, i.e., that the accused had "intentionally and repeatedly followed or harassed" the victim. (C. 2-49)

The Honorable Burt Smithart dismissed the petition on April 25, 2006. (C. 59-60)

Appellant gave notice of appeal to the Alabama Court of Criminal Appeals on May 2, 2006. (C. 65-68)

-2-

## STATEMENT OF THE ISSUE

&mdash;    WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DISMISSING THE APPELLANT'S RULE 32 PETITION AS BARRED ON THE PROCEDURAL GROUNDS SPECIFIED IN RULE 32.7(d)?

## STATEMENT OF THE FACTS

Appellant's Rule 32 petition, which was filed in the Circuit Court of Bullock County, Alabama on March 31, 2006, in which he attacked his 2004 conviction for stalking. (C. 1)  In his supplemental memorandum in support of petition, including exhibits attached, the Appellant claimed that he was denied effective assistance of trial and appellate counsel for their failure to properly preserve and raise claims on these grounds: ((1) that the trial court erred in reacting to the jury's communication that it could not reach an unanimous verdict, and (2) that the trial court was without jurisdiction to adjudge him guilty of the greater offense of stalking because he was acquitted of the lesser-included offense of harassment relating to that charge, in which the underlying lesser-included offense of harassment was used to establish an element of the stalking charge, i.e., that the accused had "intentionally and repeatedly followed or harassed" the victim. (C. 2-49) Specifically, (1) the Appellant contended that, upon learning that the jury was at an impasse, the trial court should have ordered the jury into the courtroom and addressed the jury personally, and that this should have been done in the presence of the Appellant and his attorney,  and (2) the Appellant contended that, because the offense of harassment is a lesser-included offense of the greater offense of stalking, his stalking conviction was void because the same facts that were supposedly used to prosecuted him

-4-

for the underlying misdemeanor for harassing his ex-wife or [t]-
respassing upon her premises were subsequently used to establish
an element of the stalking charge, i.e., that the accused had
"intentionally and repeatedly followed or harassed" the victim.

On April 18, 2006, Honorable Boyd Whigham, Assistant District
Attorney for the Circuit Court of Bullock County, Alabama, filed a
Motion to Dismiss Petition for Relief from Conviction or Sentence,
(C. 53-58) and, on April 25, 2006, Hon. Burt Smithart issued an
Order dismissing Appellant's petition, stating that the ineffective
assistance of trial counsel was precluded under the provisions of
Rule 32.2(a)(5) in that appeal counsel could have raised this matter
on appeal, that the petition was without merit, and that Appellant
had failed to meet his burden of proof as provided by Rule 32.3.
(C. 59-60)

Appellant filed written notice of appeal from the dismissal
of his petition by the trial court on May 2, 2006. (C. 65-68)  The
record of proceedings in this cause in the Circuit Court of Bullock
County was completed and filed with the Court of Criminal Appeals
on May 17, 2006. (C. 71)

-5-

## STATEMENT OF THE STANDARD OF REVIEW

"When reviewing a trial court's ruling on a postconviction-relief petition, the Court of Criminal Appeals must determine whether the trial court abused its discretion." <u>Payne v. State</u>, 791 So.2d 383 (Ala.Crim.App. 1999).

## SUMMARY OF THE ARGUMENT

Appellant contends that this Honorable Court should revese and render the Appellant's conviction or remand this cause to the trial court for an evidentiary hearing on his ineffective-assistance claims against trial and appellate counsel for their failure to properly preserve and raise claims on these grounds: (1) that the trial court erred in reacting to the jury's communication that it could not reach an unanimous verdict, and (2) that the trial court had been without jurisdiction to adjudicate him guilty of the greater offense of stalking because he was acquitted of the lesser-included offense of harassment relating to that charge, in which the underlying lesser-included offense of harassment was used to establish an element of the stalking charge, i.e., that the accused had "intentionally and repeatedly followed or harassed" the victim, that the accused made a "credible threat," and that the accused "intended" to place the victim in reasonable fear of death or serious bodily injury, as such claims, is not barred by any of the provisions or subsections of Rule 32.

Appellant's petition is entitled to be heard on the merits.

ARGUMENT

The Appellant contends that the trial court abused its discretion in dismissing his petition as barred on the procedural grounds specified in Rule 32.7(d).

"Rule 32.7(d), Ala.R.Crim.P., permits the trial court to dismiss the petition 'if the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings.'"

On March 31, 2006, Appellant filed a Rule 32 petition in the Bullock County Circuit Court attacking his conviction of stalking. (C. 1) In his petition, the Appellant claimed that he was denied effective assistance of counsel at trial and on appeal for their failure to properly preserve and raise claims on these grounds: (1) that the trial court erred in reacting to the jury's communication that it could not reach an unanimous verdict, and (2) that the circuit court had been without jurisdiction to adjudicate him guilty of stalking because he was acquitted of the lesser-included offense of harassment relating to that charge. (C. 2-49) Specifically, (1) the Appellant contended that, upon learning that the jury was at an impasse, the trial court should have ordered the jury into the courtroom and addressed the jury personally, and that this should have been done in the presence of the Appellant and his attorney,

-8-

and (2) the Appellant contended that, because the offense of harassment is a lesser-included of the greater offense of stalking, his stalking conviction was void because the same facts that were supposedly used to prosecuted him for the underlying misdemeanor for harassing his ex-wife or trespassing upon her premises were subsequently used to establish an element of the stalking charge, i.e., that the accused had "intentionally and repeatedly followed or harassed" the victim, that the accused made a "credible threat," and that the accused "intended" to place the victim in reasonable fear of death or serious bodily injury,

This Honorable Court had held that "[i]n order to prove that counsel was ineffective, an appellant in a post-conviction proceeding much show that the counsel's conduct was deficient and that the appellant was prejudiced by that conduct." Gibby v. State, 753 So.2d 1206 (Ala.Crim.App. 1999) citing Humphrey v. State, 605 So.2d 848 (Ala.Cr.App. 1992); and Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984).

It is udisputed that trial and appellate counsels failed to properly preserve for appellate review the aforementioned claims. The Appellant contends that the court's instruction violated the Supreme Court's holding in Ex parte Giles, 554 So.2d 1089 (Ala. 1987).

This Honorable Court has held on numerous occasions that "[w]hen a defendant makes a claim of ineffective assistance of trial counsel and that claim cannot reasonably be presented in a new trial

-9-

motion filed within 30 days, the proper method for presenting that claim for appellate review is to file a petition for post-conviction relief." See, e.g., Jones v. State, 816 So.2d 1067 (Ala.Crim.App. 2000).

As the Alabama Supreme Court explained in Ex parte N.W., 748 So.2d 190 (Ala. 1999) citing Chambers v. City of Opelika, 698 So.2d 792, 794 (Ala.Crim.App. 1996):

> "'where all the elements of an offense separate from the offense charged are present in or are included among elements of [the] charged offense, such separate offense is a lesser included offense for which [the] defendant may be convicted, though acquitted of the offense charged. To be necessarily included in the greater offense, the lesser must be such that it is impossible to commit the greater without first having committed the lesser.'"

(Quoting Sharpe v. State, 340 So.2d 885, 887 (Ala.Crim.App.). cert. denied, 340 So.2d 889 (Ala. 1976))(emphasis added in Chambers). The Appellant contends that the circuit court had been without jurisdiction to adjudicate him guilty of the greater offense of stalking because he was acquitted of the misdemeanor lesser-included offense of harassment relating to that charge.

In addition, the Appellant personally assert that he was not given properly notice that he was being charged with the criminal offense of stalking.[1] (C. 26-34)

This Honorable Court had held that "[c]laim for postconviction relief may not be summarily dismissed because petitioner failed to meet his burden of proof at initial pleading stage, as petitioner

-10-

---

[1] See, e.g., Ex parte N.W., 748 So.2d 190 (Ala. 1999).

has only burden to plead at that stage." <u>Johnson v. State</u>, 835
So.2d 1077 (Ala.Crim.App. 2001).

The Appellant contends that his allegations in his petition
for postconviction relief must be accepted as true where state
failed to properly address merit of arguments in his petition.
See, e.g., <u>Rice v. State</u>, 682 So.2d 484 (Ala.Crim.App. 1995).

Therefore, because the Appellant's claims questioned
ineffective assistance of counsel or jurisdiction, the trial court
abused its discretion in relying on the procedural grounds of Rule
32.7(d) to dismiss the Appellant's petition.

Appellant contends that the trial court should have held an
evidentiary hearing to address his claims, because, he contends,
his claims, if proven, would have entitled him to relief under
<u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.
2d 674 (1984).

Appellant further contends that in this case both the record
and the law reveal that procedural default is inapplicable.

**CONCLUSION**

The Appellant has shown that the trial court's could not be anything other than an abuse of his discretion. With respect to the allegations of the originaL indictment, which reads as follows:

> The Grand Jury of dsaid county charge that, before the finding of this indictment, DAVID DONNIE WILLIAMS, whose name is otherwise unknown to the Grand Jury, did on or about between March 24, 2004, and April 17, 2004, intentionally and repeatedly follow or harass CALLIE WILLIAMS and did make a credible threat with the intent to place CALLIE WILLIAMS in reasonable fear of death or serious bodily harm, in violation of Section 13A-6-90 of the Code of Alabama, ...

The evidence at trial basically established that on three dates, Williams was alleged to have harassed the victim, those dates were March 24th, March 30th and April 17th. Williams was acquitted of the March 30th incident. As of March 24th, the Appellant and alleged victim were still living in the same house as a couple. The relationship was without a doubt a tumultuous one. But, where the couple was still residing together in the same abode, the fact that the Appellant was around the victim cannot be made a criminal act. To the degree that the elements of stalking include a repeated and intentional harassment, the trial and appellate attorneys should have known the case was not made. To the degree the trial court denied the allegations raised in the petition summarily, those actions are due to be reversed and remanded for a proper adjudiciation of the issues.

## CERTIFICATE OF SERVICE

I hereby certify that I have delivered a copy of the above and foregoing Brief of the Appellant to the Court of Criminal Appeals for service on the Attorney General on this the 31st day of May, 2006.


David D. Williams
Pro Se, Appellant

APPENDIX    -57

NO.:_____      G. J. No. BF-04-035

A TRUE BILL, presented to the judge Presiding in open Court by the Foreperson of this Grand Jury, and filed in open court this ___ day of _____, _____.

*Leon Battle*
Grand Jury Foreman

Clerk of the Circuit Court
of Bullock County
Third Judicial Circuit

*10/19/04*
Date

## INDICTMENT

### THE STATE OF ALABAMA
*vs.*
*DAVID DONNIE WILLIAMS*

*Address: 505 JOHNSON STREET, UNION SPRINGS, AL 36089*
*alias*
*None Reported*

**CHARGES:**      CLASS   TYPE
DOMESTIC VIOLENCE THIRD DEGREE - HARASSMENT(13A-6-132)   A   M
**WITNESSES:**

CALLIE WILLIAMS, 1010 MLK BLVD, LOT #2, UNION SPRINGS, AL 36089
LAKISHA WILLIAMS, 1010 MLK BLVD, LOT 2, UNION SPRINGS, AL 36089

Previous Bond $ _____ Bail fixed at $ _____ this _____ day of _____, _____.

_____
**Judge Presiding**

**THE STATE OF ALABAMA**
**Bullock COUNTY**      **CIRCUIT COURT**
2004

**BOYD WHIGHAM**
**DISTRICT ATTORNEY**
**THIRD JUDICIAL CIRCUIT**

-14-

04-18-2006  01:03pm  From-DISTRICT ATTORNEY 3RD CIRCUIT        334 687 9269        T-781  P.001/001  F-965

58

NO. : _____                                          G. J. No.BF-04-035

THE STATE OF ALABAMA, Bullock COUNTY

Circuit Court - Third Judicial Circuit

COUNT 1

The Grand Jury of said county charge that, before the finding of this indictment, DAVID DONNIE
WILLIAMS, whose name is otherwise unknown to the Grand Jury, did on or about March 30,
2004, commit the crime of Harassment (Section 13A-11-8 of the Code of Alabama), with intent to
harass, annoy, or alarm another person, to-wit: CALLIE WILLIAMS, did direct a threat, verbal or
nonverbal, to-wit: grabbed her by her clothes and verbally threatened her, with the intent to carry
out the threat, toward another person, to-wit: CALLIE WILLIAMS, a reasonable person and target
of the threat, causing her to fear for her safety, with the victim being a current or former spouse,
parent, child, a person with whom he/she has a child in common, a present or former household
member, or a person whom he/she has or had a dating relationship, in violation of Section
13A-6-132 of the Code of Alabama,

against the peace and dignity of the State of Alabama.

                                        BOYD WHIGHAM            Ben C. Reeves, Jr.
                                        District Attorney       Chief Asst. Dist. Atty.
                                        Third Judicial Circuit

NO.: *04-144*

*12*

G. J. No. BF-04-034

A TRUE BILL, presented to the judge Presiding in open Court by the Foreperson of this Grand Jury, and filed in open court this *19* day of *Oct* , *04*

*Leon Battle*
Grand Jury Foreman

*WM*
Clerk of the Circuit Court
of Bullock County
Third Judicial Circuit

*10/19/04*
Date

# INDICTMENT

## THE STATE OF ALABAMA
*vs.*
*DAVID DONNIE WILLIAMS*

*Address: 505 JOHNSON STREET, UNION SPRINGS, AL 36089*
*alias*
**None Reported**

| CHARGES: | CLASS | TYPE |
|---|---|---|
| STALKING(13A-6-90) | C | F |

WITNESSES:

LT. JAMES FINNEY, UNION SPRINGS POLICE DEPARTMENT, UNION SPRINGS, AL 36089
CALLIE WILLIAMS, 1010 MLK BLVD, LOT #2, UNION SPRINGS, AL 36089
OFFICER NATHAN WILLIAMS, UNION SPRINGS POLICE DEPT, UNION SPRINGS, AL 36089
QUADARIOUS WILLIAMS, 1010 MLK BLVD, LOT #2, UNION SPRINGS, AL 36089

Previous Bond $ _____ Bail fixed at $ *No Bond* this *19th* day of *October, 2004*

*BF Stff*
Judge Presiding

THE STATE OF ALABAMA
Bullock COUNTY

CIRCUIT COURT
2004

BOYD WHIGHAM
DISTRICT ATTORNEY
THIRD JUDICIAL CIRCUIT

NO. : _____

*13*

G. J. No.BF-04-034

## THE STATE OF ALABAMA, Bullock COUNTY

Circuit Court - Third Judical Circuit

### COUNT 1

The Grand Jury of said county charge that, before the finding of this indictment, DAVID DONNIE WILLIAMS, whose name is otherwise unknown to the Grand Jury, did on or about between March 24, 2004 and April 17, 2004, intentionally and repeatedly follow or harass CALLIE WILLIAMS and did make a credible threat with the intent to place CALLIE WILLIAMS in reasonable fear of death or serious bodily harm, in violation of Section 13A-6-90 of the Code of Alabama,

against the peace and dignity of the State of Alabama.

BOYD WHIGHAM
District Attorney
Third Judicial Circuit

Ben C. Reeves, Jr.
Chief Asst. Dist. Atty.

CR-05-1451

# In the COURT of CRIMINAL APPEALS of ALABAMA

———————◆———————

DAVID DONNIE WILLIAMS,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

———————◆———————

On Appeal From the Circuit Court of
Bullock County, Alabama
(CC-2004-144.60)

## BRIEF OF APPELLEE

Troy King
*Attorney General*

Beth Slate Poe
*Assistant Attorney General*

Audrey Jordan
*Assistant Attorney General*
Counsel of Record*

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300*

June 28, 2006

EXHIBIT

J

PENGAD 800-631-6989

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument in this case is not necessary because the record and briefs in this case adequately set forth the facts and law.  Rule 34, A.R.A.P.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT......................... i

TABLE OF CONTENTS........................................ ii

TABLE OF CASES AND AUTHORITIES.......................... iii

STATEMENT OF THE CASE AND FACTS.......................... 1

ISSUE PRESENTED FOR REVIEW............................... 4

STANDARD OF REVIEW....................................... 5

SUMMARY OF ARGUMENT...................................... 6

ARGUMENT................................................. 7

The Trial Court Properly Denied Williams's Rule 32
Postconviction Petition Pursuant To Rule 32.7(d) Of The
Alabama Rules Of Criminal Procedure..................... 7

    A. Issue Of Whether Trial Court Properly Instructed
       The Jury To Continue Deliberations Is Not
       Properly Before This Court For Appellate Review.. 10

    B. The Trial Court Properly Adjudged Williams Guilty
       Of Stalking Because The Separate Indictment
       Charging Third-Degree Domestic Violence Was Not
       A Lesser-Included Offense....................... 12

CONCLUSION.............................................. 14

CERTIFICATE OF SERVICE.................................. 15

## TABLE OF CASES AND AUTHORITIES

**Cases**

<u>Bearden v. State</u>, 825 So. 2d 868, 870 (Ala. Crim. App. 2001) ............................................ 9

<u>Boyd v. State</u>, 913 So. 2d 1113, 1126 (Ala. Crim. App. 2003) ............................................ 9

<u>Dill v. State</u>, 767 So. 2d 366, 376 (Ala. Crim. App. 1999) ............................................ 11

<u>Duncan v. State</u>, 925 So. 2d 245, 280 (Ala. Crim. App. 2005) ............................................ 8

<u>Duren v. State</u>, 813 So. 2d 928, 930 (Ala. Crim. App. 2000) ............................................ 9

<u>Fowler v. State</u>, 890 So. 2d 1101, 1103 (Ala. Crim. App. 2004) ............................................ 9

<u>Jones v. State</u>, 753 So. 2d 1174, 1186 (Ala. Crim. App. 1999) ............................................ 11

<u>Lomnick v. State</u>, 597 So. 2d 1311, 1312 (Ala. Crim. App. 1992) ............................................ 8

<u>Murph v. State</u>, 853 So. 2d 291, 292 (Ala. Crim. App. 2002) ............................................ 9

<u>Snell v. State</u>, 677 So. 2d 786, 791 (Ala. Crim. App. 1995) ............................................ 10

<u>Woods v. State</u>, CR-02-1959, 2004 WL 1909291, at *7 (Ala. Crim. App. Aug. 27, 2004) ........................ 9

**Rules**

A.R.Crim.P.,

Rule 32.2(a)(2) and (4) ................................ 8

Rule 32.7(d) ........................................ 7, 9

## STATEMENT OF THE CASE AND FACTS

This is an appeal from the dismissal of a Rule 32 postconviction petition in the Circuit Court of Bullock County, Alabama (CC-2004-144.60). Judge L. Bernard Smithart presided.

David Donnie Williams filed a Rule 32 postconviction petition in the Bullock County Circuit Court on March 28, 2006 (C. 9), challenging his conviction of stalking and the resulting sentence of thirty-eight years' imprisonment. (C. 2) Williams raised the following grounds for relief:

> 1. The Constitution of the United States or of the State of Alabama requires a new trial because:
>
>> a. the trial court erroneously instructed the jury to continue deliberations after it informed the trial court that it was deadlocked (C. 4, 10);
>>
>> b. the trial court should have personally instructed the jury regarding its deliberations in front of Williams and his trial counsel (C. 10);
>>
>> c. Williams was denied effective assistance of trial counsel because trial counsel failed to object to the trial court's instruction that the jury continue deliberations (C. 11); and,
>>
>> d. Williams was denied effective assistance of appellate counsel because:

i.   the only issue raised on appeal was sufficiency of the evidence and "other issues were appealable" (C. 12); and,

ii.  appellate counsel's brief was "written in a manner to be totally" incomprehensible (C. 12); and,

2.   The trial court was without jurisdiction to render judgment or impose sentence because Williams was acquitted of the lesser included offense. (C. 11)

On April 18, 2005, the State filed a response and motion to dismiss Williams's petition arguing that Williams's contentions were without merit, precluded pursuant to Rule 32.2(a) of the Alabama Rules of Criminal Procedure, and failed to meet the specificity requirements of Rule 32.6(b) of the Alabama Rules of Criminal Procedure. (R. 53-56)  On April 25, 2006, the trial court entered a written order dismissing Williams's petition finding that Williams's contentions that trial counsel was ineffective were without merit and precluded pursuant to Rule 32.2(a)(5) of the Alabama Rules of Criminal Procedure.  (C. 59)  The trial court also found that its response to the jury's note that it could not reach a verdict was proper. (C. 59)  The trial court further found that Williams had failed to meet his burden of proof pursuant to Rule 32.3 of the Alabama Rules of Criminal Procedure.  (C. 59)  Williams

2

filed a written notice of appeal on May 2, 2006.  (C. 1,

65)

## ISSUE PRESENTED FOR REVIEW

Did the trial court properly dismiss Williams's Rule 32 postconviction petition?

## STANDARD OF REVIEW

The standard of review in evaluating the denial of a postconviction petition is whether the trial court abused its discretion. *See* Elliot v. State, 601 So. 2d 1118, 1119 (Ala. Crim. App. 1992). This Court will affirm the trial court's decision to deny a postconviction petition if the trial court was correct for any reason. *See* Bearden v. State, 825 So. 2d 868, 870 (Ala. Crim. App. 2001).

## SUMMARY OF ARGUMENT

The trial court properly dismissed Williams's petition pursuant to Rule 32.7(d) of the Alabama Rules of Criminal Procedure.  Williams's contention that trial counsel was ineffective for failing to preserve for appeal the trial court's instruction to the jury to continue deliberations is not properly before this Court for appellate review because it pertains to an offense for which Williams was acquitted.  Williams's apparent claim of insufficient evidence is precluded pursuant to Rule 32.2(a) of the Alabama Rules of Criminal Procedure because it was raised at trial and on direct appeal.  All other claims raised by Williams in his brief are not preserved for appellate review because they are raised for the first time on appeal.

6

## ARGUMENT

**The Trial Court Properly Denied Williams's Rule 32 Postconviction Petition Pursuant To Rule 32.7(d) Of The Alabama Rules Of Criminal Procedure.**

Williams contends that the trial court abused its discretion by dismissing his petition pursuant to Rule 32.7(d) of the Alabama Rules of Criminal Procedure. He argues that: (1) trial counsel was ineffective for failing to object to the trial court's reaction to the jury's communication that it could not reach a unanimous verdict; (2) trial counsel was ineffective for failing to object to the trial court's adjudication of guilt for stalking when the jury acquitted Williams of harassment; (3) appellate counsel was ineffective for failing to raise the former two issues on direct appeal; and, (4) Williams was not provided proper notice that he was charged with stalking. (Williams's brief, pgs. 8-10.) Williams also appears to contend that there was insufficient evidence to support his conviction. (Williams's brief, pg. 12.) Furthermore, Williams avers that the trial court should have held an

7

evidentiary hearing on his ineffectiveness claims.[1]
(Williams's brief, pg. 11.)

This Court will not review issues raised for the first time on appeal. *See* Lomnick v. State, 597 So. 2d 1311, 1312 (Ala. Crim. App. 1992). Williams's contentions numbered two, three, and four above are raised for the first time on appeal, and therefore, are not properly before this Court for appellate review. Additionally, Williams's contention that there was insufficient evidence to sustain his stalking conviction is precluded pursuant to Rule 32.2(a)(2) and (4) of the Alabama Rules of Criminal Procedure because this issue was raised at trial and on direct appeal.[2] *See* Duncan v. State, 925 So. 2d 245, 280 (Ala. Crim. App. 2005). The trial court properly dismissed Williams's remaining contention because it is without merit.

---

[1] Any additional claims raised in Williams's petition are deemed abandoned because he failed to raise them on appeal. *See* Dobyne v. State, 805 So. 2d 733, 753 (Ala. Crim. App. 2000) ("[A]llegations not expressly argued on appeal are deemed by [this Court] to be abandoned.").
[2] This Court may take judicial notice of its own records in another proceeding. Ex parte Salter, 520 So. 2d 213, 216 (Ala. Crim. App. 1987).

Rule 32.7(d) of the Alabama Rules of Criminal Procedure provides that a trial court may summarily dismiss a Rule 32 postconviction petition "[i]f [it] determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exits which would entitle the petitioner to relief." *See also* Woods v. State, CR-02-1959, 2004 WL 1909291, at *7 (Ala. Crim. App. Aug. 27, 2004); Murph v. State, 853 So. 2d 291, 292 (Ala. Crim. App. 2002). Consequently, a petitioner is not automatically entitled to an evidentiary hearing. *See* Boyd v. State, 913 So. 2d 1113, 1126 (Ala. Crim. App. 2003). Additionally, the trial court is not required to make specific findings of fact when summarily dismissing a petition. *See* Fowler v. State, 890 So. 2d 1101, 1103 (Ala. Crim. App. 2004); Duren v. State, 813 So. 2d 928, 930 (Ala. Crim. App. 2000). Furthermore, the trial court's decision to dismiss the petition will be upheld if this Court determines the trial court correctly dismissed the petition for any reason. *See* Bearden v. State, 825 So. 2d 868, 870 (Ala. Crim. App. 2001).

**A.    Issue Of Whether Trial Court Properly Instructed The Jury To Continue Deliberations Is Not Properly Before This Court For Appellate Review.**

Williams contends that trial counsel was ineffective for failing to properly preserve for review the trial court's instruction to the jury to continue deliberations after learning the jury was "at an impasse."  (Williams's brief, pg. 8.)  He argues that trial counsel should have required the trial court to personally address the jury in the presence of Williams and trial counsel.  (Williams's brief pg. 8.)  Williams's contention is not properly before this Court for appellate review.

This Court has held that "[o]nly the [charge] upon which an appellant was found guilty is subject to appellate review."  Snell v. State, 677 So. 2d 786, 791 (Ala. Crim. App. 1995).  The record on direct appeal shows that the following occurred after the jury retired for deliberations:

> (Whereupon at 6:15 p.m. the jury sent another note out.)
>
> [Court]: I want y'all to see this: It's got some vote numbers on it.
>
> The note reads - - It gives some numbers **on where they are on domestic violence.** How should we go about resolving this issue?

10

***They seem to be slit.***

[Defense Counsel]: On behalf of the defense, I recommend they continue deliberating.

[Court]: Same from the State?

[Prosecution]: Yes.

[Court]: I'm just going to write that they continue deliberations.

(Whereupon the note with the Court's response was sent back in to the jury room.)

(DA R. 548-49) [3] (Emphasis added).

Assuming, though not conceding, that the jury was "deadlocked" as Williams's contends in his petition, it is evident that the jury's split status pertained to the indictment charging third-degree domestic violence. Because Williams was acquitted of third-degree domestic violence, this issue may not be raised for review. Consequently, Williams's trial counsel was not ineffective for failing to pursue nonmeritorious claims. *See* <u>Dill v. State</u>, 767 So. 2d 366, 376 (Ala. Crim. App. 1999); <u>Jones v. State</u>, 753 So. 2d 1174, 1186 (Ala. Crim. App. 1999). Thus,

---

[3]The transcript on direct appeal will be referred to as "DA R." and "DA C." references the clerk's record on direct appeal.

the trial court properly dismissed Williams's petition pursuant to Rule 32.7(d).

> **B.   The Trial Court Properly Adjudged Williams Guilty Of Stalking Because The Separate Indictment Charging Third-Degree Domestic Violence Was Not A Lesser-Included Offense.**

Williams also contends that trial counsel was ineffective for failing to object to the trial court's adjudication of guilt for stalking.  (Williams's brief, pg. 8-9.)  As mentioned above, this issue is not preserved for appellate review because it was raised for the first time on appeal.  Furthermore, Williams's claim does not appear to be supported by the record.

The record on direct appeal shows that Williams was indicted in case numbered CC-2004-144 for stalking and for third-degree domestic violence in case numbered CC-2004-145.  (DA R. 12)  Because these offenses were charged in separate indictments and given separate case numbers, presumably they were based on different factual

circumstances.[4]  Williams has not alleged or proven otherwise.

Also, the jury verdict form indicates that the verdicts were for cases CC-2004-144 and CC-2005-145.  (DA C. 34) The trial court instructed the jury not to "read anything into the order that [the trial court] put the verdicts" on the verdict form because "[o]ne had to be first and one second."  (DA R. 544)  Furthermore, the jury was not instructed on lesser-included offenses by the trial court. (DA R. 535-546)  Thus, there is no indication that the third-degree domestic violence offense was actually a lesser-included of the stalking offense to be considered by the jury.  Hence, the trial court properly dismissed Williams's petition pursuant to Rule 32.7(d).

---

[4]The indictment in CC-2005-145 charging Williams with third-degree domestic violence is not included in the record or the record on direct appeal. It is Williams's duty to provide this Court with a complete record on appeal. *See* Johnson v. State, 823 So. 2d 1, 19 (Ala. Crim. App. 2001).

13

**CONCLUSION**

The trial court correctly dismissed Williams's petition; therefore, there was no abuse of discretion. Because Williams has shown no abuse of discretion, the trial court's decision must be affirmed.

Respectfully submitted,

Troy King
*Attorney General*

Audrey Jordan
*Assistant Attorney General*

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of June, 2006, I did serve a copy of the foregoing on Williams, by placing the same in the United States Mail,

> David Donnie Williams
> AIS # 169189
> St. Clair Correction Facility
> 1000 St. Clair Road
> Springville, Alabama 35146

Audrey Jordan
Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300

145715/94838

15

FILED
JUL - 5 2006
CLERK
ALA COURT CRIMINAL APPEALS

CRIMINAL APPEALS NO. CR-05-1451

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

DAVID DONNIE WILLIAMS,

Appellant,

vs.

STATE OF ALABAMA,

Appellee.

On Appeal from the Circuit Court of
Bullock County, Alabama (CC04-144.60)

**Reply Brief**

David Donnie Williams
Pro Se, Appellant
AIS #169189, G2-C-132
1000 St. Clair Road
Springville, AL 35146-5582



EXHIBIT
K

## TABLE OF CONTENTS

Page

Table of Authorities.....................................  ii

Summary of the Argument.................................  1

Argument................................................  2

Certificate of Service..................................  5

TABLE OF AUTHORITIES

Page

Blevins v. State, 747 So.2d 914
    (Ala.Crim.App. 1998)...............................    4

Casey v. State, 740 So.2d 1136
    (Ala.Crim.App. 1998)...............................    3

Davis v. State, 806 So.2d 404, 409
    (Ala.Crim.App. 2001)...............................    4

Dutton v. State, 807 So.2d 596
    (Ala.Crim.App. 2001)...............................    4

Ex parte Parker, 740 So.2d 432
    (Ala. 1999)........................................    4

Jones v. State, 689 So.2d 926
    (Ala.Crim.App. 1995)...............................    2

McDuffie v. State, supra...............................    4

Mims v. State, 816 So.2d 509
    (Ala.Crim.App. 2001)...............................    3

Rule 2.2, Ala.R.Crim.P.................................    3

## SUMMARY OF THE ARGUMENT

The Appellant expressly adopts the Summary of the Argument as was presented in the Appellant's brief on appeal from the denial of his Rule 32 petition, CR-05-1451.

ARGUMENT

The State asserts that Williams's contentions numbered two, three, and four above are raised for the first time on appeal, and therefore, are not properly before this Court for appellate review. (Appellee's Brief, p.8). However, this argument ignores Williams's contentions in his petition. On March 31, 2006, Williams filed a Rule 32 petition in the Bullock County Circuit Court attacking his 2004 conviction for stalking. (C.1) This petition was based on his ineffective-assistance claims against trial and appellate counsel for their failure to properly preserve and raise claims on these grounds:  (1) that the trial court erroneously instructed the jury to continue deliberations after it informed the trial court that it was deadlocked; and, (2) that the trial court was without jurisdiction to adjude the defendant guilty of stalking because he was acquitted of third-degree harassment/domestic violence, in which was a lesser-included of the stalking offense. (C.2-49)

This Court, in <u>Jones v. State</u>, 689 So.2d 926 (Ala.Crim.App. 1995), held that petitioner was entitled to consideration of merits of his claims for postconviction relief due to the numerous and convoluted nature of claims of ineffective assistance of appellate and trial counsel that were interwoven with each other.

The State contends that the trial court properly adjudged Williams guilty of stalking because the separate indictment charging third-degree domestic violence was not a lesser-included offense.

-2-

(Appellee's Brief, p.12).[1]  However, that argument ignores the obvious purpose under the plain language of §12-11-30(2), as recognized in Casey v. State, 740 So.2d 1136 (Ala.Crim.App. 1998) the circuit court has exclusive original jurisdiction over any misdemeanor charge that is a lesser included offense within a felony charge or that arises from the same incident as a felony charge.  In the present case, Williams was not indicted only for misdemeanor offense.[2]  Williams was also indicted for a felony offense, which is within the jurisdiction of the circuit court. The misdemeanor offense against Williams arose from the same incident as the felony stalking with which Williams was originally charged.  For example, in Mims v. State, 816 So.2d 509 (Ala.Crim. App. 2001) a stalking offense, in the absence of proof of misdemeanor harassment offense, i.e., that the accused had "intentionally and repeatedly followed or harassed" the victim, necessarily arises from the same incident as, and constitutes a lesser included offense of, the acquitted misdemeanor harassment charge.  Rule 2.2, Ala.R. Crim.P., appears to be consistent with this interpretation of the

---

[1] This Court should take note that the State's argument are precluded from appellate review as it has failed to comply with Rule 28(a)(10), Ala.R.App.P. by not including the required citation to appropriate authority in support of it's contentions. See, e.g. Harrison v. State, 905 So.2d 858, 860 (Ala.Crim.App. 2005).

[2] The indictment in CC-2005-145 charging Williams with third-degree harassment/domestic violence is included in the record on appeal. (C.57-58)

applicable statuted.   Rule 2.2 provides, in pertinent part:

> "(a) Felonies.  All felony charges and misdemeanor or ordinance violations which are lesser included offenses within a felony charge or which arise from the same incident as a felony charge shall be prosecuted in circuit court, except that the district court shall have concurrent jurisdiction to receive guilty pleas and to impose sentences in felony cases not punishable by sentence of death, including related and lesser included misdemeanor charges, and may hold preliminary hearings with respect to felony charges.
>
> "(b) Misdemeanors and Ordinance Violations.  All misdemeanor offenses (including an indictment charging a traffic infraction) shall be prosecuted originally in district court or, where adopted as municipal ordinance violations, municipal court, except:
>
> "(1) Misdemeanors for which an indictment has been returned by a grand jury.
>
> "(2) Misdemeanors that are lesser included offenses within a felony charge as to which concurrent jurisdiction as described in Rule 2.2(a) has not been exercised.
>
> "(c) Transfer of Cases.  Cases filed in a court that does not have original trial jurisdiction of the offense charged shall be transferred to the appropriate court as provided in Ala. Code 1975, §12-11-9."

See also Davis v. State, 806 So.2d 404, 409 (Ala.Crim.App. 2001)

citing Dutton v. State, 807 So.2d 596 (Ala.Crim.App. 2001); McDuffie

v. State, supra; Blevins v. State, 747 So.2d 914 (Ala.Crim.App.

1998), overruled in part, Ex parte Parker, 740 So.2d 432 (Ala. 1999).

    In further response to the State's brief, the Appellant re-adopts and incorporates the arguments and issues set forth in its initial brief as if fully set out herein.

CERTIFICATE OF SERVICE

I hereby certify that I have delivered a copy of the foregoing Reply Brief to the Court of Criminal Appeals for service on the Attorney General on this the 5th day of July, 2006.

David D. Williams
Pro Se, Appellant
AIS #169189, G2-C-132
1000 St. Clair Road
Springville, AL 35146-5582

Jordan 94838

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama

Judicial Building, 300 Dexter Avenue

**P. O. Box 301555**

**Montgomery, AL 36130-1555**



RELEASED

AUG 18 2005

CLERK
ALA COURT CRIMINAL APPEALS

| | |
|---|---|
| **H.W."BUCKY" McMILLAN** | Lane W. Mann |
| Presiding Judge | Clerk |
| **SUE BELL COBB** | Gerri Robinson |
| **PAMELA W. BASCHAB** | Assistant Clerk |
| **GREG SHAW** | (334) 242-4590 |
| **A. KELLI WISE** | Fax (334) 242-4689 |
| Judges | |

## MEMORANDUM

CR-05-1451                    Bullock Circuit Court CC-2004-144.60

<u>David Donnie Williams v. State of Alabama</u>

COBB, Judge.

David Donnie Williams appeals the circuit court's denial of his petition for post-conviction relief filed pursuant to Rule 32, Ala. R. Crim. P. The petition sought relief from his November 2004 conviction for stalking for which he was sentenced to 38 years' imprisonment. Williams appealed his conviction, and this Court affirmed the conviction with an unpublished memorandum. <u>Williams v. State</u>, (No. CR-04-0846) ___ So. 2d ___ (Ala. Crim. App. 2005) (table). On March 28, 2006, Williams filed this petition with the Bullock Circuit Court. In his petition, Williams alleged (1) that the trial court erred after receiving a note from the jury that it was at an impasse by sending written instructions to the jury to

1



EXHIBIT

L

continue deliberations instead of bringing the jury back into
the courtroom and orally instructing the jury in the presence
of Williams, (2) that his trial counsel was ineffective for
not objecting to the aforementioned action by the court, (3)
that the trial court was without jurisdiction to adjudicate
him guilty of stalking because the jury found him not-guilty
of third-degree domestic violence, (4) that he had ineffective
assistance of counsel at the appellate level because counsel
did not raise the issue as to whether the trial court had
jurisdiction to adjudicate Williams guilty of stalking and
because appellate counsel only raised the issue of the
sufficiency of the evidence on appeal.  On April 25, 2006, the
Bullock Circuit Court entered an order summarily dismissing
Williams's petition without an evidentiary hearing pursuant to
Rule 32.7(d), Ala. R. Crim. P.  This appeal ensues.

On appeal, Williams argues that he received ineffective
assistance of trial counsel because trial counsel did not
object to the trial judge sending a written instruction to the
jury to continue deliberating, and because trial counsel did
not object to the court's purported lack of jurisdiction to
adjudicate him guilty of stalking.  He also argues that he
received ineffective assistance of appellate counsel because
appellate counsel failed to raise the aforementioned issues on
direct appeal.  He further alleges that he did not receive
proper notice that he was being charged with stalking.

We note that Williams raises for the first time on appeal
allegations that he received ineffective assistance of counsel
because trial counsel failed to object to the purported issue
regarding the lack of jurisdiction of the trial court to
adjudicate Williams guilty of stalking and that he did not
receive proper notification that he was being charged with
stalking.  "'An issue raised for the first time on appeal is
not subject to appellate review because it has not been
properly preserved and presented.'" Dickey v. State, 901 So.
2d 750, 756 (Ala. Crim. App.  2004), quoting Pate v. State,
601 So. 2d 210, 213 (Ala. Crim. App. 1992).  Because these
issues are raised for the first time on appeal, they are not
properly before this court.

Williams's claims regarding ineffective assistance of
counsel are properly before this Court.  Rule 32.2(d), Ala. R.
Crim. P., states:

"Any claim that counsel was ineffective must be raised as soon as practicable, either at trial, on direct appeal, or in the first Rule 32 petition, whichever is applicable.  In no event can relief be granted on a claim of ineffective assistance of trial or appellate counsel raised in a successive petition."

In order for a claim of ineffective assistance of counsel to be considered on direct appeal, it must first be raised in a motion for new trial filed within 30 days of sentences pursuant to Rule 24.1(b), Ala. R. Crim. P.  Otherwise it must be raised in a Rule 32 petition for post-conviction relief. Ex parte E.D., 777 So. 2d 113 (Ala. 2000).  The record from the direct appeal indicates that Williams was sentenced on December 9, 2004.  Trial counsel filed a motion for a new trial on January 8, 2005, which was subsequently denied.  In that motion, no mention was made of ineffective assistance of counsel.  On February 24, 2005, trial counsel moved to withdraw from the case, and on March 2, 2005, the trial court granted that motion and appointed appellate counsel.  The transcript of the trial was not completed until June 20, 2005. Obviously, appellate counsel was appointed beyond the 30 days prescribed in Rule 24.1 for filing a motion for a new trial; thus, he was unable to present this issue on direct appeal. As such, Williams's petition is the first practical opportunity for Williams to raise this issue.

In order to prevail on an ineffective assistance of counsel claim, Williams must satisfy the two-pronged test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  Williams must show not only that the counsel's performance was deficient, but must also show that the deficiency prejudiced him.  Strickland, supra. "This Court indulges the presumption that trial counsel's representation was sufficient and that counsel's assistance was effective."  Bowen v. State, 899 So. 2d 310, 312 (Ala. Crim. App. 2004).

Williams's allegations that he received ineffective assistance of trial counsel are moot.  Williams asserts that his attorney should have objected to the trial judge's written instruction to the jury to continue deliberations. The jury's note to the judge, however, indicated that the jurors were

3

split on the domestic violence charge.[1]  Williams was acquitted of the domestic violence charge.  Obviously, Williams was the beneficiary of the jury's continued deliberations.  He is thus not entitled to relief.

Given the foregoing, there could be no error on the part of appellate counsel for not raising this moot issue on appeal.  In regards to Williams's other claim of ineffective assistance of counsel, it too is based on a faulty premise. A charged offense is considered a lesser included offense if "it is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged."  § 13A-1-9(a)(1), Ala. Code 1975.  The indictment charging Williams with stalking states that the charge is premised on actions taken by Williams between March 24 and April 17, 2004.  (Direct Appeal C. 13).  The indictment charging Williams with domestic violence, however, states that the charge is premised on an incident on March 30, 2004, in which Williams grabbed Callie Williams by her clothes and verbally threatened her. (R. 58).  Thus, separate evidence had to be presented regarding each charge.  As such, domestic violence cannot be considered a lesser included offense encompassed in the stalking charge.  It thus would have been improper for Williams's appellate counsel to make such an erroneous argument to this court.  Therefore, Williams is not entitled to any relief as to this claim.

For the foregoing reasons, the trial court's denial of David Donnie Williams's Rule 32 petition is affirmed.

AFFIRMED.

McMillan, P.J., and Shaw, and Wise, JJ., concur. Baschab, J., concurs in the result.

---

[1]After receiving the note from the jury, the trial judge stated the folllowing on the record: "I want y'all to see this:  It's got some vote numbers on it.  The note reads -- It gives some numbers on where they are on domestic violence. How should we go about resolving this issue?"  (Direct Appeal R. 548) (emphasis added).

"ATTORNEY GENERAL'S COPY"

FILED

AUG 28 2006

CLERK
ALA COURT CRIMINAL APPEALS

CRIMINAL APPEALS NUMBER: CR-05-1451

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

DAVID DONNIE WILLIAMS,

APPELLANT,

VS.

STATE OF ALABAMA,

APPELLEE.

On Appeal from the Circuit Court of
Bullock County, Alabama (CC-2004-144.60)

APPLICATION FOR REHEARING
Rule 39 (K) REQUEST FOR ADDITIONAL FACTS
REHEARING BRIEF

David Donnie Williams
Pro Se, Appellant
AIS #169189, G4-D-238
1000 St. Clair Road
Springville, AL 35146-5582

EXHIBIT

M

IN THE COURT CRIMINAL APPEALS OF ALABAMA

DAVID DONNIE WILLIAMS,       )
                             )
            Appellant,       )
                             )
vs.                          )    CRIMINAL APPEALS NO.
                             )    CR-05-1451
STATE OF ALABAMA,            )
                             )
            Appellee.        )

## APPLICATION FOR REHEARING

Appellant, David Donnie Williams, respectfully requests

a rehearing in the above-styled cause on the following grounds:

1. This Court erred in holding that the trial
   court has not abused its discretion in
   denying the Appellant's Rule 32 petition
   for post-conviction relief based on his
   ineffective-assistance claims against
   trial and appellate counsel for their
   failure to properly preserve and raise a
   claim on these grounds: that the trial
   court erred after receiving a note from
   the jury that it was at an impasse by
   sending written instructions to the jury
   to continue deliberations instead of
   bringing the jury back into the courtroom
   and orally instructing the jury in the
   presence of the Appellant, and that the
   trial court was without jurisdiction to
   adjudicate him guilty of the offense of
   stalking, as charged in the indictment
   because the jury found him not-guilty of
   the offense of harassment/domestic
   violence.


David D. WILLIAMS
Pro Se, Appellant
AIS #169189, G4-D-238
1000 St. Clair Road
Springville, AL 35146-5582

-i-

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

DAVID DONNIE WILLIAMS, )
)
Appellant, )
)
vs. )    CRIMINAL APPEALS NO.
)    CR-05-1451
STATE OF ALABAMA, )
)
Appellee. )

RULE 39(k), ARAP, REQUEST FOR ADDITIONAL FACTS

Comes now, David Donnie Williams, and respectfully requests that the Court add the following facts to it's opinion:

STATEMENT OF THE FACTS

The facts of this case are stated in the original opinion of this Court as follows:

The evidence at trial tended to establish that Donnie and Callie Williams worked together at Wayne Farms and also periodically lived together in the Comfort Motel Trailer Park from 1997 until March 2004. During this time, Donnie intentionally and repeatedly harassed Callie. On March 19, 2004, Donnie left and returned to Callie's residence several times. On one of these occasions, Donnie took Callie's cellular telephone. Callie became suspicious that Donnie was buying and using crack cocaine so she decided to stay with her daughter, Lakiesha Williams. Callie then informed Donnie that he needed to return her phone; she further advised him that she no longer wanted to see him because of his drug use. Later that day, Callie agreed to drive Donnie to Hendley. Before arriving at their destination, Donnie instructed Callie to turn down a dirt road. Callie refused

-ii-

and instead drove back home, believing that Donnie would kill
her if she drove down the dirt road. Callie then went to her
daughter's apartment. That night, Donnie came to her daughter's
apartment five or six times in an attempt to persuade Callie
t
to return home.

On March 24, Donnie approached Callie at work and said,
"Bitch, you don't know; I'll hurt you," then grabbed Callie's
shirt and repeated the statement. Callie told Donnie that she
wanted her phone back and that if he did not let her go that
she would lose her job. Later that day, as Callie walked to
the office, Donnie grabbed her again. Callie reported the
incident to her supervisor, who spoke with Donnie. Again that
night Donnie approached Callie and said that he "...went and
told momma what [you] did..." Callie asked Donnie to leave
her alone and again reported the confrontation to her supervisor.
After work, Callie returned to her daughter's apartment. Later,
Donnie came to the apartment in search of Callie, but no one
responded when he knocked on the door. Callie asked her landlord
at the trailer park to issue a trespass notice against Donnie,
which he did. On March 26, 2004, Donnie returned to Lakeisha's
apartment, but noboby answered the door.

On March 27, 2004, Callie returned to her residence at
the trailer park to get clothing for herself and her children.
Upon arrival, she observed Donnie's vehicle parked outside the
trailer. She contacted the police who arrived, found Donnie
asleep inside, escorted him outside and informed him of the

trespass notice filed against him.  Later that night, Donnie
confronted Callie at a local restaurant and said, "Bitch, I
don't like what you did to me."  Again, Callie told him to leave
her alone and immediately left the restaurant.  Donnie followed

her outside and said, "Bitch, I will kill you."  Callie
responded, "If you are going to do it, do it right here.  I'm
tired of you threatening my life."

On the afternoon of March 30, 2004, Callie and Lakeisha
went home to pick up her daughter, N.W.  N.W. was not there
when they arrived.  A few minutes later, Donnie drove up with
N.W. in the backseat of his truck.  Upon getting out of the
vehicle, Donnie held N.W. 's hand, preventing her from going
to Callie.  Donnie then grabbed Callie's shirt and attempted
to pull her out of the vehicle.  Callie told Donnie to let N.W.
go and he replied, "Bitch, I don't like what you did..." and
threatened to kill her.  When Donnie finally released N.W.'s
hand, she ran to her Callie.  They attempted to drive away,
but Donnie pulled his truck in front of theirs, preventing their
escape.  After Callie managed to escape, she drove to the police
station and filed a police report.

On April 17, 2004, Callie and her son Q.W. traveled to
the AG Grocery Store for orange juice.  Upon leaving the store,
Donnie was parked in the space behind her and said, "Bitch,
I don't like what you did."  Callie replied,  "Why don't you
leave me alone.  I ain't bothering you."  At this point, Q.W.

-iv-

said to Donnie, "Why don't you leave my momma alone?" Donnie
replied to Q.W., "Why don't you shut up before I fuck you up."
Donnie then stated to Callie, "...if you mess around with me,
I'd rather see you in heaven or hell." Donnie then drove away,
as did Callie. After traveling a short way Callie noticed Donnie
was following her, so she pulled over and called the police.
(emphasis added). (Direct Appeal, CR-04-0846).


David D. Williams
Pro Se, Appellant
AIS #169189, G4-D-238
1000 St. Clair Road
Springville, AL 35146-5582

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested by the Appellant.

# TABLE OF CONTENTS

| | Page |
|---|---|
| Application for Rehearing | i |
| Rule 39 (K), ARAP, Request for Additional Facts | ii |
| Statement Regarding Oral Argument | vi |
| Table of Contents | vii |
| Table of Authorities | viii |
| Statement of the Case | 1 |
| Statement of the Issue | 2 |
| Statement of the Facts | 3 |
| Statement of the Standard of Review | 4 |
| Summary of the Argument | 5 |
| Argument | 6 |
| Conclusion | 8 |
| Certificate of Service | 9 |

TABLE OF AUTHORITIES

Page

<u>Davis v. State</u>, 805 So.2d 404
    (Ala.Crim.App. 2001)..................................    7

<u>Ex parte Giles</u>, 554 So.2d 1089
    (Ala. 1987)..........................................    8

<u>Ex parte N.W.</u>, 748 So.2d 190
    (Ala. 1999)..........................................    8

Section 12-11-30(a), <u>Ala. Code 1975</u>...................    7

## STATEMENT OF THE CASE

The Appellant expressly adopts the Statement of the Case as was presented in the Appellant's brief on appeal from the denial of his Rule 32 petition, CR-05-1451.

## STATEMENT OF THE ISSUE

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE APPELLANT'S RULE 32 PETITION WITHOUT HOLDING AN EVIDENTIARY HEARING ON THE ISSUES RAISED THEREIN?

## STATEMENT OF THE FACTS

Appellant incorporates herein the Rule 39(k), ARAP, Request for Additional Facts.

## STATEMENT OF THE STANDARD OF REVIEW

The Appellant adopts the Statement of the Standard of Review as was presented in the Appellant's brief on appeal from the denial of his Rule 32 petition, CR-05-1451.

## SUMMARY OF THE ARGUMENT

The Appellant adopts the Summary of the Argument as was presented in the Appellant's brief on appeal from the denial of his Rule 32 petition, CR-05-1451.

### ARGUMENT

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE Appellant'S RULE 32 PETITION WITHOUT HOLDING AN EVIDENTIARY HEARING ON THE ISSUES RAISED THEREIN?

The Appellant again requests this Court to specifically review his claim of ineffective assistance of counsel regarding the trial judge's written instruction to the jury to continue deliberations. The Appellant's claim would entitled him to relief. For example, the trial court improperly coerced the jury into returning a guilty verdict of the stalking charge, i.e., that the accused had "intentionally and repeatedly followed or harassed" the victim after the jury informed the trial court that it was deadlocked on the underlying misdemeanor harassment/domestic violence charge.

This Court in it's discussion of the trial court's denial of the Appellant's Rule 32 petition in regards to his other claim of ineffective assistance of counsel stated that a charged offense is considered a lesser included offense if "it is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged." §13A-1-9(a)(1), Ala. Code 1975. The indictment charging the Appellant with stalking states that the charge is premised on actions taken by the Appellant between March 24 and April 17, 2004. (Direct Appeal C. 13). The indictment charging the Appellant with domestic violence, however, states that the charge

-6-

is premised on an incident on March 30, 2004, in which the
Appellant grabbed Callie Williams by her clothes and verbally
threatened her. (R.58). Thus, separate evidence had to be
presented regarding each charge. As such, domestic violence
cannot be considered a lesser included offense encompassed in
the stalking charge. It thus would have been improper for the
Appellant's appellate counsel to make such an erroneous argument
to this court. Therefore, the Appellant is not entitled to
any relief as to this claim. This is a mistatement of the
Appellant's claim of ineffective assistance of counsel in that
Section 12-11-30, Ala. Code 1975 states, in pertinent part:

> "(a) Felonies. All felony charges and misdemeanor
> or ordinance violations which are lesser included offenses
> within a felony charge or which arise from the same
> incident as a felony charge shall be prosecuted in circuit
> court.

See also Davis v. State, 806 So.2d 404 (Ala.Crim.App. 2001).

The Appellant respectfully requests that this Court again
review the Appellant's claim of ineffective assistance of counsel
A review of the Appellant's claim reveals that the alleged
incident that support to had taken placed on March 30, 2004,
for harassing his former common law wife was received into
evidence to show the Appellant's "course of conduct" of
repeatedly following or harassing her, as to the facts previously
set forth in the Statement of the Facts. The testimony of the
Appellant's misdemeanor harassment/domestic violence charge-
even those he was acquitted of the charge-was necessary to
establish a course of conduct by the Appellant.

-7-

CONCLUSION

The Appellant contends that the court's instruction violated the Supreme Court's holding in Ex parte Giles, 554 So.2d 1089 (Ala. 1987). Where all elements of an offense separate from offense charged are present in or included among elements of charged offense, such separate offense is a lesser included offense for which defendant may be convicted, though acquitted of the offense charged. To be necessarily included in the greater offense, the lesser must be such that it is impossible to commit the greater without first having committed the lesser. Ex parte N.W., 748 So.2d 190 (Ala. 1999). The Appellant respectfully requests that this Court will again review the record of the Appellant's claims of ineffective assistance of counsel and that it would than enter an order reversing the trial court's denial of the Appellant's Rule 32 petition.


David D. Williams
Pro Se, Appellant
AIS #169189, G4-D-238
1000 St. Clair Road
Springville, AL 35146-5582

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been delivered to the Court of Criminal Appeals for service on the Attorney General, this 28th day of August, 2006.


David D. Williams
Pro Se, Appellant

Case 2:07-cv-00642-WHA-SRW    Document 8-18    Filed 08/27/2007    Page 1 of 1

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

*Jordan 94838*



Lane W. Mann
  Clerk
Gerri Robinson
  Assistant Clerk

P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

September 1, 2006

**CR-05-1451**

David Donnie Williams v. State of Alabama  (Appeal from Bullock  Circuit Court:
CC04-144.60)

## NOTICE

You are hereby notified that on September 1, 2006 the following action was taken in
the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

cc: Hon. Wilbert M. Jernigan, Circuit Clerk
    David Williams, Pro Se
    Hon. Audrey Jordan, Asst. Attorney General



EXHIBIT

N

Jordan 04838

IN THE SUPREME COURT OF ALABAMA

DAVID DONNIE WILLIAMS,

APPELLANT,

VS.

STATE OF ALABAMA,

APPELLEE.

PETITION FOR WRIT OF CERTIORARI

SC No. _____
(To be inserted by Clerk of the Supreme Court)

Appealed from the Circuit Court
of Bullock County, Alabama
Case No. CC04-144.60)

Court of Criminal Appeals
Case No. CR-05-1451

David Donnie Williams
Pro Se, Appellant
AIS #169189, G3-B-214
1000 St. Clair Road
Springville, AL 35146-5582

EXHIBIT

O

DAVID DONNIE WILLIAMS

       Appellant,

vs.

STATE OF ALABAMA,

       Appellee.

Circuit Court of Bullock County

SC No. _____
(To be inserted by Clerk of the Supreme Court)

Petition for Writ of Certiorari

TO THE SUPREME COURT OF ALABAMA:

    Comes your Petitioner David Donnie Williams and petitions this Court for a writ of Certiorari to issue to the Court of Criminal Appeals in the above-styled cause under Rule 39, ARAP, and shows the following:

    1.  Petitioner suffered a judgment in the Circuit Court of Bullock County, Alabama, on April 25, 2006.  An application for rehearing was filed on August 28, 2006 and overruled on September 1, 2006.

    2.  A copy of the opinion of the appellate court is attached to this petition which shows the Court of Criminal Appeals case to be No. CR-05-1451.

    3.  Petitioner alleges as grounds for the issuance of the writ the following:

-1-

(1) The basis of this petition for the writ is that the decision of the appellate court is in conflict with a prior decision of the Supreme Court on the same point of law. In its opinion, the appellate court held: Petitioner's allegations that he received ineffective assistance of trial counsel are moot. Petitioner asserts that his attorney should have objected to the trial judge's written instruction to the jury to continue deliberations. The jury's note to the judge, however, indicted that the jurors were split on the domestic violence charge. (footnote added). Petitioner was acquitted of the domestic violence charge. Obviously, Petitioner was the beneficiary of the jury's continued deliberations. He is thus not entitled to relief. Given the foregoing, there could be no error on the part of appellate counsel for not raising this moot issue on appeal. In the case of Ex parte Giles, 554 So.2d 1089 (Ala. 1987), the Supreme Court held: Specifically, that trial court erred in reacting to jury's communication that it could not reach unanimous verdict. These statements of the law or the substance of the opinion are in conflict and the appellate court erred in failing to follow the decision of the Supreme Court on the same point of law.

(2) Another basis of this petition for the writ is that the decision of the appellate court is in conflict with a prior decision of the Supreme Court on the same point of law. In its opinion, the appellate court held: In regards to Petitioner's

other claim of ineffective assistance of counsel, it too is
based on a faulty premise. A charged offense is considered
a lesser included offense if "it is established by proof of
the same or fewer than all the facts required to establish the
commission of the offense charged." §13A-1-9(a)(1), Ala. Code
1975. The indictment charging Petitioner with stalking states
that the charge is premised on actions taken by Petitioner
between March 24 and April 17, 2004. (Direct Appeal C.13).
The indictment charging Petitioner with domestic violence,
however, states that the charge is premised on an incident on
March 30, 2004, in which Petitioner grabbed the victim by her
clothes and verbally threatened her. (R.58). Thus, separate
evidence had to be presented regarding each charge. As such,
domestic violence cannot be considered a lesser included offense
encompassed in the stalking charge. It thus would have been
improper for Petitioner's appellate counsel to make such an
erroneous argument to this court. Therefore, Petitioner is
not entitled to any relief as to this claim. In the case of
Ex parte N.W., 748 So.2d 190 (Ala. 1999), the Supreme Court
held: "' where all the elements of an offense separate from
the offense charged are presention or are included among elements
of [the] charged offense, such separate offense is a lesser
included offense for which [the] defendant may be convicted,
though acquitted of the offense charged. To be necessarily
included in the greater offense, the lesser must be such that

-3-

it is impossible to commit the greater without first having
committed the lesser.'" These statements of the law or the
substance of the opinion are in conflict and the appellate court
erred in failing to follow the decision of the Supreme Court
on the same point of law.

(3) Finally basis of this petition for the writ is that
the decision of the appellate court is in conflict with its
prior decisions on the same point of law. In its present
decision the appellate court held: Specifically, domestic
violence/harassment was not a lesser-included offense to the
offense of stalking charged in the indictment. In the case
of Mims v. State, 816 So.2d 509 (Ala.Crim.App. 2001), the
appellate court held: Cf. The court in Culbreath held that a
defendant's prior conviction for harassing his former wife was
correctly received into evidence to show the defendant's "course
of conduct" of repealedly following or harassing her and that
the court's admission of this evidence did not violate the
defendant's protection against double jeopardy. Cf. Hayes v.
State. We find that the testimony of the appellant's prior
bad acts-even those for which he might have already been
prosecuted-was properly admitted and was nesessary to establish
a course of conduct by the appellant.

As the Court of Criminal Appeals explained in Davis v.
State, 806 So.2d 404 (Ala.Crim.App. 2001):

"[the] circuit court has exclusive original

-4-

> jurisdiction over any misdemeanor charge
> that is a lesser included offense within
> a felony charge or that arises from the
> same incident as a felony charge."

(Quoting Casey v. State, 740 So.2d 1136 (Ala.Crim.App. 1998).

(emphasis added in Davis).

See: §12-11-30, Ala. Code 1975 states, in pertinent part:

> "(a) Felonies. All felony charges and misdemeanor
> or ordinance violations which are lesser included
> offenses within a felony charge or which arise
> from the same incident as a felony charge shall
> be prosecuted in circuit court."

See Also:  Rule 2.2(a), Ala.R.Crim.P.

These statements of the law are in conflict and the issue is which holding should be followed on this principle of law.

Petitioner respectfully requests that after a preliminary examination, the writ of certiorari be granted and that this Court proceed under its rules to review the matters complained of, and to reverse the judgment of the Court of Criminal Appeals, and for such other relief as Petitioner may be entitled.

I certify that I have this day served copies of this petition on all other parties to the appeal in the court of appeals and the Court of Criminal Appeals.

David D. Williams
Pro Se, Petitioner
AIS #169189, G3-B-214
1000 St. Clair Road
Springville, AL 35146-5582

-5-

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing petition has been served upon the following individuals by mailing them a copy of same by U.S. Mail, postage prepaid, this 8th day of September, 2006:

Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152

Alabama Court of Criminal Appeals
300 Dexter Avenue
P.O. Box 301555
Montgomery, Alabama 36130-1555

David D. Williams

-6-

# IN THE SUPREME COURT OF ALABAMA 94838
*Jordan*



October 13, 2006

**1051744**

Ex parte David Donnie Williams.  PETITION FOR WRIT OF CERTIORARI TO THE
COURT OF CRIMINAL APPEALS  (In re: David Donnie Williams v. State of
Alabama)   (Bullock Circuit Court: CC04-144.60; Criminal Appeals : CR-05-1451).

## CERTIFICATE OF JUDGMENT

### Writ Denied

The above cause having been duly submitted, IT IS CONSIDERED AND
ORDERED that the petition for writ of certiorari is denied.

WOODALL, J. -  Nabers, C.J., and Lyons, Smith, and Parker, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appear(s) of record in said
Court.
Witness my hand this 13th day of October, 2006

*Robert G Esdale Sr*

Clerk, Supreme Court of Alabama



EXHIBIT
P

/bb

COURT OF CRIMINAL APPEALS NO. _CL-06-1046_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF _Bullock_ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC 2004 - 144.61_

CIRCUIT JUDGE _Hon. L. Bernard Smithart_

Type of Conviction / Order Appealed From: _Rule 32 Petition_

Sentence Imposed: _Dismissed_

Defendant Indigent: [X] YES ☐ NO

_David Donnie Williams_

**NAME OF APPELLANT**

(Appellant's Attorney)                                    (Telephone No.)

(Address)

(City)                    (State)                    (Zip Code)

### V.

## STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

(For Court of Criminal Appeals Use Only)


EXHIBIT
Q

INDEX

David Donnie Williams              VS              State of Alabama
                          CC 2004 – 144.60

CAS                                                                                  1

PETITION FOR RELIEF FROM CONVICTION OR SENTENCE                 2 – 20

IN FORMA PAUPERIS DECLARATION                                   21 – 22

MOTION TO DISMISS PETITION FOR RELIEF FROM CONVICTION
OR SENTENCE                                                     23 – 24

ORDER                                                          35

PETITIONER'S RESPONSE TO RESPONDENTS MOTION TO DISMISS
PETITION FOR RELIEF FROM CONVICTION OR SENTENCE                 36 – 41

NOTICE OF APPEAL                                               42 – 46

CLERK'S NOTICE OF APPEAL                                       47

LETTER OF TRANSMITTAL                                          48

CERTIFICATE OF COMPLETION                                      49

1

```
AC   372              ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2004 000144.61
OPL  : CEC                    CASE ACTION SUMMARY
PAGE:   1                     CIRCUIT  CRIMINAL                  RUN DATE: 02/21/2007
================================================================================
IN THE CIRCUIT COURT OF  BULLOCK                                       JUDGE: LBS
STATE  OF  ALABAMA                  VS       WILLIAMS DAVID DONNIE
                                             505 JOHNSON STREET
CASE: CC 2004 000144.61
                                             UNION SPRINGS , AL  36089 0000
DOB: 08/14/1965         SEX: M  RACE: B  HT: 5 06  WT: 140   HR: BLK EYES: BRO
SSN: 014622787  ALIAS NAMES:
================================================================================
CHARGE01: RULE 32-FELONY        CODE01: RULE  LIT: RULE 32-FELONY TYP: F #: 001
OFFENSE DATE:                           AGENCY/OFFICER: 0090000

DATE WAR/CAP ISS:                       DATE ARRESTED:
DATE    INDICTED:                       DATE     FILED: 02/21/2007
DATE    RELEASED:                       DATE   HEARING:
BOND       AMOUNT:          $.00          SURETIES:

DATE 1:              DESC:              TIME: 0000
DATE 2:              DESC:              TIME: 0000

TRACKING NOS: CC 2004 000144 00  /                        /

    DEF/ATY: BRUNSON PAUL W JR          TYPE: A                        TYPE:
             P.O. BOX 475

             CLAYTON         AL 36016                       00000
PROSECUTOR: REEVES BENJAMIN C JR

================================================================================
OTH CSE: CC200400014400 CHK/TICKET NO:                      GRAND JURY:
COT  REPORTER:                  SID NO:       000169189
DE.  TATUS: PRISON              DEMAND:                         OPER: CEC
================================================================================
DATE            ACTIONS, JUDGEMENTS,  AND  NOTES
================================================================================
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|---|---|
| 3-7-07 | Motion to dismiss Petition for Relief from Conviction ... filed |
| 3-15-07 | Order filed (dismissed) . Copy to parties |
| 3-15-07 | Petitioner's response to Respondent Motion to dismiss ... filed |
| 3-23-07 | Notice of Appeal, docketing statement & reporters transcript order filed |
| 3-23-07 | Clerk's Notice of Appeals filed - forwarded to AG, DA, def & Court of Criminal Appeals |

# PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

### (Pursuant to Rule 32,
### Alabama Rules of Criminal Procedure)

FILED IN OFFICE

FEB 2 1 2007

CLERK ZORGER, BULLOCK CO., ALA.

**Case Number**

| CC | | YR | | NUMBER |
|----|--|----|--|--------|
| CC | | 04 | | 144.61 |
| ID | | YR | | NUMBER |

IN THE _____ CIRCUIT _____ COURT OF *BULLOCK* CO. ALABAMA

DAVID DONNIE WILLIAMS _____ vs. STATE OF ALABAMA _____

Petitioner (Full Name)                          Respondent

[Indicate either the "State" or,
if filed in municipal court, the
name of the "Municipality"]

Prison Number 169189 _____ Place of Confinement ST. CLAIR _____

County of conviction BULLOCK COUNTY _____

### NOTICE: BEFORE COMPLETING THIS FORM, READ CAREFULLY THE ACCOMPANYING INSTRUCTIONS.

1. Name and location (city and county) of court which entered the judgment of conviction

   or sentence under attack CIRCUIT COURT OF BULLOCK COUNTY, UNION SPRINGS, ALABAMA

2. Date of judgment of conviction NOVEMBER 23, 2004

3. Length of sentence 38 YEARS

4. Nature of offense involved (all counts) STALKING

5. What was your plea? (Check one)
   (a) Guilty _____
   (b) Not guilty XXX
   (c) Not guilty by reason of mental disease or defect _____
   (d) Not guilty and not guilty by reason of mental disease or defect _____

3

6. Kind of trial: (Check one)

   (a)   Jury ~~xxx~~          (b)   Judge only _____

7. Did you testify at the trial?

   Yes _____          No ~~xxx~~

8. Did you appeal from the judgment of conviction?

   Yes ~~xxx~~          No _____

9. If you did appeal, answer the following:

   (a)   As to the state court to which you first appealed, give the following information:

       (1)   Name of court ~~ALABAMA COURT OF CRIMINAL APPEALS~~ _____

       (2)   Result ~~AFFIRMED~~ _____

       (3)   Date of result ~~DECEMBER 16, 2005~~ _____

   (b)   If you appealed to any other court, then as to the second court to which you appealed, give the following information:

       (1)   Name of court ~~ALABAMA COURT OF CRIMINAL APPEALS~~ _____

       (2)   Result ~~REHEARING OVERRULED~~ _____

       (3)   Date of result ~~JANUARY 13, 2006~~ _____

   (c)   If you appealed to any other court, then as to the third court to which you appealed, give the following information:

       (1)   Name of court _____

       (2)   Result _____

       (3)   Date of result _____

10. Other than a direct appeal from the judgment of conviction, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

Yes **XXX**                     No _____

11. If your answer to Question 10 was "yes", then give the following information in regard to the first such petition, application, or motion you filed:

   (a)  (1)  Name of court **BULLOCK COUNTY CIRCUIT COURT** _____

        (2)  Nature of proceeding **RULE 32 PETITION** _____

        (3)  Grounds raised **DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL** _____

_____

_____

_____

_____

(attach additional sheets if necessary)

        (4)  Did you receive an evidentiary hearing on your petition, application, or motion?

            Yes _____                     No **XXX**

        (5)  Result **SUMMARILY DENIED** _____

        (6)  Date of result **APRIL 25, 2005** _____

   (b)  As to any second petition, application, or motion, give the same information:

        (1)  Name of court _____

        (2)  Nature of proceeding _____

        (3)  Grounds raised _____

_____

_____

_____

_____

(attach additional sheets if necessary)

        (4)  Did you receive an evidentiary hearing on your petition, application, or motion?

            Yes _____                     No _____

        (5)  Result _____

        (6)  Date of result _____

   (c)  As to any third petition, application, or motion, give the same information (attach additional sheets giving the same information for any subsequent petitions, applications, or motions):

        (1)  Name of court _____

(2)  Nature of procee ...ig _____

(3)  Grounds raised _____

_____

_____

_____

_____

(attach additional sheets if necessary)

(4)  Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____          No _____

(5)  Result _____

(6)  Date of result _____

(d)  Did you appeal to any appellate court the result of the action taken on any petition, application, or motion?

(1)  First petition, etc.          Yes xxx____          No _____

(2)  Second petition, etc.        Yes _____          No _____

(2)  Third petition, etc.         Yes _____          No _____

**ATTACH ADDITIONAL SHEETS GIVING THE SAME INFORMATION
FOR ANY SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS.**

(e)  If you did not appeal when you lost on any petition, application, or motion, explain briefly why you did not:

_____

_____

_____

12.  Specify every ground on which you claim that you are being held unlawfully, by placing a check mark on the appropriate line(s) below and providing the required information. Include <u>all</u> facts. If necessary, you may attach pages stating additional grounds and the facts supporting them.

# GROUNDS OF PETITION

**Listed below are the possible grounds for relief under Rule 32. Check the ground(s) that apply in your case, and follow the instruction under the ground(s):**

_____  A.  <u>The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.</u>

For your information, the following is a list of the most frequently raised claims of constitutional violation:.

4

(1)  Conviction obt..ed by plea of guilty which was unlawfull..lduced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(2)  Conviction obtained by use of coerced confession.

(3)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(4)  Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(5)  Conviction obtained by a violation of the privilege against self-incrimination.

(6)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

**XXX**     (7)  Conviction obtained by a violation of the protection against double jeopardy.

(8)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(9)  Denial of effective assistance of counsel.

**This list is not a complete listing of all possible constitutional violations.**

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each constitutional violation that you claim, whether or not it is one of the nine listed above, and include under it each and every fact you feel supports this claim. Be specific and give details.

~~XXX~~  B.  <u>The court was without jurisdiction to render the judgment or to impose the sentence.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

~~XXX~~  C.  <u>The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____  D.  <u>Petitioner is being held in custody after his sentence has expired.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____  E.  <u>Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:</u>

<u>The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable diligence; and</u>

<u>The facts are not merely cumulative to other facts that were known; and</u>

The facts do not merely amo__.it to impeachment evidence; and

**If the facts had been known at the time of trial or sentencing, the result would probably have been different; and**

**The facts establish that petitioner is innocent of the crime for which he was convicted or should not have received the sentence that he did.**

> If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____ F.  **The petitioner failed to appeal within the prescribed time and that failure was without fault on petitioner's part.**

> If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

13.  **IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS RULE 32.2(b) LIMITS YOU TO ONLY ONE PETITION IN MOST CIRCUMSTANCES. IT PROVIDES:**

> "**Successive Petitions**.  The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exist why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

A.  Other than an appeal to the Alabama Court of Criminal Appeals or the Alabama Supreme Court, have you filed in state court any petition attacking this conviction or sentence?

Yes **XXX**                    No _____

B.  If you checked "Yes," give the following information as to earlier petition attacking this conviction or sentence:

(a)  Name of court  **BULLOCK COUNTY CIRCUIT COURT**

(b)  Result  **SUMMARILY DENIED**

(c)  Date of result  **APRIL 25, 2005**
     (attach additional sheets if necessary)

C.  If you checked the "Yes" line in 13A, above, and this petition contains a different ground or grounds of relief from an earlier petition or petitions you filed, attach a separate sheet or sheets labeled: "EXPLANATION FOR NEW GROUND(S) OF RELIEF."

On the separate sheet(s) explain why "good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and [why the] failure to entertain [this] petition will result in a miscarriage of justice."

14.  Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes _____                    No **XXX**

15. Give the name and address, if known, of each attorney who represented you at the following stages of the case that resulted in the judgment under attack:

(a) At preliminary hearing ~~PAUL W. BRUNSON, JR., Esq., P.O. BOX 475~~

~~CLAYTON, ALABAMA 36016~~

(b) At arraignment and plea ~~KEITH AUSBORN, Esq., 1224 RYAN STREET~~

~~MONTGOMERY, ALABAMA, 36107~~

(c) At trial _____

_____ ~~SAME~~ _____

(d) At sentencing _____

_____ ~~SAME~~ _____

(e) On appeal ~~DONALD EUGENE SPENCER, JR., Esq., 547 SOUTH LAWRENCE~~

~~STREET, MONTGOMERY, ALABAMA 36104~~

(f) In any post-conviction proceeding _____

_____ N/A _____

_____

(g) On appeal from adverse ruling in a post-conviction proceeding _____

_____ N/A _____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes _____           No XXX

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes _____           No XXX

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

_____

(b) And give date and length of sentence to be served in the future: _____

_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes _____           No _____

18. What date is this petition being mailed?

2-7-07

   Wherefore, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

# PETITIONER'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I swear (or affirm) under penalty of perjury that the foregoing is true and correct.

Executed on _2-7-07_
             (Date)

_David Williams_
Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this the _7_ day of _February_ _2007_

Notary Public

## OR *

## ATTORNEY'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I Swear (or affirm) under penalty of perjury that, upon information and belief, the foregoing is true and correct. Executed on _____
             (Date)

Signature of Petitioner's Attorney

SWORN TO AND SUBSCRIBED before me this the _____ day of _____, _____.

Notary Public

Name and address of attorney representing petitioner in this proceeding (if any)

_____

_____

_____

_____

---

* If petitioner is represented by counsel, Rule 32.6(a) permits either petitioner or counsel to verify the petition.

**Rule 32.1 (b), A. R. Crim. P. The Trial Court Was Without Jurisdiction To Render The Judgment Or To Impose The Sentence:**

## EXPLANATION FOR NEW GROUNDS FOR RELIEF

The Petitioner avers that his claims are not procedurally barred because the ground's asserted arises pursuant to Rule 32. 1 (b).

Petitioner's challenge to the trial court's jurisdiction due to illegality of his conviction can be raised at any time. Rule 32. 2 (b), and (c), nor Rule 32.1 (b) sets out a period of limitation for the claims, as asserted by the petitioner alleging that the trial court was without jurisdiction to render the judgment or to impose the sentence. Grady v. State, 831 So. 2d 646, 648 (Ala.Crim.App. 2001).

A claim of a lack of jurisdiction to render the judgment or to impose the sentence is not precluded as a basis of relief, even though the claims could have been but was not raised at trial or on appeal or in a previous Rule 32 petition. Jones v. State, 724 So. 2d 75, 76 (Ala.Crim.App. 1998).

The Jurisdictional Claims Presented Are as Follows:

## The Trial Court Was Without Jurisdiction To Render The Judgment Or To Impose The Sentence In Allowing Multiple Prosecutions OnThe Single Act Of Harassment.

The grounds presented by petitioner establish "*good cause*" for the court to proceed under its rules to adjudicate the merits of the claims and the failure to do so would constitute a failure to correct a manifest continuing miscarriage of justice. The claims asserted by the Petitioner is properly before the court for post conviction relief and this court has jurisdiction to review the claims pursuant to Rule 32 of the A.R.Crim.P., where the claims are not procedurally barred.

### ARGUMENT

THE TRIAL COURT WAS WITHOUT SUBJECT MATTER JURISDICTION TO RENDER THE JUDGMENT OF CONVICTION FOR THE OFFENSE OF STALKING IN ABSENT AN INDICTMENT OR COMPLAINT ON THE CHARGE OF DOMESTIC VIOLENCE IN THE THIRD DEGREE.

Petitioner was indicted for the offense of Stalking, pursuant to Section 13A-6-90, Code of Alabama, 1975. Petitioner was also indicted for the offense of Domestic Violence in the third degree, pursuant to Section 13A-6-132, Code of Alabama, 1975.

2

Section 12-11-30, Code of Alabama, 1975, provides that: "The circuit court shall have exclusive original jurisdiction of all felony prosecutions and of misdemeanor or ordinance violations which are lesser included offenses within a felony charge or which arises from the same incident as a felony charge".

Rule 2. 2 (a), A.R.Crim.P. provides that: "All felony charges and misdemeanor or ordinance violation which are lesser included offenses within a felony charge or which arises from the same incident as a felony charge shall be prosecuted in the circuit court, except that the district court shall have concurrent jurisdiction to receive guilty pleas and to impose sentences in felony cases not punishable by sentence of death, including related and lesser included misdemeanor charges, and may hold preliminary hearings with respect to felony charges."

**THE TRIAL COURT WAS WITHOUT SUBJECT MATTER JURISDICTION TO RENDER THE JUDGMENT OR TO IMPOSE THE SENTENCE IN ALLOWING MULTIPLE PROSECUTIONS ON THE SINGLE ACT OF HARASSMENT.**

Petitioner was charged for the offense Domestic Violence in the Third Degree encompassed with the element of Harassment, pursuant to Section 13A-6-132, Code of Alabama, 1975. Petitioner was also charge in a separate indictment for the offense of STALKING in the First Degree, pursuant to Section 13A-11-8, Code of Alabama, 1975.

Petitioner contends that he cannot consistently with the double jeopardy clause be prosecuted of both Stalking and Domestic Violence with the element of harassment arising out of the same conduct. Because the former is an included offense of the latter rendering the prosecution for the offenses of both the same for purpose of jeopardy.

In Alabama, Section 13A-6-90 (a), Code of Alabama, 1975, the offense of Stalking provides that: "A person who intentionally and repeatedly follows or harasses another person and who makes a credible threat, either express or implied, with the intent to place that

4

person in reasonable fear of death or serious bodily harm is guilty of the crime of Stalking."

The Alabama stalking statute has three components: **First**, the accused must intentionally commit the offense; **Second**, there must be a "credible threat"; **Third**, there must be an "act" of repeatedly following or harassing another person that places that person in reasonable fear of death or serious bodily harm. Culbreath v. State, 667 So. 2d 156 (Ala.Crim.App. 1995).

Section 13A-6-132 (a), Code of Alabama, 1975; Domestic Violence in the third Degree provides that:

**(a.)**     "A person commits domestic violence in the third degree if the person committees the crime of assault in the third degree pursuant to Section 13A-6-22; the crime of menacing pursuant to Section 13A-6-23; the crime of reckless endangerment pursuant to Section 13A-6-24; the crime of criminal coercion pursuant to Section 13A-6-25; or the crime of harassment pursuant to Section 13A-11-8; and the victim is a current or former spouse, parent, child, any person with whom the

5

defendant has a child in common, a present or former household member, or a person who has or had a dating or engagement relationship with the defendant. Domestic violence in the third degree is a Class A misdemeanor, except the defendant shall serve a minimum term of imprisonment of 48 hours in a city or county jail or detention facility without consideration of reduction in time for any second or subsequent conviction under this subjection."

Section 13A-6-90 (a), Code of Alabama, 1975, in connection with the crime of Stalking, "harasses" means: "Engaged in an intentional course of conduct directed at a specified person which alarms or annoys that person, or interferes with the freedom of movement of that person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress. Constitutionally protected conduct is not included within the definition of this term."

Section 12-11-30, Code of Alabama, 1975, provides that: "The circuit court shall have exclusive original jurisdiction of all felony prosecutions and of misdemeanor or ordinance violations which are lesser included offenses within a felony charge or which arises from the same incident as a felony charge".

The trial court was without jurisdiction in allowing multiple prosecutions on the single act of harassment because each statutory provision here does not require proof of an independent fact. The only requirement of the offense for Domestic violence is that the petitioner committed one of the predicate offenses listed in this section, in this case, **harassment**, and that the victim was within the statutory definition of included victims. The offense of Stalking requires *no proof* independent of Domestic Violence with the element of harassment. **Mancuso v. State**, 853 So. 2d 1024 (Ala.Crim.App. 2002).

The **BLOCKBURGER** test necessarily means that the offenses are the same for purpose of jeopardy. Where the same act or transaction constitutes a violation of two distinct statutory provisions, the

7

test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not. Blockburger v. United States, 284 U. S. 299, 304, 52 S. CT. 180, 182, 76 L. Ed. 306 (1932).

It has been aptly noted that the **BLOCKBURGER** test is insufficient where the concern is not multiple charges under separate statutes, but rather successive prosecutions for conduct that may constitute the same act or transaction. Rashad v. Burt, 108 F. 3d 677 (6TH Cir. 1997).

"The assumption underlying the **BLOCKBURGER** Rule is that the legislature ordinarily does not intend to punish the same offense under two different statutes.

Accordingly, where two statutory provisions proscribe the same offense they are construed not to authorize cumulative prosecutions and punishments in the absence of a clear indication of contrary legislative intent". Whalen v. United States, 445 U. S. 684, 691-92, 100 S. CT. 1432, 1437-38, 63 L. Ed. 2d 715 (1980), quoted in Missouri v. Hunter, 459 U. S. 359, 367, 103 S. Ct. 673, 678, 74 L. Ed. 2d 535 (1983).

*18*

There is no indication of the intent on the part of the Alabama legislature to double punish Stalking and Domestic Violence encompassed with the element of harassment when the offenses is one of the same. Therefore, petitioner may not legally be prosecuted, convicted or sentenced for both Stalking and Domestic violence, because the element of harassment encompassed in the stalking statute is also a element of the charge for domestic violence and the lesser included offense of both. This is consistent with Ala, Code, 1975, Section 13A-1-8 **(b)**, subsection **(1)** and **(4)**.

Those Sections provides:   "When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:

**(1)**   One offense is included in the other, as defined in section 13A-1-9; or

**(4)**   The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct.

9

Under the facts of this case domestic violence in the third degree encompassed with the predicated element of Harassment is also under the statutes the same offense as defined for Stalking in Section 13A-6-90. Crear v. State, 591 So. 2d 530, 534 (Ala.Crim.App. 1991).

The Rule against splitting one crime into separate offenses was stated in Hurst v. State, 86 Ala. 604, 6 So.120 (1889). "A single crime cannot be split up, or divided, into two or more offenses".

Alabama cases have long recognized that: Constitutional double jeopardy provisions, U. S. Const. Amend. V, and Alabama Constitution of 1901; Article 1, Section 9, prohibit the splitting of a single criminal act so as to justify multiple prosecutions for the identical criminal behavior. Smith v. State, 472 So. 2d 677, 684 (Ala.Crim.App. 1984).

The state could not convert a single crime into separate offenses by alleging the essential of harassment of the same victims in separate indictments. The predicated offense of harassment is the same

offense and constitutes one offense of domestic violence in the third degree.

## CONCLUSION

All of the foregoing militates in favor of granting the Petitioner the relief requested on his Rule 32 petition. The petition contains a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. It is clear that the circumstances and conduct of the trial court in prosecuting the Petitioner for the charge of Stalking and Harassment/Demestic Violence at the same time renders the trial fundamentally unfair resulting in a manifesting miscarriage of justice. Therefore this Honorable Court shall make specific findings of fact relating to each material issue of fact presented.

Respectfully, _____

21

Case Number

CC 04 144.61

ID    YR    NUMBER

**(To be completed
by Court Clerk)**

# IN FORMA PAUPERIS DECLARATION

_Bullock County Circuit_

[Insert appropriate court]

_DAViD D. WilliAms_

(Petitioner)

vs.

_STATe of AlAbama_

(Respondent(s))

**FILED IN OFFICE**

**FEB 2 1 2007**

**CLERK-REGISTER, BULLOCK CO., ALA.**

## DECLARATION IN SUPPORT OF REQUEST TO PROCEED
## IN FORMA PAUPERIS

I, _DAViD D. WilliAms_ , declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs, or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1. Are you presently employed?    Yes _____    No _____

   a. If the answer is "yes", state the amount of your salary or wages per month, and give the name and address of your employer.

   _____

   _____

   b. If the answer is "no", state the date of last employment and the amount of the salary and wages per month which you received.

   _____

   _____

2. Have you received within the past twelve months any money from any of the following sources?

   a. Business, profession, or other form of self-employment?

      Yes _____        No _____

   b. Rent payments, interest, or dividends?

      Yes _____        No _____

   c. Pensions, annuities, or life insurance payments?

      Yes _____        No _____

   d. Gifts or inheritances?

      Yes _____        No _____

   e. Any other sources?

      Yes _____        No _____

2-21-07

_In FoRmA PaupeRis
GRANTED
BY SELF_

2

If the answer to any of the above is "yes", describe each source of money and state the amount received from each during the past twelve months.

_____

_____

_____

_____

3.  Do you own cash, or do you have money in a checking or savings account?

Yes _____          No _____

(Include any funds in prison accounts.)

If the answer is "yes", state the total value of the items owned.

_____

_____

_____

4.  Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?

Yes _____          No _____

If the answer is "yes", describe the property and state its approximate value.

_____

_____

_____

5.  List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

_____

_____

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on  _2-5-07_
                    (Date)

_David Williams_
Signature of Petitioner    _169189_

## CERTIFICATE

I hereby certify that the petitioner herein has the sum of $ _0.48_ on account to his credit at the institution where he is confined. I further certify that petitioner likewise has the foregoing securities to his credit according to the records of said _St. Clair Corr. Fac._ institution:

_____

_____

_2·6·07_
DATE

_Lisa Tucker, Bus. Manager_
AUTHORIZED OFFICER OF INSTITUTION

Rule 32

3

## IN THE CIRCUIT COURT OF BULLOCK COUNTY

DAVID DONNIE WILLIAMS, AIS#169189,   )

      Petitioner,            )

Vs.                        )

STATE OF ALABAMA,         )

      Respondent        )

**FILED IN OFFICE**

CASE NO.:12004-174-2007

CLERK-REGISTER, BULLOCK CO., ALA.

### MOTION TO DISMISS PETITION FOR
### RELIEF FROM CONVICTION OR SENTENCE
### (PURSUANT TO RULE 32)

      Comes now the State of Alabama, by and through its Assistant District Attorney, Boyd Whigham, and says as follows:

    1.    The pending Petition filed February 21, 2007, states that the ground for the Petition was a follows:

### ISSUES PRESENTED FOR REVIEW

  XXX (7)    <u>Conviction obtained by a violation of the protection against double jeopardy.</u>

  XXX B    <u>The court was without jurisdiction to render the judgment or to impose the sentence.</u>

          If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

  XXX C.    <u>The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law.</u>

          If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports

2.     The Petitioner was indicted for stalking in Case Number CC-2004-144 and was indicted for domestic violence/harassment in Case Number CC-2004-145 and was tried for both cases at the same time.

3.     The Jury returned a verdict of guilty in Case Number CC-2004-144 Stalking and not guilty in Case Number CC-2004-145 Domestic Violence / Harassment, see Jury Verdict attached as Exhibit "A".

4.     Petitioner's allegation of lack of jurisdiction is without merit and Petitioner was tried one time for both indictments and found guilty of only stalking in Case Number CC-2004-144, Stalking.

5.     The Petitioner was convicted and sentenced in only one case – Case Number CC-2004-144.

6.     The Petitioner raised the same issue in his Rule 32 Petition dated March 28, 2006 which was denied on April 25, 2006, See Exhibit "B" and Exhibit "C".

7.     The Petitioner fails to state a claim upon which relief may be granted.

8.     No material issues of fact of law exists which would entitle the Petitioner to relief. That the Petition should be dismissed or in the alternative each ground should be denied.

Respectfully submitted this ___7___ day of March, 2007.

Boyd Whigham
Assistant District Attorney
Post Office Box 61
Eufaula, AL  36027

## CERTIFICATE OF SERVICE

I hereby certify that I have this ___7___ day of March, 2007, served a copy of the above and foregoing pleading on David Donnie Williams AIS # 169189, by placing a copy of same in the United States Mail, postage prepaid and addressed to him in care of St. Clair Correctional Facility, 1000 St. Clair Road, Springville, Alabama 35146.

Boyd Whigham
Assistant District Attorney

*EX-A*

*26*

# IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

STATE OF ALABAMA,                    )
     Plaintiff,                             )
vs.                                           )         CASE NO. CC-2004-144 & 145
DAVID DONNIE WILLIAMS,          )
     Defendant.                            )

## JURY VERDICT

---

### GUILTY VERDICT

We, the Jury, find the Defendant, David Donnie Williams, guilty of the offense of Stalking, as charged in the Indictment.

_____
Foreperson

---

### NOT GUILTY VERDICT

We, the jury, find the Defendant, David Donnie Williams, not guilty of the offense of stalking.

_____
Foreperson

---

### GUILTY VERDICT

We, the jury, find the Defendant, David Donnie Williams, guilty of the offense of Harassment/Domestic violence as charged in the Indictment.

_____
Foreperson

### NOT GUILTY VERDICT

We, the jury, find the Defendant, David Donnie Williams, not guilty of the offense of Harrassment/Domestic violence.

_____
Foreperson

So Say We All.
November 23, 2004



IN THE CIRCUIT COURT OF BULLOCK COUNTY FILED IN OFFICE

DAVID DONNIE WILLIAMS, AIS#169189,    )
                                  )             APR 1 8 2006
      Petitioner,           )
                                    )    CLERK-REGISTER, BULLOCK CO., ALA.
Vs.                           )    CASE NO.: 2004-144.60
                                    )
STATE OF ALABAMA,          )
                                    )
      Respondent          )

## MOTION TO DISMISS PETITION FOR
## RELIEF FROM CONVICTION OR SENTENCE
### (PURSUANT TO RULE 32)

    Comes now the State of Alabama, by and through its Assistant District Attorney, Boyd Whigham, and says as follows:

    1.    The pending Petition dated March 28, 2006 and in forma pauperis status granted April 11, 2006, states that the ground for the Petition was a follows:

### ISSUES PRESENTED FOR REVIEW

_____    A.    The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

_____B.\_\_\_\_The court was without jurisdiction to render the judgment or to impose the sentence.

        If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

    2.    The Petitioner attached a 4 page brief with attachment from the brief in the Court of Criminal Appeal and portions of the transcript.

3.    The Petitioner raises the issue that the Trial Judge on Notice from the jury that they could not reach a decision and the Trial Judge sent word back to the jury "to keep deliberating".

4.    This response was proper and within the discretion of the Trial Judge. The Trial Judge is not required to bring the jury back into the Court for any instruction, when he merely instructs them by a note to keep deliberating.

5.    The next allegation by Petitioner is that it was ineffective assistance of counsel for Petitioner's Trial counsel not to have objected. The issue is precluded pursuant to Rule 32.2(a)(5) which could have been raised on appeal. Since counsel were not the same attorney. Even if not precluded it is not a valid issue because the trial courts action was proper.

6.    Petitioner claim that the jury verdict form found him not guilty of a "lesser included offence" relating to the felony charge of stalking. This is not the circumstances of the trial.

7.    Petitioner was charged in case number CC-2004-145 with Domestic Violence 3rd Degree/Harassment and in case number CC-2004-144 with stalking and both case were tried together and the Petitioner was found not guilty of "harassment/domestic violence". See Exhibit "A".

8.    The Petitioner was represented by capable counsel on appeal and nothing in the record would indicate that appeal counsel was ineffective. The issue that the Petitioner sets forth is "ineffective assistance of counsel", which fails to meet the requirements of Rule 32.6(b). The grounds raised as to ineffective assistance of counsel fail to rise to the level that the courts have recognized as ineffective.

9.    In order to constitute cause sufficient to overcome procedural default, a counsel's performance must be <u>constitutionally</u> ineffective under the standards of <u>Strickland v. Washington</u>, 466 U. S. 6689, 104 S. Ct. 2052, 80L. Ed 2d 674 (1984). <u>Jackson v. Herring</u>, 42 F. 3d 1350, 1358 (11th Cir. 1995); <u>Devier v. Zant</u>, 3F. 3d 1445, 1456 (11th Cir. 1993); <u>Smelchor v. Attorney General of Alabama</u>, 947 F. 2d 1472, 1475 (11th Cir. 1991).

In <u>Strickland</u> the Court set forth the text for determining whether counsel's performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Id</u>, 466, 104 S. Ct. at 2064. This test has two prongs:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixty Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable.

Under <u>Strickland,</u> counsel's performance is measured for "reasonableness under professional prevailing norms".

10.    The claim of ineffective assistance of counsel is without merit.

> *"When reviewing whether an attorney is effective, courts 'should always presume strongly that counsel's performance was reasonable and adequate'."* <u>Rogers v. Zant</u>, *13 F. 3d 384, 386 (11th Cir. 1994).*

The court has full knowledge of the Attorney's performance, which was reasonable and adequate.

11.    The Petitioner fails to state a claim upon which relief may be granted.

12.    No material issues of fact of law exists which would entitle the Petitioner to relief.

That the Petition should be dismissed or in the alternative each ground should be denied.

Respectfully submitted this _18_ day of April, 2006.

Boyd Whigham, Assistant District Attorney
Post Office Box 61
Eufaula, AL  36027

## CERTIFICATE OF SERVICE

I hereby certify that I have this _18_ day of April, 2006, served a copy of the above and foregoing pleading on David Donnie Williams AIS # 169189, by placing a copy of same in the United States Mail, postage prepaid and addressed to him in care of St. Clair Correctional Facility, 1000 St. Clair Road, Springville, Alabama 35146.

Boyd Whigham, Assistant District Attorney

*Exhibit "A"*

NO.: _____

G. J. No. BF-04-035

A TRUE BILL, presented to the judge Presiding in open Court by the Foreperson of this Grand Jury, and filed in open court this ___ day of _____ , _____.

*Leon Battle*
**Grand Jury Foreman**

**Clerk of the Circuit Court
of Bullock County
Third Judicial Circuit**

*10/19/04*
**Date**

# INDICTMENT

## THE STATE OF ALABAMA

*vs.*

### DAVID DONNIE WILLIAMS

*Address: 505 JOHNSON STREET, UNION SPRINGS, AL  36089*
*alias*

**None Reported**

**CHARGES:**
DOMESTIC VIOLENCE THIRD DEGREE - HARASSMENT(13A-6-132)

**CLASS** A

**TYPE** M

**WITNESSES:**

CALLIE WILLIAMS, 1010 MLK BLVD, LOT #2, UNION SPRINGS, AL  36089
LAKISHA WILLIAMS, 1010 MLK BLVD, LOT 2, UNION SPRINGS, AL  36089

Previous Bond $ _____ Bail fixed at $ _____ this _____ day of _____ , _____.

_____
**Judge Presiding**

THE STATE OF ALABAMA
Bullock COUNTY

**CIRCUIT COURT**
2004

**BOYD WHIGHAM
DISTRICT ATTORNEY
THIRD JUDICIAL CIRCUIT**

NO. :_____

G. J. No.BF-04-035

THE STATE OF ALABAMA, Bullock COUNTY

Circuit Court - Third Judical Circuit

## COUNT 1

The Grand Jury of said county charge that, before the finding of this indictment, DAVID DONNIE WILLIAMS, whose name is otherwise unknown to the Grand Jury, did on or about March 30, 2004, commit the crime of Harassment (Section 13A-11-8 of the Code of Alabama), with intent to harass, annoy, or alarm another person, to-wit: CALLIE WILLIAMS, did direct a threat, verbal or nonverbal, to-wit: grabbed her by her clothes and verbally threatened her, with the intent to carry out the threat, toward another person, to-wit: CALLIE WILLIAMS, a reasonable person and target of the threat, causing her to fear for her safety, with the victim being a current or former spouse, parent, child, a person with whom he/she has a child in common, a present or former household member, or a person whom he/she has or had a dating relationship, in violation of Section 13A-6-132 of the Code of Alabama,

against the peace and dignity of the State of Alabama.

BOYD WHIGHAM
District Attorney
Third Judicial Circuit

Ben C. Reeves, Jr.
Chief Asst. Dist. Atty.

IN THE CIRCUIT COURT OF BULLOCK COUNTY FILED IN OFFICE

|  |  |  |
|---|---|---|
| DAVID DONNIE WILLIAMS, AIS#169189, | ) | APR 2 5 2006 |
| Petitioner, | ) | |
| | ) | CLERK-REGISTER, BULLOCK CO., ALA. |
| Vs. | ) | CASE NO.: 2004-144.60 |
| | ) | |
| STATE OF ALABAMA, | ) | |
| Respondent | ) | |

## ORDER

This matter coming before the Court on Rule 32 Petition and response by the State, the Court makes findings of facts and conclusion of law as follows:

The Court finds that the note from the jury that they could not reach a decision and the response by the Trial Court was proper. The failure of the Trial counsel to object to the courts handling of this matter does not show ineffective assistance of trial counsel.

The Court further finds that ineffective assistance of trial counsel is precluded under the provisions of Rule 32.2(a)(5) in that appeal counsel could have raised this matter on appeal.

The Court finds that the Petition is without merit, in that the Petitioner was represented by an experienced attorney, and the records does not support the allegations of ineffective assistance of counsel. Ineffective assistance of appeal counsel as it relates to the jury verdict on two cases on one verdict form is not error and does not indicate ineffective assistance of counsel.

The Petitioner has failed to meet his burden of proof as provided by Rule 32.3.

34

It is therefore, **ORDERED** and **ADJUDGED** that the Petition be dismissed pursuant to the provisions of Rule 32.3(a)(5) and 32.3. All issues are hereby **DISMISSED** pursuant to Rule 32.7(d), Alabama Rules of Criminal Procedure.

**ORDERED** and **ADJUDGED** this _____25th_____ day of April, 2005.


Burt Smithart, Circuit Court Judge

**FILED IN OFFICE**

IN THE CIRCUIT COURT OF BULLOCK COUNTY

MAR 1 5 2007

CLERK-REGISTER, BULLOCK CO., ALA

| | |
|---|---|
| **DAVID DONNIE WILLIAMS, AIS#169189,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **Vs.** ) | **CASE NO.: 2004-144.61** |
| ) | |
| **STATE OF ALABAMA,** ) | |
| ) | |
| **Respondent** ) | |

## ORDER

This matter coming before the Court on Rule 32 Petition and response by the State, the Court makes findings of facts and conclusion of law as follows:

The Court finds that the allegation that the Court was without jurisdiction for allowing multiple prosecutions is without merit and does not accurately reflect the circumstances of Petitioner's Conviction.

The Court further finds that the allegation of double jeopardy is without merit.

The Petitioner has failed to meet his burden of proof as provided by Rule 32.3 and the allegation of lack of jurisdiction pursuant to Rule 32.1(b) and that the sentence exceeds the maximum authorized by law pursuant to Rule 32.1(c) are without merit.

It is therefore, **ORDERED** and **ADJUDGED** that the Petition be dismissed pursuant to the provisions of Rule 32.3(a)(5), Rule 32.2(b), Rule 32.2(c) and Rule 32.3. All issues are hereby **DISMISSED** pursuant to Rule 32.7(d), Alabama Rules of Criminal Procedure.

**ORDERED** and **ADJUDGED** this _____ day of March, 2007.

_____
L. Bernard Smithart
Circuit Court Judge

36

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

FILED IN OFFICE

MAR 15 2007

CLERK-REGISTER, BULLOCK CO., ALA.

DAVID DONNIE WILLIAMS
        Petitioner,

Vs.                              Case No.:CC-2004-144 & 145

STATE OF ALABAMA
        Respondents,

PETITIONER'S RESPONSE TO REPONDENTS MOTION
TO DISMISS PETITION FOR RELIEF FROM CONVICTION
OR SENTENCE PURSUANT TO RULE 32

    Comes now the petitioner David Donnie William [hereinafter
Williams] in the above styled cause of Action and Request of
this Court to deny the Respondents Motion to dismiss and set
this cause for an Evidentiary Hearing on the following grounds
to wit:

PROCEDURE HISTORY THUS FAR

    1 Williams has filed the following specific claim with
this trial court:

        "The Trial court was without subject matter
        jurisdiction to Render the Judgment or to
        Impose the sentence in allowing multiple
        prosecution on the single act of Harrassment".

    2. The State of Alabama has asked of this trial court to
dismiss this claim on page 2 of it's Motion to Dismiss as
follows:

        "Petitioner's allegation of lack of
        jurisdiction is without merit and
        petitioner was tried one time for both
        indictments and found guilty of only
        stalking in Case No. CC-04-144 stalking".

Williams claim is a Jurisdictional claim and the State of Alabama ground for Dismissal is without merit.

Williams Exhibit A is the verdict form in which the jury returned it's verdict, stating we fine defendant not guilty as follows:

> **"NOT GUILTY VERDICT**
> We the jury, find the defendant, David Donnie Williams, not guilty of the offense of Harrassment/ Domestic Violence."

This not guilty verdict of "Harrassment" was an implied Acquittal of stalking as Harrassment was underlying element of the offense stalking and if William was found not guilty of harrassment, then he was Acquitted of the Greater Charge of Stalking which couldn't exist unless Williams is guilty of Harrassment.

The trial court once informed of the jury's not guilty verdict of Harrassment, did not have subject matter jurisdiction to accept the jury's verdict for stalking or pronouncing judgment and sentence.

Williams avers to this Court that when the jury found him not guilty of "Harrassment" it was an implied Acquittal for Stalking, that could not be the basis of accepting a verdict and pronouncing by the trial court.

It is without question that one of the essenital elements of violation Section 13A-6-90 Stalking, is "Harrasses" another person:

**13A-6-90. Stalking**
(a) A person who intentionally and repeatedly follows or harrasses another person and who makes a credible

Harassment acording to section 13-A-11-8, Code Of Alabama 1975 is:

> "(1) A Person commits the crime
> of harassment if, with intent to
> harass, annoy, or alarm another
> person, he or she either:
> a. Strikes, shoves, kicks, or other-
> wise touches a person or subjects him
> or her to physical contact.
> b. Directs abusive or obscene language
> or makes an obscene gesture towards
> another person.
> (2) For purposes of this section, harass-
> ment shall include a threat, verbale or
> nonverbal, made with the intent to carry
> out the threat, that would cause a reason-
> able person who is the target to the threat
> to fear for his or her saftey."

Section 13A-11-8, Code Of Alabama 1975, "HARASSMENT", is inclusive under Section 13A-6-9, Code Of Alabama 1975, "STALKING".

The evidence during Williams trial the jury considered for a finding of guilty was that he repeatedly came to the victim home, job, children school, and called her; all constituting one crime "HARASSMENT". [Please take judicial notice of the records].

The State of Alabama also made the element of Domestic Violence in the third degree, § 13A-6-132, Code of Alabama 1975, "Harrassment" inclusive, to charge the crime.

In a similar case wherein a Jury found the defendant not guilty of the lesser charge that was an element of the greater charge. The Supreme Court of Alabama in Brabley v. State, 2005 Ala. LEXIS 166, states as follows:

> "The Jury verdict at the end of Bradley's trial
> represented more than an implicit acquittal of
> the charge of Robbery in the first degree;
> under the instructions by which the jury was bound,
> it's verdict included an explicit acquittal with
> respect to the offense of Robbery in the first degree.
> The Jury was instructed that only if it found that
> the State had failed to prove all of the elements
> of Robbery in the first degree, that the jury could
> could not find Bradley guilty of that offense, should

it "in that event",
.... move to consideration of the lesser included
offense of Assault in the second degree".
        The Law is well settled that this Court will
presume that the jury followed the trial courts
instructions unless there in evidence to the
contrary. "Wooten Vs. Ivey, 877 So.2d 585, 590
(Ala. 2003) The verdict form, which listed in
descending order the available verdict options
by which Bradley could be found guilty of Robbery
in the first degree, Assault in the second degr-
ee, or Assault in the third degree or be found
simply not guilty, conformed to the jury instru-
ctions, so that the verdict form contained no
option that stated that Bradley was not guilty of
robbery in the first degree. The verdict of not
guilty of first degree Robbery was an explicit
condition precedent, under the trial courts instru-
ctions, to the jury proceeding to consider the
offenses of Assault in the second degree and
Assault in the third degree. Accordingly,
proceeding under those instructions and using the
conforming verdict form, the jury clearly declared
by it's verdict that it had found Bradley not
guilty of the offense of Robbery in the first degree."

        This violation of Williams Rights now turns to this Courts
power to accept the Jury Verdict for Stalking, pronounce judgment
and sentence. Williams position is that this Court did not have
Jurisdiction to accept the Jury's verdict because the Jury had
found him not guilty of "Harrassment", the necessary element of
"Stalking" in this case as charged to the Jury. Nor did the Double
Jeopardy clause allow the conviction and sentencing of Williams
for "Stalking", when Williams was found not guilty of "Harrass-
ment"!

        Williams reasoning is also supported and spoken to in
_Brabley V. State, supra, as follows:

        "We affirm the decision of the Court of Criminal
        Appeals that "the Jury's verdict finding Bradley
        guilty of Second Degree Assault Effectively Acq-
        uitted Bradley of First Degree Robbery as charged
        in the indictment; Thus Bradley cannot be retried
        for Robbery in the first degree".

Williams case effectively follows the reasoning of Bradley

40

supra, as Williams was indicted for three (3) charges; "Stalki-
ng", "Harrassment", and "Domestic Violence" that all contained
an element of "Harrassment". Once the Jury verdict finding
Williams not guilty of "Harrassment" it effectively acquitted
Williams of "Stalking", as charged in his indictment, thus
Williams is unlawfully imprisoned for a crime he is innocent
of and cannot be retried for Stalking.

41

WHEREFORE, for the above said reasons, Williams prays that the States Motion to Dismiss be denied and this cause be set for an Evidentiary Hearing and the Appointment of Counsel.

Respectfully Submitted,

*[signature]*

DAVID D. WILLIAMS
169189 /H1-9A
1000 ST. CLAIR RD
SPRINGVILLE, ALABAMA
                35146


CERTIFICATE OF SERVICE

I hereby certify that I have on this the 11th day of March 2007, served a copy of the foregoing Response upon D.A. Bob Whigham at: P.O. Box 674, Clayton, Alabama 36016-0674 via., United States mail, postage prepaid and proply addressed.

*[signature]*

David D. Williams

42

In the Circuit court of __Bullock__

County, Alabama

__David William__

Petitioner, Pro Se,

vs.                                         Case No. __CC-04-144.61__

State of Alabama,

Respondent,

__Notice of Appeal to the Court of Criminal Appeals__

__of Alabama__

Notice is hereby given that __David Williams__ , petitioner pro se, appeals to the above named court from the judgment entered in this case on the __15__ day of __March__ , 200**7**, denying his Rule 32 post conviction petition.

Respectfully Submitted,

x __David Williams__

Petitioner, Pro Se

CERTIFICATE OF SERVICE

I hereby certify that I have this 21st day of _March_____, 200 7.

served a copy of the foregoing, upon the following, by placing a copy of the

same in the U.S. mail, postage prepaid and properly addressed:

Wilbert M. Jernigan, Clerk
Courthouse, 217 N. Prairie St.
P.O. Box 230____
Union Springs, Al. 36089-230


Lane Mann, Clerk                     Respectfully Submitted,
Court of Criminal Appeals            David William
300 Dexter Ave                       169189  D-13____
Montgomery, Al. 36130                1000 St. Clair Rd.
                                     Springville, Al. 35146

| State of Alabama<br>Unified Judicial System<br>Form ARAP-26 (front)   8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br><br>_____ - _____ |
| --- | --- | --- |

## A. GENERAL INFORMATION:

☑ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF _____ COUNTY

David William's _____, Appellant

V.  ☑ STATE OF ALABAMA  ☐ MUNICIPALITY OF _____

| Case Number<br>CC-04-144.61 | Date of Complaint or Indictment | Date of Judgment/Sentence/Order<br>March 15, 2007 |
| --- | --- | --- |
| Number of Days of Trial/Hearing<br><br>_____ Days | Date of Notice of Appeal<br>Oral: | Written: March 21, 2007 |

Indigent Status Requested: ☑ Yes ☐ No          Indigent Status Granted: ☑ Yes ☐ No

## B. REPRESENTATION:

Is Attorney Appointed or Retained?  ☐ Appointed  ☐ Retained.     If no attorney, will appellant represent self?  ☑ Yes ☐ No

| Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)<br>Pro-Se David William's | Telephone Number<br>Inapplicable |
| --- | --- |
| Address<br>1000 St. Clair Rd. | City<br>Springville Ala. | State<br>Ala. | Zip Code<br>35146. |

## C. CODEFENDANTS: List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
| --- | --- |
| Codefendant          N/A | Case Number |
| Codefendant | Case Number |

## D. TYPE OF APPEAL: Please check the applicable block.

1 ☐ State Conviction
2 ☑ Post-Conviction Remedy
3 ☐ Probation Revocation
4 ☐ Pretrial Order
5 ☐ Contempt Adjudication
6 ☐ Municipal Conviction
7 ☐ Juvenile Transfer Order
8 ☐ Juvenile Delinquency
9 ☐ Habeas Corpus Petition
10 ☐ Other (Specify)
_____
_____

## E. UNDERLYING CONVICTION/CHARGE: Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____
2 ☐ Homicide - § _____
3 ☐ Assault - § _____
4 ☐ Kidnapping/Unlawful Imprisonment - § _____
5 ☐ Drug Possession - § _____
6 ☐ Trafficking in Drugs - § _____
7 ☐ Theft - § _____
8 ☐ Damage or Intrusion to Property - § _____
9 ☐ Escape - § _____
10 ☐ Weapons/Firearms - § _____
11 ☐ Fraudulent Practices - § _____
12 ☐ Offense Against Family - § _____
13 ☐ Traffic - DUI - § _____
14 ☐ Traffic - Other - § _____
15 ☐ Miscellaneous (Specify):
_____ - § _____

## F. DEATH PENALTY:

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes ☐ No

## G. TRANSCRIPT:

1. Will the record on appeal have a reporter's transcript?  ☐ Yes ☑ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _____ (Date)
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes ☐ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions? ☐ Yes ☐ No

NOTE:  If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

Form ARAP-26 (back)    8/91    COURT OF CRIMINAL APPEAL, JOCKETING STATEMENT

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| | | | | | | |
| | | | N/A | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

Petitioner Filed A Rule 32 Petition in the original Court of Conviction, In which was denied.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

Whether the Trial Court Abused his discretion when ~~the~~ denied the petition,

**K. SIGNATURE:**

March 21, 2007
Date

David Williams
Signature of Attorney/ Party Filing this Form

46

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C    8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R.App.P.) | Criminal Appeal Number<br><br>_____ - _____ |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☑ CIRCUIT COURT ☐ DISTRICT COURT ☐ JUVENILE COURT OF _____

_____ David Williams _____ , COUNTY

v. ☑ STATE OF ALABAMA ☐ MUNICIPALITY OF _____ , Appellant

| Case Number<br>CC -04- 144,161 | Date of Judgment/Sentence/Order<br>March , 15, 2007 |
| Date of Notice of Appeal<br>Oral: | Written: March 21, 2007 | Indigent Status Granted:<br>☑ Yes    ☐ No |

PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE APPELLANT HAS STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

David Williams          March 21, 2007          David William
Signature                    Date                    Print or Type Name

PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED. Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                          COURT REPORTER(S)

A. ☐ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence    _____
proceedings, a transcript of the organization of the jury and arguments of counsel must    _____
be designated separately.                                                                   _____

B. ☐ ORGANIZATION OF THE JURY - This designation will include voir dire examination and    InApplicable
challenges for cause. Note that in noncapital cases the voir dire of the jury will not be    _____
recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)                         _____

C. ☐ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will    _____
not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)                  _____

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

ADDITIONAL PROCEEDINGS REQUESTED              DATE                    COURT REPORTER(S)

D. _____    _____    _____

E. A Complete Copy of the Clerks Record on Appeal

F. _____    _____    _____

G. _____    _____    _____

IMPORTANT NOTICE: The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be affective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW: I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

_____          _____          _____
Signature                    Date                    Print or Type Name

DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to:  (1) Clerk of the Court of Criminal Appeals  (2) the Court

REV. 4/1/97

**NOTICE OF APPE     TO THE ALABAMA COURT OF CR   INAL APPEALS**
**BY THE TRIAL COURT CLERK**

David Donnie Williams                              V.    [X] STATE OF ALABAMA
**APPELLANT'S NAME**                                    [ ] CITY OF _____
(as it appears on the Indictment)                                          **APPELLEE**

[X] CIRCUIT    [ ] DISTRICT    [ ] JUVENILE COURT OF Bullock _____ COUNTY
CIRCUIT/DISTRICT/JUVENILE JUDGE: Hon. L. Bernard Smithart

DATE OF NOTICE OF APPEAL: ___March 21, 2007_____
(NOTE: If the appellant is incarcerated and files notice of appeal, this date should be the date on the certificate of service, or if there was no certificate of service, use the postmark date on the envelope.)

**INDIGENCY STATUS:**
Granted Indigency Status at Trial Court:                    [X] Yes [ ] No
Appointed Trial Counsel Permitted to Withdraw on Appeal:    [ ] Yes [X] No
Indigent Status Revoked on Appeal:                          [ ] Yes [X] No

**DEATH PENALTY:**
Does this appeal involve a case where the death penalty has been imposed?   [ ] Yes [X] No

**TYPE OF APPEAL: (Please check the appropriate block.)**
[ ] State Conviction        [ ] Pretrial Appeal by State    [ ] Juvenile Transfer Order
[X] Rule 32 Petition        [ ] Contempt Adjudication       [ ] Juvenile Delinquency
[ ] Probation Revocation    [ ] Municipal Conviction        [ ] Habeas Corpus Petition
[ ] Mandamus Petition       [ ] Writ of Certiorari          [ ] Other(specify) _____

IF THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E., RULE 32 PETITION, WRIT OF HABEAS CORPUS, ETC.) OR FROM ANY OTHER ORDER ISSUED BY THE TRIAL JUDGE, COMPLETE THE FOLLOWING:

TRIAL COURT CASE NO.: CC 2004 -144.61

DATE ORDER WAS ENTERED: __March 15, 2007___        PETITION: [X] Dismissed   [ ] Denied   [ ] Granted

IF THIS IS AN APPEAL FROM A CONVICTION, COMPLETE THE FOLLOWING:
'TE OF CONVICTION: _____        DATE OF SENTENCE: _____
JUTHFUL OFFENDER STATUS:
Requested:   [ ] Yes [ ] No    Granted:   [ ] Yes [ ] No
LIST EACH CONVICTION BELOW: *(attach additional page if necessary)*
1.   Trial Court Case No. _____    CONVICTION: _____
     Sentence: _____
2.   Trial Court Case No. _____    CONVICTION: _____
     Sentence: _____
3.   Trial Court Case No. _____    CONVICTION: _____
     Sentence: _____

POST-JUDGMENT MOTIONS FILED: (complete as appropriate)   Date Filed   Date Denied   Continued by Agreement To *(Date)*
[ ] Motion for New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . .   _____   _____   _____
[ ] Motion for Judgment of Acquittal . . . . . . . . . . . . . . . . . . .   _____   _____   _____
[ ] Motion to Withdraw Guilty Plea . . . . . . . . . . . . . . . . . . . .   _____   _____   _____
[ ] Motion in Arrest of Judgment . . . . . . . . . . . . . . . . . . . . .   _____   _____   _____
[ ] Other . . . . . . . . . . . . . . . . . . . . . . .   _____   _____   _____

COURT REPORTER(S): . . . . . . . . . _____
ADDRESS: . . . . . . . . . . . . . . . . . . . . . _____

APPELLATE COUNSEL: . . . . . . . . _____
ADDRESS: . . . . . . . . . . . . . . . . . . . . . _____

APPELLANT: (IF PRO SE) . . . . . . AIS# _169189_
ADDRESS: . . . . . . . . . . . . . . . . . . . _1000 St. Clair Road__
                                              _Springville, Alabama  35146_
APPELLEE (IF CITY APPEAL): . . _____
'DRESS: . . . . . . . . . . . . . . . . . _____

I certify that the information provided above is accurate
to the best of my knowledge and I have served a copy of this
Notice of Appeal on all parties to this action on
this _23rd_day of _March_____, _2007_.                 *Wilbert M. Jernigan*
                                                        CIRCUIT COURT CLERK

AP 12-3 Letter of Transmittal of Notice of Appeal to the Court of Criminal Appeals by Trial Clerk          Printed and for Sale by Roberts & Son, Birmingham

## LETTER OF TRANSMITTAL OF NOTICE OF APPEAL TO
## THE COURT OF CRIMINAL APPEALS BY
### TRIAL CLERK

David Donnie Williams

Appellant

V.

STATE OF ALABAMA

Appellee

Offense **Rule 32 Petition**

Sentence **Dismissed**

Notice of Appeal **March 21, 2007**
Date Filed

Judgement Entry **March 15, 2007**
Date Entered

[   ] Oral notice of appeal has been given prior to or on the date of entry of the judgment of conviction in this cause,

[ X ] Written notice of appeal has been filed on the date indicated hereon (within 42 days from the entry of judgment or the order overruling a post conviction motion),

A certified copy of the entry of record of the oral notice of appeal or the written notice of appeal is forwarded herewith for filing with the Court of Criminal Appeals.

I certify that I have served a copy of this letter of transmittal along with a copy of the notice of appeal on each of the following:

1. Court Reporter (Name and address) _____
2. Defendant
3. Defendant's appellate counsel. (Name and address)_____
4. District Attorney
5. Attorney General

DATED this ____29th____ day of ____March____ ×× 2007

_Wilbert M. Jernigan_

Circuit Clerk

49

## CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD ON APPEAL BY TRIAL CLERK

__David Donnie Williams___
Appellant
v.

State of Alabama
Appellee

TO: The Clerk of the Court of
Criminal Appeals of Alabama

Case No. __CC-2004 - 144.61_____

Date of Notice of Appeal __3-21-07__

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of ___49___ pages) (_____ XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXX) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this ___29th__ day of __March__, XX2007

_Wilbert M. Jernigan_
Circuit Clerk

__Bullock_____
County

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

CRIMINAL APPEALS NO. CR-04-144.60

DAVID DONNIE WILLIAMS
APPELLANT

VS.

STATE OF ALABAMA
APPELLEE

On Appeal From the Circuit Court of Bullock County,
Alabama.

DENIAL OF RULE 32 PETITION
APPELLANT BRIEF AND ARGUMENT
Pro se

ORAL ARGUMENT REQUESTED

DAVID DONNIE WILLIAMS
AIS #169189/P-13-1A
1000 St. Clair Road
Springville, AL
                35146-5582



EXHIBIT

R

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant request appointment of Counsel in order to perform Oral Argument as he is imprisoned at St. Clair Correctional Facility.Oral Argument is essential in order to explain to this Court Appellant's position in regards the subject of the acquittial of Harassment, which was the essential element of Stalking.

i

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . i

TABLE  OF CONTENTS . . . . . . . . . . . . . . . . . . . . .. . . .. ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . .1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . .2.

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . .3,4,5

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . 6 . . .

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . .. . . . . . . . 8,9,10,11,12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 13

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . 14

## TABLE OF AUTHORITIES

BRADLEY V. STATE, 925 So.2d 237 . . . . . . . . . . . . . . . . . . . .11, 12

EXPARTE BOATWRIGHT, 471 So. 2d 1257 . . . . . . . . . . . . . . . .12

HARRISON V. BAKER, 260 ALA. 488, 493, 71 So. 2d 284 . . . . . . . . . .8

SMOOT V. STATE, 381 So. 2d 668, 671 (ALA. CRIM. APP. 1980) . . . . . . .9

STRICKLAND V. STATE, 771 So.2d 1123 . . . . . . . . . . . . . . . . . .12

WOOTEN V. IVEY, 877 So. 2d 585 . . . . . . . . . . . . . . . . . . . ..11

## STATEMENT OF THE CASE

Appellant was convicted for the offense of Stalking 13-6-90 Ala. Code 1975, and sentenced to 38 years in the Alabama Department of Corrections.

The Court of Criminal Appeals affirmed Appellant's conviction on December 16, 2005.

On February 7, 2007, Appellant filed his second Rule 32 Petition in the Circuit Court of Bullock County, Alabama.

On March 7, 2007 the State of Alabama filed a Motion to Dismiss Appellant's Rule 32 Petition.

On March 11, 2007 Appellant filed a response opposing Appelee's Motion to Dismiss.

On March 15, 2007, the Trial Court rendered it's order granting and dismissing the Appellant's Rule 32 Petition.

Notice of Appeal was filed on March 21st, 2007, which is the subject of this appeal.

1.

ISSUES FOR REVIEW

ISSUE I.

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ITS DENIAL OF
APPELLANT'S RULE 32 PETITION?

ISSUE I.A.

WHETHER THE TRIAL WAS WITHOUT JURISDICTION TO RENDER JUDGMENT
AND TO IMPOSE SENTENCE?

## STATEMENT OF THE FACTS

O    On April 21, 2004, Appellant was arrested and charged with two distinct

offenses, (Domestic/Violence/Harrasment) and (Stalking) pursuant to 13A-6-132,

13A-11-8, and 13A-6-90 Ala. Code 1975.

Appellant was acquitted for the offense of Harassment, but found guilty

and sentenced to (38) years in the Alabama Department of Corrections, for the offense

offense of Stalking.

The Court of Criminal Appeals affirmed Appellant's conviction on December

16, 2005.

On February 7, 2007, Appellant filed his second Rule 32 Petition in the

Circuit Court of Bullock County, Alabama.

The Appellant allege as grounds in his second Rule 32 Petition that the

Trial Court lacked Subject Matter Jurisdiction to accept a verdict of guilty

or to impose a sentence for the offense of stalking, once the jury rendered

a verdict of not guilty for the offense of Harassment.

The Appellant argues in his Rule 32 Petition that the State of Alabama

failed to prove the essential element of Harassment in order to sustain a

conviction for stalking, once the jury found Appellant not guilty of Harassment.

The Appellant alleges that the offense of Harassment in said cause, made up

the R Res gestae " of both offenses ( Stalking and Harassment ) and based on the

victim Ms. Callie Williams testimony, both offenses were inseparably connected

with the essential element of Harassment to secure a conviction for stalking,

which testimony was as follows:

3.

On the evening of March 19, 2004, according to Callie Williams the victim, the Appellant came to her daughter's house apprximately five or six times.

Callie Williams and Appellant's next encounter occurred at Wayne Farm, on March 24, 2004, where they both were employed.

The next encounter was on March 26, 2004, at Callie Williams daughter's house.

On March 27, 2004, Ms. Williams and Appellant had two more encounters during the course of that day.

On March 30, Ms. Williams had an encounter with Appellant , which led the victim to file annincident report against Appellant for Harassment with the Union Springs Police Department.

The last encounter between Ms. Williams and Appellant occurred at the A-G Grocery Store, in which, Ms. Williams filed another incident report against Appellant for stalking with the Union Springs Police Department.

On April 21st, 2004, the Appellant was arrested and charged with the offenses,,Domestic Violence/Harassment and Stalking.

On October 19, 2004, the State brought before the Grand Jury the charges: Domestic/Violence/Harassment  Third Degree 13A-6-132 and Stalking 13A-6-90.

The indictment of Domestic Violence Third Degree/Harassment alleged that  " David Donnie Williams " who's name is otherwise unknown to the Grand Jury, did on or about March 30, 2004, commit the crime of Harassment(section 13A-11-8 of the ALA.CODE 1975 ), with intent to harass, annoy, or alarm another person. to wit Callie Williams, did direct a threat, verbal or nonverbal, to wit:

4

Grabbed her by her clothes and verbally threatened her, with the intent to carry out the threat, toward another person, to wit:CCallie Williams , a reasonable person and target of the threat, causing her to fear for her safety, with the victim being a former spouse, parent ,child, a person with whom he/she has had a dating relationship, in violation of § 13A-6-132 Ala.Code 1975.

However, such indictment fails to obtain the date it was adjudged as a true bill by the Foreman of the Grand Jury , nor is such indictment signed by the presiding Judge and Circuit Clerk.

The indictment for stalking that " The Grand Jury  of said County charge that, before the finding of this indictment , David Donnie Williams, whose name is otherwise unknown to the Grand Jury, did on or about between March 24, 2004,until April 17, 2004, intentionally and repeatedly follow or harass Callie Williams and did make a credible threat with the intent to place Callie Williams in reasonable fear of death or serious bodily harm, in violation of § 13A- 6-90 of Ala. Code 1975, such indictment was signed and dated for October 19, 2004, by Grand Jury Foreman Leon Battle , Circuit Clerk  Wilbert M. Jernigan and presiding Judge L. BERNARD SMITHART.

## STANDARD OF REVIEW

The Standard of Review on appeal in a Postconviction Proceeding is whether the Trial Judge abused his discretion when he denied the Petition. STRICKLAND V. STATE, 771 So.2d 1123. (AL CRIM. APP. 2000 )

## SUMMARY OF THE ARGUMENT

The trial court erred in dismissing Appellant's Rule 32 petition stating that Appellant's claims lack merit.

Appellant who was indicted on two charges, one stalking (13A-6-90) the other Harassment (13A-11-8) in which jury returned a verdict of not guilty for the offense of Harassment, but a guilty verdict for stalking.

Appellant presents facts in his argument that the evidence used to indict Appellant of stalking is the evidence used to indict Appellant of Harassment, which are two distinct offenses, but are part of one continuously criminal activity. The defense offered the same evidence to the jury, and the jury found Appellant not guilty of Harassment, but guilty of Stalking.

Appellant contend that infinding a conviction for stalking the defense must prove every element of the charge, which Harasment is an essential underlying element.

Appellant's argument provides that sense the jury's verdict of not guilty for the offense of Harassment it consequently acquitted Appelland of Stalking. This causing trial court to lack subject matter jurisdiction to accept juries guilty verdict for Stalking, and the Double Jeopardy Clause protects Appellant from being retried after the acquittal of Harassment.

The State of Alabama showed no refutal evidence of Appellant's claim which could entitle Appellant relief.

Appellant's argument concludes that his claim is with merit and the trial court erred in not granting Appellant an evidentiary hearing. This matter should be reversed and remanded.

7

**WHETHER THE TRIAL COURT ABUSED IT'S DISCRETION WHEN DENYING APPELLANT'S RULE 32 PETITION CLAIM THAT THE TRIAL COURT LACKED SUBJECT MATTER JURISDICTION TO ACCEPT A VERDICT OF GUILTY FOR THE OFFENSE OF STALKING, ONCE THE JURY RENDERED A VERDICT OF NOT GUILTY OF THE OFFENSE OF HARASSMENT.**

## I

### ARGUMENT

Appellant argues that the trial court erred in dismissing Appellant's Rule 32 petition on the grounds that Appellant's claims are without merit.

Appellant was indicted on two distinct offenses, [Stalking 13A-6-90] and [Domestic Violence / Harassment 13A-6-132 and 13A-11-8].

The Jury returned a verdict of not guilty for the offense of harassment but found Appellant guilty of the offense of Stalking 13A-6-90. (See Record of Appeal R-26)

Appellant argues that the trial court Lacked Subject Matter Jurisdiction to accept a guilty verdict or to impose a sentence for the offense of Stalking once the Jury rendered a verdict of not guilty for the offence of Harassment.

Appellant avers that the offense of Harassment was interwoven and part of the Res Gestae of one continously criminal offense of Harassment and that the evidence presented to the Jury that acquitted Appellant of Harassment, was also the same evidence used to convict Appellant of the offense Stalking.

The Black Law Dictionary 7th Edition defines "Res Gestae" as follows:

> Res Gestae: [Latin things done] " The events
> at issue, or other events contem-
> poraneous with them".
> See also: Harrison V. Baker 260
> Ala. 488, 493, 71 So. 2d 284.

The Appellant argues on appeal that the trial court was without Subject Matter Jurisdiction to accept the verdict of "Stalking" in his case, due to the finding of not guilty to the charge of Domestic Violence / Harassment by the jury. Appellant further argues that the evidence admitted of the additional charge in the indictment,"Stalking" made up the " Res Gestae " of both offense " Harassment""and were relevant to prove Williams guilty or not of both offenses.

The events from March 19th, 2004 to April 17th, 2004 alleged to have been committed by Williams are the underlying elements of both Domestic Violence / Harassment and Stalking, which was Williams acts of Harassment.

Williams acts of harassment were admissible evidence necessary to indict him and necessary evidence to convict him. As the harassment evidence from March 19th, 2004, to April 17th, 2004, were admissible because they were inseparably connected with the essential element of harassment to secure a conviction of stalking or domestic violence. SMOOT V. STATE, 381 So. 2d 668, 671 (Ala. Crim. App. 1980)

This was the basis of the State Of Alabama evidence during Appellant trial and the method it was presented to the jury to settle the disputed issue. State witness Callie Williams testify's as follows as to the events of harassment that formed the essential element of each charge:

At R-27, Ms. Williams testifies that on March 24th, 2004, Appellant came to daughter's house approximately five or six times.

Ms. Callie then testified that on March 19th, 2004, after leaving the clerk's office where she obtain a criminal trespass warrant against Appellant, She arrived at her job, where she and Appellant were both employed. Ms. Callie testified that, Appellant approached her and made threats against her on two

9.

different occasions, then later arrived at her daughter's resident but she refused to open the door for Appellant. [R-24-35]

On March 26th, 2004, Appellant returned to Ms. Callie Williams daughterds house and that she still refused to open the door for Appellant. [R-36]

The next incident occurred on March 27th, 2004, where Ms. Williams testified that upon arrival at her house, she found Appellant inside her home asleep, and that she called the police, and when they arrived Appellant was escorteddout by a Union Springs police officer. [R-27-39]

Ms. Williams stated that later on that night while out to eat at the resturant known as "Smokey O's", appellant entered the resturant and begin threatening and directing verbal abuse towards her. [R-39-40]

On March 30th, 2004, Ms. Williams testified that upon arrival at the bus stop to pick up her eight year old daughter and finding that she wasn't there, later discovered that appellant had her daughter and when she confronted him, appellant became abusive while pulling on her sweatshirt and threaten her, Immediataly after the incident with appellant, she went to the Union Springs Police Department and filed charges for Harassment. [R-42-46]

Ms. Williams testified that the last encounter between her and Appellant occurred on April 17th, 2004, at the A- G Grocery store, which incident led Ms. Williams to call the Police and filing another incident report for the offense Stalking.

10.

The State Of Alabama failed to prove the essential element of harassment in order to sustain a conviction for stalking, once the jury rendered, a verdict of not guilty for the offense of harassment, and it effectively acquitted appellant of the offense of stalking. BRADLEY V. STATE, 925 So. 2d 237, 2005 Ala. Lexis 166 held:

> "The jury verdict at the end of Bradley's trial represented more than an implicit acquittal of the charge of Robbery in the first degree; under the instructions by which the jury was bound, it's verdict included an explicit acquittal with respect to the offense of Robbery in the first degree. The jury was instructed that only if it found that the State had failed to prove all of the elements of Robbery in the first degree, that the jury could not find Bradley guilty of that offense, should it that event" move to consideration of the lesser included offense of assault in the second degree.

> The law is well settled that this court will presume that the jury followed the trial courts instructions unless there is evidence to the contrary. " Wooten V. Ivey, 877 So. 2d 585, 590 (Ala. 2003). The verdict form, which listed in descending order the available verdict options by which Bradley could be found guilty of Robbery in the first degree, Assault in the second degree, or Assault in the third degree or be found simply not guilty, conformed to the jury instructions, so that the verdict form contained no option that stated that Bradley was not guilty of Robbery in the first degree . The verdict of not guilty of first degree Robbery was an explicit condition precedent, under the trial court instructions, to the jury proceeding to consider the offenses of Assault in the second degree and Assault in the third degree. Accordingly, proceeding under those instructions and using the conforming verdict form, the jury clearly declared by its verdict that it had found Bradley not guilty of the offense of Robbery in the first degree".

Appellant avers that the trial court lacked Subject Matter Jurisdiction to accept a guilty verdict on the offense of Stalking or to impose a sentence, and that the Double Jeopardy Clause protected apppllant from ever being retried

for the offense of stalking once acquitted for the offense of harassment

BRADLEY V. STATE, SUPRA held:

> "We affirm the decision of the court of criminal
> appeals that ' the jury's verdict finding Bradley
> guilty of second degree assault effectively
> acquitted Bradley of first degree robbery as
> charged in the indictment; "thus Bradley cannot
> be retried for robbery in the first degree".

The State of Alabama presented no contrary evidence to refute Appellant's claim; which if proven true would entitle Appellant to relief. See EX PARTE BOATWRIGHT 471 So. 2d 1257.

The trial court abused its discretion in denying Appellant's Rule 32 petition on the grounds that William's claim is without merit and this cause is due to be Reversed and Remanded back to the Circuit Court for an Evidentiary Hearing to determine the facts in this matter with appointment of counsel (STRICKLAND V. STATE, 771 So. 2d 1123).

-12-

## CONCLUSION

Wherefore, Appellant respectfully requests that this Honorable Court reverse the decision of the Trial Court and remand this cause back for an Evidentiary Hearing with appointment of counsel.

10.

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this brief to all

parties on this ___5 th___ day of July 2007, by placing in the United

States Mail postage pre-paid as follows: Attorney General Troy King, 11

South Union Street, Montgomery, AL 36130.

RESPECTFULLY SUBMITTED,

DAVID DONNIE WILLIAMS
AIS# 169189 P-13-1A
1000 ST. CLAIR RD.
SPRINGVILLE, AL 35146

14.

CR-06-1048

## In the COURT of CRIMINAL APPEALS
## of ALABAMA

———————————◆———————————

### DAVID DONNIE WILLIAMS,

Appellant,

v.

### STATE OF ALABAMA,

Appellee.

———————————◆———————————

*On Appeal From the Circuit Court*
*of Bullock County*
*(CC-2004-144.61)*

## BRIEF OF APPELLEE

Troy King
*Attorney General*

Beth Slate Poe
*Assistant Attorney General*

Audrey Jordan
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama  36130
(334) 242-7300 *
ajordan@ago.state.al.us

July 27, 2007

PENGAD 800-631-6989

EXHIBIT

5

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument in this case is not necessary because the record and briefs in this case adequately set forth the facts and law.  Ala. R. App. P. 34.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT......................... i

TABLE OF CONTENTS....................................... ii

TABLE OF AUTHORITIES................................... iii

STATEMENT OF THE CASE AND FACTS......................... 1

ISSUE PRESENTED FOR REVIEW.............................. 4

STANDARD OF REVIEW..................................... 4

SUMMARY OF THE ARGUMENT................................ 5

ARGUMENT............................................... 6

CONCLUSION............................................ 10

CERTIFICATE OF SERVICE................................ 11

# TABLE OF AUTHORITIES

## Cases

<u>Bearden v. State</u>, 825 So. 2d 868, 870 (Ala. Crim. App. 2001) ........................................ 7

<u>Ex parte Ward</u>, No. 1051818, 2007 WL 1576054, at *8 (Ala. Jun. 1, 2007) ........................... 8

<u>Madison v. State</u>, CR-05-0052, 2006 WL 2788983, at *5 (Ala. Crim. App. Sept. 29, 2006) ................ 7

<u>Murph v. State</u>, 853 So. 2d 291, 292 (Ala. Crim. App. 2002) ........................................ 7

<u>Sullivan v. State</u>, 944 So. 2d 164, 166 (Ala. Crim. App. 2006) ................................... 7

<u>Williams v. State</u>, CR-04-0846 (Ala. Crim. App. Dec. 16, 2005) ....................................... 9

<u>Williams v. State</u>, CR-05-1451 (Ala. Crim. App. Aug. 18, 2006) ....................................... 7

## Rules

Ala. R. Crim. P.

Rule 32.2(a)(4) ........................................ 7

Rule 32.2(b) ........................................... 9

Rule 32.2(c) ........................................... 8

## STATEMENT OF THE CASE AND FACTS

This is an appeal from the dismissal of a Rule 32 postconviction petition in the Circuit Court of Bullock County, Alabama (CC-2004-144.61).

David Donnie Williams, the appellant in this case, "repeatedly followed, harassed, and expressly threatened Callie Williams with the intent to place her in reasonable fear of death or serious bodily injury."[1] See Williams v. State, CR-04-0846 (Ala. Crim. App. Dec. 16, 2005). He was subsequently convicted of stalking.

Williams filed this Rule 32 postconviction petition, his second, in the Bullock County District Court on February 7, 2007, (C. 9), challenging his conviction and resulting sentence of thirty-eight years' imprisonment. (C. 2)  He raised the following claims in his petition:

> 1. "Conviction obtained by a violation of the protection against double jeopardy" (C. 6);
>
> 2. "The court was without jurisdiction to render judgment or impose the sentence" (C. 6) because he was convicted in violation of the double jeopardy clause (C. 13); and,

---

[1] This Court may take judicial notice of its own records. See Ex parte Salter, 520 So. 2d 213, 216 (Ala. Crim. App. 1987).

3. "The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law" (C. 6).

On March 7, 2007, the State filed a motion to dismiss arguing that Williams's claim that his conviction was against double jeopardy principles was without merit because he was convicted of only one offense – stalking. (C. 24) The State also argued that he had raised the same issue is a previous petition. (C. 24) Finally, the State argued that Williams failed to state a claim upon which relief could be granted and that there were no material issue of facts or law existing that entitled Williams to relief. (C. 24)

On March 15, 2007, the Circuit Court L. Bernard Smithart issued a written order dismissing Williams's petition. (C. 35) Judge Smithart found that Williams's double jeopardy claim was "without merit and d[id] not accurately reflect the circumstances of [his] [c]onviction." (C. 35) Judge Smithart also found that Williams had "failed to meet his burden of proof as provided by Rule 32.2" regarding his claims that the trial court was without jurisdiction and that his sentence was not authorized by law. (C. 35) Judge Bernard held that

2

Williams's petition was precluded, time-barred, and successive. (C. 35)  Williams filed a notice of appeal on March 23, 2007. (C. 1, 42)

## ISSUE PRESENTED FOR REVIEW

Did the trial court properly deny Williams's petition?


## STANDARD OF REVIEW

The standard of review in evaluating the denial of a postconviction petition is whether the trial court abused its discretion.  See <u>Elliot v. State</u>, 601 So. 2d 1118, 1119 (Ala. Crim. App. 1992).  This Court will affirm the trial court's decision to deny a postconviction petition if the trial court was correct for any reason.  See <u>Bearden v. State</u>, 825 So. 2d 868, 870 (Ala. Crim. App. 2001).

4

## SUMMARY OF THE ARGUMENT

The trial court did not abuse its discretion when it summarily denied Williams's petition arguing that his conviction was in violation of the Double Jeopardy Clause. Essentially, he claims that he could not be convicted of stalking because the jury acquitted of the lesser included offense of harassment. This claim is precluded under Rule 32.2(a)(4) because it was raised in a previous Rule 32 petition wherein this Court found the harassment charge was not a lesser included offense of the stalking charge. Additionally, Williams filed his petition six days outside the one year limitation period and therefore is time-barred. Finally, this is Williams's second petition, raising the same substantive issue, and thus is deemed successive.

**ARGUMENT**

Williams contends that the trial court abused its discretion by dismissing his petition as procedurally barred and without merit. Williams essentially argues that, because he was acquitted of the lesser included offense of harassment, his conviction for stalking was in violation of the Double Jeopardy Clause.[2] (Williams's petition, p. 8.) Because Williams's claim is without merit, precluded, time-barred, and successive the trial court did not abuse its discretion by summarily dismissing his petition.

The trial court may summarily dismiss a Rule 32 postconviction petition when it determines that "the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to

---

[2] To the extent Williams challenges the sufficiency of the evidence used to convict him of stalking, this issue is raised for the first time on appeal, and thus, not properly before this Court for appellate review. See Boyd v. State, 913 So. 2d 1113, 1143-44 (Ala. Crim. App. 2003). Moreover, his assertion that the victim's testimony was not enough to support his conviction is without merit. The testimony of the victim by itself is sufficient to establish a prima facie case of stalking. See Bartlett v. State, 701 So. 2d 305, 308 (Ala. Crim. App. 1997).

6

relief." Ala. R. Crim. P. 32.7(d). See also Murph v. State, 853 So. 2d 291, 292 (Ala. Crim. App. 2002). A petitioner is entitled to an evidentiary hearing only after he has pleaded a full factual basis which, if true, entitles him to relief. See Sullivan v. State, 944 So. 2d 164, 166 (Ala. Crim. App. 2006); Madison v. State, CR-05-0052, 2006 WL 2788983, at *5 (Ala. Crim. App. Sept. 29, 2006). The trial court's decision to dismiss the petition will be upheld if this Court determines that it correctly dismissed the petition for any reason. See Bearden v. State, 825 So. 2d 868, 870 (Ala. Crim. App. 2001).

A petitioner is not entitled to postconviction relief for any claim that he has "raised ... in any previous collateral proceeding ... whether or not the previous collateral proceeding was adjudicated on the merits of the ground[] raised." Ala. R. Crim. P. 32.2(a)(4). On March 28, 2006, Williams filed a Rule 32 petition challenging his conviction on the ground that the trial court was without jurisdiction because he was acquitted of the lesser included offense of harassment. See Williams v. State, CR-05-1451 (Ala. Crim. App. Aug. 18, 2006). This Court held:

> A charged offense is considered a lesser included
> offense if 'it is established by proof of the same

7

or fewer than all the facts required to establish the commission of the offense charged.' [] The indictment charging Williams with stalking states that the charge is premised on actions taken by Williams between March 24 and April 17, 2004. [] The indictment charging Williams with domestic violence, however, states that the charge is premised on an incident on March 30, 2004, in which Williams grabbed Callie Williams by her clothes and verbally threatened her. [] Thus, separate evidence had to be presented regarding each charge. As such, domestic violence cannot be considered a lesser included offense encompassed in the stalking charge.

Id. at 4.  Because the claim of whether Williams's harassment charge was a lesser included offense of the stalking charge has been raised in a previous petition, Williams's petition is precluded.  Moreover, this Court has found Williams's claim without merit.

Additionally, the trial court "'shall not entertain any petition for relief from a conviction or sentence' that is not timely."  Ex parte Ward, No. 1051818, 2007 WL 1576054, at *8 (Ala. Jun. 1, 2007) (holding that, though Rule 32.2(c) is not a jurisdictional bar, its application is mandatory).  A petition raising nonjurisdictional claims must be filed a "year after the issuance of the certificate of judgment" by this Court.  Ala. R. Crim. P. 32.2(c).  The certificate of judgment was issued in Williams's case on February 1, 2006.  See Williams v. State, CR-04-0846 (Ala.

8

Crim. App. Dec. 16, 2005).  Because his petition was filed outside the limitation period — on February 7, 2007 — and raised a meritless claim, the trial court properly dismissed Williams's petition.

Furthermore, Rule 32.2(b) prohibits petitioners from filing successive petitions raising the same claims.  Ala. R. Crim. P. 32.2(b).  Williams concedes that he filed a previous petition under Rule 32.  (Williams's petition, p. 3.)  It is clear that the substantive issue raised in his present petition is the same raised in his previous petition.  Consequently, Williams's petition is deemed successive.  Therefore, the trial court did not abuse its discretion by dismissing his petition.

## CONCLUSION

The trial court correctly denied Williams's petition; therefore, there was no abuse of discretion.  Because Williams has shown no abuse of discretion, the trial court's decision must be affirmed.

Respectfully submitted,

Troy King
*Attorney General*

Audrey Jordan
*Assistant Attorney General*

10

## CERTIFICATE OF SERVICE

I hereby certify that on this _27th_ day of July, 2007, I did serve a copy of the foregoing on Williams by placing same in the United States Mail, first class, postage prepaid and addressed as follows:

> David Donnie Williams
> AIS # 169189
> St. Clair Correctional Facility
> 1000 St. Clair Road
> Springville, Alabama 35146

Audrey Jordan
*Assistant Attorney General*

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

298667/106829

11

# FORM FOR USE IN APPLICATIONS

## FOR HABEAS CORPUS UNDER 28 U.S.C. § 2254   RECEIVED

David Donnie Williams                              2007 JUL 13 A 9: 30

**Name**

\# 169189                                          DEBRA P. HACKETT, CL
                                                   U.S. DISTRICT COURT
**Prison Number**                                  MIDDLE DISTRICT ALA

St. Clair Correctional Facility - 1000 St. Clair Road,

Springville, Alabama 35146

**Place of Confinement**

United States District Court __Middle__ District of __Alabama__

Case No. __2:07 cv 642 - WHA__

(To be supplied by Clerk of U. S. District Court)

David Donnie Williams _____ , PETITIONER

(Full Name)  (Include name under which you were convicted)

Ralph Hooks _____ , RESPONDENT

(Name of Warden, Superintendent, Jailor, or authorized person
having custody of Petitioner)

and

THE ATTORNEY GENERAL OF THE STATE OF __Alabama__

Troy King _____ , ADDITIONAL RESPONDENT.

(if petitioner is attacking a judgement which imposed a sentence to be
served in the <u>future</u>, petitioner must fill in the name of the state where the
judgment was entered. If petitioner has a sentence to be served in the <u>future</u>
under a federal judgment which he wishes to attack, he should file a motion
under 28 U.S.C. §2255, in the federal court which entered the judgment.)

## PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

### INSTRUCTIONS--READ CAREFULLY

(1) This petition must be legibly handwritten or typewritten and signed by the
petitioner under penalty of perjury. Any false statement of a material fact
may serve as the basis for prosecution and conviction for perjury. All
questions must be answered concisely in the proper space on the form.

EXHIBIT

T

PENGAD 800-631-6989

The Judicial Conference of the United States has adopted, effective 1/1/83, the 8½ x 11 inch paper size standard for use throughout the federal judiciary and directed the elimination of the use of legal size paper. All pleadings, etc. filed after 12/31/82 must be on 8½ x 11 inch paper, otherwise we cannot accept them.

(2) Additional pages are not permitted except with respect to the <u>facts</u> which you rely upon to support your grounds for relief. No citation of authorities need be furnished. If briefs or arguments are submitted, they should be submitted in the form of a separate memorandum.

(3) Upon receipt of a fee of $5 your petition will be filed if it is in proper order.

(4) If you do not have the necessary filing fee, you may request permission to proceed <u>in forma pauperis</u>, in which event you must execute the declaration on the last page, setting forth information establishing your inability to prepay the fees and costs or give security therefor. If you wish to proceed <u>in forma pauperis</u>, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution.

(5) Only judgments entered by one court may be challenged in a single petition. If you seek to challenge judgments entered by different courts either in the same state or in different states, you must file separate petitions as to each court.

(6) Your attention is directed to the fact that you must include all grounds for relief and all facts supporting such grounds for relief in the petition you file seeking relief from any judgment of conviction.

(7) When the petition if fully completed, <u>the original and two copies * must be mailed to the Clerk of the United States District Court whose address is</u>:

P.O. Box 711
Montgomery, Alabama 36101

(8) Petitions which do not conform to these instructions will be returned with a notation as to the deficiency.

**\*If you are proceeding <u>in forma pauperis</u>, only the original petition needs to be filed with the Court.**

## PETITION

1. Name and location of court which entered the judgment of conviction under attack _____ Circuit Court of Bullock County _____

2. Date of judgment of conviction _____

3. Length of sentence _38 years___ Sentencing Judge _____

4. Nature of offense or offenses for which you were convicted: ~~Stalking and~~ ~~Domestic Violence~~

5. What was your plea?   (check one)
   (a) Not guilty  ( X )
   (b) Guilty       ( )
   (c) Nolo contendere  ( )
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details: _____

6. Kind of trial:    (Check one)
   (a) Jury  ( X )
   (b) Judge only  ( )

7. Did you testify at the trial?  Yes  ( )     No  ( X )

8. Did you appeal from the judgment of conviction?   Yes  ( X )    No  ( )

9. If you did appeal, answer the following:
   (a) Name of court ___ ~~Alabama Court of Criminal Appeals~~
   (b) Result ___ ~~Affirmed~~
   (c) Date of result _____
   If you filed a second appeal or filed a petition for certeorari in the Supreme Court, give details: ~~Appellate Counsel Abandon direct appeal and didn't~~ ~~file Certiorari in the Supreme Court of Alabama.~~

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?   Yes  ( X )    No  ( )

11. If your answer to 10 was "yes", give the following information:
    (a) (1) Name of court ___ ~~Circuit Court of~~ BULOCK ~~County, AL~~
        (2) Nature of proceeding ___ ~~Rule 32 petition~~
        (3) Grounds raised ___ ~~Denial of effective Assistance of trial and~~ ~~appellate counsel.~~

        (4) Did you receive an evidentiary hearing on your petition, application or motion?   Yes  ( )    No  ( X )
        (5) Result _____
        (6) Date of result _____

(b) As to any second petition, application or motion give the same information:

    (1) Name of court _Circuit Court of_ Bullock _County, AL_____

    (2) Nature of proceeding __Rule 32 petition_____

    (3) Grounds raised __The trial court was without jurisdiction to accept verdict as the jury returned a verdict of not guilty to Harassment, The essential element of the charge of Stalking._____

    (4) Did you receive an evidentiary hearing on your petition, application or motion? Yes ( )  No ( x )

    (5) Result ___Denied_____

    (6) Date of result _____

(c) As to any third petition, application or motion, give the same information:

    (1) Name of Court __None_____

    (2) Nature of proceeding _____

    (3) Grounds raised _____

    (4) Did you receive an evidentiary hearing on your petition, application or motion? Yes ( )  No ( )

    (5) Result _____

    (6) Date of result _____

(d) Did you appeal to the highest state court having jurisdiction the result of any action taken on any petition, application or motion:

    (1) First petition, etc.          Yes ( )  No ( )

    (2) Second petition, etc.        Yes ( )  No ( )

    (3) Third petition, etc.        Yes ( )  No ( )

(e) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not: _Inapplicable. I appealed_____

12. State <u>concisely</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the <u>facts</u> supporting each ground.

    CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court. As to all grounds on which you have previously exhausted state court remedies, you should set them forth in this petition if you wish to seek federal relief. If you fail to set forth all such grounds in this petition, you may be barred from presenting them at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted all your state court remedies with respect to them. However, <u>you should raise in this petition all available grounds</u> (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

If you select one or more of these grounds for relief, you must allege facts in support of the ground or grounds which you choose. Do not check any of the grounds listed below. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure, [where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim].

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest, [where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim].

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

x(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

**(k) Denial of effective assistance of appellate counsel.**

A.  Ground one: ___See Attached Pages_____

Supporting FACTS   (tell your story briefly without citing cases or law):
_____See Attached Pages_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____


B.  Ground two: ___See Attached Pages_____

Supporting FACTS   (tell your story briefly without citing cases or law):
_____See Attached Pages_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____


C.  Ground three: ___See Attached Pages_____

Supporting FACTS   (tell your story briefly without citing cases or law):
_____See Attached Pages_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

D.  Ground four: __See Attached Pages__

    Supporting FACTS  (tell your story briefly without citing cases or law):
    __See Attached Pages__

13.  If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal state briefly what grounds were not so presented, and give your reasons for not presenting them: _____

14.  Do you have any petition or appeal now pending in any court, wither state or federal, as to the judgment under attack?    Yes  (  )  No  (  )

15.  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
    (a) At preliminary hearing __Kenneth Asbon__

    (b) At arraignment and plea __SAME__

    (c) At trial __SAME__

    (d) At sentencing __SAME__

    (e) On appeal _____

(f) In any post-conviction proceeding _____**NONE**_____

(g) On appeal from any adverse ruling in a post-conviction proceeding: _____
_____
_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ( **x** )    No ( )

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ( )    No ( **x** )

(a) If so, give name and location of court which imposed sentence to be served in the future: _____**N/A**_____

(b) And give date and length of sentence to be served in the future: ___**NONE**___

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ( )    No ( **x** )

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.    Executed on ___*7-2-07*_____.
                                                                        (date)

_____
Signature of Petitioner

ISSUE I.

WHETHER THE EVIDENCE ADDUCED AT TRIAL WAS SUFFICIENT TO SUSTAIN
A CONVICTION ON THE CHARGE OF "STALKING" IN VIOLATION OF
SECTION 13A-6-90.

In summary, the testimony of the witnesses for the State did not prove the State's case beyond a reasonable doubt. Starting with Ms. Baker, the Security Guard, she could not testify that she had ever seen Williams stalk Callie Williams. Also, Johnny Taylor stated that he had lied before to the Pardon and Parole Board on Williams behalf. However, Taylor has been convicterd of crimes of moral turpitude and as such he has no credibility. Furthermore, Taylor offered no evidence of stalking on the part of Williams.

Mr. Jernigan was called by the State and did not offer any testimony or evidence of stalking on the part of Williams. The younger children of Callie Williams, Quadarius (14) and Narkeisha (8), both offered testimony that was favorable to Williams' defense. Narkeisha stated that she had heard her mother and Williams cursing each other during quarrels and Quadarius teatified that <u>his mother and the prosecutor had helped him memorize his</u> <u>testimony so that they could get David Donnie Williams and send him to prison</u> <u>and that they needed his help to do so.</u> (Emphasis added)

Anthony Blakeley testified that he was in the car with Williams at the time the alleged stalking took place and that at no time did he ever hear any type of threat made by Williams. Additionally, Lt. Freeman testified that his only involvement was that of a high speed chase with Williams concerning traffic violations; that he never observed any stalking by Williams.

In fact, the only witness, other than Callie Williams herself, who gave any type of testimony favorable to the state was Lakeisha Williams, who is the adult (21-year old) daughter of Callie Williams, and her testimony closely mirrored that of her mother.

As such, the only conclusion that can be derived from these facts is that a reasonable jury couldnot have convicted Williams based on such insufficient evidence as was presented at trial. Therefore, because the wrong standard of review was held, the jury's decision failed to uphold the correct standard of review as stated in JACKSON V. VIRGINIA, 443 US 307, 61 L. Ed.2d 560, 99 S Ct. 2781.

"...As the evidence to support a state criminal conviction must be proof of guilt beyond reasonable doubt as determined by rational trier of fact."

ISSUE II.

PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE DURING TRIAL
DUE TO HIS FAILURE TO OBJECT TO THE TRIAL JUDGE'S
INSTRUCTIONS TO THE JURY TO CONTINUE DELIBERATION.

The jury's written note to the judge was that they were split on the

Domestic Violence charge. If was error for the trial court to react to the

jury's communication that it could not reach unanimous verdict.

ISSUE III.

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE
COUNSEL DUE TO HIS FAILURE TO RAISE ON DIRECT APPEAL
THAT TRIAL COUNSEL WAS INEFFECTIVE DUE TO HIS FAILURE
TO OBJECT TO THE TRIAL JUDGE'S INSTRUCTION TO THE JURY
TO CONTINUE DELIBERATION.

The Fourteenth Amendment of the United States Constitution provides

Petitioner with a fundamental right to a unanimous jury verdict on whether

the criminal act charged has been committed. It was error for the trial court

to react to the jury's communication that it could not reach unanimous verdict.

ISSUE IV.

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE
COUNSEL DUE TO HIS FAILURE TO RAISE ON DIRECT APPEAL THAT
THE CIRCUIT COURT HAS BEEN WITHOUT JURISDICTION TO ADJUDICATE
HIS GUILT OF STALKING BECAUSE HE WAS ACQUITTED OF THE LESSER-
INCLUDED OFFENSE OF HARASSMENT.

Petitioner contends that, because the offense of Harassment is a lesser-included of the greater offense of Stalking, his Stalking conviction was void because the same facts that were supposely used to prosecute him for the underlying misdemianor for Harassing his ex-wife or Trespassing upon her premises wer subsequentlyuused to establish an element of the Stalking charge, i.e., that the accused had "intentionally and repeatedly followed or harassed" the victim, that the accused made a "credible threat," and that the accused "intended" to place the victim in reasonable fear of death of serious bodily injury.

ISSUE V.

THE PETITIONER ALLEGES THAT THE CIRCUIT COURT WAS WITHOUT
JURISDICTION TO ADJUDICATE HIS GUILT OF THE GRATER OFFENSE
OF STALKING BECAUSE HE WAS ACQUITTED OF THE MISDEMEANOR
LESSER-INCLUDED OFFENSE OF HARASSMENT.

---

The Appellant argues on appeal that the trial court was without subject

matter jurisdiction to accept the verdict of "Stalking" in his case due to

the finding of not guilty to the charge of "Domestic Violence/Harassment"

by the jury. Appellant further argues that the evidence admitted of the

additional charge in the indictment, "Stalking," made up the "Res gestae"

of both offenses "Harassment" and were relevant to prove Williams guilty

of not guilty of both offenses.

13-